LAUREN E. GROCHOW, Bar No. 293601
lauren.grochow@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Telephone: 949.622.2700

DANIEL N. ANZISKA, *Pro Hac Vice*
daniel.anziska@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone: 212.704.6000
Facsimile: 212.704.6288

MACKENZIE L. WILLOW-JOHNSON, *Pro Hac Vice*
mackenzie.willow-johnson@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
305 Church at North Hills Street, Suite 1200
Raleigh, NC 27609
Telephone: 919.740.9949

Attorneys for Defendants SMART KING LTD., JIAWEI WANG, and CHAOYING DENG and Defendant and Counterclaimant FARADAY&FUTURE INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| HONG LIU,<br><br>  Plaintiff,<br><br>  v.<br><br>FARADAY&FUTURE INC., SMART KING LTD., JIAWEI WANG, and CHAOYING DENG,<br><br>  Defendants. | Case No. 2:20-cv-08035-SVW-JPR<br><br>Honorable Stephen V. Wilson<br><br>**DEFENDANT FARADAY&FUTURE INC.'S COUNTERCLAIM** |
| FARADAY&FUTURE INC.,<br><br>  Counterclaimant,<br><br>  v.<br><br>HONG LIU,<br><br>  Counter-Defendant. | |

Defendant and Counterclaimant Faraday&Future Inc. ("FF") hereby asserts its Counterclaim against Plaintiff and Counter-Defendant Hong Liu ("Liu") as follows:

## INTRODUCTION

1. Liu intentionally misrepresented his credentials, experience, and connections to fraudulently induce FF to hire him in the roles of Global General Counsel, Global Chief Administrative Officer, Global Senior Advisor, and Senior Board Member, and offer him two lucrative employment contracts.

2. Liu represented to FF that he had the experience, skills, business acumen, and the connections necessary to make FF, an innovative electric vehicle start-up company, financially successful and take it to an initial public offering (IPO).

3. But less than a year into Liu's tenure, it was apparent that he had conned FF, as he was unable to perform even the most basic functions of his roles, if he was even present at all.

4. At bottom, Liu refused or failed to perform the roles for which he was hired and paid handsomely. Liu also put his own personal interests ahead of FF's interests and for the most part, refused to perform. This conduct resulted in serious breaches of the fiduciary duties that he owed to FF and caused serious harm to FF.

5. Liu's incompetence and breaches of fiduciary duty forced FF to terminate Liu's employment and seek to rescind his employment contract, which it had an express right to do. And regardless of that right, those contracts are void *ab initio* due to Liu's fraudulent inducement.

6. In retaliation, Liu filed this lawsuit, alleging outlandish and false claims against FF, and others, but ignoring the core fact that Liu never performed any of his roles as promised. Liu now must answer for the harm that he caused to FF.

## THE PARTIES

7. FF is a California corporation headquartered in Gardena, California.

8. Liu is an individual and resident of the State of New York.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because FF and Liu are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because FF is located in this district and a substantial part of Liu's breach and other misconduct giving rise to FF's claims occurred in this district.

## FACTS COMMON TO ALL CLAIMS

### A. FF Hired Liu Based on his Representations That he was a Seasoned Financial and Legal Advisor who Could Guide FF

1. FF is an innovative U.S.-based electric vehicle start-up company that was founded by Yueting Jia ("Jia") in April 2014.

2. FF is focused on the development of intelligent electric vehicles and is currently developing its first production vehicle and flagship model, the FF 91. Building a new car company from the ground up requires significant financial investment, as well as connections within key networks.

3. At the end of 2017, Jia became FF's Chief Executive Officer (CEO). Thereafter, in November 2017, FF's indirect parent company, FF Intelligent Mobility Global Holdings Ltd. f/k/a Smart King, Ltd. ("Smart King") entered into a financial agreement with Evergrande Health Industry Group Ltd., a subsidiary of Chinese real estate conglomerate China Evergrande Group ("Evergrande"), to fund FF's efforts to develop the FF 91.

4. To achieve his vision and dream of creating a successful industry-disrupting technology company—and with the Evergrande funding that allowed him to do so—Jia sought to hire a Global Chief Administrative Officer and General

Counsel with the financial experience and legal expertise necessary to guide FF toward financial stability and an IPO.

5. Liu came recommended for the role of Global Chief Administrative Officer and General Counsel by a company acquaintance who described Liu as a "top notch" capital fundraiser and attorney.

6. In meeting with FF's then president, Jiawei "Jerry" Wang ("Wang") and Jia, Liu represented he could be FF's Global Chief Administrative Officer and General Counsel who would guide FF toward financial stability and an IPO.

7. Liu represented that, in the 1990s, he served as General Counsel and Director-General of the China Securities Regulatory Commission. In that role, he claimed to have been the lead professional regulator responsible for drafting, interpreting, and administering China's capital and securities market rules. He represented that he led the working group for drafting and enacting China's first securities law. He also purportedly served as a key member of the stock issuance examination board appointed by the State Council.

8. Liu submitted to FF a curriculum vitae and press release (the "CV"), extolling his lengthy history as a claimed financial expert and attorney.

9. Liu's CV listed that his areas of expertise encompass:

> banking and finance, mergers and acquisitions, investments and transactions, and regulatory and disputes with a strong emphasis on cross-border transactions involving Asia and Greater China. [Liu] has extensive experience representing Asia- and Greater China-based companies conducting business in the United States and other parts of the world, including in such industries as financial institutions and investment entities, real estate and infrastructure, aviation and transportation, energy and resources, real estate and infrastructure, aviation and transportation, energy and resources, and manufacturing and technology. He also advises US and foreign companies doing business in Asia and Greater China, including in market access, direct investments, public and private funds, capital markets, technology transfers and regulatory matters.

10. The CV described various roles that Liu purportedly held in managing several law firms' China and Asia practices, the most recent firm being Mayer

Brown LLP ("Mayer"). Liu's CV also described himself as a "leader of [Mayer's] US-China practice initiatives," and touted that he was "instrumental in connecting Mayer Brown's offices in Asia, Europe and the Americas." In his roles at Mayer and prior law firms, Liu claimed to have represented clients in all major categories of transactions.

11. Liu's CV also heralded his investment banking background, which consisted of serving as managing director at two large investment banks. Liu boasted of playing "an important role in a variety of China- and Asia-related M&A and other financing business transactions."

12. During Jia's first meeting with Liu, Jia described FF's history and future plans. Jia described his dream and vision for the company, the issues and financial difficulties that FF was facing at the time, and possible solutions. Jia also detailed the kind of talent that would be needed for the Global Chief Administrative Officer and General Counsel role to bring that dream and vision to fruition. At that point, Jia told Liu that his strengths lie in product technology, strategy, organization, and user operations, but that he needed an executive with experience handling capital, finance, and legal issues—a Global Chief Administrative Officer and General Counsel to lead the functional areas of the company, improve management capabilities, and quickly push forward the financing efforts of the company. Jia also told Liu that FF needed someone to lead the company to an IPO and that, after an IPO, FF wanted to truly disrupt the industry and have a distinguished finance and legal departments.

13. Liu affirmed that he could fill all of those roles and possessed the requisite experience to do so. Liu further represented that the areas Jia listed were his areas of expertise.

14. Liu represented to FF that he also had extensive connections in both the U.S. and China and could provide tremendous assistance to FF's development. Liu described his investment banking background, having worked as a managing

1 director of two U.S. investment banks to support his ability to provide such assistance.

15. Based on Liu's material representations, Liu was offered the positions of Global General Counsel, Global Chief Administrative Officer, and Global Senior Advisor at FF, and Senior Board Member at Smart King.

16. Liu began his employment with FF on February 15, 2018, pursuant to a written Employment Agreement (the "Employment Agreement") and a Director Compensation Agreement (the "Director Agreement"), which Liu drafted.

## B. The Employment Agreement

17. Liu was the only employee at FF to have a written employment contract.

18. Pursuant to the terms of the Employment Agreement, Liu was hired to serve in the roles of Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor of FF and Senior Board Member of FF's indirect parent company, Smart King.

19. Defendant FF Intelligent Mobility Global Holdings Ltd. f/k/a Smart King Ltd. was also a party to the Employment Agreement and has assigned its right to pursue litigation based on that agreement to Faraday.

20. The Employment Agreement expressly provided that Liu's "duties and responsibilities" in these roles "shall be commensurate with such positions…."

21. In exchange for fulfilling the duties and responsibilities of Global Chief Administrative Officer, Global General Counsel, Senior Board Member, and Global Senior Advisor, the Employment Agreement provided that Liu would receive: $1 million in annual base salary; $3 million as a signing bonus (payable in five equal installments due upon the signing of the Employment Agreement and on the anniversary of Liu's start of employment); and 2% of Smart King's total equity shares (20 million shares) with the standard equity share or option vesting schedule "and any of FF's earliest available vesting schedules as [Liu] may select…."

111292258 - 6 -

22. The Employment Agreement also provided for relocation costs and expenses.

23. The Employment Agreement was for a term of five years and expressly stated that "an early termination can only be effectuated based on the specific cause of a serious breach of fiduciary duty to [FF] as a senior executive of [FF] after fully adjudicated against [Liu] by a competent court in the United States…."

### C. Liu Fails to Perform the Job Duties as Promised

24. After less than a year, it was readily apparent that Liu had materially misrepresented his expertise and capabilities. He was unable to perform in almost every area of his purported expertise and did not possess the requisite legal skills to oversee the company's legal needs, let alone the business, finance, and legal acumen needed to take FF to an IPO.

25. From the start of his employment in February 2018 through February 2019—when FF had no choice but to terminate Liu's employment for his serious breaches of the fiduciary duties that he owed to FF—Liu systematically removed himself from positions of responsibility.

26. When Liu made himself available to discuss FF's financial circumstances with other executives, he often asked rudimentary questions that demonstrated his lack of understanding of financing, fundraising, and capital markets. Moreover, Liu was unable to provide recommendations, advice, or direction for equity financing.

27. Liu not only failed to provide any plans for debt or equity financing, he also failed to provide any contacts for investment banks or advisors who could assist. This was in spite of his prior claims during the interview process that he had high-level contacts at leading investment advisor firms Blackstone and Goldman Sachs, yet no one from those firms was ever introduced to FF. Liu provided no meaningful contacts or advice regarding restructuring or raising capital. Rather, he

deflected all of his responsibilities and removed himself from decision-making during some of FF's most critical points throughout the duration of his employment.

28. Despite Liu's representations that he had vast experience with the IPO process and that he could quickly lead FF to an IPO, Liu did nothing to assist FF on that front. Liu failed to identify any specific steps that FF should take or that he would assist with to get FF to an IPO, despite Jia's repeated requests.

29. Liu had also promised to help with FF's on-going litigation, as would be expected of general counsel, yet failed to do that as well.

30. For example, Liu was tasked with supervising a lawsuit between FF and EVelozcity, Inc. and FF's former executives. Yet, when questioned at executive meetings about the lawsuit, Liu could not provide even basic information about the stage of proceedings or discussions with outside counsel. Worse yet, Liu had nothing to contribute regarding the proposed litigation strategy that FF would follow.

31. Although Liu had represented to FF during the interview process that he would manage outside counsel and provide substantive guidance to help manage FF's legal expenditures, his failure to provide appropriate guidance forced FF to instead rely on other lawyers within its legal department and pay substantial legal fees to outside counsel.

32. One of the most egregious examples of Liu's failure to perform his responsibilities occurred in August 2018. That was the month Evergrande failed to provide the aforementioned contracted-for funding to FF. This refusal put the entire company at risk. Had Liu's representations about his legal abilities and experience been true, he would have been well qualified to help FF navigate the legal issues created by Evergrande's breach of its agreement to fund FF. But Liu refused to or could not assist FF with those legal issues. Instead, Liu continued his

pattern of remaining absent for some of the most difficult periods with Evergrande and, when present, deferring decisions and advice to other employees.

33. Liu's absence and failure to provide substantive guidance forced FF to make crucial decisions through others, including the decision to sue Evergrande for breach of contract. That suit was resolved by a settlement reached—again, without Liu's assistance—on December 31, 2018.

34. Even with the settlement, Evergrande's withdrawal left FF in a dire financial position. Rather than guiding FF through its profound difficulties or providing strong legal counsel, Liu removed himself from business discussions, withdrew from providing legal advice, and refrained from making management decisions.

35. Consistent with his pattern of removing himself from responsibility, Liu voluntarily vacated his senior position on the Board of Directors when FF was undergoing financial difficulties, out of concern for his own personal interest and thus putting his own self-interest over FF's.

36. Liu also refused to oversee any administrative departments as Chief Administrative Officer, abandoning that role as well, again out of concern for his own personal interests.

37. Liu further refused to sign contracts and agreements that required his approval and signature.

38. At no time did Liu express any informed opinions regarding FF's actions and corporate governance. Nor would he have been able to, as demonstrated by his sheer incompetence over the course of the year.

39. Liu failed in almost every aspect of every role. In essence, Liu was nothing more than a potted plant at FF.

40. From the outset, one of Liu's more basic employment obligations was to provide FF with a plan outlining his concrete goals for FF in the year ahead and the tasks or steps necessary to reach those goals. It took Liu eleven months into his

employment, until January 2019, to provide his first work plan: a useless mishmash of philosophical ramblings devoid of any concrete or measurable steps, tasks, or efforts to meet the vague goals and strategies described therein.  Even the most generous reading of Liu's work plan failed to reveal what Liu would actually do for the company during the upcoming year.

41. With good cause, Jia rejected Liu's work plan and requested a revised plan enumerating concrete tasks Liu sought to accomplish during the upcoming year.

42. Liu's revised plan failed to provide any concrete or measurable steps, tasks, or efforts that he sought to undertake for FF.  His revised plan instead added more philosophical ramblings and, in a conclusory fashion, proclaimed, "I Will Bring into Full Play My Own Capabilities."

43. On February 8, 2019, Liu emailed Jia, claiming that he was now willing to perform his contractual and legal obligations to the company.  But these empty statements could not mitigate Liu's abject failure to perform his duties over the prior year and did not indicate how or why he would be able to perform any of the duties he previously failed to perform.  And the email provided no justification to return him to any of the roles that he willingly abandoned out concern for his own personal circumstances.

44. FF had no alternative but to terminate Liu's employment for his serious breaches of the fiduciary duties owed to them, or risk incurring additional negative consequences and damages while continuing to suffer from his incompetence.

45. For one-years' worth of "work," FF paid Liu total compensation of $1,836,466.21.

# FIRST COUNTERCLAIM

## (Fraudulent Inducement)

46. FF re-alleges and incorporates paragraphs 1 through 45 as if set for in full herein.

47. Liu fraudulently induced FF to enter into the Employment Agreement.

48. As described above, during the interview process, Liu made numerous express and oral representations to FF that he had the skills, business acumen, and the connections necessary for the roles he obtained with FF.

49. Also, as described above, Liu's representations were false.

50. Liu knew these representations were false when he made them, or he made those representations without regard for their truth.

51. Liu intended that FF rely on those representations and made those representations to induce FF to hire him and to enter the Employment Agreement with him.

52. FF reasonably and justifiably relied on Liu's representations when it decided to hire Liu and when it entered the Employment Agreement with Liu.

53. Had FF known that Liu's representations were false, FF would not have entered the Employment Agreement with Liu.

54. Because of Liu's misrepresentations, FF has been harmed in an amount no less than $1,836,466.21 to be proven at trial. FF also seeks a judicial declaration that the Employment Agreement was void and unenforceable due to Liu having fraudulently induced FF to enter that agreement.

# SECOND COUNTERCLAIM

## (Breach of Fiduciary Duty)

55. FF re-alleges and incorporates paragraphs 1 through 54 as if set for in full herein.

56. Liu owed fiduciary duties to FF as FF's Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor.

57.     Those duties included the duties of loyalty and care.  The duty of care requires corporate officers such as Liu to exercise good business judgment when making decisions on behalf of the corporation.  Liu also breached his duty of loyalty by failing to take action in the best interests of FF.

58.     Liu breached his duty of loyalty to FF by abstaining, refusing and failing to undertake necessary tasks and actions as FF's Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor, to further his own self interests.

59.     Liu breached his duty of care when he failed to act as a reasonably careful Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor would have acted under the same or similar circumstances.

60.     FF has been damaged by Liu's breaches of his fiduciary duties in an amount to be proven at trial.  FF also seeks a judicial declaration that Liu was terminated "based on the specific cause of a serious breach of fiduciary duty" under the Employment Agreement.

## THIRD COUNTERCLAIM

### (Breach of the Employment Agreement)

61.     FF re-alleges and incorporates paragraphs 1 through 60 as if set for in full herein.

62.     FF and Liu entered into the Employment Agreement.

63.     Under that agreement, Liu was to act as a Senior Board Member, Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor.

64.     Liu's "duties and responsibilities" in these roles under the Employment Agreement were to "be commensurate with such positions."

65.     Liu failed to undertake the vast majority of his duties and responsibilities as Senior Board Member, Global Chief Administrative Officer,

Global General Counsel, and Global Senior Advisor, breaching the Employment Agreement.

66. FF did all, or substantially all of the significant things that the Employment Agreement required it to do, until Liu's serious breaches of his fiduciary duties excused FF from continuing to perform.

67. If the Court finds the Employment Agreement enforceable and not void for Liu's fraud, than FF pleads, in the alternative, that FF was damaged by Liu's breaches of the Employment Agreement in an amount no less than $1,836,466.21 to be proven at trial.

## FOURTH COUNTERCLAIM
### (Rescission of the Employment Agreement)

68. FF re-alleges and incorporates paragraphs 1 through 67 as if set for in full herein.

69. FF and Liu entered into the Employment Agreement.

70. Liu made numerous express and oral fraudulent statements to FF prior to entering that agreement.

71. FF's consent to enter the Employment Agreement was obtained by fraud exercised by Liu.

72. FF received no consideration from Liu under the Employment Agreement as Liu refused or was unable to deliver the services FF contracted for him to provide.

73. Liu's fraud makes the Employment Agreement rescindable and entitles FF to all of its damages incurred as a result of the consideration that it paid under the agreement, including, but not limited to, no less than $1,836,466.21 in benefits and compensation paid to Liu.

## PRAYER FOR RELIEF

WHEREFORE, FF prays for judgment against Liu on each of the claims, as follows:

    (a)    For general and direct damages according to proof but alleged to be in excess of $1,836,466.21;

    (b)    For special, consequential, and punitive damages according to proof;

    (c)    For rescission of the Employment Agreement;

    (d)    For a judicial declaration that Liu was terminated "based on the specific cause of a serious breach of fiduciary duty" under the Employment Agreement;

    (e)    For interest at the maximum legal rate;

    (f)    For costs of suit incurred herein; and

    (g)    For such other further relief as this Court deems just and proper.

Dated: November 19, 2020    TROUTMAN PEPPER HAMILTON SANDERS LLP

By: /s/ Lauren E. Grochow
    Daniel N. Anziska
    Lauren E. Grochow
    Mackenzie L. Willow-Johnson

Attorneys for Defendants SMART KING LTD., JIAWEI WANG, and CHAOYING DENG and Defendant and Counterclaimant FARADAY&FUTURE INC.