LAUREN E. GROCHOW, Bar No. 293601
lauren.grochow@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Telephone: 949.622.2700

DANIEL N. ANZISKA, *Pro Hac Vice*
daniel.anziska@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone: 212.704.6000
Facsimile: 212.704.6288

MACKENZIE L. WILLOW-JOHNSON, *Pro Hac Vice*
mackenzie.willow-johnson@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
305 Church at North Hills Street, Suite 1200
Raleigh, NC 27609
Telephone: 919.740.9949

Attorneys for Defendants SMART KING LTD., JIAWEI WANG,
and CHAOYING DENG and Defendant and Counterclaimant
FARADAY&FUTURE INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| HONG LIU, | Case No. 2:20-cv-08035-SVW-JPR |
| Plaintiff, | Honorable Stephen V. Wilson |
| v. | **DEFENDANT FARADAY&FUTURE INC.'S FIRST AMENDED COUNTERCLAIM** |
| FARADAY&FUTURE INC., SMART KING LTD., JIAWEI WANG, and CHAOYING DENG, | |
| Defendants. | |
| FARADAY&FUTURE INC., | |
| Counterclaimant, | |
| v. | |
| HONG LIU, | |
| Counter-Defendant. | |

- 1 -

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Defendant and Counterclaimant Faraday&Future Inc. ("FF") hereby asserts its First Amended Counterclaim ("FAC") against Plaintiff and Counter-Defendant Hong Liu ("Liu") as follows:

**INTRODUCTION**

1.      This FAC concerns, and seeks to judicially redress, Liu's fraudulent inducement of, and wrongful acts and omissions committed during, his employment with FF, manifest in, among other things, Liu's misrepresentations regarding his credentials, experience, and connections, and resulting in FF hiring Liu to serve as its Global General Counsel, Global Chief Administrative Officer, Global Senior Advisor, and Senior Board Member under two agreements—an Employment Contract with FF and a Director Compensation Agreement with FF's indirect parent company, FF Intelligent Mobility Global Holdings Ltd. f/k/a Smart King, Ltd. ("Smart King"). These agreements not only paid him an annual salary of $1,000,000, but also provided him with the ability to earn and receive lucrative stock options, bonuses, and other benefits.

2.      Liu repeatedly made express written and oral representations to FF that he had the experience, skills, business acumen, and connections necessary both to take FF, an innovative electric vehicle company, to an initial public offering ("IPO") and to play a leading role in making FF financially successful. The truth, however, was that such representations were false, and that Liu knew and concealed the falsity of his representations in order to fraudulently induce FF to hire him for executive positions under the lucrative agreements that he was not remotely qualified to occupy.

3.      Within a year of his employment with FF, the falsity of Liu's intentional misrepresentations, which continued during his employment, was exposed following his repeated, demonstrated inability to perform even the most basic functions of his executive positions, failure to fulfill specific tasks that he committed to during the interview process, and revelation of Liu's breaches of

- 2 -

fiduciary duties owed to FF manifest in his promotion and advancement of his own personal interests ahead of, and to the substantial financial detriment to, FF's interests, and in his abdication of his job duties and responsibilities.

4.     This is not a case of an employer disagreeing with the quality of work that a high-level employee provided.  Rather, this is a case where a top executive was completely inept and could not perform the work whatsoever.

5.     In response to the discovery of Liu's fraudulent misrepresentations, concealment, and breaches of his fiduciary duties, FF terminated Liu's employment, and, among other things, now seeks to rescind his Employment Agreement, which is void *ab initio* due to*, inter alia,* Liu's fraudulent conduct.

## THE PARTIES

6.     FF is a California corporation headquartered in Gardena, California.

7.     Liu is an individual and resident of the State of New York.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because FF and Liu are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because FF is located in this district and a substantial part of Liu's breach and other misconduct giving rise to FF's claims occurred in this district.

## FACTS COMMON TO ALL CLAIMS

**A. FF Hired Liu Based on his Representations That he was a Seasoned Financial and Legal Advisor who Could Guide FF**

10.     FF is an innovative U.S.-based electric vehicle company that was founded by Yueting Jia ("Jia") in April 2014.

11.     FF is focused on the development of intelligent electric vehicles and is currently developing its first production vehicle and flagship model, the FF 91.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Building a new car company from the ground up requires significant financial investment, as well as connections within key networks.

12.     At the end of 2017, Jia became FF's Chief Executive Officer ("CEO"). Thereafter, in November 2017, FF's indirect parent company, Smart King entered into a financial agreement with Evergrande Health Industry Group Ltd., a subsidiary of Chinese real estate conglomerate China Evergrande Group ("Evergrande"), to fund FF's efforts to develop the FF 91.

13.     To achieve his vision and dream of creating a successful industry-disrupting technology company—and with the Evergrande funding that allowed him to do so—Jia sought to hire a Global Chief Administrative Officer and General Counsel with the financial experience and legal expertise necessary to guide FF toward financial stability and an IPO.

14.     Liu came recommended for the role of Global Chief Administrative Officer and General Counsel by a company acquaintance who described Liu as a "top notch" capital fundraiser and attorney.

15.     Between October 2017 and mid-February 2018, FF held several interviews with Liu for the roles of Global Chief Administrative Officer and General Counsel.

16.     The first meeting, occurring between FF's then President, Jiawei "Jerry" Wang ("Wang"), Jia, and Liu, took place on October 17, 2017 at FF's headquarters in Gardena, California.  During that meeting, which lasted about two hours, Jia introduced the history of FF and the company's future plans to Liu: to create an electric vehicle company that would truly disrupt the industry.  Jia described his dream and vision for the company, the issues and financial difficulties that FF was facing at the time, and possible solutions.

17.     Jia also detailed the skills, experience, and abilities FF sought for the Global Chief Administrative Officer and General Counsel roles to bring that dream and vision to fruition.  Jia explained to Liu that his own strengths lie in product

- 4 -

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

technology, strategy, organization, and user operations, and that he was looking for a high-level executive to balance out his skill set: someone with experience handling capital, finance, and legal issues—a Global Chief Administrative Officer and General Counsel to lead the functional areas of the company, improve management capabilities, and quickly push forward the financing efforts of the company.  Essentially, as he explained to Liu, Jia was looking for FF's "Joe Tai of Alibaba"—i.e. the virtual "partner with Jack Ma."

18.    During this same October 17 meeting, Liu responded that he valued the dream Jia had for the company and that the areas Jia sought to improve (functional areas, management, financing, and legal), were Liu's areas of strength. Liu affirmed that he could and would fill the high-level roles and possessed the requisite experience, skills, and ability to do so.  As detailed below, however, these representations were patently untrue.

19.    Liu assured FF that, as FF's Global Chief Administrative Officer and General Counsel, he would provide specific and measurable deliverables.

20.    Liu met with FF officials several more times after the October 17, 2017 meeting, including, but not limited to, several phone meetings with Wang soon after the October 17, 2017 meeting and several in person meetings at FF's headquarters and corporate clubhouse in Palos Verdes, California on January 10, January 21, January 22, and January 24, 2018.  Others attended the meetings at the corporate clubhouse, including FF China employee, Michael Wang, the FF acquaintance who introduced FF and Liu, Xiao Qiang Wu ("Wu"); and FF's Vice President of Administration, Chaoying Deng ("Deng").  There was also a dinner meeting held at SHAN Social House in Beverly Hills, which was attended by Jia, Wang, and Wu.  At each of these meetings, FF, through Jia or Wang, and Liu engaged in considerable discussions regarding the necessary abilities, skills, and experience that the Global Chief Administrative Officer and Global General Counsel of FF should possess.  They also discussed the specific deliverables FF

- 5 -

expected of an individual filling those roles.  And Liu confirmed that he could meet FF's expectation and deliver under those roles.

21.    Notably, these conversations and the curriculum vitae ("CV") that Liu provided, caused FF to believe that Liu had the requisite skills and ability to deliver on his guarantees.  For example, Liu represented that, in the 1990s, he served as General Counsel and Director-General of the China Securities Regulatory Commission.  In that role, he claimed to have been the lead professional regulator responsible for drafting, interpreting, and administering China's capital and securities market rules.  He represented that he led the working group for drafting and enacting China's first securities law.  He also purportedly served as a key member of the stock issuance examination board appointed by the State Council. In other words, FF had no reason to suspect that Liu either could not, or would not, deliver the guarantees and deliverables he assured FF he could and would provide.

22.    Building on these representations, in a January 10, 2018 meeting with Jia and Wang at FF's headquarters, Liu represented that he had close connections with top Chinese government officials, including the president of China.  He told Jia and Wang that he could connect FF with those officials to facilitate FF's business in China.  As with many of his representations and as detailed below, after hiring Liu, FF would discover that this was untrue.

23.    Liu's CV further extolled his lengthy purported history as a claimed financial expert and attorney.

24.    Liu's CV expressly listed that his areas of expertise encompass:

> banking and finance, mergers and acquisitions, investments and transactions, and regulatory and disputes with a strong emphasis on cross-border transactions involving Asia and Greater China. [Liu] has extensive experience representing Asia- and Greater China-based companies conducting business in the United States and other parts of the world, including in such industries as financial institutions and investment entities, real estate and infrastructure, aviation and transportation, energy and resources, real estate and infrastructure, aviation and transportation, energy and resources, and manufacturing and technology.  He also

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

advises US and foreign companies doing business in Asia and Greater China, including in market access, direct investments, public and private funds, capital markets, technology transfers and regulatory matters.

25.    The CV listed impressive roles that Liu purportedly held in managing several law firms' China and Asia practices, the most recent firm being Mayer Brown LLP ("Mayer").  Liu's CV also described himself as a "leader of [Mayer's] US-China practice initiatives," and touted that he was "instrumental in connecting Mayer Brown's offices in Asia, Europe and the Americas."  In his roles at Mayer and prior law firms, Liu claimed to have represented clients in all major categories of transactions.

26.    Critically, Liu, by his CV and oral representations during the October 17, 2017 meeting and subsequent pre-hiring calls and meetings, including, but not limited to the January 21, 2017 meeting with Wang, claimed to have vast experience working with investors, public and private funds, and capital markets, which FF viewed as critical, having recently entered into the transaction with Evergrande and knowing that it would be seeking additional financing.

27.    During that same initial October 17, 2017 meeting, and the subsequent pre-hiring calls and meetings, including, but not limited to the January 21, 2017 meeting with Wang, and building off of his purported experience at Mayer, Liu also assured FF that he could guide FF through litigation, including FF's then pending litigation against EVelozcity, Inc. ("EVelozcity").  He specifically touted that he would personally lead the effort.  Further, he guaranteed that, based on his experience and guidance, FF would "win" its lawsuit against EVelozcity.

28.    Liu's CV also heralded his investment banking background, which consisted of serving as managing director at two large investment banks.  His CV boasted of playing "an important role in a variety of China- and Asia-related M&A and other financing business transactions."

113416215

29.     Building on these representations, in the October 17, 2017 meeting, and the subsequent pre-hiring calls and meetings, including, but not limited to the January 21, 2017 meeting with Wang, Liu represented that he could connect FF with individuals from top investment firms, such as the CEO of Blackstone, and top banks, such as key bankers at Goldman Sachs, Citibank, and Lazard.  Liu represented that these connections would be part of his plan to bring FF to financial stability and an IPO in 2019.  But FF would come to discover that these representations were all untrue.  FF is informed and believes that Liu never intended to guide FF to an IPO or to connect FF with any top investment firms or banks, to the extent he truly knew senior people at these institutions.

30.     Essentially, for each qualification FF identified that it was looking for in a candidate to fill its high-level positions, Liu repeatedly represented that he had the corresponding skills, experience, and ability.  For each deliverable FF identified, such as taking the company to IPO and successfully defending the EVelozcity suit, Liu represented he could deliver specific results.

31.     Liu was offered the positions of Global General Counsel, Global Chief Administrative Officer, and Global Senior Advisor at FF, and Senior Board Member at Smart King, based on Liu's material representations made throughout the four month hiring process, as detailed above, and which included, but are not limited to, his purported ability to:

    a.  guide FF to an IPO in 2019;

    b.  connect FF with government officials in China;

    c.  work with investors, work with public and private funds placement, and navigate capital markets;

    d.  manage outside counsel and increase legal efficiencies and decrease FF's legal expenditures;

    e.  advise and guide FF to obtain additional debt and equity financing;

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

f.   to advise and guide FF through litigation matters, including helping FF "win" the EVelozcity lawsuit;

g.   connect FF with individuals at top investors and banks; and

h.   serve in the roles for which he was interviewing.

32.   Liu began his employment with FF on February 15, 2018, pursuant to a written Employment Agreement (the "Employment Agreement") and a Director Compensation Agreement (the "Director Agreement"), which Liu drafted.

**B. <u>The Employment Agreement</u>**

33.   Liu was the only employee at FF to have a written employment contract.

34.   Pursuant to the terms of the Employment Agreement, Liu was hired to serve in the roles of Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor of FF and Senior Board Member of FF's indirect parent company, Smart King.

35.   Smart King was also a party to the Employment Agreement and has assigned its right to pursue litigation based on that agreement to FF.

36.   The Employment Agreement expressly provided that Liu's "duties and responsibilities" in these roles "shall be commensurate with such positions…."

37.   In exchange for fulfilling the duties and responsibilities of Global Chief Administrative Officer, Global General Counsel, Senior Board Member, and Global Senior Advisor, the Employment Agreement provided that Liu would receive: $1 million in annual base salary; $3 million as a signing bonus (payable in five equal installments due upon the signing of the Employment Agreement and on the anniversary of Liu's start of employment); and 2% of Smart King's total equity shares (20 million shares) with the standard equity share or option vesting schedule "and any of FF's earliest available vesting schedules as [Liu] may select…."

38.   The Employment Agreement also provided for relocation costs and expenses.

113416215

39.    The Employment Agreement was for a term of five years and expressly stated that "an early termination can only be effectuated based on the specific cause of a serious breach of fiduciary duty to [FF] as a senior executive of [FF] after fully adjudicated against [Liu] by a competent court in the United States…."

40.    These compensation terms were not for a mere senior counsel or administrative officer at an early stage, pre-revenue company.  Rather, they were commensurate with Liu's contemplated "partner with Jia" role.

**C.  Liu's Inability to Perform Even Basic Job Duties or Deliver on Any of His Representations**

41.    Once Liu was employed and tasked with serious financial, legal and operational responsibilities, it soon became apparent that he had materially misrepresented his expertise and capabilities.  He was unable to perform in almost every area of his purported expertise and did not possess the requisite legal skills to oversee the company's basic legal needs, let alone the business, finance, and legal acumen needed to take FF to an IPO.

42.    From the start of his employment in February 2018 through February 2019—when FF had no choice but to terminate Liu's employment for his serious breaches of the fiduciary duties that he owed to FF—Liu systematically failed to perform even basic functions of his positions, let alone provide the type of high-level decision making and guidance with which FF had entrusted him.

43.    Liu regularly showed up to the office late and left early, refused to attend company meetings, and handled personal matters during working hours.

44.    To conceal his inability to complete the tasks given to him under his various roles, Liu requested that his assistant schedule "meetings" on his calendar with other FF employees to make it appear that he was busy and working.  Yet, when asked to provide the agenda for these meetings, Liu responded that there were no agendas.  Liu paid little attention during these meetings, which were largely an

113416215

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

unnecessary waste of time.  These scheduled meetings were not actual productive meetings, but instead a ploy to make Liu appear busy and unavailable, while he avoided performing his duties.

45.     One of the most egregious examples of Liu's utter inability and failure to perform his responsibilities occurred in August 2018.  That was the month Evergrande failed to provide the aforementioned contracted-for funding to FF.  Important meetings were scheduled to be held with Evergrande in Boston, Massachusetts in or around the second week of September 2018 to seek a resolution.

46.     By virtue of his roles at FF and his vast purported capital markets experience involving Chinese investment companies, like Evergrande, Liu should have been the key person to help guide FF through this dispute.  But instead, at first, Liu attempted to avoid the Boston Evergrande meetings completely.  He eventually agreed to join those meetings.  Yet, rather than take the helm as would be expected given his leadership roles and purported experience, Liu left in the middle of those meetings, having contributed nothing and leaving FF's issues with Evergrande unresolved as FF's relationship with Evergrande deteriorated.

47.     When the director of FF's capital markets team, attempted to get Liu to stay at the meetings, or at least provide the team with guidance, Liu instead responded with useless platitudes.

48.     For example, on September 9, 2018, in response to a text from FF's director of capital markets, seeking Liu to provide direction,  Liu responded "[p]lease provide [Wang] with all your support.  He thinks highly of you."  Liu also instructed the team member to "remind him to seek directions from [Jia.]"  Liu offered absolutely no guidance to FF and subsequently refused to return to the negotiations.  This refusal put the entire company at risk.  Had Liu's representations about his legal abilities and experience been true, he would have been well qualified to help FF navigate the legal issues created by Evergrande's breach of its

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

113416215

agreement to fund FF.  But Liu simply could not assist FF with navigating these legal issues.

49.     Even after Evergrande and FF settled their dispute, Evergrande's withdrawal left FF in a difficult financial position.  Others at FF worked tirelessly to find additional financings.  However, Liu contributed nothing.  Liu not only failed to provide any plans for debt or equity financing, he also failed to connect FF with any investment firms, banks, or other advisors who could assist.  This was in spite of his pre-employment representations that he would connect FF with the CEO of Blackstone and high up individuals at banks, including Citibank, Goldman Sachs, and Lazars.

50.     Liu provided no meaningful contacts or advice regarding restructuring or raising capital.  Rather, he deflected all of his responsibilities and removed himself from decision-making during some of FF's most critical points throughout the duration of his employment.

51.     Liu's inability to provide useable advice was further apparent when Liu, albeit infrequently, made himself available to discuss FF's financial and legal circumstances with other executives.  He often asked rudimentary questions demonstrating his lack of understanding of legal, managerial, financing, fundraising, and capital markets—all skills that he represented that he possessed and would bring to FF in his CV and orally during the October 17, 2017 meeting and in subsequent calls with Wang and in-person meetings, including, but not limited to, the January 10, 21, 22, and 24, 2018 meetings with Jia, Wang, Michael Wang, Wu, and Deng and the dinner meeting in Beverly Hills.  As he did regarding the Evergrande meetings in Boston, he also would provide platitudes devoid of any terminology or substance suggesting underlying legal or financial knowledge.  For example:

113416215

a. In response to a May 1, 2018 email raising an important legal question regarding an issue that could overlap with the EVelozcity litigation, Liu responded, "[b]e firm and professional will be a good approach."

b. In response to a May 31, 2018 email requesting advice on responding to a potential vendor's concerns regarding potential indemnification under U.S. consumer protection laws, Liu responded, "[s]afety regulations are important."

c. In response to a July 30, 2018 email regarding whether it would be legal and beneficial to record internal meetings, Liu responded, "it would be in the company as well as everyone's best interest to follow the applicable laws and rules."

d. In response to a September 24, 2018 email regarding a potential reduction in workforce, Liu responded, "[l]egal compliance is paramount, and Sherry and legal team please get involved."

52. Each of the above examples evidences that Liu was entirely incapable of providing the functional legal and financial advice, as would be expected of a company's general counsel and chief administrative officer, Harvard LLM and Oxford MBA graduate, and former partner at Mayer, and that he represented that he would provide in inducing FF to enter into the lucrative Employment Contract with him.

53. Similarly, Liu did nothing to help FF with the EVelozcity suit. Based on his representations that he could guide FF to "win" that lawsuit, Liu was tasked with supervising that lawsuit. But, when questioned about the lawsuit at weekly executive meetings, which were held on Monday mornings at 9 a.m., including, specifically, the executive meeting on June 4, 2018, Liu could not provide even basic information about the stage of proceedings or discussions with outside counsel. Worse yet, Liu had nothing to contribute regarding the proposed litigation strategy that FF would follow.

113416215

54.     Although Liu had represented to FF during the interview process that he would manage outside counsel and provide substantive guidance to help manage FF's legal expenditures, his failure to provide appropriate guidance forced FF to instead rely on other lawyers within its legal department and pay substantial legal fees to outside counsel.

55.     Liu also refused to oversee any administrative departments as Chief Administrative Officer, abandoning that role as well, again out of concern for his own personal interests.

56.     To make matters worse, Liu clashed with other senior members of FF's legal team, including the heads of legal in the U.S. and China, respectively, who saw Liu for the fraudster that he was.  To cover up his own incompetence, Liu sought to have them removed in order to hire new team members who would be loyal to him.  Specifically, throughout the summer of 2018, with regard to FF's former head of legal in China, Liu informed two FF legal team members that they were forbidden from talking to him and would be fired for doing so.

57.     Liu also constantly harassed, the manager of FF's equity incentive program, to issue him his equity grants under the Employment Agreement, even though they were being treated just like every other employee's grants.

58.     Liu was fixated on his options under the Employment Agreement.  In the fall of 2018, when the Smart King Board granted Liu his options, Liu asked FF's long-term outside counsel at Sidley Austin LLP ("Sidley") what the fair market value exercise price of his options would be.  When Sidley informed him that it would be as of the date of the grant, in accordance with U.S. tax laws, Liu told Sidley that he wanted the fair market value to be as of the date he was hired, which was more beneficial to Liu.  When Sidley told Liu that FF had to comply with the law, Liu threatened to fire Sidley, despite their long-term relationship with FF, if they did not find a way to violate the law and give Liu what most personally benefitted him.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

59.     Liu further refused to sign contracts and agreements that required his approval and signature.

60.     At no time did Liu express any informed opinions regarding FF's actions and corporate governance.  Nor would he have been able to, as demonstrated by his sheer incompetence over the course of the year.

61.     Liu failed in almost every aspect of every role.  In essence, Liu was nothing more than a potted plant at FF.

62.     When confronted about his inabilities, Liu persisted with his false guarantees and promises to provide results.

63.     For example, from the outset, one of Liu's more basic employment obligations was to provide FF with a plan outlining his concrete goals for FF in the year ahead and the tasks or steps necessary to reach those goals, including getting FF to IPO.  It took Liu eleven months into his employment, until January 2019, to provide his first work plan: a useless mishmash of philosophical ramblings devoid of any concrete or measurable steps, tasks, or efforts to meet the vague goals and strategies described therein.  In the two-page plan, titled "2019 Work Considerations and Planning," Liu continued to misrepresent that he could and would guide FF to an IPO.  However, even the most generous reading of Liu's work plan failed to reveal what Liu would actually do for the company during the upcoming year.

64.     That work plan was chocked full of vague and indecipherable banalities, such as "financing deals with onerous terms is like drinking poison to quench one's thirst."  As a resolution, he proposed that FF "stay confident and look forward unitedly[.]"  He suggested that FF "create a company IPO team, under the guidance of the global CEO, to roll out the work in a timely fashion."  In addition, he recommended FF "[s]et IPO as a purpose . . . [a]nd [u]tilize IPO standards as a driving force[.]"

65.     To support this goal, Liu continued to represent that he would "focus

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

[his] energy on the preparation and execution of the company's IPO team . . . ." This was made possible by his "practical, long-term, hands-on and management-related experience with international laws, investment banking, securities, regulatory, etc. and [his] willing[ness] and abil[ity] to continue sharing the burden of management work . . ."  He also credited his "degree of credibility, recognition, and various connections and resources in the United States, China, and even internationally" as providing support.  Thus, he claimed he was "willing and able to stand up, lead the way and contribute all when the company needs it most."

66.    With good cause, Jia rejected Liu's work plan and requested a revised plan enumerating concrete tasks Liu sought to accomplish during the upcoming year.

67.    Liu's revised plan failed to provide any concrete or measurable steps, tasks, or efforts that he sought to undertake for FF.  His revised plan instead added more philosophical ramblings and, in a conclusory fashion, offered no concrete advice and continued making false commitments.

68.    For example, under the heading "Four. I Will Bring into Full Play My Own Capabilities," Liu wrote the following nonsensical and generic statement of his commitment to FF, despite having contributed nothing to FF in the eleven months prior

> 1. Based on company's needs and historical events, I will continue to take the initiative to share the company's burdens and concerns, and be an active part in internal and external events.  As we have reached a settlement with shareholder and have ensure the company creator's status as the real controller, we should be less concerned and have the boldness to work and shoulder responsibilities.  This is what is needed and also this is my due responsibility.
>
> 2. Based on my communication with the global CEO, I am willing to continue to carry out the following responsibilities in accordance with the CEO's arrangements.  Apart form continuing coordinating the work of the abovementioned business departments, I will also focus more on the preparation and implementation work of IPO leading team.  Apart from working on the critical task of IPO, I can continue to, if arranged by global CEO, coordinate or help coordinate functional committee, a platform for discussion

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

and coordination, so as to enhance synergy in the functional area.

3. I uphold loyalty and a sense of responsibility to the company, and carry out my duties with dedication.  The reason why I left my job without hesitation and followed the call to join the company is exactly because of the vision and dream of transforming the industry.  I want to, after having reached a certain height in the field of international laws, capital and supervision, work with the team and create splendor once again in the smart EV industry which can change human being's way of living, so that everyone in the company can have something to aspire to and can have a good feeling.  All of us stay true to our commitment, never forget why we are here together, and have true loyalty to the company and the job.  This is not empty talk, but substantive truth, this is not a short-lived whim, but long-term belief.  This is not just what is needed based on the situation, it is also a contract. Truth be told, in the execution process, I have some disagreements on some issues, but I still take a lot of action and speak little, taking in to account the company's fundamental and long-term interests.  Personality determines destiny, and unity is strength.  Having been through trials and tribulations together, we need to show more trust, coordination, support, respect, endurance and understanding to each other, and complement and discuss with each other more.  We cannot destroy ourselves in every cycle, just like what westerners comment on China's history, rather, we must embark on the bright road featuring virtuous cycle and constant success.

16    69.    On February 8, 2019, Liu emailed Jia, claiming that he was now

17  willing to perform his contractual and legal obligations to the company.  But these

18  empty statements could not mitigate Liu's abject failure to perform his duties over

19  the prior year and did not indicate how or why he would be able to perform any of

20  the duties he previously failed to perform.  And the email provided no justification

21  to return him to any of the roles that he willingly abandoned out concern for his

22  own personal circumstances.

23    70.    Essentially, Liu failed in almost every aspect of every role because he

24  could not perform.  FF is informed and believes that Liu never intended to perform.

25    71.    FF had no alternative but to terminate Liu's employment for his

26  serious breaches of the fiduciary duties owed to them, or risk incurring additional

27
28

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

negative consequences and damages while continuing to suffer from his incompetence.

72.    For one-years' worth of "work," FF paid Liu total compensation of $1,836,466.21.

## FIRST COUNTERCLAIM

### (Fraudulent Inducement)

73.    FF re-alleges and incorporates paragraphs 1 through 72 as if set for in full herein.

74.    Liu fraudulently induced FF to enter into the Employment Agreement.

75.    As described above, during the interview process, Liu made numerous express and oral representations to FF that he had the skills, business acumen, and the connections necessary for the roles he obtained with FF.

76.    Specifically, as detailed above, during the October 17, 2017 meeting with Jia and Wang, and during subsequent calls with Wang and meetings, including, but not limited to the meetings on January 10, 21, 22, and 24, 2018 with Jia, Wang, Michael Wang, Wu, and Deng, Liu made the many misrepresentations, including, but not limited to the following:

   a. That he could guide FF to an IPO in 2019;

   b. That he could connect FF with his close connections with top Chinese government officials, including the president of China, to help FF with its business in China;

   c. That he had vast experience working with investors, public and private funds, and capital markets, which he would bring to FF to assist FF accordingly;

   d. That he could advise and guide FF to obtain additional debt and equity financing;

   e. That he would manage outside counsel and increase efficiencies of FF's legal spending while guiding FF's legal processes;

113416215

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

f. That he would guide FF through litigation, including the EVelozcity litigation, which he guaranteed FF could "win" under his guidance.

g. That he would connect FF with key individuals at investment firms and banks, such as the CEO of Blackstone and high-up employees of Goldman Sachs, Citibank, and Lazar; and

h. That he would act as FF's General Counsel, Global Chief Administrative Officer, and Global Senior Advisor and perform duties commensurate with those roles.

77. Also, as described above, Liu's representations were false. With regard to the above listed examples, Liu

a. was entirely incapable of providing any guidance with regard to how to proceed to IPO, as demonstrated by his inability to detail the concrete, executable steps that FF needed to take in Liu's 2019 business plan;

b. never connected FF with any top Chinese government officials, to the extent he ever actually had such connections;

c. was incapable of working with or advising FF regarding investors, public and private funds, or capital markets;

d. was incapable of guiding FF in any way toward obtaining additional debt or equity financing;

e. was incapable of managing outside counsel and did nothing to increase efficiencies or improve FF legal processes;

f. was incapable of guiding FF regarding litigation matters and could not guide FF in the EVelocity litigation whatsoever, let alone guide FF to "win" that litigation, as promised;

g. was incapable of connecting FF with investment firms and banks, to the extent he actually had such connections; and

h.  was incapable of fulfilling any of the duties commensurate with the roles of General Counsel, Chief Administrative Officer, or Global Senior Advisor.

78.    FF is informed and believes that Liu never intended to perform any of his representations.  Liu was never capable of performing those representations and he knew these representations were false when he made them, or he made them without regard for their truth.

79.    Liu made these misrepresentations and concealed these material facts in order to make FF believe he had the ability and willingness to deliver specific results and perform in these high-level roles so that FF would hire him and execute the Employment Agreement with him.

80.    FF reasonably and justifiably relied on Liu's representations when it decided to hire Liu and when it entered the Employment Agreement with Liu.  That reliance was bolstered by Liu's representations as to his background and accolades, including, but not limited to, his LLM from Harvard, JSD from Peking University Law School, and MBA from Oxford; his experience working as General Counsel and Director-General of the China Securities Regulatory Commissions; and his experience as a partner at internationally renowned law firm, Mayer.

81.    Further, as set forth above, during the course of his employment with FF, Liu continued to misrepresent his willingness and ability to perform his job duties, take FF to an IPO, and how his purported abilities and connections would allow him to fulfill his obligations as the General Counsel, Global Chief Administrative Officer, Global Senior Advisor, and Senior Board Member.  In fact, Liu knew or should have known that he lacked the requisite skill, experience, expertise, and knowledge to deliver the results and perform his job duties.

82.    Such representations made by Liu during the course of his employment were false, and Liu knew, or was reckless in failing to know, that such statements were false at the time they were made.  FF learned that such

- 20 -

representations were false when Liu demonstrated an inability, or unwillingness, to perform even rudimentary tasks, let alone deliver the specific results he assured FF he both could and would.

83.    Had FF known that Liu's representations were false, FF would not have entered the Employment Agreement with Liu.

84.    Because of Liu's misrepresentations, FF has been harmed in an amount no less than $1,836,466.21 to be proven at trial.  FF also seeks a judicial declaration that the Employment Agreement was void and unenforceable due to Liu having fraudulently induced FF to enter that agreement.

## SECOND COUNTERCLAIM
### (Intentional Misrepresentation)

85.    FF re-alleges and incorporates paragraphs 1 through 84 as if set for in full herein.

86.    As detailed above, Liu made numerous false representations during the October 17, 2017 meeting with Jia and Wang, and during subsequent meetings, including, but not limited to, the meetings on January 10, 22, and 24, 2018 with Jia, Wang, and others, including, but not limited to, representations that

    a.  That he could guide FF to an IPO in 2019;

    b.  That he could connect FF with his close connections with top Chinese government officials, including the president of China, to help FF with its business in China;

    c.  That he had vast experience working with investors, public and private funds, and capital markets, which he would bring to FF to assist FF accordingly;

    d.  That he could advise and guide FF to obtain additional debt and equity financing;

    e.  That he would manage outside counsel and increase efficiencies of FF's legal spending while guiding FF's legal processes;

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

f.   That he would guide FF through litigation, including the EVelozcity litigation, which he guaranteed FF could "win" under his guidance.

g.   That he would connect FF with key individuals at investment firms and banks, such as the CEO of Blackstone and high-up employees of Goldman Sachs, Citibank, and Lazar; and

h.   That he would act as FF's General Counsel, Global Chief Administrative Officer, and Global Senior Advisor and perform duties commensurate with those roles.

87.   Liu not only made these representations during the hiring process, but he continued making such representations during his employment with Faraday, including in his 2019 "Business Plan."

88.   These representations were false and Liu knew they were false when he made them or he made them recklessly and without regard for their truth.

89.   Liu intended that FF rely on his intentional misrepresentations and FF is informed and believes that Liu never had any intention of performing.

90.   FF reasonably relied on Liu's representations in both hiring Liu and continuing to employ Liu until it was forced to terminate him in February 2019.

91.   Because of Liu's intentional misrepresentations, FF has been harmed in an amount no less than $1,836,466.21 to be proven at trial.  FF also seeks a judicial declaration that the Employment Agreement was void and unenforceable due to Liu having fraudulently induced FF to enter that agreement.

## THIRD COUNTERCLAIM
### (Negligent Misrepresentation)

92.   FF re-alleges and incorporates paragraphs 1 through 91 as if set for in full herein.

93.   FF alleges, in the alternative to its claim for fraudulent inducement and intentional misrepresentation claims, that the representations Liu made to FF during

113416215

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

the interview process were negligent misrepresentations.  Those representations were untrue and include, but are not limited to:

    a.  That he could guide FF to an IPO in 2019;

    b.  That he could connect FF with his close connections with top Chinese government officials, including the president of China, to help FF with its business in China;

    c.  That he had vast experience working with investors, public and private funds, and capital markets, which he would bring to FF to assist FF accordingly;

    d.  That he could advise and guide FF to obtain additional debt and equity financing;

    e.  That he would manage outside counsel and increase efficiencies of FF's legal spending while guiding FF's legal processes;

    f.  That he would guide FF through litigation, including the EVelozcity litigation, which he guaranteed FF could "win" under his guidance.

    g.  That he would connect FF with key individuals at investment firms and banks, such as the CEO of Blackstone and high-up employees of Goldman Sachs, Citibank, and Lazar; and

    h.  That he would act as FF's General Counsel, Global Chief Administrative Officer, and Global Senior Advisor and perform duties commensurate with those roles.

94.    Even if Liu believed that his representations were true, he had no reasonable grounds for doing so.

95.    Liu intended to induce and did induce FF to rely on his misrepresentations.

96.    FF's reliance upon Liu's misrepresentations was justified.  That reliance was bolstered by Liu's representations as to his background and accolades, including, but not limited to, his LLM from Harvard, JSD from Peking University

113416215

Law School, and MBA from Oxford; his experience working as General Counsel and Director-General of the China Securities Regulatory Commissions; and his experience as a partner at internationally renowned law firm, Mayer.

97.     FF has been harmed by its reliance on Liu's misrepresentations in an amount no less than $1,836,466.21 to be proven at trial.

## FOURTH COUNTERCLAIM

### (Breach of Fiduciary Duty)

98.     FF re-alleges and incorporates paragraphs 1 through 97 as if set for in full herein.

99.     Liu owed fiduciary duties to FF as FF's Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor and by virtue of his employment with FF.

100.    Those duties included the duties of loyalty and care.  The duty of care requires corporate officers such as Liu to exercise good business judgment when making decisions on behalf of the corporation.  Liu also breached his duty of loyalty by failing to take action in the best interests of FF.

101.    Liu breached his duty of loyalty to FF by, among other things, abstaining, refusing and failing to undertake necessary tasks and actions as FF's Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor, to further his own self interests.

102.    Liu breached his duty of care when he, among other things, failed to act as a reasonably careful Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor would have acted under the same or similar circumstances.

103.    FF has been damaged by Liu's breaches of his fiduciary duties in an amount to be proven at trial.  Moreover, because Liu's breaches of his fiduciary duties were done with oppression, fraud, or malice, punitive damages are warranted for his conduct.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

104.   FF also seeks a judicial declaration that Liu was terminated "based on the specific cause of a serious breach of fiduciary duty" under the Employment Agreement.

## FIFTH COUNTERCLAIM

### (Breach of the Employment Agreement)

105.   FF re-alleges and incorporates paragraphs 1 through 104 as if set for in full herein.

106.   FF and Liu entered into the Employment Agreement.

107.   Under that agreement, Liu was to act as a Senior Board Member, Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor.

108.   Liu's "duties and responsibilities" in these roles under the Employment Agreement were to "be commensurate with such positions."

109.   Liu failed to undertake the vast majority of his duties and responsibilities as Senior Board Member, Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor, breaching the Employment Agreement.

110.   FF did all, or substantially all of the significant things that the Employment Agreement required it to do, until Liu's serious breaches of his fiduciary duties excused FF from continuing to perform.

111.   If the Court finds the Employment Agreement enforceable and not void for Liu's fraud, then FF pleads, in the alternative, that FF was damaged by Liu's breaches of the Employment Agreement in an amount no less than $1,836,466.21 to be proven at trial.

## SIXTH COUNTERCLAIM

### (Rescission of the Employment Agreement for Fraud)

112.   FF re-alleges and incorporates paragraphs 1 through 111 as if set for in full herein.

113416215

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

113. FF and Liu entered into the Employment Agreement.

114. Liu made numerous express and oral fraudulent statements during the October 17, 2017 meeting with Jia and Wang, and during subsequent meetings, including, but not limited to, the meetings on January 10, 22, and 24, 2018 with Jia, Wang, and others, prior to entering that agreement, including, but not limited to:

    a. That he could guide FF to an IPO in 2019;

    b. That he could connect FF with his close connections with top Chinese government officials, including the president of China, to help FF with its business in China;

    c. That he had vast experience working with investors, public and private funds, and capital markets, which he would bring to FF to assist FF accordingly;

    d. That he could advise and guide FF to obtain additional debt and equity financing;

    e. That he would manage outside counsel and increase efficiencies of FF's legal spending while guiding FF's legal processes;

    f. That he would guide FF through litigation, including the EVelozcity litigation, which he guaranteed FF could "win" under his guidance.

    g. That he would connect FF with key individuals at investment firms and banks, such as the CEO of Blackstone and high-up employees of Goldman Sachs, Citibank, and Lazar; and

    h. That he would act as FF's General Counsel, Global Chief Administrative Officer, and Global Senior Advisor and perform duties commensurate with those roles.

115. FF's consent to enter the Employment Agreement was obtained by fraud exercised by Liu.

113416215

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

116.   FF received no consideration from Liu under the Employment Agreement as Liu refused or was unable to deliver the services FF contracted for him to provide.

117.   Liu's fraud makes the Employment Agreement rescindable and entitles FF to all of its damages incurred as a result of the consideration that it paid under the agreement, including, but not limited to, no less than $1,836,466.21 in benefits and compensation paid to Liu.

## SEVENTH COUNTERCLAIM

### (Rescission of the Employment Agreement for Unilateral Mistake)

118.   FF re-alleges and incorporates paragraphs 1 through 117 as if set for in full herein.

119.   In the alternative to FF's claim for Rescission of the Employment Agreement for Fraud, FF pleads that it is entitled to rescind the Employment Agreement because it entered the Employment Agreement based on unilateral mistake of fact.

120.   FF mistakenly believed that Liu was capable of guiding FF to an IPO in 2019; connecting FF with his close connections with top Chinese government officials, including the president of China, to help FF with its business in China; working with investors, public and private funds, and capital markets, which he would bring to FF to assist FF accordingly; managing outside counsel and increasing efficiencies of FF's legal spending and processes; guiding FF through litigation, including the EVelozcity litigation, which he guaranteed FF could "win" under his guidance; connecting FF with key individuals at investment firms and banks, such as the CEO of Blackstone and high-up employees of Goldman Sachs, Citibank, and Lazar; and acting as FF's General Counsel, Global Chief Administrative Officer, and Global Senior Advisor and perform duties commensurate with those roles.

121.   Each of these mistaken beliefs were material.

113416215

122.   Liu knew or should have known that FF entered the Employment Agreement with these mistaken beliefs.

123.   Thus, the Employment Agreement is unconscionable and, thus rescindable, entitling FF to all of its damages incurred as a result of the consideration that it paid under the agreement, including, but not limited to, no less than $1,836,466.21 in benefits and compensation paid to Liu.

### PRAYER FOR RELIEF

WHEREFORE, FF prays for judgment against Liu on each of the claims, as follows:

(a)      For general and direct damages according to proof but alleged to be in excess of $1,836,466.21;

(b)      For special, consequential, and punitive damages according to proof;

(c)      For rescission of the Employment Agreement;

(d)      For a judicial declaration that Liu was terminated "based on the specific cause of a serious breach of fiduciary duty" under the Employment Agreement;

(e)      For interest at the maximum legal rate;

(f)      For costs of suit incurred herein; and

(g)      For such other further relief as this Court deems just and proper.

Dated:  February 18, 2021                    TROUTMAN PEPPER HAMILTON SANDERS LLP


                                             By:  /s/ Lauren E. Grochow
                                             Daniel N. Anziska
                                             Lauren E. Grochow
                                             Mackenzie L. Willow-Johnson

                                             Attorneys for Defendant
                                             FARADAY&FUTURE INC.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

113416215