LAUREN E. GROCHOW, Bar No. 293601
lauren.grochow@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Telephone: 949.622.2700

DANIEL N. ANZISKA, *Pro Hac Vice*
daniel.anziska@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
Telephone: 212.704.6000
Facsimile:  212.704.6288

MACKENZIE L. WILLOW-JOHNSON, *Pro Hac Vice*
mackenzie.willow-johnson@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
305 Church at North Hills Street, Suite 1200
Raleigh, NC 27609
Telephone: 919.740.9949

Attorneys for Defendants SMART KING LTD., JIAWEI WANG,
and CHAOYING DENG and Defendant and Counterclaimant
FARADAY&FUTURE INC.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| HONG LIU,<br><br>          Plaintiff,<br><br>    v.<br><br>FARADAY&FUTURE INC.,<br>SMART KING LTD., JIAWEI<br>WANG, and CHAOYING DENG,<br><br>          Defendants. | Case No.  2:20-cv-08035-SVW-JPR<br><br>Honorable Stephen V. Wilson<br><br>**DEFENDANT<br>FARADAY&FUTURE INC.'S<br>SECOND AMENDED<br>COUNTERCLAIM** |
| FARADAY&FUTURE INC.,<br><br>          Counterclaimant,<br><br>    v.<br><br>HONG LIU,<br><br>          Counter-Defendant. | |

40267265

Defendant and Counterclaimant Faraday&Future Inc. (**"FF"**) hereby asserts its Second Amended Counterclaim pursuant to Federal Rule of Civil Procedure 15(a)(1) against Plaintiff and Counter-Defendant Hong Liu (**"Liu"**) as follows:

## INTRODUCTION

1.     Liu was a New York barred attorney and a partner at Mayer Brown LLP (**"Mayer"**) when he was first introduced to FF on or about October 17, 2017. At that time, Liu advised FF that Mayer was a full-service law firm, able to offer FF everything from "consummating one or more funding transactions" to "advis[ing] the company on the panoply of legal issues that face a global mobility company," to assisting FF's controlling shareholder Yueting Jia (**"Jia"**) "in wealth management and estate planning matters." Liu further advised FF that he would be the "FF Client Team Leader & Main Contact Partner" for the work Mayer performed for FF.

2.     Following its October 17, 2017 meeting with Liu, FF retained Liu as its attorney, which attorney-client relationship was memorialized in the form of a fully executed engagement agreement between FF and Mayer dated October 20, 2017, and was signed by Liu on Mayer's behalf (the **"Engagement Agreement"**).

3.     Soon after the execution of the Engagement Agreement, Liu, despite representing FF in legal matters as a Mayer partner, began encouraging FF to hire him to serve as its Global General Counsel, Global Chief Administrative Officer, and Global Senior Advisor, and repeatedly touted his purported credentials, experience and connections that he assured FF both qualified and made him well suited to serve in each of those high level executive positions.

4.     In response to Liu's solicitations, and in reliance upon his representations as to his qualifications, experience and connections required to fulfill each of those executive roles, FF hired Liu on or about January 26, 2018 while he still a Mayer partner, to serve as its Global General Counsel, Global Chief Administrative Officer, and Global Senior Advisor, and he was appointed to the

11409610461

Board of Directors of FF's indirect parent company, FF Intelligent Mobility Global Holdings Ltd. f/k/a Smart King (**"Smart King"**), under two agreements: an Employment Agreement between Liu and FF (the **"Employment Agreement"**); and a Director Compensation Agreement between Liu and Jia (the **"Director Agreement"**).

5.     Liu drafted and thereafter presented both the Employment Agreement and the Director Agreement to FF while he was a Mayer partner, each of which agreements was unfairly and unreasonably advantageous to Liu.   Moreover, in presenting and entering into these agreements with FF, Liu, among other things and as alleged below, violated the rules of professional conduct governing attorneys. These violations, among other things, render the Employment Agreement void *ab initio,* and entitle FF to, *inter alia*, rescission of that agreement as well as to other remedies.

6.     Consistent with his violations of the governing rules of professional conduct, Liu put his personal interests ahead of, and in direct conflict with, those of his client, FF.  To that end, Liu included provisions in the Employment Agreement and in the Director Agreement that, among other things, not only were designed to severely and unreasonably limit FF's ability to terminate Liu, but also purported to guarantee Liu $8 million in salary and signing bonus pay, regardless of whether he performed under the agreements or was terminated "for any reason" whatsoever. Equally egregious, the Employment Agreement that Liu drafted and convinced his client FF to sign, further purported to award Liu with options in FF, and to provide for the immediate vesting of those options even if Liu was terminated for breach of his fiduciary duty owed to FF, and was judicially found to have committed that breach.

7.     As FF's lead counsel at Mayer, Liu knew of confidential and privileged information that he used in convincing FF to hire him, and to enter into the Employment and Director Agreements he drafted while serving as FF's counsel.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Moreover, the individuals at FF who negotiated the Employment and Director Agreements on FF's behalf—Jia and FF's General Manager of Global Capital and Investment Banking, Jiawei "Jerry" Wang (**"Wang"**)—were not native English speakers, which fact not only was known to Liu, but also was used by him to his unfair advantage, manifest in Liu's presentation of the Employment and Director Agreements to Jia and Wang only in English.

8.    Despite Liu's competing interests from those of his client FF in the Employment and Director Agreements, and despite the fiduciary duties Liu owed to FF as its counsel and FF's corresponding expectation that Liu would honor those duties as well as his professional obligations, Liu never explained the materially adverse consequences of the terms of the Employment or Director Agreements to FF, never obtained either FF's informed written consent, or a conflict waiver signed by FF, and never disclosed to FF in writing that it could and should retain independent counsel expressly required by governing law.  Notably, Liu engaged in such conduct, despite the obvious risk that Liu's professional judgment on FF's behalf, as its counsel, would be adversely affected by his own financial, business, property, and personal interests in the Employment and Director Agreements, disincentivize Liu FF to protect itself from Liu's misconduct, and reward Liu for his misconduct.

9.    After entering the decidedly one-sided Employment and Director Agreements, FF discovered that, contrary to his representations, Liu was not remotely qualified to serve in any of the high level executive positions for which he was hired.  Moreover, after he moved to California to serve as its General Counsel, FF further discovered that Liu was also practicing law in California without a license as a result of his never having passed the California state bar exam nor having taken the steps required to register as in-house counsel in this State.

10.    In addition, within a year of his employment with FF, Liu repeatedly demonstrated an inability to perform the basic functions of each of his other executive positions.  During that year, Liu failed to fulfill the specific tasks that he had

- 3 -

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

committed to complete and, as he did while at Mayer, breached the fiduciary duties he owed to FF by promoting and advancing his own personal interests ahead, and to the substantial financial detriment, of FF's interests, in further violation and abdication of his job duties and responsibilities.

11.     This is not simply a case of an employer's dissatisfaction with a high level employee's quality of work.  Rather, this is a case where an attorney used his undue influence over his client and violated his ethical responsibilities to convince that client to hire him under patently unfair and unreasonable terms for top-level legal and executive positions that he was unqualified to fulfill.

12.     In response to Liu's misconduct and failings, detailed below, FF terminated Liu's employment, and, among other things, now seeks to rescind his Employment Agreement, which is void *ab initio* as a result of*, inter alia,* Liu's flagrant violation of the governing Rules of Professional Conduct, and the undue influence he exerted over FF.

## THE PARTIES

13.     FF is a California corporation headquartered in Gardena, California.

14.     FF is informed and believes, and based thereon alleges, that Liu is an individual and resident of the State of New York.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because FF and Liu are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because FF is located in this district and a substantial part of Liu's breach and other misconduct giving rise to FF's claims occurred in this district.

## FACTS COMMON TO ALL CLAIMS

### A. FF's Hiring of Liu

17.    FF is an innovative U.S.-based electric vehicle company that was founded by Jia in April 2014.

18.    FF is focused on the development of intelligent electric vehicles and is currently developing its first production vehicle and flagship model, the FF 91. Building a new car company from the ground up requires significant financial investment, as well as connections within key networks.

19.    At the end of 2017, Jia became FF's Chief Executive Officer (**"CEO"**). Thereafter, in November 2017, Smart King entered into a financial agreement with Evergrande Health Industry Group Ltd., a subsidiary of the Chinese real estate conglomerate China Evergrande Group (**"Evergrande"**), to fund FF's efforts to develop the FF 91.

20.    To achieve his vision and dream of creating a successful industry-disrupting technology company, and with the acquisition of Evergrande funding enabling him to do so, Jia sought to hire a Global Chief Administrative Officer and General Counsel with both the financial experience and legal expertise necessary to guide FF toward financial stability and to an initial public offering (**"IPO"**).

21.    Liu was introduced to FF by a company acquaintance.  The parties' first meeting took place at FF's headquarters in Gardena, California, between Liu, Jia, and Wang, on or about October 17, 2017 (the **"October 2017 Meeting"**).  During the October 2017 meeting, which lasted approximately two hours, Jia presented FF's history and the company's future plans to Liu, which were designed to create an electric vehicle company that would truly dominate and disrupt the industry.  Jia also described his dream and vision for the company, the issues and financial difficulties that FF was facing at the time, and possible solutions to those problems.

22.    At the October 2017 Meeting, Jia further detailed the skills, experience, and abilities required for the FF Global Chief Administrative Officer and General

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Counsel roles and to bring Jia's dream and vision to fruition.  Jia explained to Liu that his own personal strengths lie in product technology, strategy, organization, and user operations, and that he was looking for a Global Chief Administrative Officer and General Counsel to balance out his skill set—*i.e.,* someone with experience handling capital, finance, and legal issues to lead the functional areas of the company, improve management capabilities, and quickly push forward the financing efforts and goals of the company.  As he explained to Liu, Jia was looking for FF's "Joe Tai of Alibaba"—the virtual "partner with Jack Ma."

23.  At the October 2017 Meeting, Liu not only pitched himself and his firm, Mayer, as an invaluable resource that could help FF achieve its goals and resolve the issues and financial difficulties that FF was facing, but also assured Jia and Wang that the areas Jia sought to improve—management, financing, and legal—were Liu's personal areas of strength.  Liu further advised Jia and wang that he was qualified to serve in the high-level executive roles FF needed to fill, and that he possessed the requisite experience, skills, and ability to do so for FF's benefits.  Accordingly, while pitching Mayer to be FF's go-to full-service law firm, Liu simultaneously solicited FF that, if hired directly as FF's Global Chief Administrative Officer and General Counsel, Liu would provide specific and measurable deliverables, including the legal services to be provided by Mayer.  As detailed below, however, Liu's representations were false, and were relied upon by FF to its detriment in entering into the Employment Agreement.

24.  On or around October 20, 2017, Liu provided FF with the Mayer Engagement Agreement, as well as with a work plan, and other documents marketing Liu's and Mayer's services.

25.  The Engagement Agreement provided for Mayer to deliver a broad array of "legal services and advice [to FF] in connection with [its] capital raising, strategies, regulatory, corporate, securities, intellectual property, litigation, wealth

11409610461

management matters and on such other tasks and matters as may be instructed by [FF] from time to time and as we explicitly agree to undertake . . . ."

26.     In the work plan, Liu and Mayer advised FF that they were "eager to play a role in FF's mission of bringing premium intuitive, and seamlessly connected electric vehicles to people worldwide" and identified a multitude of services to be provided by the firm's "Corporate and Finance team," "Auto Industry team," "Initial public offering team," "General Counsel team," and "Wealth Management" team, all of which were to be overseen by Liu as the "FF Client Team Leader & Main Contact Partner."   The parties thereafter executed the Engagement Agreement with Liu countersigning that agreement on Mayer's behalf.

27.     Following the October 2017 Meeting, Liu met or otherwise communicated with FF officials on numerous other occasions, including, without limitation, multiple phone conversations with Wang soon after the October 2017 Meeting and in multiple in-person meetings at FF's headquarters and corporate clubhouse in Palos Verdes, California on January 10, January 21, January 22, and January 24, 2018, which meetings were attended by Wang and Jia, as well as others, including FF China employee, Michael Wang; the FF acquaintance who introduced FF and Liu, Xiao Qiang Wu (**"Wu"**); and FF's Vice President of Administration, Chaoying Deng (**"Deng"**).   There was also a dinner meeting during this time that was held at SHAN Social House in Beverly Hills and that was attended by Liu, Jia, Wang, Deng, and Wu.   At each of these meetings, Liu and FF, through Jia or Wang, engaged in detailed discussions regarding the necessary abilities, skills, and experience that the Global Chief Administrative Officer and Global General Counsel of FF was required to possess.   Jia and Wang also discussed with Liu the specific deliverables FF expected of an individual filling those executive roles.   Following those discussions, Liu repeatedly assured and confirmed that he could meet FF's expectations and deliver in and under each of those roles.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

11409610461

28.     As a result of the parties' foregoing discussions and the curriculum vitae ("**CV**") that Liu provided, Liu led FF to believe that he had the requisite skills and ability to deliver on representations and promises.  To that end and by way of example, Liu represented that, in the 1990s, he served as General Counsel and Director-General of the China Securities Regulatory Commission, and claimed to have been the lead professional regulator responsible for drafting, interpreting, and administering China's capital and securities market rules in that role.  Liu further represented that he led the working group responsible for drafting and enacting China's first securities law and served as a key member of the stock issuance examination board appointed by the Chinese State Council.  In other words, FF did not suspect that Liu either could not, or would not, deliver the guarantees and deliverables he assured FF he could and would provide.

29.     Building upon his foregoing representations, in a January 10, 2018 meeting with Jia and Wang at FF's headquarters, Liu represented that he had close connections with top Chinese government officials, including with the president of China himself.  Liu further represented to Jia and Wang that, if hired by FF, he could and would connect it with those government officials to facilitate FF's business in China.  As detailed below, after hiring Liu, FF discovered that Liu's representations were false, and made in furtherance of his efforts to convince FF that: (i) Liu would work to advance FF's best interests; and that (ii) FF should grant Liu compensation and rights that could lead to materially adverse consequences to FF, while providing materially favorable benefits to Liu.

30.     Liu's CV further extolled his purported lengthy history as a claimed financial expert and attorney, and expressly represented that his alleged areas of expertise encompassed:

> banking and finance, mergers and acquisitions, investments and transactions, and regulatory and disputes with a strong emphasis on cross-border transactions involving Asia and Greater China.  [Liu] has extensive experience representing Asia- and Greater China-based companies conducting

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

- 8 -

business in the United States and other parts of the world, including in such industries as financial institutions and investment entities, real estate and infrastructure, aviation and transportation, energy and resources, real estate and infrastructure, aviation and transportation, energy and resources, and manufacturing and technology.  He also advises US and foreign companies doing business in Asia and Greater China, including in market access, direct investments, public and private funds, capital markets, technology transfers and regulatory matters.

31.     Liu's CV further identified a litany of impressive roles that he purportedly held in managing several law firms' China and Asia practices, including Mayer's, with respect to which Liu's CV represented that he not only was a "leader of [Mayer's] US-China practice initiatives," but also touted that he was "instrumental in connecting Mayer Brown's offices in Asia, Europe and the Americas."  In his roles at Mayer and prior law firms, Liu also claimed to have represented clients in all major categories of transactions.

32.     Liu, by and through his CV and his oral representations made during the October 2017 Meeting and subsequent pre-hiring calls and meetings, including, without limitation, a January 21, 2018 meeting between Liu and Wang, claimed to have vast experience working with investors, public and private funds, and capital markets, which FF viewed as critical, having recently entered into the transaction with Evergrande and knowing its need to seek additional financing.

33.     During that same October 2017 Meeting, and the subsequent pre-hiring calls and meetings, including, but not limited to the January 21, 2018 meeting with Wang, and building off of his represented experience at Mayer, Liu also assured FF that he not only could counsel and guide FF through litigation, including FF's then pending litigation against EVelozcity, Inc. ("**EVelozcity**"), but also assured FF that he would personally take the lead in doing so, and that, based upon his experience and with his guidance, FF would "win" its lawsuit against EVelozcity.

34.     Liu's CV additionally heralded his alleged investment banking background, which consisted of serving as managing director at two large investment

banks, as well as represented that Liu played "an important role in a variety of China- and Asia-related M&A and other financing business transactions."

35.     Building upon, and consistent with the representations Liu made to FF in the October 2017 Meeting, and in the subsequent pre-hiring calls and meetings, including, but not limited to the January 21, 2018 meeting with Wang, Liu assured FF that he could connect it with individuals from top investment firms, such as the CEO of Blackstone, and with top banks and key bankers at Goldman Sachs, Citibank, and Lazard.  Liu further represented that these connections would be part of his plan to bring FF to financial stability and an IPO in 2019.  FF would later come to discover, however, that Liu neither had the experience nor was capable of guiding FF to an IPO.  Nor did Liu ever connect FF with any top investment firms or banks, to the extent he even actually knew senior people at any of those institutions.

36.     Essentially, for each qualification FF identified that it was looking for in a candidate to fill its high-level positions, Liu repeatedly represented that he had the corresponding skills, experience, and ability.  And, for each deliverable FF identified, such as taking the company to IPO and successfully defending the EVelozcity suit, Liu represented that he not only was qualified and experienced, but also could deliver specific results.

37.     Liu was offered the positions of Global General Counsel, Global Chief Administrative Officer, and Global Senior Advisor at FF, and Senior Board Member at Smart King, based upon Liu's foregoing material representations made throughout the four month hiring process, during which time he was simultaneously engaged as FF's counsel through Mayer.  As previously detailed above, those representations included, Liu's proclaimed ability to:  (a) guide FF to an IPO in 2019; (b) connect FF with government officials in China; (c) work with investors and with public and private funds placement, and navigate capital markets; (d) manage outside counsel and increase legal efficiencies and decrease FF's legal expenditures; (e) advise and guide FF to obtain additional debt and equity financing; (f) advise and guide FF

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

through litigation matters, including helping FF "win" the EVelozcity lawsuit; (g) connect FF with individuals at top investors and banks; and (h) fulfill each of the requirements of the executive positions for which he was interviewing and was ultimately hired. All of these matters were within Mayer's scope of representation. Rather than have Mayer perform that work at the agreed-upon hourly rate set forth in the Engagement Agreement, Liu used his undue influence to persuade FF to shift that work in-house by employing him directly in exchange for a multi-million dollar windfall.

38.    Liu began his employment with FF on February 15, 2018, pursuant to the written Employment Agreement, and as a Smart King Director pursuant to the Director Agreement with Jia, both of which Liu drafted. Again, both agreements were written in English, despite much of the negotiations having taken place in Mandarin, and despite FF's primary negotiators, Jia and Wang, not being native English speakers.

### B. The Employment Agreement

39.    Liu was the only employee at FF to have a written employment contract.

40.    Pursuant to the terms of the Employment Agreement, Liu was hired to serve in the roles of Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor of FF[1] and as a Senior Board Member of FF's indirect parent company, Smart King.

41.    Smart King was also a party to the Employment Agreement and has assigned its right to pursue litigation based on that agreement to FF.

42.    The Employment Agreement defined Liu's position and duties as follows:

_____

[1] FF was defined by the Employment Agreement as "FF Global Holdings Ltd., and Smart King Limited which owns 100% of and controls such entities including, without limitation, FF Global Holdings Ltd., Faraday & Future Inc., LeSEE (in VIE Structure), City Sky Limited, d/b/a Faraday and their successors, assignees and transferees."

FF shall appoint [Liu] Senior Board Member of FF Global Board; Global Chief administrative Officer, with the Chinese translation of…, or other similar and comparable title as may be further discussed and agreed, and concurrently the Global General Counsel at [Liu's] choice,  and the Global Senior Advisor of FF, directly reporting to FF's CEO. … [Liu's] duties and responsibilities shall be commensurate with such positions, and subject to typical expectations for serving on other civic/charitable/corporate boards with no direct conflict of interest with FF and for managing person investments.

43.    In exchange for fulfilling the duties and responsibilities of Global Chief Administrative Officer, Global General Counsel, Senior Board Member, and Global Senior Advisor, the Employment Agreement provided, in relevant part, that:

a. "FF shall guarantee [Liu's] employment and base salaries as provided in the Terms for five years except for [Liu] decides to leave FF at his own;"

b. "FF shall pay [Liu] a minimum annual base salary of $1,000,000.00, in semi-monthly (bi-weekly) installments, for five years.  If [Liu] is terminated by FF *for any reason* during the five year term he will be entitled to receive any remaining portion of the five years of base salaries not yet paid in lump sum" (emphasis added);

c. "FF shall pay [Liu] a signing bonus of $3,000,000.00, payable in five equal installments, with the first installment paid upon the singing of the Agreement and each of the remaining installments paid at each of the following four anniversary of [Liu's] start of employment at FF and paid in lump sum in the event of an early termination by FF during the five year guaranteed employment term";

d. "FF shall grant [Liu] at minimum cost required by law and outright, 2% of FF's total equity shares pre Series A dilution in the form of restrictive stocks or equity option as [Liu] may select based on any of [Liu's] available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 12 -

11409610461

1,000,000,000.000 equity shares of FF pre Series A, as FF represented and warranted, with the FF established and standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as [Liu] may select and with adequate consideration of tax benefits available to [Liu]. **Any and all of the remaining unvested portion of such 2% of the total shares shall become immediately and fully vested to [Liu] upon early termination by FF of [Liu's] employment within the guaranteed employment term with FF.** *Such an early termination can only be effectuated based on the specific cause of a serious breach of fiduciary duty to FF as a senior executive of FF after fully adjudicated against [Liu] by a competent court in the United States, and [Liu] will be fully covered by FF with executive indemnifications*" (emphasis added).

44.     The Employment Agreement also provided for relocation costs and expenses in connection with Liu's move to California to work for FF.

45.     These compensation terms were unfair and unreasonable to FF and Liu did nothing to explain how the Employment Agreement resulted in a windfall to him. Instead, Liu pushed for FF to rush and sign the Employment Agreement, and failed to advise FF in writing to seek the advice of an independent lawyer of its choice as expressly required by law.  He also failed to disclose any conflict, even though one clearly existed between Liu's personal economic interest in obtaining a windfall from FF and his obligations as a Mayer partner to work in FF's best interests; failed to adequately explain to FF the material risks of the proposed Employment Agreement and any reasonably available alternatives; and failed to obtained informed written consent to the transaction, in clear violation of New York Rules of Professional

11409610461

Conduct 1.5, 1.7, and 1.8(a) and California Rules of Professional Conduct 3-300, 3-31, and 4-200.[2]

### C. **The Director Agreement**

46.    Liu also convinced Jia to enter into a Director Agreement, through which Liu was appointed to the Board of Directors of FF Top Holding Ltd. (the indirect parent company of Smart King and FF), in exchange for "a cash amount, or other means of payment . . . equal to the cash value of shares equal to . . . 1% of [Smart King's] total equity shares pre Series A dilution, namely 10,000,000.00 equity shares representing 1% of the total and all of 1,000,000,000.00 equity shares of [Smart King] pre Series A."

47.    This compensation was "subject to the same vesting conditions as provided and agreed in the Employment Agreement . . . ."

48.    As with the Employment Agreement, the Director Agreement contained unreasonable vesting provisions, which provided that:

a. "If [Liu] decides to leave the Company [defined as Smart King] at his own will during his employment term as provided in the [Employment Agreement] or his employment at the Company is terminated by the Company during such a term based on the specific cause of a serious breach of fiduciary duties to the Company as a senior executive of the Company after finally adjudicated [sic] against [Liu] by a competent court in the United States ('Departure or Termination') . . . any remaining unvested portion of the Director Compensation at the time when such Departure or Termination effectuates will be automatically forfeited."

---

[2] The California Rules of Professional Conduct were revised effective November 1, 2018.  Thus, to the extent that Liu's conduct was after November 1, 2018, California Rules of Professional Conduct 1.5, 1.7, and 1.8.1 apply.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

11409610461

b. "If [Liu] leaves the Company without such a Departure or Termination, any and all of the remaining unvested portion of the Director Compensation shall become immediately and fully vested to [Liu] as is similarly provided in the [Employment Agreement]."

49.    As with the Employment Agreement, Liu failed to obtain any conflict waiver even though there was a clear conflict between Liu's personal economic interest in obtaining a windfall from FF (*e.g.*, the immediate vesting of shares upon the occurrence of any of a "parade of horribles" leading to Liu's termination so long as it was not a fully adjudicated "serious breach of fiduciary duties as a senior executive of the Company"), and Liu's obligations as a Mayer partner to work in FF's best interests; failed to adequately explain to FF the material risks of the proposed Director Agreement and any reasonably available alternatives; and failed to obtained informed written consent to the transaction, in clear violation of the New York Rules of Professional Conduct 1.5, 1.7, and 1.8(a) and California Rules of Professional Conduct 3-300, 3-310, and 4-200.

## D. **Liu's Fails to Deliver on His Representations**

50.    Once Liu was employed and tasked with serious financial, legal and operational responsibilities, it soon became apparent that he had compounded his violations of the rules of professional conduct by materially misrepresenting his expertise and capabilities.  Put simply, Liu was unable to perform in virtually all areas of his represented expertise, and did not possess the requisite legal skills to oversee the company's basic legal needs, let alone the business, finance, and legal acumen needed to take FF to an IPO or advice or guide it through litigation.  Moreover, as confirmed by the California State Bar website, Liu never completed the steps required to practice law in California as Registered In House Counsel (*see* Cal. Rule of Court 9.46; Cal. Rule of Prof. Conduct 5.5), nor ever passed the California Bar Exam prerequisite to otherwise practicing in this State.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 15 -

51.    From the start of his employment in February 2018 through February 2019—when FF terminated Liu's employment for his serious breaches of the fiduciary duties that he owed to FF and his inability to perform in the roles for which he was hired—Liu failed to perform even basic functions of his executive positions, let alone provide the type of high-level decision making and guidance with which he was entrusted.

52.    To conceal his inability to perform or complete the tasks required under his various executive roles, Liu requested that his assistant schedule "meetings" on his calendar with other FF employees to make it appear as if he was both busy and working.  Yet, when asked to provide the agenda for these meetings, Liu responded that there were no agendas.  Liu paid little attention during these meetings, which were largely an unnecessary waste of time.  These scheduled meetings were not actual productive meetings, but instead a ploy to make Liu appear busy and unavailable, while he continued to avoid performing his required duties.[3]

53.    In August 2018, Evergrande failed to provide the aforementioned contracted-for funding to FF.  Important meetings were scheduled to be held with Evergrande in Boston, Massachusetts in or around the second week of September 2018 in the hope of reaching a resolution.

54.    By virtue of his roles at FF and his purported vast capital markets experience involving Chinese investment companies such as Evergrande, Liu should have been the key person to help guide FF through this dispute.  Instead, Liu first attempted to avoid the Boston Evergrande meetings completely.  Although he later agreed to join those meetings begrudgingly, rather than lead those meetings as would be expected from someone with his represented skills, expertise and experience, Liu left in the middle of them, having contributed nothing, and leaving FF's issues with

---

[3] Likewise, Liu regularly showed up to the office late and left early, refused to attend company meetings, and handled personal matters during working hours.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Evergrande unresolved as well as culminating the deterioration of FF's relationship with Evergrande.

55.     When the director of FF's capital markets team attempted to get Liu to stay at the meetings, or to at least provide the team with guidance, Liu failed and substantively refused to do so.

56.     For example, on September 9, 2018, in response to a text from FF's director of capital markets asking Liu to provide direction, Liu responded "[p]lease provide [Wang] with all your support.  He thinks highly of you."  Liu also instructed the team member to "remind him to seek directions from [Jia.]"  Liu thereafter refused to return to the negotiations, putting the entire company at risk.  Had Liu's representations about his legal abilities and experience been true, he would have been well qualified to help FF navigate the legal issues created by Evergrande's breach of its agreement to fund FF.  But Liu did not assist FF with navigating these legal issues.

57.     Even after Evergrande and FF settled their dispute, Evergrande's withdrawal left FF in a difficult financial position.  Others at FF worked tirelessly to find additional financings.  Liu, however, failed to provide any plans for debt or equity financing, and further failed to connect FF with any investment firms, banks, or other advisors who could assist.  This was in spite of his pre-employment representations that he would connect FF with the CEO of Blackstone, and with senior executives at banks, including at Citibank, Goldman Sachs, and Lazars.

58.     Liu provided no meaningful contacts or advice regarding restructuring or raising capital.  Instead, he deflected all of his responsibilities and removed himself from the decision-making process during some of FF's most critical points throughout the duration of his employment.

59.     Liu's inability to provide useable advice further was manifest when he infrequently did make himself available to discuss FF's financial and legal circumstances with other executives.  He often asked rudimentary questions demonstrating his lack of understanding of legal, managerial, financing, fundraising,

- 17 -

and capital markets—all of which skills Liu represented in his CV he possessed and represented he would bring to FF during the October 2017 Meeting, and in subsequent telephone conversations with Wang and in-person meetings, including, but not limited to, the January 10, 21, 22, and 24, 2018 meetings with Jia, Wang, Michael Wang, Wu, and Deng, as well as the aforementioned dinner meeting in Beverly Hills.  As he did in the Evergrande meetings in Boston, Liu was unable to offer anything but platitudes in these meetings, thereby again demonstrating his glaring lack of the requisite legal or financial knowledge he expressly represented he possessed. For example:

    a. In response to a May 1, 2018 email raising an important legal question regarding an issue that could overlap with the EVelozcity litigation, Liu responded, "[b]e firm and professional will be a good approach."

    b. In response to a May 31, 2018 email requesting advice on responding to a potential vendor's concerns regarding potential indemnification under U.S. consumer protection laws, Liu responded, "[s]afety regulations are important."

    c. In response to a July 30, 2018 email regarding whether it would be legal and beneficial to record internal meetings, Liu responded, "it would be in the company as well as everyone's best interest to follow the applicable laws and rules."

    d. In response to a September 24, 2018 email regarding a potential reduction in workforce, Liu responded, "[l]egal compliance is paramount."

60.    As evidenced by the foregoing representative  examples, Liu, after violating his ethical duties and responsibilities in order to convince FF to hire him, was manifestly incapable of providing the functional legal and financial advice he represented he was uniquely qualified and capable of delivering.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

61.     Similarly, Liu did nothing to help FF with the EVelozcity suit.  Based upon his representations that he could guide FF to "win" that lawsuit, Liu was tasked with supervising that litigation.  But, when questioned about the lawsuit at weekly executive meetings held on Monday mornings at 9 a.m., including, specifically, the executive meeting on June 4, 2018, Liu could not provide basic information about the stage of the litigation proceedings or discussions with outside counsel.  Additionally, Liu did not meaningfully contribute toward the proposed litigation strategy FF would later employ.

62.     Although Liu had represented to FF during the interview process that he would manage outside counsel and provide substantive guidance to help manage FF's legal expenditures, his failure to provide appropriate guidance forced FF to instead rely on other lawyers within its legal department and pay substantial legal fees to outside counsel.

63.     Liu also refused to oversee administrative departments as Chief Administrative Officer, and abandoned his duties and responsibilities in that role as well.

64.     To make matters worse, Liu clashed with other senior members of FF's legal team, including the respective heads of legal in the U.S. and China, each of whom questioned Liu's abilities.  FF is informed and believes, and based thereon alleges, that to prevent the concerns of the heads of legal in the U.S. and China from being reported and escalating within FF, Liu sought to have them removed in order to hire new team members who would be loyal to him.  And when those efforts were unsuccessful, Liu sought to undermine those executives' authority.  For example, throughout the summer of 2018, Liu informed two FF legal team members that they were forbidden from talking to FF's then current head of legal in China, and would be fired for doing so.

11409610461

65.     Liu also repeatedly harassed the manager of FF's equity incentive program to issue him his equity grants under the Employment Agreement, even though they were being treated the same as every other employee's grants.

66.     Liu was fixated on his options under the Employment Agreement.  In the fall of 2018, when the Smart King Board granted Liu his options, Liu asked FF's outside counsel at Sidley Austin LLP ("Sidley") what the fair market value exercise price of his options would be.  When Sidley informed him that it would be as of the date of the grant in accordance with U.S. tax laws, Liu told Sidley that he wanted the fair market value to be as of the date he was hired, which was more beneficial to Liu. When Sidley told Liu that FF had to comply with the law, Liu threatened to fire Sidley, despite their long-term relationship with FF, if they did not find a way to violate the law and give Liu what most personally benefitted him.

67.     Liu further refused to sign contracts and agreements that required his approval and signature, including ordinary operational contracts as well as engagement agreements with outside counsel.

68.     As detailed above Liu also refused or was unable to express informed opinions regarding many of FF's actions and corporate governance.

69.     When confronted about his demonstrated inabilities, Liu persisted with his false guarantees and promises to provide results.  For example, one of Liu's more basic employment obligations from the outset was to provide a plan outlining his concrete goals for FF in the ensuing year and the tasks or steps necessary to reach those goals, including getting FF to an IPO.  It wasn't until 11 months into his employment in January 2019, that Liu finally provided his first work plan, which failed to identify any concrete or measurable steps, tasks, or efforts to meet the vague goals and strategies it described.  In that two-page plan titled "2019 Work Considerations and Planning," Liu continued to misrepresent that he could and would guide FF to an IPO.  However, even the most generous reading of Liu's work plan failed to reveal what Liu would actually do for the company during the upcoming

11409610461

year.  Rather, he avoided providing advice by offering banalities such as "financing deals with onerous terms is like drinking poison to quench one's thirst."  As a resolution, he proposed that FF "stay confident and look forward unitedly[.]"  He suggested that FF "create a company IPO team, under the guidance of the global CEO, to roll out the work in a timely fashion."  In addition, he recommended FF "[s]et IPO as a purpose . . . [a]nd [u]tilize IPO standards as a driving force[.]"

70.    To support his proffered goals, Liu essentially doubled-down on his earlier professional responsibility failings in negotiating his agreements with FF and on his corresponding misrepresentations about his purported skills and experience designed to ensure the Employment and Director Agreements he drafted were executed.  For example, Liu continued to represent that he would "focus [his] energy on the preparation and execution of the company's IPO team . . . ."  This was made possible by his "practical, long-term, hands-on and management-related experience with international laws, investment banking, securities, regulatory, etc. and [his] willing[ness] and abil[ity] to continue sharing the burden of management work . . ."  Liu also credited his "degree of credibility, recognition, and various connections and resources in the United States, China, and even internationally," and falsely claimed that he was "willing and able to stand up, lead the way and contribute all when the company needs it most."

71.    With good cause, Jia rejected Liu's work plan and requested a revised plan enumerating concrete tasks Liu sought to accomplish during the upcoming year.

72.    Liu's revised plan again failed to provide sufficient concrete or measurable steps, tasks, or efforts he sought to undertake for FF.  Instead, Liu's revised plan simply added more philosophical ramblings, offered no concrete advice and continued making false commitments.

73.    For example, under the heading "Four. I Will Bring into Full Play My Own Capabilities," Liu wrote the following nonsensical and generic statement of his

Troutman Pepper Hamilton Sanders LLP
3 Park Plaza
Suite 1400
Irvine, CA 92614-2545

commitment to FF, despite having contributed nothing to FF in the 11 months of his employment:

> 1. Based on company's needs and historical events, I will continue to take the initiative to share the company's burdens and concerns, and be an active part in internal and external events. As we have reached a settlement with shareholder[sic] and have ensure[sic] the company creator's status as the real controller, we should be less concerned and have the boldness to work and shoulder responsibilities. This is what is needed and also this is my due responsibility.
>
> 2. Based on my communication with the global CEO, I am willing to continue to carry out the following responsibilities in accordance with the CEO's arrangements. Apart from continuing coordinating the work of the abovementioned business departments, I will also focus more on the preparation and implementation work of IPO leading team. Apart from working on the critical task of IPO, I can continue to, if arranged by global CEO, coordinate or help coordinate functional committee, a platform for discussion and coordination, so as to enhance synergy in the functional area.
>
> 3. I uphold loyalty and a sense of responsibility to the company, and carry out my duties with dedication. The reason why I left my job without hesitation and followed the call to join the company is exactly because of the vision and dream of transforming the industry. I want to, after having reached a certain height in the field of international laws, capital and supervision, work with the team and create splendor once again in the smart EV industry which can change human being's way of living, so that everyone in the company can have something to aspire to and can have a good feeling. All of us stay true to our commitment, never forget why we are here together, and have true loyalty to the company and the job. This is not empty talk, but substantive truth, this is not a short-lived whim, but long-term belief. This is not just what is needed based on the situation, it is also a contract. Truth be told, in the execution process, I have some disagreements on some issues, but I still take a lot of action and speak little, taking in to account the company's fundamental and long-term interests. Personality determines destiny, and unity is strength. Having been through trials and tribulations together, we need to show more trust, coordination, support, respect, endurance and understanding to each other, and complement and discuss with each other more. We cannot destroy ourselves in every cycle, just like what westerners comment on China's history, rather, we must embark on the bright road featuring virtuous cycle and constant success.

74.     On February 8, 2019, Liu emailed Jia, claiming that he was now willing to perform his contractual and legal obligations to the company. But these empty statements could not mitigate Liu's inadequate performance and abdication of his

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

duties over the prior year, and tellingly failed to indicate or explain how or why Liu would now suddenly be able to perform any of those duties going forward.

75.    For one-years' worth of "work," FF paid Liu total compensation of $1,836,466.21.

## FIRST COUNTERCLAIM

### (Rescission of the Employment Agreement for Violation of the Rules of Professional Conduct)

76.    FF re-alleges and incorporates paragraphs 1 through 75 as if set forth in full herein.

77.    At the time that Liu entered into the Employment Agreement with FF, Liu and his firm, Mayer, had an attorney-client relationship with Liu.  This relationship was memorialized by the Engagement Agreement (that Liu executed on Mayer's behalf), the Work Plan, and the accompanying documents provided by Liu and Mayer to FF.

78.    As a New York-barred attorney, Liu was bound by the New York Rules of Professional Conduct.

79.    Under New York Rule of Professional Conduct 1.7:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either:

(1) the representation will involve the lawyer in representing differing interests; or

(2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

80. Under New York Rule of Professional Conduct 1.8:

(a) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:

(1) the transaction is fair and reasonable to the client and the terms of the transaction are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

81. New York Rule of Professional Conduct 1.5 states, in relevant part, that:

(a) A lawyer shall not make an agreement for, charge, or collect an excessive or illegal fee or expense. A fee is excessive when, after a review of the facts, a reasonable lawyer would be left with a definite and firm conviction that the fee is excessive. The factors to be considered in determining whether a fee is excessive may include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

82.   To the extent that Liu, as a New York attorney practicing in California, was also bound by the California Rules of Professional Conduct, in negotiating and entering the Employment Agreement, Liu additionally was required to comply with California Rule of Professional Conduct 3-310, which states, in relevant part, that:

> (B) A member shall not accept or continue representation of a client without providing written disclosure to the client where:
>
> > (1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or
> >
> > (2) The member knows or reasonably should know that: (a) the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and (b) the previous relationship would substantially affect the member's representation; or
> >
> > (3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or
> >
> > (4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

83.   Furthermore, to the extent applicable, Liu was also required to comply with California Rule of Professional Conduct 3-300, which states:

> A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

11409610461

(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

84.   In addition, to the extent applicable, Liu was also required to comply with California Rule of Professional Conduct 4-200, providing that:

(A) A member shall not enter into an agreement for, charge, or collect an illegal or unconscionable fee.

(B) Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. Among the factors to be considered, where appropriate, in determining the conscionability of a fee are the following:

(1) The amount of the fee in proportion to the value of the services performed.

(2) The relative sophistication of the member and the client.

(3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

(4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member.

(5) The amount involved and the results obtained.

(6) The time limitations imposed by the client or by the circumstances.

(7) The nature and length of the professional relationship with the client.

(8) The experience, reputation, and ability of the member or members performing the services.

(9) Whether the fee is fixed or contingent.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

(10) The time and labor required.

(11) The informed consent of the client to the fee.

85.     In entering into the Employment Agreement with FF, Liu violated New York Rule of Professional Conduct 1.7, and California Rule of Professional Conduct 3-310, as applicable, because his professional judgment on behalf of FF was adversely affected by his own personal financial interest in obtaining the most lucrative terms for himself under the Employment Agreement.  Even if Liu had obtained the informed written consent of FF, the conflict would still exist because Liu could not have reasonably believed that he could have competently represented FF, and the representation was prohibited by law.  Thus, it was an unwaivable conflict.

86.     Liu also violated New York Rule of Professional Conduct 1.8 and California Rule of Professional Conduct 3-300, as applicable, by entering into a business transaction with FF and knowingly using his undue influence over FF to acquire an ownership interest in FF and other pecuniary interest adverse to FF under terms that were not fair or reasonable. Liu further violated these rules by failing to advise FF in writing to seek the advice of an independent lawyer of FF's choice.

87.     Liu also violated New York Rule of Professional Conduct 1.5 and California Rule of Professional Conduct 4-200, as applicable, by entering into an agreement with FF for an illegal and unconscionable fee, that was not proportional to the value of services provided, did not involve the disclosure in all material facts, involved fraud or overreaching in negotiating that fee, and involved taking advantage of the fact that FF's negotiators in entering the agreement were not native English speakers, among other factors supporting its unconscionability.

88.     Liu further violated these rules by failing to obtain FF's informed written and signed consent to the terms of the transaction and Liu's role in it, as well as a conflict waiver.  *See* N.Y. Rule of Prof. Conduct 1.0(j) ("'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer

has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives.'"); Cal. Rule of Prof. Conduct 3-310(A)(1) and (2) ("(1) 'Disclosure' means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client; (2) 'Informed written consent' means the client's or former client's written agreement to the representation following written disclosure.").

89.     Rather than abide by those rules, Liu used his undue influence over FF to obtain the unfair and unreasonable Employment Contract with FF that greatly advantaged him at FF's expense and to its significant detriment.

90.     The Employment Agreement is rescindable and voidable due to Liu's violations of the Rules of Professional Conduct. *See, e.g., Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Corp.*, 6 Cal.5th 59, 73-74 (2018); *Greene v. Greene*, 56 N.Y.2d 86, 93 (1982).

91.     FF also seeks a judicial declaration that the Employment Agreement is void *ab initio* given Liu's violation of pertinent rules of professional conduct and according violation of public policy, and ordering that FF be restored to its original position prior to entering the Employment Agreement, including by payment of all remuneration paid by FF to Liu during his employment at FF.

## SECOND COUNTERCLAIM

**(Breach of Fiduciary Duty for Violation of the Rules of Professional Conduct)**

92.     FF re-alleges and incorporates paragraphs 1 through 91 as if set forth in full herein.

93.     As memorialized in the executed the Engagement Agreement (that Liu executed on Mayer's behalf), the Work Plan, and the accompanying documents provided by Mayer Brown and Liu to FF, Liu and FF had an attorney client relationship.

- 28 -

94.     By virtue of that attorney-client relationship, Liu owed fiduciary duties to FF, including the duties of loyalty, care, competence, and good faith.

95.     Liu breached those duties when he entered the Employment Agreement with FF, which, as detailed above, was extremely advantageous to Liu to FF's significant detriment, by, among other things, failing to adequately describe Liu's role in the transaction, providing guaranteed remuneration and other benefits to Liu, and by greatly restricting the terms under which FF could terminate Liu, in violation of New York Rules of Professional Conduct 1.5, 1.7, and 1.8 and/or California Rules of Professional Conduct 3-300, 3-310, and 4-200 (or Rules 1.5, 1.7, and 1.8.1 for Liu's conduct occurring after November 1, 2018).

96.     FF was harmed as a result of Liu's breaches of his fiduciary duties owed to it.

97.     Liu's conduct was the proximate cause of FF's harm.

98.     Because of Liu's breaches, FF has been harmed in an amount no less than $1,836,466.21 to be proven at trial.

## THIRD COUNTERCLAIM

### (Constructive Fraud)

99.     FF re-alleges and incorporates paragraphs 1 through 98 as if set forth in full herein.

100.    As memorialized in the executed the Engagement Agreement (that Liu executed on Mayer's behalf), the Work Plan, and the accompanying documents provided by Mayer and Liu to FF, Liu and FF had an attorney client relationship.

101.    By virtue of that relationship, Liu owed FF fiduciary duties, including the duty of care, loyalty, competence, good faith, the duty to inform FF of that information necessary to obtain FF's informed written consent to the transaction under the governing rules of professional responsibility, and the duty to fully disclose all material facts within his knowledge and of which FF was ignorant.

11409610461

102.   Liu owed these duties to FF at the time that he entered the Employment Agreement with FF.

103.   As detailed above, the Employment Agreement was extremely advantageous to Liu to FF's significant detriment, by, among other things, providing guaranteed remuneration and other benefits to Liu, advancement of millions of dollars upon termination, immediate vesting of options even if it was found that Liu breached his fiduciary obligations to FF (again, without disclosing the material adverse consequences that could result to FF thereby), and by unconscionably restricting the terms under which FF could terminate Liu.

104.   Liu knew, or should have known, that the Employment Agreement was extremely advantageous to himself to the detriment of FF, but misled FF, in breach of his duties of care, loyalty, competence, good faith, and the duty to fully disclose all material facts within his knowledge and which FF was ignorant, by using his undue influence over Faraday and omitting that the terms of the Employment Agreement were not fair and reasonable to FF.

105.   Liu was legally bound by applicable Rules of Professional Conduct to disclose that the transaction was not fair and reasonable, to properly disclose his role in the transaction, to advise FF in writing to obtain independent counsel, and to give FF adequate time to seek that independent counsel.  Liu omitted this information and failed to act in order to mislead FF into entering into the Employment Contract.

106.   FF justifiably relied on Liu based, in part, on his position as FF's attorney when it entered into the Employment Agreement.

107.   Because of Liu's fraud, FF has been harmed in an amount no less than $1,836,466.21 to be proven at trial.  Liu's constructive fraud also makes the Employment Agreement rescindable.  Moreover, Liu's actions were malicious, oppressive, and fraudulent thereby justifying the imposition of punitive damages.

## FOURTH COUNTERCLAIM

### (Rescission Based on Unconscionability)

108.   FF re-alleges and incorporates paragraphs 1 through 107 as if set forth in full herein.

109.   As detailed above, the terms of the Employment Agreement are so inherently unfair that they are unconscionable and, thus, unenforceable.  Those terms permeate the entire contract and include, but are not limited to, the Employment Agreement providing guaranteed remuneration and other benefits to Liu, advancement of millions of dollars upon termination, immediate vesting of options even if it was found that Liu breached his fiduciary obligations to FF, and by unconscionably restricting the terms under which FF could terminate Liu

110.   The Employment Agreement is rescindable and voidable due to its unconscionability.

111.   FF seeks a judicial declaration that the Employment Agreement is void *ab initio* as unconscionable, and ordering that FF be restored to its original position prior to entering the Employment Agreement.

## FIFTH COUNTERCLAIM

### (Breach of Fiduciary Duty)

112.   FF re-alleges and incorporates paragraphs 1 through 112 as if set forth in full herein.

113.   Liu's conduct during his employment with FF breached the fiduciary duties that he owed to FF.

114.   Liu owed fiduciary duties to FF as FF's Global General Counsel, Global Chief Administrative Officer, and Global Senior Advisor and by virtue of his employment with FF.

115.   Those duties included the duties of loyalty and care.  The duty of care requires corporate officers such as Liu to exercise good business judgment when

making decisions on behalf of the corporation.  Liu also breached his duty of loyalty by failing to take action in the best interests of FF.

116.   Liu breached his duty of loyalty to FF by, among other things, abstaining, refusing and failing to undertake necessary tasks and actions as FF's Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor, to further his own personal self-interests.

117.   Liu breached his duty of care when he, among other things, failed to act as a reasonably careful Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor would have acted under the same or similar circumstances.

118.   If the Court finds the Employment Agreement enforceable and not void, FF pleads that it has been damaged by Liu's breaches of his fiduciary duties in an amount to be proven at trial.  Moreover, because Liu's breaches of his fiduciary duties were done with oppression, fraud, or malice, punitive damages are warranted for his conduct.

119.   FF also seeks a judicial declaration that Liu was terminated "based on the specific cause of a serious breach of fiduciary duty" under the Employment Agreement.

## SIXTH COUNTERCLAIM

### (Breach of the Employment Agreement)

120.   FF re-alleges and incorporates paragraphs 1 through 75 as if set forth in full herein.

121.   FF pleads, in the alternative and in the event that the Employment Agreement is not rescinded or declared unenforceable, that Liu breached the Employment Agreement.

122.   FF and Liu entered into the Employment Agreement.

123.   Under that agreement, Liu was to act as a Senior Board Member, Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

11409610461

124.   Liu's "duties and responsibilities" in these roles under the Employment Agreement were to "be commensurate with such positions."

125.   Liu failed to undertake the vast majority of his duties and responsibilities as Global General Counsel, Global Chief Administrative Officer, Global Senior Advisor, Senior Board Member, thereby breaching the Employment Agreement.

126.   FF did all, or substantially all of the significant things that the Employment Agreement required it to do, until breaches of his fiduciary duties excused FF from continuing to perform.

127.   If the Court finds the Employment Agreement enforceable and not void, then FF seeks to be returned to its original position prior to hiring Liu, including disgorgement of all amounts it paid to Liu, in an amount of no less than $1,836,466.21, and rescission of the Employment Agreement for Liu's breaches of his fiduciary duties.

## SEVENTH COUNTERCLAIM

**(Unlawful, Unfair, and Fraudulent Business Practices in Violation of Cal. Bus. & Prof. Code § 17200, *et seq.*)**

128.   FF re-alleges and incorporates paragraphs 1 through 127 as if set forth in full herein.

129.   Liu's conduct in entering the Employment Agreement by virtue of his position as a New York barred attorney and as FF's counsel constitutes an unlawful act under California Business and Professions Code § 17200 *et seq*. (the "UCL").

130.   California Business and Professions Code § 6125 states that "[n]o person shall practice law in California unless the person is an active licensee of the State Bar."

131.   In representing FF and entering the Employment Agreement, Liu unlawfully practiced law in California without an active license from the California State Bar.

11409610461

132.  As detailed above, Liu's conduct also violated the California Rules of Professional Conduct 3-310, 3-300, and 4-200 and New York Rules of Professional Conduct 1.5, 1.7, and 1.8, as applicable.

133.  As a direct and proximate result of Liu's unlawful conduct, FF was injured when it entered into the Employment Agreement with Liu, the terms of which were unfair and unreasonable.

134.  Liu's omission of information that he was legally obligated to disclose to FF also amounts to unfair conduct.  In addition, the oppressive terms of the Employment Agreement that Liu obtained via unlawful means, utilizing his position of trust and in breach of his fiduciary duties as FF's counsel, were unfair to FF.  Such a practice offends an established public policy against attorneys acting adversely to their clients and amounts to immoral, unethical, and oppressive behavior.

135.  As a direct and proximate result of Liu's unfair conduct, FF was injured when it entered into the Employment Agreement with Liu, the terms of which were unfair and unreasonable.

136.  As detailed above, Liu also committed constructive fraud against FF in entering the Employment Agreement.

137.  As a direct and proximate result of Liu's fraudulent conduct, FF was injured when it entered into the Employment Agreement with Liu, the terms of which were unfair and unreasonable.

138.  FF seeks restitution and disgorgement of all amounts improperly gained by Liu and lost by FF as a result of his unlawful and fraudulent conduct in an amount to be determined at trial but in an amount of no less than $1,836,466.21.

## **EIGHTH COUNTERCLAIM**

### **(Declaratory Judgment)**

139.  FF re-alleges and incorporates paragraphs 1 through 138 as if set forth in full herein.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

140.   There is an actual controversy relating to the legal rights and duties of the parties to this action.

141.   A judicial declaration or determination is necessary at this time regarding the legal rights and duties of the parties.

142.   Specifically, for Liu's breaches of fiduciary duty, violation of New York Rules of Professional Conduct 1.5, 1.7, and 1.8 and California Rules of Professional Conduct 3-300, 3-310, 4-200 (as applicable), and/or California Business and Professions Code § 6125, FF requests a judicial declaration that the Employment Agreement be declared void *ab initio* and that FF be restored to its position prior to entering that agreement.

143.   In the alternative, should the Court find that Liu's breaches of fiduciary duty, violation of the Rules of Professional Conduct, and/or violation of California Business and Professions Code § 6125 do not render the Employment Agreement void *ab initio*, FF seeks a judicial declaration that the terms of the Employment Agreement are so inherently unfair that they are unconscionable and, thus, unenforceable.

144.   In the alternative, should the Court find that Liu's breaches of fiduciary duty, violation of the Rules of Professional Conduct, and/or violation of California Business and Professions Code § 6125 do not render the Employment Agreement void *ab initio*, FF seeks a judicial declaration that the Employment Agreement be declared rescinded and void as unconscionable and that FF be restored to its position prior to entering that agreement.

145.   In the alternative, should the Court find that the Employment Agreement is enforceable, FF seeks a declaration that Liu was terminated "based on the specific cause of a serious breach of fiduciary duty" under the Employment Agreement.

146.   In the alternative, should the Court find that the Employment Agreement is enforceable, FF seeks a declaration that FF is not required to pay Liu amounts under the Employment Agreement for serving as Global General Counsel to FF, as

- 35 -

Liu was not admitted to practice law in California nor registered as in-house counsel in California when he worked in California for FF.

## **PRAYER FOR RELIEF**

WHEREFORE, FF prays for judgment against Liu on each of the claims, as follows:

(a)     For general and direct damages according to proof but alleged to be in excess of $1,836,466.21;

(b)     For special, consequential, and punitive damages according to proof;

(c)     For rescission of the Employment Agreement and restoration of the parties to their positions prior to entering that agreement;

(d)     For a judicial declaration that the Employment Agreement be declared void *ab initio* based on Liu's violations of the governing rules of professional conduct and that FF be restored to its position prior to entering that agreement;

(e)     For a judicial declaration that Liu was terminated "based on the specific cause of a serious breach of fiduciary duty" under the Employment Agreement;

(f)     For a judicial declaration that FF has no obligation to pay Liu anything under the Employment Agreement because Liu was not admitted to practice law in California nor registered as in-house counsel in California when he worked in California for FF, and that Liu accordingly must return money that he received from FF;

(g)     For interest at the maximum legal rate;

(h)     For costs of suit incurred herein; and

(i)     For such other further relief as this Court deems just and proper.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

11409610461

1 | Dated:  March 11, 2021

TROUTMAN PEPPER HAMILTON
SANDERS LLP

By:  /s/ Lauren E. Grochow
  Daniel N. Anziska
  Lauren E. Grochow
  Mackenzie L. Willow-Johnson

  Attorneys for Defendants SMART
  KING LTD., JIAWEI WANG, and
  CHAOYING DENG and Defendant
  and Counterclaimant
  FARADAY&FUTURE INC

11409610461