# Exhibit D

**From:** **Jerry Wang (FF China)** Jerry.Wang@ff.com
**Subject:** RE: [EXTERNAL] Further revisions on Share Transfer Agreement
**Date:** January 26, 2018 at 18:38
**To:** H. Liu  henryliuesq@gmail.com



Dear Mr. Liu,

Thanks again for your patience, please refer to below the terms in Series A documents that set the limit to share transfer. Please let us know how you would like to revise the draft to avoid triggering the terms and we will cooperative and have it signed ASAP once confirmed with this point.

Thanks again for your understanding!

Best,
Jerry

---------------------------------

4.1 Restriction on Transfers.
(a)    Shareholders. Prior to a Qualified IPO, no Shareholder shall, and shall procure that each of its Affiliates shall not, directly or indirectly, sell, assign, transfer, pledge, hypothecate, or otherwise encumber or dispose of in any way or otherwise grant any interest or right with respect to (the "Transfer," "Transferring," "Transferred," "Transferor" and "Transferee" having meanings correlative to the foregoing) all or any part of any interest in any Equity Securities of the Company now or hereafter owned or held by such Shareholders, save as provided in Section 4.1(b) and provided that such Transfers are made in compliance with this Section 4.

(b)    Permitted Transfers. The restrictions on Transfer set forth in Section 4.1(a) shall not apply to the following Transfers (each, a "Permitted Transfer"):
(i)    Subject to Section 12.2(d), the Founder HoldCo shall be permitted to direct the Company to grant and issue Class A Ordinary Shares pursuant to the STI representing in aggregate not more than 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) (the "STI Target Number") to eligible Applicable Employees, selected by Founder HoldCo, to incentivise them for the best interests of the Group;

(ii)    The Founder HoldCo shall be permitted to Transfer such number of Class B Preferred Shares up to another 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) for purposes of discharging any contingent liabilities of the Founder HoldCo, Founder and their respective Affiliates provided that: (A) unless otherwise approved by the Majority Class A Preferred Shareholder in writing, the Class B Preferred Shares so Transferred shall immediately upon completion of such Transfer be automatically re-designated into Class B Ordinary Shares and the Directors shall ensure the register of members of the Company duly reflect such automatic re-designation; and (B) any Transfer proposed to be made pursuant to this Section 4.1(b)(ii) shall be subject to the rights of first refusal of the Class A Preferred Shareholders provided under Section 4.2(a)(1)-(5) and Section 4.3 and, accordingly, the provisions of Section 4.2(a)(1)-(5) and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(ii), but Section 4.2(a)(6)-(10) shall not

apply.

(iii)     Any Shareholder (other than a Class A Preferred Shareholder) shall be permitted to Transfer any outstanding Equity Securities issued by the Company upon receipt of the prior written consent to such Transfer by the Majority Class A Preferred Shareholder and the Founder HoldCo, which consent may be granted by the Majority Class A Preferred Shareholder and the Founder HoldCo in their respective sole and absolute discretion, provided that after such consent is granted, the Transfer subject to such consent shall then be subject to the rights of first refusal and co-sale rights of all the Class A Preferred Shareholders and the Founder HoldCo (including the Shareholders granting the consent to such Transfer in the first place) provided under Section 4.2 and Section 4.3.

(iv)     The following shall apply in relation to Transfers by relevant Class A Preferred Shareholders:
(1)      The first Transfer by the Series A Investor of all or part of its Class A Preferred Shares in a single transaction after First Closing shall not be restricted in any respects and none of the provisions of Section 4.2 or Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(iv)(1);
(2)      Any Class A Preferred Shareholder shall, after the first Transfer set forth in clause (1) above, be permitted to Transfer any of its Class A Preferred Shares to any Person other than a Competitor, and provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Founder HoldCo provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(iv)(2);
(v)      A Transfer of Class B Preferred Shares by the Founder HoldCo in accordance with Section 5.13(b) of the Subscription Agreement, which shall automatically (without a resolution of the Directors and/or Shareholders or any other action being required) be re-designated into Class A Ordinary Shares immediately on such Transfer being effected; and

(vi)     Any Transfer of Equity Securities by the Founder HoldCo after a Default Notice has been issued in accordance with Section 12.1 and provided that all of the rights described in Section 12.2(a) to 12.2(e) have and continue to be in effect, and further provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Majority Class A Preferred Shareholder provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(vi).

For the avoidance of doubt, any Transfer made pursuant to Sections 4.1(b)(i), 4.1(b)(iv)(1), or 4.1(b)(v) is not subject to or in any way restricted or limited by Section 4.2 or Section 4.3.

8. Reserved Matters. The Shareholders shall exercise all voting rights and other powers of control available to them in relation to each Group Company to procure that each Group Company and/or its board of directors shall not, and as a separate covenant the Company shall exercise all voting rights and other powers of control available to it in relation to each Group Company (other than the Company itself) to procure that each such other Group Company and/or its board of directors shall not, at any time on or after the First Closing and thereafter, do or approve any of the matters set forth in Schedule II (Reserved Matters), in each case without the prior approval in writing of the Majority Class A Preferred Shareholder or a Series A Director. As a separate and independent

Class A Preferred Shareholder or a Series A Director. As a separate and independent covenant, the Company agrees that it shall (so far as it is legally able to do so) observe and comply with the provisions, prohibitions and restrictions in this Section 8.

SCHEDULE II Reserved Matters
(a) Subject to Section 16.12, change its name or amend its Charter Documents;

(b) Approve any annual budget and business plan other than those relating to the Business;

(c) Issue, repurchase or redeem (or agree to issue, repurchase or redeem) any Equity Securities or debt securities or amend the rights attaching to any Equity Securities or debt securities, or undertake any consolidation, sub-division, reclassification or conversion of any of its share capital, except an issuance of Equity Securities following a failure to make a Subscription Payment (as defined in the Subscription Agreement) and an issuance of Equity Securities in accordance with the Subscription Agreement (in the form entered into on the date of this Agreement).

(d) Make any material change to the nature or scope of its business or the Business;

(e) Declare, pay or make any dividend or distribution;

(f) Enter into (or agree to enter into) any transaction other than in its ordinary and usual course of business in relation to the Business, including the disposal or transfer of any business, property or assets or any interests therein (other than in its ordinary and usual course of business);

(g) Enter into (or agree to enter into) any transaction with any Connected Person, including the Founder, the Founder HoldCo, the Class A Ordinary Shareholders and their respective Affiliates;

(h) Pass any resolution that may result in its dissolution, winding-up or liquidation or any receivership or enter into any material debt restructuring or arrangement with its third party creditors;

(i) Implement any IPO; and/or

(j) Any matters that may have a Material Adverse Effect on it or on the Group.

12. Default Notice
12.1 If any of the following events occurs, the Majority Class A Preferred Shareholder may at any time after such occurrence give a "Default Notice" in writing to Founder HoldCo (with reasonable details specifying the event which the Default Notice relates to):
... …
(d) the Founder ceases to own (directly or indirectly) 100% of the economic rights and 100% of the voting rights in any Founder Entity; or (ii) the Founder HoldCo Transfers any of its Equity Securities in breach of Section 4; or (iii) the Founder otherwise ceases to own (directly or indirectly) 100% of the economic rights and 100% voting powers with respect to any of the Class B Preferred Shares held by Founder HoldCo from time to time (other than in each case as a result of a Transfer of Class B Preferred Shares in compliance with this Agreement or pursuant to the Share Pledge Agreement) (each a

compliance with this Agreement or pursuant to the Share Pledge Agreement), (each a "Change of Control Event"), provided that, with respect to this clause (d), "100% shall be deemed to be "50%" in the case of a involuntary Transfer of Equity Securities effected as a result of an enforcement event by one or more creditors against the Equity Securities;

… …

_____

**Faraday Future**

**Jerry Wang**

General Manager | Global Capital and Investment Banking

e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Friday, January 26, 2018 1:06 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached SA as further revised per your request. It looks like that what may be best at this point, without destroying the whole purposes and what has already been agreed on, is to put in some simple and necessary definitions on the restrictive time period to reflect the current Series A financing documents as you have stated.

Best regards to you and DG.

Henry