# EXHIBIT 4

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614

troutman.com



**Jeffrey M. Goldman**
D 949.567.3547
F 866.728.3537
jeffrey.goldman@troutman.com

April 13, 2021

<u>Via E-Mail</u>

Amiad Kushner, Esq.
Seiden Law Group, LLP
469 7th Avenue, 5th Floor
New York, NY 10018

Re:  **Hong Liu v. Faraday&Future Inc., et al., and related counterclaim**
     **Case No: 20-CV-08035-SVW-JPR**
     *<u>Demand for Return and Non-Use of Privileged and Confidential Documentation</u>*

Dear Mr. Kushner:

Earlier today, at the deposition of Bob Ye in the above-referenced action, your colleague conducting the deposition utilized documents that are protected from disclosure by virtue of the attorney-client privilege, the attorney work product doctrine, and client confidentiality rights possessed by my clients, Faraday&Future and Smart King Ltd. (collectively, "FF").  FF's counsel, Kevin Crisp, Esq., stated and objected on the record that Plaintiff Hong Liu ("Liu") and your law firm, Seiden Law Group, LLP ("Seiden"), have no right to possess FF's privileged and/or confidential documentation, much less utilize the same in deposition or otherwise in this case.

We hereby demand that Seiden and Liu return to this office any privileged documents, documents protected by the attorney work product doctrine, and/or documents reflecting client confidences in your or Liu's possession ("Privileged Documents"), and to destroy any remaining copies of the Privileged Documents.  To the extent your firm or Liu has shared any Privileged Documents with any third parties, such copies much also be destroyed.

Be advised that the possession of the Privileged Documents by Liu and Seiden, as well as your failure to notify us of the same – not to mention Seiden's use of certain of those Privileged Documents during today's deposition – blatantly and intentionally violates *Rico v. Mitsubishi Motors Corp.*, 42 Cal. 4th 807 (2007) and subjects Seiden to disqualification in this action.

**Amiad Kushner, Esq.**
**Seiden Law Group LLP**
April 13, 2021
Page 2



---

*Rico* requires that:

> 'When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is necessary to ascertain if the materials are privileged, and shall immediately notify the sender if he or she possesses material that appears to be privileged.  The parties may then proceed to resolve the situation by agreement or may resort to the Court for guidance with the benefit of protective orders and other judicial intervention as may be justified.'

*Id*. at 817 (quoting *State Fund Comp. Ins. Fund v. WPS, Inc.*, 70 Cal. App. 4th 644, 656-57 (1999)).

We also demand that the parties stipulate that the court reporter for Mr. Ye's deposition shall return to FF's counsel any Privileged Document marked at Mr. Ye's deposition and that the exhibit and any portion of the deposition during which Mr. Ye was examined regarding the document be placed under seal, as to the original and all copies of the deposition.

Liu was not entitled to retain Privileged Documents after he left FF, much less utilize them to the detriment of FF in violation of his ethical obligations.  What makes this all the more galling is that we informed your office a month ago, on March 15, 2021, in my meet-and-confer correspondence in connection with our anticipated Motion for Judgment on the Pleadings about this crucial privilege issue.  *See* Exh. 1 hereto.  In particular, we quoted *General Dynamics Corporation v. Superior Court*, 7 Cal. 4th 1164, 1190 (1994), to specifically advise you that the "the in-house attorney who publicly exposes the client's secrets will usually find no sanctuary in the Courts" and that where, as here, "the elements of a wrongful discharge in violation of public fundamental policy claim cannot, for reasons peculiar to the particular case, be fully established without breaching the attorney-client privilege ***the suit must be dismissed at the interest of preserving the privilege***."  (emphasis added).  We discussed *General Dynamics* during the telephonic meet-and-confer discussion concerning our intended Motion for Judgment on the Pleadings, and neither Mr. Nachmani nor anyone else from Seiden provided any substantive response or rejoinder.

**Amiad Kushner, Esq.**
**Seiden Law Group LLP**
April 13, 2021
Page 3



Put simply, you have come into possession of privileged information and used it for your own ends in this litigation.  Liu, having served as FF's Global General Counsel, is well aware that these documents are privileged.  Your and Liu's conduct requires disqualification of your firm, pursuant to *Rico* and *Clark v. Superior Court*, 196 Cal. App. 4th 37 (2011).  I have included both opinions with this correspondence for your review as Exhibits 2 and 3 hereto.

*Clark* warrants particular attention.  In *Clark*, an attorney, Clark, left his employer, VeriSign, and took privileged documents with him.  He then shared those documents with his attorney and used them support his action against VeriSign.  The Court determined that this was improper, that the Clark's attorney had violated his obligations under *Rico*, and that, "once the examination showed a document had been transmitted between an attorney representing VeriSign and either an officer or employee of VeriSign, that examination would suffice to ascertain the materials are privileged, and any further examination would exceed the permissible limits."  *Id*. at 53 (citation omitted).  The Court affirmed the *Clark* attorney's disqualification.

**<u>We expect your agreement to confirm return and destruction of all Privileged Documents by no later than 5:00 p.m. PT on April 14, 2021.</u>**

We also intend to move to disqualify Seiden in light of its review, analysis, and use of the Privileged Documents.  Until resolution by agreement or by the Court, the Privileged Documents may not be used or reviewed for any purpose.

Govern yourselves accordingly, and please let us hear from you immediately.

Sincerely,


<u>/s/ Jeffrey M. Goldman</u>
Jeffrey M. Goldman

cc:     Jake Nachmani, Esq.
        Alan J. Kessel, Esq.
        Kevin Crisp, Esq.

**Amiad Kushner, Esq.**
**Seiden Law Group LLP**
April 13, 2021
Page 4



# EXHIBIT 1

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614

troutman.com



**Jeffrey M. Goldman**
D 949.567.3547
jeffrey.goldman@troutman.com

<u>**Via E-mail Only**</u>

March 15, 2021

Jake Nachmani, Esq.
Seiden Law Group LLP
469 7th Avenue, 5th Floor
New York, NY  10018

Re:     **Meet and Confer Correspondence Pursuant to Central District of California Local Rule 7-3**

Dear Mr. Nachmani:

I write to institute the Meet and Confer process required by the Central District of California Local Rule 7-3 in connection with a Motion for Judgment on the Pleadings as to Plaintiff's Complaint that our clients, Faraday&Future Inc. ("FF"), Smart King Ltd. ("Smart King"), Jiawei Wang and Chaoying Deng (collectively, "Defendants") intend on filing.  To that end, this correspondence summarizes the governing law requiring the dismissal of each of the Complaint's following alleged causes of action:

1.     <u>**Intentional Infliction of Emotional Distress**</u>

This alleged cause of action is legally required to be dismissed under the California's Worker's Compensation Act which provides the exclusive remedy for Plaintiff Hong Liu's ("Liu") claim for intentional infliction of emotional distress.  *See, e.g., Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 902 (2008) ("Plaintiffs allege defendants engaged in 'outrageous conduct' that was intended to, and did, cause plaintiffs 'severe emotional distress,' giving rise to common law causes of action for intentional infliction of emotional distress.  The alleged wrongful conduct, however, occurred at the worksite, in the normal course of the employer-employee relationship, and therefore workers' compensation is plaintiffs' exclusive remedy for any injury that may have resulted."); *Thomas v. Stars Entm't LLC*, Case No. 2:15-cv-09239-CAS(MRWx), 2016 WL 844799, *8 (C.D. Cal. Feb. 29, 2016) (where "alleged conduct occurred while plaintiff was either at work, performing functions required by his employment, or attending meetings regarding his work," and where "the majority, if not all, of . . . alleged misconduct relates to . . . efforts to discipline, and ultimately fire, plaintiff," a claim for intentional infliction of emotional distress is based on a "normal part of the employment relationship" and is therefore barred by the Worker's Compensation Act (citations omitted)).

Jake Nachmani, Esq.
March 15, 2021
Page 2



2.    **Breach of Contract**

As detailed in Defendants' Second Amended Counterclaim, the Employment Agreement can conceivably only constitute a valid and enforceable agreement if Liu complied with New York Rules of Professional Conduct 1.5, 1.7, and 1.8, as well as with California Rules of Professional Conduct 3-310, 3-300, and 4-200.

As evident on its face, the Complaint fails to allege Liu's compliance with those rules, and therefore fails to plead the existence of a legally enforceable contract between Liu, Smart King and FF under governing law.  *See, e.g.*, *Fletcher v. Davis*, 33 Cal. 4th 61, 71 (2004) (affirming trial court's sustaining of demurrer to attorney's claim for fees pursuant to a charging lien where attorney failed to allege compliance with and failed to abide by California Rule of Professional Conduct 3-300); *Fletcher v. Gilbert*, Case No. CV 06-05048-SJO (RNB), 2006 U.S. Dist. LEXIS 103689, at *7 (C.D. Cal. Oct. 12, 2006) (finding that "the California Supreme Court [in *Fletcher v. Davis*, *supra*] assumed that the facts as alleged in plaintiff's Superior Court complaint were true and that plaintiff could not plead facts showing the perfection of a lien on the judgment obtained by his former client or that the defendants in the Superior Court action had knowledge of such a lien."); *Luna & Glushon v. Tri-Valley Corp. (In re Tri-Valley Corp.)*, 2013 Bankr. LEXIS 1783, at *11–12 (Bankr. D. Del. May 1, 2013) ("Based on the decision in *Fletcher* [*v. Davis*], the Court concludes that under California law, attorneys must plead in their complaint that they complied with Rule 3-300 when seeking a declaratory judgment that they have a charging lien for hourly fees.  Here, L&G failed to do so.  The Complaint and the Fee Agreement are silent as to whether or not L&G advised the Debtors in writing of their right to seek the advice of an independent lawyer or whether the Debtors consented after a reasonable opportunity to seek such advise (sic).  The Court will, therefore, grant the Debtors' Motion to Dismiss the Complaint.") Furthermore, Liu cannot amend to fix this pleading deficiency without violating Federal Rule of Civil Procedure 11, since it is not disputable that he failed to abide by the aforementioned rules of professional conduct.

3.    **Section 10(b) of the Exchange Act and Rule 10(b)-5**

Liu's alleged 10(b)-5 is similarly untenable.  That is because the options at issue in the Employment Agreement were not "sold" to Liu.  Moreover, Liu's contention that "[b]y accepting an offer of employment in exchange for receiving securities, Mr. Liu effectively purchased securities" is a *non-sequitur*, particularly where Liu does not identify what it was from Smart King or FF he agreed to forego in exchange for the options.  (Compl., ¶120.)  As held by the U.S. Supreme Court in *International Board of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 559 (1979):



> In every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security. . . . No portion of an employee's compensation other than the potential pension benefits has any of the characteristics of a security, yet these noninvestment interests cannot be segregated from the possible pension benefits. Only in the most abstract sense may it be said that an employee 'exchanges' some portion of his labor in return for these possible benefits. He surrenders his labor as a whole, and in return receives a compensation package that is substantially devoid of aspects resembling a security. His decision to accept and retain covered employment may have only an attenuated relationship, if any, to perceived investment possibilities of a future pension. Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment.

Nor were the options at issue "purchased" by Liu simply because he allegedly gave an "income stream and retirement benefits from his Mayer Brown partnership," (Compl., ¶120), particularly where the undefined and speculative value of Liu's alleged partnership and revenue stream does not constitute any form of legal consideration provided by Liu to Smart King or FF. *See, e.g.*, *Wyatt v. Cendant Corp.*, 81 F. Supp. 2d 550, 558 (D.N.J. 2000) (no standing where employee does not give anything of value for stock other than employment services); *McLaughlin v. Cendant Corp.*, 76 F. Supp. 2d 539, 550 (D.N.J. 1999) (same); *Fraser v. Fiduciary Trust Co. Int'l*, 417 F. Supp. 2d 310, 318 (S.D.N.Y. 2006) (same).

### 4.   Fraudulent Inducement and Negligent Misrepresentation

These claims fail for several reasons.

*First*, Liu's fraudulent inducement claim hinges upon allegations that all Defendants "falsely represented that in December 2017, Evergrande had invested $2 billion in Smart King in a Series A offering that valued Smart King at $4.5 billion. Defendants also falsely represented that Mr. Liu would be entitled to Directors' and Officers' insurance while working at Faraday." (Compl., ¶ 125.) The former statement is belied by the Employment Agreement itself attached and incorporated into the Complaint, which expressly provides that Smart King and FF "had successfully completed *first closing* of Series A financing in December 2017, *which is subject to CFIUS approval*. . . ." (*Id.*, Ex. A, p. 2 (emphasis added).) In light of the Employment Agreement's patent disclosure that the subject financing had not been completed or approved in its entirety, there neither is, nor can be, any reasonable reliance by Liu on any alleged pre-contractual representations that a definitive investment purported had been made and remitted.

Jake Nachmani, Esq.
March 15, 2021
Page 4



*Second*, the Complaint's fraud claim is implausible under the U.S. Supreme Court's seminal decisions in *Iqbal* and *Twombly*, let alone sufficient under Federal Rule of Civil Procedure 9's heightened pleading standard.  More particularly, it is implausible that Liu would not have joined Smart King and FF had he known that the Series A financing had allegedly not been completed or D&O insurance had not been procured, in light of the egregiously one-sided multi-million dollar package, complete with acceleration clauses, to which he secured Smart King and FF's agreement.  Certainly he will not be able to show that Mayer Brown would have guaranteed him that much money on similar terms.

*Third*, the Complaint fails to allege causation with respect to the fraudulent inducement or the negligence claim.  In particular, Liu has not pled that Smart King and FF were unable to pay all amounts owed on the Employment Agreement or provide options, but rather, that they simply had not paid all amounts allegedly due and owing.  In other words, Liu's claim is that the Employment Agreement was breached and thus money is owed; *not* that the Company lacked the ability pay him at the time the parties entered the Employment Agreement.

*Fourth*, and related to the immediately preceding point, the Complaint's alleged fraudulent inducement and negligent misrepresentation claims are subject to the economic loss rule, especially where those claims specifically incorporate, and impermissibly attempt to repackage, Liu's alleged breach of contract claim as torts.  *See, e.g., Aas v. Super. Ct.*, 24 Cal. 4th 627, 643 (2000) (a party "may not ordinarily recovery in tort for breaches of duties that merely restate contractual obligations"), *superseded on other grounds by* Cal. Civ. Code, §§ 895 *et seq.*; *JMP Sec. LLP v. Altair Nanotechnologies, Inc.*, 880 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) ("[N]o tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement."); *Sam Rubin Ent., Inc. v. AARP, Inc.*, No. CV 16-6431-RSWL-SSX, 2016 WL 7336554, at *7 (C.D. Cal. Dec. 15, 2016) (dismissing fraudulent inducement claim under economic loss rule).  Liu additionally neither has, nor can, allege that Smart King's and FF's alleged fraud or negligent misrepresentations purportedly subjected him to liability to third parties thereby further requiring dismissal of the Complaint's fraudulent inducement and negligent misrepresentation claims under the economic loss rule on that separate and independent ground, as well

*Finally*, the negligent misrepresentation claim merely recites the elements of the cause of action without any, much less with the requisite, specificity.  It thus fails to meet the Rule 9 standard, and is legally required to be dismissed.  *See, e.g., Arch Ins. Co. v. Allegiant Prof'l Bus. Servs.*, No. CV 11-1675 CAS (PJWx), 2012 U.S. Dist. LEXIS 56605, at *7 (C.D. Cal. Apr. 23, 2012) ("The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.").  The Complaint's negligent misrepresentation cause of action further fails to adequately allege the identity of the "special relationship" between any of the Defendants, let alone all of them, and Liu (Compl., ¶ 144), and similarly fails to allege any specific facts whatsoever establishing how Chaoying Deng and Jiawei Wang legally can be held personally liable under the Complaint's alleged fraudulent inducement and negligent misrepresentation claims.



5. **Wrongful Termination in Violation of Public Policy**

The Complaint fails to plausibly state a claim for wrongful termination.  Instead, it only (i) alleges certain concerns Liu had with the way the Company operated; and (ii) recites actions he purportedly took in his capacity as General Counsel.  (*See* Compl., ¶¶ 70–72.)  Those allegations are legally insufficient for at least two independently dispositive reasons.

*First*, Liu has not alleged any statutory or constitutional provision giving rise to a fundamental public policy prerequisite to maintenance of the Complaint's purported Wrongful Termination claim.  *See Stevenson v. Super. Ct.*, 16 Cal. 4d 880, 889–90 (1997).  Likewise, Liu has failed to allege, let alone establish, how any such policy inures to the benefit of the public as opposed to Liu's own personal interests.  *Id.*  Nor has Liu explained how that unalleged policy is "fundamental" and "substantial."  *Id.*

*Second*, Liu fails to offer any explanation, let alone a plausible one, as to how performing his job functions in the Legal Department somehow gives rise to a wrongful termination claim.  Under governing California Supreme Court law, wrongful termination claims brought by in-house counsel not only are disfavored and limited, but also are required to be "grounded in *explicit* and *unequivocal ethical norms* embodied into Rules of Professional Responsibility and *statutes*, and claims which are maintainable by the *non-* attorney employee . . . under circumstances in which the Legislature has manifested a judgment that the principle of professional confidentiality *does not apply*." *Gen. Dynamics Corp. v. Super. Ct.,* 7 Cal. 4th 1164, 1189–90 (1994) (emphasis in original).   *Id.* (citations omitted).  Despite those legal requirements, Liu neither has identified any such explicit and unequivocal ethical norms or statutes, nor has alleged any circumstance for which the California Legislature has manifested its judgment that a principle of professional confidentiality would not apply.

In fact, by revealing the internal secrets of FF and Smart King in his publicly-filed Complaint while lacking any grounds for believing that confidentiality does not apply, Liu has again violated his ethical responsibilities.  (*See, e.g.*, Compl., ¶¶ 64, 71, 72, 74, 83).  This is true under both California and New York law.  *See, e.g.*, *Strickland v. City of Inglewood*, No. CV 08-1595 ABC(CTx), 2009 U.S. Dist. LEXIS 136870, at *4-5 (C.D. Cal. Apr. 23, 2009) ("California attorneys, such as plaintiff, are constrained by an ethical obligation not to disclose client confidences and secrets. Cal. Bus. & Prof. Code § 6068 (e) (2004). This is a broader prohibition than the evidentiary attorney-client privilege. *Goldstein v. Lees*, 46 Cal. App. 3d 614, 621, 120 Cal. Rptr. 253 (1975). It precludes an attorney from disclosing not only confidential communications made for the purposes of obtaining legal representation, but any information that might be detrimental to a client's interests.  *See Matter of Johnson*, 4 Cal. State Bar Ct. Rptr. 179, 189 (2000) (disclosure of fact that client was a convicted felon); ABA Model Rule of Prof. Conduct 1.6 (a) (2009), and Comment (5) (absent client consent, lawyer prohibited from revealing confidential client information except as necessary to carry out representation); Rest.3d Law Governing Lawyers § 59 (2000) ("confidential client information" is 'information relating to representation of a client, other than information that is generally known'").  Also unlike the attorney-client privilege, the California attorney's duty to preserve client confidences applies equally to ancillary, non-legal business services.  *See* Cal. Prac. Guide Prof. Resp., 7:28.2 (citing Cal. State Bar Form. Opn.

Jake Nachmani, Esq.
March 15, 2021
Page 6



1995-141).  This duty outlives the attorney-client relationship, and it even survives in a wrongful termination case, such as this one, brought by an attorney against her former client.  *See General Dynamics v. Sup. Ct. (Rose)*, 7 Cal. 4th 1164, 1190, 32 Cal. Rptr. 2d 1, 876 P.2d 487 (1994)); *NCK Org., Ltd. v. Bregman*, 542 F.2d 128, 133 (2d Cir. 1976) ("[The] client's privilege in confidential information disclosed to his attorney 'is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources.'") (citation omitted); *U.S. v. Mackey*, 405 F. Supp. 854, 865 (E.D.N.Y. 1975) ("Attorneys, in particular, are under a professional ethical obligation to refuse to disclose confidential matters.") (citing A.B.A. Code of Professional Responsibility, Canon 4).

It is for this very reason that "the in-house attorney who publicly exposes the client's secrets will usually find no sanctuary in the courts[,]" and that where, as here, "the elements of a wrongful discharge in violation of fundamental public policy claim cannot, for reasons peculiar to the particular case, be fully established without breaching the attorney-client privilege, ***the suit must be dismissed in the interest of preserving the privilege.***"  *Gen. Dynamics Corp.*, 7 Cal. 4th at 1190 (emphasis added).

Given the foregoing, it is clear that Liu cannot maintain this cause of action, particularly where doing so will necessarily result in his violating both the privilege and his ethical duties of confidentiality.

## 6.    <u>Declaratory Relief</u>

For each of the foregoing reasons, the Complaint's alleged declaratory relief cause of action is correspondingly defective and legally required to be dismissed.  *See, e.g., Renovate Am., Inc. v. Lloyd's Syndicate 1458*, No. 3:19-cv-01456-GPC-WVG, 2019 U.S. Dist. LEXIS 212874, at *14 (S.D. Cal. Dec. 10, 2019) (a declaratory relief request "rises and falls with the substantive claims to that effect" because the "Declaratory Judgment Act creates a remedy for litigants but is not an independent cause of action.") (citation omitted).

Please provide us with the dates and times you are available this week to conduct a telephonic meet-and-confer conference on the foregoing matters.

Thank you in advance for your anticipated cooperation.

Sincerely,

Jeffrey M. Goldman

**Amiad Kushner, Esq.**
**Seiden Law Group LLP**
April 13, 2021
Page 5



**EXHIBIT 2**

⚠ Caution
As of: April 14, 2021 3:31 AM Z

## *Rico v. Mitsubishi Motors Corp.*

Supreme Court of California

December 13, 2007, Filed

S123808

**Reporter**
42 Cal. 4th 807 *; 171 P.3d 1092 **; 68 Cal. Rptr. 3d 758 ***; 2007 Cal. LEXIS 13892 ****

ZERLENE RICO et al., Plaintiffs and Appellants, v. MITSUBISHI MOTORS CORPORATION et al., Defendants and Respondents.

**Prior History: [****1]** Court of Appeal of California, Fourth Appellate District, Division Two, No. E033616, San Bernardino County, Superior Court No. RCV39233, Ben T. Kayashima, Judge.

*Rico v. Mitsubishi Motors Corp., 116 Cal. App. 4th 51 [10 Cal. Rptr. 3d 601, 2004 Cal. App. LEXIS 219] (Cal. App. 4th Dist., 2004)*

**Disposition:** The judgment of the intermediate appellate court was affirmed.

## Core Terms

disqualification, inadvertence, deposition, privileged, plaintiffs', documents, trial court, session, confidential, impressions, work product, circumstances, cases, attorney's work product, work product doctrine, discovery, defense expert, legal research, prepare, printed

## Case Summary

**Procedural Posture**
Various plaintiffs sued defendant automobile manufacturer after a sport utility vehicle rolled over while being driven on a freeway. The trial court entered an order granting a defense motion to disqualify plaintiffs' legal team and experts. The California Court of Appeal, Fourth Appellate District, Division Two, affirmed the disqualification order. Plaintiffs sought review.

**Overview**
An attorney representing plaintiffs obtained through inadvertence notes of one of the defense attorneys and used them during a deposition to impeach a defense expert. The notes were written in a dialogue style and summarized conversations between defense counsel and defense experts. The court concluded that plaintiffs' attorney should not have read the document any more closely than was necessary to ascertain that it was privileged. Once it became apparent that the content was privileged, plaintiffs' attorney should have immediately notified defense counsel and tried to resolve the situation. The notes were absolutely protected work product under *Code Civ. Proc., § 2018.030*, because they contained the ideas of the defense attorney and his legal team about the case. Disqualification was the proper remedy. After reviewing the notes, plaintiffs' attorney made copies and disseminated them to plaintiffs' experts and other attorneys. Plaintiffs' attorney acted unethically in making full use of the confidential document. Without disqualification of plaintiffs' legal team and their experts, the damage caused by plaintiffs' attorney's use and dissemination of the notes was irreversible.

Jeffrey Goldman

**Outcome**

The judgment of the intermediate appellate court was affirmed.

# LexisNexis® Headnotes

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Scope of Protection

*HN1*[↓] **Work Product Doctrine, Scope of Protection**

See *Code Civ. Proc., § 2018.030*.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Scope of Protection

*HN2*[↓] **Work Product Doctrine, Scope of Protection**

The legislature has declared that it is state policy to preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases. *Code Civ. Proc., § 2018.020, subd. (a)*. In addition, the legislature has declared its intent to prevent attorneys from taking undue advantage of their adversary's industry and efforts. *Code Civ. Proc., § 2018.020, subd. (b)*.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Scope of Protection

*HN3*[↓] **Work Product Doctrine, Scope of Protection**

The codified work product doctrine absolutely protects from discovery writings that contain an attorney's impressions, conclusions, opinions, or legal research or

theories. *Code Civ. Proc., § 2018.030, subd. (a)*. The protection extends to an attorney's written notes about a witness's statements. When a witness's statement and the attorney's impressions are inextricably intertwined, the work product doctrine provides that absolute protection is afforded to all of the attorney's notes.

Civil Procedure > ... > Discovery > Privileged Communications > Attorney-Client Privilege

Evidence > Privileges > Attorney-Client Privilege > Scope

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Scope of Protection

*HN4*[↓] **Privileged Communications, Attorney-Client Privilege**

When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified.

Civil Procedure > ... > Discovery > Privileged Communications > Attorney-Client Privilege

Evidence > Privileges > Attorney-Client Privilege > Scope

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Scope of Protection

*HN5*[↓] **Privileged Communications, Attorney-Client Privilege**

An attorney has an obligation not only to protect his or her client's interests but also to respect the legitimate

42 Cal. 4th 807, *807; 171 P.3d 1092, **1092; 68 Cal. Rptr. 3d 758, ***758; 2007 Cal. LEXIS 13892, ****1

interests of fellow members of the bar, the judiciary, and the administration of justice. An attorney is held to a reasonable standard of professional conduct when confidential or privileged materials are inadvertently disclosed.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Scope of Protection

**HN6**[⤓] **Work Product Doctrine, Scope of Protection**

In applying the rule regarding an attorney who receives privileged documents through inadvertence, courts must consider whether reasonably competent counsel, knowing the circumstances of the litigation, would have concluded the materials were privileged, how much review was reasonably necessary to draw that conclusion, and when counsel's examination should have ended.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Attorneys > Disqualification of Counsel

**HN7**[⤓] **Standards of Review, Abuse of Discretion**

An appellate court reviews a trial court's disqualification order for abuse of discretion.

Civil Procedure > ... > Discovery > Privileged Communications > Attorney-Client Privilege

Evidence > Privileges > Attorney-Client Privilege > General Overview

Civil Procedure > Attorneys > Disqualification of Counsel

**HN8**[⤓] **Privileged Communications, Attorney-Client Privilege**

Mere exposure to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Scope of Protection

**HN9**[⤓] **Work Product Doctrine, Scope of Protection**

When a writing is protected under the absolute attorney work product privilege, courts do not invade upon the attorney's thought processes by evaluating the content of the writing. Once it is apparent that the writing contains an attorney's impressions, conclusions, opinions, legal research or theories, the reading stops and the contents of the document for all practical purposes are off limits. In the same way, once the court determines that the writing is absolutely privileged, the inquiry ends. Courts do not make exceptions based on the content of the writing.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Scope of Protection

**HN10**[⤓] **Work Product Doctrine, Scope of Protection**

Under the work product doctrine, a writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances. *Code Civ. Proc., § 2018.030, subd. (a)*. With respect to such a writing, the legislature intends that the crime or fraud exception only apply in any official investigation by a law enforcement agency or proceeding or action brought by a public prosecutor if the services of the lawyer were sought or obtained to enable or aid anyone to commit a crime or fraud. *Code Civ. Proc., § 2018.050*.

# Headnotes/Summary

## Summary

CALIFORNIA OFFICIAL REPORTS SUMMARY

Various plaintiffs sued an automobile manufacturer after

42 Cal. 4th 807, *807; 171 Cal. Rptr. 3d 1092, **1092; 68 Cal. Rptr. 3d 758, ***758; 2007 Cal. LEXIS 13892, ****1

a sport utility vehicle rolled over while being driven on a freeway. Through inadvertence, an attorney representing plaintiffs obtained notes of one of the defense attorneys and used them during a deposition to impeach a defense expert. The notes were written in a dialogue style and summarized conversations between defense counsel and defense experts. The trial court entered an order granting a defense motion to disqualify plaintiffs' legal team and experts. (Superior Court of San Bernardino County, No. RCV39233, Ben T. Kayashima, Judge.) The Court of Appeal, Fourth Dist., Div. Two, No. E033616, affirmed the disqualification order.

The Supreme Court affirmed the judgment of the Court of Appeal. The court concluded that plaintiffs' attorney should not have read the document any more closely than was necessary to ascertain that it was privileged. Once it became apparent that the content was privileged, plaintiffs' attorney should have immediately notified defense counsel and tried to resolve the situation. The notes were absolutely protected work product under *Code Civ. Proc., § 2018.030*, because they contained the ideas of the defense attorney and his legal team about the case. Disqualification was the proper remedy. After reviewing the notes, plaintiffs' attorney made copies and disseminated them to plaintiffs' experts and other attorneys. Plaintiffs' attorney acted unethically in making full use of the confidential document. Without disqualification of plaintiffs' legal team and their experts, the damage to the defense caused by plaintiffs' attorney's use and dissemination of the notes was irreversible. (Opinion by Corrigan, J., expressing the unanimous view of the court.) **[*808]**

**Headnotes**

CALIFORNIA OFFICIAL REPORTS HEADNOTES

## CA(1)[⬇] (1)

**Discovery and Depositions § 35—Privileges—Work Product.**

The Legislature has declared that it is state policy to preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases (*Code Civ. Proc., § 2018.020, subd. (a)*). In addition, the Legislature has declared its intent to prevent attorneys from taking undue advantage of their adversary's industry and efforts (*Code Civ. Proc., § 2018.020, subd. (b)*).

## CA(2)[⬇] (2)

**Discovery and Depositions § 35—Privileges—Work Product—Attorney's Notes—Witness's Statements.**

The codified work product doctrine absolutely protects from discovery writings that contain an attorney's impressions, conclusions, opinions, or legal research or theories (*Code Civ. Proc., § 2018.030, subd. (a)*). The protection extends to an attorney's written notes about a witness's statements. When a witness's statement and the attorney's impressions are inextricably intertwined, the work product doctrine provides that absolute protection is afforded to all of the attorney's notes.

## CA(3)[⬇] (3)

**Discovery and Depositions § 34.2—Attorney-client Privilege—Inadvertent Disclosure.**

When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified.

## CA(4)[⬇] (4)

**Discovery and Depositions § 34.2—Attorney-client Privilege—Inadvertent Disclosure—Reasonable Standard of Professional Conduct.**

An attorney has an obligation not only to protect his or her client's interests but also to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice. An attorney is held to a reasonable standard of professional conduct when confidential or privileged materials are inadvertently disclosed.

**[*809]** CA(5)[⬇] (5)

42 Cal. 4th 807, *809; 171 P.3d 1092, **1092; 68 Cal. Rptr. 3d 758, ***758; 2007 Cal. LEXIS 13892, ****1

**Discovery and Depositions § 34.2—Attorney-client Privilege—Inadvertent Disclosure.**

In applying the rule regarding an attorney who receives privileged documents through inadvertence, courts must consider whether reasonably competent counsel, knowing the circumstances of the litigation, would have concluded the materials were privileged, how much review was reasonably necessary to draw that conclusion, and when counsel's examination should have ended.

*CA(6)*[⬇] (6)

**Discovery and Depositions § 34.2—Attorney-client Privilege—Disqualification.**

Mere exposure to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification.

*CA(7)*[⬇] (7)

**Discovery and Depositions § 34.2—Attorney-client Privilege—Inadvertent Disclosure—Use of Notes to Impeach Expert—Disqualification.**

In a case in which an automobile manufacturer was sued by various plaintiffs after a sport utility vehicle rolled over while being driven on a freeway, disqualification of plaintiffs' legal team and experts was proper, where one of plaintiffs' attorneys obtained through inadvertence notes of one of the defense attorneys and used them during a deposition to impeach a defense expert. Plaintiffs' attorney acted unethically in making full use of the confidential document. Without disqualification of plaintiffs' legal team and their experts, the damage caused by plaintiffs' attorney's use and dissemination of the notes was irreversible.

[*Cal. Forms of Pleading and Practice (2007) ch. 72, Attorney Practice and Ethics, § 72.33*; 1 Kiesel et al., Matthew Bender Practice Guide: Cal. Pretrial Civil Procedure (2007) § 3.06; 1 Witkin, Cal. Procedure (5th ed. 2008) Attorneys, § 539; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 76.]

*CA(8)*[⬇] (8)

**Discovery and Depositions § 34.2—Attorney-client Privilege—Content of Document.**

When a writing is protected under the absolute attorney work product privilege, courts do not invade upon the attorney's thought processes by evaluating the content of the writing. Once it is apparent that the writing contains an attorney's impressions, conclusions, opinions, legal research or theories, the reading stops and the contents of the document for all practical purposes are off limits. In the same way, once the court determines that the writing is absolutely privileged, the inquiry ends. Courts do not make exceptions based on the content of the writing.

*CA(9)*[⬇] (9)

**Discovery and Depositions § 35—Privileges—Work Product—Crime or Fraud Exception.**

Under the work product doctrine, a writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances (*Code Civ. [*810] Proc., § 2018.030, subd. (a)*). With respect to such a writing, the Legislature intends that the crime or fraud exception only apply in any official investigation by a law enforcement agency or proceeding or action brought by a public prosecutor if the services of the lawyer were sought or obtained to enable or aid anyone to commit a crime or fraud (*Code Civ. Proc., § 2018.050*).

**Counsel:** Pine & Pine, Norman Pine, Beverly Pine; Law Offices of Raymond Paul Johnson, Raymond Paul Johnson, Robert A. Balbuena, Michelle M. West; Law Offices of Jack L. Mattingly and Jack L. Mattingly for Plaintiffs and Appellants.

Yukevich & Sonnett, James J. Yukevich, Alexander G. Calfo, Stephanie A. Hingle; Bingham McCutchen, Leslie G. Landau,[*] Claudia Y. Sanchez; Snell & Wilmer, Michael D. Zimmerman, Richard A. Derevan and Michael S. McIntosh for Defendants and Respondents.

Hugh F. Young, Jr., and Harvey M. Grossman for the Product Liability Advisory Council, Inc., as Amicus

_____

[*] Reporter's Note: Appeared only in the Court of Appeal prior to being appointed a judge of the Contra Costa County Superior Court on September 26, 2003, and withdrawing as counsel.

42 Cal. 4th 807, *810; 171 P.3d 1092, **1092; 68 Cal. Rptr. 3d 758, ***758; 2007 Cal. LEXIS 13892, ****1

Curiae on behalf of Defendants and Respondents.

**Judges:** Opinion by Corrigan, J., expressing the unanimous view of the court.

**Opinion by:** Corrigan

# Opinion

[**1094] [***760] **CORRIGAN, J.**—Here we consider what action is required of an attorney who receives privileged documents through inadvertence and whether the remedy of disqualification is appropriate. We conclude that, under the authority of *State Comp. Ins. Fund v. WPS, Inc. (1999) 70 Cal. App. 4th 644 [82 Cal. Rptr. 2d 799]* (*State Fund*), an attorney [****2] in these circumstances may not read a document any more closely than is necessary to ascertain that it is privileged. Once it becomes apparent that the content is privileged, counsel must immediately notify opposing counsel and try to resolve the situation. We affirm the disqualification order under the circumstances presented here.

[*811]

[***761] FACTUAL BACKGROUND

Two Mitsubishi corporations [1] (collectively, Mitsubishi or defendants), and the California Department of Transportation (Caltrans), were sued by various plaintiffs after a Mitsubishi Montero rolled over while being driven on a freeway. Subsequently, Mitsubishi representatives met with their lawyers, James Yukevich and Alexander Calfo, and two designated defense experts to discuss their litigation strategy and vulnerabilities. Mitsubishi's case manager, Jerome Rowley, also attended the meeting. Rowley and Yukevich had worked together over a few years. Yukevich asked Rowley to take notes at the meeting and indicated specific areas to be summarized. The trial

court later found that Rowley, who had typed the notes on Yukevich's computer, had acted as Yukevich's paralegal. At the end of the six-hour session, Rowley returned the computer and never [****3] saw a printed version of the notes. Yukevich printed only one copy of the notes, which he later edited and annotated. Yukevich never intentionally showed the notes to anyone, and the court determined that the [**1095] sole purpose of the document was to help Yukevich defend the case.

The notes are written in a dialogue style and summarize conversations among Yukevich, Calfo, and the experts. They are dated, but not labeled "confidential" or "work product." The printed copy of these compiled and annotated notes is the document at issue here. [2]

Less than two weeks after the strategy session, Yukevich deposed plaintiffs' expert witness, Anthony Sances, at the offices of plaintiffs' counsel, Raymond Johnson. Yukevich, court reporter Karen Kay, and Caltrans counsel Darin Flagg were told that Johnson and Sances would be late for the deposition. After waiting in the conference room for some time, Yukevich [****4] went to the restroom, leaving his briefcase, computer, and case file in the room. The printed document from the strategy session was in the case file. While Yukevich was away, Johnson and Sances arrived. Johnson asked Kay and Flagg to leave the conference room. Kay and Flagg's departure left only plaintiffs' representatives and counsel in the conference room. Yukevich returned to find Kay and Flagg standing outside. Yukevich waited approximately five minutes, then knocked and asked to retrieve his briefcase, computer, and file. After a brief delay, he was allowed to do so.

[*812]

Somehow, Johnson acquired Yukevich's notes. Johnson maintained that they were accidentally given to him by the court reporter. Yukevich insisted that they were taken from his file while only Johnson and plaintiffs' team were in the conference room. As a result, Mitsubishi moved to disqualify plaintiffs' attorneys and experts. The trial court ordered an evidentiary hearing to determine how Johnson obtained the document.

The court reporter was deposed and denied any specific

---

[1] Mitsubishi Motors Corporation and Mitsubishi Motor Sales of America, Inc.

[2] Because the document was confidential, the court ordered it sealed along with relevant portions of the reporter's transcript where the contents of the document were discussed. The document has remained sealed since that time.

42 Cal. 4th 807, *812; 171 P.3d 1092, **1095; 68 Cal. Rptr. 3d 758, ***761; 2007 Cal. LEXIS 13892, ****4

recollection of the Sances deposition. She could not testify what she had done with the deposition exhibits that night and could only relate her **[****5]** general practice. She said she generally collects exhibits and puts them in a plastic covering. She did not remember ever having given exhibits to an attorney. She also testified that she had never seen the document in question. If documents other **[***762]** than exhibits remain on a conference table, she leaves them there. The trial court found that the Sances deposition took place over approximately eight hours. It was a document-intense session and documents were placed on the conference table.

Another member of plaintiffs' legal team submitted a declaration supporting Johnson's assertion that he received the document from the reporter. The court ultimately concluded that the defense had failed to establish that Johnson had taken the notes from Yukevich's file. It thus ruled that Johnson came into the document's possession through inadvertence.

The court found the 12-page document was dated, but not otherwise labeled. It contained notations by Yukevich. Johnson admitted that he knew within a minute or two that the document related to defendants' case. He knew that Yukevich did not intend to produce it and that it would be a "powerful impeachment document." Nevertheless, Johnson made a copy **[****6]** of the document. He scrutinized and made his own notes on it. He gave copies to his cocounsel and his experts, all of whom studied the document. Johnson specifically discussed the contents of the document with each of his experts.

A week after he acquired Yukevich's notes, Johnson used them during the deposition of defense expert Geoffrey Germane. [3] The notes purportedly indicate that the defense experts made statements at the strategy session that were inconsistent with their deposition testimony. Johnson used the document while questioning Germane, asking about Germane's participation in the strategy session. **[*813]**

Defense Counsel Calfo defended the Germane deposition. Yukevich did not attend. **[**1096]** Calfo had never seen the document and was not given a copy during the deposition. When he asked about the document's source, Johnson vaguely replied that "It was

put in Dr. Sances' file." Calfo repeatedly objected to the "whole line of inquiry with respect to an unknown document." He specifically said, "I don't even know where this exhibit came from."

Only after the deposition did Johnson give a **[****7]** copy of the document to Calfo, who contacted Yukevich. When Yukevich realized that Johnson had his only copy of the strategy session notes and had used it at the deposition, he and Calfo wrote to Johnson demanding the return of all duplicates. The letter was faxed the day after Germane's deposition. The next day, defendants moved to disqualify plaintiffs' legal team and their experts on the ground that they had become privy to and had used Yukevich's work product. As a result, they complained, Johnson's unethical use of the notes and his revelation of them to cocounsel and their experts irremediably prejudiced defendants.

The trial court concluded that the notes were absolutely privileged by the work product rule. [4] The court also held that Johnson had acted unethically by examining the document more closely than was necessary to determine that its contents were confidential, by failing to notify Yukevich that he had a copy of the document, and by surreptitiously using it to gain maximum adversarial value from it. The court determined that Johnson's violation of the work product rule had prejudiced the defense and "the bell cannot be **[***763]** 'unrung' by use of in limine orders." Accordingly, **[****8]** the court ordered plaintiffs' attorneys and experts disqualified. [5]

Plaintiffs appealed the disqualification order. The Court of Appeal affirmed.

_____

[3] Johnson also used the document at the subsequent deposition of defense expert Dennis Schneider.

_____

[4] The trial court also held that the document fell under the attorney-client privilege. The Court of Appeal held to the contrary. That issue is not before us and we express no view thereon.

[5] The court continued the case to provide plaintiffs an opportunity to retain new counsel. The court noted that it did not appear that plaintiffs were made privy to the document's contents, so disqualification would be an effective remedy, because there was no issue about plaintiffs providing new counsel with the information. The court also imposed a gag order on all who attended the hearing on the motion to disqualify, specifically instructing plaintiffs' counsel and experts to keep the contents of the document confidential and not reveal any information about the document to plaintiffs and their new attorneys.

42 Cal. 4th 807, *813; 171 P.3d 1092, **1096; 68 Cal. Rptr. 3d 758, ***763; 2007 Cal. LEXIS 13892, ****8

## DISCUSSION

### Attorney Work Product

Plaintiffs contend that the Court of Appeal erred by holding that the entire document was protected as attorney work product. We reject that contention.

[*814]

The Legislature has protected attorney work product [****9] under *California Code of Civil Procedure* [6] *section 2018.030*, [7] which provides, **HN1**[⬆] "(a) A writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances. [¶] (b) The work product of an attorney, other than a writing described in subdivision (a), is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice."

**HN2**[⬆] **CA(1)**[⬆] **(1)** The Legislature has declared [****10] that it is state policy to "[p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases." (*§ 2018.020, subd. (a)*.) In addition, the Legislature declared its intent to "[p]revent attorneys [**1097] from taking undue advantage of their adversary's industry and efforts." (*§ 2018.020, subd. (b)*.)

**CA(2)**[⬆] **(2)** Thus, **HN3**[⬆] the codified work product doctrine absolutely protects from discovery writings that contain an "attorney's impressions, conclusions, opinions, or legal research or theories." (*§ 2018.030, subd. (a)*; see *Wellpoint Health Networks, Inc. v. Superior Court (1997) 59 Cal.App.4th 110, 120 [68 Cal. Rptr. 2d 844]*.) The protection extends to an attorney's

---

[6] Unless otherwise indicated, further undesignated statutory references are to the Code of Civil Procedure.

[7] We note that the Court of Appeal relied on former section 2018 in setting forth the work product rule. Section 2018 was repealed. (Stats. 2004, ch. 182, § 22, operative July 1, 2005.) The Legislature replaced it with *sections 2018.010–2018.080*. *Section 2018.040* provides the Legislature did not intend to make any changes to the work product doctrine, referring to the new statutes as a "restatement of existing law" that is "not intended to expand or reduce the extent to which work product is discoverable under existing law in any action."

written notes about a witness's statements. (See *Rodriguez v. McDonnell Douglas Corp. (1978) 87 Cal. App. 3d 626, 649 [151 Cal. Rptr. 399]* (*Rodriguez*); see also *Dowden v. Superior Court (1999) 73 Cal.App.4th 126, 135 [86 Cal. Rptr. 2d 180]*.) "[A]ny such notes or recorded statements taken by defendants' counsel would be protected by the absolute work product privilege because they would reveal counsel's 'impressions, conclusions, [****11] opinions, or legal research or theories' within the meaning of [the work product doctrine]." (*Nacht & Lewis Architects, Inc. v. Superior Court (1996) 47 Cal.App.4th 214, 217 [***764] [54 Cal. Rptr. 2d 575]*.) When a witness's statement and the attorney's impressions are inextricably intertwined, the work product doctrine provides that absolute protection is afforded to all of the attorney's notes. (*Rodriguez, supra, 87 Cal. App. 3d at p. 648*.)

[*815]

Plaintiffs urge that the document is not work product because it reflects the statements of declared experts. They are incorrect. The document is not a transcript of the August 28, 2002 strategy session, nor is it a verbatim record of the experts' own statements. It contains Rowley's summaries of points from the strategy session, made at Yukevich's direction. Yukevich also edited the document in order to add his own thoughts and comments, further inextricably intertwining his personal impressions with the summary. (See *Rodriguez, supra, 87 Cal. App. 3d at pp. 647–648*.) In this regard, the trial court found: "As to the content of the document, although it doesn't contain overt statements setting forth the lawyer's conclusions, its very existence is owed to the lawyer's thought [****12] process. The document reflects not only the strategy, but also the attorney's opinion as to the important issues in the case. Directions were provided by Mr. Yukevich as to the key pieces of information to be recorded, and Mr. Yukevich also added his own input as to the important details, by inserting other words in the notes. The attorney's impressions of the case were the filter through which all the discussions at the conference were passed through on the way to the page." The court concluded, "[T]his court determines that the attorney's directions to record only portions of the conference specific to the attorney's concerns in the litigation are sufficient to support the finding that the notes are covered by the absolute work product [doctrine], as the choices in statements to record show the thought process and are too intertwined with the document."

Although the notes were written in dialogue format and

contain information attributed to Mitsubishi's experts, the document does not qualify as an *expert's* report, writing, declaration, or testimony. The notes reflect the *paralegal's* summary along with *counsel's* thoughts and impressions about the case. The document was absolutely protected **[****13]** work product because it contained the ideas of Yukevich and his legal team about the case. (*§ 2018.030, subd. (a)*.) [8]

*Ethical Duty Owed upon Receipt of Attorney Work Product*

Because the document is work product we consider what ethical duty Johnson owed once he received it. Plaintiffs rely on **[**1098]** *Aerojet-General Co. v.* **[*816]** *Transport Indemnity Insurance (1993) 18 Cal.App.4th 996 [22 Cal. Rptr. 2d 862]* (*Aerojet*) to argue that because the document **[****14]** was inadvertently received, Johnson was dutybound to use the nonprivileged portions of it to his clients' advantage. This **[***765]** argument fails. *Aerojet* is distinguishable because there are no "unprivileged portions" of the document.

A review of *Aerojet, supra, 18 Cal.App.4th 996*, demonstrates that it does not assist plaintiffs. Aerojet's insurance brokers had sent a package of materials to Aerojet's risk manager. The risk manager sent them on to Aerojet's attorney, DeVries. Among these documents was a memo from an attorney at an opposing law firm. It was never ascertained how opposing counsel's memo found its way into the package of documents. The memo revealed the existence of a witness whom DeVries ultimately deposed. When opposing counsel learned that DeVries had received the memo and thus discovered the witness, counsel sought sanctions. The trial court imposed monetary sanctions under *section 128.5, subdivision (a)*. (*Aerojet, at pp. 1001–1002*.) The

Court of Appeal reversed the sanctions order.

The *Aerojet* court first noted that DeVries was free of any wrongdoing in his initial receipt of the document. The court also observed that the existence and identification of the witness was not **[****15]** privileged. "Nor can 'the identity and location of persons having knowledge of relevant facts' be concealed under the attorney work product rule … . [Citation.]" (*Aerojet, supra, 18 Cal.App.4th at p. 1004*.) The defendants claimed no prejudice to their case as a result of the witness's disclosure. Indeed, they prevailed at trial. (*Ibid.*) Because counsel was blameless in his acquisition of the document *and because* the information complained of was not privileged, DeVries was free to use it. (*Id. at p. 1005*.) Plaintiffs' reliance on *Aerojet* founders on the facts that distinguish it. Here, Yukevich's notes were absolutely protected by the work product rule. Thus, Johnson's reliance on *Aerojet* is unavailing, particularly in light of the clear standard set out in *State Fund, supra, 70 Cal.App.4th 644*.

In *State Fund, supra, 70 Cal.App.4th 644*, the plaintiff sent the defendant's attorney (Telanoff) three boxes of documents that were identical to the documents provided during discovery. Inadvertently, the plaintiff also sent 273 pages of forms entitled, " 'Civil Litigation Claims Summary,' " marked as " 'ATTORNEY-CLIENT COMMUNICATION/ATTORNEY WORK PRODUCT,' " and with the warning, " 'DO **[****16]** NOT CIRCULATE OR DUPLICATE.' " (*Id. at p. 648*.) In addition, "[t]he word 'CONFIDENTIAL' [was] repeatedly printed around the perimeter of the first page of the form." (*Ibid.*) When counsel discovered the **[*817]** mistake and demanded return of the documents, Telanoff refused. The trial court, relying on American Bar Association (ABA) Formal Ethics Opinion No. 92-368 (Nov. 10, 1992), imposed monetary sanctions.

The Court of Appeal framed the issue as follows: "[W]hat is a lawyer to do when he or she receives through the inadvertence of opposing counsel documents plainly subject to the attorney-client privilege?" (*State Fund, supra, 70 Cal.App.4th at p. 651*.) After determining that the documents were privileged and that inadvertent disclosure did not waive the privilege, the court discussed an attorney's obligation. The Court of Appeal disagreed that the ABA opinion should regulate Telanoff's conduct. The court noted that the ABA Model Rules of Professional Conduct on which the opinion was based "do not establish ethical standards in California, as they have not been adopted in California and have no legal force

---

[8] We also reject plaintiffs' contention that defendants waived their right to assert the protection of the work product doctrine because they failed to make a proper objection at Germane's deposition. The record shows that at Germane's deposition, defendants' counsel, Calfo, did not know Johnson was using the document, so he could not raise a specific objection based on the work product doctrine. In fact, when asked how Johnson obtained the document, Johnson told Calfo, "It was put in Dr. Sances' file." Also, Calfo did make numerous objections to the document's use, including those where he stated that he objected "to the exhibit as a whole" because it lacked foundation and "to this whole line of inquiry with respect to an unknown document." Accordingly, there was no waiver.

of their own. [Citations.]" (*State Fund, at pp.* 655–656.) Likewise, the court held **[\*\*\*766]** that an "ABA formal opinion does not **[\*\*\*\*17]** establish an obligatory standard of conduct imposed on California lawyers." (*Id. at p.* 656.) Thus, under the circumstances "Telanoff should not have been sanctioned for engaging in conduct which has been condemned by an ABA formal opinion, but which has not been condemned by any decision, statute or [r]ule of [p]rofessional [c]onduct applicable in this state." (*Ibid.*)

**[\*\*1099]** *CA(3)*[⬆] **(3)** The *State Fund* court went on to articulate the standard to be applied prospectively: *HN4*[⬆] "When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified." (*State Fund, supra,* 70 Cal.App.4th *at pp.* 656–657.) **[\*\*\*\*18]** To ensure that its decision was clear in setting forth the applicable standard in these cases, the court explicitly stated that it "declared the standard governing the conduct of California lawyers" in such instances. (*Id. at p.* 657.)

The existing *State Fund* rule is a fair and reasonable approach. [9] The rule supports the work product doctrine (*§ 2018.030*), and is consistent with the **[\*818]** state's policy to "[p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable

_____

[9] We also reject plaintiffs' contention that *State Fund, supra, 70 Cal.App.4th 644,* only applies to materials protected by the attorney-client privilege. The Court of Appeal held that there was no distinction "between the attorney-client privilege and the work product privilege in this context [because] … [t]he *State Fund* standard applies to documents that are plainly privileged and confidential, regardless of whether they **[\*\*\*\*19]** are privileged under the attorney-client privilege, the work product privilege, or any other similar doctrine that would preclude discovery based on the confidential nature of the document." We agree.

aspects of those cases" and to "[p]revent attorneys from taking undue advantage of their adversary's industry and efforts." (*§ 2018.020, subds. (a),* *(b)*.)

The *State Fund* rule also addresses the practical problem of inadvertent disclosure in the context of today's reality that document production may involve massive numbers of documents. A contrary holding could severely disrupt the discovery process. As amicus curiae the Product Liability Advisory Council, Inc., argues, "Even apart from the inadvertent disclosure problem, the party responding to a request for mass production must engage in a laborious, time consuming process. If the document producer is confronted with the additional prospect that any privileged documents inadvertently produced will become fair game for the opposition, the minute screening and re-screening that inevitably would follow not only would add enormously to that burden but would slow the pace of discovery to a degree sharply at odds with the general goal of expediting litigation."

*CA(4)*[⬆] **(4)** Finally, we note that *HN5*[⬆] "[a]n attorney has an obligation not only to protect his **[\*\*\*767]** client's interests but also to respect the legitimate **[\*\*\*\*20]** interests of fellow members of the bar, the judiciary, and the administration of justice." (*Kirsch v. Duryea (1978)* 21 Cal.3d 303, 309 [146 Cal. Rptr. 218, 578 P.2d 935].) The *State Fund* rule holds attorneys to a reasonable standard of professional conduct when confidential or privileged materials are inadvertently disclosed.

*CA(5)*[⬆] **(5)** Here, it is true that Yukevich's notes were not so clearly flagged as confidential as were the forms in *State Fund, supra,* 70 Cal.App.4th 644. But, as the Court of Appeal observed, "[T]he absence of prominent notations of confidentiality does not make them any less privileged." The *State Fund* rule is an objective standard.*HN6*[⬆] In applying the rule, courts must consider whether reasonably competent counsel, knowing the circumstances of the litigation, would have concluded the materials were privileged, how much review was reasonably necessary to draw that conclusion, and when counsel's examination should have ended. (*Id. at pp.* 656–657.)

**[\*819]**

The standard was properly and easily applied here. Johnson admitted that after a minute or two of review he realized the notes related to the case and that Yukevich did not **[\*\*1100]** intend to reveal them. Johnson's own admissions and subsequent conduct clearly

42 Cal. 4th 807, *819; 171 P.3d 1092, **1100; 68 Cal. Rptr. 3d 758, ***767; 2007 Cal. LEXIS 13892, ****20

demonstrate that **[****21]** he violated the *State Fund* rule. We note, however, that such admissions are not required for the application of the objective standard in evaluating an attorney's conduct.

### Disqualification of Counsel and Experts

The court properly applied the *State Fund* rule and determined that Johnson violated it. The next question is whether disqualification was the proper remedy. *HN7*[🔼] We review the court's disqualification order for abuse of discretion. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 [86 Cal. Rptr. 2d 816, 980 P.2d 371].)

*CA(6)*[🔼] **(6)** The *State Fund* court held that *HN8*[🔼] " '[m]ere exposure' " to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification. (*State Fund, supra,* 70 Cal.App.4th at p. 657.) The court counseled against a draconian rule that " '[could] nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox.' " (*Ibid.*) However, the court, did not "rule out the possibility that in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in the manner **[****22]** specified above, assuming other factors compel disqualification." (*Ibid.*)

*CA(7)*[🔼] **(7)** After reviewing the document, Johnson made copies and disseminated them to plaintiffs' experts and other attorneys. In affirming the disqualification order, the Court of Appeal stated, "The trial court settled on disqualification as the proper remedy because of the unmitigable damage caused by Johnson's dissemination and use of the document." Thus, "the record shows that Johnson not only failed to conduct himself as required under *State Fund, [supra,* 70 Cal.App.4th 644,]* but also acted unethically in making full use of the confidential document." The Court of Appeal properly concluded that such use of the document undermined the defense experts' opinions and placed defendants at a great disadvantage. Without disqualification of plaintiffs' counsel and their experts, the damage caused by Johnson's use and dissemination of the notes was irreversible. Under the **[***768]** circumstances presented in this case, the trial court did not abuse its discretion by ordering disqualification for violation of the *State Fund* rule.

**[*820]**

Plaintiffs attempt to justify Johnson's use of the document by accusing the defense experts of giving false **[****23]** testimony during their depositions. Plaintiffs allege that the statements attributed to the experts in the document contradicted their deposition statements and that the experts lied about the technical evidence involved in the case. As an initial matter, we are not persuaded that any of the defense experts ever actually adopted as their own the statements attributed to them. The document is not a verbatim transcript of the strategy session, but Rowley's summary of points that Yukevich directed him to note. Yukevich then edited the document, adding his own thoughts and comments. As the trial court observed, the document was an interpretation and summary of what others thought the experts were saying. [10]

*CA(8)*[🔼] **(8)** Moreover, we agree with the Court of Appeal that, *HN9*[🔼] "when a writing is protected under the absolute attorney work product privilege, courts do not invade upon the attorney's thought processes by evaluating the content of the writing. Once [it is apparent] that the writing contains an attorney's impressions, conclusions, opinions, legal research or theories, the reading stops and the contents of the document for all practical purposes are off limits. In the same way, once the court determines that the writing is **[**1101]** absolutely privileged, the inquiry ends. Courts do not make exceptions based on the content of the writing." Thus, "regardless of its potential impeachment value, Yukevich's personal notes should never have been subject to opposing counsel's scrutiny and use."

*CA(9)*[🔼] **(9)** We also reject plaintiffs' argument that the crime or fraud exception should apply to privileged work product in this civil proceeding. *HN10*[🔼] Under the work product doctrine "[a] writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories *is not discoverable under any circumstances*." (*§ 2018.030, subd. (a),* italics

---

[10] While Johnson was testifying on direct examination at the hearing on the motion to disqualify, the court interjected: "The difficulty with that concept [that Germane's direct statement is contained in the document at issue] is that you're assuming it's a direct quote." Soon after the court further stated, "No, listen to me very carefully. You're assuming all along that this is a direct quotation from the so-called experts, the four that you recognize. Whereas, in truth, it may be **[****24]** that it is an interpretation of what someone said through somebody else's mind."

42 Cal. 4th 807, *820; 171 P.3d 1092, **1101; 68 Cal. Rptr. 3d 758, ***768; 2007 Cal. LEXIS 13892, ****24

 **[****25]** added.) With respect to such a writing, the Legislature intended that the crime or fraud exception only apply "in any official investigation by a law enforcement agency or proceeding or action brought by a public prosecutor … if the services of the lawyer were sought or obtained to enable or aid anyone to commit … a crime or fraud." (*§ 2018.050*.) By its own terms, the crime or fraud exception does not apply here.

 **[*821]**

### DISPOSITION

We affirm the Court of Appeal's judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

---

**End of Document**

**Amiad Kushner, Esq.**
**Seiden Law Group LLP**
April 13, 2021
Page 6



**EXHIBIT 3**

**Clark v. Superior Court, 196 Cal.App.4th 37 (2011)**

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Sanchez Ritchie v. Energy, S.D.Cal., August 13, 2014

196 Cal.App.4th 37
Court of Appeal, Fourth District, Division 1, California.

Grant L. CLARK, Petitioner,
v.
The SUPERIOR COURT of San Diego County, Respondent;
Verisign, Inc., et al., Real Parties in Interest.

No. D058568.
|
June 2, 2011.
|
Rehearing Denied June 22, 2011.
|
Review Denied Aug. 17, 2011.

**Synopsis**
**Background:** Former employee brought action against employer for breach of contract and securities fraud. Employer moved to disqualify employee's attorneys. The Superior Court, San Diego County, No. 37-2009-00081864-CU-WT-CTL, William R. Nevitt, Jr., J., granted the disqualification motion. Employee petitioned for writ of mandate.

**Holdings:** The Court of Appeal, McDonald, J., held that:

[1] evidence supported finding that employee gave his attorneys numerous documents subject to employer's attorney-client privilege;

[2] in camera review was not a prerequisite to trial court's determination that the documents were privileged;

[3] evidence supported finding that employee's attorneys excessively reviewed the documents; and

[4] disqualifying law firm was proper remedy.

Petition denied.

West Headnotes (15)

**[1]** **Appeal and Error**⬦Disqualification

A trial court's ruling on an attorney disqualification motion is reviewed under the deferential abuse of discretion standard.

2 Cases that cite this headnote

**[2]** **Appeal and Error**⬦Disqualification
**Attorneys and Legal Services**⬦Discretion of court

In exercising its discretion on an attorney disqualification motion, the trial court must make a reasoned judgment that complies with applicable legal principles and policies, and the order is subject to reversal only when there is no reasonable basis for the trial court's decision.

6 Cases that cite this headnote

**[3]** **Appeal and Error**⬦Counsel

In deciding whether a trial court abused its discretion on an attorney disqualification motion, courts are bound by the substantial evidence rule; the trial court's order is presumed correct, all intendments and presumptions are indulged to support it, conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive.

16 Cases that cite this headnote

**[4]** **Appeal and Error**⬦Disqualification

Where there are no express findings on an

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

attorney disqualification motion, courts must review the trial court's exercise of discretion based on implied findings that are supported by substantial evidence.

9 Cases that cite this headnote

**[5]**     **Attorneys and Legal Services** Inherent power or jurisdiction

A trial court's authority to disqualify an attorney derives from its inherent power to "control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." West's Ann.Cal.C.C.P. § 128(a)(5).

4 Cases that cite this headnote

**[6]**     **Attorneys and Legal Services** Relation of remedy to client's right to counsel of choice

When ruling on an attorney disqualification motion, the paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar, and the important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of the judicial process. West's Ann.Cal.C.C.P. § 128(a)(5).

7 Cases that cite this headnote

**[7]**     **Attorneys and Legal Services** Labor and Employment

Trial court's finding that employee gave his attorneys numerous documents subject to employer's attorney-client privilege, in disqualifying the attorneys' law firm from representing employee in breach of contract and securities fraud litigation, was supported by substantial evidence, including employer's

counsel's declaration that all of the disputed communications involved an officer or employee of employer transmitting a communication to an attorney for employer or persons working at the attorney's direction, and evidence that employee himself had designated some of the documents as attorney-client privileged while he worked for employer. West's Ann.Cal.C.C.P. § 128(a)(5).

23 Cases that cite this headnote

**[8]**     **Privileged Communications and Confidentiality** In camera review

In camera review of employer's documents was not a prerequisite to trial court's determination that the documents were privileged, in disqualifying employee's attorneys from representing employee in breach of contract and securities fraud litigation for excessively reviewing the documents. West's Ann.Cal.C.C.P. § 128(a)(5).

7 Cases that cite this headnote

**[9]**     **Privileged Communications and Confidentiality** Professional Character of Employment or Transaction

To determine whether a communication is covered by the attorney-client privilege, the focus of the inquiry is the dominant purpose of the relationship between the parties to the communication; when the party claiming the privilege shows the dominant purpose of the relationship between the parties to the communication was one of attorney-client, the communication is protected by the privilege.

20 Cases that cite this headnote

**[10]**    **Mandamus** Scope of inquiry and powers of court

**Clark v. Superior Court, 196 Cal.App.4th 37 (2011)**

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

Employee's failure to present a summary of all of the evidence presented at the trial court hearing most favorably to the judgment forfeited the argument that no substantial evidence supported trial court's finding that employee's counsel excessively reviewed employer's attorney-client privileged materials, for purposes of employee's petition for writ of mandate challenging the disqualification of employee's counsel from representing him in breach of contract and securities fraud litigation.

3 Cases that cite this headnote

**[11]**   **Appeal and Error**◄─Sufficiency of evidence; verdict, findings, and judgment

Failure to set forth in a brief all of the material evidence on an issue waives a claim of insufficiency of the evidence.

20 Cases that cite this headnote

**[12]**   **Attorneys and Legal Services**◄─Labor and Employment

Trial court's finding that employee's attorneys violated their obligation to refrain from examining attorney-client privileged materials any more than was essential to ascertain if the materials were privileged*, in disqualifying the attorneys' law firm from representing employee in breach of contract and securities fraud litigation, was supported by substantial evidence, including evidence that the attorneys' initial review of the documents examined the content of each document in sufficient detail to allow them to determine the documents' subject matter for categorization, and evidence that after being warned that they possessed privileged documents attorneys performed a subsequent review to determine whether the dominant purpose of an e-mail was business or legal advice, which necessarily involved an assessment of its contents. West's Ann.Cal.C.C.P. § 128(a)(5).

See *Cal. Jur. 3d, Evidence, § 515; Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2010) ¶¶ 4:239.20, 7:150.1 (CAPROFR Ch. 4-D, 7-B); 1 Witkin, Cal. Procedure (5th ed. 2008) Attorneys, § 539.*

11 Cases that cite this headnote

**[13]**   **Attorneys and Legal Services**◄─Receipt of or Access to Privileged Information

A lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged must (1) refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and (2) immediately notify the sender that he or she possesses material that appears to be privileged.

13 Cases that cite this headnote

**[14]**   **Attorneys and Legal Services**◄─Labor and Employment

Trial court acted within its discretion in disqualifying the law firm that represented employee in breach of contract and securities fraud litigation as a remedy for the firm's excessive review of documents covered by employer's attorney-client privilege, where firm retained the documents for over nine months, and the inevitable questions about the sources of firm's knowledge could undermine the public trust and confidence in the integrity of the adjudicatory process. West's Ann.Cal.C.C.P. § 128(a)(5).

1 Cases that cite this headnote

**[15]**   **Attorneys and Legal Services**◄─Labor and

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

Employment

Trial court's finding that there was a genuine likelihood that employee's attorneys' review of employer's attorney-client privileged materials could affect the outcome of the proceedings, in disqualifying the attorneys' law firm from representing employee in litigation against employer, was supported by substantial evidence, including evidence that employee used a privileged memo as the basis for a securities fraud claim, and that questions employee posed to employer's former chief executive officer might have derived from a privileged legal opinion from an outside law firm. West's Ann.Cal.C.C.P. § 128(a)(5).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*364** Higgs, Fletcher & Mack, San Diego, John Morris, Steven J. Cologne, Thomas W. Ferrell, Sam Sherman and Victoria E. Fuller for Petitioner.

No appearance for Respondent.

Paul, Hastings, Janofsky & Walker, Los Angeles, Nancy L. Abell, Thomas A. Zaccaro, Eleanor K. Mercado and Kai S. Bartolomeo for Real Parties in Interest.

**Opinion**

McDONALD, J.

**\*41** Grant Clark seeks a writ of mandate directing the Superior Court of San Diego County to vacate its November 8, 2010, order disqualifying Clark's chosen law firm of Higgs, Fletcher & Mack LLP (Higgs) from continuing to represent Clark in his action against real parties in interest VeriSign, Inc., et al. (Verisign). VeriSign sought the disqualification order because Higgs allegedly received from Clark numerous documents protected by the attorney-client privilege held by VeriSign, and Higgs thereafter (1) excessively reviewed the documents, (2) did not immediately return the documents and (3) affirmatively employed the documents to pursue Clark's lawsuit against VeriSign. VeriSign asserted these actions violated Higgs's obligations under

*Rico v. Mitsubishi Motors Corp.* (2007) 42 Cal.4th 807, 68 Cal.Rptr.3d 758, 171 P.3d 1092 (*Rico* ) and *State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 82 Cal.Rptr.2d 799 (*State Fund* ) and warranted disqualification of Higgs as Clark's counsel in this action. The trial court found, on disputed facts, Higgs had received and excessively reviewed privileged documents, disqualification was warranted because there was a genuine likelihood Higgs's conduct could affect the outcome of the litigation, and the paramount concern of protecting the public trust in the administration of justice and integrity of the bar outweighed any infringement of Clark's right to the counsel of his choice.

In this writ proceeding, Clark asserts the disqualification order was an abuse of discretion. Clark's principal argument is that VeriSign's claim of privilege as to the contested documents is "highly suspect," and he asserts there was no substantial evidence on which the court could conclude Higgs violated its obligations under *Rico* and *State Fund* until it had first conducted an in camera review of the contested documents to determine whether the documents were *in fact* privileged. Second, Clark asserts that, even assuming some or all of the documents were privileged, there is no evidence to support the conclusion that Higgs did not properly discharge its obligations under *Rico* and *State Fund.* Finally, Clark asserts that disqualification was an overly draconian remedy because there was no evidence to support the conclusion that Higgs's review of the privileged documents provided Clark with any **\*42** unfair advantage that would undermine the integrity of the judicial proceedings, and any taint could have been cured by a **\*\*365** protective order, thereby preserving Clark's right to counsel of his choice.

I

FACTUAL AND PROCEDURAL BACKGROUND

*A. The Parties*

VeriSign provides internet infrastructure services. Clark is an active member of the California State Bar with experience in litigation, and had also acted as in-house and general counsel for corporations.

Clark v. Superior Court, 196 Cal.App.4th 37 (2011)

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

### B. *The Parties' Relationship*

In late September 2007 VeriSign hired Clark as its chief administrative officer. In conjunction with his employment, Clark signed VeriSign's nondisclosure agreement, which included a provision that he would not remove VeriSign's confidential or privileged information and would return all confidential or privileged information to VeriSign on termination of his employment.

In late 2008, Clark was informed by VeriSign that Clark's position was being eliminated. Clark's employment was terminated effective December 31, 2008. In January 2009, Clark filed his lawsuit against VeriSign. Clark was represented by Higgs.

### C. *The March and April 2009 Correspondence*

On March 25, 2009, Mr. Cologne (an attorney with Higgs representing Clark in the lawsuit against VeriSign) sent a letter to VeriSign's counsel stating Clark intended to assert an additional claim based on allegations that "deception and delay [surround] the termination of [William] Roper," VeriSign's former chief executive officer. Cologne's letter stated the deception "played out against the backdrop of a June 4, 2008[,] internal memorandum from Ken Bond, Senior Vice President in charge of investor relations."

Counsel for VeriSign suspected Cologne was referring to an e-mail sent by Bond (senior vice president in charge of investor relations) to Richard **43** Goshorn (VeriSign's general counsel) and Susan Insley (VeriSign's director of internal audit acting under the direction of VeriSign's law department) concerning a confidential internal investigation. VeriSign, believing the so-called "Bond memo" was a privileged communication Clark had improperly taken from VeriSign in violation of the nondisclosure agreement,[1] demanded in a letter to Cologne dated March 31, 2009, that Clark immediately return all of VeriSign's documents, including any attorney-client privileged information, and to cease and desist using that information or documents. When Cologne was silent in response to VeriSign's demand,[2] VeriSign's attorney again wrote to Cologne reiterating its demand that Clark return confidential or privileged documents and cease using the documents, and

specifically referred to *Rico* and the obligations imposed by that case. Clark and Higgs responded by denying any improper conduct, and apparently did not return any materials to VeriSign.

**366** D. *The Discovery of Clark's Possession of Privileged Documents*

In mid-February 2010, Clark produced documents pursuant to VeriSign's discovery demand. VeriSign thereafter determined Clark's production included numerous privileged documents, many of which were prominently marked "Attorney–Client Privileged," "Prepared at Request of Counsel," and/or "Highly Confidential." VeriSign also determined Clark was in possession of other confidential documents taken in violation of the nondisclosure agreement.

In mid-March 2010, VeriSign's counsel wrote to Higgs demanding Clark return the privileged materials (which it identified by Bates numbers), return the other documents VeriSign contended were confidential or proprietary, and cease using any privileged or confidential information to pursue Clark's lawsuit. Clark's response did not include an agreement to return the privileged documents. Although Clark subsequently agreed to return the documents he characterized as "irrelevant," and later agreed to destroy most of the documents VeriSign identified as protected by the attorney-client privilege, Higgs thereafter indicated it would be unable to destroy the documents because VeriSign's motion to compel Clark to answer certain deposition **44** questions required that he retain those documents for use in opposing the motion to compel answers. By the fall of 2010, Higgs had neither returned nor destroyed the allegedly privileged documents.

### E. *The Use of the Privileged Documents*

In the fall of 2010, the court granted VeriSign's motion to compel Clark to answer certain deposition questions. At his October 1, 2010, deposition, Clark conceded certain documents contained privileged information but stated that his counsel would decide whether to seek their admission at trial. More importantly, Clark conceded he used the Bond memo as the basis for one of the securities fraud claims he was pursuing against VeriSign, and apparently was relying on another privileged document in support of his breach of contract and securities fraud

Clark v. Superior Court, 196 Cal.App.4th 37 (2011)

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

claims.

F. *The Motion to Disqualify*

Promptly after completing Clark's deposition, VeriSign moved to disqualify Higgs and for ancillary relief. VeriSign argued Clark and Higgs had improperly obtained, retained, reviewed and used privileged documents, and had obtained an improper advantage from that conduct, in violation of the requirements imposed by *Rico, supra,* 42 Cal.4th 807, 68 Cal.Rptr.3d 758, 171 P.3d 1092 and *State Fund, supra,* 70 Cal.App.4th 644, 82 Cal.Rptr.2d 799. In support of the motion, VeriSign provided (among other things) a declaration from Goshorn attesting to the circumstances surrounding (and privileged nature of) the disputed communications.

Clark opposed the motion, asserting the standards imposed and remedies available under *State Fund* and *Rico* have no application unless the documents are *inadvertently* provided to opposing counsel by the attorneys for the party holding the privilege. Clark alternatively argued that no sanctions may be imposed absent a showing the documents obtained by Higgs were actually privileged, and the showing made by VeriSign was insufficient to show that the dominant purpose of each communication was for legal, rather than business, advice. Clark finally asserted Higgs did not misuse any of the material obtained and there was no proof VeriSign had suffered any disadvantage as a result of Higgs's review of the documents.

**367 G. *The Challenged Disqualification Order*

The trial court granted the motion to disqualify Higgs. The court first found Higgs had received numerous documents from Clark subject to the attorney-client privilege, some of which "bore obvious indicia of the privilege held by *45 VeriSign," were "explicitly marked as privileged by Mr. Clark while he was employed by VeriSign," and/or were conceded to be privileged by Clark.[3]

The court, after noting Higgs had a "duty not to review these documents more than was reasonably necessary to make the determination that they are privileged and to immediately notify VeriSign that they were in possession of VeriSign's privileged documents," specifically found

that "[d]espite repeated warnings from VeriSign's counsel, [Higgs's] review exceeded this limit" and also found "[Higgs] did not immediately notify VeriSign that [it was] in possession of the documents."

The court concluded Higgs's conduct warranted disqualification as well as other ancillary relief. The court recognized that when ruling on a disqualification motion, which requires resolution of the tension between the client's right to choose his or her counsel and the need to maintain ethical standards, the paramount concern must be to preserve the public trust in the scrupulous administration of justice. The court resolved the conflict by concluding Clark's right to counsel of his choice "does not trump the policy behind protecting the attorney-client privilege from being undermined." Accordingly, the court ordered that (1) Higgs be disqualified, (2) the documents be returned, and (3) Higgs be enjoined from discussing the contents of the documents with anyone or providing Higgs's work product in the action to either Clark or any representative of Clark. The court ruled these measures were prophylactic, not punitive, and were necessary to protect VeriSign's rights as well as the integrity of the judicial proceedings, and found there " 'exists a *genuine likelihood that the ... misconduct of* [*Higgs* ] *will affect the outcome of the proceedings before the court.*' " (*Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453, 467, 51 Cal.Rptr.3d 561.)

H. *The Writ Petition*

Clark timely filed this writ petition, requesting we vacate the order disqualifying Higgs from acting as Clark's attorney. We issued an order to show cause, and the parties have fully briefed this matter.

*46 In this writ proceeding, Clark raises three claims. First, he argues VeriSign's claim of privilege as to the contested documents is "highly suspect," and asserts it was improper for the court to conclude Higgs violated its obligations under *Rico* without reviewing the contested documents to determine whether they were in fact privileged. Second, Clark asserts that, even assuming some or all of the documents were in fact privileged, there is no evidence to support the conclusion that Higgs did not properly discharge its obligations under *Rico.* Finally, he asserts disqualification was an overly draconian remedy because there was no evidence to support the conclusion that Higgs's review of the privileged documents provided Clark with any unfair advantage that would undermine the integrity of the judicial proceedings, and any taint or prejudice could have been cured by a

protective **\*\*368** order preserving Clark's right to counsel of his choice.

## II

## LEGAL STANDARDS

A. *Standard of Review*
[1] [2] A trial court's ruling on a disqualification motion is reviewed under the deferential abuse of discretion standard. ( *People ex rel Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144, 86 Cal.Rptr.2d 816, 980 P.2d 371 (*SpeeDee* ); *McPhearson v. Michaels Co.* (2002) 96 Cal.App.4th 843, 851, 117 Cal.Rptr.2d 489; *City National Bank v. Adams* (2002) 96 Cal.App.4th 315, 322, 117 Cal.Rptr.2d 125.) "In exercising its discretion, the trial court must make a reasoned judgment that complies with applicable legal principles and policies." ( *Strasbourger Pearson Tulcin Wolff Inc. v. Wiz Technology, Inc.* (1999) 69 Cal.App.4th 1399, 1403, 82 Cal.Rptr.2d 326 (*Strasbourger* ); accord *McPhearson,* at p. 851, 117 Cal.Rptr.2d 489.) "The order is subject to reversal only when there is no reasonable basis for the trial court's decision." ( *Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.* (1998) 68 Cal.App.4th 856, 860, 80 Cal.Rptr.2d 634 (*Federal Home* ).)

[3] [4] "In deciding whether the trial court abused its discretion, '[w]e are ... bound ... by the substantial evidence rule.' " ( *Strasbourger, supra,* 69 Cal.App.4th at p. 1403, 82 Cal.Rptr.2d 326.) The trial court's order is " 'presumed correct; all intendments and presumptions are indulged to support [it]; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial **\*47** court's resolution of any factual disputes arising from the evidence is conclusive.' " (*Ibid.;* accord *Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 728, 135 Cal.Rptr.2d 415.) Hence, we presume the trial court found in VeriSign's favor on "all disputed factual issues." ( *Strasbourger,* at p. 1403, 82 Cal.Rptr.2d 326.) Further, "where there are no express findings, we must review the trial court's exercise of discretion based on implied findings that are supported by substantial

evidence." ( *Federal Home, supra,* 68 Cal.App.4th at p. 860, 80 Cal.Rptr.2d 634.) "In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable." (*Ibid.*) "If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence." ( *SpeeDee, supra,* 20 Cal.4th at p. 1143, 86 Cal.Rptr.2d 816, 980 P.2d 371; accord *City National Bank v. Adams, supra,* 96 Cal.App.4th at p. 322, 117 Cal.Rptr.2d 125.)

B. *Legal Standards for Disqualification*
[5] A trial court's authority to disqualify an attorney derives from its inherent power to "control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(5); *SpeeDee,* 20 Cal.4th at p. 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371; see also *Oaks Management Corporation v. Superior Court, supra,* 145 Cal.App.4th at p. 462, 51 Cal.Rptr.3d 561.) "The power is frequently exercised on a showing that disqualification **\*\*369** is required under professional standards governing ... potential adverse use of confidential information." ( *Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1723–1724, 20 Cal.Rptr.2d 756.)

[6] A disqualification motion involves a conflict between a client's right to counsel of his or her choice, on the one hand, and the need to maintain ethical standards of professional responsibility, on the other. ( *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846, 43 Cal.Rptr.3d 771, 135 P.3d 20.) Although disqualification necessarily impinges on a litigant's right to counsel of his or her choice, the decision on a disqualification motion "involves more than just the interests of the parties." ( *SpeeDee, supra,* 20 Cal.4th at p. 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371.) When ruling on a disqualification motion, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to

Clark v. Superior Court, 196 Cal.App.4th 37 (2011)

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

ethical considerations that **\*48** affect the fundamental principles of our judicial process." ( *SpeeDee,* at p. 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371; see also *Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 705–706, 3 Cal.Rptr.3d 877.)

The *SpeeDee* court recognized that one of the fundamental principles of our judicial process is the attorney-client privilege: "Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. The attorney-client privilege is a hallmark of our jurisprudence that furthers the public policy of ensuring ' "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." ' [Quoting *Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 599, 208 Cal.Rptr. 886, 691 P.2d 642.]" ( *SpeeDee, supra,* 20 Cal.4th at p. 1146, 86 Cal.Rptr.2d 816, 980 P.2d 371.) Because it is this privilege that was the touchstone for the trial court's disqualification ruling, we outline the rules developed for safeguarding that privilege.

### C. *Rico and State Fund*

In *State Fund, supra,* 70 Cal.App.4th 644, 82 Cal.Rptr.2d 799, the court evaluated the ethical obligations of a lawyer when that lawyer comes into possession of privileged materials without the holder of the privilege having waived it. ( *Id.* at pp. 654–655, 82 Cal.Rptr.2d 799.) The court, to "protect the sanctity of the attorney-client privilege and to discourage unprofessional conduct" ( *id* at p. 657, 82 Cal.Rptr.2d 799), ruled that:

"the obligation of an attorney receiving privileged documents due to the inadvertence of another is as follows: When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged." ( *Id.* at p. 656, 82 Cal.Rptr.2d 799.)

In *Rico,* the court adopted the obligations articulated in *State Fund* and extended them to materials protected by the attorney work product privilege, noting those obligations were rooted in the attorney's obligation to " 'respect the legitimate **\*\*370** interests of fellow members of the bar, the judiciary, and the administration of justice.' " ( *Rico, supra,* 42 Cal.4th at p. 818, 68 Cal.Rptr.3d 758, 171 P.3d 1092.) *Rico* also addressed the question of remedy when the attorney, having obtained privileged documents, did not comply with those obligations. *Rico* echoed *State Fund's* caution that " ' "[m]ere exposure" ' to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification" ( *Rico,* at p. 819, 68 Cal.Rptr.3d 758, 171 P.3d 1092, quoting *State Fund,* at p. 657, 82 Cal.Rptr.2d 799), **\*49** because *Rico* agreed such a "a draconian rule ... ' "[could] nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox." ' " ( *Rico,* at p. 819, 68 Cal.Rptr.3d 758, 171 P.3d 1092.) *Rico* also stated, however, that " 'in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in the manner specified above, assuming other factors compel disqualification.' " ( *Ibid.*)

III

ANALYSIS

A. *Substantial Evidence Supports the Finding Higgs Received Privileged Documents from Clark*

[7] The trial court expressly found Clark gave Higgs numerous documents subject to the attorney-client privilege. Substantial evidence supports this finding: some of the documents were explicitly designated *by Clark* as attorney-client privileged while he was employed by Verisign; Higgs acknowledged (during the May through July correspondence between counsel attempting to resolve the document issues) that a substantial portion of the documents were privileged; and Higgs conceded at oral argument below that some of the documents were privileged. Additionally, for the documents Clark did not concede were privileged,

Clark v. Superior Court, 196 Cal.App.4th 37 (2011)

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

VeriSign's counsel provided a declaration stating the identities of the parties to each of the sets of communications (one of whom was invariably either an in-house attorney or outside counsel) and the general nature of the purpose of the communication (all of which involved obtaining legal advice on a variety of subjects).

In *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 101 Cal.Rptr.3d 758, 219 P.3d 736 (*Costco* ), the court explained that when a trial court examines a claim that a communication is protected by the attorney-client privilege, "[t]he party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e., *a communication made in the course of an attorney-client relationship.* [Citations.] Once that party establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply." ( *Id.* at p. 733, 101 Cal.Rptr.3d 758, 219 P.3d 736, italics added.) Here, VeriSign's showing provided substantial evidence from which the court could have found each of the contested documents involved communications between a VeriSign employee and a VeriSign attorney in the course of an attorney-client relationship.

[8] **\*50** Clark's principal contention is that an in camera review of the documents was a *prerequisite* to determining whether the documents were in fact privileged. Clark asserts that under **\*\*371** *2,022 Ranch v. Superior Court* (2003) 113 Cal.App.4th 1377, 7 Cal.Rptr.3d 197 (*2,022 Ranch* ) the determination of privilege turns on the "dominant purpose" of each communication. Clark relies on the portion of the *2,022 Ranch* opinion in which the court stated:

"In certain instances it is difficult to determine if the attorney-client privilege ... attaches to a communication, particularly where there may be more than one purpose for that communication: ' " 'Where it is clear that the communication has but a single purpose, there is little difficulty in concluding that the privilege should be applied or withheld accordingly. If it appears that the communication is to serve a dual purpose, one for transmittal to an attorney "in the course of professional employment" and one not related to that purpose, the question presented to the trial court is as to *which purpose predominates....*' "

[Citation.]' ( *Travelers Ins. Companies v. Superior Court* (1983) 143 Cal.App.3d 436, 452, 191 Cal.Rptr.

871, italics added.) This 'dominant purpose' test not only looks to the dominant purpose for the communication, but also to the dominant purpose of the attorney's *work.* [Citations.] Thus, 'the attorney-client privilege [would] not apply without qualification where the attorney was merely acting as a negotiator for the client [citation], or merely gave business advice [citation], or was merely acting as a trustee for the client.' " (*2,022 Ranch,* at pp. 1390–1391, 7 Cal.Rptr.3d 197.)

Clark asserts that, because the dominant purpose of the communications could only be ascertained by examining the contents of each specific communication in camera, and no examination proceeding was involved here, there was no evidence to permit the conclusion any of the documents were privileged.[4] However, Clark's argument ignores that the *Costco* court, after observing "Evidence Code section 915 prohibits disclosure of the information claimed to be privileged as a confidential communication between attorney and client 'in order to rule on the claim of privilege' " ( *Costco, supra,* 47 Cal.4th at pp. 731–732, 101 Cal.Rptr.3d 758, 219 P.3d 736), stated "because the privilege protects a *transmission* irrespective of its content, there should be no need to examine the content in order to rule on a claim of privilege." ( *Id.* at p. 739, 101 Cal.Rptr.3d 758, 219 P.3d 736.) *Costco* went on to state **\*51** that, "[b]ecause we hold that a court may not order disclosure of a communication claimed to be privileged to allow a ruling on the claim of privilege, we disapprove two cases plaintiffs have cited in support of the trial court's orders," including *2,022 Ranch.* ( *Costco,* at p. 739, 101 Cal.Rptr.3d 758, 219 P.3d 736.) *Costco,* reviewing the approach advocated in *2,022 Ranch,* noted the *2,022 Ranch* court:

"distinguished communications reporting the results of factual investigations from those reflecting the rendering of legal advice, held only the latter were privileged, and ordered the trial court to review each of the communications to **\*\*372** determine its dominant purpose. [Citation.] In this respect, the court erred. The proper procedure would have been for the trial court first to determine the dominant purpose *of the relationship* between the insurance company and its in-house attorneys, i.e., was it one of attorney-client or one of claims adjuster-insurance corporation (as some of the evidence suggested, [citation] ). The corporation, having the burden of establishing the preliminary fact that the communications were made during the course of an attorney-client relationship [citation], was free to *request* an in camera review of the communications to

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

aid the trial court in making that determination, but the trial court could not *order* disclosure of the information over the corporation's objection. If the trial court determined the communications were made during the course of an attorney-client relationship, the communications, including any reports of factual material, would be privileged, even though the factual material might be discoverable by some other means. If the trial court instead concluded that the dominant purpose of the relationship was not that of attorney and client, the communications would not be subject to the attorney-client privilege and therefore would be generally discoverable." ( *Costco,* at pp. 739–740, 101 Cal.Rptr.3d 758, 219 P.3d 736.)

[9] We interpret *Costco's* disapproval of *2,022 Ranch* as making clear that, to determine whether a communication is privileged, the focus of the inquiry is the dominant purpose of the relationship between the parties to the communication. Under that approach, when the party claiming the privilege shows the dominant purpose of the relationship between the parties to the communication was one of attorney-client, the communication is protected by the privilege.

Employing *Costco's* approach, there was substantial evidence to support the trial court's finding that *all* of the disputed communications, including the so-called Bond memo, were privileged communications because VeriSign's declarations established all of the disputed communications involved an officer or employee of VeriSign transmitting a communication to an attorney for VeriSign (either Goshorn[5] or other attorneys) or persons working at the **52** attorney's direction. Although Clark continues to assert the Bond memo e-mail was not privileged, he conceded below that the Bond memo was sent by an employee of VeriSign to both Goshorn (VeriSign's attorney) and Insley, who (as the director of internal audit for VeriSign) was reporting directly to Goshorn.[6] Clark's argument—that the Bond memo was not privileged because " 'the *dominant purpose of the e-mail* was Mr. Bond's expression of frustration ... concerning a VeriSign investigation' "—appears irreconcilable with *Costco's* admonition that the relevant inquiry is not the *content* of the communication but is instead the *relationship* of the communicators. We conclude there was substantial evidence to support the trial **373** court's finding that all of the disputed communications were privileged communications.

B. *Substantial Evidence Supports the Finding that*

*Higgs Excessively Reviewed Privileged Materials*

[10] Higgs, after coming into possession of the privileged documents, was obligated not to review these documents more than was reasonably necessary to make the determination that they were privileged and to immediately notify VeriSign that it was in possession of VeriSign's privileged documents. The trial court found Higgs violated those obligations because (1) "[d]espite repeated warnings from VeriSign's counsel, [Higgs's] review exceeded this limit," and (2) "[Higgs] did not immediately notify VeriSign that [it was] in possession of the documents." Clark appears to argue that no substantial evidence supports the conclusion that Higgs excessively reviewed privileged documents in violation of the obligations imposed by *State Fund* and *Rico.* Clark's argument appears to be that Higgs obtained the documents from Clark properly, made no effort to hide that the documents were in its possession, met and conferred with VeriSign to resolve VeriSign's claims of privilege, and "responsibly sequestered" the disputed documents while this process was ongoing without excessively reviewing the documents, thus complying with its obligations.

[11] As a preliminary matter, Clark has waived this contention because, rather than presenting a summary of *all* of the evidence presented at the hearing below most favorably to the judgment, Clark only discusses the evidence *he* presented on this issue.[7] "Failure to set forth [all of] the material evidence on an issue waives a claim of insufficiency of the evidence." **53** ( *Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96, 131 Cal.Rptr.2d 746.) When parties assert a challenge to the trial court's decision based on the absence of substantial supporting evidence, they " 'are required to set forth in their brief *all* the material evidence on the point and *not merely their own* evidence. Unless this is done the error is deemed to be waived.' " ( *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881, 92 Cal.Rptr. 162, 479 P.2d 362.) By discussing only evidence tending to support his position, Clark has waived his right to challenge the sufficiency of the evidence to support the court's conclusions. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246, 19 Cal.Rptr.3d 416, *Brockey v. Moore, supra,* 107 Cal.App.4th at pp. 96–97, 131 Cal.Rptr.2d 746.)

[12] [13] More importantly, even if the argument had not been waived, there is substantial evidence that Higgs's actions violated *State Fund* and *Rico.* Those cases make clear that "a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged ... [must (1) ] refrain from examining the materials any

Clark v. Superior Court, 196 Cal.App.4th 37 (2011)

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

more than is essential *to ascertain if the materials are privileged,* and [ (2) ] immediately notify the sender that he or she possesses material that appears to be privileged." ( **374 *State Fund, supra,* 70 Cal.App.4th at p. 656, 82 Cal.Rptr.2d 799.) Under *Costco,* once the examination showed a document had been transmitted between an attorney representing VeriSign and either an officer or employee of VeriSign, that examination would suffice to ascertain the materials are privileged, and any further examination would exceed permissible limits. ( *Costco, supra,* 47 Cal.4th at p. 733, 101 Cal.Rptr.3d 758, 219 P.3d 736.) There is evidence to support the finding that Higgs's review exceeded those limitations: Higgs's initial review also examined the content of each document in sufficient detail to allow Higgs to "determine their subject matter for categorization," and Higgs's subsequent review (occurring after VeriSign warned that Higgs possessed privileged documents) was focused on "whether the dominant purpose of the e-mail was business or legal advice," which necessarily involved an assessment of its contents.[8] There was also some evidence from which a trial court could have concluded Higgs affirmatively used some of the substantive information contained in the privileged documents to question witnesses or to support Clark's claims, and Clark concedes *54 Higgs employed the Bond memo to craft a claim against VeriSign, which necessarily required an excessive review of the content of that memo beyond what would be permissible to determine the memo was privileged under *Costco.* We conclude substantial evidence supports the finding Higgs violated its obligations as outlined in *State Fund* and *Rico.*

### C. *The Selected Remedy Was Not an Abuse of Discretion*

The *Rico* court also addressed the question of remedy when the attorney, having obtained privileged documents, violated the obligations imposed under *State Fund.* Although *Rico* echoed *State Fund's* caution that " ' "[m]ere exposure" ' to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification" ( *Rico, supra,* 42 Cal.4th at p. 819, 68 Cal.Rptr.3d 758, 171 P.3d 1092, quoting *State Fund, supra,* 70 Cal.App.4th at p. 657, 82 Cal.Rptr.2d 799), *Rico* also stated that " 'in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in the manner specified above, assuming other factors compel disqualification.' " (*Ibid.*)

[14] Clark asserts the trial court erred when it concluded the appropriate remedy for the violations was to disqualify Higgs. However, Clark does not suggest the court *misunderstood* the applicable legal principles guiding its discretionary decision.[9] Instead, Clark disagrees with *how* the court exercised its discretion, specifically **375 arguing there was no showing of any "risk of prejudice" from Higgs's review and use of the privileged documents.

When exercising its discretion, a trial court must "make a reasoned judgment that complies with applicable legal principles and policies" ( *Strasbourger, supra,* 69 Cal.App.4th at p. 1403, 82 Cal.Rptr.2d 326), and we will reverse "only when there is no reasonable basis for the trial court's decision." ( *Federal Home, supra,* 68 Cal.App.4th at p. 860, 80 Cal.Rptr.2d 634.) "In deciding whether the trial court abused its discretion, '[w]e are ... bound ... by the substantial evidence rule.' " ( *Strasbourger,* at p. 1403, 82 Cal.Rptr.2d 326.)

The trial court's order, expressly "designed to be prophylactic, not punitive," found disqualification was necessary "not only to protect the rights of VeriSign but also to preserve the integrity of the judicial proceedings," and *55 further found there was a "genuine likelihood" that Higgs's review of the privileged materials could affect the outcome of the proceedings. The former finding, which reflects a sensitivity to *SpeeDee's* admonition that the "paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar" ( *SpeeDee, supra,* 20 Cal.4th at p. 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371), has substantial evidentiary support. On this record, a trier of fact could conclude Higgs's continued representation of Clark would trigger doubts over the integrity of the judicial process because whenever Higgs's advocacy against VeriSign began to touch on matters contained in the privileged documents that Higgs retained (for over nine months) and excessively reviewed, the inevitable questions about the sources of Higgs's knowledge (even if Higgs in fact obtained such knowledge from legitimate sources) could undermine the public trust and confidence in the integrity of the adjudicatory process.[10]

[15] The latter finding—that there was a "genuine likelihood" Higgs's review of the privileged materials could affect the outcome of the proceedings—also has some evidentiary support. Certainly, Higgs's review and use of the Bond memo had a direct and immediate impact on the legal posture of Clark's case. Moreover, even if the Bond memo were later determined to be discoverable, there were other documents (also found to be privileged

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

by the trial court) the trial court could have found had been used by Clark to develop or support his case against VeriSign.[11] Finally, and contrary to Higgs's apparent contention that disqualification is improper absent an affirmative showing of existing injury from the misuse of privileged documents, disqualification is proper as a prophylactic measure to prevent future prejudice to the opposing party from information the attorney should not have **376 possessed. (See *Chronometrics, Inc. v. Sysgen, Inc.* (1980) 110 Cal.App.3d 597, 607–608, 168 Cal.Rptr. 196; accord, *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 308–309, 254 Cal.Rptr. 853.) On this record, we do not find the trial court so exceeded the bounds of reason that its decision to disqualify Higgs, rather than to select some other remedy, was an abuse of discretion.

**\*56** DISPOSITION

The petition is denied. The stay issued by this court on November 23, 2010, will be vacated 10 days after the opinion is final as to this court. Real parties in interest shall recover costs in the writ proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(A).)

WE CONCUR: BENKE, Acting P.J., and NARES, J.

**All Citations**

196 Cal.App.4th 37, 125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693, 2011 Daily Journal D.A.R. 8023

## Footnotes

[1]  VeriSign was not certain Higgs was in possession of the Bond memo because a copy was not attached to Cologne's letter, and it was not until VeriSign deposed Clark in October 2010 that Clark confirmed the "memorandum" to which Cologne referred was in fact the Bond memo.

[2]  Cologne's response was limited to asking whether each of VeriSign's board members was (1) aware of VeriSign's allegations, and (2) agreed with VeriSign's attorney's demand for return of the documents.

[3]  The court ordered Higgs to return all hard copies of 36 specified documents, which it identified by the Bates Stamp numbers, and erase all electronic copies of those documents. The 36 documents the court ordered Higgs to return included all of the documents VeriSign, in its numerous letters to Higgs, had consistently contended were privileged.

[4]  Clark also cites *Chicago Title Ins. Co. v. Superior Court* (1985) 174 Cal.App.3d 1142, 1151, 220 Cal.Rptr. 507 for the proposition that the "dominant purpose" test is particularly important when examining communications involving in-house counsel because the attorney-client privilege is inapplicable when the business portions of an in-house attorney's communication are not clearly separable from the legal portions of the communication. However, the cited pages contain no such discussion. Moreover, the core conclusion of the *Chicago Title* court was that "given the peculiar surrounding circumstances in the case at bench, the ... attorney client privilege [was] impliedly waived." (*Id.* at p. 1154, 220 Cal.Rptr. 507.) *Chicago Title* has no bearing on the present action because there is no claim that VeriSign waived the privilege as to any of the documents.

[5]  VeriSign produced evidence that Goshorn was VeriSign's general counsel, and his primary responsibility was to serve as VeriSign's chief legal officer to provide legal counsel and advice to VeriSign and its officers and employees. Clark apparently provided no competent evidence suggesting Goshorn ever acted in a nonlegal capacity for VeriSign, or that he was acting in a nonlegal capacity with respect to the communications at issue in this matter.

[6]  VeriSign's showing below confirmed Insley was assisting an investigation under the direction and control of VeriSign's law department and, in that capacity, had interviewed Bond in connection with the "Roper

125 Cal.Rptr.3d 361, 2011 IER Cases 24,354, 11 Cal. Daily Op. Serv. 6693...

Investigation."

[7]     In Clark's brief filed in connection with this writ proceeding, the argument asserting Higgs's handling of the documents was proper cites *only* to the evidence contained (1) in *Clark's* declaration filed in opposition to the disqualification motion, (2) in the declarations of *Clark's attorneys* filed in opposition to the disqualification motion, and (3) in the *exhibits filed by Clark* in opposition to the disqualification motion. Clark makes no reference to any of VeriSign's evidence, or any effort to present that evidence most favorably to the trial court's findings.

[8]     Indeed, in Higgs's April 27, 2010, letter concerning the disputed documents, it stated (1) "many of the documents were irrelevant to this lawsuit" and would be gladly returned by Clark, and (2) one of the documents authored by Goshorn "is not a confidential document as Mr. Goshorn is giving business and not legal advice." We are uncertain how such a content-specific characterization of those documents could have been proffered by Higgs *without* an in-depth examination of the content of those documents.

[9]     The record shows the trial court clearly understood the guiding principles. In its ruling, the trial court expressly stated that it "recognize[d] that 'disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process.' [Quoting *SpeeDee, supra, 20 Cal.4th at p. 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371.*]"

[10]    For example, VeriSign submitted a transcript from Roper's deposition taken in September 2010 by an attorney with Higgs. That attorney asked Roper questions VeriSign argued were "derive[d] from a privileged legal opinion from an outside law firm that VeriSign obtained in September 2007," which Clark had taken and turned over to Higgs. Although Higgs's opposition below claimed the questions did *not* derive from that document, this is but one example of the type of concerns that could have reasonably led the trial court to conclude that disqualification for prophylactic purposes was appropriate.

[11]    First, as discussed above, the questions posed to Roper may have derived from a privileged legal opinion from an outside law firm. Second, when Clark was questioned in his deposition about various aspects of his claims against VeriSign, he indicated he could not verify that he would not offer certain of the privileged documents into evidence to support his claims.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

   © 2021 Thomson Reuters. No claim to original U.S. Government Works.