

Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email:  kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiden Law Group LLP
469 Seventh Avenue, 5th Fl.
New York, NY 10018
Telephone:   (646) 766-1914
Facsimile:    (646) 304-5277

*Attorneys for Plaintiff/Counter-Defendant, Hong Liu*

## UNITED STATES DISTRICT COURT FOR

## THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| HONG LIU,<br><br>            Plaintiff,<br><br>            v.<br><br>FARADAY&FUTURE INC., SMART KING LTD., JIAWEI WANG, and CHAOYING DENG<br><br>            Defendants.<br><hr>FARADAY&FUTURE INC.,<br><br>            Counterclaimant,<br><br>            v.<br><br>HONG LIU,<br><br>            Counter-Defendant. | **Case No:** 2:20-cv-08035-SVW-JPR<br><br>**PLAINTIFF HONG LIU'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS CROSS MOTION FOR SUMMARY JUDGMENT, IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT, AND IN OPPOSITION TO FARADAY&FUTURE INC. AND SMART KING LTD.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing on Motions:  June 1, 2021;<br>                     June 21, 2021<br><br>Judge:      Hon. Stephen V. Wilson<br>Trial Date:  July 27, 2021 |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ........................................................................................2

ARGUMENT ..........................................................................................................8

I.    Plaintiff Is Entitled To Partial Summary Judgment On His Claim for breach Of The Employment Agreement ............................................................................8

II.   Summary judgment Should be granted on ALL OF DEFENDANTS' COUNTERCLAIMS AND AFFIRMATIVE DEFENSES THAT SEEK TO RESCIND OR HOLD UNENFORCEABLE THE EMPLOYMENT AGREEMENT 10

III.  Summary judgment should be denied as to Plaintiff's wrongful termination Claim ..................................................................................................................19

CONCLUSION ......................................................................................................25

## **TABLE OF AUTHORITIES**

No table of authorities entries found.
No table of authorities entries found.

**Other Authorities**

N.Y. State Eth. Op. 1054 (2015) ................................................................11, 14, 15, 16

The Restatement (Third) of the Law Governing Lawyers § 123, cmt. B.....................13

Plaintiff Hong Liu ("Plaintiff" or "Mr. Liu"), by his undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits this memorandum of points and authorities in support of his (i) cross motion for summary judgment on (a) defendant Faraday&Future Inc.'s ("FF") Second Amended Counterclaim (ECF 95); (b) FF and defendant FF Intelligent Mobility Global Holdings Ltd.'s (f/k/a Smart King Ltd. ("Smart King") and collectively with FF, "Defendants") affirmative defenses set forth in FF and Smart King's Second Amended Answers (ECF 93 & 94, respectively); (ii) partial summary judgment on Count I of the Complaint; and (iii) in opposition to FF and Smart King's motion for summary judgment (ECF 131) ("Defendants' Motion").[1]

## **PRELIMINARY STATEMENT**

By this motion, Plaintiff seeks summary judgment on liability as to his claim for breach of the Employment Agreement and dismissal of Defendants' counterclaims and defenses to the extent they seek to preclude enforcement of that agreement.  Defendants' Motion should be denied in its entirety.  A jury trial is required to resolve Plaintiff's wrongful termination claim and to fix the damages from Defendants' breach of contract.

Summary judgment should be entered on liability as to Plaintiff's claim for breach of the Employment Agreement. The terms of the agreement are clear and unambiguous.  Defendants failed to pay Plaintiff the compensation they agreed to pay him upon an early termination.  No material issues of fact exist.  Defendants' purported defenses to enforcement are nothing more than an impermissible attempt to evade a clear and unambiguous agreement.

Defendants' attempts to invalidate the Employment Agreement based upon purported attorney ethics violations fail.  There was no ethics violation.  Plaintiff never

---

[1] All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Complaint (ECF 1) and Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF 25).  "¶___" are references to paragraphs in the Complaint.  "SUF ¶___" are references to paragraphs of Plaintiff's Statement of Uncontroverted Facts, submitted herewith.  Unless otherwise noted, all emphasis is added, and all internal quotations and citations are omitted.

provided any legal advice to Defendants while he was employed at Mayer Brown. Defendants' own evidence shows that Plaintiff did not bill time to FF while at Mayer Brown.   FF's post-hoc contention that it was somehow dependent upon Plaintiff collapses in the face of the overwhelming evidence that its in-house counsel and outside counsel at Sidley Austin LLP reviewed the agreement.

FF offers no precedent for what it is asking the Court to do here: allow a sophisticated client with a multi-billion dollar valuation to use an alleged "attorney ethics violation" to rescind a clear and unambiguous contract that the client negotiated with the benefit of in-house and outside counsel.   The Court should enter summary judgment in Plaintiff's favor on this claim.

Defendants' summary judgment motion as to Plaintiff's wrongful termination claim should be denied.   Defendants ignore or misread well-established California law which allows attorneys to bring wrongful termination claims against their clients. Defendants also disregard the Court's holdings that they have waived the privilege over broad categories of documents in this action.   Defendants' waivers thoroughly undermine their assertions.   Summary judgment should be denied on this claim.

For these reasons and as more fully explained below, Plaintiff's Cross Motion should be granted, and Defendants' Motion should be denied.

## STATEMENT OF FACTS

### Mr. Liu Did No Legal Work For FF While At Mayer Brown

In April 2014, Mr. Liu began working at Mayer Brown LLP ("Mayer Brown") as a partner in the firm's New York office.   SUF ¶1.   At all relevant times, Mr. Liu has been admitted to practice law in New York.   SUF ¶2.

In both December 2015 and May 2017, FF engaged Mayer Brown on regulatory matters.   SUF ¶8.   Philip Recht, a partner in Mayer Brown's Los Angeles office, led Mayer Brown's work for FF on these matters.   SUF ¶¶8, 20.   Mr. Liu had no involvement in these engagements, which involved other Mayer Brown lawyers.   SUF ¶¶4-5.   Mr. Liu neither performed any legal services for FF while at Mayer Brown nor

supervised any Mayer Brown lawyers who represented FF. SUF ¶¶4-5. While at Mayer Brown, Mr. Liu never billed any time to any matter in which Mayer Brown represented FF. SUF ¶4-5.

**FF Solicits Mr. Liu**

On October 15, 2017, Michael Wang, a representative of FF, reached out to Mr. Liu and invited him to meet with FF in California. SUF ¶6. On October 17, 2017, Mr. Liu travelled to FF's California offices and met with FF representatives, including FF's then-CEO YT Jia ("Jia") and defendant Jiawei ("Jerry") Wang. SUF ¶6. At the meeting, Mr. Jia indicated FF would pay Mayer Brown's outstanding legal fees. He also discussed potential work Mayer Brown could perform for FF and requested that Mr. Liu send a proposal for such work. SUF ¶7. Given Mr. Liu's professional experience and reputation, Jia also suggested FF would benefit from having someone like Mr. Liu but did not explicitly make an employment offer to him. SUF ¶7.

On October 20, 2017 and in response to Mr. Jia's request, Plaintiff sent FF an unsigned draft engagement on Mayer Brown letterhead for a range of potential legal services. SUF ¶10. For over two months, FF did not sign this engagement. SUF ¶10, 20. Shortly after Mr. Lu sent this draft document, Jerry Wang reached out to Mr. Liu to discuss Mr. Liu's proposed employment at FF. SUF ¶11.

On October 25, 2017, Jerry Wang sent Mr. Liu a comprehensive proposal for Mr. Liu's employment at FF, including (i) a document entitled "DRAFT EMPLOYMENT AGREEMENT TERM SHEET FOR HENRY L," proposing that Mr. Liu serve as FF's Vice Chairman and Global General Counsel with a $900,000 annual salary and eligibility to receive a minimum 2% equity interest in FF ("Smart King Options"); and (ii) a spreadsheet containing FF's projections of the value of that equity interest, ranging from $42 million (before an IPO) to $1 billion (three years after an IPO). SUF ¶¶12-14.

In late October 2017, Mr. Liu verbally advised Jerry Wang on several occasions that FF should seek independent counsel in connection with negotiating the terms of Mr. Liu's potential employment at FF. SUF ¶15. During these conversations, Jerry

-3-

Wang repeatedly assured Mr. Liu that, in connection with negotiating the terms of Mr. Liu's employment, FF would be advised by its own in-house legal department as well as by its outside counsel at Sidley Austin LLP ("Sidley Austin").  SUF ¶15.

In November 2017, Jerry Wang sent Mr. Liu an email under the subject line "FF US employment contract" containing several attachments, including an offer letter template.  SUF ¶18. At Mr. Wang's request, Mr. Liu modified the template to reflect the terms that had been agreed upon up to that point.  SUF ¶19.  No further substantive employment-related discussion occurred until January 2018.  SUF ¶21.

**FF Re-Engages Mayer Brown**

On December 22, 2017, Amanda Walker, an in-house FF counsel, sent an email to Mayer Brown partner Phil Recht (without copying Mr. Liu), attaching the draft engagement letter which Mr. Liu had previously sent to FF two months prior in October 2017 with FF's signature.  SUF ¶20.  Although FF transmitted its signature on December 22, 2017, it did not change the date on the engagement letter, which remained October 20, 2017.  SUF ¶20.  In her cover email attaching this document, Ms. Walker stated: "Attached please also find the supplemental engagement letter that one of your colleagues had requested back in October to reinitate the engagement." SUF ¶20.

That same day, December 22, 2017, Mr. Recht forwarded the engagement letter with FF's signature to Mr. Liu, who counter-signed it.  SUF ¶20. The fully-executed agreement was sent later that day back to FF.  SUF ¶20.

During his tenure at Mayer Brown, Mr. Liu did not perform any work on this engagement, as reflected in Mayer Brown's timesheets on the matter for December 2017, January 2018, and February 2018 that Defendants submitted on their motion.  *See* Declaration of Jerry Wang, Exs. 1-3; *see also* SUF ¶4-5.

**FF and Its Counsel Advance The Employment Negotiations With Mr. Liu**

On January 1, 2018, Jerry Wang sent a draft employment agreement to Mr. Liu.  SUF ¶21.  On January 10, 2018, at Jerry Wang's invitation, Mr. Liu met with Mr. Jia in California.  SUF ¶¶21-22.  Mr. Jia proposed that Mr. Liu's compensation package be

divided into two agreements: the Employment Agreement (between FF and Mr. Liu) and the Director Compensation Agreement (between Mr. Jia and Mr. Liu).  SUF ¶22.

Between January 10 and January 26, 2018, Mr. Wang and Mr. Liu exchanged multiple drafts of the Employment Agreement and Director Compensation Agreements. SUF ¶23.  During this time period, Mr. Wang repeatedly informed Mr. Liu in writing that FF's human resources department, in-house counsel, and outside counsel at Sidley Austin were reviewing both agreements.  SUF ¶23.

On January 26, 2018, Sidley Austin emailed Mr. Wang regarding its review of the Employment Agreement and asked whether FF desired to have Sidley Austin's employee benefits specialists conduct a further review of the agreement.  SUF ¶24.  Mr. Wang responded that Liu "will sign our standard offer letter so that should be fine to cover some basic terms in there."  SUF ¶24.

On January 26, 2018, Mr. Liu signed the Employment Agreement.  SUF ¶25.  FF counter-signed the agreement that same day.  SUF ¶25.

Between January 26 and February 2, 2018, Jerry Wang and Mr. Liu continued to negotiate the Director Compensation Agreement.  SUF ¶32.  Mr. Wang made clear to Mr. Liu that Sidley Austin was closely involved in reviewing and commenting on this agreement for FF.  SUF ¶32.  Thus, for example, on January 30, 2018, Mr. Wang provided Mr. Liu with a revised draft of the agreement that Mr. Wang said was "drafted by company external counsel Sidley;" Mr. Wang noted that "Sidley is happy to arrange a conference call together with us to walk through and discuss solutions."  SUF ¶34.

On February 2, 2018, Mr. Liu signed the Directors Compensation Agreement and emailed Jerry Wang the executed copy.  SUF ¶35.

On February 7, 2018, Mr. Liu resigned from his Mayer Brown partnership.  SUF ¶35.  On February 15, 2018, he began working at FF.  On April 17, 2018, he registered as in-house counsel to FF pursuant to California Rule of Court 9.46.  SUF ¶37.

**The Terms Of The Employment Agreement**

Pursuant to the executed January 26, 2018 Employment Agreement, Plaintiff would serve as FF's Global General Counsel ("GC"), Chief Administrative Officer ("CAO"), and Global Senior Advisor. SOF ¶26. Under the terms of the agreement, FF guaranteed Plaintiff's employment for five years. SOF ¶5.

Under the terms of the Employment Agreement, FF agreed to pay Mr. Liu a package of cash and equity compensation, as follows. SOF ¶¶28-31. *First*, FF agreed to pay Mr. Liu a $3 million dollar signing bonus, payable in five equal installments of $600,000, with the first installment paid upon signing of the Employment Agreement and the remaining four installments paid on each of the four anniversaries of Mr. Liu's first date of employment. SOF ¶29. In the event that Mr. Liu was terminated during his guaranteed five-year employment term, he would receive all of the unpaid installment payments in a lump sum. SOF ¶29.

*Second*, FF agreed to pay Mr. Liu a minimum annual base salary of $1 million during each of the five years of his guaranteed five-year term, *i.e.*, a minimum base salary compensation of $5 million. SOF ¶30. If FF terminated Mr. Liu "***for any reason***" during the five-year term, FF was required to pay any unpaid portion of the $5 million base salary in a lump sum. SOF ¶30.

And *third*, FF agreed to grant Mr. Liu 20 million shares of FF, which represented two percent of FF's total equity prior to its Series A round, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options (the "Smart King Options"). SOF ¶31. The Employment Agreement provides in relevant part:

> FF shall grant [Mr. Liu] at a minimum cost required by law and outright, ***2% of FF's total equity shares pre Series A dilution in the form of restrictive stocks or equity option*** as [Mr. Liu] may select based on any of FF's available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.00 equity shares of FF pre Series A, as FF has represented and warranted, with the FF established and

standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as [Mr. Liu] may select [].

SOF ¶28-31.

The Employment Agreement further provides this equity interest would "***become immediately and fully vested to [Mr. Liu] upon any early termination by FF of [Mr. Liu's] employment within the guaranteed employment term with FF.***" SOF ¶28-31.[2]

Concurrent with his start date, FF paid Mr. Liu the first $600,000 installment of his $3 million signing bonus under the Employment Agreement. Beginning with his date of hire, FF also paid Mr. Liu a salary at the rate of $1 million per annum, as required by his Employment Agreement. SOF ¶25.

**Plaintiff Performs His Duties For FF**

Upon being hired at FF in mid-February 2018, Mr. Liu assumed leadership of the legal and administrative functions of FF SOF ¶38.

On August 1, 2018, FF issued a press release that formally announced Mr. Liu's hiring. The press release stated in relevant part:

Faraday Future (FF) announced today that ***Henry (Hong) Liu, renowned expert in international legal, banking, and regulatory affairs***, and former global equity partner at international law firm Mayer Brown LLP, has ***assumed the positions of Global Chief Administrative Officer (CAO), Global Executive Vice President and Global General Counsel*** . . .With more than 25 years of professional, business and management experience in the United States and Asia Pacific regions, ***Mr. Liu is a crucial asset to FF*** as it heads toward the launch of its luxury all-electric, connected and smart FF 91 and subsequent expansion of products and services, as well as further enhancement of the corporate

---

[2] On or about February 2, 2018, as a further inducement to Mr. Liu to join Faraday, Mr. Liu entered into a Director Compensation Agreement with Mr. Jia. In the Director Agreement, Mr. Jia personally agreed to pay Mr. Liu, upon certain trigger events such as an initial public offering of Smart King, a cash amount equal to 1% of the value of Smart King shares as calculated prior to its Series A offering. SOF ¶¶32-36.

governance. ***He will be leading legal, government affairs, administration, and capital, globally*** . . Prior to joining FF, besides an equity partner at Mayer Brown LLP based in New York, Mr. Liu counts more than two decades of global career experience in the legal, banking, and regulatory areas. He has been partner, managing partner, and chair of China & Asia practice at several global law firms . . . He has been licensed to practice law in the US for more than 25 years.

SOF ¶39.

### Smart King Issues 20 Million Options To Mr. Liu

In October 2018, Smart King's board of directors passed a resolution granting Mr. Liu 20,000,000 options pursuant to the Employment Agreement. SOF ¶40. In or about January 2019, Mr. Liu confirmed that he had been issued the options by accessing his account at an employee benefits website. SOF ¶40.

On or about February 11, 2019, Mr. Liu's employment was terminated. On the same date and unbeknownst to Mr. Liu, Mr. Liu's 20,000,000 Smart King options were cancelled. SOF ¶¶45-46. Further, FF never paid Mr. Liu the unpaid portion of the $3 million signing bonus, which is $2,400,000, as required under the Employment Agreement. Nor has FF paid the unpaid portion of Mr. Liu's $5 million in base salary, which totals approximately $4 million. SOF ¶47.

## ARGUMENT

Where parties file summary judgment cross-motions, a court must consider the evidence submitted in support of both motions before ruling on either motion. *See Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Because of that rule, the parties' cross-motions should be addressed together. *Rahban v. Detrex Corp.*, 2009 WL 10674232, at *2 (C.D. Cal. Aug. 27, 2009).

## I.   PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON HIS CLAIM FOR BREACH OF THE EMPLOYMENT AGREEMENT

To establish a breach of contract claim, a plaintiff must show (1) a contract; (2) a party's performance or excuse for non-performance; (3) breach; and (4) resulting

damages. *Fifty-Six Hope Rd. v. Jammin Java Corp.*, No., 2017 WL 2719981, at *2 (C.D. Cal. Feb. 22, 2017). Summary judgment is warranted as to each of these elements.

It is undisputed that in January 2018 Plaintiff entered into the Employment Agreement with FF and Smart King and that in February 2018 he resigned from his Mayer Brown partnership and assumed the roles of FF's Global GC, CAO, and Global Senior Advisor. It is also undisputed that in October 2018, after Plaintiff had been working at FF for eight months and pursuant to the Employment Agreement, Smart King granted Plaintiff options to acquire 20 million Smart King shares. It is also undisputed that Plaintiff was terminated on February 11, 2019, prior to the expiration of the five-year term in the Employment Agreement.

FF breached the Employment Agreement by failing to pay Mr. Liu the consideration he was promised. Specifically, under the Employment Agreement's unambigious terms and in the event of an early termination during Plaintiff's five-year employment term, FF was to pay Plaintiff the balance owed to him of his unpaid bonus and annual salary and provide Plaintiff with fully vested Smart King equity. FF breached the Employment Agreement by, upon terminating Plaintiff, failing to pay Plaintiff all of this consideration.

*First*, FF failed to pay Mr. Liu $2,400,000, the unpaid portion of the $3 million signing bonus that FF is required to pay under the Employment Agreement (the $2,400,000 was required to be paid to Mr. Liu in a lump sum upon his early termination). SOF ¶47. *Second*, FF failed to pay Mr. Liu approximately $4 million, the unpaid portion of the $5 million in minimum base salary required to be paid to Mr. Liu over his guaranteed five-year employment term (the $4 million was required to be paid to Mr, Liu in a lump sum upon his early termination). SOF ¶47. And *third*, FF breached the Employment Agreement's unambiguous requirement that Plaintiff's Smart King options shall "***become immediately and fully vested to [Mr. Liu] upon any early termination by FF of [Mr. Liu's] employment within the guaranteed employment term with FF.***" ECF 1-1; SOF ¶¶27-31. As was revealed in discovery,

Defendants cancelled Plaintiff's 20 million Smart King options on his February 11, 2019 termination date.   SOF ¶46.

Defendants can raise no triable issue as to any of these undisputed facts. Accordingly, Plaintiff is entitled to partial summary judgment on liability on his breach of contract claim.  *See Capstone Turbine Corp. v. Malkamaki*, 2014 WL 12558004, at *6 (C.D. Cal. July 10, 2014) (granting partial summary judgment on breach of contract claim where contract language indisputably reflected intent of parties, and defendants' failure to pay under clear terms of contract constituted breach); *Tesoro Ref. & Mktg. Co. LLC v. S&S Fuel, Inc.*, 2020 WL 3203057, at *5 (C.D. Cal. Mar. 30, 2020) (granting motion for partial summary judgment on breach of contract claim because "[n]o reasonable interpretation of this provision" could give rise to a triable issue of fact). The calculation of Plaintiff's damages should be determined at this case's jury trial.

## II. SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL OF DEFENDANTS' COUNTERCLAIMS AND AFFIRMATIVE DEFENSES THAT SEEK TO RESCIND OR HOLD UNENFORCEABLE THE EMPLOYMENT AGREEMENT

### A. Summary Judgment Should Be Granted On Defendants' Claims And Defenses Based Upon Alleged Attorney Ethics Violations

Plaintiff is entitled to summary judgment on Defendants' counterclaims and defenses that seek to rescind, invalidate, or excuse performance under the Employment Agreement based upon Plaintiff's alleged violation of attorney ethics rules in connection with the negotiation of the agreement.[3]

---

[3] These counterclaims and defenses are FF's (i) first counterclaim for a violation of the Rules of Professional Conduct; (ii) second counterclaim for breach of fiduciary duty in connection with the Rules of Professional Rules of Conduct; (iii) third counterclaim for constructive fraud; (iv) eighth counterclaim seeking a declaratory judgment to the extent it seeks to invalidate the Employment Agreement based upon alleged attorney ethics violations; and (v) FF and Smart King's affirmative defenses that are substantively duplicative of these counterclaims: 2, 3, 6, 9, 22, 23 and 26.

### 1. Only New York's Attorney Ethics Rules Apply

As a preliminary matter, Defendants maintain that both California's Rules of Professional Conduct ("CA Rules") and New York's Rules of Professional Conduct ("NY Rules") apply to Mr. Liu during the course of his negotiating his employment with FF. *See* Def. Br. at 14-19. Defendants are wrong.

NY Rule 8.5(b) states that "*[i]f the lawyer is licensed to practice only in [New York], the rules to be applied shall be the rules of [New York]*." NY Rule 8.5(b)(2)(i); N.Y. State Eth. Op. 1054 (2015) (foreign ethics laws may apply "[i]f the [New York-admitted] lawyer is permitted to practice in [the foreign state]"). Under California's Rules of Professional Conduct, California ethics rules apply to non-member of the California Bar only when they are "*engaged in the performance of lawyer functions in [California]*." Calif. Rule of Prof. Cond. 1-100(D).

Here, during the course of Plaintiff's employment negotiations, Mr. Liu was licensed to practice law only in New York. Prior to his joining FF and in connection with his negotiating the terms of his employment, Mr. Liu was not performing lawyer functions in California. Accordingly, only the NY Rules apply to Mr. Liu's conduct in negotiating the Employment Agreement.[4]

### 2. Plaintiff Did Not Violate New York's Attorney Ethics Rules

FF contends that Plaintiff violated NY Rules 1.8(a), 1.7 and 1.5 in connection with the negotiation and drafting of the Employment Agreement. Based upon the New York authorities cited below and the record on this motion, no material issues of fact exist and Plaintiff is entitled to summary judgment dismissing FF's claims under each

---

[4] Defendants cite *Odish v. Cognitive Code Corp.*, 2015 WL 11347592 (C.D. Cal. May 27, 2015) for the proposition that an attorney based outside of California is "required to comply with California's rules of professional conduct" while "providing legal services" to California-based clients. *See* Defs' Br. at 14. Here, however, Mr. Liu provided no legal services to FF while at Mayer Brown. *See* SOF ¶4. Indeed, Defendants' own evidence shows that Mayer Brown's invoices to FF contain no time billed by Mr. Liu. *See* SOF ¶4.

MEMORANDUM OF POINTS AND AUTHORITIES

of these provisions of New York ethics rules.  In further support, Plaintiff respectfully submits the expert report of Rick Supple ("Supple Rep."), a partner at Clyde & Co US LLP in New York with decades of experience in attorney ethics matters, concerning the principles governing the New York attorney ethics rules and their application to Mr. Liu's conduct.  *See* Declaration of Amiad Kushner Ex. B ("Supple Rep.").[5]

### a. Plaintiff Did Not Violate NY Rule 1.8(a)

New York Rule 1.8(a) prohibits a lawyer from "enter[ing] into a business transaction ***with a client***" if the lawyer and "client" have "differing interests and if ***the client expects the lawyer to exercise professional judgment therein for the protection of the client*** unless" the lawyer makes certain written disclosures to the client, obtains consent for the transaction, and the transaction is "fair and reasonable."  Here there was no Rule 1.8(a) violation because (i) FF was never Mr. Liu's "client" while he was employed at Mayer Brown, and (ii) FF did not expect Mr. Liu to exercise professional judgment for FF's protection while it was negotiating the Employment Agreement.  No material issues of fact exist concerning these issues.

*First*, FF was not Mr. Liu's "client" at Mayer Brown.  *See* Supple Rep. ¶¶ 35-40. Mr. Liu did no legal work for FF while he was employed at Mayer Brown, nor did he supervise such work.  Liu Decl. ¶4.  All work for FF was done by other Mayer Brown attorneys.  Liu Decl. ¶4, 5, 20.  Tellingly, the Mayer Brown invoices that Defendants submitted on this motion reflect no time billed by Mr. Liu.  *See* Supple Rep. ¶¶ 15, 45; *see also* SUF ¶4.

---

[5] *See GemCap Lending, LLC v. Quarles & Brady, LLP,* 269 F. Supp. 3d 1007, 1022–23, 1028-29 (C.D. Cal. 2017) (in attorney malpractice action, reports of attorney ethics experts were admissible on summary judgment); *id.* at 1028-29 (admitting expert opinion on whether attorney's conduct aligned with "the relevant standard of care for legal opinion writing" and noting that "[e]xpert witnesses are not expressly prohibited from rendering opinions on whether a defendant met the relevant standard of care").

FF may contend that *other* Mayer Brown attorneys were advising FF and that the attorney-client relationship of such other attorneys should be imputed to Liu for purposes of a NY Rule 1.8(a). However, there is no basis for any such "imputation" theory under the circumstances. *See* Supple Rep. ¶¶ 35-40.

The Restatement (Third) of the Law Governing Lawyers § 123, cmt. B, provides that imputation of conflicts between attorneys may be appropriate where: (1) "a lawyer's relationship with a client creates an incentive to violate an obligation to another client," (2) "confidential information will be shared among affiliated lawyers" involved in conflicting representations at the firm, or (3) a situation where "a client would . . . have difficulty proving that the adverse representation by an affiliated lawyer was wholly isolated." The Restatement cautions that "considerations of free choice of lawyers by clients and the free mobility of lawyers between firms or other employers caution against extending imputation further than necessary." *See* Supple Rep. ¶38.

Here, there is no evidence that Mayer Brown's regulatory work for Faraday provided any "incentive" for Liu to violate any obligations to FF while he negotiated the Employment Agreement. There is no evidence that any confidential information provided by FF to Mr. Recht (or any other Mayer Brown lawyer representing FF) helped Liu negotiate different and more favorable employment terms with FF. Nor is there any evidence that Mr. Liu was representing a client adverse to FF's interests. Because none of these concerns applies, any imputation theory in applicable. *See* Supple Rep. ¶¶ 35-40.

Indeed, if the NY Rules 1.8(a) were strictly construed in the context of global law firms like Mayer Brown (with thousands of lawyers), extreme and unwarranted results would follow. Lawyers who negotiate employment agreements with sophisticated clients, with in-house legal teams, could be subject after-the-fact, draconian claims for recission based on the imputation of other lawyers' conduct, even though the lawyer

did no legal work for the client and notwithstanding that the firm's relationship with a client was irrelevant to the negotiation or its outcome. *See* Supple Rep. ¶40.[6]

Even if FF was Mr. Liu's client (which it was not), NY Rule 1.8(a) is not triggered because it was not reasonable for Mr. Liu to believe or expect that FF was relying upon him to exercise personal judgment to protect FF's interests in the negotiation of the Employment Agreement.  *See* Supple Rep. ¶¶ 41-43.  A leading New York ethics opinion sets forth the factors determinative of whether a client expects a lawyer to exercise reasonable professional judgment on the client's behalf:

> (i) whether the client has other counsel in the matter, for example, because it is a corporation or other entity with a legal department, (ii) whether the lawyer is responsible for client matters in the subject area, and (iii) whether the client is an individual or an entity and the client's level of sophistication in legal matters.  We believe it is more likely that an individual client or one that is not sophisticated in legal matters is more likely to rely on a lawyer that does not represent the client in that matter than would be the case with an institutional client.

N.Y. State Eth. Opp. 1055 n. 1 (2015); *see also* Supple Rep. ¶41.

Applying these principles, it was not reasonable for FF to expect that Mr. Liu would exercise professional judgment on its behalf in negotiating the Employment Agreement.  Mr. Liu was repeatedly informed that FF was being represented by in-house counsel and outside counsel at Sidley Austin for its negotiation with Liu.  Mr. Liu was not responsible for FF's matters with Mayer Brown and had never done legal work for FF.  Liu Decl. ¶¶ 4, 5, 15, 20, 23.  And FF was a sophisticated client with a multi-billion dollar valuation.  NY Rule 1.8(a) should not be applied under these circumstances. *See Matter of Chariff,* 633 N.Y.S.2d 618, 620 (N.Y. App. Div. 1995) (although attorney did not comply with disclosure and consent requirements when

---

[6] Further, the NY Rules are "rules of reason" which "should be interpreted with reference to the purposes of legal representation and of the law itself."  NY Rules, Scope, cmt. [6]; *Niesig v. Team I,* 558 N.E. 1030, 1032 (1990) (disciplinary rules are "guidelines to be applied with due regard for the broad range of interests at stake").

making a loan agreement with his client, the predecessor version of NY Rule 1.8(a) was not violated insofar the sophisticated businessman client was not deceived by his lawyer and was aware of all relevant information before making the loan"); NY Rule 1.8, cmt. [1] (stating that where a client "is represented by lawyers for a transaction, the client should not be heard to argue later that the lawyer on the receiving end of the transaction exercised professional judgment for the client's benefit in the deal"). *See* Supple Rep. ¶¶41-43.

### b. Plaintiff Did Not Violate NY Rule 1.7(a)

NY Rule 1.7(a) provides that: "[A] lawyer shall not represent a client if a reasonable lawyer would conclude that … there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests," unless the client consents to the representation. "When a reasonable lawyer would conclude that the risk of adverse effect on professional judgment is not a significant one, then there is no conflict …" N.Y. State Eth. Op. 1048 (2015); N.Y. State Eth. Op. 712 (1999) (no conflict of interest merely because of a "fanciful, theoretical or *de minimis* risk that the lawyer's judgment will be affected adversely by a potentially relevant set of interests").

Here, the record reflects no basis for concluding that Mayer Brown's legal work for FF somehow adversely affected Mr. Liu's professional judgment in a manner that prejudiced FF in the employment agreement negotiation. As noted above, Mr. Liu performed no legal work for FF while at Mayer Brown. FF solicited Mr. Liu for an employment position. Liu Decl. ¶¶ 4-19, 20-22. FF proposed equity-based compensation for Mr. Liu, and FF provided projected values for that equity compensation. Liu Decl. ¶¶ 12-14. FF repeatedly informed Mr. Liu that it was being advised by its own human resources department, in-house counsel, and outside counsel. Liu Decl. ¶¶ 15, 23. Mayer Brown's regulatory work for Faraday bore no meaningful relationship to the subject of Liu's employment negotiations. *See* N.Y. State Eth. Op. 994 (2013) (opining that Rule 1.7 was not violated where an attorney whose firm

-15-

represented a school district negotiated for employment as a sports coach at a school in the district because there was little risk "of adverse effect if … the legal work on behalf of the school district were unrelated to the lawyer's work as coach").  *See* Supple Rep. ¶46.

### c.  Plaintiff Did Not Violate NY Rule 1.5(a)

Under NY Rule 1.5(a), a lawyer may not "collect an excessive or illegal fee."

> A fee is excessive when, after a review of the facts, ***a reasonable lawyer would be left with a definite and firm conclusion that the fee is excessive.***"  Whether or not a fee is excessive depends upon a non-exclusive list of factors, including "(1) the time and skill required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service property; (2) the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation and ability of the lawyer … performing the services; and (8) whether the fee is fixed or contingent.

As the text of NY Rule 1.5 indicates, the test for determining whether a legal fee is excessive is difficult to meet.

Here, there is no basis to conclude that a reasonable lawyer would be left with a "definite and firm conclusion" that Mr. Liu's "fee" is excessive.  At the time FF solicited Mr. Liu, he was a senior equity partner at Mayer Brown making $1.35 million per year.  Liu Decl. ¶¶ 1-3.  FF solicited Liu to oversee its legal and administrative matters as its general counsel and chief administrative officer. Liu Decl. ¶¶15-19, 20-21.  Plainly, as Liu was already very well compensated as a senior equity partner in a large law firm, FF needed to make Liu a substantial offer if it genuinely hoped to entice Liu to leave Mayer Brown.

The experience, reputation and ability of the lawyer is "the most important factor" when determining whether a legal fee is excessive.  N.Y. State Eth. Op. 1004 (2015).  The facts indicate that Liu was a senior partner at the globally respected firm Mayer Brown and had decades of experience.  Liu Decl. ¶¶ 1-4; Supple Rep. ¶50.   For all of these reasons, there is no basis to find that a reasonable lawyer would "definitely and firmly" conclude that Liu's acceptance of FF's employment terms violated NY Rule 1.5.

### 3.  Rescission Of The Employment Agreement Is Inappropriate

Even if Plaintiff violated any of the NY Rules (which he did not), any such violation should not be a basis for rescinding or voiding the Employment Agreement. An attorney's showing that "the dealing was fair and just," and "the client was fully advised" notwithstanding the attorney's not providing written advice to retain independent counsel warrants the enforcement of the agreement between the attorney and client.  *Ferguson v. Yaspan*, 233 Cal. App. 4th 676, 685 (2014).

Here, the Employment Agreement was fair to FF and to Mr. Liu.  Plaintiff was at the pinnacle of his career, earning well over a million dollars per year, and left his lucrative equity partnership at Mayer Brown to join a start-up with uncertain prospects. In joining FF, Plaintiff's responsibilities would be enormous; he was tasked with managing all of FF's legal and administrative matters globally.   To make the risk worthwhile for Plaintiff, FF had to provide him with substantial compensation.

The fact that FF was advised (or had access to) in-house and external counsel during the Employment Agreement negotiations further militates against rescission. *See Pizzorno v. Draper*, 2017 WL 4712071, at *6 (C.D. Cal. July 7, 2017) (that client retained independent counsel in connection with negotiating agreement with attorney discharged attorney from having to advice client in writing to seek independent counsel); *Ferguson v. Yaspan*, 233 Cal. App. 4th 676, 688 (2014) (rejecting argument that attorney's failing to provide advice in writing to seek independent counsel gave rise to ethical violation where client did in fact have independent counsel).  *Cf.* ECF 144 at

-17-

3-4 (granting Plaintiff's motion to dismiss Defendants' counterclaim based on alleged unconscionability of Employment Agreement, where "***Defendant was at the time of contracting a well-resourced corporation, having just received a multi-billion dollar valuation, and had ready access to counse***l.").

Further, in October 2017, Plaintiff orally advised FF numerous times to retain independent counsel.  SUF ¶15.   Jerry Wang, FF's lead negotiator, responded that Sidley Austin and FF's own internal legal and HR departments would be reviewing the Employment Agreement on FF's behalf.  SUF ¶15.  In January 2018, Mr. Wang confirmed that Sidley Austin was reviewing the Employment Agreement. SUF ¶23. Prior to Plaintiff's entering into the Employment Agreement, FF's legal department messaged Plaintiff, confirming that the legal department had reviewed the Employment Agreement.  SUF ¶23.  These facts demonstrate that enforcement of the Employment Agreement is appropriate.

### B. Summary Judgment Should Be Granted On Defendants' Defenses To Enforcement Of The Employment Agreement Based On Plaintiff's Allegedly Deficient Performance

Defendants have asserted numerous affirmative defenses to the Employment Agreement based upon Mr. Liu's allegedly deficient performance.[7]  Under Defendants' theory, if Mr. Liu's performance was deficient, he cannot enforce the Employment Agreement.  Defendants' defenses fail as a matter of law.

In the carefully-negotiated Employment Agreement, the parties agreed that if Mr. Liu was terminated for "*any reason*" during his five year term of employment, he would receive any unpaid portion of his guaranteed minimum salary of $5 million in a lump sum.  Similarly, upon any "early termination," any unpaid portion of Mr Liu's $3 million signing bonus was required to be paid in a lump sum.  Further, upon any early termination, all of Mr. Liu's unvested options would be immediately vested, with the

---

[7] *See* ECF 93 & 94, Affirmative Defenses 5, 7, 8, 11, 14, 15, 19, 20, & 27.

sole exception of a situation in which an early termination was "effectuated" based on a "serious breach of fiduciary duty" that was "adjudicated" by a U.S. court.

Here, FF terminated Mr. Liu before the expiration of his five year employment term. FF did so without obtaining any court order finding Mr. Liu in serious breach of fiduciary duty (and FF has since dismissed with prejudice its counterclaim against Mr. Liu for breach of fiduciary duty based upon his employment performance). Accordingly, FF's affirmative defenses seeking to excuse their payment obligations upon an early termination must be rejected as being post hoc attempts to re-write the parties' carefully negotiated and unambiguous Employment Agreement.

## III.   SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S WRONGFUL TERMINATION CLAIM

Genuine issues of material fact exist as to Plaintiff's wrongful termination claim, warranting denial of Defendants' Motion. Defendants' only bases for seeking summary judgment on Plaintiff's claim are meritless threshold issues which have no bearing here.

### A. The Wrongful Termination Claim Comports With *General Dynamics*

Defendants' primary basis for dismissal is the argument that Plaintiff's wrongful termination claim is barred by *General Dynamics Corp. v. Super. Ct.*, 7 Cal. 4th 1164 (1994) ("*General Dynamics*"). *See* Def. Br. at 20. In Defendants' view, because Plaintiff's wrongful termination claim can be proven *only* by the use of purportedly privileged information, the  claim must be dismissed under *General Dynamics*. *See* Def. Br. at 22. Defendants are wrong.

*General Dynamics* permits a wrongful termination claim to proceed where in-house counsel can prosecute his claim with non-privileged materials. *See Gen. Dynamics Corp.*, 7 Cal. 4th at 1169 ("there is no reason inherent in the nature of an attorney's role as in-house counsel to a corporation that in itself precludes the maintenance of a retaliatory discharge claim, provided it can be established without breaching the attorney-client privilege").

Plaintiff's claim for wrongful termination is on all fours with *General Dynamics* and should proceed for all of the following reasons. *First,* Plaintiff's wrongful termination claim can be established without using privileged materials. Plaintiff alleges and can prove – without intruding upon the attorney-client privilege and without disclosing the specific content of the advice he provided to FF – that he was terminated in retaliation for giving advice on the following topics: (i) the Worker Adjustment and Retraining Notification ("WARN") Act and its California statutory counterpart, and (ii) the legality of FF's recording its corporate meetings without employees' or other individuals' consent. Plaintiff need not delve into the content of the advice; the act of providing advice on these topics was itself the basis for Plaintiff's wrongful termination.

*Second*, to the extent attorney-client communications support Plaintiff's claim, Defendants waived privilege by affirmatively putting these topics at issue through their counterclaims concerning Plaintiff's termination. *See Bittaker v. Woodford*, 331 F.3d 715, 718–19 (9th Cir. 2003) (litigant waives attorney-client privilege as to a topic by putting the topic at issue); *Columbia Pictures Television Inc. v. Krypton Broadcasting*, 259 F.3d 1186, 1196 (9th Cir. 2001) (same); ECF 120-1 at 11-12 (citing authorities).

Through their SACC, Defendants specifically put at issue their purported reasons for Plaintiff's termination, including Plaintiff's purportedly "failing to provide substantive legal advice with respect to . . . ***the recording of internal meetings, and a potential reduction in FF's workforce***." ECF 124 at 18. By doing so, Defendants waived the attorney client privilege as to communications on these topics. Indeed, the Court held that because Defendants put these topics at issue, they "***waived the privilege***

***as to documents and communications concerning Plaintiff's termination***" as well as the above enumerated topics.  ECF 146 at 4, 7; *see generally* May 12, 2021 Tr.[8]

Plaintiff can prove he was wrongfully terminated by relying on all of the following materials for which ***the privilege has been waived:***

- Plaintiff's own testimony and communications between himself and YT Jia that, when FF began to run out of cash (as a result of Evergrande's cut-off of funding) and Mr. Jia planned mass layoffs and/or "furloughs" of hundreds of FF employees, Plaintiff advised Mr. Jia of FF's obligations to comply with applicable federal and California law (including the WARN Act) concerning such workforce reductions.  SUF ¶41, 44.

- Plaintiff's own testimony and communications between himself and YT Jia that he advised directed that advice be given to FF to stop or refrain from surreptitiously recording its corporate meetings and events without getting the required consent from the attending individuals.  SUF ¶42, 44.

- Plaintiff's testimony that on February 11, 2019, when Mr. Jia told Plaintiff that he was being terminated, Mr. Jia angrily highlighted Plaintiff's communications with Evergrande and Plaintiff's advice in connection with the Evergrande funding dispute as the main reasons for Plaintiff's termination.  Liu Decl. ¶45.

*General Dynamics* provides no bar to Plaintiff's relying on these waived materials to prosecute his wrongful termination claim; Plaintiff may do so.  *See Hoeper v. City & Cty. of San Francisco*, 2020 WL 740478, at *10 (Cal. Ct. App. Feb. 13, 2020) (defendants' waiver of attorney-client privilege foreclosed barring of wrongful termination claim under *General Dynamics*); *Wadler v. Bio-Rad Lab'ys, Inc.*, 212 F.

---

[8] Notwithstanding that Defendants voluntarily dismissed their fourth and fifth counterclaims, Defendants continue to put every aspect of Plaintiff's job performance and termination at issue through their affirmative defenses, triggering a broad waiver over all aspects of Plaintiff's employment.  *See, e.g.*, *Bittaker v. Woodford*, 331 F.3d 715, 718, 719 (9th Cir. 2003) (noting waiver occurs "where the client asserts ***a claim or defense*** that places at issue the nature of the privileged material.").

Supp. 3d 829, 854 (N.D. Cal. 2016) (allowing attorney's claim for wrongful termination to proceed because of defendant's waiver of attorney-client privilege).

And *third*, even if Plaintiff does in part rely on privileged materials, which he will not, under *General Dynamics*, the use of such materials is not a per se basis for dismissing Plaintiff's claim. In fact, *General Dynamics* specifically contemplates and permits an in-house counsel's bringing a wrongful termination claim while using privileged materials to establish his claim. *See  Gen. Dynamics Corp.*, 7 Cal. 4th at 1189.  Such a claim may proceed under *General Dynamics* because "***trial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege***." *Gen. Dynamics Corp.*, 7 Cal. 4th at 1191.  Because a court can use "sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings"  courts should be "***confident that by taking an aggressive managerial role, judges can minimize the dangers to the legitimate privilege interests the trial of such cases may present***." *Id.* Indeed, "*General Dynamics* teaches that a former in-house counsel ***may use privileged information***, with careful controls against inappropriate disclosure, in order to pursue a wrongful termination claim against his or her former employer." *Chubb & Son v. Superior Ct.*, 228 Cal. App. 4th 1094, 1106 (2014).

Defendants' argument for dismissal amounts to mere conjecture.  Defendants merely speculate that Plaintiff cannot establish his claim without using privileged materials.  *See* Def. Br. at 7-8, 22-24.  First, as set forth above, this is false.  Second, FF's argument is merely conclusory and fails for that separate reason.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (on summary judgment, "the

movant must ***affirmatively demonstrate*** that no reasonable trier of fact could find other than for the moving party." (emphasis added)).[9]

## B. The Wrongful Termination Claim Is Based On Statutory Violations

Defendants further contend that Plaintiff's wrongful termination claim must be dismissed because the Complaint does not tether Plaintiff's claim to a statutory public policy violation permitting disclosure. Def. Br. at 19-21. This contention is meritless.

As a preliminary matter, this Court has specifically held "that a plaintiff's failure to plead citations to specific statutory or constitutional provisions ***in the complaint*** is not fatal, [] so long as plaintiff identifies them ***at a later time, such as in opposition to a summary judgment motion***." *Jacobson v. Hair*, 2011 WL 13112239, at *29 (C.D. Cal. Jan. 31, 2011) (citing *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 84 (1998) (that plaintiff on defendants' motion for summary judgment provided specific FAA regulations in connection to wrongful termination was sufficient for wrongful termination claim); *see also Kaplan v. Baxter Healthcare. Inc.*, 2011 WL 13220471, at *4 (C.D. Cal. Nov. 28, 2011) (Wilson, J.) (noting that while the complaint did not adequately identify the statutory predicate for a wrongful termination claim, "Plaintiff

---

[9] Defendants' cited authorities which purportedly stand for the incorrect proposition that *General Dynamics* bars Plaintiff's wrongful termination claim are inapposite. *See Tam v. Qualcomm, Inc.*, 300 F. Supp. 3d 1130, 1144 (S.D. Cal. 2018) (no waiver of privilege); *Olivo v. City of Vernon*, 2010 WL 2958398, at *12 (Cal. Ct. App. July 29, 2010) (no triable issue of fact as to whether defendant employer had waived the attorney client privilege, causing *General Dynamics* to be applicable); *Degenshein v. 21st Century Toys, Inc.*, 2007 WL 1242171, at *1, *4-5 (Cal. Ct. App. Apr. 30, 2007) (no waiver of attorney-client privilege and plaintiff attorney admitted his case could be proven only by exclusive reliance on privileged materials); *Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451, 466 (2001) (neither defendant law firm nor plaintiff attorney's former clients waived attorney-client privilege as to materials to be used in the prosecution or defense of claim).

cured this deficiency in his Opposition [to summary judgment]").  Contrary to what Defendants argue, no such pleading requirement exists under California law.[10]

Here, the record on summary judgment reflects that Plaintiff can establish he was wrongfully terminated in violation of public policy, as set forth by statute.  Specifically, Plaintiff was wrongfully terminated in violation of public policy, as reflected in California Labor Code Sections 1102.5(b) and (c) (both of which can also be asserted as independent causes of action here), for violations of the following statutes:

- **Federal Worker Adjuster and Retraining Notification ("WARN") Act, 29 U.S.C.A. §§ 2101, 2102(a)-(d), 2104(a); and California's WARN Act, Cal. Lab. Code §§ 1400-04**: for Plaintiff's advising FF of its obligations to provide its employees with adequate 60-day notice of impending layoffs in connection with FF's mass layoff of its employees in the fall of 2018, so as to protect FF's employees from sudden and unexpected loss of income. *See* SUF ¶¶41, 44.

- **Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq.; & Cal. Penal Code §§ 631, 632; and the constitutional right to privacy under the California Constitution, Article I, § 1**: for Plaintiff's advising FF not to record corporate meetings without its employees' consent.  SUF ¶¶42, 44.

This submission concerning violations of employee-protection statutes satisfies the requirement that Plaintiff must tie his wrongful termination claim to a colorable public policy interest.  *See Howe v. Target Corp.*, 2020 WL 5630273, at *9 (S.D. Cal. Sept. 21, 2020) (invasion of privacy was colorable constitutional and statutory public

---

[10] *See Halliburton v. Remington Coll.-Denver Campus, Inc.*, 2008 WL 1851060, at *8 (Cal. Ct. App. Apr. 28, 2008) (rejecting argument that "plaintiff must allege a specific public policy within his or her complaint (or seek leave to amend to do so)"; providing statutory bases for public policy violations in supplemental briefing on summary judgment was sufficient); *Daily v. Kaiser Found. Hosps.*, 2005 WL 3007131, at *7 (Cal. Ct. App. Nov. 10, 2005) (rejecting "fallacy of [the] argument" that a statutory basis for wrongful termination must be pled in the complaint and cannot be done in opposition to summary judgment); *Perez-Falcon v. Synagro W., LLC*, 2011 WL 6752533, at *4 (E.D. Cal. Dec. 23, 2011) (statutory predicates for wrongful termination claim may be raised in opposition to motion for summary judgment).

interest basis for wrongful termination claim); *Horn v. Azusa Pac. Univ.*, 2019 WL 9044606, at *9 (C.D. Cal. Jan. 14, 2019) (statutory predicate concerned law governing the safety of workplaces); *Tam v. Qualcomm, Inc.*, 2018 WL 9918097, at *5 (S.D. Cal. Oct. 31, 2018) (FMLA and CFRA violations were proper predicates for wrongful termination claim); *Scheu v. Charter Commc'ns, Inc.*, 2009 WL 10672161, at *12 (C.D. Cal. Mar. 2, 2009) (UCL was an adequate statutory predicate); *Cardenas v. U.P.S., Inc.*, 2010 WL 5116343, at *8 (C.D. Cal. Dec. 9, 2010) (FLSA was colorable statutory basis for wrongful termination claim); *Nagy v. Whittlesey Auto. Grp.*, 47 Cal. Rptr. 2d 395, 398 (Ct. App. 1995) (unlawful recording of customers was actionable public policy interest in support of wrongful termination claim).

Moreover, the Complaint already specifically sets forth actionable public policy interests in violation of which Defendants' terminated Plaintiff, including the WARN Act (¶¶83, 132). *See Scott v. Cent. California Fac. Med. Grp., Inc.*, 2018 WL 1542517, at *15 (Cal. Ct. App. Mar. 29, 2018) (plaintiff's repeatedly mentioning bases for public policy violations was sufficient to establish wrongful termination claim).[11]

## CONCLUSION

For all of the foregoing reasons, Plaintiff's motion should be granted and Defendants' motion should be denied.

---

[11]Defendants' cited authorities are unavailing. In *Turner v. Anheuser-Busch, Inc*., 7 Cal. 4th 1238 (1994), the alleged violations of public policy concerned economic relationships between beverage manufacturers and their competitors, which did not give rise to a public policy interest; here, breaches of employee privacy and statutory violations of employment laws requiring providing notice to to-be-fired employees are at issue. *See id.* at 125. *See id. Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988) is also inapposite; there, unlike here, the purported public policy violation concerned the duty to report an employee who was embezzling from the employer, which the court found to be merely a private interest, not a public one (*see id.* at 670).

DATED:  May 18, 2021

FOUNDATION LAW GROUP LLP


By:/s/ Kevin D. Hughes
     KEVIN D. HUGHES
     *Attorneys for Plaintiff/Counter-Defendant*
     *HONG LIU*


SEIDEN LAW GROUP LLP


By: /s/ Amiad Kushner
     AMIAD KUSHNER
     JAKE NACHMANI
     *Attorneys for Plaintiff/Counter-Defendant*
     *HONG LIU*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I caused a true and correct copy of the foregoing to be filed using the Court's Electronic Filing System ("ECF System"). The document is available for viewing and downloading via the ECF System and will be served by operation of the ECF System upon all counsel of record.

Dated: May 18, 2021                                      /s/ Kevin D. Hughes

                                                                        Kevin D. Hughes

-28-

MEMORANDUM OF POINTS AND AUTHORITIES