Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email: kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiden Law Group LLP
469 Seventh Avenue, 5th Fl.
New York, NY 10018
Telephone: (646) 766-1914
Facsimile: (646) 304-5277

*Attorneys for Plaintiff/Counter-Defendant,
Hong Liu*

**UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| HONG LIU,<br><br>       Plaintiff,<br><br>       v.<br><br>FARADAY&FUTURE INC., SMART KINGLTD., JIAWEI WANG, and CHAOYING DENG<br><br>       Defendants.<br><br>FARADAY&FUTURE INC.,<br><br>       Counterclaimant,<br><br>       v.<br>HONG LIU,<br>       Counter-Defendant. | **Case No:** 2:20-cv-08035-SVW-JPR<br><br>**DECLARATION OF HONG LIU** |

I, Hong ("Henry") Liu, declare as follows:

1. I am the Plaintiff in this action. I have personal knowledge of the facts stated in this Declaration. If called upon to do so, I would testify competently thereto.

2. I submit this Declaration in opposition to Defendants' motion for summary judgment and in support of Plaintiff's cross-motion for partial summary judgment.

### At Mayer Brown, I Did No Legal Work for FF

3. Between April 28, 2014 and February 7, 2018, I was a partner at Mayer Brown LLP ("Mayer Brown"). Throughout my time at Mayer Brown, I was based in its New York office. I am, and was while working at Mayer Brown, admitted to practice law in the state of New York. While at Mayer Brown I made $1.35 million in 2017.

4. While employed by Mayer Brown, I advised numerous clients on a wide range of matters. During my entire career at Mayer Brown, I never provided any legal advice to Faraday&Future Inc. ("FF") on any matter. I never supervised the work of other Mayer Brown attorneys on any matter in which Mayer Brown represented FF. While at Mayer Brown, I did not bill time to any matter in which Mayer Brown was representing FF.

5. At Mayer Brown, partners who originated a relationship with a particular client were designated as the "billing partner" for matters on which Mayer Brown represented any such client. I was designated as the billing partner on twenty-four client matters. I never served as the billing partner on any matter involving FF.

### FF Approaches Me

6. On October 15, 2017, Mr. Junmin "Michael" Wang invited me to visit FF's offices in California. In response to this invitation, on October 17 and 18, I met with representatives of FF in Los Angeles, including FF's Vice President of Capital Markets Jiawei "Jerry" Wang, Michael Wang, FF's Vice-President of Administration Chaoying Deng, and FF's then CEO Yueting Jia.

2
DECLARATION OF HONG LIU
CASE NO.: 2:20-CV-08035-SVW-JPR

7. During the October 17 and 18 meetings, Mr. Jia told me that it would be advantageous to FF to have a person with my status and recognition. However, at that time, although it was my impression that Mr. Jia desired me to consider joining FF, he did not explicitly make any employment offer, and I did not entertain any discussion of employment terms.

8. At the time of the October 17 and 18 meetings, I understood that Mayer Brown had previously done regulatory work for FF for which there was a substantial unpaid balance (and that, at the time, Mayer Brown had suspended work for FF in light of the unpaid balance). I learned that there were two previous engagement letters between Mayer Brown and FF, entered into in December 2015 and May 2017. Attached as Exhibit 1 is a true and correct copy of the May 31, 2017 engagement letter and attached as Exhibit 2 is a true and correct copy of the December 22, 2015 engagement letter. I also understood that Mr. Phil Recht, a Mayer Brown partner based in its Los Angeles office, had supervised these engagements.

9. During my October 17 and 18 visits to FF's offices, Mr. Jia indicated that FF would pay past due balances on Mayer Brown's invoices. Mr. Jia also asked me to send a proposal to FF regarding Mayer Brown's potential representation of FF on new matters, including a potential series A financing.

10. On October 20, 2017, in response to Mr. Jia's request, I sent an email to FF attaching an unsigned draft engagement letter and proposed work plan. Attached as Exhibit 3 is a true and correct copy of this email. For over two months, FF did not sign this document.

**FF Sends me a Draft Term Sheet for the Employment Agreement**

11. Shortly after I sent the above-referenced draft engagement letter on October 20, 2017, Jerry Wang reached out to me to discuss whether I would be interested in working at FF.

12. On October 25, 2017, Mr. Wang sent me an email with two attachments. The first attachment was a document entitled "DRAFT EMPLOYMENT AGREEMENT TERM SHEET FOR HENRY L." (the "Term Sheet"). The second attachment was an Excel spreadsheet containing information under the heading "FF Option Valuation Estimation." (the "Option Valuation"). Attached as Exhibit 4 is a true and correct copy of this email and the two attachments.

13. The Term Sheet contained a proposal for me to serve as "Vice Chairman and Global General Counsel of FF Inc." *See* Exhibit 4 at 7. It contained a number of proposed terms, including "Annual salary and bonus of US$900,000 per year," and "20,000,000 (2%) of the fully diluted equity of the Company as stock option." *See id.* I did not solicit the proposed equity interests in the Term Sheet.

14. The Option Valuation contained a range of estimated values for the 2% equity stake that was referenced in the Term Sheet. *Id.* at 5. The lowest estimated value was $42.8 million, which was labeled as the "Series A Value." *See id.* The next highest estimated value was between $100 and $150 million, which was labelled as the "Series B Value." *See id.* The next highest estimated value was $432 million to $648 million, which was labelled as the "IPO Value." *See id.* The highest estimated value was $1 billion, which was labelled as the "IPO 3 years Value." *See id*.

15. Between October 26 and 29, 2017, I had several conversations with Jerry Wang in which I verbally advised him that FF should seek independent counsel in connection with negotiating the terms of my potential employment at FF. During these conversations, Jerry Wang repeatedly assured me that FF had its own in-house legal department and would also seek advice from its outside counsel at Sidley Austin LLP in connection with negotiating the terms of my potential employment.

16. On October 29, 2017, Jerry Wang asked me to send him information concerning my compensation at Mayer Brown. I sent him my compensation package

4
DECLARATION OF HONG LIU
CASE NO.: 2:20-CV-08035-SVW-JPR

that same day with my resume in English and Chinese.   *See* Exhibit 5, a true and correct copy of the October 29, 2017 email and its attachments.

17.   On November 2, 2017, Jerry Wang sent me a Chinese article and a message stating "Dear Mr. Liu, please refer to the latest information above, recently there are some negative rumors going on in China, these are all completely fake and I hope won't influence your judgment, appreciated and I sincerely look forward to your reply."   *See* Exhibit 6, a true and correct copy of Jerry Wang and my conversation.

18.   Between November 2 and 15, 2017, I did not have substantive discussions with FF concerning my potential employment.   On November 16, 2017, Jerry Wang sent me an email with the subject line "FF US employment contract."   *See* Exhibit 7, a true and correct copy of the email and its attachments.   The email contained multiple attachments, including an offer letter template ("the "Offer Template").   *See generally id.* at 4.   Jerry Wang soon after sent me a message stating: "I've shared standard FF package for your view to your personal gmail address."   *See* Exhibit 6

19.   After Jerry Wang sent me the Offer Template, I confirmed with him that I should "fill those terms that we have so far agreed on and those we have been discussing into the form letter agreement you provided."   *See* Exhibit 6.   Jerry Wang responded, "Sounds good, thanks a lot Mr. Liu!"   *See id.*   During this time Jerry Wang and I agreed to change the equity grant from 2% to 3%. On November 21, 2017, I emailed Jerry Wang the employment contract (entitled "Term Sheet") with the terms filled in based on our prior discussions. Exhibit 7A is a true and correct copy of this email and attachment. No further substantive discussions took place until December 29, 2017.

**FF Sends the Executed Engagement Letter to Phil Recht at Mayer Brown**

20.   On December 22, 2017, Amanda Walker, FF's Corporate Counsel, emailed Phil Recht FF's signed Mayer Brown and FF engagement letter, which had been sent on October 20, 2017. FF did not update the date from October 20 to December 22, 2017.

5
DECLARATION OF HONG LIU
CASE NO.: 2:20-CV-08035-SVW-JPR

Ms. Walker stated in her December 22, 2017 email: "Attached please also find the supplemental engagement letter that one of your colleagues had requested back in October to reinitiate the engagement." *See* Exhibit 8. I was not copied on this email. *See id.* Later that day, Phil Recht forwarded me the engagement letter and I signed it. The fully executed agreement was sent later that day to FF.

**FF's Human Resources Team, In-House Attorneys and Sidley Austin LLP, Negotiate the Terms of My Employment**

21. On December 29, 2017, Jerry Wang called me and invited me to visit FF's offices in California on January 10, 2018. On January 1, 2018, Mr. Wang then emailed me and attached an updated term sheet contract in clean and redline form. *See* Exhibit 9. Mr. Wang's email stated, "Happy New Year! Please refer to attachment comments based on our discussion and previous term sheet, please let me know your feedback and sincerely look forward to partnership!" *See* Exhibit 9.

22. On January 10, 2018, I met in person with Mr. Jia, who was then CEO of FF, and it was there that Mr. Jia divided my compensation package into two agreements: the Stock Transfer Agreement (which eventually became the Director Compensation Agreement between Mr. Jia and me) and the Employment Agreement (between FF and me). The equity interest that was promised to me was subdivided between the two agreements. *See* Exhibit 10, a true and correct copy of an email with my equity interest divided between the two agreements. Mr. Jia was not a client of Mayer Brown; while I worked at Mayer Brown, I never provided him with legal advice.

23. Between January 10 and January 26, 2018, Mr. Wang and I exchanged multiple drafts of the Employment Agreement and Stock Transfer Agreement. Throughout my negotiations with FF I was told by Mr. Wang that FF's in house attorneys, FF's outside counsel Sidley Austin LLP, and FF's Human Resources ("HR") team were reviewing both agreements. On January 22, 2018, Jerry Wang told me "Thank

you, manager Liu, for accepting my modifications to the Employment Agreement. I no longer have any issues with this agreement. Ultimately the HR director DG will need to review it. If he also does not have any other issue with it, we can then finalize it." Attached is Exhibit 11, a true and correct copy of the translated message. On January 25, 2018, I was told in writing that FF's internal Legal Department was "working closely with HR in doing the final review." *See* Exhibit 12, a true and correct copy of the translated message. On January 26, 2018, I was told that "Sidley's company partner VJ is reviewing this agreement for us right now to make sure there is no violation of any stipulations with investors." *See* Exhibit 13, a true and correct copy of the translated message. On January 26, 2018, Jerry Wang sent a message to myself and Wentao Huang, a lawyer who worked in FF's legal department, "Many thanks to Mr. Huang for your coordination for the term(s) of the employment contract(s)." *See* Exhibit 14, a true and correct copy of the translated message exchange between Jerry Wang, Wentao Huang, and myself.

24. Late in the day on January 26, 2018, I signed my Employment Agreement dated January 25, 2018, and emailed the executed agreement to Jerry Wang. *See* Exhibit 15, a true and correct copy of the email correspondence and attachments. FF sent me back the countersigned agreement that same day. *See* Exhibit 16, a true and correct copy of the email exchange and attachments.

25. However, my compensation and employment terms were not yet complete. Between January 26 and February 2, 2018, Jerry Wang and I had extensive negotiations over the Stock Transfer Agreement. Sidley Austin LLP, FF's external counsel, through Jerry Wang, continued to be involved in the drafting process. On January 30, 2018, Jerry Wang sent me an updated redline of the Stock Transfer Agreement and told me to "Please take a look this version drafted by company external counsel Sidley, and I make it clear to make it unchanged as much as possible and reflect all business terms that we

7
DECLARATION OF HONG LIU
CASE NO.: 2:20-cv-08035-SVW-JPR

mutually agreed. Please let me know if we need to do a call to explain further, and Sidley is happy to arrange a conference call together with us to walk through and discuss solutions." *See* Exhibit 17, a true and correct copy of the email exchange and attachments. The Stock Transfer Agreement was completely revised by Sidley Austin LLP and its title had changed to the Director Compensation Agreement. *See id.*

26. Later on January 30, 2018, I applied edits to the Director Compensation Agreement and sent Jerry Wang a revised version. Jerry Wang responded with new edits and told me "please let me know if you would like to schedule a call with Sidley to briefly discuss how to best describe the specific amount." *See* Exhibit 18, a true and correct copy of the email exchange and attachments. At 10:33 PM, on January 30, 2018, after further negotiations, Jerry Wang sent me comments on the Director's Compensation Agreement and told me "if you think it is fine I will forward to Sidley and discuss with them." *See* Exhibit 19, a true and correct copy of the email exchange and attachments.

27. After further exchanges of drafts of the Director Compensation Agreement between Jerry Wang and I, on February 1, 2018, Jerry Wang passed along what he described as a comment from Sidley: "thanks Jerry – this is better, but still carries moderate risk of breach of the shareholders agreement (and will have to be disclosed in connection with an IPO)." *See* Exhibit 20, a true and correct copy of the email exchange and attachments.

28. On February 2, 2018, Mr. Jia and I signed the Directors Compensation Agreement and I emailed Jerry Wang my executed copy. *See* Exhibit 21, a true and correct copy of the email exchange and attachments. On February 7, 2018, I officially resigned from my partnership at Mayer Brown. *See* Exhibit 22.

**I Begin Working At FF**

29. After signing the Employment Agreement and Director Compensation Agreement, I relocated with my family from New York to California and began working at FF on February 15, 2018.

30. Within my first week on the job, FF assisted me in registering with the State Bar of California as in-house counsel, which occured on April 17, 2018. *See* Exhibit 23, a true and correct copy of the email exchange between Sandy Gilliam of FF and myself; *see also* Exhibit 24, a true and correct copy of my certificate of registration for in-house counsel with FF.

31. My job duties at FF included leading the legal affairs and coordinating administrative functions of FF, including but not limited to overseeing the expansion of the legal team, managing the development of policies and procedures, hiring additional in-house lawyers to enhance the FF legal department, and coordinating external counsels and internal litigations.

32. On August 1, 2018, FF issued a press release formally announcing my hiring. *See* Exhibit 25, a true and correct copy of the August 1, 2018 press release.

33. On or about October 25, 2018, I was informed that my 20,000,000 options were entered into FF's stock option system provided by a third party, Solium. In late October 2018, Smart King's board of directors passed a resolution granting my 20,000,000 options in Smart King pursuant to the Employment Agreement. On or about January 2019, I confirmed online that my options had been issued. *See* Exhibit 26, a true and correct copy of the confirmation that my options had been issued.

**My Attempts to Stop Illegal Work-Place Violations & Advise FF Through The Evergrande Dispute**

34. My work at FF included helping FF when its largest investor, Evergrande, backed out of its funding commitment in August 2018 (the "Evergrande

9
DECLARATION OF HONG LIU
CASE NO.: 2:20-cv-08035-SVW-JPR

Dispute"). Because of the Evergrande Dispute, FF, specifically Mr. Jia, planned furloughs and mass layoffs. I directed my legal team to write memos on the best practices under California law before termination in compliance with the Worker Adjustment and Retraining Notification Act ("WARN Act"), which requires 60-day notice to employees before mass terminations, as well as what the requirements of Smart King's board were to comply with their fiduciary duties. *See, e.g.,* Exhibit 27, a true and correct copy of an email exchange in which I had my advice on the WARN Act reflected in the Board of Directors meeting minutes.

35. Another issue that I raised concerned Mr. Jia's practice and commandment that all management meetings be recorded. At my request, a memo was prepared outlining why Mr. Jia's request ran afoul of California law. A true and correct copy of an email reflecting this memo is attached hereto as Exhibit 28. Mr. Jia ignored the recommendations.

36. During the month of October 2018, as Mr. Jia refused to comply with California law, multiple core management team and FF Board members, including FF's co-founder Nick Sampson and I, recommended that Mr. Jia be removed as CEO. At FF's management meeting in late October 2018, I suggested to Mr. Jia that he should step down to help save the company. In response, Mr. Jia stripped me of my Global General Counsel position and began to remove me from many important actions within the company. Other senior management members, including Mr. Sampson, quit, or were forced to resign, or were effectively fired in direct response to the request for Mr. Jia to step down as CEO.

37. While after October 2018 I no longer held my Global General Counsel position title and no longer was included as a legal counsel at legal department meetings, I continued to report on and try to correct workplace violations. These ongoing violations included, but were not limited to, secret recordings of office meetings in violation of

California law and violations of the WARN Act and/or labor laws. The multiple memos I had written by my team on these issues were never seriously considered by FF. My duties being stripped and my advice not being taken eventually culminated with me sending an email to Yueting Jia himself on January 23, 2019. The email stated that:

> As is widely known, at least since October 2018, my management responsibilities have been continuously reduced, removed and replaced by you, and my authority and support in performing my duties have also diminished, all without my advance knowledge or agreement. I have been very concerned about these actions, and I have protested to you many times during our past conversations. I have previously expressed to you my grave concern regarding the company's failure to comply with the laws of the State of California and the United States, as well as the company's failure to build a best practice in corporate governance. For example, I have directly expressed my views to you and others at the company on how to best comply with laws regarding many company practices, including but not limited to, your improper authorization of the recording of meetings without required consent; immigration and work permit compliance issues which you have ignored; failing to adequately investigate sexual harassment complaints against management especially your close associates; retaliation against employees who have raised concerns regarding financial issues; and timely compliance with the WARN Act. I have also constantly reminded you to resolve your personal situations as someone identified as a repeated "Dishonest Person" by the Chinese courts, and to try to resolve your numerous personal lawsuits. I have also advised you to address the reports about your other possible legal issues and financing dealings, including the surprise visits by the US FBI to you in May 2018, so that these issues will not hurt the company and its stakeholders including you yourself. I sincerely wish that you had not and would not retaliate against me for what I have done in performing my responsibilities and duties.

*See* Exhibit 29, a true and correct copy of the email exchange.

38. I was terminated from my position without being given any cause roughly three weeks later on February 11, 2019. Mr. Jia told me during my termination meeting that my effort and suggestion to remove Mr. Jia and save the company was the reason for my termination. Defendants now suggest something different: in their most recent counterclaims, they claim to have terminated me because, among other reasons, I failed to advise on the WARN Act and with respect to recording management meetings. As set forth above, these allegations are demonstrably false.

39. After my termination, FF never vested my 20,000,000 Smart King Options. I was never paid $2.4 million of my $3 million signing bonus and I was never paid the remaining $4 million of my $5 million guaranteed base salary over the five year employment term in the Employment Agreement.

I declare under penalty of perjury that the foregoing is, to the best of my knowledge and belief, true and correct.

Dated:      May 18, 2021

*/s/ Hong Liu*
Hong Liu