# Exhibit B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

————————————————————X

| | | |
|---|---|---|
| HONG LIU, | : | Case No. 2-20-cv-08035-SVW-JPR |
| Plaintiff, | : | Hon. Stephen V. Wilson |
| v. | : | |
| FARADAY&FUTURE INC., SMART KING LTD., JIA WEI WANG and CHAOYING DENG, | : | |
| | : | |
| Defendants. | : | |
| AND RELATED COUNTERCLAIM | : | |

————————————————————X

### EXPERT REPORT OF J. RICHARD SUPPLE, JR.

1.   I am a partner in the New York office of Clyde & Co US LLP.  Plaintiff Hong Liu has retained me in this matter as an expert in lawyers' professional ethics.  I submit this Report in connection therewith.

### *Background*

2.   My qualifications as an expert are as follows:

a.   Since 1993, I have regularly and continuously practiced as a lawyer in the area of professional ethics.  From 1993 to 1999, I was a Senior Staff Attorney at the Departmental Disciplinary Committee, Appellate Division, First Judicial Department in New York, where I prosecuted charges of professional misconduct against lawyers in dozens of matters.  Since 1999, I have continuously been in private practice representing law firms and lawyers of all kinds and in all manner of professional ethics matters, including, but not limited to, advisory matters, federal and state court litigations involving alleged attorney malpractice or misconduct, arbitrations, and appeals.  In the last 5 years, I was retained in two now-concluded

federal and state litigations (one in the United States District Court for the Southern District of New York and the other in the New York State Supreme Court, Erie County) and was qualified in a still-pending arbitration in New York before the American Arbitration Association where I testified. Because the matters settled shortly after I submitted my reports, I was not deposed and did not testify in the above-referenced federal and state court litigations.

        b.       In addition to practicing for clients, I was general counsel of an AmLaw 100-sized law firm between 2017 and 2019, during which time I advised senior management of my now-former firm on sensitive ethics issues on a near-daily basis.

        c.       I have taught and spoken extensively on issues of professional ethics at continuing legal education seminars or in other conference settings across the United States and outside the country.

        d.       From 2004 to 2016, I was an adjunct professor of law at the Benjamin N. Cardozo Law School, where I taught a course each year on professional ethics.

        e.       I am a co-author of New York Attorney Discipline, Practice and Procedure (New York Law Journal Press), which is updated and re-published every other year, and author of the chapter on professional discipline in the Fifth Edition of the well-known treatise, Commercial Litigation in New York State Courts (Thomson Reuters), released in October 2020.

        f.       From 2010-2013, I was chair of the Professional Discipline Committee, New York City Bar Association.

My curriculum vitae is attached as **Exhibit A**.

        3.       I am being compensated at $750 per hour for preparing this Report and, if necessary, for giving testimony. Associates from my firm who assist me are being compensated at their usual hourly rates.

*Facts*

4. For purposes of forming my opinions and preparing this Report, I reviewed the following documents:

    a. The papers comprising Faraday&Future, Inc. ("Faraday") and Smart King Ltd.'s motion for summary judgment or, in the alternative, partial summary judgment, of plaintiff Hong Liu's complaint, dated April 26, 2021;

    b. Order, dated April 29, 2021;

    c. The exhibits attached to plaintiff Hong Liu's opposition to the motion described in paragraph 4(a) *supra* and in support of Hong Liu's cross-motion for summary judgment, to be filed the same day as this Report.

5. I have no first-hand knowledge of facts relevant to this case. For purposes of my analysis, I assume the following facts to be substantially accurate.

*Background*

6. Plaintiff Hong "Henry" Liu is, and at all times relevant to this Report, was an attorney admitted to practice in New York.

7. Defendant Faraday is an electric automobile company headquartered in California. Faraday's indirect parent company is Defendant Smart King Ltd.

8. Jia Wei "Jerry" Wang is, and at all times relevant to this Report, was Vice-President of Capital Markets at Faraday.

9. Chaoying Deng is, and at all times relevant to this Report, was Vice-President of Administration at Faraday.

10. As of 2015, Liu was a partner in the New York office of the large international law firm Mayer Brown LLP.

*Faraday's Retentions of Mayer Brown*

11.     In December 2015, Faraday retained Mayer Brown for regulatory matters. Mayer Brown's lead partner for the Faraday engagement was Philip Recht, an attorney in Mayer Brown's Los Angeles office.

12.     On May 31, 2017, Faraday executed a second written retainer agreement with Mayer Brown. Recht was Mayer Brown's lead partner for this second engagement.

13.     On October 20, 2017, Liu sent Faraday a proposed retainer agreement for a range of legal services, including advice concerning capital markets, strategies, corporate, securities, intellectual property, wealth management matters, and "other tasks and matters as may be instructed by" Faraday. The proposed agreement's signature line for Mayer Brown did not originally identify a specific partner.

14.     More than two months later, on December 22, 2017, Faraday signed and returned the October 20 draft agreement to Recht, but not Liu. Recht forwarded the agreement to Liu who signed it for Mayer Brown. The fully executed agreement was thereupon sent to Faraday.

15.     While at Mayer Brown, Liu was not billing partner for Faraday and personally did no work for Faraday, nor did he supervise the work of other Mayer Brown attorneys.

*Faraday Solicits Liu For Employment*

16.     On or about October 15, 2017, Faraday affirmatively contacted Liu and invited him to meet with Faraday in person in California.

17.     On October 17, 2017, Liu travelled to California to meet with Faraday. At the meeting, Faraday discussed potential future engagements with Mayer Brown and suggested possible employment for Liu with the company.

18.     On October 25, 2017, Wang sent Liu a term sheet and option valuation estimate relating to Faraday's proposed employment of Liu. In addition to salary considerations, Faraday

4

proposed that Liu receive equity interests in the company, including certain stock options, and that the equity interests be derived from two sources, Faraday and Yueting Jia ("Jia"), Faraday's then-chief executive officer.  The option valuation estimate Wang sent to Liu indicated that Faraday projected its value to be in the hundreds of millions to billions of United States dollars.

19. Before Wang sent these documents to Liu, Liu had not demanded or solicited equity interests in Faraday as consideration for his employment.

20. As of October 15, 2017, Faraday was a substantial ongoing business with its own in-house legal department.  Faraday had also retained the law firm Sidley Austin LLP as outside counsel.

21. Between October 26 and 29, 2017, Liu and Wang discussed Liu's potential employment at Faraday.  Liu verbally told Wang that Faraday should be advised by independent counsel regarding his prospective employment and Wang responded that Faraday would be advised in the matter by Sidley Austin.

22. On November 16, 2017, Wang sent Liu documents with respect to Liu's prospective employment, including a template document that invited Liu's response to Faraday's proposals for equity and options-based employment compensation.  On November 21, 2017, Liu sent Wang a term sheet that, amongst other provisions, proposed to grant Liu 3% of Faraday's total equity shares.

23. On January 1, 2018, Wang sent Liu a proposed employment agreement.  On January 10, 2018, Jia proposed that Faraday equity interests be conveyed to Liu in two separate agreements – one that would continue to be referred to as Liu's employment agreement (conveying 2% of Faraday's equity shares) and the other called a stock transfer agreement (later titled a director compensation agreement and transferring to Liu from Jia 1% of Faraday's equity shares).  Jia was not an individual client of Mayer Brown or Liu personally.

5

24. On January 22, 2018, Wang advised Liu that Faraday's Human Resources department was reviewing the proposed agreements.

25. On January 25, 2018, Wang advised Liu that Faraday's legal department was doing a final review of the proposed agreements.

26. On January 26, 2018, Wang informed Liu that Sidley Austin was reviewing the proposed employment agreement for Faraday.

27. On January 26, 2018, Sidley Austin asked Wang whether Faraday wanted employee benefits attorneys in the firm to further review the employment agreement. Wang responded that Liu would be signing Faraday's standard offer letter "so it should be fine to cover some basic terms in there."

28. On January 26, 2018, Faraday and Liu executed Liu's employment agreement.

29. Between January 26, 2018 and February 2, 2018, Faraday and Liu negotiated and finalized Liu's director compensation agreement. Sidley Austin provided legal advice regarding this agreement to Faraday on an ongoing, continuous basis during this period.

30. On April 17, 2018, after commencing employment with Faraday, Liu registered as in-house counsel to Faraday pursuant to California Rule of Court 9.46.

*Analysis*

31. My opinions below are grounded upon prevailing ethics rules and law as well as relevant bar opinions in New York and respected secondary sources regarding lawyers' duties to clients and third parties. At all times relevant for my analysis, New York's Rules of Professional Conduct (hereafter, "NY Rules") were applicable to Liu because he was licensed to practice law only in New York as of February 2, 2018. NY Rule 8.5(b)(2)(i) ("If the lawyer is licensed to practice only in this state, the rules to be applied shall be the rules of this state."); N.Y. State Eth. Op. 1054 (2015) (foreign ethics laws may apply "[i]f the [New York-admitted] lawyer is permitted to practice in [the foreign state]")*; and see* Calif. Rule of Prof. Cond. 1-

6

100(D) (California disciplinary rules only apply to non-members of the California Bar when they are "engaged in the performance of <u>lawyer functions</u> in [California]") (emphasis added).

32.     Faraday contends that Liu's conduct while negotiating employment violated NY Rules 1.8(a), 1.7 and 1.5, which respectively prohibit attorneys from: (a) transacting business with current clients under certain circumstances; (b) acting for a client despite an un-waived conflict of interest; and (c) making an agreement with a client for an excessive legal fee.  The NY Rules are "rules of reason.  They should be interpreted with reference to the purposes of legal representation and of the law itself."  NY Rules, Scope, cmt. [6]; *see also Niesig v. Team I,* 558 N.E. 1030, 1032 (N.Y. 1990) (New York courts apply disciplinary rules in litigation "as guidelines to be applied with due regard for the broad range of interests at stake"), *citing Foley & Co. v. Valderbilt,* 523 F.2d 1357, 1360 (2d Cir. 1975) (Gurfein, J. concurring) ("When we agree that the Code applies in an equitable manner to a matter before us, we should not hesitate to apply it with vigor. When we find an area of uncertainty, however, we must use our judicial process to make our own decision in the interests of justice to all concerned.")

33.     In consideration of the above-recited facts, it is my professional opinion that Liu did not violate a duty of care to Faraday under any of the above-referenced NY Rules.

*Rule 1.8(a)*

34.     NY Rule 1.8(a) forbids a lawyer from "enter[ing] into a business transaction with a client" if the lawyer and "client" have "differing interests and if the client expects the lawyer to exercise professional judgment therein for the protection of the client unless" the lawyer makes certain written disclosures to the client, obtains consent for the transaction, and the transaction itself is "fair and reasonable."  Liu and Faraday did not, of course, negotiate with identical interests.  Accordingly, as threshold conditions for NY Rule 1.8(a)'s imposition of written disclosure and consent requirements, it must be determined whether Faraday was a "client" of Liu's for purposes of the rule, and if Faraday was Liu's client, whether Faraday expected Liu to

7

"exercise professional judgment" for Faraday's protection when negotiating his employment. *See* N.Y. State Eth. Op. 913 (2012) ("Rule 1.8(a) invites a twofold inquiry. The first is whether the transaction itself is one in which the lawyer and client have differing interests <u>and</u> in which the client expects the lawyer to exercise the lawyer's independent professional judgment on the client's behalf. If the answers are yes, then as a second step the lawyer must assure that the terms are fair and reasonable" and the other writing and consent requirements in the rule are met) (emphasis in original).

<u>Whether Faraday was Liu's "Client"</u>

35. As an initial consideration, I do not believe Faraday was Liu's client (as opposed to Mayer Brown's client) for purposes of NY Rule 1.8(a).

36. As per the facts above, Liu personally performed or supervised no work for Faraday before and while negotiating his employment. All work for Faraday was done by other Mayer Brown attorneys. Accordingly, the only theory for finding that Faraday was Liu's client is imputation; namely, that because certain Mayer Brown attorneys were acting for Faraday, Liu (and every other Mayer Brown attorney) should automatically be deemed Faraday's "lawyer."

37. NY Rule 1.10 deals with the circumstances under which conduct by one lawyer in a law firm is attributed to all other lawyers in the law firm. Rule 1.10 states that "[w]hile lawyers are associated in a firm, none of them shall knowingly <u>represent</u> a client when any one of them practicing alone would be <u>prohibited</u> from doing so by Rule 1.7, 1.8 or 1.9, unless as otherwise provided therein." (emphasis added). NY Rule 1.10 does not logically encompass NY Rule 1.8(a) because, although NY Rule 1.8(a) regulates certain transactions between lawyers and their clients, it does not prohibit a lawyer from representing a client. Thus, the mere fact that other Mayer Brown attorneys represented Faraday should not make Liu Faraday's "lawyer" for purposes of a NY Rule 1.8(a) analysis. This conclusion is reinforced by the concerns underlying the rationale for imputing conduct between lawyers generally.

8

38. According to the Restatement (Third) of the Law Governing Lawyers § 123, cmt. b:

> Imputation of conflicts of interest to affiliated lawyers reflects three concerns. First, lawyers in a law firm or other affiliation … ordinarily share each other's interests. A fee for one lawyer in a partnership, for example, normally benefits all lawyers in the partnership. Where a lawyer's relationship with a client creates an incentive to violate an obligation to another client, an affiliated lawyer will often have similar incentive to favor one client over the other. Second, lawyers affiliated as described in this Section ordinarily have access to files and other confidential information about each other's clients. Indeed, clients might assume that their confidential information will be shared among affiliated lawyers … Sharing confidential client information among affiliated lawyers might compromise the representation of one or both clients if the representations conflict. Third, a client would often have difficulty proving that the adverse representation by an affiliated lawyer was wholly isolated. Duties of confidentiality on the part of the affiliated lawyers prevents adequate disclosure of the interactions among them. Moreover, to demonstrate that the lawyer misused confidential information the client often would be forced to reveal the very information whose confidentiality the client seeks to protect. However, considerations of free choice of lawyers by clients and the free mobility of lawyers between firms or other employers caution against extending imputation further than necessary.

39. Based on the facts made known to me, none of the Restatement's three above-cited concerns is relevant here. Mayer Brown's work for Faraday did not incentivize Liu to negotiate a better or worse employment agreement for himself and the facts do not suggest that confidential information provided by Faraday to Recht (or another Mayer Brown lawyer actively representing Faraday) helped Liu negotiate different and more favorable employment terms with Faraday, which proposed employment terms to Liu on its own account. Moreover, Liu's negotiation with Faraday was plainly an "isolated" matter, and Liu was not representing a client adverse to Faraday's interests. Because none of the above concerns applies, the Restatement's cautionary language that imputation should not unreasonably be extended to interfere with a lawyer's mobility between employers is applicable.

40. Further, if NY Rules 1.8(a) and 1.10 were strictly construed such that Recht's (or other Mayer Brown lawyers') work for Faraday automatically made Faraday Liu's client for purposes of NY Rule 1.8(a), inequitable results contrary to the "reasonable" purposes of the NY

9

Rules could follow.  Law firms like Mayer Brown are enormous entities, with thousands of lawyers spread throughout the world. Applying NY Rule 1.8(a) in a strict liability sense, without regard to reason, facts and circumstances, could make lawyers who negotiate for a position with a sophisticated entity client, with an in-house legal team, vulnerable to an after-the-fact, draconian claim for recission based on the imputation of other lawyers' conduct, even though the lawyer did no legal work for the client and notwithstanding that the lawyer's firm's relationship with a corporate client was literally of no moment to the negotiation or its outcome. A rule of ethics grounded on reason and equity would not permit such a result.

<u>Whether Faraday Expected Liu to Exercise Professional Judgment on its Behalf</u>

41.     Even if Faraday was Liu's client, NY Rule 1.8(a) should not apply to Liu's negotiations with Faraday because it was not reasonable for Liu to believe or expect that Faraday was relying upon him to exercise personal judgment to protect its interests when Liu was negotiating the terms of his prospective employment with Faraday.  The issue of client reliance is the key element of a NY Rule 1.8(a) analysis.  N.Y. State Eth. Opp. 1055 n. 1 (2015), the leading New York ethics opinion on the subject, sets forth the factors determinative of whether the client expects the lawyer to exercise reasonable professional judgment on the client's behalf:

> These include (i) whether the client has other counsel in the matter, for example, because it is a corporation or other entity with a legal department, (ii) whether the lawyer is responsible for client matters in the subject area, and (iii) whether the client is an individual or an entity and the client's level of sophistication in legal matters.  We believe it is more likely that an individual client or one that is not sophisticated in legal matters is more likely to rely on a lawyer that does not represent the client in that matter than would be the case with an institutional client.

42.     An application of these factors indicates that Faraday was not expecting Liu to exercise professional judgment on its behalf in connection with the negotiation of the employment agreement.  Faraday had both in-house and outside counsel for its negotiation with Liu.  Liu was not responsible for Faraday's matters with Mayer Brown and had never done legal

10

work for Faraday. And, in contrast to an unsophisticated lay individual, Faraday was a sophisticated international automobile company that valued itself in terms of hundreds of millions or billions of United States dollars. In sum, none of the facts known to me suggest that Faraday was in any way dependent upon Liu. NY Rule 1.8(a) should not be applied prophylactically under these circumstances. *See e.g. Matter of Chariff,* 633 N.Y.S.2d 618, 620 (N.Y. App. Div. 1995) (although attorney did not comply with disclosure and consent requirements when making a loan agreement with his client, the predecessor version of NY Rule 1.8(a) was not violated insofar the sophisticated businessman client was not deceived by his lawyer and was aware of all relevant information before making the loan"); *and see* N.Y. City Eth. Op. 2000-3 (2000) (there is "no *per se* ethical prohibition on the acceptance of shares or other securities, including options, as compensation for legal services to be rendered").

      43.     "The crucial question is whether the defendant attorney established that the contract was made by the client with full knowledge of all material circumstances known to the attorney, and was in every respect free from fraud …" *Howard v. Murray,* 346 N.E.2d 238, 239 (N.Y. 1976) (internal citations omitted). Here, Liu was in no position to take advantage of Faraday, and any argument that Faraday would not have agreed to the employment agreements it signed with Liu if only Liu had reminded it to consult its own legal counsel – as Faraday, in fact, was doing – seems far-fetched. "A lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a … financial transaction with a client … For these reasons business transactions between a lawyer and client are not advisable." NY Rule 1.8, cmt. [1]. Where, however, a "client" is actually represented by lawyers for a transaction, the client should not be heard to argue later that the lawyer on the receiving end of the transaction exercised professional judgment for the client's benefit in the deal.

*Rule 1.7*

44. NY Rule 1.7(a) states: "[A] lawyer shall not represent a client if a reasonable lawyer would conclude that … there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests," unless the client consents to the representation. "When a reasonable lawyer would conclude that the risk of adverse effect on professional judgment is not a significant one, then there is no conflict …" N.Y. State Eth. Op. 1048 (2015). Put another way, for a risk to be "significant," it must be more than just "possible." *See also* N.Y. State Eth. Op. 712 (1999) (there is no conflict of interest merely because there is a "fanciful, theoretical or *de minimis* risk that the lawyer's judgment will be affected adversely by a potentially relevant set of interests").

45. Based on the facts and circumstances discussed above, it is my opinion that a reasonable lawyer would not conclude there was a "significant risk" when Liu was negotiating his employment terms that he would exercise professional judgment improperly for Faraday. For the reasons discussed above, Faraday formulated its own proposals for equity-based compensation, applying its own valuations, and was not looking for Liu to exercise his professional judgment for its benefit while negotiating Liu's employment. Instead, Faraday relied on its own human resources department, in-house counsel, and outside counsel for professional judgment vis-à-vis Liu's prospective employment.

46. Further diminishing any prospect that Liu might exercise judgment adversely to Faraday is that Mayer Brown's regulatory work for Faraday bore no meaningful relationship to the subject of Liu's employment negotiations. *See* N.Y. State Eth. Op. 994 (2013) (opining that Rule 1.7 was not violated where an attorney whose firm represented a school district negotiated for employment as a sports coach at a school in the district because there was little risk "of

adverse effect if … the legal work on behalf of the school district were unrelated to the lawyer's work as coach").

*Rule 1.5*

47. Pursuant to NY Rule 1.5(a), a lawyer may not:

make an agreement" to "collect an excessive or illegal fee … A fee is excessive when, after a review of the facts, a reasonable lawyer would be left with a definite and firm conclusion that the fee is excessive." Whether or not a fee is excessive depends upon a non-exclusive list of factors, including "(1) the time and skill required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service property; (2) the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation and ability of the lawyer … performing the services; and (8) whether the fee is fixed or contingent
.
48. Whether an exchange of securities for legal services would amount to an "excessive" fee should be considered in terms of the facts known to the lawyer when the agreement was made and should not be determined "with the wisdom of hindsight." N.Y. City Eth. Op. 2000-3 *supra*; *see also Lawrence v. Miller,* 901 N.E.2d 1268, 1272 n. 4 (N.Y. 2008) ("In general, agreements entered into between competent adults, where there is no deception or overreaching in their making, should be enforced as written. Accordingly, the power to invalidate fee agreements with hindsight should be exercised only with great caution.").

49. As the text of NY Rule 1.5 indicates, the test for determining whether a legal fee is excessive is fact-intensive and the standard for showing that a legal fee is "excessive" is difficult to meet. *See* N.Y. City Eth. Op. 2000-3 *supra* (determining whether a fee is excessive where securities are received for legal services is "more complex"). In this instance, I do not believe that the standard is met. Some of the NY Rule 1.5 factors are plainly inapplicable to a negotiation for in-house employment. But to the extent other factors may be applied, they argue for substantial compensation. Faraday solicited Liu to take responsibility for managing its legal

13

and administrative matters as its general counsel and chief administrative officer. Plainly, as Liu was already very well compensated as a senior equity partner in a large international law firm, Faraday was for all intents and purposes obligated to make Liu a substantial offer if it genuinely hoped to entice Liu to leave Mayer Brown.  Further, it is generally known and understood that compensation for a general counsel of a substantial company is high.

50.     The experience, reputation and ability of the lawyer is "the most important factor" when determining whether a legal fee is excessive.  N.Y. State Eth. Op. 1004 (2015).  The facts indicate that Liu was a senior partner at the globally respected firm Mayer Brown and had decades of experience.  Accordingly, I do not believe, on the record presented to me, that a reasonable lawyer would "definitely and firmly" conclude that Liu's acceptance of employment terms offered by Faraday (at the time the terms were accepted) amounted to a breach of his ethical obligations to Faraday under NY Rule 1.5.

*Conclusion*

51.     For the reasons herein, it is my professional opinion that Liu did not violate a duty to Faraday under NY Rules 1.8(a), 1.7 or 1.5.

Dated: May 18, 2021

*J. Richard Supple, Jr.*
J. Richard Supple, Jr.

# EXHIBIT A

**J. Richard Supple Jr.**
c/o Clyde & Co US LLP
405 Lexington Avenue
New York, NY 10174
212.710.3914
rick.supple@clydeco.us

**Legal Experience**

Clyde & Co US LLP, New York, NY (Partner 11/19 to present)

Represents law firms and lawyers in all kinds of professional ethics-related matters, including disciplinary and legal malpractice cases, partnership and fee disputes, internal investigations, disqualification and sanctions motions, and appeals.  Also advises on risk management and regulatory compliance issues, litigation finance, lateral movement, and law firm partnership agreements and dissolution.

Hinshaw & Culbertson LLP, New York, NY (Partner 3/04-11/19)

Litigated all manner of ethics-related cases for lawyers and law firms, including at trial, arbitration and on appeal.  Retained as an expert in matters concerning a lawyer's duty of care.  Advised clients regarding litigation finance and risk management issues.  Leader of the firm's 40+ attorney Professional Responsibility and Risk Management Practice Group from 1/16 to 2/19 and served as the firm's General Counsel from 3/17 to 2/19.

Edwards & Angell, LLP, New York, NY (Counsel 5/01-2/04)

Lead attorney in disciplinary and other professional ethics-related litigations, including appeals.  Handled hearings, arbitrations and depositions.  Also represented clients in significant class action litigation, mass tort cases, intellectual property matters and other commercial disputes in jurisdictions around the country.

Beldock, Levine & Hoffman LLP, New York, NY (Associate 6/99-5/01)

Represented clients in disciplinary, malpractice and other professional ethics-related litigations, including appeals.  Also handled state and federal criminal cases and civil litigations involving patent and trademark issues, creditor rights, personal injury, and estate matters.

Supreme Court, State of New York, Appellate Division, First Department
Departmental Disciplinary Committee, New York, NY (Staff Attorney 3/94-6/99)

Investigated and prosecuted complex disciplinary matters, including approximately 20 reported cases involving formal hearings.

Legal Aid Society, Brooklyn, NY (9/89-3/94)

Represented indigent defendants in state criminal cases from arraignment to trial.  Lead counsel at numerous felony jury trials.

**Significant Professional Affiliations**

Benjamin N. Cardozo School of Law, Adjunct Professor, 2004 – 2016

Practising Law Institute, Faculty Member

New York City Bar Association, Professional Discipline Committee, Chair, 2010 – 2013

**Education**

University of Wisconsin Law School, Madison, WI, J.D., 5/89

Duke University, Durham, NC, B.A. *magna cum laude*, 5/85

**Authorships**

Co-author, Commercial Litigation in New York State Courts (5th ed.)

Co-author, New York Attorney Discipline: Practice and Procedure (Biennial editions through 2020)

**Recent Speaking Presentations**

"Ethical Considerations for Attorneys in the Gig Economy," Calvary Institute, New York, NY, October 2020

"Negotiation Ethics," New York State Attorney General's Office, New York, NY, September 2020

"Ethics for the Negotiating Lawyer," Practising Law Institute, New York, NY, January 2013, January 2014, March 2015, March 2016, January 2017, January 2018, January 2019, January 2020

"Cryptocurrency: Show Me the Money," Legal Malpractice & Risk Management Conference (LMRM), Chicago, IL, March 2019

"Update – Litigation Finance," General Counsel Roundtable, Miami, FL, January 2019, Oklahoma City, OK, April 2019

"It's a Jungle Out There: Managing Risks in Mid-Sized Firms," LMRM, Chicago, IL, March 2018

"Winning the Arms Race in Big Civil Cases — the Upside and Downside of Litigation Finance," LMRM, Chicago, IL, March 2017

"The 'New' New York Rules on Attorney Discipline Procedure," Practicing Law Institute, New York, NY, January 2017

"Staying Out of Trouble 2016: The In-House Attorney-Client Privilege and Ethics and Technology Quiz Show," Practicing Law Institute, New York, NY, December 2016

"Playing the Away Game, How Can Non-Resident New York Lawyers Comply," New York State Bar Association, Miami, FL, September 2016

"Understanding the Moral Compass of In-House Lawyers," NYU Stern School of Business, New York, NY, July 2016

"Evaluation of Attorneys' Fees in Complex Litigation," New York, NY, June 2016

"Phantom Clients and How to Exorcise Them," LMRM, Chicago, IL, March 2016

"Ethics for the Trademark Lawyer," Practising Law Institute, New York, NY, March 2015

"Defenses to Disqualification Motions: What Works and What Doesn't," LMRM, Chicago, IL, February 2015

"Getting Admitted in the First and Second Departments," New York City Bar Association, New York, NY, October 2014

"Attorney Discipline in New York: Structure, Process & Trends," New York City Bar Association, New York, NY, July 2014

"'Playbook' Disqualifications," LMRM, Chicago, IL, March 2014

"Staying Out of Trouble: What Every Lawyer Should Know About Ethics," Practicing Law Institute, New York, NY, December 2013

"Defending Wall Street and Main Street: The Revolving Door and Lawyers as Whistleblowers," New York County Lawyers Association, New York, NY, November 2013

"Attorney Discipline in New York—Four Different Departments, Four Different Approaches," New York State Bar Association, New York, NY, January 2013

"Ethics in Purchases and Sales of Homes," New York State Bar Association, New York, NY, April 2013 and May 2015

"Ethics and Professionalism: Best Practices for Attorneys," New York City Bar Association, New York, NY, April 2013, April 2014 and May 2015

"The Disciplinary Process—How it Works," New York City Bar Association, New York, NY, July 2013