1  Kevin D. Hughes (Bar No. 188749)
   kevin@foundationlaw.com
2  FOUNDATION LAW GROUP LLP
   1999 Avenue of the Stars, Suite 1100
3  Los Angeles, CA 90067
   Tel: 424.253.1266
4
5  Amiad Kushner (*pro hac vice*)
   Akushner@seidenlawgroup.com
6  Jake Nachmani (*pro hac vice*)
   Jnachmani@seidenlawgroup.com
7  SEIDEN LAW GROUP LLP
   469 Seventh Avenue 5th Fl.
8  New York, NY 10018
   Tel: 646.766.1914
9  Facsimile:  646.304.5277

10 Attorneys for Plaintiff/Counter-Defendant Hong Liu

11              **UNITED STATES DISTRICT COURT**

12             **CENTRAL DISTRICT OF CALIFORNIA**

13

14 HONG LIU,                          CASE NO.  2:20-cv-08035-SVW-JPR

           Plaintiff,                 Honorable Stephen V. Wilson
15
       v.                             **NOTICE OF ERRATA RE TABLE OF
16                                     CONTENTS AND TABLE OF
   FARADAY&FUTURE INC., SMART          AUTHORITIES IN PLAINTIFF'S
17 KING LTD., JIAWEI WANG, and         MEMORANDUM OF POINTS AND
   CHAOYING DENG.                      AUTHORITIES IN SUPPORT OF HIS
18                                     CROSS-MOTION FOR SUMMARY
           Defendants.                 JUDGMENT, AND IN OPPOSITION
19                                     TO FARADAY&FUTURE INC. AND
                                       SMART KING LTD.'S MOTION FOR
20                                     SUMMARY JUDGMENT (*FILED AS
                                       DKT. 160*)**
21
                                      **HEARING ON MOTIONS:    June 1,
22                                     2021; June 21, 2021
                                       TIME:    1:30 p.m.
23                                     CTRM:   10A**
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FARADAY&FUTURE INC.,

Counterclaimant,

v.

HONG LIU,

Counter-Defendant.

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff Hong Liu hereby submits this Notice of Errata with respect to his Notice of Motion and Cross-Motion for Summary Judgment on Defendant Faraday&Future Inc.'s Second Amended Counterclaim and Defendant Faraday&Future Inc.'s and Defendant Smart King Ltd.'s Affirmative Defenses and Partial Summary Judgment on Plaintiff's Breach of Contract Claim ("Cross-Motion and Opposition") (Docket No. 160).  The Memorandum of Points and Authorities was filed with an erroneous Table of Contents and Table of Authorities.  The corrected Table of Contents and Table of Authorities have been inserted into the Corrected Memorandum of Points and Authorities attached hereto.  No other changes were made to the Memorandum of Points and Authorities.

For the convenience of the Court and parties, Plaintiff attaches the complete Cross-Motion and Opposition, including the Corrected Memorandum of Points and Authorities, as Exhibit "A" hereto.

Dated: May 19, 2021                          FOUNDATION LAW GROUP LLP


By: /s/ Kevin D. Hughes
   Attorneys for Plaintiff

# EXHIBIT A

Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email:  kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiden Law Group LLP
469 Seventh Avenue, 5th Fl.
New York, NY 10018
Telephone:  (646) 766-1914
Facsimile:  (646) 304-5277

*Attorneys for Plaintiff/Counter-Defendant,
Hong Liu*

## UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| HONG LIU,<br><br>              Plaintiff,<br><br><br>           v.<br><br>FARADAY&FUTURE INC., SMART KINGLTD., JIAWEI WANG, and CHAOYING DENG<br><br>           Defendants.<br><br>FARADAY&FUTURE INC.,<br><br><br>           Counterclaimant,<br><br><br>           v.<br><br>HONG LIU,<br><br>              Counter-Defendant. | **Case No:** 2:20-cv-08035-SVW-JPR<br><br>**NOTICE OF MOTION AND CROSS-MOTION OF PLAINTIFF FOR SUMMARY JUDGMENT ON DEFENDANT FARADAY&FUTURE INC.'S SECOND AMENDED COUNTERCLAIM AND DEFENDANT FARADAY&FUTURE INC.'S AND DEFENDANT SMART KING LTD.'S AFFIRMATIVE DEFENSES AND PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM**<br><br>**JUDGE:   Hon. Stephen V. Wilson**<br>**DATE:     June 21, 2021**<br>**TIME:     1:30 p.m.**<br>**CTRM:    10A** |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 21 2021 at 1:30 P.M. or as soon thereafter as this matter can be heard before the Honorable Stephen V. Wilson of the United States District Court for the Central District of California, in Courtroom 10A of the above-entitled Court, located at First Street Courthouse, 350 W. 1st Street, Los Angeles, California 90012, Plaintiff/Counter-Defendant Hong Liu ("Plaintiff") will and hereby does move the Court pursuant to Federal Rule of Civil Procedure 56 for: (i) summary judgment on Defendant/Counterclaimant Faraday&Future Inc.'s ("FF") Second Amended Counterclaim (ECF 95); (ii) summary judgment on FF and defendant FF Intelligent Mobility Global Holdings Ltd.'s (f/k/a Smart King Ltd. ("Smart King")) affirmative defenses in FF and Smart King's Second Amended Answers (ECF 93 & 94, respectively); and (iii) partial summary judgment on Count I of Plaintiff's Complaint.

This motion is made following the conferences of counsel for Plaintiff and defendants FF and Smart King pursuant to L.R. 7-3, which took place on May 11, 2021.

This Motion is based on this Notice; the supporting Memorandum of Points and Authorities filed and served herewith; the Declarations of Hong Liu and Amiad Kushner and the exhibits attached thereto to each; the papers on file with the Court in this matter; and upon such further evidence and argument as may be presented to this Court prior to or at the hearing on this motion. Plaintiff also serves and lodges along with this motion a proposed order pursuant to L.R. 7-20.

**Dated:**     Los Angeles, California
               May 18, 2021


                                        **Respectfully Submitted,**

                                        FOUNDATION LAW GROUP LLP


                                        By:/s/ Kevin D. Hughes
                                        KEVIN D. HUGHES
                                        1999 Avenue of the Stars, Suite 1100
                                        Los Angeles, CA 90067
                                        Tel: 424.253.1266
                                        Email:  kevin@foundationlaw.com

                                        *Attorneys for Plaintiff/Counter-Defendant
                                        HONG LIU*

Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email:  kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiden Law Group LLP
469 Seventh Avenue, 5th Fl.
New York, NY 10018
Telephone:   (646) 766-1914
Facsimile:    (646) 304-5277

*Attorneys for Plaintiff/Counter-Defendant, Hong Liu*

**UNITED STATES DISTRICT COURT FOR**

**THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| HONG LIU,<br><br>    Plaintiff,<br><br>    v.<br><br>FARADAY&FUTURE INC., SMART KING LTD., JIAWEI WANG, and CHAOYING DENG<br><br>    Defendants.<br>_____<br>FARADAY&FUTURE INC.,<br><br>    Counterclaimant,<br><br>    v.<br><br>HONG LIU,<br><br>    Counter-Defendant. | **Case No:** 2:20-cv-08035-SVW-JPR<br><br>**PLAINTIFF HONG LIU'S CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS CROSS MOTION FOR SUMMARY JUDGMENT, IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT, AND IN OPPOSITION TO FARADAY&FUTURE INC. AND SMART KING LTD.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing on Motions:  June 1, 2021;<br>                                      June 21, 2021<br><br>Judge:        Hon. Stephen V. Wilson<br>Trial Date:  July 27, 2021 |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS .......................................................................... 2

ARGUMENT ................................................................................................ 8

I.     Plaintiff Is Entitled To Partial Summary Judgment On His Claim For Breach Of The Employment Agreement ................................................................. 8

II.    Summary Judgment Should Be Granted On All Of Defendants' Counterclaims And Affirmative Defenses That Seek To Rescind Or Hold Unenforceable The Employment Agreement ..................................................................... 10

  A.  Summary Judgment Should Be Granted On Defendants' Claims And Defenses Based Upon Alleged Attorney Ethics Violations ......................................... 10

    1.   Only New York's Attorney Ethics Rules Apply ...................................... 11

    2.   Plaintiff Did Not Violate New York's Attorney Ethics Rules ................. 11

    a.   Plaintiff Did Not Violate NY Rule 1.8(a) .................................... 12

    b.   Plaintiff Did Not Violate NY Rule 1.7(a) .................................... 15

    c.   Plaintiff Did Not Violate NY Rule 1.5(a) .................................... 16

    3.   Rescission Of The Employment Agreement Is Inappropriate ................. 17

  B.  Summary Judgment Should Be Granted On Defendants' Defenses To Enforcement Of The Employment Agreement Based On Plaintiff's Allegedly Deficient Performance ..................................................................... 18

III.   Summary Judgment Should Be Denied As To Plaintiff's Wrongful Termination Claim ................................................................................. 19

  A.  The Wrongful Termination Claim Comports With *General Dynamics* ........ 19

  B.  The Wrongful Termination Claim Is Based On Statutory Violations .......... 23

CONCLUSION .......................................................................................... 25

1

## TABLE OF AUTHORITIES

**Cases**

*Bittaker v. Woodford*,
   331 F.3d 715 (9th Cir. 2003)................................................................20, 21

*Capstone Turbine Corp. v. Malkamaki*,
   2014 WL 12558004 (C.D. Cal. July 10, 2014) ........................................10

*Cardenas v. U.P.S., Inc.*,
   2010 WL 5116343 (C.D. Cal. Dec. 9, 2010) ............................................25

*Chubb & Son v. Superior Ct.*,
   228 Cal. App. 4th 1094 (2014)..................................................................22

*Columbia Pictures Television Inc. v. Krypton Broadcasting*,
   259 F.3d 1186 (9th Cir. 2001)...................................................................20

*Degenshein v. 21st Century Toys, Inc.*,
   2007 WL 1242171 (Cal. Ct. App. Apr. 30, 2007) ....................................23

*Fair Housing Council of Riverside County, Inc. v. Riverside Two*,
   249 F.3d 1132 (9th Cir. 2001).....................................................................8

*Ferguson v. Yaspan*,
   233 Cal. App. 4th 676 (2014)....................................................................17

*Fifty-Six Hope Rd. v. Jammin Java Corp.*,
   2017 WL 2719981 (C.D. Cal. Feb. 22, 2017).............................................9

*Foley v. Interactive Data Corp.*,
   47 Cal. 3d 654 (1988)................................................................................25

*GemCap Lending, LLC v. Quarles & Brady, LLP*,
   269 F. Supp. 3d 1007 (C.D. Cal. 2017).....................................................12

*General Dynamics Corp. v. Super. Ct.*,
   7 Cal. 4th 1164 (1994).........................................................................*passim*

*Hoeper v. City & Cty. of San Francisco*,
   2020 WL 740478 (Cal. Ct. App. Feb. 13, 2020)........................................21

*Horn v. Azusa Pac. Univ.*,
2019 WL 9044606 (C.D. Cal. Jan. 14, 2019) ..................................................25

*Jacobson v. Hair*,
2011 WL 13112239 (C.D. Cal. Jan. 31, 2011) ................................................23

*Kaplan v. Baxter Healthcare. Inc.*,
2011 WL 13220471 (C.D. Cal. Nov. 28, 2011) ...............................................23

*Matter of Chariff*,
633 N.Y.S.2d 618 (N.Y. App. Div. 1995) .......................................................14

*Nagy v. Whittlesey Auto. Grp.*,
47 Cal. Rptr. 2d 395 (Ct. App. 1995) ..............................................................25

*Niesig v. Team I*,
558 N.E. 1030 (1990) ......................................................................................14

*Odish v. Cognitive Code Corp.*,
2015 WL 11347592 (C.D. Cal. May 27, 2015) ...............................................11

*Olivo v. City of Vernon*,
2010 WL 2958398 (Cal. Ct. App. July 29, 2010) ............................................23

*Pizzorno v. Draper*,
2017 WL 4712071 (C.D. Cal. July 7, 2017) ....................................................17

*Rahban v. Detrex Corp.*,
2009 WL 10674232 (C.D. Cal. Aug. 27, 2009) .................................................8

*Scheu v. Charter Commc'ns, Inc.*,
2009 WL 10672161 (C.D. Cal. Mar. 2, 2009) .................................................25

*Scott v. Cent. California Fac. Med. Grp., Inc.*,
2018 WL 1542517 (Cal. Ct. App. Mar. 29, 2018) ..........................................25

*Solin v. O'Melveny & Myers, LLP*,
89 Cal. App. 4th 451 (2001) ...........................................................................23

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007) ..........................................................................22

*Tam v. Qualcomm, Inc.*,
   2018 WL 9918097 (S.D. Cal. Oct. 31, 2018) ........................................25

*Tesoro Ref. & Mktg. Co. LLC v. S&S Fuel, Inc.*,
   2020 WL 3203057 (C.D. Cal. Mar. 30, 2020) .......................................10

*Turner v. Anheuser-Busch, Inc.*,
   7 Cal. 4th 1238 (1994) ..........................................................................25

*Wadler v. Bio-Rad Lab'ys, Inc.*,
   212 F. Supp. 3d 829 (N.D. Cal. 2016) ...................................................21

**Statutes, Constitutional Provisions & Rules**

Federal Rule of Civil Procedure 56 ...............................................................1

Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. ............24

Worker Adjuster and Retraining Notification Act, 29 U.S.C.A. § 2101 et seq. ..........24

California Constitution, Article I .................................................................24

California Labor Code Section 1102.5 .........................................................24

California Penal Code §§  631, 632 ..............................................................24

Worker Adjuster and Retraining Notification Act, Cal. Lab. Code §§ 1400-04..........24

California Rule of Professional Conduct 1-100 ...........................................11

New York Rule of Professional Conduct 1.5 ...............................................16

New York Rule of Professional Conduct 1.7 ...............................................15

New York Rule of Professional Conduct 1.8 ..........................................*passim*

New York Rule of Professional Conduct 8.5 ...............................................11

**Other Authorities**

New York State Ethics Opinion 712 (1999)..................................................15

New York State Ethics Opinion 994 (2013)..................................................15

New York State Ethics Opinion 1054 (2015)....................................11, 14, 15

The Restatement (Third) of the Law Governing Lawyers § 123 ................13

Plaintiff Hong Liu ("Plaintiff" or "Mr. Liu"), by his undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits this memorandum of points and authorities in support of his (i) cross motion for summary judgment on (a) defendant Faraday&Future Inc.'s ("FF") Second Amended Counterclaim (ECF 95); (b) FF and defendant FF Intelligent Mobility Global Holdings Ltd.'s (f/k/a Smart King Ltd. ("Smart King") and collectively with FF, "Defendants") affirmative defenses set forth in FF and Smart King's Second Amended Answers (ECF 93 & 94, respectively); (ii) partial summary judgment on Count I of the Complaint; and (iii) in opposition to FF and Smart King's motion for summary judgment (ECF 131) ("Defendants' Motion").[1]

## **PRELIMINARY STATEMENT**

By this motion, Plaintiff seeks summary judgment on liability as to his claim for breach of the Employment Agreement and dismissal of Defendants' counterclaims and defenses to the extent they seek to preclude enforcement of that agreement. Defendants' Motion should be denied in its entirety. A jury trial is required to resolve Plaintiff's wrongful termination claim and to fix the damages from Defendants' breach of contract.

Summary judgment should be entered on liability as to Plaintiff's claim for breach of the Employment Agreement. The terms of the agreement are clear and unambiguous. Defendants failed to pay Plaintiff the compensation they agreed to pay him upon an early termination. No material issues of fact exist. Defendants' purported defenses to enforcement are nothing more than an impermissible attempt to evade a clear and unambiguous agreement.

---

[1] All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Complaint (ECF 1) and Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF 25). "¶__" are references to paragraphs in the Complaint. "SUF ¶__" are references to paragraphs of Plaintiff's Statement of Uncontroverted Facts, submitted herewith. "Liu Decl. ¶__" refers to paragraphs of the declaration of Plaintiff Hong Liu, submitted herewith. "Supple Rep. ¶__" refers to paragraphs of the report of J. Richard Supple, Jr., attached as Exhibit B to the Declaration of Amiad Kushner, submitted herewith. Unless otherwise noted, all emphasis is added; all internal quotations and citations are omitted.

Defendants' attempts to invalidate the Employment Agreement based upon purported attorney ethics violations fail.  There was no ethics violation.  Plaintiff never provided any legal advice to Defendants while he was employed at Mayer Brown.  Defendants' own evidence shows that Plaintiff did not bill time to FF while at Mayer Brown.  FF's post-hoc contention that it was somehow dependent upon Plaintiff collapses in the face of the overwhelming evidence that its in-house counsel and outside counsel at Sidley Austin LLP reviewed the agreement.

FF offers no precedent for what it is asking the Court to do here: allow a sophisticated client with a multi-billion dollar valuation to use an alleged "attorney ethics violation" to rescind a clear and unambiguous contract that the client negotiated with the benefit of in-house and outside counsel.  The Court should enter summary judgment in Plaintiff's favor on this claim.

Defendants' summary judgment motion as to Plaintiff's wrongful termination claim should be denied.  Defendants ignore or misread well-established California law which allows attorneys to bring wrongful termination claims against their clients.  Defendants also disregard the Court's holdings that they have waived the privilege over broad categories of documents in this action.  Defendants' waivers thoroughly undermine their assertions.  Summary judgment should be denied on this claim.

For these reasons and as more fully explained below, Plaintiff's Cross Motion should be granted, and Defendants' Motion should be denied.

## STATEMENT OF FACTS

### Mr. Liu Did No Legal Work For FF While At Mayer Brown

In April 2014, Mr. Liu began working at Mayer Brown LLP ("Mayer Brown") as a partner in the firm's New York office.  SUF ¶1.  At all relevant times, Mr. Liu has been admitted to practice law in New York.  SUF ¶2.

In both December 2015 and May 2017, FF engaged Mayer Brown on regulatory matters.  SUF ¶8.  Philip Recht, a partner in Mayer Brown's Los Angeles office, led Mayer Brown's work for FF on these matters.  SUF ¶¶8, 20.  Mr. Liu had no

involvement in these engagements, which involved other Mayer Brown lawyers.  SUF ¶¶4-5.  Mr. Liu neither performed any legal services for FF while at Mayer Brown nor supervised any Mayer Brown lawyers who represented FF.  SUF ¶¶4-5.  While at Mayer Brown, Mr. Liu never billed any time to any matter in which Mayer Brown represented FF.  SUF ¶¶4-5.

**FF Solicits Mr. Liu**

On October 15, 2017, Michael Wang, a representative of FF, reached out to Mr. Liu and invited him to meet with FF in California.  SUF ¶6.  On October 17, 2017, Mr. Liu travelled to FF's California offices and met with FF representatives, including FF's then-CEO YT Jia ("Jia") and defendant Jiawei ("Jerry") Wang.  SUF ¶6.  At the meeting, Mr. Jia indicated FF would pay Mayer Brown's outstanding legal fees.  He also discussed potential work Mayer Brown could perform for FF and requested that Mr. Liu send a proposal for such work.  SUF ¶7.  Given Mr. Liu's professional experience and reputation, Jia also suggested FF would benefit from having someone like Mr. Liu but did not explicitly make an employment offer to him.  SUF ¶7.

On October 20, 2017 and in response to Mr. Jia's request, Plaintiff sent FF an unsigned draft engagement on Mayer Brown letterhead for a range of potential legal services.  SUF ¶10.  For over two months, FF did not sign this engagement.  SUF ¶10, 20.  Shortly after Mr. Lu sent this draft document, Jerry Wang reached out to Mr. Liu to discuss Mr. Liu's proposed employment at FF.  SUF ¶11.

On October 25, 2017, Jerry Wang sent Mr. Liu a comprehensive proposal for Mr. Liu's employment at FF, including (i) a document entitled "DRAFT EMPLOYMENT AGREEMENT TERM SHEET FOR HENRY L," proposing that Mr. Liu serve as FF's Vice Chairman and Global General Counsel with a $900,000 annual salary and eligibility to receive a minimum 2% equity interest in FF ("Smart King Options"); and (ii) a spreadsheet containing FF's projections of the value of that equity interest, ranging from $42 million (before an IPO) to $1 billion (three years after an IPO). SUF ¶¶12-14.

In late October 2017, Mr. Liu verbally advised Jerry Wang on several occasions

that FF should seek independent counsel in connection with negotiating the terms of Mr. Liu's potential employment at FF.  SUF ¶15.  During these conversations, Jerry Wang repeatedly assured Mr. Liu that, in connection with negotiating the terms of Mr. Liu's employment, FF would be advised by its own in-house legal department as well as by its outside counsel at Sidley Austin LLP ("Sidley Austin").  SUF ¶15.

In November 2017, Jerry Wang sent Mr. Liu an email under the subject line "FF US employment contract" containing several attachments, including an offer letter template.  SUF ¶18. At Mr. Wang's request, Mr. Liu modified the template to reflect the terms that had been agreed upon up to that point.  SUF ¶19.  No further substantive employment-related discussion occurred until January 2018.  SUF ¶21.

**FF Re-Engages Mayer Brown**

On December 22, 2017, Amanda Walker, an in-house FF counsel, sent an email to Mayer Brown partner Phil Recht (without copying Mr. Liu), attaching the draft engagement letter which Mr. Liu had previously sent to FF two months prior in October 2017 with FF's signature.  SUF ¶20.  Although FF transmitted its signature on December 22, 2017, it did not change the date on the engagement letter, which remained October 20, 2017.  SUF ¶20.  In her cover email attaching this document, Ms. Walker stated: "Attached please also find the supplemental engagement letter that one of your colleagues had requested back in October to reinitate the engagement." SUF ¶20.

That same day, December 22, 2017, Mr. Recht forwarded the engagement letter with FF's signature to Mr. Liu, who counter-signed it.  SUF ¶20. The fully-executed agreement was sent later that day back to FF.  SUF ¶20.

During his tenure at Mayer Brown, Mr. Liu did not perform any work on this engagement, as reflected in Mayer Brown's timesheets on the matter for December 2017, January 2018, and February 2018 that Defendants submitted on their motion.  *See* Declaration of Jerry Wang, Exs. 1-3; *see also* SUF ¶¶4-5.

**FF and Its Counsel Advance The Employment Negotiations With Mr. Liu**

On January 1, 2018, Jerry Wang sent a draft employment agreement to Mr. Liu.

SUF ¶21.  On January 10, 2018, at Jerry Wang's invitation, Mr. Liu met with Mr. Jia in California.  SUF ¶¶21-22.  Mr. Jia proposed that Mr. Liu's compensation package be divided into two agreements: the Employment Agreement (between FF and Mr. Liu) and the Director Compensation Agreement (between Mr. Jia and Mr. Liu).  SUF ¶22.

Between January 10 and January 26, 2018, Mr. Wang and Mr. Liu exchanged multiple drafts of the Employment Agreement and Director Compensation Agreements.  SUF ¶23.  During this time period, Mr. Wang repeatedly informed Mr. Liu in writing that FF's human resources department, in-house counsel, and outside counsel at Sidley Austin were reviewing both agreements.  SUF ¶23.

On January 26, 2018, Sidley Austin emailed Mr. Wang regarding its review of the Employment Agreement and asked whether FF desired to have Sidley Austin's employee benefits specialists conduct a further review of the agreement.  SUF ¶24.  Mr. Wang responded that Liu "will sign our standard offer letter so that should be fine to cover some basic terms in there."  SUF ¶24.

On January 26, 2018, Mr. Liu signed the Employment Agreement.  SUF ¶25.  FF counter-signed the agreement that same day.  SUF ¶25.

Between January 26 and February 2, 2018, Jerry Wang and Mr. Liu continued to negotiate the Director Compensation Agreement.  SUF ¶32.  Mr. Wang made clear to Mr. Liu that Sidley Austin was closely involved in reviewing and commenting on this agreement for FF.  SUF ¶32.  Thus, for example, on January 30, 2018, Mr. Wang provided Mr. Liu with a revised draft of the agreement that Mr. Wang said was "drafted by company external counsel Sidley;" Mr. Wang noted that "Sidley is happy to arrange a conference call together with us to walk through and discuss solutions."  SUF ¶34.

On February 2, 2018, Mr. Liu signed the Directors Compensation Agreement and emailed Jerry Wang the executed copy.  SUF ¶35.

On February 7, 2018, Mr. Liu resigned from his Mayer Brown partnership.  SUF ¶35.  On February 15, 2018, he began working at FF.  On April 17, 2018, he registered as in-house counsel to FF pursuant to California Rule of Court 9.46.  SUF ¶37.

## The Terms Of The Employment Agreement

Pursuant to the executed January 26, 2018 Employment Agreement, Plaintiff would serve as FF's Global General Counsel ("GC"), Chief Administrative Officer ("CAO"), and Global Senior Advisor.  SOF ¶26.  Under the terms of the agreement, FF guaranteed Plaintiff's employment for five years.  SOF ¶5.

Under the terms of the Employment Agreement, FF agreed to pay Mr. Liu a package of cash and equity compensation, as follows.  SOF ¶¶28-31. *First*, FF agreed to pay Mr. Liu a $3 million dollar signing bonus, payable in five equal installments of $600,000, with the first installment paid upon signing of the Employment Agreement and the remaining four installments paid on each of the four anniversaries of Mr. Liu's first date of employment.  SOF ¶29.  In the event that Mr. Liu was terminated during his guaranteed five-year employment term, he would receive all of the unpaid installment payments in a lump sum.   SOF ¶29.

*Second*, FF agreed to pay Mr. Liu a minimum annual base salary of $1 million during each of the five years of his guaranteed five-year term, *i.e.*, a minimum base salary compensation of $5 million.  SOF ¶30.  If FF terminated Mr. Liu "***for any reason***" during the five-year term, FF was required to pay any unpaid portion of the $5 million base salary in a lump sum.   SOF ¶30.

And *third*, FF agreed to grant Mr. Liu 20 million shares of FF, which represented two percent of FF's total equity prior to its Series A round, with the shares to be issued (at Mr. Liu's election) in the form of restricted stock or options (the "Smart King Options").  SOF ¶31.  The Employment Agreement provides in relevant part:

> FF shall grant [Mr. Liu] at a minimum cost required by law and outright, ***2% of FF's total equity shares pre Series A dilution in the form of restrictive stocks or equity option*** as [Mr. Liu] may select based on any of FF's available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.00 equity shares of FF pre Series A, as FF has represented and warranted, with the FF established and

standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as [Mr. Liu] may select [].

SOF ¶¶28-31.

The Employment Agreement further provides this equity interest would "***become immediately and fully vested to [Mr. Liu] upon any early termination by FF of [Mr. Liu's] employment within the guaranteed employment term with FF.***"  SOF ¶¶28-31.[2]

Concurrent with his start date, FF paid Mr. Liu the first $600,000 installment of his $3 million signing bonus under the Employment Agreement.  Beginning with his date of hire, FF also paid Mr. Liu a salary at the rate of $1 million per annum, as required by his Employment Agreement.  SOF ¶25.

**Plaintiff Performs His Duties For FF**

Upon being hired at FF in mid-February 2018, Mr. Liu assumed leadership of the legal and administrative functions of FF  SOF ¶38.

On August 1, 2018, FF issued a press release that formally announced Mr. Liu's hiring.  The press release stated in relevant part:

Faraday Future (FF) announced today that ***Henry (Hong) Liu, renowned expert in international legal, banking, and regulatory affairs***, and former global equity partner at international law firm Mayer Brown LLP, has ***assumed the positions of Global Chief Administrative Officer (CAO), Global Executive Vice President and Global General Counsel*** . . .With more than 25 years of professional, business and management experience in the United States and Asia Pacific regions, ***Mr. Liu is a crucial asset to FF*** as it heads toward the launch of its luxury all-electric, connected and smart FF 91 and subsequent expansion of products and services, as well as further enhancement of the corporate

---

[2] On or about February 2, 2018, as a further inducement to Mr. Liu to join Faraday, Mr. Liu entered into a Director Compensation Agreement with Mr. Jia.  In the Director Agreement, Mr. Jia personally agreed to pay Mr. Liu, upon certain trigger events such as an initial public offering of Smart King, a cash amount equal to 1% of the value of Smart King shares as calculated prior to its Series A offering.   SOF ¶¶32-36.

governance. ***He will be leading legal, government affairs, administration, and capital, globally*** . .  Prior to joining FF, besides an equity partner at Mayer Brown LLP based in New York, Mr. Liu counts more than two decades of global career experience in the legal, banking, and regulatory areas. He has been partner, managing partner, and chair of China & Asia practice at several global law firms  . . . He has been licensed to practice law in the US for more than 25 years.

SOF ¶39.

### Smart King Issues 20 Million Options To Mr. Liu

In October 2018, Smart King's board of directors passed a resolution granting Mr. Liu 20,000,000 options pursuant to the Employment Agreement.  SOF ¶40.  In or about January 2019, Mr. Liu confirmed that he had been issued the options by accessing his account at an employee benefits website.   SOF ¶40.

On or about February 11, 2019, Mr. Liu's employment was terminated.   On the same date and unbeknownst to Mr. Liu, Mr. Liu's  20,000,000 Smart King options were cancelled.  SOF ¶¶45-46.  Further, FF never paid Mr. Liu the unpaid portion of the $3 million signing bonus, which is $2,400,000, as required under the Employment Agreement.   Nor has FF paid the unpaid portion of Mr. Liu's $5 million in base salary, which totals approximately $4 million.   SOF ¶47.

## ARGUMENT

Where parties file summary judgment cross-motions, a court must consider the evidence submitted in support of both motions before ruling on either motion.  *See Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Because of that rule, the parties' cross-motions should be addressed together. *Rahban v. Detrex Corp.*, 2009 WL 10674232, at *2 (C.D. Cal. Aug. 27, 2009).

### I.  PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON HIS CLAIM FOR BREACH OF THE EMPLOYMENT AGREEMENT

To establish a breach of contract claim, a plaintiff must show (1) a contract; (2) a party's performance or excuse for non-performance; (3) breach; and (4) resulting

damages.  *Fifty-Six Hope Rd. v. Jammin Java Corp.*, 2017 WL 2719981, at \*2 (C.D. Cal. Feb. 22, 2017).  Summary judgment is warranted as to each of these elements.

It is undisputed that in January 2018 Plaintiff entered into the Employment Agreement with FF and Smart King and that in February 2018 he resigned from his Mayer Brown partnership and assumed the roles of FF's Global GC, CAO, and Global Senior Advisor.  It is also undisputed that in October 2018, after Plaintiff had been working at FF for eight months and pursuant to the Employment Agreement, Smart King granted Plaintiff options to acquire 20 million Smart King shares.  It is also undisputed that Plaintiff was terminated on February 11, 2019, prior to the expiration of the five-year term in the Employment Agreement.

FF breached the Employment Agreement by failing to pay Mr. Liu the consideration he was promised.  Specifically, under the Employment Agreement's unambigious terms and in the event of an early termination during Plaintiff's five-year employment term, FF was to pay Plaintiff the balance owed to him of his unpaid bonus and annual salary and provide Plaintiff with fully vested Smart King equity. FF breached the Employment Agreement by, upon terminating Plaintiff, failing to pay Plaintiff all of this consideration.

*First*, FF failed to pay Mr. Liu $2,400,000, the unpaid portion of the $3 million signing bonus that FF is required to pay under the Employment Agreement (the $2,400,000 was required to be paid to Mr. Liu in a lump sum upon his early termination).  SOF ¶47.  *Second*, FF failed to pay Mr. Liu approximately $4 million, the unpaid portion of the $5 million in minimum base salary required to be paid to Mr. Liu over his guaranteed five-year employment term (the $4 million was required to be paid to Mr, Liu in a lump sum upon his early termination). SOF ¶47. And *third*, FF breached the Employment Agreement's unambiguous requirement that Plaintiff's Smart King options shall "***become immediately and fully vested to [Mr. Liu] upon any early termination by FF of [Mr. Liu's] employment within the guaranteed employment term with FF.***" ECF 1-1; SOF ¶¶27-31.  As was revealed in discovery,

Defendants cancelled Plaintiff's 20 million Smart King options on his February 11, 2019 termination date.   SOF ¶46.

Defendants can raise no triable issue as to any of these undisputed facts. Accordingly, Plaintiff is entitled to partial summary judgment on liability on his breach of contract claim.  *See Capstone Turbine Corp. v. Malkamaki*, 2014 WL 12558004, at *6 (C.D. Cal. July 10, 2014) (granting partial summary judgment on breach of contract claim where contract language indisputably reflected intent of parties, and defendants' failure to pay under clear terms of contract constituted breach); *Tesoro Ref. & Mktg. Co. LLC v. S&S Fuel, Inc.*, 2020 WL 3203057, at *5 (C.D. Cal. Mar. 30, 2020) (granting motion for partial summary judgment on breach of contract claim because "[n]o reasonable interpretation of this provision" could give rise to a triable issue of fact). The calculation of Plaintiff's damages should be determined at this case's jury trial.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL OF DEFENDANTS' COUNTERCLAIMS AND AFFIRMATIVE DEFENSES THAT SEEK TO RESCIND OR HOLD UNENFORCEABLE THE EMPLOYMENT AGREEMENT

### A.   Summary Judgment Should Be Granted On Defendants' Claims And Defenses Based Upon Alleged Attorney Ethics Violations

Plaintiff is entitled to summary judgment on Defendants' counterclaims and defenses that seek to rescind, invalidate, or excuse performance under the Employment Agreement based upon Plaintiff's alleged violation of attorney ethics rules in connection with the negotiation of the agreement.[3]

---

[3] These counterclaims and defenses are FF's (i) first counterclaim for a violation of the Rules of Professional Conduct; (ii) second counterclaim for breach of fiduciary duty in connection with the Rules of Professional Rules of Conduct; (iii) third counterclaim for constructive fraud; (iv) eighth counterclaim seeking a declaratory judgment to the extent it seeks to invalidate the Employment Agreement based upon alleged attorney ethics violations; and (v) FF and Smart King's affirmative defenses that are substantively duplicative of these counterclaims: 2, 3, 6, 9, 22, 23 and 26.

### 1. Only New York's Attorney Ethics Rules Apply

As a preliminary matter, Defendants maintain that both California's Rules of Professional Conduct ("CA Rules") and New York's Rules of Professional Conduct ("NY Rules") apply to Mr. Liu during the course of his negotiating his employment with FF.  *See* Def. Br. at 14-19.  Defendants are wrong.

NY Rule 8.5(b) states that "*[i]f the lawyer is licensed to practice only in [New York], the rules to be applied shall be the rules of [New York]*."  NY Rule 8.5(b)(2)(i); N.Y. State Eth. Op. 1054 (2015) (foreign ethics laws may apply "[i]f the [New York-admitted] lawyer is permitted to practice in [the foreign state]").  Under California's Rules of Professional Conduct, California ethics rules apply to non-member of the California Bar only when they are "*engaged in the performance of lawyer functions in [California]*."  Calif. Rule of Prof. Cond. 1-100(D).

Here, during the course of Plaintiff's employment negotiations, Mr. Liu was licensed to practice law only in New York.  Prior to his joining FF and in connection with his negotiating the terms of his employment, Mr. Liu was not performing lawyer functions in California.  Accordingly, only the NY Rules apply to Mr. Liu's conduct in negotiating the Employment Agreement.[4]

### 2. Plaintiff Did Not Violate New York's Attorney Ethics Rules

FF contends that Plaintiff violated NY Rules 1.8(a), 1.7 and 1.5 in connection with the negotiation and drafting of the Employment Agreement.  Based upon the New York authorities cited below and the record on this motion, no material issues of fact exist and Plaintiff is entitled to summary judgment dismissing FF's claims under each

---

[4] Defendants cite *Odish v. Cognitive Code Corp.*, 2015 WL 11347592 (C.D. Cal. May 27, 2015) for the proposition that an attorney based outside of California is "required to comply with California's rules of professional conduct" while "providing legal services" to California-based clients.  *See* Defs' Br. at 14.  Here, however, Mr. Liu provided no legal services to FF while at Mayer Brown.  *See* SOF ¶4.  Indeed, Defendants' own evidence shows that Mayer Brown's invoices to FF contain no time billed by Mr. Liu.  *See* SOF ¶4.

MEMORANDUM OF POINTS AND AUTHORITIES

of these provisions of New York ethics rules.  In further support, Plaintiff respectfully submits the expert report of Rick Supple ("Supple Rep."), a partner at Clyde & Co US LLP in New York with decades of experience in attorney ethics matters, concerning the principles governing the New York attorney ethics rules and their application to Mr. Liu's conduct.  *See* Declaration of Amiad Kushner Ex. B ("Supple Rep.").[5]

### a.   Plaintiff Did Not Violate NY Rule 1.8(a)

New York Rule 1.8(a) prohibits a lawyer from "enter[ing] into a business transaction ***with a client***" if the lawyer and "client" have "differing interests and if ***the client expects the lawyer to exercise professional judgment therein for the protection of the client*** unless" the lawyer makes certain written disclosures to the client, obtains consent for the transaction, and the transaction is "fair and reasonable."  Here there was no Rule 1.8(a) violation because (i) FF was never Mr. Liu's "client" while he was employed at Mayer Brown, and (ii) FF did not expect Mr. Liu to exercise professional judgment for FF's protection while it was negotiating the Employment Agreement.  No material issues of fact exist concerning these issues.

*First*, FF was not Mr. Liu's "client" at Mayer Brown.  *See* Supple Rep. ¶¶35-40.  Mr. Liu did no legal work for FF while he was employed at Mayer Brown, nor did he supervise such work.  Liu Decl. ¶4.  All work for FF was done by other Mayer Brown attorneys.  Liu Decl. ¶4, 5, 20.  Tellingly, the Mayer Brown invoices that Defendants submitted on this motion reflect no time billed by Mr. Liu.  *See* Supple Rep. ¶¶15, 45; *see also* SUF ¶4.

---

[5] *See GemCap Lending, LLC v. Quarles & Brady, LLP,* 269 F. Supp. 3d 1007, 1022–23, 1028-29 (C.D. Cal. 2017) (in attorney malpractice action, reports of attorney ethics experts were admissible on summary judgment); *id.* at 1028-29 (admitting expert opinion on whether attorney's conduct aligned with "the relevant standard of care for legal opinion writing" and noting that "[e]xpert witnesses are not expressly prohibited from rendering opinions on whether a defendant met the relevant standard of care").

FF may contend that *other* Mayer Brown attorneys were advising FF and that the attorney-client relationship of such other attorneys should be imputed to Liu for purposes of a NY Rule 1.8(a).  However, there is no basis for any such "imputation" theory under the circumstances.  *See* Supple Rep. ¶¶35-40.

The Restatement (Third) of the Law Governing Lawyers § 123, cmt. B, provides that imputation of conflicts between attorneys may be appropriate where: (1) "a lawyer's relationship with a client creates an incentive to violate an obligation to another client," (2) "confidential information will be shared among affiliated lawyers" involved in conflicting representations at the firm, or (3) a situation where "a client would . . . have difficulty proving that the adverse representation by an affiliated lawyer was wholly isolated." The Restatement cautions that "considerations of free choice of lawyers by clients and the free mobility of lawyers between firms or other employers caution against extending imputation further than necessary." *See* Supple Rep. ¶38.

Here, there is no evidence that Mayer Brown's regulatory work for FF provided any "incentive" for Liu to violate any obligations to FF while Liu negotiated the Employment Agreement. There is no evidence that any confidential information provided by FF to Mr. Recht (or any other Mayer Brown lawyer representing FF) helped Liu negotiate different, more favorable employment terms with FF. Nor is there any evidence that Mr. Liu represented a client adverse to FF's interests.  Because none of these concerns applies, any imputation theory in applicable. *See* Supple Rep. ¶¶35-40.

Indeed, if the NY Rules 1.8(a) were strictly construed in the context of global law firms like Mayer Brown (with thousands of lawyers), extreme and unwarranted results would follow. Lawyers who negotiate employment agreements with sophisticated clients, with in-house legal teams, could be subject after-the-fact, draconian claims for recission based on the imputation of other lawyers' conduct, even though the lawyer

did no legal work for the client and notwithstanding that the firm's relationship with a client was irrelevant to the negotiation or its outcome. *See* Supple Rep. ¶40.[6]

Even if FF was Mr. Liu's client (which it was not), NY Rule 1.8(a) is not triggered because it was not reasonable for Mr. Liu to believe or expect that FF was relying upon him to exercise personal judgment to protect FF's interests in the negotiation of the Employment Agreement. *See* Supple Rep. ¶¶41-43. A leading New York ethics opinion sets forth the factors determinative of whether a client expects a lawyer to exercise reasonable professional judgment on the client's behalf:

> (i) whether the client has other counsel in the matter, for example, because it is a corporation or other entity with a legal department, (ii) whether the lawyer is responsible for client matters in the subject area, and (iii) whether the client is an individual or an entity and the client's level of sophistication in legal matters. We believe it is more likely that an individual client or one that is not sophisticated in legal matters is more likely to rely on a lawyer that does not represent the client in that matter than would be the case with an institutional client.

N.Y. State Eth. Opp. 1055 n. 1 (2015); *see also* Supple Rep. ¶41.

Applying these principles, it was not reasonable for FF to expect that Mr. Liu would exercise professional judgment on its behalf in negotiating the Employment Agreement. Mr. Liu was repeatedly informed that FF was being represented by in-house counsel and outside counsel at Sidley Austin for its negotiation with Liu. Mr. Liu was not responsible for FF's matters with Mayer Brown and had never done legal work for FF. Liu Decl. ¶¶4-5, 15, 20, 23. And FF was a sophisticated client with a multi-billion dollar valuation. NY Rule 1.8(a) should not be applied under these circumstances. *See Matter of Chariff,* 633 N.Y.S.2d 618, 620 (N.Y. App. Div. 1995) (although attorney did not comply with disclosure and consent requirements when

---

[6] Further, the NY Rules are "rules of reason" which "should be interpreted with reference to the purposes of legal representation and of the law itself." NY Rules, Scope, cmt. [6]; *Niesig v. Team I,* 558 N.E. 1030, 1032 (1990) (disciplinary rules are "guidelines to be applied with due regard for the broad range of interests at stake").

making a loan agreement with his client, the predecessor version of NY Rule 1.8(a) was not violated insofar the sophisticated businessman client was not deceived by his lawyer and was aware of all relevant information before making the loan"); NY Rule 1.8, cmt. [1] (stating that where a client "is represented by lawyers for a transaction, the client should not be heard to argue later that the lawyer on the receiving end of the transaction exercised professional judgment for the client's benefit in the deal"). *See* Supple Rep. ¶¶41-43.

> b.    Plaintiff Did Not Violate NY Rule 1.7(a)

NY Rule 1.7(a) provides that: "[A] lawyer shall not represent a client if a reasonable lawyer would conclude that … there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests," unless the client consents to the representation.  "When a reasonable lawyer would conclude that the risk of adverse effect on professional judgment is not a significant one, then there is no conflict …"  N.Y. State Eth. Op. 1048 (2015); N.Y. State Eth. Op. 712 (1999) (no conflict of interest merely because of a "fanciful, theoretical or *de minimis* risk that the lawyer's judgment will be affected adversely by a potentially relevant set of interests").

Here, the record reflects no basis for concluding that Mayer Brown's legal work for FF somehow adversely affected Mr. Liu's professional judgment in a manner that prejudiced FF in the employment agreement negotiation.  As noted above, Mr. Liu performed no legal work for FF while at Mayer Brown.  FF solicited Mr. Liu for an employment position.    Liu Decl. ¶¶4-19, 20-22.    FF proposed equity-based compensation for Mr. Liu, and FF provided projected values for that equity compensation.  Liu Decl. ¶¶12-14.  FF repeatedly informed Mr. Liu that it was being advised by its own human resources department, in-house counsel, and outside counsel.  Liu Decl. ¶¶15, 23.  Mayer Brown's regulatory work for Faraday bore no meaningful relationship to the subject of Liu's employment negotiations.  *See* N.Y. State Eth. Op. 994 (2013) (opining that Rule 1.7 was not violated where attorney whose firm

represented a school district negotiated for employment as a sports coach at a school in the district because there was little risk "of adverse effect if … the legal work on behalf of the school district were unrelated to the lawyer's work as coach"). *See* Supple Rep. ¶46.

  c. <u>Plaintiff Did Not Violate NY Rule 1.5(a)</u>

Under NY Rule 1.5(a), a lawyer may not "collect an excessive or illegal fee."

> A fee is excessive when, after a review of the facts, ***a reasonable lawyer would be left with a definite and firm conclusion that the fee is excessive.***" Whether or not a fee is excessive depends upon a non-exclusive list of factors, including "(1) the time and skill required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service property; (2) the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation and ability of the lawyer … performing the services; and (8) whether the fee is fixed or contingent.

As the text of NY Rule 1.5 indicates, the test for determining whether a legal fee is excessive is difficult to meet.

Here, there is no basis to conclude that a reasonable lawyer would be left with a "definite and firm conclusion" that Mr. Liu's "fee" is excessive. At the time FF solicited Mr. Liu, he was a senior equity partner at Mayer Brown making $1.35 million per year. Liu Decl. ¶¶1-3. FF solicited Liu to oversee its legal and administrative matters as its general counsel and chief administrative officer. Liu Decl. ¶¶15-19, 20-21. Plainly, as Liu was already very well compensated as a senior equity partner in a large law firm, FF needed to make Liu a substantial offer if it genuinely hoped to entice Liu to leave Mayer Brown.

The experience, reputation and ability of the lawyer is "the most important factor" when determining whether a legal fee is excessive.  N.Y. State Eth. Op. 1004 (2015).  The facts indicate that Liu was a senior partner at the globally respected firm Mayer Brown and had decades of experience.  Liu Decl. ¶¶1-4; Supple Rep. ¶50.  For all of these reasons, there is no basis to find that a reasonable lawyer would "definitely and firmly" conclude that Liu's acceptance of FF's employment terms violated NY Rule 1.5.

### 3.     Rescission Of The Employment Agreement Is Inappropriate

Even if Plaintiff violated any of the NY Rules (which he did not), any such violation should not be a basis for rescinding or voiding the Employment Agreement.  An attorney's showing that "the dealing was fair and just," and "the client was fully advised" notwithstanding the attorney's not providing written advice to retain independent counsel warrants the enforcement of the agreement between the attorney and client.  *Ferguson v. Yaspan*, 233 Cal. App. 4th 676, 685 (2014).

Here, the Employment Agreement was fair to FF and to Mr. Liu.  Plaintiff was at the pinnacle of his career, earning well over a million dollars per year, and left his lucrative equity partnership at Mayer Brown to join a start-up with uncertain prospects.  In joining FF, Plaintiff's responsibilities would be enormous; he was tasked with managing all of FF's legal and administrative matters globally.   To make the risk worthwhile for Plaintiff, FF had to provide him with substantial compensation.

The fact that FF was advised (or had access to) in-house and external counsel during the Employment Agreement negotiations further militates against rescission.  *See Pizzorno v. Draper*, 2017 WL 4712071, at *6 (C.D. Cal. July 7, 2017) (that client retained independent counsel in connection with negotiating agreement with attorney discharged attorney from having to advice client in writing to seek independent counsel); *Ferguson v. Yaspan*, 233 Cal. App. 4th 676, 688 (2014) (rejecting argument that attorney's failing to provide advice in writing to seek independent counsel gave rise to ethical violation where client did in fact have independent counsel).  *Cf.* ECF 144 at

-17-

3-4 (granting Plaintiff's motion to dismiss Defendants' counterclaim based on alleged unconscionability of Employment Agreement, where "***Defendant was at the time of contracting a well-resourced corporation, having just received a multi-billion dollar valuation, and had ready access to counse***l.").

Further, in October 2017, Plaintiff orally advised FF numerous times to retain independent counsel. SUF ¶15. Jerry Wang, FF's lead negotiator, responded that Sidley Austin and FF's own internal legal and HR departments would be reviewing the Employment Agreement on FF's behalf. SUF ¶15. In January 2018, Mr. Wang confirmed that Sidley Austin was reviewing the Employment Agreement. SUF ¶23. Prior to Plaintiff's entering into the Employment Agreement, FF's legal department messaged Plaintiff, confirming that the legal department had reviewed the Employment Agreement. SUF ¶23. These facts demonstrate that enforcement of the Employment Agreement is appropriate.

## B. SUMMARY JUDGMENT SHOULD BE GRANTED ON DEFENDANTS' DEFENSES TO ENFORCEMENT OF THE EMPLOYMENT AGREEMENT BASED ON PLAINTIFF'S ALLEGEDLY DEFICIENT PERFORMANCE

Defendants have asserted numerous affirmative defenses to the Employment Agreement based upon Mr. Liu's allegedly deficient performance.[7] Under Defendants' theory, if Mr. Liu's performance was deficient, he cannot enforce the Employment Agreement. Defendants' defenses fail as a matter of law.

In the carefully-negotiated Employment Agreement, the parties agreed that if Mr. Liu was terminated for "*any reason*" during his five year term of employment, he would receive any unpaid portion of his guaranteed minimum salary of $5 million in a lump sum. Similarly, upon any "early termination," any unpaid portion of Mr Liu's $3 million signing bonus was required to be paid in a lump sum. Further, upon any early termination, all of Mr. Liu's unvested options would be immediately vested, with the

---

[7] *See* ECF 93 & 94, Affirmative Defenses 5, 7, 8, 11, 14, 15, 19, 20, & 27.

sole exception of a situation in which an early termination was "effectuated" based on a "serious breach of fiduciary duty" that was "adjudicated" by a U.S. court.

Here, FF terminated Mr. Liu before the expiration of his five year employment term.  FF did so without obtaining any court order finding Mr. Liu in serious breach of fiduciary duty (and FF has since dismissed with prejudice its counterclaim against Mr. Liu for breach of fiduciary duty based upon his employment performance).  Accordingly, FF's affirmative defenses seeking to excuse their payment obligations upon an early termination must be rejected as being post hoc attempts to re-write the parties' carefully negotiated and unambiguous Employment Agreement.

## III.  SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S WRONGFUL TERMINATION CLAIM

Genuine issues of material fact exist as to Plaintiff's wrongful termination claim, warranting denial of Defendants' Motion.  Defendants' only bases for seeking summary judgment on Plaintiff's claim are meritless threshold issues which have no bearing here.

### A.  THE WRONGFUL TERMINATION CLAIM COMPORTS WITH *GENERAL DYNAMICS*

Defendants' primary basis for dismissal is the argument that Plaintiff's wrongful termination claim is barred by *General Dynamics Corp. v. Super. Ct.*, 7 Cal. 4th 1164 (1994) ("*General Dynamics*").  *See* Def. Br. at 20.  In Defendants' view, because Plaintiff's wrongful termination claim can be proven *only* by the use of purportedly privileged information, the  claim must be dismissed under *General Dynamics*.  *See* Def. Br. at 22.  Defendants are wrong.

*General Dynamics* permits a wrongful termination claim to proceed where in-house counsel can prosecute his claim with non-privileged materials. *See Gen. Dynamics Corp.*, 7 Cal. 4th at 1169 ("there is no reason inherent in the nature of an attorney's role as in-house counsel to a corporation that in itself precludes the maintenance of a retaliatory discharge claim, provided it can be established without breaching the attorney-client privilege").

MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff's claim for wrongful termination is on all fours with *General Dynamics* and should proceed for all of the following reasons. *First,* Plaintiff's wrongful termination claim can be established without using privileged materials. Plaintiff alleges and can prove – without intruding upon the attorney-client privilege and without disclosing the specific content of the advice he provided to FF – that he was terminated in retaliation for giving advice on the following topics: (i) the Worker Adjustment and Retraining Notification ("WARN") Act and its California statutory counterpart, and (ii) the legality of FF's recording its corporate meetings without employees' or other individuals' consent. Plaintiff need not delve into the content of the advice; the act of providing advice on these topics was itself the basis for Plaintiff's wrongful termination.

*Second*, to the extent attorney-client communications support Plaintiff's claim, Defendants waived privilege by affirmatively putting these topics at issue through their counterclaims concerning Plaintiff's termination. *See Bittaker v. Woodford*, 331 F.3d 715, 718–19 (9th Cir. 2003) (litigant waives attorney-client privilege as to a topic by putting the topic at issue); *Columbia Pictures Television Inc. v. Krypton Broadcasting*, 259 F.3d 1186, 1196 (9th Cir. 2001) (same); ECF 120-1 at 11-12 (citing authorities).

Through their SACC, Defendants specifically put at issue their purported reasons for Plaintiff's termination, including Plaintiff's purportedly "failing to provide substantive legal advice with respect to . . . *the recording of internal meetings, and a potential reduction in FF's workforce*." ECF 124 at 18. By doing so, Defendants waived the attorney client privilege as to communications on these topics. Indeed, the Court held that because Defendants put these topics at issue, they "*waived the privilege*

***as to documents and communications concerning Plaintiff's termination***" as well as
the above enumerated topics.  ECF 146 at 4, 7; *see generally* May 12, 2021 Tr.[8]

Plaintiff can prove he was wrongfully terminated by relying on all of the
following materials for which ***the privilege has been waived:***

- Plaintiff's own testimony and communications between himself and
  YT Jia that, when FF began to run out of cash (as a result of
  Evergrande's cut-off of funding) and Mr. Jia planned mass layoffs
  and/or "furloughs" of hundreds of FF employees, Plaintiff advised
  Mr. Jia of FF's obligations to comply with applicable federal and
  California law (including the WARN Act) concerning such
  workforce reductions.  SUF ¶¶41, 44.

- Plaintiff's own testimony and communications between himself and
  YT Jia that he advised directed that advice be given to FF to stop or
  refrain from surreptitiously recording its corporate meetings and
  events without getting the required consent from the attending
  individuals.  SUF ¶¶42, 44.

- Plaintiff's testimony that on February 11, 2019, when Mr. Jia told
  Plaintiff that he was being terminated, Mr. Jia angrily highlighted
  Plaintiff's communications with Evergrande and Plaintiff's advice
  in connection with the Evergrande funding dispute as the main
  reasons for Plaintiff's termination.  Liu Decl.  ¶45.

*General Dynamics* provides no bar to Plaintiff's relying on these waived
materials to prosecute his wrongful termination claim; Plaintiff may do so.  *See Hoeper
v. City & Cty. of San Francisco*, 2020 WL 740478, at *10 (Cal. Ct. App. Feb. 13, 2020)
(defendants' waiver of attorney-client privilege foreclosed barring of wrongful
termination claim under *General Dynamics*); *Wadler v. Bio-Rad Lab'ys, Inc.*, 212 F.

---

[8] Notwithstanding that Defendants voluntarily dismissed their fourth and fifth
counterclaims, Defendants continue to put every aspect of Plaintiff's job performance
and termination at issue through their affirmative defenses, triggering a broad waiver
over all aspects of Plaintiff's employment.  *See, e.g.*, *Bittaker v. Woodford*, 331 F.3d
715, 718, 719 (9th Cir. 2003) (noting waiver occurs "where the client asserts ***a claim or
defense*** that places at issue the nature of the privileged material.").

Supp. 3d 829, 854 (N.D. Cal. 2016) (allowing attorney's claim for wrongful termination to proceed because of defendant's waiver of attorney-client privilege).

And *third*, even if Plaintiff does in part rely on privileged materials, which he will not, under *General Dynamics*, the use of such materials is not a per se basis for dismissing Plaintiff's claim. In fact, *General Dynamics* specifically contemplates and permits an in-house counsel's bringing a wrongful termination claim while using privileged materials to establish his claim. *See   Gen. Dynamics Corp.*, 7 Cal. 4th at 1189.  Such a claim may proceed under *General Dynamics* because "***trial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege***." *Gen. Dynamics Corp.*, 7 Cal. 4th at 1191.  Because a court can use "sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings"  courts should be "***confident that by taking an aggressive managerial role, judges can minimize the dangers to the legitimate privilege interests the trial of such cases may present***." *Id.* Indeed, "*General Dynamics* teaches that a former in-house counsel ***may use privileged information***, with careful controls against inappropriate disclosure, in order to pursue a wrongful termination claim against his or her former employer." *Chubb & Son v. Superior Ct.*, 228 Cal. App. 4th 1094, 1106 (2014).

Defendants' argument for dismissal amounts to mere conjecture.  Defendants merely speculate that Plaintiff cannot establish his claim without using privileged materials.  *See* Def. Br. at 7-8, 22-24.  First, as set forth above, this is false.  Second, FF's argument is merely conclusory and fails for that separate reason. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (on summary judgment, "the

movant must **affirmatively demonstrate** that no reasonable trier of fact could find other than for the moving party." (emphasis added)).[9]

## B.   THE WRONGFUL TERMINATION CLAIM IS BASED ON STATUTORY VIOLATIONS

Defendants further contend that Plaintiff's wrongful termination claim must be dismissed because the Complaint does not tether Plaintiff's claim to a statutory public policy violation permitting disclosure.  Def. Br. at 19-21.  This contention is meritless.

As a preliminary matter, this Court has specifically held "that a plaintiff's failure to plead citations to specific statutory or constitutional provisions **in the complaint** is not fatal, [] so long as plaintiff identifies them **at a later time, such as in opposition to a summary judgment motion**."  *Jacobson v. Hair*, 2011 WL 13112239, at *29 (C.D. Cal. Jan. 31, 2011) (citing *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 84 (1998) (that plaintiff on defendants' motion for summary judgment provided specific FAA regulations in connection to wrongful termination was sufficient for wrongful termination claim); *see also Kaplan v. Baxter Healthcare. Inc.*, 2011 WL 13220471, at *4 (C.D. Cal. Nov. 28, 2011) (Wilson, J.) (noting that while the complaint did not adequately identify the statutory predicate for a wrongful termination claim, "Plaintiff

---

[9] Defendants' cited authorities which purportedly stand for the incorrect proposition that *General Dynamics* bars Plaintiff's wrongful termination claim are inapposite.  *See Tam v. Qualcomm, Inc.*, 300 F. Supp. 3d 1130, 1144 (S.D. Cal. 2018) (no waiver of privilege); *Olivo v. City of Vernon*, 2010 WL 2958398, at *12 (Cal. Ct. App. July 29, 2010) (no triable issue of fact as to whether defendant employer had waived the attorney client privilege, causing *General Dynamics* to be applicable); *Degenshein v. 21st Century Toys, Inc.*, 2007 WL 1242171, at *1, *4-5 (Cal. Ct. App. Apr. 30, 2007) (no waiver of attorney-client privilege and plaintiff attorney admitted his case could be proven only by exclusive reliance on privileged materials); *Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451, 466 (2001) (neither defendant law firm nor plaintiff attorney's former clients waived attorney-client privilege as to materials to be used in the prosecution or defense of claim).

cured this deficiency in his Opposition [to summary judgment]").  Contrary to what Defendants argue, no such pleading requirement exists under California law.[10]

Here, the record on summary judgment reflects that Plaintiff can establish he was wrongfully terminated in violation of public policy, as set forth by statute.  Specifically, Plaintiff was wrongfully terminated in violation of public policy, as reflected in California Labor Code Sections 1102.5(b) and (c) (both of which can also be asserted as independent causes of action here), for violations of the following statutes:

- **Federal Worker Adjuster and Retraining Notification ("WARN") Act, 29 U.S.C.A. §§ 2101, 2102(a)-(d), 2104(a); and California's WARN Act, Cal. Lab. Code §§ 1400-04**: for Plaintiff's advising FF of its obligations to provide its employees with adequate 60-day notice of impending layoffs in connection with FF's mass layoff of its employees in the fall of 2018, so as to protect FF's employees from sudden and unexpected loss of income. *See* SUF ¶¶41, 44.

- **Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq.; & Cal. Penal Code §§ 631, 632; and the constitutional right to privacy under the California Constitution, Article I, § 1**: for Plaintiff's advising FF not to record corporate meetings without its employees' consent.  SUF ¶¶42, 44.

This submission concerning violations of employee-protection statutes satisfies the requirement that Plaintiff must tie his wrongful termination claim to a colorable public policy interest.  *See Howe v. Target Corp.*, 2020 WL 5630273, at *9 (S.D. Cal. Sept. 21, 2020) (invasion of privacy was colorable constitutional and statutory public

---

[10] *See Halliburton v. Remington Coll.-Denver Campus, Inc.*, 2008 WL 1851060, at *8 (Cal. Ct. App. Apr. 28, 2008) (rejecting argument that "plaintiff must allege a specific public policy within his or her complaint (or seek leave to amend to do so)"; providing statutory bases for public policy violations in supplemental briefing on summary judgment was sufficient); *Daily v. Kaiser Found. Hosps.*, 2005 WL 3007131, at *7 (Cal. Ct. App. Nov. 10, 2005) (rejecting "fallacy of [the] argument" that a statutory basis for wrongful termination must be pled in the complaint and cannot be done in opposition to summary judgment); *Perez-Falcon v. Synagro W., LLC*, 2011 WL 6752533, at *4 (E.D. Cal. Dec. 23, 2011) (statutory predicates for wrongful termination claim may be raised in opposition to motion for summary judgment).

interest basis for wrongful termination claim); *Horn v. Azusa Pac. Univ.*, 2019 WL 9044606, at *9 (C.D. Cal. Jan. 14, 2019) (statutory predicate concerned law governing the safety of workplaces); *Tam v. Qualcomm, Inc.*, 2018 WL 9918097, at *5 (S.D. Cal. Oct. 31, 2018) (FMLA and CFRA violations were proper predicates for wrongful termination claim); *Scheu v. Charter Commc'ns, Inc.*, 2009 WL 10672161, at *12 (C.D. Cal. Mar. 2, 2009) (UCL was an adequate statutory predicate); *Cardenas v. U.P.S., Inc.*, 2010 WL 5116343, at *8 (C.D. Cal. Dec. 9, 2010) (FLSA was colorable statutory basis for wrongful termination claim); *Nagy v. Whittlesey Auto. Grp.*, 47 Cal. Rptr. 2d 395, 398 (Ct. App. 1995) (unlawful recording of customers was actionable public policy interest in support of wrongful termination claim).

Moreover, the Complaint already specifically sets forth actionable public policy interests in violation of which Defendants' terminated Plaintiff, including the WARN Act (¶¶83, 132). *See Scott v. Cent. California Fac. Med. Grp., Inc.*, 2018 WL 1542517, at *15 (Cal. Ct. App. Mar. 29, 2018) (plaintiff's repeatedly mentioning bases for public policy violations was sufficient to establish wrongful termination claim).[11]

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion should be granted and Defendants' motion should be denied.

---

[11]Defendants' cited authorities are unavailing. In *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238 (1994), the alleged violations of public policy concerned economic relationships between beverage manufacturers and their competitors, which did not give rise to a public policy interest; here, breaches of employee privacy and statutory violations of employment laws requiring providing notice to to-be-fired employees are at issue. *See id.* at 125. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988) is also inapposite; there, unlike here, the purported public policy violation concerned the duty to report an employee who was embezzling from the employer, which the court found to be merely a private interest, not a public one. *See id.* at 670.

DATED:  May 18, 2021

FOUNDATION LAW GROUP LLP

By:/s/ Kevin D. Hughes
    KEVIN D. HUGHES
    *Attorneys for Plaintiff/Counter-Defendant*
    *HONG LIU*

SEIDEN LAW GROUP LLP

By: /s/ Amiad Kushner
    AMIAD KUSHNER
    JAKE NACHMANI
    *Attorneys for Plaintiff/Counter-Defendant*
    *HONG LIU*

MEMORANDUM OF POINTS AND AUTHORITIES

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day I caused a true and correct copy of the foregoing to be filed using the Court's Electronic Filing System ("ECF System").  The document is available for viewing and downloading via the ECF System and will be served by operation of the ECF System upon all counsel of record.

Dated: May 19, 2021                                    /s/ Kevin D. Hughes

                                                                Kevin D. Hughes

MEMORANDUM OF POINTS AND AUTHORITIES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM OF POINTS AND AUTHORITIES

Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email:   kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiden Law Group LLP
322 Eighth Avenue, Suite 1704
New York, NY 10001
Telephone:   (646) 766-1914
Facsimile:   (646) 304-5277

*Attorneys for Plaintiff/Counter-Defendant,
Hong Liu*

## UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| HONG LIU,<br><br>Plaintiff,<br><br>v.<br><br>FARADAY&FUTURE INC., SMART KINGLTD., JIAWEI WANG, and CHAOYING DENG<br><br>Defendants. | **Case No:** 2:20-cv-08035-SVW-JPR<br><br>**PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Complaint filed on: January 3, 2020 |
| FARADAY&FUTURE INC.,<br><br>Counterclaimant,<br><br>v.<br><br>HONG LIU,<br><br>Counter-Defendant. | Defendants' Motion filed on: April 26, 2021<br><br>Hearing on Motions: June 1, 2021; June 21, 2021 |
| | Judge:   Hon. Stephen V. Wilson<br>Trial Date:   July 27, 2021 |

1

Plaintiff Hong Liu ("Plaintiff" or "Mr. Liu") hereby submits the following Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiff's Cross-Motion for Partial Summary Judgment.[1]

## UNCONTROVERTED FACTS

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 1.    Between April 2014 and February 2018, Plaintiff worked at Mayer Brown LLP ("Mayer Brown") as a partner in the firm's New York office of Mayer Brown. | 1. Liu Decl. at ¶3. |
| 2.    Mr. Liu is, and was while working at Mayer Brown, admitted to practice law in the state of New York. | 2. Liu Decl. at ¶3. |
| 3.    Mr. Liu made roughly $1.35 million in 2017. | 3. Liu Decl. at ¶3. |
| 4.    While employed by Mayer Brown, I advised numerous clients on a wide range of matters. During my entire career at Mayer Brown, I never provided any legal advice to Faraday&Future Inc. ("FF") on any matter.    I never | 4. Liu Decl. ¶4; Declaration of Jerry Wang ("Wang Decl.), Exs. 1-3 (showing Mayer Brown's invoices to FF for December 2017, January 2018, and February 2018, and that Plaintiff did not bill any time to FF) |

---

[1] References to the "Liu Decl." are to the Declaration of Hong Liu.    References to "Ex." are to the Exhibits attached to the Liu Decl.

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| supervised the work of other Mayer Brown attorneys on any matter in which Mayer Brown represented FF.   While at Mayer Brown, I did not bill time to any matter in which Mayer Brown was representing FF. | |
| 5.     At Mayer Brown, partners who originated a relationship with a particular client were designated as the "billing partner" for matters on which Mayer Brown represented any such client.   Mr. Liu was designated as the billing partner on twenty-four client matters. Plaintiff never served as the billing partner on any matter involving FF. | 5. Liu Decl. ¶5; Declaration of Amiad Kushner Exhibit ("Kushner Decl. Ex.") D (testimony of Mayer Brown indicating that Plaintiff was the billing partner on 24 matters at Mayer Brown, none of which was FF). |
| 6.     On October 15, 2017, Mr. Junmin "Michael" Wang invited Mr. Liu to visit FF's offices in California.   In response to this invitation, on October 17 and 18, Mr. Liu met with representatives of FF in Los Angeles, including FF's Vice President of Capital Markets Jiawei "Jerry" Wang, Michael Wang, FF's Vice- | 6. Liu Decl. ¶6. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| President of Administration Chaoying Deng, and FF's then CEO Yueting Jia. | |
| 7.      During the October 17 and 18 meetings, Mr. Jia told Mr. Liu that it would be advantageous to FF to have a person with my status and recognition. However, at that time, although it was Plaintiff's impression that Mr. Jia desired Mr. Liu to consider joining FF, Mr. Jia did not explicitly make any employment offer, and Mr. Liu did not entertain any discussion of employment terms. | 7. Liu Decl. ¶7. |
| 8.      At the time of the October 17 and 18 meetings, Plaintiff understood that Mayer Brown had previously done regulatory work for FF for which there was a substantial unpaid balance (and that, at the time, Mayer Brown had suspended work for FF in light of the unpaid balance).   Mr. Liu learned that there were two previous engagement letters between Mayer Brown and FF, entered into in December 2015 and May 2017.   Mr. Liu also understood that Mr. | 8. Liu Decl. ¶8; Ex. 1; Ex. 2. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| Phil Recht, a Mayer Brown partner based in its Los Angeles office, had supervised these engagements. | |
| 9.    During Mr. Liu's October 17 and 18 visits to FF's offices, Mr. Jia indicated that FF would pay past due balances on Mayer Brown's invoices.   Mr. Jia also asked Mr. Liu to send a proposal to FF regarding Mayer Brown's potential representation of FF on new matters, including a potential series A financing. | 9. Liu Decl. ¶9. |
| 10.    On October 20, 2017, in response to Mr. Jia's request, Mr. Liu sent an email to FF attaching an unsigned draft engagement letter and proposed work plan.   For over two months, FF did not sign this document. | 10. Liu Decl. ¶10; Exhibit 3. |
| 11.    Shortly after Mr. Liu sent the above-referenced draft engagement letter on October 20, 2017, Jerry Wang reached out to Mr. Liu to discuss whether he would be interested in working at FF. | 11. Liu Decl. ¶ 11. |

| Uncontroverted Facts | Supporting Evidence |
| --- | --- |
| 12. On October 25, 2017, Mr. Wang sent Mr. Liu an email with two attachments. The first attachment was a document entitled "DRAFT EMPLOYMENT AGREEMENT TERM SHEET FOR HENRY L." (the "Term Sheet"). The second attachment was an Excel spreadsheet containing information under the heading "FF Option Valuation Estimation." (the "Option Valuation"). | 12. Liu Decl. ¶12; Ex. 4. |
| 13. The Term Sheet contained a proposal for me to serve as "Vice Chairman and Global General Counsel of FF Inc." It contained a number of proposed terms, including "Annual salary and bonus of US$900,000 per year," and "20,000,000 (2%) of the fully diluted equity of the Company as stock option." Mr. Liu did not solicit the proposed equity interests in the Term Sheet. | 13. Liu Decl. ¶13; Ex. 4. |
| 14. The Option Valuation contained a range of estimated values for the 2% equity stake that was referenced in the Term Sheet. The lowest estimated value | 14. Liu Decl. ¶14. |

| Uncontroverted Facts | Supporting Evidence |
| --- | --- |
| was $42.8 million, which was labeled as the "Series A Value."   The next highest estimated value was between $100 and $150 million, which was labelled as the "Series B Value."   The next highest estimated value was $432 million to $648 million, which was labelled as the "IPO Value."   The highest estimated value was $1 billion, which was labelled as the "IPO 3 years Value." | |
| 15.     Between October 26 and 29, 2017, Mr. Liu had several conversations with Jerry Wang in which Mr. Liu verbally advised him that FF should seek independent counsel in connection with negotiating the terms of my potential employment at FF.     During these conversations, Jerry Wang repeatedly assured Plaintiff that FF had its own in-house legal department and would also seek advice from its outside counsel at Sidley Austin LLP in connection with | 15. Liu Decl. ¶15. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| negotiating the terms of my potential employment. | |
| 16.    On October 29, 2017, Jerry Wang asked me to send him information concerning my compensation at Mayer Brown.   Mr. Liu sent him his compensation package that same day with his resume in English and Chinese. | 16. Liu Decl. ¶16; Ex. 5. |
| 17.    On November 2, 2017, Jerry Wang sent Mr. Liu a Chinese article and a message stating "Dear Mr. Liu, please refer to the latest information above, recently there are some negative rumors going on in China, these are all completely fake and I hope won't influence your judgment, appreciated and I sincerely look forward to your reply." | 17. Liu Decl. ¶17; Ex. 6. |
| 18.    Between November 2 and 15, 2017, Mr. Liu did not have substantive discussions with FF concerning his potential employment.    On November 16, 2017, Jerry Wang sent me an email with the subject line "FF US employment | 18. Liu Decl. ¶18; Ex. 6; Ex. 7. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| contract."   The email contained multiple attachments, including an offer letter template ("the "Offer Template").   Jerry Wang soon after sent me a message stating: "I've shared standard FF package for your view to your personal gmail address." | |
| 19.   After Jerry Wang sent Mr. Liu the Offer Template, Plaintiff confirmed with Mr. Wang that he should "fill those terms that we have so far agreed on and those we have been discussing into the form letter agreement you provided."   Jerry Wang responded, "Sounds good, thanks a lot Mr. Liu!"   During this time Jerry Wang and Plaintiff agreed to change the equity grant from 2% to 3%.   On November 21, 2017, Mr. Liu emailed Jerry Wang the employment contract (entitled "Term Sheet") with the terms filled in based on our prior discussions. | 19. Decl. ¶19; Ex. 6; Ex. 7A. |
| 20.   On December 22, 2017, Amanda Walker, FF's Corporate Counsel, emailed Phil Recht FF's signed Mayer Brown and | 20. Liu Decl. ¶20; Ex. 8. |

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| FF engagement letter, which had been sent on October 20, 2017. FF did not update the date from October 20 to December 22, 2017.   Ms. Walker stated in her December 22, 2017 email: "Attached please also find the supplemental engagement letter that one of your colleagues had requested back in October to reinitiate the engagement." Mr. Liu was not copied on this email. Later that day, Phil Recht forwarded Mr. Liu the engagement letter and he signed it. The fully executed agreement was sent later that day to FF. | |
| 21.    On December 29, 2017, Jerry Wang called Mr. Liu and invited him to visit FF's offices in California on January 10, 2018. On January 1, 2018, Mr. Wang then emailed Plaintiff and attached an updated term sheet contract in clean and redline form.   Mr. Wang's email stated, "Happy New Year! Please refer to attachment comments based on our discussion and previous term sheet, | 21. Liu Decl. ¶21; Ex. 9 |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| please let me know your feedback and sincerely look forward to partnership!" | |
| 22.    On January 10, 2018, Mr. Liu met in person with Mr. Jia, who was then CEO of FF, and it was there that Mr. Jia divided his compensation package into two agreements: the Stock Transfer Agreement (which eventually became the Director Compensation Agreement between Mr. Jia and me) and the Employment Agreement (between FF and me). The equity interest that was promised to him was subdivided between the two agreements.   Mr. Jia was not a client of Mayer Brown; while Mr. Liu worked at Mayer Brown hr never provided Mr. Jia with legal advice. | 22. Liu Decl. ¶22; Ex. 10. |
| 23.    Between January 10 and January 26, 2018, Mr. Wang and Mr. Liu exchanged multiple drafts of the Employment Agreement and Stock Transfer Agreement.   Throughout Plaintiff's negotiations with FF, he was | 23. Liu Decl. ¶23; Ex. 11; Ex. 12; Ex. 13; Ex. 14. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| told by Mr. Wang that FF's in house attorneys, FF's outside counsel Sidley Austin LLP, and FF's Human Resources ("HR") team were reviewing both agreements. On January 22, 2018, Jerry Wang told Mr. Liu "Thank you, manager Liu, for accepting my modifications to the Employment Agreement.   I no longer have any issues with this agreement. Ultimately the HR director DG will need to review it.   If he also does not have any other issue with it, we can then finalize it."   On January 25, 2018, Mr. Liu was told in writing that FF's internal Legal Department was "working closely with HR in doing the final review.   On January 26, 2018, Mr. Liu was told that "Sidley's company partner VJ is reviewing this agreement for us right now to make sure there is no violation of any stipulations with investors." On January 26, 2018, Jerry Wang sent a message to Plaintiff and Wentao Huang, a lawyer who worked in FF's legal department, | |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| "Many thanks to Mr. Huang for your coordination for the term(s) of the employment contract(s)." | |
| 24.    Feifei Bian and Vijay Sekhon of Sidley Austin LLP reviewed the Employment Agreement on January 26, 2018, and offered for Sidley Austin LLP's "employee benefits specialists to take a look." | Kushner Decl. Ex. A (a copy of the e-mail and its attachments). |
| 25.    Late in the day on January 26, 2018, Mr. Liu signed his Employment Agreement dated January 25, 2018, and emailed the executed agreement to Jerry Wang. FF sent Plaintiff back the countersigned agreement that same day. Concurrently with Mr. Liu's start date, he was paid the first $600,000 installment of his $3 million signing bonus under the Employment Agreement, and was paid his salary at a rate of $1 million per annum, as required under the Employment Agreement. | 24. Liu Decl. ¶24; Ex. 15; Ex. 16. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 26.     The Employment Agreement provided that Mr. Liu would serve as FF's Global General Counsel ("GC"), Chief Administrative Officer ("CAO"), and Global Senior Advisor. | 25. Liu Decl. at ¶24, Ex. 16 at 5-7; *see also* ECF 1-1. |
| 27.     Mr. Liu's employment was guaranteed under the terms of the Employment Agreement for five years. | 26. Ex. 16 at 5-7; *see also* ECF 1-1. |
| 28.     FF agreed to pay Mr. Liu a package of cash and equity compensation under the terms of the Employment Agreement. | 27. Ex. 16 at 5-7; *see also* ECF 1-1. |
| 29.     FF agreed to pay Mr. Liu a $3 million signing bonus, payable in five equal installments of $600,000, with the first installment paid upon signing of the Employment Agreement and the remaining four installments paid on each of the four anniversaries of Mr. Liu's first date of employment. Plaintiff would receive all of the unpaid installments of his Employment | 28. Ex. 16 at 5-7; *see also* ECF 1-1. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| Agreement if he was terminated during his five-year employment term. | |
| 30.     Under the terms of the Employment Agreement, FF agreed to pay Mr. Liu a minimum annual base salary of $1 million during each of the fives years of his guaranteed five year term.    The Employment Agreement also required FF to pay any unpaid portion of the $5 million base salary in a lump sum if Plaintiff was fired for any reason. | 29. Ex. 16 at 5-7; *see also* ECF 1-1. |
| 31.     The Employment Agreement granted Mr. Liu 20 million shares of FF, representing two percent of FF's total equity prior to its Series A round, with the shares to be issued, at Mr. Liu's election, in the form of restricted stock or options (the "Smart King Options"). The Employment provided that Mr. Liu's Smart King Options | 30. Ex. 16 at 5-7; *see also* ECF 1-1. |

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN
SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Uncontroverted Facts | Supporting Evidence |
| --- | --- |
| would fully vest upon any early termination of Mr. Liu by FF. | |
| 32.      However, Plaintiff's compensation and employment terms were not yet complete. Between January 26 and February 2, 2018, Jerry Wang and Mr. Liu had extensive negotiations over the Stock Transfer Agreement. Sidley Austin LLP, FF's external counsel, through Jerry Wang, continued to be involved in the drafting process. On January 30, 2018, Jerry Wang sent Plaintiff an updated redline of the Stock Transfer Agreement and told him to "Please take a look this version drafted by company external counsel Sidley, and I make it clear to make it unchanged as much as possible and reflect all business terms that we mutually agreed.   Please let me know if we need to do a call to explain further, and Sidley is happy to arrange a conference call together with us to walk through and discuss solutions."   The Stock Transfer | 31. Liu Decl. ¶25; Ex. 17. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| Agreement was completely revised by Sidley Austin LLP and its title had changed to the Director Compensation Agreement. | |
| 33.     Later on January 30, 2018, Mr. Liu applied edits to the Director Compensation Agreement and sent Jerry Wang a revised version. Jerry Wang responded with new edits and told him "please let me know if you would like to schedule a call with Sidley to briefly discuss how to best describe the specific amount." At 10:33 PM, on January 30, 2018, after further negotiations, Jerry Wang sent Mr. Liu comments on the Director's Compensation Agreement and told him "if you think it is fine I will forward to Sidley and discuss with them." | 32. Liu Decl. ¶26; Ex. 18; Ex. 19. |
| 34.     After further exchanges of drafts of the Director Compensation Agreement between Jerry Wang and Plaintiff, on February 1, 2018, Jerry Wang passed along what he described as a comment from Sidley to Mr. Liu: "thanks Jerry – | 33. Liu Decl. ¶27; Ex. 20. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| this is better, but still carries moderate risk of breach of the shareholders agreement (and will have to be disclosed in connection with an IPO)." | |
| 35.   On February 2, 2018, Mr. Jia and Mr. Liu signed the Directors Compensation Agreement and Mr. Liu emailed Jerry Wang his executed copy. On February 7, 2018, Mr. Liu officially resigned from his partnership at Mayer Brown. | 34. Liu Decl. ¶28; Ex. 21; Ex. 22. |
| 36.   After signing the Employment Agreement and Director Compensation Agreement, Mr. Liu relocated with his family from New York to California and began working at FF on February 15, 2018. | 35. Liu Decl. ¶29. |
| 37.   Within Plaintiff's first week on the job FF assisted him in registering with the State Bar of California as in-house counsel on April 17, 2018. | 36. Liu Decl. ¶30; Ex. 23; Ex. 24. |
| 38.   Mr. Liu's job duties at FF included leading the legal affairs and coordinating administrative functions of FF, including | 37. Liu Decl. at ¶31. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| but not limited to overseeing the expansion of the legal team, managing the development of policies and procedures, hiring additional in-house lawyers to enhance the FF legal department, and coordinating external counsels and internal litigations. | |
| 39.     FF issued a press release formally announcing Mr. Liu's hiring on August 1, 2018. | 38. Liu Decl. at ¶32; Ex. 25. |
| 40.     On or about October 25, 2018, Mr. Liu was informed that his 20,000,000 options were entered into FF's stock option system provided by a third party, Solium.    In late October 2018, Smart King's board of directors passed a resolution granting his 20,000,000 options in Smart King pursuant to the Employment Agreement.    On or about January 2019, Mr. Liu confirmed online that my options had been issued. | 39. Liu Decl. at ¶33; Ex. 26; Kushner Decl. Ex. E at Requests for Admission 1-3; Kushner Decl. Exs. F-J. |
| 41.     Plaintiff's work at FF included helping FF when its largest investor, Evergrande, backed out of its funding | 40. Liu Decl. ¶34; Ex. 27. |

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| commitment in August 2018 (the "Evergrande Dispute"). Because of the Evergrande Dispute, FF, specifically Mr. Jia, planned furloughs and mass layoffs. Mr. Liu directed his legal team to write memos on the best practices under California law before termination in compliance with the Worker Adjustment and Retraining Notification Act ("WARN Act"), which requires 60-day notice to employees before mass terminations, as well as what the requirements of Smart King's board were to comply with their fiduciary duties. | |
| 42.    Another issue that Mr. Liu raised concerned Mr. Jia's practice and commandment that all management meetings be recorded. At Plaintiff's request, a memo was prepared outlining why Mr. Jia's request ran afoul of California law. Mr. Jia ignored the recommendations. | 41. Liu Decl. ¶36; Ex. 28 |

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN
SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 43.     During the month of October 2018, as Mr. Jia refused to comply with California law, multiple core management team and FF Board members, including FF's co-founder Nick Sampson and Mr. Liu, recommended that Mr. Jia be removed as CEO. At FF's management meeting in late October 2018, Plaintiff suggested to Mr. Jia that he should step down to help save the company. In response, Mr. Jia stripped him of his Global General Counsel position and began to remove him from many important actions within the company.   Other senior management members, including Mr. Sampson, quit, or were forced to resign, or were effectively fired in direct response to the request for Mr. Jia to step down as CEO. | 42. Liu Decl. ¶36. |
| 44.     While after October 2018 Mr. Liu no longer held his Global General Counsel position title and no longer was included as a legal counsel at legal department meetings, he continued to | 43. Liu Decl. ¶37; Ex. 29. |

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN
SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No.: 2:20-cv-08035-SVW-JPR

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| report on and try to correct workplace violations. These ongoing violations included, but were not limited to, secret recordings of office meetings in violation of California law and violations of the WARN Act and/or labor laws. The multiple memos he had written by his team on these issues were never seriously considered by FF. Plaintiff's duties being stripped and his advice not being taken eventually issues culminated with Plaintiff sending an email to Yueting Jia himself on January 23, 2019. | |
| 45.      Mr. Liu was terminated from his position without being given any cause roughly three weeks later on February 11, 2019. Mr. Jia told Plaintiff during his termination meeting that Plaintiff's effort and suggestion to remove Mr. Jia and save the company was the reason for his termination. Defendants now suggest something different: in their most recent counterclaims, they claim to have terminated Mr. Liu because, among other | 44. Liu Decl. ¶38. |

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| reasons, Plaintiff failed to advise on the WARN Act and with respect to recording management meetings. As set forth above, these allegations are demonstrably false. | |
| 46.   On the same date Mr. Liu was terminated, without telling him, FF cancelled his 20,000,000 Smart King options. Mr. Liu was never paid $2.4 million of his $3 million signing bonus and Plaintiff was never paid the remaining $4 million of his $5 million base salary. | 45. Liu Decl. ¶39; Kushner Decl. Exs. E-J. |
| 47.   FF never paid Mr. Liu the unpaid portion of his $3 million signing bonus under the Employment Agreement, totaling $2,400,000.   FF never paid Mr. Liu $4 million of his $5 million base salary. | 46. Liu Decl. at ¶40. |

Dated: May 18, 2021

SEIDEN LAW GROUP LLP


/s/ Amiad Kushner
Amiad Kushner
Seiden Law Group LLP
322 Eighth Avenue, Suite 1704

New York, NY 10001
akushner@seidenlegal.com
(212) 523-0686

*Counsel for Plaintiff Hong Liu*

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN
SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email:   kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiyerden Law Group LLP
322 Eighth Avenue, Suite 1704
New York, NY 10001
Telephone:   (646) 766-1914
Facsimile:   (646) 304-5277

*Attorneys for Plaintiff/Counter-Defendant,*
*Hong Liu*

## UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| HONG LIU,<br><br>    Plaintiff,<br><br>  v.<br><br>FARADAY&FUTURE INC., SMART KINGLTD., JIAWEI WANG, and CHAOYING DENG<br><br>    Defendants.<br><br>—————————————<br>FARADAY&FUTURE INC.,<br><br>    Counterclaimant,<br><br>  v.<br><br>HONG LIU,<br><br>    Counter-Defendant. | **Case No:** 2:20-cv-08035-SVW-JPR<br><br>**PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint filed on: January 3, 2020<br><br>Defendants' Motion filed on: April 26, 2021<br><br>Hearing on Motions: June 1, 2021; June 21, 2021<br><br>Judge: Hon. Stephen V. Wilson<br>Trial Date: July 27, 2021 |

Plaintiff Hong Liu ("Plaintiff" or "Mr. Liu") hereby submits this statement of genuine disputes pursuant to Central District of California Rule 56-2 in opposition to the motion for summary judgment herein filed by Defendant FF Intelligent Mobility Global Holdings Ltd.'s (f/k/a Smart King Ltd. ("Smart King")) and Defendant Faraday&Future Inc. ("FF") (collectively "Defendants").[1]

Facts 1 through 25 below correspond to the facts and supporting evidence presented in the Statement of Uncontroverted Facts filed by the moving party. These facts are followed by additional material facts and supporting evidence showing a genuine issue.

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| 1.     Faraday was and is an electric vehicle company headquartered in Los Angeles, California. | 1.     Undisputed. |
| 2.     Smart King is the indirect parent company of Faraday. | 2.     Undisputed. For purposes of this response, Plaintiff assumes that the entity formerly known as Smart King Ltd. is currently known as FF Intelligent Mobility Global Holdings Ltd. |
| 3.     Between October 2017 and February 2018, Liu was a New York attorney and partner with the law firm Mayer Brown LLP ("**Mayer**"). | 3.     Undisputed.   Plaintiff notes that he resigned from Mayer Brown LLP ("Mayer") on February 7, 2018.   *See* Liu Decl. at 3, 28, Ex. 22. |

---

[1] References to the "Liu Decl." are to the Declaration of Hong Liu.   References to "Ex" are to the Exhibits attached to the Liu Decl.

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| 4.      In October 2017, Liu provided FF with (i) an Engagement Agreement (the "**Engagement Agreement**"), as well as with (ii) a Mayer Brown Proposal and Work Plan for FF Global Holdings Ltd., Faraday & Future Inc., d/b/a Faraday Future (the "**Work Plan**"); (iii) Mayer Brown Current Working Team Hourly Rates for Faraday Future; and (iv) International Terms of Business. | 4.      Undisputed. |
| 5.      The Mayer Work Plan stated, in relevant part, that:  We are very excited to have been given the opportunity to make a proposal and work plan to provide legal services to Faraday Future ("FF"). We are eager to play a role in FF's mission of bringing premium, intuitive, and seamlessly connected electric vehicles to people worldwide.  The Work Plan further identified the legal services to be provided by Mayer's "Corporate and Finance team," "Auto Industry team," "Initial public offering team," "General Counsel team," and | 5.      Disputed.    The Mayer Work Plan does not state that Mr. Liu would oversee anything.    Plaintiff respectfully refers the Court to the Mayer Work Plan for its complete and accurate context.    *See* Declaration of Chaoying Deng ("Deng Decl."), Ex. 2 at pp. 1-3. |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| "Wealth management" team, all of which were to be overseen by Liu in his capacity and role as the "FF Client Team Leader & Main Contact Partner." | |
| 6.    FF and Mayer executed the Engagement Agreement dated October 20, 2017, thereby memorializing their attorney-client relationship. Liu executed the Engagement Agreement on Mayer's behalf. The Engagement Agreement stated, in relevant part, that:<br><br>This letter confirms our agreement that FF Global Holdings Ltd., Faraday & Future Inc., d/b/a Faraday Future (collectively the "Clients" or "you" and each a "Client" or "you") have engaged Mayer Brown LLP, a limited liability partnership in the United States (the "Firm" or "we" or "us"), to provide Clients with legal services and advice in connection with your capital raising, strategies, regulatory, corporate, securities, intellectual property, litigation, wealth management matters and on such other tasks and matters as may be instructed by you from time to time and as | 6.    Disputed.    The engagement dated October 20, 2017, was not signed by either party until December 22, 2017. *See* Liu Decl. at ¶20; Ex. 8.    Further, Mr. Liu never provided any legal advice to FF during his employment at Mayer. *See* Liu Decl. at ¶¶4-5.    Plaintiff respectfully refers the Court to the Engagement Agreement for its full and accurate contents.    Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement. |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| we explicitly agree to undertake (the "Matter").<br><br>***<br>As the Firm's designated leader of the FF Client Team, I [Liu] will be responsible for this engagement… | |
| 7.    Between December 2017 and February 2018, Mayer and Liu, in his capacity as an attorney and partner with Mayer, represented FF in various legal matters in their capacity as outside legal counsel. | 7.    Disputed.    Mr.    Liu    never provided any legal advice to FF during his employment at Mayer.    *See* Liu Decl. at ¶¶4-5; *see also* Wang Decl., Exs. 1-3 (showing that Mr. Liu did not bill any time on any FF matter). |
| 8.    Between October 20, 2017 and January 25, 2018, Liu solicited, drafted, and negotiated an employment agreement ("**Employment Agreement**") with FF, under which Liu was retained as Faraday's Global General Counsel, Global Chief Administrative Office, and Global Senior Advisor. Liu and FF executed the Employment Agreement on or about January 25, 2018. | 8.    Disputed.    FF solicited Mr. Liu's employment.    On October 25, 2017, FF provided Mr. Liu with a term sheet containing proposed terms for Mr. Liu's prospective employment at FF.    *See* Liu Decl. at ¶¶12-13.    Both parties were involved in the negotiation and drafting of the Employment Agreement. *See id.* at ¶¶11-19, 21-24.    The Employment Agreement was executed on January 26, 2018 (not January 25, 2018).    *See id.* at ¶24. |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| 9.    The Employment Agreement between FF and Mayer stated, in relevant part, that:<br><br>FF shall guarantee [Liu's] employment and base salaries as provided in the Terms for five years except for [Liu] decid[ing] to leave FF on his own.<br><br>***<br><br>FF shall pay [Liu] a minimum annual base salary of $1,000,000.00, in semi-monthly (bi-weekly) installments, for five years. If [Liu] is terminated for any reason during the five year term he will be entitled to receive any remaining portion of the five years base salaries not yet paid in a lump sum. Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF.<br><br>***<br><br>FF shall pay [Liu] a signing bonus of $3,000,000.00, payable in five equal installments, with the first installment paid upon the signing of the Agreement and each of the | 9.    Undisputed.    Plaintiff respectfully refers the Court to the Employment Agreement for its complete and accurate contents. *See* ECF 1-1; *see also* Ex. 16 at 5-7. |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| remaining following four anniversary of [Liu's] start of employment at FF and paid in lump sum in the event of an early termination by FF during the five year guaranteed employment term.<br><br>***<br>FF shall grant [Liu] at minimum cost required by law and outright, 2% of FF's total equity shares pre Series A dilution in the form of restrictive stocks or equity option as [Liu] may select based on any of [Liu's] available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.000 equity shares of FF pre Series A, as FF has represented and warranted, with the FF established and standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as [Liu] may select and with adequate consideration of tax benefits available to [Liu]. Any and all of the remaining unvested portion of such 2% of the total shares shall become immediately and fully vested to [Liu] upon early termination by FF of [Liu's] employment within the guaranteed employment term with FF. Such an early termination can only be | |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| effectuated based on the specific cause of a serious breach of fiduciary duty to FF as a senior executive of FF after fully adjudicated against [Liu] by a competent court in the United States, and [Liu] will be fully covered by FF with executive indemnifications.<br><br>***<br><br>FF shall entitled [Liu] to participate in all benefit plans and programs at the same level with all senior level executive of FF, including, without limitation . . , insurances including health, life, and D&O. | |
| 10.　　In soliciting, negotiating, drafting the terms of, and procuring the Employment Agreement with FF, Liu never advised FF in writing to seek and obtain independent legal counsel in connection with the drafting and negotiation of the Employment Agreement. | 10.　　Disputed.　　FF solicited Mr. Liu's employment.　　On October 25, 2017, FF provided Mr. Liu with a term sheet containing proposed terms for Mr. Liu's prospective employment.　　*See* Liu Decl. at ¶¶12-13.　　Both parties were involved in the negotiation and drafting of the Employment Agreement.　　*See id.* at ¶¶11-19, 21-24.　　Plaintiff does not dispute that he never advised FF in writing to obtain independent counsel in |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| | connection with the Employment Agreement; however, Plaintiff verbally advised FF to obtain independent counsel. *See* Liu Decl. at ¶15. |
| 11. In soliciting, negotiating, drafting the terms of, and procuring the Employment Agreement with FF, Liu never informed FF of any actual and reasonably foreseeable adverse consequences of, materials risks of, and reasonably available alternatives to, the Employment Agreement's terms concerning Liu's cash compensation, stock options, the circumstances under which FF was permitted to terminate Liu's employment, and the effect of such termination on Liu's compensation. | 11. Disputed. Faraday solicited Mr. Liu's employment at Faraday. On October 25, 2017, Faraday provided Mr. Liu with a term sheet containing proposed terms for Mr. Liu's prospective employment at Faraday. *See* Liu Decl. at ¶¶12-13. Both parties were involved in the negotiation and drafting of the Employment Agreement. *See id.* at ¶¶11-19, 21-24. The terms of the Employment Agreement were fully disclosed on the face of the agreement. Plaintiff verbally advised FF to obtain independent counsel in connection with the Employment Agreement. *See* Liu Decl. at ¶15. Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually contain |

9

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 2:20-cv-08035-SVW-JPR

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| | legal conclusions that are inappropriate subjects for a Rule 56.1 statement. |
| 12.    In soliciting, negotiating, drafting the terms of, and procuring the Employment Agreement with FF, Liu never disclosed to FF that Liu was negotiating the Employment Agreement exclusively on his own behalf and for his benefit; never disclosed that he was not providing FF with the same legal advice in connection with the Employment Agreement that he would have given FF had FF been negotiating that contract with a third-person; and failed to actually provide FF with the same legal advice in connection with the Employment Agreement that he would have given FF had FF been negotiating that contract with a third-person. | 12.    Disputed.    Faraday solicited Mr. Liu's employment at Faraday.    On October 25, 2017, Faraday provided Mr. Liu with a term sheet containing proposed terms for Mr. Liu's prospective employment at Faraday. *See Liu Decl.* at ¶¶12-13.    Both parties were involved in the negotiation and drafting of the Employment Agreement. *See id.* at ¶¶11-19, 21-24.    The terms of the Employment Agreement were fully disclosed on the face of the agreement. Plaintiff verbally advised FF to obtain independent counsel in connection with the Employment Agreement.    *See* Liu Decl. at ¶15.    Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 2:20-cv-08035-SVW-JPR

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| 13.   In soliciting, negotiating, drafting the terms of, and procuring the Employment Agreement with FF, Liu never disclosed in writing to FF, or obtained FF's fully informed written consent to, Liu's conflict of interest with respect to the negotiation, drafting, and terms of the Employment Agreement. | 13.   Disputed.   Faraday solicited Mr. Liu's employment at Faraday.   On October 25, 2017, Faraday provided Mr. Liu with a term sheet containing proposed terms for Mr. Liu's prospective employment at Faraday. *See* Liu Decl. at ¶¶12-13.   Both parties were involved in the negotiation and drafting of the Employment Agreement. *See id.* at ¶¶11-19, 21-24.   The terms of the Employment Agreement were fully disclosed on the face of the agreement. Plaintiff verbally advised FF to obtain independent counsel in connection with the Employment Agreement.   *See* Liu Decl. at ¶15.   Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement. |
| 14.   Liu has acknowledged in writing his familiarity with and agreement to abide by the Rules of Professional Conduct. | 14. Undisputed that Mr. Liu signed a document on April 28, 2014, entitled "Conforming to the Rules of Professional Conduct."   *See* Decl. of |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| | Lauren E. Grochow, ¶7, Ex. 5.  The document stated "I have currently reviewed with care the Rules of Professional Conduct applicable to each jurisdiction in which I am licensed to practice or in which I am seeking a license."  *See id.*  Mr. Liu was not licensed in California before registering with the California state bar in April 2018.  *See* Liu Decl. at ¶30. |
| 15.    Faraday and Smart King have provided notice of their rescission of the Employment Agreement via their respective Answers to Liu's Complaint and Faraday's Second Amended Counterclaim against Liu. | 15. Disputed.   Defendant's pleadings do not constitute a "notice of their rescission of the Employment Agreement."   Further, the fraud-based rescission claims that Defendant's asserted in their initial pleadings in this action have been dismissed.   *See* ECF 144.   Defendants did not raise their current claims for rescission of the Employment Agreement based on purported violations of attorney ethics rules until their third round of pleadings in this action.   *See* ECF 72, 83, 95. Plaintiff further notes that Defendants' |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| | alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement. |
| 16. FF terminated Liu's employment in February 2019, after having already paid Liu more than $1.8 million in cash compensation. | 16. Disputed. Defendants included over $230,000 non-cash compensation in their calculation, specifically the "RELOCATION" and "PTO" expenses were not "cash compensation." *See* Wang Declaration, Ex. 4 at 24. |
| 17. The Complaint's First Cause of Action for Breach of Contract against FF alleges that FF breached the Employment Agreement by failing to provide him with $6.4 million in cash and lucrative stock options following his termination in February 2019. | 17. Disputed. The Complaint's First Cause of Action for Breach of Contract alleges, inter alia that FF breached the Employment Agreement by failing to vest stock options that were previously issued to Liu. *See* ECF 1 at 21-23. Plaintiff respectfully refers the Court to the Complaint for its complete and accurate contents. |
| 18. The Complaint's Fourth Cause of Action for Wrongful Termination in Violation of Public Policy against FF alleges that FF terminated Liu in retaliation for Liu reporting alleged | 18. Disputed. The Complaint's Fourth Cause of Action is not limited in this manner, and alleges "As a direct result of his whistleblowing, Plaintiff was wrongfully discriminated against by |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| "compliance issues and violations of law" to FF management concerning supposed "immigration law, failures to adequately investigate sexual harassment complaints, illegal retaliation against employees, breach of employee's privacy, irregular financial activities and timely compliance with the labor law including the WARN Act." | Smart King and Faraday. Plaintiff's work responsibilities were reduced dramatically, and he was then terminated, all in violation of public policy. Specifically, Plaintiff was terminated in retaliation for truthfully expressing his concerns with regard to Faraday's failure to comply with applicable California and federal law."   *See* ECF 1 at 25-26. Plaintiff respectfully refers the Court the Complaint for its complete and accurate contents. |
| 19.    Liu recently produced 62 of FF's privileged attorney-client documents (totaling 308 pages) in this lawsuit, thereby revealing that he retained those privileged materials following his termination from FF in February 2019 and has possessed them since the inception of this action (the "**Illicit Privileged Materials**"). | 19. Disputed.    The nature and scope of attorney-client privilege in this action, and whether any such privilege has been waived, is highly disputed between the parties.    The Court has held that Defendants have waived attorney-client privilege with respect to broad categories of documents in this action, including all documents relating to the solicitation, drafting, and negotiation of the Employment Agreement, all documents related to |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| | Plaintiff's termination, and enumerated areas in which Defendants allege Plaintiff provided deficient advice or failed to provide advice.   *See* ECF 146 at 6.   Further, the Court has held that it may revisit issues of privilege waiver following the Court's decision on Summary Judgment.   *See* Declaration of Amiad Kushner Exhibit ("Kushner Decl. Ex.") C.   Further, under California law, an attorney may retain and use privileged materials for purposes of wrongful termination claims.   *See e.g., Chubb & Son v. Super. Ct.*, 176 Cal. Rptr. 3d 389, 398 (Cal. App. 1st Dist. 2014) (*"General Dynamics* teaches that a former in-house counsel may use privileged information, with careful controls against inappropriate disclosure, in order to pursue a wrongful termination claim against his or her former employer."). Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| | contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement. |
| 20.    The Illicit Privileged Materials retained and possessed by Liu and recently produced in this action include the following documents:<br><br>• Drafts of company policies prepared by FF's other in-house legal counsel, and not by Liu himself;<br>• A document disclosing FF's legal strategy *vis-à-vis* its sales model;<br>• Drafts of Board of Director meeting minutes prepared by counsel and disclosing privileged information presented to FF's Board;<br>• Legal memoranda prepared by FF's in-house counsel for review and consideration by FF's senior executives;<br>• Email communications with FF's outside legal counsel regarding | 20. Disputed.    The nature and scope of attorney-client privilege in this action, and whether any such privilege has been waived, is highly disputed between the parties.    The Court has held that Defendants have waived attorney-client privilege with respect to broad categories of documents in this action, including all documents relating to the solicitation, drafting, and negotiation of the Employment Agreement, all documents related to Plaintiff's termination, and enumerated areas in which Defendants allege Plaintiff provided deficient advice or failed to provide advice.    *See* ECF 146 at 6. Further, the Court has held that it may revisit issues of privilege waiver following the Court's decision on Summary Judgment. Kushner Decl. Ex. C.    Further, under California law, an |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| FF's Series A financing transaction, and FF's related legal dispute and litigation, with Evergrande;<br><br>• Text message and email correspondence between Liu, FF employees, and outside counsel regarding requests for, and the provision of legal advice regarding, corporate governance issues;<br><br>• Emails between FF's employees, inhouse counsel, and outside counsel regarding labor and employment issues involving the WARN Act, alleged sexual harassment complaints, furloughs, and investigations;<br><br>• Email correspondence and draft documents exchanged with outside counsel relating to FF's Employee Stock Option Plan; | attorney may retain and use privileged materials for purposes of wrongful termination claims.  *See e.g., Chubb & Son v. Super. Ct.*, 176 Cal. Rptr. 3d 389, 398 (Cal. App. 1st Dist. 2014) (*"General Dynamics* teaches that a former in-house counsel may use privileged information, with careful controls against inappropriate disclosure, in order to pursue a wrongful termination claim against his or her former employer."). Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement. |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
| --- | --- |
| • Emails reflecting FF seeking legal advice from in-house regarding the recording of company meetings;<br>• Email chains containing legal advice from outside counsel concerning banking laws;<br>• An email from an FF employee seeking legal advice regarding how to respond to meeting comments;<br>• An email summarizing work performed by FF's in-house legal department; and<br>• A presentation to FF's management regarding the company's key legal strategies and the status of various legal matters. | |
| 21.     During the April 13, 2021 deposition of FF employee Qing Ye ("**Ye Deposition**"), Liu's counsel attempted to introduce and question the witness on Illicit Privileged Materials—namely, a privileged communication between FF and its legal counsel containing legal | 21. Disputed.    Plaintiff disputes that the communication at issue contained legal advice or that it is privileged, and if so, whether any such privilege was waived.    Plaintiff respectfully refers the Court to its responses to nos. 19 and 20 above.    Plaintiff further notes that |

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| advice about corporate governance, relevant only to Liu's wrongful termination claim. | Defendants' alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement.   Plaintiff respectfully refers the court to the cited portions of the transcript of the deposition for its complete and accurate contents. |
| 22.    In response to his attempted introduction of Illicit Privileged Materials, FF's attorney admonished Liu's counsel that such unauthorized possession and use of FF's privileged materials not only violates the attorney-client privilege, but also subjects Liu's counsel to disqualification under governing California law. | 22. Disputed.    At the deposition in question, Plaintiff's counsel made clear to Defendant's counsel that the document in question contained no legal advice and was not privileged.   *See* Declaration of Lauren Grochow, Ex. 2 (Ye Dep. Tr.) at 18:2-14.    Plaintiff respectfully refers the Court to its responses to nos. 19 and 20 above. Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement.   Plaintiff respectfully refers the court to the cited portions of the transcript of the deposition for its complete and accurate contents. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE No.: 2:20-CV-08035-SVW-JPR

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
| --- | --- |
| 23.     During the April 14, 2021 deposition of Chaoying Deng ("**Deng Deposition**"), Liu's counsel once again attempted to question the witness with Illicit Privileged Materials—namely, a privileged communication between FF and its outside legal counsel concerning FF's financial position. | 23. Disputed.    At the deposition in question, Plaintiff's counsel disputed that the document in question was privileged. *See* Grochow Decl., Ex. 4 at 98: 4-7.    Plaintiff respectfully refers the Court to its responses to nos. 19 and 20 above.    Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule 56.1 statement.    Plaintiff respectfully refers the court to the cited portions of the transcript of the deposition for its complete and accurate contents. |
| 24.     In response to FF's attorney's objection and demand that all Illicit Privileged Materials be immediately returned and/or destroyed, Liu's attorney admitted Liu's use and intention to further use FF's privileged information "in support of" the Complaint's "claim for retaliation." | 24. Disputed.    At the deposition in question, Plaintiff's counsel disputed that the document in question was privileged. *See* Grochow Decl., Ex. 4 at 98: 4-7.    Plaintiff respectfully refers the Court to its responses to nos. 19 and 20 above.    Plaintiff further notes that Defendants' alleged "uncontroverted facts" actually contain legal conclusions that are inappropriate subjects for a Rule |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

| Moving Party's Alleged Uncontroverted Facts | Response to Opposition |
|---|---|
| | 56.1 statement.   Plaintiff respectfully refers the court to the cited portions of the transcript of the deposition for its complete and accurate contents. |
| 25.    The Complaint's Seventh Cause of Action for Declaratory Judgment against FF "seeks a declaratory judgment that under the terms of the Employment Agreement, [Liu] is owed $6,400,000 in unpaid salary and bonus compensation and that his 20 million Smart King options must be vested immediately." | 25.   Disputed.    The Complaint's Seventh Cause of Action is not limited to the quotations that Defendants have excerpted.    Plaintiff respectfully refers the Court to the Complaint in its complete and accurate contents.   *See* ECF 1 at 27-28. |

Dated: May 18, 2021                            SEIDEN LAW GROUP LLP


/s/ Amiad Kushner
Amiad Kushner
Seiden Law Group LLP
322 Eighth Avenue, Suite 1704
New York, NY 10001
akushner@seidenlegal.com
(212) 523-0686

*Counsel for Plaintiff Hong Liu*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 2:20-CV-08035-SVW-JPR

Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email: kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiden Law Group LLP
469 Seventh Avenue, 5th Fl.
New York, NY 10018
Telephone: (646) 766-1914
Facsimile: (646) 304-5277

*Attorneys for Plaintiff/Counter-Defendant, Hong Liu*

# UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| HONG LIU,<br><br>Plaintiff,<br><br>v.<br><br>FARADAY&FUTURE INC., SMART KINGLTD., JIAWEI WANG, and CHAOYING DENG<br><br>Defendants. | **Case No:** 2:20-cv-08035-SVW-JPR<br><br>**DECLARATION OF HONG LIU** |
| FARADAY&FUTURE INC.,<br><br>Counterclaimant,<br><br>v.<br><br>HONG LIU,<br><br>Counter-Defendant. | |

I, Hong ("Henry") Liu, declare as follows:

1.     I am the Plaintiff in this action.    I have personal knowledge of the facts stated in this Declaration.    If called upon to do so, I would testify competently thereto.

2.     I submit this Declaration in opposition to Defendants' motion for summary judgment and in support of Plaintiff's cross-motion for partial summary judgment.

## At Mayer Brown, I Did No Legal Work for FF

3.     Between April 28, 2014 and February 7, 2018, I was a partner at Mayer Brown LLP ("Mayer Brown"). Throughout my time at Mayer Brown, I was based in its New York office. I am, and was while working at Mayer Brown, admitted to practice law in the state of New York. While at Mayer Brown I made $1.35 million in 2017.

4.     While employed by Mayer Brown, I advised numerous clients on a wide range of matters. During my entire career at Mayer Brown, I never provided any legal advice to Faraday&Future Inc. ("FF") on any matter. I never supervised the work of other Mayer Brown attorneys on any matter in which Mayer Brown represented FF. While at Mayer Brown, I did not bill time to any matter in which Mayer Brown was representing FF.

5.     At Mayer Brown, partners who originated a relationship with a particular client were designated as the "billing partner" for matters on which Mayer Brown represented any such client.   I was designated as the billing partner on twenty-four client matters. I never served as the billing partner on any matter involving FF.

## FF Approaches Me

6.     On October 15, 2017, Mr. Junmin "Michael" Wang invited me to visit FF's offices in California.    In response to this invitation, on October 17 and 18, I met with representatives of FF in Los Angeles, including FF's Vice President of Capital Markets Jiawei "Jerry" Wang, Michael Wang, FF's Vice-President of Administration Chaoying Deng, and FF's then CEO Yueting Jia.

7.      During the October 17 and 18 meetings, Mr. Jia told me that it would be advantageous to FF to have a person with my status and recognition. However, at that time, although it was my impression that Mr. Jia desired me to consider joining FF, he did not explicitly make any employment offer, and I did not entertain any discussion of employment terms.

8.      At the time of the October 17 and 18 meetings, I understood that Mayer Brown had previously done regulatory work for FF for which there was a substantial unpaid balance (and that, at the time, Mayer Brown had suspended work for FF in light of the unpaid balance). I learned that there were two previous engagement letters between Mayer Brown and FF, entered into in December 2015 and May 2017. Attached as Exhibit 1 is a true and correct copy of the May 31, 2017 engagement letter and attached as Exhibit 2 is a true and correct copy of the December 22, 2015 engagement letter. I also understood that Mr. Phil Recht, a Mayer Brown partner based in its Los Angeles office, had supervised these engagements.

9.      During my October 17 and 18 visits to FF's offices, Mr. Jia indicated that FF would pay past due balances on Mayer Brown's invoices. Mr. Jia also asked me to send a proposal to FF regarding Mayer Brown's potential representation of FF on new matters, including a potential series A financing.

10.     On October 20, 2017, in response to Mr. Jia's request, I sent an email to FF attaching an unsigned draft engagement letter and proposed work plan. Attached as Exhibit 3 is a true and correct copy of this email. For over two months, FF did not sign this document.

**FF Sends me a Draft Term Sheet for the Employment Agreement**

11.     Shortly after I sent the above-referenced draft engagement letter on October 20, 2017, Jerry Wang reached out to me to discuss whether I would be interested in working at FF.

12.     On October 25, 2017, Mr. Wang sent me an email with two attachments. The first attachment was a document entitled "DRAFT EMPLOYMENT AGREEMENT TERM SHEET FOR HENRY L."  (the "Term Sheet").   The second attachment was an Excel spreadsheet containing information under the heading "FF Option Valuation Estimation."  (the "Option Valuation").   Attached as Exhibit 4 is a true and correct copy of this email and the two attachments.

13.     The Term Sheet contained a proposal for me to serve as "Vice Chairman and Global General Counsel of FF Inc."  *See* Exhibit 4 at 7.   It contained a number of proposed terms, including "Annual salary and bonus of US$900,000 per year," and "20,000,000 (2%) of the fully diluted equity of the Company as stock option."  *See id.* I did not solicit the proposed equity interests in the Term Sheet.

14.     The Option Valuation contained a range of estimated values for the 2% equity stake that was referenced in the Term Sheet.  *Id.* at 5.   The lowest estimated value was $42.8 million, which was labeled as the "Series A Value." *See id.*   The next highest estimated value was between $100 and $150 million, which was labelled as the "Series B Value."  *See id.*   The next highest estimated value was $432 million to $648 million, which was labelled as the "IPO Value."  *See id.*   The highest estimated value was $1 billion, which was labelled as the "IPO 3 years Value."  *See id.*

15.     Between October 26 and 29, 2017, I had several conversations with Jerry Wang in which I verbally advised him that FF should seek independent counsel in connection with negotiating the terms of my potential employment at FF. During these conversations, Jerry Wang repeatedly assured me that FF had its own in-house legal department and would also seek advice from its outside counsel at Sidley Austin LLP in connection with negotiating the terms of my potential employment.

16.     On October 29, 2017, Jerry Wang asked me to send him information concerning my compensation at Mayer Brown. I sent him my compensation package

that same day with my resume in English and Chinese.   *See* Exhibit 5, a true and correct copy of the October 29, 2017 email and its attachments.

17.     On November 2, 2017, Jerry Wang sent me a Chinese article and a message stating "Dear Mr. Liu, please refer to the latest information above, recently there are some negative rumors going on in China, these are all completely fake and I hope won't influence your judgment, appreciated and I sincerely look forward to your reply."   *See* Exhibit 6, a true and correct copy of Jerry Wang and my conversation.

18.     Between November 2 and 15, 2017, I did not have substantive discussions with FF concerning my potential employment.   On November 16, 2017, Jerry Wang sent me an email with the subject line "FF US employment contract."   *See* Exhibit 7, a true and correct copy of the email and its attachments.    The email contained multiple attachments, including an offer letter template ("the "Offer Template").   *See generally id.* at 4.    Jerry Wang soon after sent me a message stating: "I've shared standard FF package for your view to your personal gmail address."   *See* Exhibit 6

19.     After Jerry Wang sent me the Offer Template, I confirmed with him that I should "fill those terms that we have so far agreed on and those we have been discussing into the form letter agreement you provided."   *See* Exhibit 6.    Jerry Wang responded, "Sounds good, thanks a lot Mr. Liu!"   *See id.*    During this time Jerry Wang and I agreed to change the equity grant from 2% to 3%. On November 21, 2017, I emailed Jerry Wang the employment contract (entitled "Term Sheet") with the terms filled in based on our prior discussions. Exhibit 7A is a true and correct copy of this email and attachment. No further substantive discussions took place until December 29, 2017.

**FF Sends the Executed Engagement Letter to Phil Recht at Mayer Brown**

20.     On December 22, 2017, Amanda Walker, FF's Corporate Counsel, emailed Phil Recht FF's signed Mayer Brown and FF engagement letter, which had been sent on October 20, 2017. FF did not update the date from October 20 to December 22, 2017.

Ms. Walker stated in her December 22, 2017 email: "Attached please also find the supplemental engagement letter that one of your colleagues had requested back in October to reinitiate the engagement." *See* Exhibit 8.   I was not copied on this email. *See id.*   Later that day, Phil Recht forwarded me the engagement letter and I signed it. The fully executed agreement was sent later that day to FF.

**FF's Human Resources Team, In-House Attorneys and Sidley Austin LLP, Negotiate the Terms of My Employment**

21.    On December 29, 2017, Jerry Wang called me and invited me to visit FF's offices in California on January 10, 2018. On January 1, 2018, Mr. Wang then emailed me and attached an updated term sheet contract in clean and redline form.   *See* Exhibit 9.   Mr. Wang's email stated, "Happy New Year! Please refer to attachment comments based on our discussion and previous term sheet, please let me know your feedback and sincerely look forward to partnership!" *See* Exhibit 9.

22.    On January 10, 2018, I met in person with Mr. Jia, who was then CEO of FF, and it was there that Mr. Jia divided my compensation package into two agreements: the Stock Transfer Agreement (which eventually became the Director Compensation Agreement between Mr. Jia and me) and the Employment Agreement (between FF and me). The equity interest that was promised to me was subdivided between the two agreements. *See* Exhibit 10, a true and correct copy of an email with my equity interest divided between the two agreements. Mr. Jia was not a client of Mayer Brown; while I worked at Mayer Brown, I never provided him with legal advice.

23.    Between January 10 and January 26, 2018, Mr. Wang and I exchanged multiple drafts of the Employment Agreement and Stock Transfer Agreement. Throughout my negotiations with FF I was told by Mr. Wang that FF's in house attorneys, FF's outside counsel Sidley Austin LLP, and FF's Human Resources ("HR") team were reviewing both agreements. On January 22, 2018, Jerry Wang told me "Thank

you, manager Liu, for accepting my modifications to the Employment Agreement.   I no longer have any issues with this agreement. Ultimately the HR director DG will need to review it.   If he also does not have any other issue with it, we can then finalize it." Attached is Exhibit 11, a true and correct copy of the translated message. On January 25, 2018, I was told in writing that FF's internal Legal Department was "working closely with HR in doing the final review."   *See* Exhibit 12, a true and correct copy of the translated message.   On January 26, 2018, I was told that "Sidley's company partner VJ is reviewing this agreement for us right now to make sure there is no violation of any stipulations with investors." *See* Exhibit 13, a true and correct copy of the translated message. On January 26, 2018, Jerry Wang sent a message to myself and Wentao Huang, a lawyer who worked in FF's legal department, "Many thanks to Mr. Huang for your coordination for the term(s) of the employment contract(s)." *See* Exhibit 14, a true and correct copy of the translated message exchange between Jerry Wang, Wentao Huang, and myself.

24.     Late in the day on January 26, 2018, I signed my Employment Agreement dated January 25, 2018, and emailed the executed agreement to Jerry Wang. *See* Exhibit 15, a true and correct copy of the email correspondence and attachments. FF sent me back the countersigned agreement that same day. *See* Exhibit 16, a true and correct copy of the email exchange and attachments.

25.     However, my compensation and employment terms were not yet complete. Between January 26 and February 2, 2018, Jerry Wang and I had extensive negotiations over the Stock Transfer Agreement. Sidley Austin LLP, FF's external counsel, through Jerry Wang, continued to be involved in the drafting process. On January 30, 2018, Jerry Wang sent me an updated redline of the Stock Transfer Agreement and told me to "Please take a look this version drafted by company external counsel Sidley, and I make it clear to make it unchanged as much as possible and reflect all business terms that we

mutually agreed.   Please let me know if we need to do a call to explain further, and Sidley is happy to arrange a conference call together with us to walk through and discuss solutions."   *See* Exhibit 17, a true and correct copy of the email exchange and attachments.   The Stock Transfer Agreement was completely revised by Sidley Austin LLP and its title had changed to the Director Compensation Agreement. *See id.*

26.   Later on January 30, 2018, I applied edits to the Director Compensation Agreement and sent Jerry Wang a revised version. Jerry Wang responded with new edits and told me "please let me know if you would like to schedule a call with Sidley to briefly discuss how to best describe the specific amount." *See* Exhibit 18, a true and correct copy of the email exchange and attachments. At 10:33 PM, on January 30, 2018, after further negotiations, Jerry Wang sent me comments on the Director's Compensation Agreement and told me "if you think it is fine I will forward to Sidley and discuss with them." *See* Exhibit 19, a true and correct copy of the email exchange and attachments.

27.   After further exchanges of drafts of the Director Compensation Agreement between Jerry Wang and I, on February 1, 2018, Jerry Wang passed along what he described as a comment from Sidley: "thanks Jerry – this is better, but still carries moderate risk of breach of the shareholders agreement (and will have to be disclosed in connection with an IPO)." *See* Exhibit 20, a true and correct copy of the email exchange and attachments.

28.   On February 2, 2018, Mr. Jia and I signed the Directors Compensation Agreement and I emailed Jerry Wang my executed copy. *See* Exhibit 21, a true and correct copy of the email exchange and attachments. On February 7, 2018, I officially resigned from my partnership at Mayer Brown. *See* Exhibit 22.

**I Begin Working At FF**

29.     After signing the Employment Agreement and Director Compensation Agreement, I relocated with my family from New York to California and began working at FF on February 15, 2018.

30.     Within my first week on the job, FF assisted me in registering with the State Bar of California as in-house counsel, which occured on April 17, 2018. *See* Exhibit 23, a true and correct copy of the email exchange between Sandy Gilliam of FF and myself; *see also* Exhibit 24, a true and correct copy of my certificate of registration for in-house counsel with FF.

31.     My job duties at FF included leading the legal affairs and coordinating administrative functions of FF, including but not limited to overseeing the expansion of the legal team, managing the development of policies and procedures, hiring additional in-house lawyers to enhance the FF legal department, and coordinating external counsels and internal litigations.

32.     On August 1, 2018, FF issued a press release formally announcing my hiring.   *See* Exhibit 25, a true and correct copy of the August 1, 2018 press release.

33.     On or about October 25, 2018, I was informed that my 20,000,000 options were entered into FF's stock option system provided by a third party, Solium.    In late October 2018, Smart King's board of directors passed a resolution granting my 20,000,000 options in Smart King pursuant to the Employment Agreement.   On or about January 2019, I confirmed online that my options had been issued.   *See* Exhibit 26, a true and correct copy of the confirmation that my options had been issued.

**My Attempts to Stop Illegal Work-Place Violations & Advise FF Through The Evergrande Dispute**

34.     My work at FF included helping FF when its largest investor, Evergrande, backed out of its funding commitment in August 2018 (the "Evergrande

Dispute").   Because of the Evergrande Dispute, FF, specifically Mr. Jia, planned furloughs and mass layoffs. I directed my legal team to write memos on the best practices under California law before termination in compliance with the Worker Adjustment and Retraining Notification Act ("WARN Act"), which requires 60-day notice to employees before mass terminations, as well as what the requirements of Smart King's board were to comply with their fiduciary duties. *See, e.g.,* Exhibit 27, a true and correct copy of an email exchange in which I had my advice on the WARN Act reflected in the Board of Directors meeting minutes.

35.     Another issue that I raised concerned Mr. Jia's practice and commandment that all management meetings be recorded. At my request, a memo was prepared outlining why Mr. Jia's request ran afoul of California law. A true and correct copy of an email reflecting this memo is attached hereto as Exhibit 28. Mr. Jia ignored the recommendations.

36.     During the month of October 2018, as Mr. Jia refused to comply with California law, multiple core management team and FF Board members, including FF's co-founder Nick Sampson and I, recommended that Mr. Jia be removed as CEO. At FF's management meeting in late October 2018, I suggested to Mr. Jia that he should step down to help save the company. In response, Mr. Jia stripped me of my Global General Counsel position and began to remove me from many important actions within the company.   Other senior management members, including Mr. Sampson, quit, or were forced to resign, or were effectively fired in direct response to the request for Mr. Jia to step down as CEO.

37.     While after October 2018 I no longer held my Global General Counsel position title and no longer was included as a legal counsel at legal department meetings, I continued to report on and try to correct workplace violations. These ongoing violations included, but were not limited to, secret recordings of office meetings in violation of

California law and violations of the WARN Act and/or labor laws. The multiple memos I had written by my team on these issues were never seriously considered by FF. My duties being stripped and my advice not being taken eventually culminated with me sending an email to Yueting Jia himself on January 23, 2019. The email stated that:

> As is widely known, at least since October 2018, my management responsibilities have been continuously reduced, removed and replaced by you, and my authority and support in performing my duties have also diminished, all without my advance knowledge or agreement. I have been very concerned about these actions, and I have protested to you many times during our past conversations. I have previously expressed to you my grave concern regarding the company's failure to comply with the laws of the State of California and the United States, as well as the company's failure to build a best practice in corporate governance. For example, I have directly expressed my views to you and others at the company on how to best comply with laws regarding many company practices, including but not limited to, your improper authorization of the recording of meetings without required consent; immigration and work permit compliance issues which you have ignored; failing to adequately investigate sexual harassment complaints against management especially your close associates; retaliation against employees who have raised concerns regarding financial issues; and timely compliance with the WARN Act. I have also constantly reminded you to resolve your personal situations as someone identified as a repeated "Dishonest Person" by the Chinese courts, and to try to resolve your numerous personal lawsuits. I have also advised you to address the reports about your other possible legal issues and financing dealings, including the surprise visits by the US FBI to you in May 2018, so that these issues will not hurt the company and its stakeholders including you yourself. I sincerely wish that you had not and would not retaliate against me for what I have done in performing my responsibilities and duties.

*See* Exhibit 29, a true and correct copy of the email exchange.

38.     I was terminated from my position without being given any cause roughly three weeks later on February 11, 2019. Mr. Jia told me during my termination meeting that my effort and suggestion to remove Mr. Jia and save the company was the reason for my termination. Defendants now suggest something different: in their most recent counterclaims, they claim to have terminated me because, among other reasons, I failed to advise on the WARN Act and with respect to recording management meetings. As set forth above, these allegations are demonstrably false.

39.     After my termination, FF never vested my 20,000,000 Smart King Options. I was never paid $2.4 million of my $3 million signing bonus and I was never paid the remaining $4 million of my $5 million guaranteed base salary over the five year employment term in the Employment Agreement.

I declare under penalty of perjury that the foregoing is, to the best of my knowledge and belief, true and correct.

Dated:      May 18, 2021

*/s/ Hong Liu*
Hong Liu

# Exhibit 1

MAYER · BROWN

Mayer Brown LLP
350 South Grand Avenue
25th Floor
Los Angeles, California 90071-1503

Main Tel +1 213 229 9500
Main Fax +1 213 625 0248
www.mayerbrown.com

**Philip Recht**
Direct Tel +1 213 229 9512
Direct Fax +1 213 576 8140
precht@mayerbrown.com

May 31, 2017

Kevin Vincent
FF Global Holdings Ltd.
Faraday Future
18455 South Figueroa Street
Gardena, California  90248

Dear Mr. Vincent:

This letter confirms our agreement that FF Global Holdings Ltd. and its wholly-owned subsidiary Faraday Future (collectively the "<u>Clients</u>" and each a "<u>Client</u>") have engaged Mayer Brown LLP, a limited liability partnership established in the United States (the "<u>Firm</u>"), to provide Clients preliminary oral advice concerning the application of state law in California, New York, Florida, Washington, and Texas to Clients' proposed subscription vehicle rental plan, all as more fully described in Kevin Vincent's email to me dated May 17, 2017 (the "<u>Matter</u>").

This letter and the International Terms of Business dated January 2015 (the "<u>International Terms</u>"), which are enclosed, govern our ongoing relationship in all matters and supersede all existing agreements or understandings to the contrary with the following two exceptions: (1) the language in parentheses in the first sentence of Section A.9.5 of the International Terms is deleted and the following is inserted in lieu thereof: "(including in transactions, bankruptcy and insolvency, but excluding any arbitration or litigation unless Client agrees in writing)", and (2) Section II of the Schedule of Non-fee Charges to Clients is deleted.

Our engagement on your behalf is limited to the Matter and only to those additional specific matters which we from time to time explicitly agree to undertake. We expect that each subsequent undertaking by the Firm will be described in writing.

I will be responsible for this representation and will use other attorneys and professionals of the Firm as appropriate and cost-effective for Clients. The Firm's fees for services are based on time (in quarter hour increments, except if our fees require court approval they may have to be calculated to the nearest tenth of an hour) spent on specific projects, computed at our hourly rates, discounted by 10%, for those persons performing the services. The Firm's fees for the Matter will be capped at $22,500. Hourly rates are subject to adjustment by the Firm from time to time, including for associate level class progressions and promotions of lawyers from one rank to the next (e.g., from associate to partner).

HLIU003592

Mr. Kevin Vincent
May 31, 2017
Page 2

As a retainer you agree to pay the Firm upon the execution of this letter the sum of US $10,000.00. The retainer you are paying is agreed between us to be a security retainer. The retainer will be deposited into a pooled client trust account. Under Illinois law, any interest earned on this account is paid to the Lawyers Trust Fund of Illinois. Retainer funds shall remain the property of Clients unless and until applied to invoices for fees and costs. We agree to apply the retainer to our final invoice as long as you have timely paid all periodic invoices to which you have not objected in writing within 15 days after receipt of said invoice. The Firm reserves the right, however, to apply the retainer to any unpaid invoices and you agree to replenish the retainer up to the original deposited amount at the Firm's request. Any balance remaining in the retainer after the Matter is completed will be refunded promptly.

The Clients acknowledges a substantial relationship with the Firm's office in Chicago, Illinois and consents to our depositing the security retainer in a pooled trust account maintained by us at Bank of America, 135 South LaSalle Street, Chicago, Illinois.

Each of the undersigned confirms that he or she is authorized to sign this letter on behalf of the applicable party specified below.

If you have any questions, please call me. If you want us to proceed on your behalf, please acknowledge your agreement with the terms of our relationship by signing and returning to me the enclosed copy of this letter. In any event, please note that the Clients' directing us or continuing to direct us to proceed on their behalf will constitute full acceptance of the terms contained in this letter and in the International Terms.

///

///

///

///

///

///

///

///

///

HLIU003593

Mr. Kevin Vincent
May 31, 2017
Page 3

Very truly yours,
MAYER BROWN LLP

Philip Recht

AGREED:


FF Global Holdings Ltd., a Cayman Islands company


By: _O. Kevin Vincent_

Name Printed: _O. Kevin Vincent_

Its: _____

Date: _May 31, 2017_


Faraday Future, a


By: _O. Kevin Vincent_

Name Printed: _O. Kevin Vincent_

Its: _Director of Regulatory & Safety Affairs_

Date: _May 31, 2017_


cc:     James J. Held

HLIU003594

Mayer Brown LLP U. S. Offices

<u>Schedule of Non-fee Charges to Clients</u>

August, 2015

I.      <u>Long Distance Telephone.</u>

We purchase our long-distance telephone service from telecommunications providers at discounted rates. We charge clients at rates calculated to recover our cost.

II.     <u>Automated Research.</u>

We purchase services from Lexis and Westlaw at fixed monthly rates which are substantially below their published rates. We charge clients for the Lexis and Westlaw connections at rates calculated to recover our cost.

III.    <u>Third Party Expenses.</u>

When possible, the Client agrees to contract directly with local counsel, experts and/or consultants ("Third Party Servicers").  In the event that the Firm engages a Third Party Servicer on behalf, or for the benefit, of the Client or jointly with the Client, the Client agrees that (a) the Firm and/or Client will instruct the Third Party Servicer to look solely to the Client and not the Firm for any payments owing to said Third Party Servicer or (b) the Client will provide currently available funds to the Firm in the amount of any approved outstanding Third Party Servicer invoice prior to the time that payment of such invoice to the Third Party Servicer is due. Notwithstanding the above, if the Firm does advance or pay any Third Party Servicer expense on behalf, or for the benefit, of the Client, the Client agrees to reimburse the Firm promptly for any such expense.

IV.     <u>Document Reproduction.</u>

We charge clients for standard-size internal black and white copies at the rate of $.15 per page. We charge clients for standard-size internal color document reproduction (if specifically

724436844.1 42006021

HLIU003595

requested by clients) at the rate of $1.00 per page. We currently reproduce documents using

photocopiers, laser printers, and digital copiers, and may in the future use other means of

reproduction. Outside copying is charged at actual out-of-pocket cost.

V.      Secretarial, Word Processing and Proofreading Services.

We accrue for client accounts document preparation charges at the rate of $120 per hour for

word processors and secretaries generally when documents (originals or amendments) of over 10

pages are prepared or for secretarial overtime.  Proofreading services accrue at the rate of $140

per hour.

VI.     Mayer Brown Provided Electronic Discovery Services.

To the extent that the Client elects to host electronic discovery information on the Firm's

Electronic Discovery Services ("EDS") servers, we charge a monthly comprehensive services fee

for hosting and supporting that data.  We calculate this charge for each month based on the data

volume residing on the EDS servers at the end of such month, at a rate of $65 per gigabyte

("GB"), which covers EDS department expenses relating to that internally supported data,

including any hosting expenses, processing, handling, and response to case team or client needs.

VII.    Postage.

We charge clients at cost for postage when the cost of mailing is $1.00 or more.

VIII.   Out-of-pocket Disbursements.

The following types of disbursements when related to a client matter are charged at the Firm's

cost:

> Advances on behalf of clients (*e.g.*, tax payments, filing fees, title
>    charges)
> Courier and messenger services
> Court reporters
> Equipment when purchased solely for a client matter
> Meals

724436844.1 42006021

HLIU003596

Outside services (including cost of litigation support services
    purchased from outside vendors)

Service of process

Records searches

Supplies (when amounts are large or type of supply item is special)

Tax return processing charges

Taxis, mileage, parking (local)

Travel (airfares, hotels, meals, car rentals, fees of travel agencies
    and professionals, taxis and incidentals)*

Trial exhibits

Witness fees and costs

Other items not covered above that are directly attributable to a
    client matter

*When our independent travel agency of record is used to book
    airfare there is a fee charged of not more than $32 per
    reservation.

IX.    <u>Items Not Charged to Clients.</u>

Administrative overhead

Air conditioning and electricity for overtime work

Client entertainment

Local and suburban telephone calls

Rent for conference rooms

Telefax services

HLIU003597

MAYER · BROWN

# International Terms of Business

January 2015

## A. General Terms

### 1. Introduction

Mayer Brown is a global services provider. The Mayer Brown legal services providers (the **"Mayer Brown Practices"**) are: Mayer Brown LLP (the **"US LLP"**) and Mayer Brown Europe-Brussels LLP, both limited liability partnerships established in Illinois USA; Mayer Brown International LLP (the **"UK LLP"**), a limited liability partnership incorporated in England and Wales (authorized and regulated by the Solicitors Regulation Authority and registered in England and Wales number OC 303359); Mayer Brown, a  SELAS established in France; Mayer Brown Mexico, S.C., a sociedad civil formed under the laws of the State of Durango, Mexico; Mayer Brown JSM, a Hong Kong partnership and its associated legal practices in Asia (the **"HK Partnership"**); Tauil & Chequer Advogados, a Brazilian law partnership with which Mayer Brown is associated; and any other entities which become Mayer Brown Practices.  The Mayer Brown non-legal service providers are Mayer Brown Consulting (Singapore) Pte. Ltd and its subsidiary, which provide customs and trade advisory and consultancy services.

These international terms (the **"International Terms"**) are the general terms that govern the relationship between each or any Mayer Brown Practice and you.  Additional terms may apply to the services provided by specific Mayer Brown Practices in a Particular Matter (as defined below).  In these International Terms, **"we"** or **"us"** means the Mayer Brown Practice providing you with services in any specific matter and **"you"** means the person or entity to whom we provide our services.

When you instruct or engage any Mayer Brown Practice on a new matter (**"Particular Matter"**), we will normally confirm your instructions or engagement in writing (an **"Engagement Letter"**).  These International Terms and the Engagement Letter (which may include the additional terms relating to a Particular Matter), if any, together form the contract (the **"Engagement Contract"**) between you and the Mayer Brown Practice specified in the Engagement Letter (the **"Principal Mayer Brown Practice"**).  The Principal Mayer Brown Practice may, as agent on your behalf, engage another Mayer Brown Practice to work alongside it on a Particular Matter, if appropriate.

You are only a client of a Mayer Brown Practice in a Particular Matter if that Mayer Brown Practice is providing services to you in such Particular Matter, and no Mayer Brown Practice will have liability in Particular Matters where it is not providing services.

Each Mayer Brown Practice will apply the applicable local professional conduct rules in the Particular Matter for which it is engaged.

### 1.1 Our services

### 1.2 Scope of our services

The scope of our services in a Particular Matter will be limited to those described in the related Engagement Letter and to any additional tasks in such Particular Matter that we accept in writing.

We will not advise on the tax or insurance implications (including coverage) of any Particular Matter or course of action in any Particular Matter or provide notices to insurers or re-insurers unless (and then only to the extent) agreed in writing.

Our services in a transaction are limited to advising on legal issues arising in the negotiation, documenting and closing the transaction and do not include giving you financial or business advice as to the merits of the transaction.

Upon completion of our work on a Particular Matter, we will not update you on legal developments related to such Particular Matter unless we have agreed to do so in our Engagement Letter.

### 1.3 Authority to instruct us and receive advice

Where our client is an entity, we will assume that any of its personnel who gives instructions to us has authority to do so and to receive advice on behalf of the entity, unless you tell us otherwise in writing.

### 1.4 Joint ventures, partnerships, trade associations, etc.

If you are a trade association, partnership, joint venture or similar joint entity only that entity will be our client and, unless otherwise agreed in writing, we will only represent it and not its individual members, venturers or partners.

### 1.5 Affiliates

We only represent the entity named in the Engagement Letter and not its stockholders or other Affiliates (as defined in part A paragraph 18) and therefore we are able to represent another client with interests adverse to your stockholders or other Affiliates without obtaining consent from you.  Even if you choose to give us confidential information about any Affiliate, this will not of itself create a lawyer-client relationship between the Affiliate and any Mayer Brown Practice.

### 2. Charges

### 2.1 Your agreement to pay

You will pay the fees and other charges billed by the Principal Mayer Brown Practice and, where appropriate, any other Mayer Brown Practice.  Unless otherwise agreed in writing, you are required to pay such fees and charges whether or not a Particular Matter proceeds to closing or is otherwise concluded in the ordinary course.

### 2.2 Professional fees

Unless otherwise agreed in writing, our fees will be based principally on the time we spend on your matter. From time to time, we review our hourly rates and we will notify you in writing of any increase in rates that (unless otherwise agreed) will be applicable to the Particular Matter.  If contract lawyers or paraprofessionals are assigned to work on any Particular Matter, whether or not they are employed through an independent agency, the Mayer Brown Practice will charge you hourly rates based upon its then hourly rates for Mayer Brown lawyers and paraprofessionals with similar experience and qualifications.

After consultation, our fees may additionally take account of other factors including the complexity or urgency of the matter, the specialized knowledge and skill required and, if appropriate, the value of the property or subject matter involved and overall outcome.

Applicable sales or service taxes will be added to your bill where appropriate.

1

HLIU003598

Without limiting any other provision in this part A paragraph 2.2, you will pay us at our hourly rates (as adjusted from time to time) for activities incidental to our representation of you, whether during or after the termination of the lawyer-client relationship. This includes, but is not limited to, our time spent responding to subpoenas, searching for and producing documents, preparing for testimony and testifying, and otherwise dealing with your requests or third party claims or actions relating to a matter we are handling or have handled for you. You will also pay or reimburse us for all reasonable expenses and other charges in connection with such incidental activities, including, but not limited to, the fees of outside counsel that we retain.

### 2.3 Estimate of fees

An estimate is our indication of our likely charges for a Particular Matter and is based on the information known at the time the estimate is given. Unless we agree otherwise in writing, any estimate does not amount to a promise or agreement that we will perform our services within a fixed time or for a fixed or capped fee. An estimate is subject to revision and is not binding on us.

### 2.4 Fixed fees

A fixed fee is an agreement by us in writing to render services in a Particular Matter for a stated fee. Unless otherwise agreed in writing, if we agree to a fixed fee and undertake work outside the agreed scope of the Particular Matter, we will charge for the additional work on the basis referred to in part A paragraph 2.2.

### 2.5 Expenses

Unless we agree otherwise, we will instruct third parties that we engage on your behalf to seek payment from you directly and we will have no liability for amounts owing to the third party from you. If we incur or pay certain expenses on your behalf in connection with an Engagement Contract, including but not limited to third party fees, court fees, stamp duty, registration or search fees, they will be payable by you as a charge in addition to our fees and other non-fee charges in each Particular Matter and, unless we agree otherwise, you will provide us with funds in advance to pay those expenses. Non-fee charges may include photocopying, telephone charges and other charges notified by the Mayer Brown Practice. Additional sales or service taxes may be payable by you on some of these expenses.

### 3. Billing arrangements and settlement of our accounts

### 3.1 Our bills

We may send you bills at monthly or other intervals while your Particular Matter is in progress and in any event upon completion of the Particular Matter.

### 3.2 Payment of full amount

Our bills must be paid without any deduction or withholding on account of taxes or charges of any nature. If a deduction or withholding is required by law you must pay such additional amount as is necessary so that we receive the full amount of our bill. We also may issue a bill in which our fees are grossed up to account for such deduction or withholding.

### 3.3 Interest

Each of our bills must be paid within 30 days after the date the bill is sent. We may charge interest on any outstanding amount from the due date for payment until the bill is paid in full at a rate per annum equal to four percent plus the most currently available US Government 10 year yield as quoted in the Financial Times (such yield to start on the due date for payment and adjusted every 30 days thereafter based on the then most current quote of yield).

### 3.4 Charges of other Mayer Brown Practices

The Principal Mayer Brown Practice may engage another Mayer Brown Practice on your behalf. If so, each Mayer Brown Practice may issue separate bills or the fees and expenses of other Mayer Brown Practices may be included in a bill issued by the Principal Mayer Brown Practice. Such fees and expenses may be expressed as a separate disbursement to meet local requirements.

### 3.5 Liability for our fees

If we agree to accept payment of our fees and expenses from a third party you will remain liable to us for them in the event of non-payment.

### 4. File and information management

### 4.1 Format and retention of files

We keep our files partly in paper form and partly in electronic form.

Unless otherwise agreed in writing, once the Particular Matter is closed we will retain the related files in accordance with applicable professional conduct rules and our then effective records retention policy. At the end of the retention period we may dispose of the files without notice to you. We will not destroy original signed documents we have agreed in writing to deposit in safe custody or documents we are required to retain as a matter of law or by our regulators.

### 4.2 Costs of retrieval of files and documents from storage

If, after a Particular Matter is closed, you ask us to retrieve any material belonging to you from the file we will do so without passing on the direct cost of retrieval. However, we may charge you for time spent in complying with your request and answering any inquiries from you. We may also charge for delivery to you of any materials.

### 4.3 Copyright

Unless otherwise agreed in writing, the copyright in the original materials we produce for you belongs to us. The fees you pay for our work, however, permit you to make use of such materials for the purpose for which they are created.

### 5. Termination

### 5.1 Your right to terminate

You may terminate our acting for you in any Particular Matter at any time by giving us notice in writing.

### 5.2 Our right to terminate

Subject to any limitations in applicable professional conduct rules, we may terminate acting for you in any Particular Matter at any time by giving you notice in writing.

### 5.3 Payment of fees and expenses on termination

You must pay our outstanding fees and expenses (and those accrued but not yet billed) if you or we terminate our Engagement Contract in connection with a Particular Matter.

### 5.4 Timing of termination of an engagement

Unless otherwise agreed in writing, an Engagement Contract in connection with a Particular Matter will come to an end or be deemed to have come to an end at the completion of our legal work in the Particular Matter or, if earlier, 12 months after the relevant Mayer Brown Practice last rendered any billable services to you on the Particular Matter. The lawyer-client relationship between you and the relevant Mayer Brown Practice will terminate at that point unless the relevant Mayer Brown Practice is providing other services under an Engagement Contract in another Particular Matter that has not then terminated or been deemed to have been terminated. Even if we inform you of developments in the law by newsletters or similar alerts, or we or persons associated with us are named as (or become) a recipient of a notice on your behalf, this will not create or revive any lawyer-client relationship.

In some Mayer Brown Practices, we may maintain a system to calendar due dates for the payment of maintenance and/or annuity fees relating to, or the renewal dates for the preservation of certain legal rights attaching to, intellectual property. In connection with this system, we may notify the person or entity listed in our records as the holder of such rights of the necessity of paying maintenance and/or annuity fees or obtaining a renewal in order to preserve such rights. Neither the maintenance of such system nor any such notification or renewal will constitute the provision of services for the purposes of determining whether there is a continuing lawyer-client relationship.

### 6. Communication

### 6.1 Use of email

We may communicate with you by email unless you ask us not to.

We prefer to encrypt email that we send to you (whether it contains confidential information or not), provided we are able to implement mutually acceptable encryption standards and protocols.

2

You are responsible for protecting your system from viruses and any other harmful codes or devices. We try to eliminate them from email and attachments but we do not accept liability for any that remain.

We may monitor or access any or all email sent to us. In addition, we scan incoming email for spam, viruses and other undesirable material, which may mean that email communications do not reach the intended recipient. Therefore, you should always follow up each important email by contacting the person to whom it has been sent.

### 6.2    Marketing materials

We may from time to time provide you with details relating to the Mayer Brown Practices and the services we provide, including updates on legal developments. If at any time you do not wish to receive that information, please tell us.

## 7.    Money laundering and other notification to authorities

### 7.1    Notifications to regulators and consent

In many jurisdictions in which we operate, we are required by law or regulators to put in place procedures to prevent money laundering. If we know or suspect (or have reasonable grounds for suspecting) that a matter or transaction involves money laundering we may, in accordance with our statutory obligations and those procedures, be required to make a notification of our knowledge or suspicion to the relevant regulatory authorities.

In certain jurisdictions, rules or regulations require taxpayers engaging in certain types of transactions to disclose their participation in such transactions to the tax authorities, and in some cases where we are acting as your tax adviser we are also required to report transactions to the tax authorities. In some circumstances, we may be obliged to maintain a list of and notify the tax authorities (notwithstanding any otherwise applicable duty of confidentiality) of the names of investors and other details. Depending on the circumstances, we may be unable to seek your consent or inform you that we have made such a notification.

### 7.2    Liability

We do not accept liability for any loss or damage you suffer by actions we take in good faith to comply with anti-money laundering legislation or other statutory or regulatory obligations.

### 7.3    Client due diligence requirements

Applicable anti-money laundering and other similar legislation and requirements and our internal procedures may require us to identify and verify the identity of our clients and in some cases also their beneficial owners, and to conduct other background checks. We may be required to retain and update our records of the information obtained. We may also be required to make detailed inquiries as to a number of matters, including as to the source of funds being used in Particular Matters on which we advise and the beneficial owner of them. We refer to these requirements as the **"CDD Requirements"**.

Where possible, we try to meet the CDD Requirements using information from public sources and/or by electronic verification. However, we may need to ask you for (and retain) documents and other information for this purpose. We may provide copies of this information to any other adviser you engage or whom we engage on your behalf for their use in meeting similar requirements imposed on them.

We may delay commencing work, decline to act or (if appropriate) cease to act if the CDD Requirements are not met to our satisfaction and within a reasonable period of time.

We may charge you in the normal way for work that we have to do and for expenses incurred for the purpose of meeting the CDD Requirements.

### 7.4    Cash

We do not accept cash without prior agreement. If cash is deposited directly with our bank we may charge for any additional checks we deem necessary regarding the source of funds and the beneficial owner(s) of them to meet the CDD Requirements.

## 8.    No third party reliance

Our services are provided for your benefit alone and solely for the purposes of the Particular Matter to which they relate. Unless otherwise agreed in writing,

our work may not be used or relied on by any third party, even if such third party may have agreed to pay our bill.

## 9.    Confidentiality, disclosure and conflicts

### 9.1    Confidentiality and disclosure

We owe you a duty of confidentiality in respect of information relating to you that we obtain while dealing with your matters. We will not disclose such information except in the circumstances set out in this part A paragraph 9 or otherwise as required or permitted by the applicable professional conduct rules. We owe the same duty of confidentiality to all our clients. Accordingly, if at any time we possess information in respect of which we owe a duty of confidentiality to a former or another current client, we will not be required to disclose such information to you nor use it on your behalf even though the information may be material to your Particular Matter.

### 9.2    Disclosure to certain third parties

Our duty to keep confidential information relating to you or your Particular Matter on which we are acting, or have acted, for you is subject to any disclosures we consider in good faith we are required to make to any police, governmental, regulatory or supervisory authority under any statutory or regulatory obligations (including those described in part A paragraph 7 (*Money laundering and other notification to authorities*) or in accordance with any internal procedures that we have put in place to meet those obligations.

We may, when required by our insurers, auditors or other professional advisers (including independent counsel or debt collection agencies) provide to them information relating to you or details of a Particular Matter or Matters on which we are acting or have acted for you.

From time to time, we may use third parties to provide typing, photocopying, printing, data handling and other business support services, subject to contractual duties of confidentiality.

### 9.3    Disclosure to other Mayer Brown Practices

We may disclose confidential information relating to you, or Particular Matters, to other Mayer Brown Practices, all of which are bound by the same duty of confidentiality that we have to you regarding to any such information.

### 9.4    Publicity

We may disclose that you are a client and describe in general terms the work we do for you unless you ask us not to do so in writing. However, we will not, without your consent, disclose that we are acting, or have acted, for you on a Particular Matter if the matter remains otherwise confidential.

### 9.5    Conflicts of interest - advance waiver

We may now or in the future without your consent act for your competitors, adverse parties or our other clients whose interests are or may be opposed to or in conflict with yours or your Affiliates in matters not substantially related to Particular Matters we are handling for you (including in transactions, bankruptcy, insolvency, arbitration, litigation or other forms of dispute resolution). Where we are acting for you on a Particular Matter, however, we will not act for another client on the same matter unless and to the extent that we are permitted to do so by the applicable professional conduct rules.

### 9.6    Conflicts of interest and confidentiality

Subject to applicable professional conduct rules, where we have information in respect of which we owe you a duty of confidentiality and which is or may be material to a matter on which we are acting for another client, we may act for that other client, provided we put in place arrangements, such as "ethical" or "information" screens, which are reasonably appropriate in the circumstances to ensure that the confidentiality of your information is maintained.

## 10.    Joint representations

Where we act for you jointly with others in a Particular Matter, we may disclose to all the parties we represent any confidential information we obtain from you and the content of our communications with you. To that extent, the advice we give will cease to be privileged as between you and the other clients. Unless otherwise agreed in writing, you will remain jointly and severally liable for our fees even if you have made different arrangements with the other parties. If a conflict arises during the course of a Particular Matter, we may need to cease to act for you unless the conflict can be otherwise resolved. In those circumstances, we may continue to act for some or all of the

3

HLIU003600

other clients. Representation of an association, partnership, joint venture or similar joint entity is not a joint representation. Where you and another client or clients jointly instruct us, we will assume that any of you has authority to give instructions on behalf of you unless any of you tell us otherwise in writing.

## 11.     Data

### 11.1     Use of data

We will hold, use and process any data you provide to us (including data relating to you, your Associated Persons (as defined in part A paragraph 18 (Definitions) and your respective employees) to carry out conflict checks, client identification and other client intake and maintenance procedures pursuant to our CDD Requirements, comply with statutory and regulatory obligations and our internal procedures, conduct the work in the related Particular Matter and update our client databases. The data may be shared with other Mayer Brown Practices.

### 11.2     Provision and use of personal data

You must make sure that any personal data you provide to us and our use and disclosure of that data in accordance with your instructions does not breach any applicable data protection laws and regulations. We will comply with our duties as a law firm under applicable data protection and privacy laws and regulations. Further information about our privacy policy, including our data protection inquiries policy, may be found under the legal notices section of our website at www.mayerbrown.com/legal-notices.

## 12.     No waiver of our privilege

We represent many clients and handle a great number of complex matters. As a result, from time to time, issues may arise that raise questions under our applicable professional conduct rules, including possible disputes with a client and conflicts of interest issues. When such issues arise, we generally seek the advice of our internal counsel (or, if we choose, outside counsel). You agree that we, in our own discretion, may do so. We consider such consultations to be protected from disclosure under the lawyer-client privilege. While some courts have limited this privilege under certain circumstances, we believe that it is in both your and our interest that we receive expert analysis of our obligations. Our ongoing representation of you will not result in a waiver of any lawyer-client privilege that we may have to protect the confidentiality of our communications with such counsel.

## 13.     Force majeure

We will not be liable to you if we are unable to perform our services in a Particular Matter as a result of any cause beyond our reasonable control. If this happens, we will tell you as soon as reasonably practicable.

## 14.     Assignment

### 14.1     Permitted assignment

We may assign, or may assign the benefit of, any Engagement Contract to any successor partnership or corporate entity that carries on the business or any part of the business of the relevant Principal Mayer Brown Practice. You will accept the performance by such assignee of the Engagement Contract in substitution for the Principal Mayer Brown Practice. References in these International Terms and in any relevant Engagement Letter to the Mayer Brown Practice include any such assignee.

### 14.2     Other assignment

Subject to part A paragraph 14.1, neither you nor we have the right to assign or transfer the benefit or burden of an Engagement Contract without the written agreement of the other.

### 14.3     Assignment by other Mayer Brown Practices

References in these International Terms or in any Engagement Letter to another Mayer Brown Practice includes any limited liability partnership or other partnership or corporate entity to or by which all or part of the business of the other Mayer Brown Practice is from time to time transferred or carried on.

## 15.     Associated Persons

Unless the Engagement Letter expressly states otherwise, you accept the provisions of the Engagement Contract on your own behalf and as agent for each Associated Person. You confirm that you have, or will have, the authority

to retain us on behalf of each Associated Person. You will procure that each Associated Person will act on the basis that they are a party to and are bound by the relevant Engagement Contract. All references in these terms of business (other than in part A paragraph 15) and in the Engagement Letter to "you" (and derivatives of it) mean you and each Associated Person.

## 16.     Financial transactions

### 16.1     Representing financial institutions

Unless otherwise agreed in writing, when we represent a financial institution in a Particular Matter, we will not be responsible for advising the financial institution on compliance with applicable laws and regulations arising out of its legal or regulatory status or the general nature of its business or on its internal governance issues.

### 16.2     Refiling; re-recording

Whether or not you are a financial institution, unless we otherwise agree in writing in the Engagement Contract, we do not undertake responsibility for advising you upon or ensuring compliance with periodic refiling or re-recording requirements.

## 17.     Use of client accounts

In certain jurisdictions outside the United States a Mayer Brown Practice is permitted at its discretion to provide client account facilities to receive, hold and transfer funds in connection with a matter on which it is acting. If we have agreed to the use of our client account such use is at your own risk. You must tell us in advance when you are transferring funds to us as unexpected or unidentified receipts may either be retained pending further investigation or returned to the sender. We may charge for any checks we deem necessary regarding the source of funds and the beneficial owner(s) to meet the CDD Requirements.

## 18.     Definitions

In these International Terms and (where applicable) in an Engagement Letter any reference to a statute or a statutory provision includes any consolidation, re-enactment, modification or replacement of the same from time to time and:

"Affiliate" means in relation to an entity any person who or entity that controls or is under common control with or is controlled by that entity.

"Associated Person" in a Particular Matter, means (subject to part A paragraph 8 (No third party reliance)) any Affiliate that is with our agreement in writing a recipient of and entitled to rely on our services in relation to that matter.

## 19.     Inconsistencies

In the event of any inconsistency between an Engagement Letter and these International Terms, the Engagement Letter will prevail.

## 20.     Law and jurisdiction

Each Engagement Contract will, unless otherwise agreed in the Engagement Letter, and except as provided in part B paragraph 3.6 (Law and Jurisdiction), be subject to and governed by the laws of the jurisdiction in which the Principal Mayer Brown Practice is established or incorporated. Any dispute arising from or under an Engagement Contract will be subject to the exclusive jurisdiction of the courts of that jurisdiction.

## 21.     Application of these International Terms and amendments

These International Terms supersede any earlier terms of business to which we may have agreed and, unless otherwise agreed in writing, apply to the services referred to in any Engagement Letter accompanying these terms and all subsequent services we provide to you.

## B. Additional Terms

## 1.     Additional Terms applicable to the US LLP only

### 1.1     Provision for work performed by lawyers resident in our New York office

In the event you have a fee dispute with us in an amount that is between US$1,000 and US$50,000, you may have the right to seek resolution of that dispute in an arbitration under Part 137 of the Rules of the Chief Administrator, New York State Office of Court Administration. For further information about

4

the fee dispute arbitration procedures, please refer to the text of Part 137, available on the internet at www.courts.state.ny.us/admin/feedispute.

### 1.2 Provision for work performed by lawyers resident in our Houston office

NOTICE TO CLIENTS: The State Bar of Texas requires us to inform you that it prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar's Office of Chief Disciplinary Counsel will provide you with information about how to file a complaint. Please call 1 800 932 1900 toll-free for more information.

### 1.3 Securities and Exchange Commission – Standards of Professional Conduct

Pursuant to Part 205 in Title 17 of the Code of Federal Regulations (**"Standards of Professional Conduct"**), if any lawyer of the US LLP represents you in appearing and practicing before the Securities and Exchange Commission (the **"SEC"**), we may have obligations imposed on us, as further described in the Standards of Professional Conduct. These obligations currently are limited to up-the-ladder reporting within your organization, although some form of reporting to the SEC may be adopted. If any of our lawyers currently represents, or in the future represents, you in appearing and practicing before the SEC, you acknowledge that we are (or will become) subject to the obligations imposed on us by the Standards of Professional Conduct.

## 2. Additional Terms applicable to the UK LLP only

### 2.1 Regulatory information

Mayer Brown International LLP is a limited liability partnership incorporated in England and Wales under no. OC303359. It is authorized and regulated by the Solicitors Regulation Authority. Its registered office is 201 Bishopsgate, London EC2M 3AF.

### 2.2 Members and partners

An English limited liability partnership is a body corporate which has members and not partners. In these terms references to a "partner" in relation to the UK LLP means a member of Mayer Brown International LLP. However, in our dealings with you, the UK LLP may also use the term partner to refer to an employee or consultant of the UK LLP who is a lawyer with equivalent standing or qualification, or to a lawyer with equivalent standing in another Mayer Brown Practice.

### 2.3 Interest on client account

The UK LLP main client account is with the Royal Bank of Scotland. Unless we agree otherwise in writing we deposit client money in an instant access deposit account and will pay interest for the period during which the money is held, unless such interest is de minimis. We calculate interest at a rate equivalent to that payable by our bank on such accounts. Our policy for the handling of client funds, including the basis of payment of interest, can be found in the legal notices section of our website at www.mayerbrown.com/legal-notices.

### 2.4 Complaints

We will do what we reasonably can to resolve any complaint about our services or bills in accordance with the UK LLP's complaints handling policy, a copy of which is available in the legal notice section of our website at www.mayerbrown.com/legal-notices and which will be provided on request. If you are not satisfied with our handling of your complaint you may be eligible to complain to the Legal Ombudsman (**"LeO"**) at PO Box 6806 Wolverhampton WV1 9WJ. You must contact LeO within six months of our final response; otherwise LeO may decide not to investigate your complaint. More information is available at www.legalombudsman.org.uk. You may have a right to object to a bill from the UK LLP by making a complaint as above and/or by applying to the Court for an assessment of the bill under Part III Solicitors Act 1974.

### 2.5 The Financial Services and Markets Act 2000 ("FSMA")

### 2.5.1 Insurance contracts

If and to the extent that our legal services involve insurance mediation activity (which is, broadly, the advising on, selling and administration of insurance contracts) from the UK, you should note that we are not "authorised" by the Financial Conduct Authority under FSMA. However, we are included in the

register maintained by it so that we can carry on insurance mediation activity. The register can be accessed via the Financial Conduct Authority website atwww.fca.org.uk/register. This part of our business, including arrangements for complaints or redress if anything goes wrong, is regulated by the Solicitors Regulation Authority, the independent regulatory body of the Law Society of England & Wales (a designated professional body for the purposes of FSMA) of which we are members. We will not provide insurance mediation services unless you expressly ask us to do so.

### 2.5.2 Investments

Depending on the nature of the services we provide to you, it is possible that we may, on occasions when you instruct us to do so, provide you with legal services which relate to investments. We are not "authorised" by the Financial Conduct Authority under FSMA. Where our services are provided from the UK, we are permitted to undertake certain activities in relation to investments that are limited in scope and incidental to our legal services or which may be regarded as a necessary part of our legal services because we are regulated by the Solicitors Regulation Authority (which together with LeO also provides complaints and redress mechanisms). No communication either to you, or on your behalf to any other person, during the course of our engagement is an invitation or inducement to engage in investment activity and nothing we say or write should be construed as such.

### 2.6 Third party rights

Other than part B paragraphs 2.8 and 2.9, no provision of an Engagement Contract is intended to be enforceable pursuant to the Contracts (Rights of Third Parties) Act 1999. Accordingly, other than our employees, consultants or partners wishing to rely on those paragraphs, no third party will have any right to enforce, or rely on, any provision of an Engagement Contract.

### 2.7 Professional indemnity insurance

The UK LLP is required to hold a minimum level of insurance cover under the Solicitors' Indemnity Insurance Rules. The territorial coverage is worldwide for the UK LLP and details of our insurers can be found under the legal and regulatory information page of the legal notices section of our website, at www.mayerbrown.com/legal-notices.

### 2.8 Exclusions and limitations on our liability

### 2.8.1 Proportional liability

If you suffer loss or damage because of our breach of contract or of our negligence, our liability will be limited to a just and equitable proportion of the total loss or damage you suffer having regard to the extent of the responsibility of any other party who may also be liable to you in respect of such loss and damage. Our liability in these circumstances will not be increased because of any actual or potential shortfall in recovery from another party whether due to any exclusion or limitation of liability that you have agreed to with another party, difficulty in enforcement, settlement of claims or any other reason.

### 2.8.2 Liability in respect of other parties

Where we instruct another party on your behalf (for example, a barrister, expert or co-counsel) we will not be liable for the services provided by that other party.

### 2.8.3 Liability cap

We may, from time to time, if permitted by local laws and applicable professional conduct rules, agree with you that our aggregate liability to you for a Particular Matter or Matters is limited to an amount specified in the relevant Engagement Letter (a **"Liability Cap"**).

A Liability Cap will apply to all liability we may have to you in respect of the relevant Particular Matter or Matters, including for breach of contract and for negligence (but not for banking failure or compliance with legislation in respect of which a separate limit of liability applies as set out in part B paragraph 2.10).

The Liability Cap (if any) will apply on an aggregate basis to all liabilities that we may have to you and any Associated Person (including third parties when a consent to such third parties is given under part A paragraph 8 (*No third party reliance*)) in the relevant Particular Matter or Matters.

### 2.9 No claim against individual employees/partners

No individual employee, consultant or partner of the UK LLP has a contract with you or owes you a duty of care. Any services performed by an employee,

5

consultant or partner are performed on behalf of the relevant Mayer Brown Practice and that person does not assume any personal responsibility to you or any other party for those services. Accordingly, it is a fundamental provision of these International Terms that you will not bring any claim against any individual employee, consultant or partner, directly or indirectly, in connection with our services.

None of the provisions of this part B paragraph 2.9 limit or exclude the liability of the UK LLP for the acts or omissions of any employee, consultant or partner.

### 2.10   No liability for banking failure and our compliance with legislation

We do not accept liability for any loss or damage you suffer if any bank that we use collapses or for reasons outside of our control is otherwise unable to transact business or transfer funds in a timely manner or at all. However, if such liability is nonetheless imposed on us by a court of law, our liability to you will not exceed an amount equal to the minimum level of insurance cover required from time to time under any applicable rules governing the insurance of solicitors. This limitation of liability will not be increased by any Liability Cap agreed with you.

### 2.11   Inside information

If you are a company that has, or the subsidiary of a company that has, securities that are listed on a regulated market you will tell us if a matter on which we are advising you is or becomes "inside information" in relation to that company or its securities. Following any such notification, we will implement our internal procedures relating to the handling of such information.

### 2.12   Our rights over your property (our lien)

If any, or any part of any, bill is not paid within 30 days after the bill is sent, we will, to the extent we are permitted to do so as a matter of law and applicable professional conduct rules, retain money, papers and other property belonging to you even if these have been provided to us in relation to a different matter until such time as all amounts due to us are paid in full. Subject to applicable professional conduct rules, we may seek a charging order over property that we recover or preserve for you in litigation. We do not waive these rights if we accept any alternative security for our costs, for example a payment on account.

## 3.   Additional Terms applicable to the HK Partnership only

### 3.1   Third party rights

Other than part B paragraphs 3.2 and 3.3, no provision of an Engagement Contract is intended to be enforceable pursuant to the Contracts (Rights of Third Parties) Ordinance (Cap 623).

### 3.2   Exclusions and limitations on our liability

### 3.2.1   Proportional liability

If you suffer loss or damage because of our breach of contract or of our negligence, our liability will be limited to a just and equitable proportion of the total loss or damage you suffer having regard to the extent of the responsibility of any other party who may also be liable to you in respect of such loss and damage. Our liability in these circumstances will not be increased because of any actual or potential shortfall in recovery from another party whether due to any exclusion or limitation of liability that you have agreed to with another party, difficulty in enforcement, settlement of claims or any other reason.

### 3.2.2   Liability in respect of other parties

Where we instruct another party on your behalf (for example, a barrister, expert or co-counsel) we will not be liable for the services provided by that other party.

### 3.2.3   Liability cap

We may, from time to time, if permitted by local laws and applicable professional conduct rules, agree with you that our aggregate liability to you for a Particular Matter or Matters is limited to an amount specified in the relevant Engagement Letter (a **"Liability Cap"**).

A Liability Cap will apply to all liability that we may have to you in respect of the relevant Particular Matter or Matters, including for breach of contract and for negligence (but not for banking failure or compliance with legislation in respect of which a separate limit of liability applies as set out in part B paragraph 3.4).

The Liability Cap (if any) will apply on an aggregate basis to all liabilities that we may have to you and any Associated Person (including third parties when a consent to such third parties is given under part A paragraph 9 (*No third party reliance*)) in the relevant Particular Matter or Matters.

### 3.3   No claim against individual employees/partners

No individual employee, consultant or partner of the HK Partnership has a contract with you or owes you a duty of care. Any services performed by an employee, consultant or partner are performed on behalf of the HK Partnership and that person does not assume any personal responsibility to you or any other party for those services. Accordingly, it is a fundamental provision of these International Terms that you will not bring any claim against any individual employee, consultant or partner, directly or indirectly, in connection with our services.

None of the provisions of this part B paragraph 3.3 limit or exclude the liability of the HK Partnership for the acts or omissions of any employee, consultant or partner.

### 3.4   No liability for banking failure and our compliance with legislation

We do not accept liability for any loss or damage you suffer if any bank that we use collapses or for reasons outside of our control is otherwise unable to transact business or transfer funds in a timely manner or at all. However, if such liability is nonetheless imposed on us by a court of law, our liability to you will not exceed an amount equal to the minimum level of insurance cover required from time to time under any applicable rules governing the insurance of solicitors. This limitation of liability will not be increased by any Liability Cap agreed with you.

### 3.5   Our rights over your property (our lien)

If any, or any part of any, bill is not paid within 30 days after the bill is sent, we will, to the extent we are permitted to do so as a matter of law and applicable professional conduct rules, retain money, papers and other property belonging to you even if these have been provided to us in relation to a different matter until such time as all amounts due to us are paid in full. Subject to applicable professional conduct rules, we may seek a charging order over property that we recover or preserve for you in litigation. We do not waive these rights if we accept any alternative security for our costs, for example a payment on account.

### 3.6   Law and jurisdiction

Notwithstanding part A paragraph 20 (Law and jurisdiction), and unless otherwise agreed in writing, each Engagement Contract with Mayer Brown JSM or its associated legal practice in Asia will be governed by Hong Kong law and any dispute arising from or under such Engagement Contract will be subject to the exclusive jurisdiction of Hong Kong courts.

HLIU003603

# Exhibit 2

MAYER · BROWN

Mayer Brown LLP
350 South Grand Avenue
25th Floor
Los Angeles, California 90071-1503

Main Tel +1 213 229 9500
Main Fax +1 213 625 0248
www.mayerbrown.com

**Philip Recht**
Direct Tel +1 213 229 9512
Direct Fax +1 213 576 8140
precht@mayerbrown.com

December 22, 2015

Kevin Vincent
Faraday Future
18455 South Figueroa Street
Gardena, California  90248

Dear Mr. Vincent:

This letter confirms our agreement that Faraday Future (the "Client") has engaged Mayer Brown LLP, a limited liability partnership established in the United States (the "Firm"), to advise and assist Client on regulatory issues in the U.S., China, and the EU concerning Client's proposed manufacture and sale of an electric car (the "Matter"). This letter and the International Terms of Business dated January 2015 (the "International Terms"), which are enclosed, govern our ongoing relationship in all matters and supersede all existing agreements or understandings to the contrary.  Our engagement on your behalf is limited to the Matter and only to those additional specific matters which we from time to time explicitly agree to undertake.  We expect that each subsequent undertaking by the Firm will be described in writing.

I will be responsible for this representation and will use other attorneys and professionals of the Firm as appropriate and cost-effective for Client.  The Firm's fees for services are based on time (in quarter hour increments, except if our fees require court approval they may have to be calculated to the nearest tenth of an hour) spent on specific projects, computed at our hourly rates, discounted by 10%, for those persons performing the services.  Hourly rates are subject to adjustment by the Firm from time to time, including for associate level class progressions and promotions of lawyers from one rank to the next (e.g., from associate to partner).

As a retainer you agree to pay the Firm upon the execution of this letter the sum of US $10,000.00.  The retainer you are paying is agreed between us to be a security retainer.  The retainer will be deposited into a pooled client trust account.  Under Illinois law, any interest earned on this account is paid to the Lawyers Trust Fund of Illinois.  Retainer funds shall remain the property of Client unless and until applied to invoices for fees and costs.  We will apply the retainer against each invoice 15 days after it is issued and sent to you, except to the extent that you object in writing to specific charges on the invoice within that 15 day period.  You understand and agree that after 50% of the retainer has been applied, you will be required to replenish the retainer up to the original deposited amount or to some other level warranted by the

Mayer Brown LLP operates in combination with other Mayer Brown entities (the "Mayer Brown Practices"), which have offices in North America, Europe and Asia and are associated with Tauil & Chequer Advogados, a Brazilian law partnership.

719016316.1 063

HLIU003604

Mr. Kevin Vincent
December 22, 2015
Page 2

specific circumstances of your Matter. Any balance remaining in the retainer after the Matter is completed will be refunded promptly.

The Client acknowledges a substantial relationship with the Firm's office in Chicago, Illinois and consents to our depositing the security retainer in a pooled trust account maintained by us at Bank of America, 135 South LaSalle Street, Chicago, Illinois.

Each of the undersigned confirms that he or she is authorized to sign this letter on behalf of the applicable party specified below.

If you have any questions, please call me. If you want us to proceed on your behalf, please acknowledge your agreement with the terms of our relationship by signing and returning to me the enclosed copy of this letter. In any event, please note that the Client's directing us or continuing to direct us to proceed on its behalf will constitute full acceptance of the terms contained in this letter and in the International Terms.

Very truly yours,
MAYER BROWN LLP

Philip Recht

AGREED:

Faraday Future, a

By: _____

Name Printed: _____

Its: _____

Date: _____

cc:    James J. Held

HLIU003605

Mayer Brown LLP U. S. Offices

Schedule of Non-fee Charges to Clients

August, 2015

I.    Long Distance Telephone.

We purchase our long-distance telephone service from telecommunications providers at discounted rates. We charge clients at rates calculated to recover our cost.

II.    Automated Research.

We purchase services from Lexis and Westlaw at fixed monthly rates which are substantially below their published rates. We charge clients for the Lexis and Westlaw connections at rates calculated to recover our cost.

III.    Third Party Expenses.

When possible, the Client agrees to contract directly with local counsel, experts and/or consultants ("Third Party Servicers").  In the event that the Firm engages a Third Party Servicer on behalf, or for the benefit, of the Client or jointly with the Client, the Client agrees that (a) the Firm and/or Client will instruct the Third Party Servicer to look solely to the Client and not the Firm for any payments owing to said Third Party Servicer or (b) the Client will provide currently available funds to the Firm in the amount of any approved outstanding Third Party Servicer invoice prior to the time that payment of such invoice to the Third Party Servicer is due. Notwithstanding the above, if the Firm does advance or pay any Third Party Servicer expense on behalf, or for the benefit, of the Client, the Client agrees to reimburse the Firm promptly for any such expense.

IV.    Document Reproduction.

We charge clients for standard-size internal black and white copies at the rate of $.15 per page. We charge clients for standard-size internal color document reproduction (if specifically

-1-

HLIU003606

requested by clients) at the rate of $1.00 per page. We currently reproduce documents using photocopiers, laser printers, and digital copiers, and may in the future use other means of reproduction. Outside copying is charged at actual out-of-pocket cost.

V.    Secretarial, Word Processing and Proofreading Services.

We accrue for client accounts document preparation charges at the rate of $120 per hour for word processors and secretaries generally when documents (originals or amendments) of over 10 pages are prepared or for secretarial overtime.  Proofreading services accrue at the rate of $140 per hour.

VI.    Mayer Brown Provided Electronic Discovery Services.

To the extent that the Client elects to host electronic discovery information on the Firm's Electronic Discovery Services ("EDS") servers, we charge a monthly comprehensive services fee for hosting and supporting that data.  We calculate this charge for each month based on the data volume residing on the EDS servers at the end of such month, at a rate of $65 per gigabyte ("GB"), which covers EDS department expenses relating to that internally supported data, including any hosting expenses, processing, handling, and response to case team or client needs.

VII.    Postage.

We charge clients at cost for postage when the cost of mailing is $1.00 or more.

VIII.    Out-of-pocket Disbursements.

The following types of disbursements when related to a client matter are charged at the Firm's cost:

>       Advances on behalf of clients (*e.g.*, tax payments, filing fees, title
>           charges)
>       Courier and messenger services
>       Court reporters
>       Equipment when purchased solely for a client matter
>       Meals

719016316.1 063

HLIU003607

Outside services (including cost of litigation support services
   purchased from outside vendors)
Service of process
Records searches
Supplies (when amounts are large or type of supply item is special)
Tax return processing charges
Taxis, mileage, parking (local)
Travel (airfares, hotels, meals, car rentals, fees of travel agencies
   and professionals, taxis and incidentals)*
Trial exhibits
Witness fees and costs
Other items not covered above that are directly attributable to a
   client matter

*When our independent travel agency of record is used to book
   airfare there is a fee charged of not more than $32 per
   reservation.

IX.   <u>Items Not Charged to Clients.</u>

Administrative overhead
Air conditioning and electricity for overtime work
Client entertainment
Local and suburban telephone calls
Rent for conference rooms
Telefax services

HLIU003608

MAYER · BROWN

# International Terms of Business

January 2015

## A. General Terms

## 1.    Introduction

Mayer Brown is a global services provider.  The Mayer Brown legal services providers (the **"Mayer Brown Practices"**) are: Mayer Brown LLP (the **"US LLP"**) and Mayer Brown Europe-Brussels LLP, both limited liability partnerships established in Illinois USA; Mayer Brown International LLP (the **"UK LLP"**), a limited liability partnership incorporated in England and Wales (authorized and regulated by the Solicitors Regulation Authority and registered in England and Wales number OC 303359); Mayer Brown, a  SELAS established in France; Mayer Brown Mexico, S.C., a sociedad civil formed under the laws of the State of Durango, Mexico; Mayer Brown JSM, a Hong Kong partnership and its associated legal practices in Asia (the **"HK Partnership"**); Tauil & Chequer Advogados, a Brazilian law partnership with which Mayer Brown is associated; and any other entities which become Mayer Brown Practices.  The Mayer Brown non-legal service providers are Mayer Brown Consulting (Singapore) Pte. Ltd and its subsidiary, which provide customs and trade advisory and consultancy services.

These international terms (the **"International Terms"**) are the general terms that govern the relationship between each or any Mayer Brown Practice and you.  Additional terms may apply to the services provided by specific Mayer Brown Practices in a Particular Matter (as defined below).  In these International Terms, **"we"** or **"us"** means the Mayer Brown Practice providing you with services in any specific matter and **"you"** means the person or entity to whom we provide our services.

When you instruct any Mayer Brown Practice on a new matter (**"Particular Matter"**), we will normally confirm your instructions or engagement in writing (an **"Engagement Letter"**). These International Terms and the Engagement Letter (which may include the additional terms relating to a Particular Matter), if any, together form the contract (the **"Engagement Contract"**) between you and the Mayer Brown Practice specified in the Engagement Letter (the **"Principal Mayer Brown Practice"**). The Principal Mayer Brown Practice may, as agent on your behalf, engage another Mayer Brown Practice to work alongside it on a Particular Matter, if appropriate.

You are only a client of a Mayer Brown Practice in a Particular Matter if that Mayer Brown Practice is providing services to you in such Particular Matter, and no Mayer Brown Practice will have liability in Particular Matters where it is not providing services.

Each Mayer Brown Practice will apply the applicable local professional conduct rules in the Particular Matter for which it is engaged.

### 1.1    Our services

### 1.2    Scope of our services

The scope of our services in a Particular Matter will be limited to those described in the related Engagement Letter and to any additional tasks in such Particular Matter that we accept in writing.

We will not advise on the tax or insurance implications (including coverage) of any Particular Matter or course of action in any Particular Matter or provide notices to insurers or re-insurers unless (and then only to the extent) agreed in writing.

Our services in a transaction are limited to advising on legal issues arising in the negotiation, documenting and closing the transaction and do not include giving you financial or business advice as to the merits of the transaction.

Upon completion of our work on a Particular Matter, we will not update you on legal developments related to such Particular Matter unless we have agreed to do so in our Engagement Letter.

### 1.3    Authority to instruct us and receive advice

Where our client is an entity, we will assume that any of its personnel who gives instructions to us has authority to do so and to receive advice on behalf of the entity, unless you tell us otherwise in writing.

### 1.4    Joint ventures, partnerships, trade associations, etc.

If you are a trade association, partnership, joint venture or similar joint entity only that entity will be our client and, unless otherwise agreed in writing, we will only represent it and not its individual members, venturers or partners.

### 1.5    Affiliates

We only represent the entity named in the Engagement Letter and not its stockholders or other Affiliates (as defined in part A paragraph 18) and therefore we are able to represent another client with interests adverse to your stockholders or other Affiliates without obtaining consent from you. Even if you choose to give us confidential information about any Affiliate, this will not of itself create a lawyer-client relationship between the Affiliate and any Mayer Brown Practice.

## 2.    Charges

### 2.1    Your agreement to pay

You will pay the fees and other charges billed by the Principal Mayer Brown Practice and, where appropriate, any other Mayer Brown Practice.  Unless otherwise agreed in writing, you are required to pay such fees and charges whether or not a Particular Matter proceeds to closing or is otherwise concluded in the ordinary course.

### 2.2    Professional fees

Unless otherwise agreed in writing, our fees will be based principally on the time we spend on your matter. From time to time, we review our hourly rates and we will notify you in writing of any increase in rates that (unless otherwise agreed) will be applicable to the Particular Matter. If contract lawyers or paraprofessionals are assigned to work on any Particular Matter, whether or not they are employed through an independent agency, the Mayer Brown Practice will charge you hourly rates based upon its then hourly rates for Mayer Brown lawyers and paraprofessionals with similar experience and qualifications.

After consultation, our fees may additionally take account of other factors including the complexity or urgency of the matter, the specialized knowledge and skill required and, if appropriate, the value of the property or subject matter involved and overall outcome.

Applicable sales or service taxes will be added to your bill where appropriate.

HLIU003609

Without limiting any other provision in this part A paragraph 2.2, you will pay us at our hourly rates (as adjusted from time to time) for activities incidental to our representation of you, whether during or after the termination of the lawyer-client relationship. This includes, but is not limited to, our time spent responding to subpoenas, searching for and producing documents, preparing for testimony and testifying, and otherwise dealing with your requests or third party claims or actions relating to a matter we are handling or have handled for you. You will also pay or reimburse us for all reasonable expenses and other charges in connection with such incidental activities, including, but not limited to, the fees of outside counsel that we retain.

### 2.3    Estimate of fees

An estimate is our indication of our likely charges for a Particular Matter and is based on the information known at the time the estimate is given. Unless we agree otherwise in writing, any estimate does not amount to a promise or agreement that we will perform our services within a fixed time or for a fixed or capped fee. An estimate is subject to revision and is not binding on us.

### 2.4    Fixed fees

A fixed fee is an agreement by us in writing to render services in a Particular Matter for a stated fee. Unless otherwise agreed in writing, if we agree to a fixed fee and undertake work outside the agreed scope of the Particular Matter, we will charge for the additional work on the basis referred to in part A paragraph 2.2.

### 2.5    Expenses

Unless we agree otherwise, we will instruct third parties that we engage on your behalf to seek payment from you directly and we will have no liability for amounts owing to the third party from you. If we incur or pay certain expenses on your behalf in connection with an Engagement Contract, including but not limited to third party fees, court fees, stamp duty, registration or search fees, they will be payable by you as a charge in addition to our fees and other non-fee charges in each Particular Matter and, unless we agree otherwise, you will provide us with funds in advance to pay those expenses. Non-fee charges may include photocopying, telephone charges and other charges notified by the Mayer Brown Practice. Additional sales or service taxes may be payable by you on some of these expenses.

### 3.    Billing arrangements and settlement of our accounts

### 3.1    Our bills

We may send you bills at monthly or other intervals while your Particular Matter is in progress and in any event upon completion of the Particular Matter.

### 3.2    Payment of full amount

Our bills must be paid without any deduction or withholding on account of taxes or charges of any nature. If a deduction or withholding is required by law you must pay such additional amount as is necessary so that we receive the full amount of our bill. We also may issue a bill in which our fees are grossed up to account for such deduction or withholding.

### 3.3    Interest

Each of our bills must be paid within 30 days after the date the bill is sent. We may charge interest on any outstanding amount from the due date for payment until the bill is paid in full at a rate per annum equal to four percent plus the most currently available US Government 10 year yield as quoted in the Financial Times (such yield to start on the due date for payment and adjusted every 30 days thereafter based on the then most current quote of yield).

### 3.4    Charges of other Mayer Brown Practices

The Principal Mayer Brown Practice may engage another Mayer Brown Practice on your behalf. If so, each Mayer Brown Practice may issue separate bills or the fees and expenses of other Mayer Brown Practices may be included in a bill issued by the Principal Mayer Brown Practice. Such fees and expenses may be expressed as a separate disbursement to meet local requirements.

### 3.5    Liability for our fees

If we agree to accept payment of our fees and expenses from a third party you will remain liable to us for them in the event of non-payment.

### 4.    File and information management

### 4.1    Format and retention of files

We keep our files partly in paper form and partly in electronic form.

Unless otherwise agreed in writing, once the Particular Matter is closed we will retain the related files in accordance with applicable professional conduct rules and our then effective records retention policy. At the end of the retention period we may dispose of the files without notice to you. We will not destroy original signed documents we have agreed in writing to deposit in safe custody or documents we are required to retain as a matter of law or by our regulators.

### 4.2    Costs of retrieval of files and documents from storage

If, after a Particular Matter is closed, you ask us to retrieve any material belonging to you from the file we will do so without passing on the direct cost of retrieval. However, we may charge you for time spent in complying with your request and answering any inquiries from you. We may also charge for delivery to you of any materials.

### 4.3    Copyright

Unless otherwise agreed in writing, the copyright in the original materials we produce for you belongs to us. The fees you pay for our work, however, permit you to make use of such materials for the purpose for which they are created.

### 5.    Termination

### 5.1    Your right to terminate

You may terminate our acting for you in any Particular Matter at any time by giving us notice in writing.

### 5.2    Our right to terminate

Subject to any limitations in applicable professional conduct rules, we may terminate acting for you in any Particular Matter at any time by giving you notice in writing.

### 5.3    Payment of fees and expenses on termination

You must pay our outstanding fees and expenses (and those accrued but not yet billed) if you or we terminate our Engagement Contract in connection with a Particular Matter.

### 5.4    Timing of termination of an engagement

Unless otherwise agreed in writing, an Engagement Contract in connection with a Particular Matter will come to an end or be deemed to have come to an end at the completion of our legal work in the Particular Matter or, if earlier, 12 months after the relevant Mayer Brown Practice last rendered any billable services to you on the Particular Matter. The lawyer-client relationship between you and the relevant Mayer Brown Practice will terminate at that point unless the relevant Mayer Brown Practice is providing other services under an Engagement Contract in another Particular Matter that has not then terminated or been deemed to have been terminated. Even if we inform you of developments in the law by newsletters or similar alerts, or we or persons associated with us are named as (or become) a recipient of a notice on your behalf, this will not create or revive any lawyer-client relationship.

In some Mayer Brown Practices, we may maintain a system to calendar due dates for the payment of maintenance and/or annuity fees relating to, or the renewal dates for the preservation of certain legal rights attaching to, intellectual property. In connection with this system, we may notify the person or entity listed in our records as the holder of such rights of the necessity of paying maintenance and/or annuity fees or obtaining a renewal in order to preserve such rights. Neither the maintenance of such system nor any such notification or renewal will constitute the provision of services for the purposes of determining whether there is a continuing lawyer-client relationship.

### 6.    Communication

### 6.1    Use of email

We may communicate with you by email unless you ask us not to.

We prefer to encrypt email that we send to you (whether it contains confidential information or not), provided we are able to implement mutually acceptable encryption standards and protocols.

HLIU003610

You are responsible for protecting your system from viruses and any other harmful codes or devices. We try to eliminate them from email and attachments but we do not accept liability for any that remain.

We may monitor or access any or all email sent to us. In addition, we scan incoming email for spam, viruses and other undesirable material, which may mean that email communications do not reach the intended recipient. Therefore, you should always follow up each important email by contacting the person to whom it has been sent.

### 6.2 Marketing materials

We may from time to time provide you with details relating to the Mayer Brown Practices and the services we provide, including updates on legal developments. If at any time you do not wish to receive that information, please tell us.

## 7. Money laundering and other notification to authorities

### 7.1 Notifications to regulators and consent

In many jurisdictions in which we operate, we are required by law or regulators to put in place procedures to prevent money laundering. If we know or suspect (or have reasonable grounds for suspecting) that a matter or transaction involves money laundering we may, in accordance with our statutory obligations and those procedures, be required to make a notification of our knowledge or suspicion to the relevant regulatory authorities.

In certain jurisdictions, rules or regulations require taxpayers engaging in certain types of transactions to disclose their participation in such transactions to the tax authorities, and in some cases where we are acting as your tax adviser we are also required to report transactions to the tax authorities. In some circumstances, we may be obliged to maintain a list of and notify the tax authorities (notwithstanding any otherwise applicable duty of confidentiality) of the names of investors and other details. Depending on the circumstances, we may be unable to seek your consent or inform you that we have made such a notification.

### 7.2 Liability

We do not accept liability for any loss or damage you suffer by actions we take in good faith to comply with anti-money laundering legislation or other statutory or regulatory obligations.

### 7.3 Client due diligence requirements

Applicable anti-money laundering and other similar legislation and requirements and our internal procedures may require us to identify and verify the identity of our clients and in some cases also their beneficial owners, and to conduct other background checks. We may be required to retain and update our records of the information obtained. We may also be required to make detailed inquiries as to a number of matters, including as to the source of funds being used in Particular Matters on which we advise and the beneficial owner of them. We refer to these requirements as the **"CDD Requirements"**.

Where possible, we try to meet the CDD Requirements using information from public sources and/or by electronic verification. However, we may need to ask you for (and retain) documents and other information for this purpose. We may provide copies of this information to any other adviser you engage or whom we engage on your behalf for their use in meeting similar requirements imposed on them.

We may delay commencing work, decline to act or (if appropriate) cease to act if the CDD Requirements are not met to our satisfaction and within a reasonable period of time.

We may charge you in the normal way for work that we have to do and for expenses incurred for the purpose of meeting the CDD Requirements.

### 7.4 Cash

We do not accept cash without prior agreement. If cash is deposited directly with our bank we may charge for any additional checks we deem necessary regarding the source of funds and the beneficial owner(s) of them to meet the CDD Requirements.

## 8. No third party reliance

Our services are provided for your benefit alone and solely for the purposes of the Particular Matter to which they relate. Unless otherwise agreed in writing,

our work may not be used or relied on by any third party, even if such third party may have agreed to pay our bill.

## 9. Confidentiality, disclosure and conflicts

### 9.1 Confidentiality and disclosure

We owe you a duty of confidentiality in respect of information relating to you that we obtain while dealing with your matters. We will not disclose such information except in the circumstances set out in this part A paragraph 9 or otherwise as required or permitted by the applicable professional conduct rules. We owe the same duty of confidentiality to all our clients. Accordingly, if at any time we possess information in respect of which we owe a duty of confidentiality to a former or another current client, we will not be required to disclose such information to you nor use it on your behalf even though the information may be material to your Particular Matter.

### 9.2 Disclosure to certain third parties

Our duty to keep confidential information relating to you or your Particular Matter on which we are acting, or have acted, for you is subject to any disclosures we consider in good faith we are required to make to any police, governmental, regulatory or supervisory authority under any statutory or regulatory obligations (including those described in part A paragraph 7 (*Money laundering and other notification to authorities*) or in accordance with any internal procedures that we have put in place to meet those obligations.

We may, when required by our insurers, auditors or other professional advisers (including independent counsel or debt collection agencies) provide to them information relating to you or details of a Particular Matter or Matters on which we are acting or have acted for you.

From time to time, we may use third parties to provide typing, photocopying, printing, data handling and other business support services, subject to contractual duties of confidentiality.

### 9.3 Disclosure to other Mayer Brown Practices

We may disclose confidential information relating to you, or Particular Matters, to other Mayer Brown Practices, all of which are bound by the same duty of confidentiality that we have to you regarding to any such information.

### 9.4 Publicity

We may disclose that you are a client and describe in general terms the work we do for you unless you ask us not to do so in writing. However, we will not, without your consent, disclose that we are acting, or have acted, for you on a Particular Matter if the matter remains otherwise confidential.

### 9.5 Conflicts of interest - advance waiver

We may now or in the future without your consent act for your competitors, adverse parties or our other clients whose interests are or may be opposed to or in conflict with yours or your Affiliates in matters not substantially related to Particular Matters we are handling for you (including in transactions, bankruptcy, insolvency, arbitration, litigation or other forms of dispute resolution). Where we are acting for you on a Particular Matter, however, we will not act for another client on the same matter unless and to the extent that we are permitted to do so by the applicable professional conduct rules.

### 9.6 Conflicts of interest and confidentiality

Subject to applicable professional conduct rules, where we have information in respect of which we owe a duty of confidentiality and which is or may be material to a matter on which we are acting for another client, we may act for that other client, provided we put in place arrangements, such as "ethical" or "information" screens, which are reasonably appropriate in the circumstances to ensure that the confidentiality of your information is maintained.

## 10. Joint representations

Where we act for you jointly with others in a Particular Matter, we may disclose to all the parties we represent any confidential information we obtain from you and the content of our communications with you. To that extent, the advice we give will cease to be privileged as between you and the other clients. Unless otherwise agreed in writing, you will remain jointly and severally liable for our fees even if you have made different arrangements with the other parties. If a conflict arises during the course of a Particular Matter, we may need to cease to act for you unless the conflict can be otherwise resolved. In those circumstances, we may continue to act for some or all of the

3

HLIU003611

other clients. Representation of an association, partnership, joint venture or similar joint entity is not a joint representation. Where you and another client or clients jointly instruct us, we will assume that any of you has authority to give instructions on behalf of you unless any of you tell us otherwise in writing.

## 11. Data

### 11.1 Use of data

We will hold, use and process any data you provide to us (including data relating to you, your Associated Persons (as defined in part A paragraph 18 (Definitions)) and your respective employees) to carry out conflict checks, client identification and other client intake and maintenance procedures pursuant to our CDD Requirements, comply with statutory and regulatory obligations and our internal procedures, conduct the work in the related Particular Matter and update our client databases. The data may be shared with other Mayer Brown Practices.

### 11.2 Provision and use of personal data

You must make sure that any personal data you provide to us and our use and disclosure of that data in accordance with your instructions does not breach any applicable data protection laws and regulations. We will comply with our duties as a law firm under applicable data protection and privacy laws and regulations. Further information about our privacy policy, including our data protection inquiries policy, may be found under the legal notices section of our website at www.mayerbrown.com/legal-notices.

## 12. No waiver of our privilege

We represent many clients and handle a great number of complex matters. As a result, from time to time, issues may arise that raise questions under our applicable professional conduct rules, including possible disputes with a client and conflicts of interest issues. When such issues arise, we generally seek the advice of our internal counsel (or, if we choose, outside counsel). You agree that we, in our own discretion, may do so. We consider such consultations to be protected from disclosure under the lawyer-client privilege. While some courts have limited this privilege under certain circumstances, we believe that it is in both your and our interest that we receive expert analysis of our obligations. Our ongoing representation of you will not result in a waiver of any lawyer-client privilege that we may have to protect the confidentiality of our communications with such counsel.

## 13. Force majeure

We will not be liable to you if we are unable to perform our services in a Particular Matter as a result of any cause beyond our reasonable control. If this happens, we will tell you as soon as reasonably practicable.

## 14. Assignment

### 14.1 Permitted assignment

We may assign, or may assign the benefit of, any Engagement Contract to any successor partnership or corporate entity that carries on the business or any part of the business of the relevant Principal Mayer Brown Practice. You will accept the performance by such assignee of the Engagement Contract in substitution for the Principal Mayer Brown Practice. References in these International Terms and in any relevant Engagement Letter to the Mayer Brown Practice include any such assignee.

### 14.2 Other assignment

Subject to part A paragraph 14.1, neither you nor we have the right to assign or transfer the benefit or burden of an Engagement Contract without the written agreement of the other.

### 14.3 Assignment by other Mayer Brown Practices

References in these International Terms or in any Engagement Letter to another Mayer Brown Practice includes any limited liability partnership or other partnership or corporate entity to or by which all or part of the business of the other Mayer Brown Practice is from time to time transferred or carried on.

## 15. Associated Persons

Unless the Engagement Letter expressly states otherwise, you accept the provisions of the Engagement Contract on your own behalf and as agent for each Associated Person. You confirm that you have, or will have, the authority

to retain us on behalf of each Associated Person. You will procure that each Associated Person will act on the basis that they are a party to and are bound by the relevant Engagement Contract. All references in these terms of business (other than in this part A paragraph 15) and in the Engagement Letter to **"you"** (and derivatives of it) mean you and each Associated Person.

## 16. Financial transactions

### 16.1 Representing financial institutions

Unless otherwise agreed in writing, when we represent a financial institution in a Particular Matter, we will not be responsible for advising the financial institution on compliance with applicable laws and regulations arising out of its legal or regulatory status or the general nature of its business or on its internal governance issues.

### 16.2 Refiling; re-recording

Whether or not you are a financial institution, unless we otherwise agree in writing in the Engagement Contract, we do not undertake responsibility for advising you upon or ensuring compliance with periodic refiling or re-recording requirements.

## 17. Use of client accounts

In certain jurisdictions outside the United States a Mayer Brown Practice is permitted at its discretion to provide client account facilities to receive, hold and transfer funds in connection with a matter on which it is acting. If we have agreed to the use of our client account such use is at your own risk. You must tell us in advance when you are transferring funds to us as unexpected or unidentified receipts may either be retained pending further investigation or returned to the sender. We may charge for any checks we deem necessary regarding the source of funds and the beneficial owner(s) to meet the CDD Requirements.

## 18. Definitions

In these International Terms and (where applicable) in an Engagement Letter any reference to a statute or a statutory provision includes any consolidation, re-enactment, modification or replacement of the same from time to time and:

**"Affiliate"** means in relation to an entity any person who or entity that controls or is under common control with or is controlled by that entity.

**"Associated Person"** in a Particular Matter, means (subject to part A paragraph 8 (No third party reliance)) any Affiliate that is with our agreement in writing a recipient of and entitled to rely on our services in relation to that matter.

## 19. Inconsistencies

In the event of any inconsistency between an Engagement Letter and these International Terms, the Engagement Letter will prevail.

## 20. Law and jurisdiction

Each Engagement Contract will, unless otherwise agreed in the Engagement Letter, and except as provided in part B paragraph 3.6 (Law and Jurisdiction), be subject to and governed by the laws of the jurisdiction in which the Principal Mayer Brown Practice is established or incorporated. Any dispute arising from or under an Engagement Contract will be subject to the exclusive jurisdiction of the courts of that jurisdiction.

## 21. Application of these International Terms and amendments

These International Terms supersede any earlier terms of business to which we may have agreed and, unless otherwise agreed in writing, apply to the services referred to in any Engagement Letter accompanying these terms and all subsequent services we provide to you.

## B. Additional Terms

## 1. Additional Terms applicable to the US LLP only

### 1.1 Provision for work performed by lawyers resident in our New York office

In the event you have a fee dispute with us in an amount that is between US$1,000 and US$50,000, you may have the right to seek resolution of that dispute in an arbitration under Part 137 of the Rules of the Chief Administrator, New York State Office of Court Administration. For further information about

4

HLIU003612

the fee dispute arbitration procedures, please refer to the text of Part 137, available on the internet at www.courts.state.ny.us/admin/feedispute.

### 1.2   Provision for work performed by lawyers resident in our Houston office

NOTICE TO CLIENTS: The State Bar of Texas requires us to inform you that it prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar's Office of Chief Disciplinary Counsel will provide you with information about how to file a complaint.  Please call 1 800 932 1900 toll-free for more information.

### 1.3   Securities and Exchange Commission – Standards of Professional Conduct

Pursuant to Part 205 in Title 17 of the Code of Federal Regulations ("**Standards of Professional Conduct**"), if any lawyer of the US LLP represents you in appearing and practicing before the Securities and Exchange Commission (the "**SEC**"), we may have obligations imposed on us, as further described in the Standards of Professional Conduct.  These obligations currently are limited to up-the-ladder reporting within your organization, although some form of reporting to the SEC may be adopted.  If any of our lawyers currently represents, or in the future represents, you in appearing and practicing before the SEC, you acknowledge that we are (or will become) subject to the obligations imposed on us by the Standards of Professional Conduct.

## 2.   Additional Terms applicable to the UK LLP only

### 2.1   Regulatory information

Mayer Brown International LLP is a limited liability partnership incorporated in England and Wales under no. OC303359.  It is authorized and regulated by the Solicitors Regulation Authority.  Its registered office is 201 Bishopsgate, London EC2M 3AF.

### 2.2   Members and partners

An English limited liability partnership is a body corporate which has members and not partners.  In these terms references to a "partner" in relation to the UK LLP means a member of Mayer Brown International LLP.  However, in our dealings with you, the UK LLP may also use the term partner to refer to an employee or consultant of the UK LLP who is a lawyer with equivalent standing or qualification, or to a lawyer with equivalent standing in another Mayer Brown Practice.

### 2.3   Interest on client account

The UK LLP main client account is with the Royal Bank of Scotland.  Unless we agree otherwise in writing we deposit client money in an instant access deposit account and will pay interest for the period during which the money is held, unless such interest is de minimis.  We calculate interest at a rate equivalent to that payable by our bank on such accounts.  Our policy for the handling of client funds, including the basis of payment of interest, can be found in the legal notices section of our website at www.mayerbrown.com/legal-notices.

### 2.4   Complaints

We will do what we reasonably can to resolve any complaint about our services or bills in accordance with the UK LLP's complaints handling policy, a copy of which is available in the legal notice section of our website at www.mayerbrown.com/legal-notices and which will be provided on request.  If you are not satisfied with our handling of your complaint you may be eligible to complain to the Legal Ombudsman ("**LeO**") at PO Box 6806 Wolverhampton WV1 9WJ.  You must contact LeO within six months of our final response; otherwise LeO may decide not to investigate your complaint.  More information is available at www.legalombudsman.org.uk.  You may have a right to object to a bill from the UK LLP by making a complaint as above and/or by applying to the Court for an assessment of the bill under Part III Solicitors Act 1974.

### 2.5   The Financial Services and Markets Act 2000 ("FSMA")

#### 2.5.1   Insurance contracts

If and to the extent that our legal services involve insurance mediation activity (which is, broadly, the advising on, selling and administration of insurance contracts) from the UK, you should note that we are not "authorised" by the Financial Conduct Authority under FSMA.  However, we are included on the

register maintained by it so that we can carry on insurance mediation activity.  The register can be accessed via the Financial Conduct Authority website at www.fca.org.uk/register.  This part of our business, including arrangements for complaints or redress if anything goes wrong, is regulated by the Solicitors Regulation Authority, the independent regulatory body of the Law Society of England & Wales (a designated professional body for the purposes of FSMA) of which we are members.  We will not provide insurance mediation services unless you expressly ask us to do so.

#### 2.5.2   Investments

Depending on the nature of the services we provide to you, it is possible that we may, on occasions when you instruct us to do so, provide you with legal services which relate to investments.  We are not "authorised" by the Financial Conduct Authority under FSMA.  Where our services are provided from the UK, we are permitted to undertake certain activities in relation to investments that are limited in scope and incidental to our legal services or which may be regarded as a necessary part of our legal services because we are regulated by the Solicitors Regulation Authority (which together with LeO also provides complaints and redress mechanisms).  No communication either to you, or on your behalf to any other person, during the course of our engagement is an invitation or inducement to engage in investment activity and nothing we say or write should be construed as such.

### 2.6   Third party rights

Other than part B paragraphs 2.8 and 2.9, no provision of an Engagement Contract is intended to be enforceable pursuant to the Contracts (Rights of Third Parties) Act 1999.  Accordingly, other than our employees, consultants or partners wishing to rely on those paragraphs, no third party will have any right to enforce, or rely on, any provision of an Engagement Contract.

### 2.7   Professional indemnity insurance

The UK LLP is required to hold a minimum level of insurance cover under the Solicitors' Indemnity Insurance Rules.  The territorial coverage is worldwide for the UK LLP and details of our insurers can be found under the legal and regulatory information page of the legal notices section of our website, at www.mayerbrown.com/legal-notices.

### 2.8   Exclusions and limitations on our liability

#### 2.8.1   Proportional liability

If you suffer loss or damage because of our breach of contract or of our negligence, our liability will be limited to a just and equitable proportion of the total loss or damage you suffer having regard to the extent of the responsibility of any other party who may also be liable to you in respect of such loss and damage.  Our liability in these circumstances will not be increased because of any actual or potential shortfall in recovery from another party whether due to any exclusion or limitation of liability that you have agreed to with another party, difficulty in enforcement, settlement of claims or any other reason.

#### 2.8.2   Liability in respect of other parties

Where we instruct another party on your behalf (for example, a barrister, expert or co-counsel) we will not be liable for the services provided by that other party.

#### 2.8.3   Liability cap

We may, from time to time, if permitted by local laws and applicable professional conduct rules, agree with you that our aggregate liability to you for a Particular Matter or Matters is limited to an amount specified in the relevant Engagement Letter (a "**Liability Cap**").

A Liability Cap will apply to all liability that we may have to you in respect of the relevant Particular Matter or Matters, including for breach of contract and for negligence (but not for banking failure or compliance with legislation in respect of which a separate limit of liability applies as set out in part B paragraph 2.10).

The Liability Cap (if any) will apply on an aggregate basis to all liabilities that we may have to you and any Associated Person (including third parties when a consent to such third parties is given under part A paragraph 8 (No third party reliance)) in the relevant Particular Matter or Matters.

### 2.9   No claim against individual employees/partners

No individual employee, consultant or partner of the UK LLP has a contract with you or owes you a duty of care.  Any services performed by an employee,

HLIU003613

consultant or partner are performed on behalf of the relevant Mayer Brown Practice and that person does not assume any personal responsibility to you or any other party for those services. Accordingly, it is a fundamental provision of these International Terms that you will not bring any claim against any individual employee, consultant or partner, directly or indirectly, in connection with our services.

None of the provisions of this part B paragraph 2.9 limit or exclude the liability of the UK LLP for the acts or omissions of any employee, consultant or partner.

### 2.10   No liability for banking failure and our compliance with legislation

We do not accept liability for any loss or damage you suffer if any bank that we use collapses or for reasons outside of our control is otherwise unable to transact business or transfer funds in a timely manner or at all. However, if such liability is nonetheless imposed on us by a court of law, our liability to you will not exceed an amount equal to the minimum level of insurance cover required from time to time under any applicable rules governing the insurance of solicitors. This limitation of liability will not be increased by any Liability Cap agreed with you.

### 2.11   Inside information

If you are a company that has, or the subsidiary of a company that has, securities that are listed on a regulated market you will tell us if a matter on which we are advising you is or becomes "inside information" in relation to that company or its securities. Following any such notification, we will implement our internal procedures relating to the handling of such information.

### 2.12   Our rights over your property (our lien)

If any, or any part of any, bill is not paid within 30 days after the bill is sent, we will, to the extent we are permitted to do so as a matter of law and applicable professional conduct rules, retain money, papers and other property belonging to you even if these have been provided to us in relation to a different matter until such time as all amounts due to us are paid in full. Subject to applicable professional conduct rules, we may seek a charging order over property that we recover or preserve for you in litigation. We do not waive these rights if we accept any alternative security for our costs, for example a payment on account.

## 3.   Additional Terms applicable to the HK Partnership only

### 3.1   Third party rights

Other than part B paragraphs 3.2 and 3.3, no provision of an Engagement Contract is intended to be enforceable pursuant to the Contracts (Rights of Third Parties) Ordinance (Cap 623).

### 3.2   Exclusions and limitations on our liability

### 3.2.1   Proportional liability

If you suffer loss or damage because of our breach of contract or of our negligence, our liability will be limited to a just and equitable proportion of the total loss or damage you suffer having regard to the extent of the responsibility of any other party who may also be liable to you in respect of such loss and damage. Our liability in these circumstances will not be increased because of any actual or potential shortfall in recovery from another party whether due to any exclusion or limitation of liability that you have agreed to with another party, difficulty in enforcement, settlement of claims or any other reason.

### 3.2.2   Liability in respect of other parties

Where we instruct another party on your behalf (for example, a barrister, expert or co-counsel) we will not be liable for the services provided by that other party.

### 3.2.3   Liability cap

We may, from time to time, if permitted by local laws and applicable professional conduct rules, agree with you that our aggregate liability to you for a Particular Matter or Matters is limited to an amount specified in the relevant Engagement Letter (a "**Liability Cap**").

A Liability Cap will apply to all liability that we may have to you in respect of the relevant Particular Matter or Matters, including for breach of contract and for negligence (but not for banking failure or compliance with legislation in respect of which a separate limit of liability applies as set out in part B paragraph 3.4).

The Liability Cap (if any) will apply on an aggregate basis to all liabilities that we may have to you and any Associated Person (including third parties when a consent to such third parties is given under part A paragraph 9 (No third party reliance)) in the relevant Particular Matter or Matters.

### 3.3   No claim against individual employees/partners

No individual employee, consultant or partner of the HK Partnership has a contract with you or owes you a duty of care. Any services performed by an employee, consultant or partner are performed on behalf of the HK Partnership and that person does not assume any personal responsibility to you or any other party for those services. Accordingly, it is a fundamental provision of these International Terms that you will not bring any claim against any individual employee, consultant or partner, directly or indirectly, in connection with our services.

None of the provisions of this part B paragraph 3.3 limit or exclude the liability of the HK Partnership for the acts or omissions of any employee, consultant or partner.

### 3.4   No liability for banking failure and our compliance with legislation

We do not accept liability for any loss or damage you suffer if any bank that we use collapses or for reasons outside of our control is otherwise unable to transact business or transfer funds in a timely manner or at all. However, if such liability is nonetheless imposed on us by a court of law, our liability to you will not exceed an amount equal to the minimum level of insurance cover required from time to time under any applicable rules governing the insurance of solicitors. This limitation of liability will not be increased by any Liability Cap agreed with you.

### 3.5   Our rights over your property (our lien)

If any, or any part of any, bill is not paid within 30 days after the bill is sent, we will, to the extent we are permitted to do so as a matter of law and applicable professional conduct rules, retain money, papers and other property belonging to you even if these have been provided to us in relation to a different matter until such time as all amounts due to us are paid in full. Subject to applicable professional conduct rules, we may seek a charging order over property that we recover or preserve for you in litigation. We do not waive these rights if we accept any alternative security for our costs, for example a payment on account.

### 3.6   Law and jurisdiction

Notwithstanding part A paragraph 20 (Law and jurisdiction), and unless otherwise agreed in writing, each Engagement Contract with Mayer Brown JSM or its associated legal practice in Asia will be governed by Hong Kong law and any dispute arising from or under such Engagement Contract will be subject to the exclusive jurisdiction of Hong Kong courts.

6

HLIU003614

Exhibit 3

| | |
|---|---|
| **From:** | Jerry Wang (FF China) [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A13EE35D36764DFDACED9FB3DBFE2A11-JERRY] |
| **Sent:** | 10/20/2017 5:48:48 PM |
| **To:** | Liu, Hong (Henry) [HLiu@mayerbrown.com]; Wentao Huang [/o=First Organization/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f38e87726cf742bc89eedebfffb246dc-Wenta] |
| **CC:** | Duffee, David K. [DDuffee@mayerbrown.com]; Recht, Philip R. [PRecht@mayerbrown.com]; Newhouse, Brian E. [BNewhouse@mayerbrown.com] |
| **Subject:** | RE: [EXTERNAL] Mayer Brown Proposal & Work Plan and Engagement Letter & Terms |

Well received, thank you very much Mr. Liu!

**From:** Liu, Hong (Henry) [mailto:HLiu@mayerbrown.com]
**Sent:** Friday, October 20, 2017 2:18 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>; Wentao Huang <Wentao.Huang@ff.com>
**Cc:** Duffee, David K. <DDuffee@mayerbrown.com>; Recht, Philip R. <PRecht@mayerbrown.com>; Newhouse, Brian E. <BNewhouse@mayerbrown.com>
**Subject:** [EXTERNAL] Mayer Brown Proposal & Work Plan and Engagement Letter & Terms

Dear Jerry and Wentao,

As discussed, attached please find Mayer Brown Proposal and Work Plan for Faraday Future, and our Engagement Letter and Terms.

Please if you could let me know if you may have any questions.

We are exited about working with you and your team, and about working to bring Faraday Future a complete success.

Many thanks and best regards,

Henry

**(Henry) Hong Liu**
**Partner**
**Mayer Brown LLP**
1221 Avenue of the Americas
New York, NY 10020-1001
T +1 212 506 2886
C +1 917 753 0885
F +1 212 894 5866
hliu@mayerbrown.com

---

This email and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. If you are not the named addressee you should not disseminate, distribute or copy this e-mail.

FF00000105

Exhibit 4

**From:**      Jerry Wang (FF China) [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A13EE35D36764DFDACED9FB3DBFE2A11-JERRY]
**Sent:**      10/25/2017 10:41:08 PM
**To:**        HenryLiuEsq@Gmail.Com
**Subject:**   Follow up
**Attachments:** Draft_Executive Contract Term Sheet (Henry L) - 171024.docx; Draft_Option valuation form - Henry.xlsx

Dear Mr. Liu,

As discussed please refer to attachment. Much appreciated and very much looking forward to next step!

Sincerely,
Jerry

**Jerry Wang**
General Manager | Global Capital and Investment Banking

 **Faraday Future**

e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF, Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF, Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF, Inc. email system is solely the responsibility of the sender, and none of the consent of any such email is to be attributed to FF, Inc. No one who receives an email purportedly from FF, Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF, Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF, Inc. email, without FF, Inc.'s express written permission.

All we do is for our earth, please consider the environment before printing out this email.

FF00000086

**NATIVE DOCUMENT PLACEHOLDER**

**Please review the native document FF00000086.XLSX**

**FF Option Valuation Estimation**

*For Henry L review only, does not have any legal-binding obligation*

| | Total offer shares | 20,000,000 | |
| --- | --- | --- | --- |
| Percentage | | 2% | |

| | Base | | Good |
| --- | --- | --- | --- |
| Series A Value | $ 42,857,143 | $ | 42,857,143 |
| Series B Value | $ 100,000,000 | $ | 150,000,000 |
| IPO Value | $ 432,432,432 | $ | 648,648,649 |
| IPO 3 years Value | $ 1,000,000,000 | $ | 1,000,000,000 |

| FF | | | RMB rate | 6.6 |
|---|---|---|---|---|
| Percentage | 2.00000% | | | |
| Current Share | 1,000,000,000 | | Assumption | |
| A Share | 1,400,000,000 | | | |
| B Share | 1,600,000,000 | | | |
| IPO Share | 1,850,000,000 | | Base | Good |
| IPO 3 years Share | 2,000,000,000 | | | |
| Valuation | | | | |
| A Valuation | 3,000,000,000 | 3,000,000,000 | 3B USD | |
| B Valuation | 8,000,000,000 | 12,000,000,000 | 8B USD | 12B USD |
| IPO Valuation | 40,000,000,000 | 60,000,000,000 | 40B USD | 60B USD |
| IPO 3 years | 100,000,000,000 | 100,000,000,000 | 100B USD | |
| Share price | | | | |
| A Price | 2.14 | 2.14 | | |
| B Price | 5.00 | 7.50 | Offer | |
| IPO Price | 21.62 | 32.43 | Cash+Bonus | 900,000 |
| IPO 3 years Price | 50.00 | 50.00 | FF | 20,000,000 |
| Share offered | 20,000,000 | 20,000,000 | FF % | 2.00% |
| Share value | | | | |
| A Value | 42,857,143 | 42,857,143 | | |
| B Value | 100,000,000 | 150,000,000 | | |
| IPO Value | 432,432,432 | 648,648,649 | | |
| IPO 3 years Value | 1,000,000,000 | 1,000,000,000 | | |

FF00000084-FF00000085

# DRAFT EMPLOYMENT AGREEMENT TERM SHEET
# FOR HENRY L

This draft term sheet sets forth the terms and conditions of employment for Henry L (the "Executive") to serve FF Inc., (the "Company") as Vice Chairman and Global General Counsel, **BEFORE** Series A Financing. These terms and conditions will be memorialized in an executive employment agreement, by and between the Company and the Executive (the "Agreement") together with such other reasonable and customary terms and conditions as may be negotiated in good faith between the Company and the Executive. If the Executive decides to join the Company **AFTER** Series A Financing, the terms and conditions will be invalid and subject to further discussion. This term sheet is only for reference, without any legal-binding obligation.

| | |
|---|---|
| Position and Duties | Vice Chairman and Global General Counsel of FF Inc. The Executive is reporting to the CEO of the Company. Duties and responsibilities commensurate with such position, and subject to typical exceptions for serving on other civic / charitable / corporate boards with no conflict of interest of the Company and for managing personal investments. |
| Term | Commences on [], 2017 and continues until terminated pursuant to the terms set forth in the Agreement. |
| Salary and Bonus | Annual salary and bonus of US$900,000 per year.  Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of the Company. |
| Additional Bonus Opportunity (Short-Term Incentive) | After successful financing including Series A, China Joint Venture etc., in which the Executive is one of the leading role of the project group and makes substantial contributions, the Executive will have access to special Bonus based on a percentage of overall transaction. |
| Equity Grants (Long-Term Incentive) | Will be eligible for at least an overall 20,000,000(2%) of the fully diluted equity of the Company as stock option, with initial grant of 10,000,000(1%) and follow-on grant of 10,000,000(1%). |
| Benefits/PTO | Participation in all benefit plans and programs at the same level as all senior level executives of the Company, including corporate housing, transportation, retirement, welfare, vacation and PTO. Specific details will be provided shortly after the Executive joins the Company. |

*[Signature Page Follows]*

1

Sincerely,                          Agreed to and accepted:


Signature: _____     Signature: _____
Printed Name:                       Printed Name: _____
Title:                                            _____
Date:

CONFIDENTIAL                                      FF00000085

Exhibit 5

| | |
|---|---|
| **From:** | H. Liu |
| **Sent:** | Sunday, October 29, 2017 9:39 AM CDT |
| **To:** | jiawei.wang.1990@gmail.com |
| **BCC:** | Liu gmail Henry H. |
| **Subject:** | Attachments |
| **Attachments:** | 2017HLiuNetSalaryDrawExcludingBonus&Dividends(Confidential).pdf, 102017HLiuOfficialAttorneyBioonMayerBrownFirmWebsite(English).pdf, 102017HLiuOfficialAttorneyBioonMayerBrownFirmWebsite(Chinese).pdf |

Please find the attached.  Best regards.

HLIU008288

HLIU008292-HLIU008293

MAYER·BROWN

# 刘 洪

## 合伙人

hliu@mayerbrown.com
纽约
电话 +1 212 506 2886
传真 +1 212 849 5866

**Mayer Brown**（美亚博孖士达国际律师事务所）是当今世界规模最庞大、历史最悠久和业务最广泛的国际性律师事务所之一，其分所和办事处遍布美洲、欧洲和亚洲主要经济和金融中心。刘洪律师作为全球合伙人律师，以纽约为主要工作基地，负责全所在美国的亚洲与大中华相关业务的管理和协调，并且在全所位于亚洲、欧洲和美洲的各个分所与办事处之间起着重要的协调作用。

刘律师的专业特长，除了金融之外，还包括收购兼并、各类投资、商业交易、资本市场和监管事务等。刘律师在处理亚洲和大中华企业在美国和全球其它地区开展业务，包括投资融资、股票债券、金融银行、收购兼并、房地产、基础设施、航空交通、各类能源、资产证券化和其它商业活动等方面，有着广泛和深厚的业务经验。同时，刘律师在处理美国和其它国家与地区的企业在亚洲和大中华地区开展业务，包括市场进入、外商投资、公私基金、技术转让、监管事务等方面，有着长期和坚实的专业实践。刘律师代表着包括全球性大公司和财富 500 强以及新兴公司在内的广大客户，跨越众多的行业领域、广泛的业务板块和多样的交易类型。刘律师还帮助许多中国和亚洲企业、金融机构和投资资金等实体和机构，在美国和全球开展大量业务。

在上世纪九十年代，刘律师在中国证券监督管理委员会（"中国证监会"）担任首席律师和几个部门的主任（正厅局级），成为中国资本市场法律、法规和政策的起草、解释和实施等工作的主要负责人之一。他还担任了中国证监会《证券法》起草工作小组组长，为中国首部《证券法》的起草和出台做了重要工作。刘律师还长期担任过中国国务院任命的股票发行审核委员会的重要成员。刘律师被广泛认可为中国资本市场和证券市场的发展做了许多工作。

刘律师的投资银行背景包括于本世纪初在美国著名的帝杰投资银行（DLJ）和全球性瑞士信贷第一波士顿投资银行（CSFB）担任投资银行董事总经理，在与亚洲和中国相关的收购兼并和其他金融业务中起到了重要作用。刘律师长期的国际法律执业经历包括在几个全球性律师事务所担任合伙人和亚太暨大中华业务主席兼管理合伙人。

2015 年美国《国家法律杂志》授予刘律师"法律监管拓荒领军者奖"，这是美国法律专业最高荣誉和认可之一，奖励他早年帮助中国法治进程所做的工作；奖励他目前所从事的帮

HLIU008292

助亚洲和中国公司在美国和全球开展业务、遵循国际惯例的拓荒和先行工作；奖励他关于全球商业和资本的流动只有基于遵循共同规则才能高效实现的信念和探索。

刘律师于 1998 年和 1999 年连续两次获得美国《商业周刊》授予的"亚洲之星"奖，奖励他在参与处理亚洲金融危机、推进中国经济建设和中国法治改革所起的作用。1999 年，世界经济论坛在瑞士全球首脑会议上为他颁授"全球未来领导者奖"。1999 年在中华人民共和国建国 50 周年之际，时代杂志的《亚洲周刊》认可他是"为中国建设作出杰出贡献者"。

刘律师获有美国哈佛大学法学硕士学位、英国牛津大学工商管理硕士学位和中国北京大学法学博士学位，并曾就读和完成美国斯坦福大学法学博士必修课程。他还毕业于中国南开大学和外交学院。刘律师曾任哈佛大学和斯坦福大学约翰 M.奥林法律与经济学研究员、牛津大学美标管理学研究员。刘律师拥有美国纽约州律师执照长达 25 年，并且拥有中国律师资格。

教育背景

- Harvard Law School, LLM
- Peking University Law School, JSD
- University of Oxford, MBA

执业资格

- 纽约州
- 中国

新闻和出版物

- "赴美投资方程式 | 外国企业投资美国攻略," 12 June 2017
- "Mayer Brown partner (Henry) Hong Liu named a "2015 Regulatory & Compliance Trailblazer" by *The National Law Journal*," 24 June 2015
- "The National Law Journal's Regulatory & Compliance Trailblazers 2015: Henry Hong Liu, Mayer Brown," *The National Law Journal*, 22 June 2015

www.mayerbrown.com
https://www.mayerbrown.com/zh-CHS/people/henry-hong-liu/

HLIU008293

HLIU008289-HLIU008290

## MAYER • BROWN

# Henry Hong Liu

## Partner

hliu@mayerbrown.com
New York
T +1 212 506 2886
F +1 212 849 5866

(Henry) Hong Liu is a partner of Mayer Brown LLP, one of the largest full service global law firms, with offices in major economic and financial centers around the world. Based in the firm's New York office, Henry plays a leading role in managing and coordinating the firm's Greater China and Asia practice in the US. As a leader of the firm's US-China practice initiatives, he is instrumental in connecting our offices in Asia, Europe and the Americas.

Henry's broad practice areas have included banking and finance, mergers and acquisitions, investments and transactions, and regulatory and disputes with a strong emphasis on cross-border transactions involving Asia and Greater China. Henry has extensive experience representing Asia- and Greater China-based companies conducting business in the United States and other parts of the world, including in such industries as financial institutions and investment entities, real estate and infrastructure, aviation and transportation, energy and resources, and manufacturing and technology. He also advises US and foreign companies doing business in Asia and Greater China, including in market access, direct investments, public and private funds, capital markets, technology transfers and regulatory matters.

In the 1990s, Henry served as the General Counsel and Director-General of the China Securities Regulatory Commission (CSRC). In that role, he was the lead professional regulator responsible for drafting, interpreting, and administering China's capital and securities market rules. He headed up the working group for drafting and enacting China's first securities law. He also served as a key member of the stock issuance examination board appointed by the State Council. He is regarded as having made significant contributions to the development of China's securities and financial markets.

Henry's investment banking background has consisted of serving as a managing director of investment banking at Donaldson, Lufkin & Jenrette (DLJ) and Credit Suisse First Boston (CSFB) in the early 2000s, where he played an important role in a variety of China- and Asia-related M&A and other financing and business transactions. His legal practice has included serving as a partner, chairman, and managing partner of China and Asia practices for several global law firms.

In 2015 Henry was honored by *The National Law Journal* (NLJ) in the United States as a "Regulatory & Compliance Trailblazer". Henry was twice honored with the "Stars of Asia Award" by *BusinessWeek* as China's national policymaker in 1998 and 1999 for his role in China's economic and legal reforms and in the Asia Financial Crisis. He received the "Global Leader for Tomorrow Award" from the World Economic Forum in Davos in 1999. *AsiaWeek* (Time) recognized him as a "Nation Builder" in 1999.

Henry earned an LLM degree from Harvard Law School (as a John M. Olin Fellow in Law and Economics), a JSD degree from Peking University Law School, and an MBA from Oxford University (as The American

1

HLIU008289

Standard Companies Fellow in Management). He has been licensed as a New York and international lawyer for more than 25 years.

## Education

- Harvard Law School, LLM
- Peking University Law School, JSD
- University of Oxford, MBA

## Admissions

- New York
- People's Republic of China

## Activities

- New York State Bar Association
- American Bar Association

## News & Publications

- "Formulas for Successful US Investing Series | Tips for Overseas Investors Tapping into the US Market," *Mayer Brown Video*, 12 June 2017
- "Mayer Brown partner (Henry) Hong Liu named a "2015 Regulatory & Compliance Trailblazer" by *The National Law Journal*," 24 June 2015
- "The National Law Journal's Regulatory & Compliance Trailblazers 2015: Henry Hong Liu, Mayer Brown," *The National Law Journal*, 22 June 2015

2

HLIU008290

HLIU008291

**Mayer Brown LLP**
**2017 Partner Distribution Projection**
**TK#: 48692  Name: Liu, Hong**

Date Prepared: 10/4/2017

## INCOME PARTICIPATION

| | | | |
|---|---|---:|---:|
| Parts Income - 2017 | | | |
| | Bracket | 10 | |
| | Parts Income - 338.00 parts at $ 3,667  (2016 Value) | | 1,239,446 |
| | Parts Income - Holdback | 10% | (123,945) |
| | Add Estimated Interest on Contributed Capital | | 12,074 |
| | | | |
| | **TOTAL INCOME** | | **1,127,575** |

## LESS CHARGES AGAINST INCOME

| | Months | Per Month | |
|---|---|---|---:|
| Standard Monthly Draw | 12 | 25,000 | 300,000 |

| | | | |
|---|---|---:|---:|
| **Other Distributions** | | | **0** |

### Interim Special Income Distributions

| | | | |
|---|---|---:|---:|
| Mar | 100.00 | 33,800 | |
| Apr | 100.00 | 33,800 | |
| May | 100.00 | 33,800 | |
| Jun | 100.00 | 33,800 | |
| Jul | 150.00 | 50,700 | |
| Aug | 200.00 | 67,600 | |
| Sep | 250.00 | 84,500 | |
| Oct | 250.00 | 84,500 | |
| Nov | 250.00 | 84,500 | |
| Dec | 0.00 | 58,616 | 565,616 |
| Jan 2018 | | | 0 |
| Mar 2018 | | | 0 |

### INSURANCE / OTHER

| | | |
|---|---:|---:|
| Insurance | 44,197 | |
| Penalties, Advances, Interest on Advances | 0 | |
| Personal Charges | 0 | |
| Prior Year Adj's / Special Charges | 0 | 44,197 |

### RETIREMENT PLAN CONTRIBUTIONS

| | | |
|---|---:|---:|
| Regular Savings Plan | 36,000 | |
| Sec. 401(k) Savings Plan | 24,000 | |
| Cash Bal Plan | 30,000 | |
| CB (Gains)/Losses | 0 | 90,000 |

### ESTIMATED WITHHELD INCOME TAXES

| | | |
|---|---:|---:|
| Illinois Tax | 15,408 | |
| New York Tax | 0 | |
| CA Tax | 0 | |
| State Group Filings | 12,347 | |
| NY Metro | 0 | |
| PY Adj to US Tax | 0 | |
| Germany | 10,100 | |
| PY Adj Germany | 0 | |
| UK | 0 | 37,855 |

| | | |
|---|---|---:|
| **Capital contribution / capital loan** | | 78,217 |
| **Interest on capital financing loan** | | |
| | | 11,690 |
| | **TOTAL CHARGES** | **1,127,575** |
| | **NET BALANCE** | **0** |

HLIU008291

Exhibit 6

will try to find time to speak today and if not we shall plan on speaking tomorrow. Best regards. H

### 王佳伟Jerry 18:11
Well received, thank you so much Mr. Liu!

———— 2017-11-2 ————

### 王佳伟Jerry 16:05
[乐视相关人士：没听说高管被查，发审委委员被查与乐视网无关：https://gu.qq.com/news-zixuangu?id=nestech-20171101023797&wxurl=qqstock://stocknewsV2/nestech-20171101023797///8/sz300104//&pagetype=share&stockName=%E4%B9%90%E8%A7%86%E7%BD%91&stockCode=sz300104]

### 王佳伟Jerry 16:11
Dear Mr. Liu, please refer to the latest information above, recently there are some negative rumors going on in China, these are all competely fake and I hope won't influence your judgment, appreciated and I sincerely looking forward to your reply.

### 王佳伟Jerry 21:22
Looking forward to your reply, thank you Mr. Liu!

———— 2017-11-3 ————

### Henry Liu 11:47
Sorry for not being able to speak early. Can you speak now? Best regards.

### 王佳伟Jerry 12:06
Thank you for your reply Mr. Liu, I'm driving now can I call you back around 35 mins?

### 王佳伟Jerry 12:08
Probably around noon time LA?

### 王佳伟Jerry 12:08
Apologize sincerely

### Henry Liu 12:12
Fully understood. No problem. Drive safely.

### 王佳伟Jerry 15:00
Hi Mr. Liu, apologize again for the delay, is now a good time to talk? Thanks!

———— 2017-11-10 ————

### 王佳伟Jerry 02:52
刘律师，您看可能留出11/20过来FF吗？谢谢您

### Henry Liu 11:59
Hi Jerry -- Let's talk about it. Regards.

———— 2017-11-11 ————

**Henry Liu 01:32**

Jerry -- When can you speak. I can speak now if you want to. I was afraid that it might not be as convenient to speak when I start traveling tomorrow. Regards. H

**王佳伟Jerry 01:33**

Thank you Mr. Liu, can you do WeChat call?

**Henry Liu 01:35**

Sure

———————— 2017-11-12 ————————

**王佳伟Jerry 12:07**

Dear Mr. Liu, please let me know when is a good time to talk, thanks!

**Henry Liu 18:56**

How about now or in half an hour.

**王佳伟Jerry 19:32**

Now is a good time?

**Henry Liu 19:36**

Sorry. In 5 minutes.

**王佳伟Jerry 19:40**

Pls call me whenever is good on your side, thanks Mr. Liu

———————— 2017-11-16 ————————

**王佳伟Jerry 23:28**

Dear Mr. Liu, hope everything is going on well with you China trip! Sincerely apologize for the significant delay due to investor due diligence session, I've shared standard FF package for your view to your personal gmail address

HLIU006898


H Liu <hliusunshine@gmail.com>

---

## Chat history between "王佳伟Jerry" and "Henry Liu"   Work Product - Attorney Client

**H Liu** <hliusunshine@gmail.com>                                    Mon, Apr 12, 2021 at 10:34 AM
To: H Liu Sunshine Legal Matter Email <HLiuSunshine@gmail.com>

Dear:

The text and image chat history between "王佳伟Jerry" and "Henry Liu" is as follows.

———————————— 2017-11-16 ————————————

### 王佳伟Jerry 23:28
Dear Mr. Liu, hope everything is going on well with you China trip! Sincerely apologize for the significant delay due to investor due diligence session, I've shared standard FF package for your view to your personal gmail address

### 王佳伟Jerry 23:28
Please let me know anytime you would like to discuss further, thanks.

———————————— 2017-11-17 ————————————

### Henry Liu 10:57
Hi Jerry -- Thanks for the e-mail and I can only open up two attachments while I am traveling. Shall I fill those terms that we have so far agreed on and those we have been discussing into the form letter agreement you have provided, so that going forward we can base our discussions in some written format and develop it into a letter agreement. I can perhaps start sending you preliminary and draft mark-ups in over the weekend. For the basis of the equity participations we had talked about Yidao, Lucid and LeSee, in addition to FF. So far only FF is defined as the US equity that is provided in the current form agreement you have so far provided. Would you want to provide those three in the same form agreement with FF, or if you have other equity participation forms, or if we need to draft another agreement for those three? Best regards.

### 王佳伟Jerry 21:40
Sounds good, thanks a lot Mr. Liu!

### 王佳伟Jerry 21:41
LeSEE is in VIE, 100% owned by FF so there is no separate option plan for LeSEE. Lucid and Yidao are completely outside so no relationship with FF or FF option plan as well.

### 王佳伟Jerry 21:42
No one executive in FF has any shares or options in Yidao or Lucid, except YT himself of course.

———————————— 2017-11-19 ————————————

### 王佳伟Jerry 02:54
Dear Mr. Liu, I was wondering what should be our next step? Thanks.

### Henry Liu 17:30

Exhibit 7

| From: | Jerry Wang (FF China) |
|---|---|
| Sent: | Thursday, November 16, 2017 10:17 PM CST |
| To: | HenryLiuEsq@Gmail.Com |
| Subject: | FF US employment contract |
| Attachments: | FF_Confidential Agreement_Gardena (legalrev6.6.17) - Final.pdf, Offer Letter Template (6.27.2017).docx, US Equity Documents.zip |

Dear Mr. Liu,

Apologize for the delay, please refer to attachment, thank you and very much looking forward to next step!

Sincerely,
Jerry

**Jerry Wang**
General Manager | Global Capital and Investment Banking



e  jerry.wang@ff.com
c  +1 201-354-7734 / +86 151-1690-3389
a  18455 S Figueroa St, Gardena, CA 90248
w  www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

HLIU001348-HLIU001351

 Faraday Future

Employee Name
1234 Street St
City, ST 91919
Email Address

Dear First Name,

I am pleased to offer you a position with Faraday&Future Inc. (the "Company"), as an exempt [a non-exempt] Job Title reporting to Supervisor Name, Supervisor Title. If you decide to join us, you will receive an annual salary of $000,000 [an hourly rate of $00.00, plus any applicable overtime required by law,] that will be paid semi-monthly [bi-weekly] in accordance with the Company's normal payroll procedures. You should note that the Company may modify job titles, salaries, and benefits from time to time as it deems necessary.

[In addition, the Company will advance a signing bonus of $0,000, subject to the terms of the attached Signing Bonus Agreement, and provided you meet the employment conditions set forth below and accept and return this offer letter and the Signing Bonus Agreement by March X 2017.]

[The Company will reimburse you for your reasonable and customary moving expenses associated with your relocation to the Los Angeles, California area, subject to the terms and conditions of the Company's Relocation Policy and your Benefits Relocation Agreement, which are attached to this offer letter. In conjunction with your relocation, the Company will also provide a settling in allowance of $XX intended to cover other reasonable move-related expenses not otherwise covered by Faraday's policies, which will be included with your first company payroll check.]

As an employee, you will also be eligible to receive a discretionary performance bonus with a target amount of up to $00,000 (less deductions and withholdings required by law). The actual amount or payment of any discretionary bonus is subject to the Company achieving its business objectives and your individual contributions to the Company's business goals, as assessed by your Manager at the time the Company annual performance reviews take place. You must also be an active employee on the date any discretionary bonus becomes payable. The bonus will not be deemed earned by you and become payable unless or until it is awarded in the sole discretion of the Company.

As an employee, you will also be eligible to receive Company subsidized health insurance, the opportunity to participate in the Company's Fidelity 401k-retirement plan, paid time off, and holiday entitlement, specific details of which will be provided shortly after you join the Company.

You will also be eligible to receive an employee stock option grant equal to 0,000 options to purchase Class A ordinary shares in FF Global Holdings Ltd (which is the holding company that represents both the U.S. design company and any current manufacturing subsidiaries). All employee stock option grants are subject to approval by the Board of Directors and the terms of the FF Global Holdings Ltd Equity Incentive Plan, and will have an exercise price equal to the then-current fair market value of the Company's ordinary shares as of the grant date (as determined by the Board of Directors.) Any grant will become vested and exercisable as follows: 25% will become vested and exercisable on the first anniversary of your start date and the remainder of the options will become vested and exercisable in equal installments over the next 36 months (1/48 per month), subject

HLIU001348

 Faraday Future

to your continued, uninterrupted employment with the Company or an eligible affiliate. Full details of this program will be made available to you at the time any stock option grant is issued, which will occur upon completion of a current third party valuation of the Class A shares and receiving Board Consent.

This offer is contingent on the Company's verification of your right to work in the United States and your successful clearance of a background and reference check. Upon receipt of a signed authorization form from you, the Company will undertake a background and reference check in a manner consistent with the requirements of applicable state and local laws, including the City of Los Angeles' Fair Chance Initiative for Hiring Ordinance. This investigation may also include a consumer report, as defined by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. 1681a, and/or an investigative consumer report, as defined by FCRA, 15 U.S.C. 1681a, and California Civil Code 1786.2(c). This investigation will not include information bearing on your credit worthiness. Please refer to the attached Background Check Disclosure and Authorization for important information regarding your rights. For purposes of federal immigration law, you also will be required to provide the Company with documentary evidence verifying your identity and eligibility for employment in the United States, within three (3) business days of your start date. Failure to provide this documentation or failure to successfully clear a background investigation and reference check may result in this offer of employment being withdrawn, in Company's sole discretion, after any notices and assessments required by law have been provided to you.

The Company is excited about you joining us and we look forward to a beneficial and productive relationship. Nevertheless, you should be aware that your employment with the Company is for no specified period of time and constitutes at-will employment. As a result, you are free to resign at any time, for any reason or for no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, with or without cause, and with or without notice. We request that, in the event of your resignation, you give the Company at least two weeks' notice. Nothing contained in this offer letter or any Company policy shall be construed to as a contract of employment or to modify the terms of your at-will employment relationship with Company.

We also ask that, if you have not already done so, you disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and you represent that such is the case. Moreover, you agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting, or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities, that conflict with your obligations to the Company. Similarly, you agree not to bring any third party confidential information to the Company, including that of your former employer, and that, in performing your duties for the Company, you will not in any way utilize any such information.

As a Company employee, you will be expected to abide by the Company's policies, rules and standards of conduct. As a condition of your employment, you are also required to sign and comply with an At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "Agreement"), a copy of which is being provided with this offer letter. Please note that we must receive your signed Agreement before your first day of employment.

 Faraday Future

To accept the Company's offer, please sign and date this letter in the space provided below. A duplicate original is enclosed for your records. If you accept our offer, your first day of employment will be at a mutually agreeable date, as confirmed below. This letter, along with the Company's policies, the Agreement and all other documents referenced herein, set forth the terms and conditions of your employment with the Company and supersede any prior representations or agreements including, but not limited to, any representations made during your recruitment, interviews, or pre-employment negotiations, whether written or oral. This letter, including, but not limited to, its at-will employment provision, may not be modified or amended except by a written agreement signed by either the CEO or CFO of the Company and you.

We look forward to your favorable reply and to working with you at Faraday&Future Inc. This offer letter will automatically be withdrawn if not accepted on or before DATE.

SINCERELY,

_____

[RECRUITER NAME]
RECRUITER

FARADAY&FUTURE INC.

_____

DATE

_____

AGREED TO AND ACCEPTED BY
(Print Name)

_____

Employee Signature

_____

DATE

FF.com                18455 S Figueroa St.
+1 424 276 7616       Gardena, CA 90248

HLIU001350

 Faraday Future

_____
CONFIRMED START DATE

HLIU001351

HLIU001388-HLIU001398

v. 6.6.17



# At-Will Employment Confidential Information Invention Assignment Arbitration Agreement

As a condition of my employment with Faraday&Future Inc. its subsidiaries, affiliates, successors or assigns (together, the "Company" or "Faraday"), and in consideration of my employment with the company and my receipt of the compensation now and hereafter paid to me by company, I agree to the following provisions of this At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "Agreement"):

## 1.  AT-WILL EMPLOYMENT

I UNDERSTAND, ACKNOWLEDGE AND AGREE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. THIS MEANS THAT COMPANY CANNOT GUARANTEE MY EMPLOYMENT FOR ANY SPECIFIED PERIOD OF TIME. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF FARADAY. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR  FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE  COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

## 2.  CONFIDENTIALITY

A. *Definition of Confidential Information*. I acknowledge and understand that company is engaged in a highly competitive industry. Company's involvement in this business has required and continues to require the expenditure of substantial amounts of money and the use of skills developed over a long period of time.  As a result of these investments of money, skill and time, company has developed and will continue to develop Company Confidential Information (defined below) that is particular to company's business and the disclosure of which would cause great and irreparable harm to company. During your employment, company may provide you with access to Company Confidential Information. I understand that "Company Confidential Information" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential

Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of  the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware    configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available  prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records. I understand that nothing in this Agreement is intended to limit my right to discuss the terms, wages, and working conditions of my employment, as protected by applicable  law.

B. *Nonuse and Nondisclosure*. I agree that during and after my employment with the Company, for any reason, whether voluntary or involuntary, I will hold in the  strictest confidence, and take all reasonable precautions to prevent any   unauthorized  use  or  disclosure  of    Company Confidential Information, and I will not (i) use  the  Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, nor (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of

1

HLIU001388

Faraday & Future, (as applicable). I agree that I obtain no right, title or other interest in or to any Company Confidential Information, and that as between Company and myself, Faraday, retains all Company Confidential Information as the sole property of Faraday. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this Section 2.B shall continue after termination of my employment.

C. *Former Employer Confidential Information*. I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto  the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third  party.

D. *Third Party Information*. I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, contractors, suppliers, licensors, licensees, partners, or collaborators ("Associated Third Parties"), their confidential or proprietary information ("Associated Third Party Confidential Information") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third  Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third  Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe  the Company and its Associated Third  Parties a duty to hold all  such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination of my employment and legal action by the Company.

3. **OWNERSHIP**

A. *Assignment of Inventions*. As between Company and myself, I agree that all right, title, and interest in and to any and all Company-business copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in Section  3.C below (collectively, "Inventions"), are the sole property of Faraday. I also agree to promptly make full written disclosure to Faraday, of any Inventions, and to deliver and assign and hereby irrevocably assign fully to Faraday, all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to Faraday, of ownership of Inventions that are not yet in existence. I further acknowledge and agree that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the   United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such  Inventions.

B. *Pre-Existing Materials*. I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, trade secrets and other proprietary information or  intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company and which are subject to California Labor Code Section 2870 (attached hereto as Exhibit B), and which relate to  the Company's proposed business, products, or research and development ("Prior Inventions"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement. I will promptly inform Faraday in writing before incorporating such Prior Inventions into any Invention or otherwise utilizing such Prior Invention in the course of my employment with  the Company, and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sub-licenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and

2

HLIU001389

to practice any method related thereto. I will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without Faraday's prior written permission.

C. *Moral Rights*. Any assignment to Faraday of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D. *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of Faraday at all times.

E. *Further Assurances*. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this Section 3.E shall continue after the termination of this Agreement.

F. *Attorney-in-Fact*. I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Faraday, in Section 3.A, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and

effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G. *Exception To Assignments*. I UNDERSTAND THAT THE PROVISIONS OF THIS AGREEMENT REQUIRING ASSIGNMENT OF INVENTIONS TO FARADAY, DO NOT APPLY TO ANY INVENTION THAT QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870 (ATTACHED HERETO AS EXHIBIT B). I WILL ADVISE FARADAY PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE CRITERIA IN CALIFORNIA LABOR CODE SECTION 2870 AND ARE NOT OTHERWISE DISCLOSED ON EXHIBIT A.

H. *Publicity Release*. I hereby grant Company and its affiliates the absolute right and unrestricted permission to use my name, likeness, image, voice and/or appearance as such may be embodied in any photos, video recordings, audiotapes, digital images, and the like, taken or made on behalf of Company in the course of performing my duties for Company (each, an "Image"). I understand and agree that Company has complete ownership of any Image and can use such Image in any lawful manner consistent with Company's mission, including, without limitation, in Company promotional materials, social media postings, press releases, internal presentations, videos, advertisements, Web sites or educational materials, in any medium. I further understand that any Image may be edited, copied, exhibited, published or distributed and I waive the right to inspect or approve any finished product reflecting my Image. I acknowledge that I will not receive any compensation for the use of any Image. I hereby release Company and its agents, affiliates, representatives and assignees from any and all claims and demands arising out of the Images, including, without limitation, any claims for invasion of privacy, right of publicity, misappropriation or misuse of image or defamation.

4. **CONFLICTING OBLIGATIONS**

A. *Current Obligations*. I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B. *Prior Relationships*. Without limiting Section 4.A, I represent and warrant that I have no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I

3

HLIU001390

represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). I agree to fully defend and indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns from and against any and all claims, lawsuits, verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

## 5.   RETURN OF COMPANY MATERIALS

Upon separation from employment with the Company, for any reason, or upon Company's earlier request during my employment, or at any time subsequent to my employment upon demand from the Company, I will immediately deliver to Faraday, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all devices and equipment belonging to the Company (including, without limitation, computers, handheld electronic devices, telephone equipment, and other electronic devices), all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to Section 3.D. I also consent to an exit interview to confirm my compliance with this Article 5.

## 6.   TERMINATION CERTIFICATION

Upon separation from employment with the Company, for any reason, I agree to immediately sign and deliver to the Company a "Termination Certification" in substantially in the form attached hereto as Exhibit C. I also agree to keep Faraday advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

## 7.   NOTIFICATION OF NEW EMPLOYER

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

## 8.   SOLICITATION OF EMPLOYEES

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly (i) solicit any of the Company's employees to leave their employment at the Company; nor (ii) solicit any of the Company's customers, vendors or distributors to breach any contractual agreement it may have in place with Company. I agree that nothing in this Article 8 shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under Article 2.

## 9.   CONFLICT OF INTEREST GUIDELINES

I agree to diligently adhere to all policies of the Company, including, without limitation, the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as Exhibit D hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

## 10.   REPRESENTATIONS

Without limiting my obligations under Section 3.E above, where required, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and that I will not enter into, any oral or written agreement in conflict herewith.

## 11.   AUDIT

I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, voice mail, or documents that are used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's Software licensing policies, to ensure compliance with the Company's policies, to ensure the safety of Company's employees, vendors and contractors, and for any other lawful business-related purposes, in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or noncompliant applications to the Company's

4

HLIU001391

technology systems, including, without limitation, open Source or free software not authorized by the Company, and that I shall refrain from copying unlicensed Software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I may be given access in connection with my employment. I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all network traffic to and from any computer I may use to conduct business on behalf of Company. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems, with or without notice to me, or in my absence. This includes, but is not limited to,   all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voice mail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

## 12.  ARBITRATION AND EQUITABLE  RELIEF

A. *Arbitration*. In consideration of my  employment with the Company, its promise to arbitrate all employment-related disputes, and my receipt of the compensation, pay raises, and other benefits paid to me by the Company, at present and in the future, I agree that any and all controversies, claims, or disputes with anyone (including the Company and any employee, officer, director, shareholder, or benefit plan of the company, in their capacity as such or otherwise), arising out of, relating to, or otherwise resulting from my employment with the Company or the termination of my employment with the Company, including any breach of this agreement, shall be subject to binding arbitration under the arbitration rules set forth in California Code of Civil Procedure section 1280 through 1294.2, including section 1281.8 (The "Act"), and pursuant to California law. The federal arbitration act shall continue to apply with full force and effect notwithstanding the application of procedural rules set forth in the Act. Disputes that I agree to arbitrate, and thereby agree to waive any right to a trial by jury, include, but are not limited to, the following: All common law claims and all statutory claims  under local, state, or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964,  the Americans with Disabilities Act of 1990, the Age Discrimination  in Employment Act of 1967, the Older Workers Benefit Protection Act, the Sarbanes-Oxley Act, the Worker Adjustment and  Retraining Notification Act,

the California Fair Employment and Housing Act, the Family and Medical Leave Act, the   California Family Rights Act, the California Labor Code, claims of harassment, discrimination, and wrongful termination, and any statutory or common law claims. I further understand that this agreement to arbitrate also applies to any disputes that the Company may have with me.

B. *Procedure*. I agree that any arbitration will be administered by a single, neutral arbitrator through the Judicial Arbitration & Mediation Services, Inc. ("JAMS"), pursuant to JAMS' employment arbitration rules & procedures, which are available at www.jamsadr.com and incorporated herein by reference (collectively, the "JAMS Rules"). I agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including, without limitation, motions for summary judgment or adjudication, motions to dismiss and demurrers, prior to any arbitration hearing. I agree that the arbitrator shall issue a written decision on the merits. I also agree that the arbitrator shall have the power to award any remedies available under applicable law, and that the arbitrator shall award attorneys' fees and costs to the prevailing party, except as prohibited by law. I agree that the decree or award rendered by the arbitrator may be entered as a final and binding judgment in any court having jurisdiction thereof. I understand that the Company will pay for any administrative or hearing fees charged by the arbitrator or JAMS except that I shale, pay any filing fees associated with any arbitration that I initiate, but only so much of the filing fees as I would have instead paid had I filed a complaint in a court of law. I agree that the arbitrator shall administer and conduct any arbitration in accordance with California law, including, without limitation, the California Code of Civil Procedure, and that the arbitrator shall apply substantive and procedural California law to any dispute or claim, without reference to rules of conflict of law. To the extent that the JAMS Rules conflict with California law, California law shall take precedence. I agree that any arbitration shall be conducted in Los Angeles County, California.

C. *Remedy*. Except as provided by the act and this agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between me and the company. Accordingly, except as provided for by the act and this agreement, neither I nor the Company will be permitted to pursue court action regarding claims that are subject to arbitration.

D. *Administrative Relief*. I understand that this Agreement does not prohibit me from pursuing an administrative claim with a local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, including, but not limited to, the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission, the National Labor Relations Board, or the Workers' Compensation Appeals Board. This Agreement does, however, preclude me from pursuing court action regarding any such

HLIU001392

claim, except as permitted by law,

**E.** *CLASS ACTION WAIVER:* **ANY DISPUTES ARE TO BE HEARD BY A SINGLE ARBITRATOR ON AN INDIVIDUAL BASIS AND NOT AS A CLASS ACTION. NEITHER EMPLOYEE NOR COMPANY MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS OR ENTITIES, OR ARBITRATE ANY CLAIM AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.**

F. *Voluntary Nature of Agreement.* I acknowledge and agree that I am executing this Agreement voluntarily and without any duress or undue influence by the Company or anyone else. I acknowledge and agree that I have received a  copy of the text of California Labor Code section 2870 at Exhibit B, I further acknowledge and agree that I have  carefully read this Agreement and that I have asked any questions needed for me to understand the terms, consequences, and binding effect of this Agreement and fully understand it, including that **I am waiving my right to a jury trial**. Finally, I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement.

13. **MISCELLANEOUS**

A. *Governing Law.* I agree to comply with all applicable law in the course of performing my duties to the Company and, in all situations where the Company could be liable for, or implicated as a result of, my actions or inactions.. This Agreement will be governed by the laws of the State of California without regard to California's conflicts of law rules that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in California for any lawsuit filed against me by the Company.

B. *Assignability.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, Faraday may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Faraday's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C. *Entire Agreement.* This Agreement, together with the Exhibits herein any executed written offer letter or any other agreements signed between me and the Company, to the extent such materials are not in conflict with this Agreement, set forth the  entire agreement and understanding between the Company and me with respect to the subject matter herein and supersede all prior written and oral agreements, discussions, or representations between us, including, but not limited to,  any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

D. *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E. *Severability.* If a court or other body of competent jurisdiction finds, or the parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement will continue in full force and effect.

F. *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of Faraday and me. Waiver by Faraday of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G. *Survivorship.* The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

H. *Execution.* This Agreement may be executed in one of more counterparts and by facsimile or other electronic means, each of which shall be deemed an original and the counterparts together shall be deemed a complete original.

**BY SIGNING BELOW, I FULLY UNDERSTAND AND AGREE TO THE TERMS OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ITS PROVISIONS FOR "AT-WILL" EMPLOYMENT AND MANDATORY ARBITRATION OF DISPUTES BETWEEN ME AND THE COMPANY.**

Employee:

Name (printed) _____

Signature _____

Date _____

HLIU001393

v. 6.6.17

Accepted by:

Signature _____

Name (printed)

_____

_

HLIU001394

**Exhibit A**

# List of Prior Inventions
# and Original Works of Authorship

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

☐ No inventions or improvements

☐ Additional sheets attached

Name of Employee (printed) _____   Date _____

Signature _____

8

HLIU001395

**Exhibit B**          California Labor Code Section 2870 Invention on Own Time-Exemption From Agreement

(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)          Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)          Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

HLIU001396

**Exhibit C**

# Faraday&Future Inc.
# Termination Certification

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, models, prototypes, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Faraday & Future Inc., or its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement ("Agreement") signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that Agreement.

I further agree that, in compliance with the Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, as those terms are defined in the Agreement, including, without limitation, trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the Agreement during and after this twelve (12) month period, including, without limitation, my obligations under Article 2 (Confidentiality) thereof.

After leaving the Company's employment, I will be employed by: _____, in the position of_____.

Name of Employee (printed)     _____     Date   _____

Signature     _____

Address for Notification     _____

10

**Exhibit D**

# Faraday & Future
# Conflict of Interest Guidelines

It is the policy of Faraday&Future Inc. ("Company" or "Faraday") to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics.  Accordingly, all officers, employees, and contractors of Faraday must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company.  The following are potentially compromising situations that must be avoided:

1.      Revealing confidential information to outsiders or misusing Company Confidential Information.  Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended.  (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.      Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.      Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.      Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.      Initiating or approving any form of personal or social harassment of employees.

6.      Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.      Borrowing from or lending to employees, customers, or suppliers.

8.      Acquiring real estate of interest to the Company.

9.      Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.     Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11.     Making any unlawful agreement with distributors with respect to prices.

12.     Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13.     Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and contractor of Faraday must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review.  Violations of this conflict of interest policy may result in disciplinary action, up to and including termination of employment without warning.

HLIU001398

HLIU001386-HLIU001387

**FIRST AMENDMENT TO**
**FF GLOBAL HOLDINGS LTD.**
**EQUITY INCENTIVE PLAN**

The purpose of this First Amendment (this "Amendment") to the FF Global Holdings Ltd. Equity Incentive Plan (the "Plan") is to permit employees, directors and consultants of Related Entities (as defined herein) of FF Global Holdings Ltd., an exempted company incorporated with limited liability under the Laws of the Cayman Islands (the "Company") participate in the Plan.

1.      **DEFINITIONS.**   As used herein, the following definitions shall be revised to read as follows:

1.1      Consultant means any natural person, including an advisor, engaged by the Company or by a Related Entity to render bona fide services to such entity, provided the services (i) are not in connection with the offer or sale of securities in a capital-raising transaction, and (ii) do not directly promote or maintain a market for the Company's securities, in each case, within the meaning of Form S-8 promulgated under the Securities Act, and provided further, that a Consultant will include only those persons to whom the issuance of Shares may be registered under Form S-8 promulgated under the Securities Act.

1.2      Director means a member of the Board or a member of the Board of Directors of a Related Entity.

1.3      Employee means any person, including an Officer or Director, who is an employee (as defined in accordance with Code Section 3401(c)) of the Company or a Related Entity.  An Employee shall not cease to be an Employee in the case of (i) any leave of absence approved by the Company, or (ii) transfers between locations of the Company or between the Company, its Related Entities, or any successor.  Neither service as a Director nor payment of a director's fee by the Company shall be sufficient, by itself, to constitute "employment" by the Company.

1.4      Service Provider means an Employee, Director or Consultant of the Company or of a Related Entity.

2.      **NEW DEFINITION.**   The Plan shall contain a new definition of "Related Entity" which shall read as follows:

2.1      Related Entity means the Company, any "parent" (as defined in Rule 405 of the Securities Act) of the Company, or any Majority-Owned Subsidiary (as defined in Rule 405 of the Securities Act) of the Company or of such a "parent".

HLIU001386

*First Amendment to FF Global Holdings Ltd. Equity Incentive Plan*

3.    **LEAVES OF ABSENCE/TRANSFER BETWEEN LOCATIONS.**

Section 18 of the Plan shall be revised to read as follows:

"Unless the Administrator provides otherwise, vesting of Awards granted hereunder will be suspended during any unpaid leave of absence.  A Holder will not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company and a Related Entity.  For purposes of Incentive Share Options, no such leave may exceed three (3) months, unless reemployment upon expiration of such leave is guaranteed by statute or contract.  If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then six (6) months following the first (1st) day of such leave, any Incentive Share Option held by the Holder will cease to be treated as an Incentive Share Option and will be treated for tax purposes as a Non-qualified Share Option."

HLIU001387

HLIU001352-HLIU001371

# FF GLOBAL HOLDINGS LTD.

# EQUITY INCENTIVE PLAN

**HLIU001352**

*FF Global Holdings Ltd. Equity Incentive Plan*

# FF GLOBAL HOLDINGS LTD.
# EQUITY INCENTIVE PLAN

1.    **PURPOSES OF THE PLAN.**  The purpose of this FF Global Holdings Ltd. Equity Incentive Plan is to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees, Directors and Consultants of FF Global Holdings Ltd., an exempted company incorporated with limited liability under the Laws of the Cayman Islands (the "Company") and to promote the success of the business of the Company and its Subsidiaries.  The Plan provides for the grant of Restricted Shares, Unrestricted Shares, Restricted Shares Units, and Non-qualified Share Options.

2.    **DEFINITIONS.**  As used herein, the following definitions shall apply:

2.1    <u>Acquisition</u> means the occurrence of any of the following events:

(a)    <u>Change in Ownership of the Company</u>.  A change in the ownership of the Company which occurs on the date that any one person, or more than one person acting as a group ("Person"), acquires ownership of the shares of the Company that, together with the shares held by such Person, constitutes more than fifty percent (50%) of the total voting power of the shares of the Company; provided, however, that for purposes of this subsection, the acquisition of additional shares by any one Person, who is considered to own more than fifty percent (50%) of the total voting power of the shares of the Company will not be considered an Acquisition; provided, further, that any change in the ownership of the shares of the Company as a result of a private financing of the Company that is approved by the Board also will not be considered an Acquisition.  Further, if the members of the Company immediately before such change in ownership continue to retain immediately after the change in ownership, in substantially the same proportions as their ownership of shares of the Company's voting shares immediately prior to the change in ownership, direct or indirect beneficial ownership of fifty percent (50%) or more of the total voting power of the shares of the Company or of the ultimate parent entity of the Company, such event shall not be considered an Acquisition under this subsection (a).  For this purpose, indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting securities of one or more corporations or other business entities which own the Company, as the case may be, either directly or through one or more subsidiary corporations or other business entities; or

(b)    <u>Change in Effective Control of the Company</u>.  If the Company has a class of securities registered pursuant to Section 12 of the Exchange Act, a change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any twelve (12) month period by Directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the

2

HLIU001353

*FF Global Holdings Ltd. Equity Incentive Plan*

appointment or election.  For purposes of this subsection (b), if any Person is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered an Acquisition; or

        (c)     <u>Change in Ownership of a Substantial Portion of the Company's Assets</u>.  A change in the ownership of a substantial portion of the Company's assets which occurs on the date that any Person acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than fifty percent (50%) of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions; provided, however, that for purposes of this subsection (c), the following will not constitute a change in the ownership of a substantial portion of the Company's assets: (A) a transfer to an entity that is controlled by the Company's members immediately after the transfer, or (B) a transfer of assets by the Company to: (1) a member of the Company (immediately before the asset transfer) in exchange for or with respect to the Company's shares, (2) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the Company, (3) a Person, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all the outstanding shares of the Company, or (4) an entity, at least fifty percent (50%) of the total value or voting power of which is owned, directly or indirectly, by a Person described in this subsection (c)(B)(3).  For purposes of this subsection (c), gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.

        For purposes of this Section 2.1, persons will be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of shares, or similar business transaction with the Company.

        Notwithstanding the foregoing, a transaction will not be deemed an Acquisition unless the transaction qualifies as a change in control event within the meaning of Code Section 409A, as it has been and may be amended from time to time, and any proposed or final Treasury Regulations and Internal Revenue Service guidance that has been promulgated or may be promulgated thereunder from time to time.

        Further and for the avoidance of doubt, a transaction will not constitute an Acquisition if: (i) its sole purpose is to change the jurisdiction of the Company's incorporation, or (ii) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.

        2.2     <u>Administrator</u> means the Board or the Committee responsible for conducting the general administration of the Plan, as applicable, in accordance with Section 4.

        2.3     <u>Applicable Law</u> means the legal and regulatory requirements relating to the issuance and administration of equity and share option plans, including, but not limited to, under the Cayman Islands laws, the states' corporate laws and federal and state securities laws of the United States of America, the Code, any stock exchange or quotation system on which the

HLIU001354

*FF Global Holdings Ltd. Equity Incentive Plan*

Class A Ordinary Shares are listed or quoted and the applicable laws of any foreign country or jurisdiction where Awards are granted under the Plan.

2.4    Award means an award of, Restricted Shares, Unrestricted Shares, Restricted Share Units, or Options granted to a Service Provider under this Plan.

2.5    Award Agreement means the Option Agreement or other written agreement between the Company or Subsidiary employer and a Service Provider evidencing the terms and conditions of an individual Award.  The Award Agreement shall be subject to the terms and conditions of the Plan.

2.6    Board means the Board of Directors of the Company.

2.7    Cause shall have the meaning ascribed to it in any written employment or service agreement between the Company (or Subsidiary employer) and the Service Provider.  If not otherwise defined, "Cause" shall mean (a) a failure by the Service Provider to perform his or her duties or to comply with any material provision of his or her employment or service agreement with the Company (or Subsidiary), where such failure is not cured by the Service Provider within thirty (30) days after receiving written notice from the Company (or Subsidiary) specifying in reasonable detail the nature of the failure, (b) a breach of the Service Provider's fiduciary duty to the Company (or Subsidiary) by reason of receipt of personal profits, (c) conviction of a felony or any act of moral turpitude, (d) any material violation of a policy of the Company (or Subsidiary), including any sexual harassment of another employee of the Company (or Subsidiary), or (e) any other willful and gross misconduct committed by the Service Provider affecting the Company (or Subsidiary).

2.8    Class A Ordinary Share(s) or Share(s), means the Class A ordinary common shares of the Company, par value $0.00001 per share.

2.9    Code means the Internal Revenue Code of 1986, as amended, or any successor statute or statutes thereto.  Reference to any particular Code section shall include any successor section and any regulations or authorities promulgated thereunder.

2.10    Committee means a committee appointed by the Board in accordance with Section 4.

2.11    Company means FF Global Holdings Ltd., an exempted company incorporated with limited liability under the Laws of the Cayman Islands.

2.12    Consultant means any natural person, including an advisor, engaged by the Company or a Parent or Subsidiary to render bona fide services to such entity, provided the services (i) are not in connection with the offer or sale of securities in a capital-raising transaction, and (ii) do not directly promote or maintain a market for the Company's securities, in each case, within the meaning of Form S-8 promulgated under the Securities Act, and provided further, that a Consultant will include only those persons to whom the issuance of Shares may be registered under Form S-8 promulgated under the Securities Act.

HLIU001355

*FF Global Holdings Ltd. Equity Incentive Plan*

2.13    Director means a member of the Board or a member of the Board of Directors of a Subsidiary.

2.14    Employee means any person, including an Officer or Director, who is an employee (as defined in accordance with Code Section 3401(c)) of the Company or a Parent or a Subsidiary.  An Employee shall not cease to be an Employee in the case of (i) any leave of absence approved by the Company, or (ii) transfers between locations of the Company or between the Company, its Subsidiaries, or any successor.  Neither service as a Director nor payment of a director's fee by the Company shall be sufficient, by itself, to constitute "employment" by the Company.

2.15    Exchange Act means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.  Reference to any particular Exchange Act section shall include any successor section and any regulations or authorities promulgated thereunder.

2.16    Fair Market Value of a Share means, as of any date, the fair market value determined consistent with the requirements of Code Sections 422 and 409A, as follows:

(a)    If the Class A Ordinary Shares are listed on any established stock exchange or a national market system, its Fair Market Value shall be the closing price as quoted on such exchange or system on the date of determination, as reported in The Wall Street Journal or such other source as the Administrator deems reliable;

(b)    If the Class A Ordinary Shares are regularly quoted by a recognized securities dealer but selling prices are not reported, its Fair Market Value shall be the closing price for a Class A Ordinary Share on the date of determination; or

(c)    In the absence of an established market for the Class A Ordinary Shares, the Fair Market Value thereof shall be determined in good faith by the Administrator in accordance with Applicable Law, except as provided in Section 11.

2.17    Holder means a person who has been granted an Award or who becomes the holder of an Award or who holds Shares acquired pursuant to the exercise of an Award.

2.18    Incentive Share Option means an Option that by its terms qualifies and is otherwise intended to qualify as an incentive stock option within the meaning of Code Section 422 and the regulations promulgated thereunder.

2.19    Independent Director means a Director who is not an Employee of the Company.

2.20    Non-qualified Share Option means an Option that by its terms does not qualify or is not intended to qualify as an Incentive Share Option.

2.21    Officer means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act.

HLIU001356

*FF Global Holdings Ltd. Equity Incentive Plan*

2.22    Option, or Share Option means a share option granted pursuant to Section 6 of the Plan.

2.23    Option Agreement means the written agreement between the Company or a Subsidiary employer and a Service Provider evidencing the terms and conditions of an individual Option.  The Option Agreement shall be subject to the terms and conditions of the Plan.

2.24    Parent means a "parent corporation," whether now or hereafter existing, as defined in Code Section 424(e).

2.25    Plan means this FF Global Holdings Ltd. Equity Incentive Plan.

2.26    Public Offering means consummation of an underwritten public offering of the Company's Shares registered under the Securities Act or registered under the securities laws of another jurisdiction under which the Shares are publicly traded.

2.27    Restricted Shares means Shares acquired pursuant to a grant of Restricted Shares under Section 8 or pursuant to the exercise of an unvested Option in accordance with Section 7.5.

2.28    Restricted Share Unit ("RSU") means a right to receive Shares in the future upon completion of a specified vesting period in accordance with Section 8.

2.29    Rule 16b-3 means that certain Rule 16b-3 under the Exchange Act, as such Rule may be amended from time to time.

2.30    Securities Act means the Securities Act of 1933, as amended, or any successor statute or statutes thereto.  Reference to any particular Securities Act section shall include any successor section.

2.31    Service Provider means an Employee, Director or Consultant of the Company or a Subsidiary.

2.32    Subsidiary means any corporation, whether now or hereafter existing (other than the Company), in an unbroken chain of corporations beginning with the Company if each of the entities other than the last corporation in the unbroken chain owns equity possessing more than fifty percent (50%) of the total combined voting power of all classes of equity in one of the other entities in such chain or any other entity of which a majority of the outstanding voting shares or voting power is beneficially owned directly or indirectly by the Company.

2.33    Unrestricted Shares shall mean an Award granted under Section 8 of the Plan of fully vested Shares.

3.    **SHARES SUBJECT TO THE PLAN.**  The Shares subject to Award grants shall be Class A Ordinary Shares.  Subject to the adjustment provisions of Section 10, the maximum aggregate number of Shares which may be issued pursuant to Awards under the Plan shall be Three Hundred Million (300,000,000) Class A Ordinary Shares.  If an Award expires, is

HLIU001357

*FF Global Holdings Ltd. Equity Incentive Plan*

canceled, becomes unexercisable or is forfeited, without having been exercised or vested in full, the unpurchased or unvested Shares which were subject thereto shall become available for future Awards under the Plan (unless the Plan has terminated).  Shares which are delivered by the Holder or withheld by Company upon the exercise of an Option or receipt of an Award, in payment of the exercise price thereof or tax withholding thereon, may again be awarded hereunder.  If Shares issued pursuant to Awards are repurchased by, or are forfeited to, the Company due to failure to vest, such Shares shall become available for future Awards under the Plan.  To the extent an Award under the Plan is paid out in cash rather than Shares, such cash payment will not result in reducing the number of Shares available for issuance under the Plan.  Notwithstanding the foregoing and, subject to adjustment as provided in Section 10, the maximum number of Class A Ordinary Shares that may be issued upon the exercise of Incentive Share Options is Two Billion (2,000,000,000) Shares.

4.   **ADMINISTRATION OF THE PLAN.**

4.1   <u>Administrator</u>.  The Plan shall be administered by the Board or by a Committee to which administration of the Plan, or of part of the Plan, is delegated by the Board.  The Board shall appoint and remove members of the Committee in its discretion in accordance with Applicable Laws.  If necessary, in the Board's discretion, to comply with Rule 16b-3 under the Exchange Act and Code Section 162(m), the Committee shall be comprised solely of "non-employee directors" within the meaning of said Rule 16b-3 and "outside directors" within the meaning of Code Section 162(m).  The foregoing notwithstanding, the Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper and the Board, in its absolute discretion, may at any time and from time to time exercise any and all rights and duties of the Administrator under the Plan.

4.2   <u>Powers of the Administrator</u>.  Subject to the express provisions of the Plan and the specific duties delegated by the Board to such Committee, and subject to the approval of any relevant authorities, the Administrator shall have plenary authority to the maximum extent permissible by Applicable Law, in its sole discretion:

(a)   to determine the Fair Market Value of a Share;

(b)   to select the Service Providers to whom Awards may from time to time be granted hereunder and the time of such Awards;

(c)   to determine the number of Shares to be covered by each such Award granted hereunder;

(d)   to approve forms of Award Agreements for use under the Plan;

(e)   to determine the terms and conditions of any Awards granted hereunder (such terms and conditions include the exercise price, the time or times when Awards may vest or be exercised (which may be based on, among other things, the passage of time, specific events or performance criteria), any acceleration (as permissible under Code Section 409A) of such vesting or exercise date or imposition or waiver of forfeiture restrictions, and any restriction or limitation regarding any Shares received upon grant or exercise of an Award, based in each case on such factors as the Administrator, in its sole discretion, shall determine);

HLIU001358

*FF Global Holdings Ltd. Equity Incentive Plan*

(f)     to determine whether to offer to repurchase, replace or reprice a previously granted Award and to determine the terms and conditions of such offer (including whether any purchase price is to be paid in cash or Shares);

(g)     to determine whether and under what conditions options granted under another option plan of the Company, a Subsidiary or an entity which is acquired by or merged into the Company or a Subsidiary may be converted into Options on Company Shares granted under and subject to the terms of this Plan;

(h)     to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of qualifying for preferred tax treatment under foreign tax laws;

(i)     to determine the amount and timing of withholding tax obligations and to allow or require Holders to satisfy withholding tax obligations by electing, if applicable, to have the Company withhold from the Shares to be issued pursuant to any Award the number of Shares having a Fair Market Value equal to the minimum amount, determined by the Administrator in its sole discretion, required to be withheld based on the statutory withholding rates for federal, state and local tax purposes that apply to supplemental taxable income.  The Fair Market Value of the Shares to be withheld shall be determined on the date that the amount of tax is required to be withheld.  All elections by Holders to have Shares withheld for this purpose shall be made in such form and under such conditions as the Administrator may deem necessary or advisable;

(j)     to exercise its sole discretion in a manner such that Awards which are granted to individuals who are foreign nationals or are employed outside the United States may contain terms and conditions which are different from the provisions otherwise specified in the Plan but which are consistent with the tax and other laws of foreign jurisdictions applicable to the Service Providers and which are designed to provide the Service Providers with benefits which are consistent with the Company's objectives in establishing the Plan;

(k)     to (a) determine which Subsidiaries shall be covered by the Plan; (b) determine which Service Providers are eligible to participate in the Plan; (c) modify the terms and conditions of any Award granted to Service Providers to comply with applicable foreign laws or listing requirements of any such non-U.S. securities exchange or for purposes of qualifying for favorable tax treatment under non-U.S. laws; (d) establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable (and any such subplans and/or modifications shall be attached to the Plan as appendices); provided, however, that no such subplans and/or modifications shall increase the share limit or individual award limits contained in Sections 3 hereof, respectively; and (e) take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local governmental regulatory exemptions or approvals or listing requirements of any such foreign securities exchange;

(l)     to amend the Plan or any Award granted under the Plan as provided in Section 17; and

HLIU001359

*FF Global Holdings Ltd. Equity Incentive Plan*

(m)      to construe and interpret the terms of the Plan and Awards granted pursuant to the Plan and to exercise such powers and perform such acts as the Administrator deems necessary or desirable to promote the best interests of the Company which are not in conflict with the provisions of the Plan.

4.3      <u>Compliance with Code Section 409A</u>.  To the extent Holder is or becomes subject to U.S. Federal income taxation, this Section 4.3 shall apply.  Notwithstanding any other provision of the Plan, the Administrator shall have no authority to issue an Award under the Plan under terms and conditions which would cause such Award to violate the provisions of Code Section 409A to the extent that a Holder of such an Award is subject to U.S. Federal income taxation.  It is the intent that the Plan and all Award Agreements be interpreted to be exempt from or comply in all respects with Code Section 409A and to be exempt from Code Section 457A, however, the Company shall have no liability to Service Providers or Holders in the event taxes or excise taxes may ultimately be determined to be applicable to any Award under the Plan.

4.4      <u>Effect of Administrator's Decision</u>.  All decisions, determinations and interpretations of the Administrator shall be final and binding on all Holders.

4.5      <u>Liability of Administrator</u>.  No member of the Board, Committee or acting Administrator shall be liable for anything whatsoever in connection with the administration of the Plan, except such member's own willful misconduct.  Under no circumstances shall any member of the Board or Committee be liable for any act or omission of any other member of the Board or Committee.  In the performance of its functions with respect to the Plan, the Board and Committee shall be entitled to rely upon information and advice furnished by the Company's officers, accountants, legal counsel and any other qualified consultant the Administrator determines is necessary to consult for proper administration of the Plan, and no member of the Board or Committee shall be liable for any action taken or not taken in reliance upon any such advice.

5.      **ELIGIBILITY.**

5.1      <u>Eligible Persons</u>. Awards (other than Incentive Share Options) may be granted to all Service Providers.  Incentive Share Options may be granted only to Employees.

5.2      <u>Administrative Discretion</u>. If otherwise eligible, a Service Provider who has been granted an Award may be granted additional Awards.  In exercising its authority to set the terms and conditions of Awards, and subject only to the limits of Applicable Law, the Administrator shall be under no obligation or duty to treat similarly situated Service Providers or Holders in the same manner, and any action taken by the Administrator with respect to one Service Provider or Holder shall in no way obligate the Administrator to take the same or similar action with respect to any other Service Provider or Holder.

6.      **GRANT OF OPTIONS.**

6.1      <u>Grant of Options</u>.  The Committee may grant Options to Service Providers, for such number of Shares, and subject to such terms and conditions as the Administrator may determine in its sole discretion.  Incentive Share Options may be granted only to Employees.

HLIU001360

*FF Global Holdings Ltd. Equity Incentive Plan*

6.2 <u>Term of Option</u>. The term of each Option shall be stated in the Option Agreement; <u>provided</u>, <u>however</u>, that the term shall be no more than ten (10) years from the date of grant thereof. In the case of an Incentive Share Option granted to a Holder who, at the time the Incentive Share Option is granted, owns shares representing more than ten percent (10%) of the total combined voting power of all classes of shares of the Company or any Parent or Subsidiary, the term of the Incentive Share Option will be five (5) years from the date of grant or such shorter term as may be provided in the Award Agreement.

6.3 <u>Limitations</u>. Each Option will be designated in the Award Agreement as either an Incentive Share Option or a Non-qualified Share Option. Notwithstanding such designation, however, to the extent that the aggregate Fair Market Value of the Shares with respect to which Incentive Share Options are exercisable for the first time by the Service Provider during any calendar year (under all plans of the Company and any Parent or Subsidiary) exceeds one hundred thousand dollars ($100,000), such Options will be treated as Non-qualified Share Options. For purposes of this Section 6.3, Incentive Share Options will be taken into account in the order in which they were granted, the Fair Market Value of the Shares will be determined as of the time the Option with respect to such Shares is granted, and calculation will be performed in accordance with Code Section 422 and Treasury Regulations promulgated thereunder.

6.4 <u>No Member Rights</u>. The Holder of an Option shall have no rights of a member with respect to Shares covered by such Option until the Holder exercises the Option and the Shares are issued to the Holder. If the Holder uses Shares to exercise an Option, the Holder will continue to be treated as owning such Shares until new Shares are issued under the exercised Option.

7.    **OPTION EXERCISE.**

7.1 <u>Vesting; Fractional Exercises</u>. Except as provided in Section 9, Options granted hereunder shall be vested and exercisable according to the terms hereof at such times and under such conditions as determined by the Administrator and set forth in the Option Agreement. No Option may be exercised for a fraction of a Share.

7.2 <u>Exercise Price</u>. Except as provided in Section 9, the per Share exercise price for any Option granted under that Plan shall be no less (and shall not have the potential to become less at any time) than one hundred percent (100%) of the Fair Market Value per Share on the date of grant. In addition, in the case of an Incentive Share Option granted to an Employee who owns shares representing more than ten percent (10%) of the voting power of all classes of shares of the Company or any Parent or Subsidiary, the per Share exercise price will be no less than one hundred ten percent (110%) of the Fair Market Value per Share on the date of grant. Notwithstanding the foregoing, Options may be granted with, or converted at, a per Share exercise price other than as required above: (i) pursuant to a merger, acquisition or other corporate transaction if consistent with the requirements of Applicable Law; or (ii) to a person that the Administrator determines is not subject to U.S. Federal income taxation, provided the grant is not expected to result in any adverse tax consequences, as the Administrator determines in its sole discretion.

HLIU001361

*FF Global Holdings Ltd. Equity Incentive Plan*

7.3     Consideration. The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall be determined by the Administrator.  Such consideration may consist of (1) cash, (2) check, (3) other Shares which (x) in the case of Shares acquired from Company, have been owned by the Holder for more than six (6) months on the date of surrender, and (y) have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which such Option shall be exercised, (4) surrendered Shares then issuable upon exercise of the Option having a Fair Market Value on the date of exercise equal to the aggregate exercise price of the Option or exercised portion thereof, (5) property of any kind which constitutes good and valuable consideration, (6) to the extent consistent with Applicable Law, delivery of a notice that the Holder has placed a market sell order with a broker with respect to Shares then issuable upon exercise of the Options and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to Company in satisfaction of the Option exercise price provided, that payment of such proceeds is then made to Company upon settlement of such sale, or (7) any combination of the foregoing methods of payment.

7.4     Deliveries upon Exercise.  All or a portion of an exercisable Option shall be deemed exercised upon delivery of all of the following to the Secretary of the Company or his or her office:

(a)     A written or electronic notice complying with the applicable rules established by the Administrator stating that such Option, or a portion thereof, is exercised.  The notice shall be signed by the Holder or other person then entitled to exercise the Option or such portion of the Option;

(b)     Such representations and documents as the Administrator deems necessary or advisable to effect compliance with Applicable Law.  The Administrator may also take whatever additional actions it deems appropriate to effect such compliance, including placing legends on Share certificates and issuing stop transfer notices to agents and registrars; and

(c)     In the event that the Option shall be exercised by any person or persons other than the Holder, appropriate proof of the right of such person or persons to exercise the Option.

7.5     Early Exercisability.  The Administrator may provide in the terms of a Holder's Option Agreement that the Holder may, at any time before the Holder's status as a Service Provider terminates, exercise the Option in whole or in part in exchange for Restricted Shares prior to the full vesting of the Option; provided however, that Shares acquired upon exercise of an Option which has not fully vested shall be subject to the same forfeiture, transfer or other restrictions as determined by the Administrator and set forth in the Option Agreement.

7.6     Buyout Provisions.  The Administrator may at any time offer to repurchase for a payment in cash or Shares, an Option previously granted, based on such terms and conditions as the Administrator shall establish and communicate to the Holder at the time that such offer is made.

HLIU001362

*FF Global Holdings Ltd. Equity Incentive Plan*

7.7     Termination of Relationship as a Service Provider.  If a Holder ceases to be a Service Provider other than by reason of the Service Provider's disability or death or termination for Cause, the Option shall remain exercisable for a period of time as determined by the Administrator and set forth in the Option Agreement.  If, on the date of termination, the Holder is not vested as to the entire Option, unless otherwise provided by the Administrator, the Shares covered by the unvested portion of the Option immediately cease to be issuable under the Option.  If, after termination, the Holder does not exercise the Option within the applicable time period, the Option shall terminate. If the Holder is terminated for Cause and to the extent permissible under Applicable Laws, the Option shall terminate upon such termination for Cause.

7.8     Disability of Holder.  If a Holder ceases to be a Service Provider as a result of the Service Provider's disability, unless otherwise specified in the Option Agreement, the Option shall remain exercisable for a period of time as determined by the Administrator and set forth in the Option Agreement.  If, on the date of termination, the Holder is not vested as to the entire Option, unless otherwise provided by the Administrator, the Shares covered by the unvested portion of the Option shall immediately cease to be issuable under the Option.  If, after termination, the Holder does not exercise the Option within the time specified herein, the Option shall terminate.

7.9     Death of Holder.  If a Service Provider dies while a Service Provider, unless otherwise specified in the Option Agreement, the Option shall remain exercisable for a period of time as determined by the Administrator and set forth in the Option Agreement.  If, at the time of death, the Holder is not vested as to the entire Option, unless otherwise provided by the Administrator, the Shares covered by the unvested portion of the Option shall immediately cease to be issuable under the Option.  The Option may be exercised by the executor or administrator of the Holder's estate or, if none, by the person(s) entitled to exercise the Option under the Holder's will or the laws of descent or distribution.  If the Option is not so exercised within the time specified herein, the Option shall terminate.

7.10     Regulatory Extension.  Unless otherwise provided by a Holder's Option Agreement, if the exercise of the Option following the termination of the Holder's status as a Service Provider (other than upon the Holder's death or disability) would be prohibited at any time solely because the issuance of Shares would violate the registration requirements under the Securities Act, then the Option shall terminate on the earlier of (i) the expiration of the term of the Option set forth in Section 6.2 or (ii) the expiration of the period of three (3) months (after the termination of the Holder's status as a Service Provider) during which the exercise of the Option would no longer be in violation of such registration requirements.

8.     **EQUITY BASED AWARDS OTHER THAN OPTIONS**

8.1     Unrestricted Share Awards.  The Administrator may grant Unrestricted Share Awards to Service Providers under the terms of the Plan, in such amounts, and subject to such terms and conditions as the Administrator may determine, in its sole discretion. The Administrator may require a Service Provider to pay a purchase price to receive Unrestricted Shares at the time the Award is granted, in which case the purchase price shall be paid by the Service Provider prior to the issuance of the Shares.

HLIU001363

*FF Global Holdings Ltd. Equity Incentive Plan*

        8.2    <u>Restricted Share Awards</u>.

        8.2.1    <u>Restricted Share Grant</u>.  The Administrator may grant Restricted Shares to Service Providers, in such amounts, and subject to such terms and conditions as the Administrator may determine, in its sole discretion, including restrictions on transferability, which restrictions may lapse separately or in combination at such times, under such circumstances, in such installments, or otherwise.

        8.2.2    <u>Award Agreement</u>.  Restricted Shares shall be granted under an Award Agreement and shall be evidenced by certificates registered in the name of the Holder and bearing an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Shares.  Company may retain physical possession of any such certificates, and Company may require a Service Provider awarded Restricted Shares to deliver a share power to Company, endorsed in blank, relating to the Restricted Shares for so long as the Restricted Shares are subject to a risk of forfeiture or repurchase by Company at Fair Market Value.

        8.2.3    <u>Restricted Share Purchase</u>.  The Administrator may require a Service Provider to pay a purchase price to receive Restricted Shares at the time the Award is granted, in which case the purchase price and the form and timing of payment shall be specified in the Award Agreement in addition to the vesting provisions and other applicable terms.

        8.2.4    <u>Withholding</u>.  The Administrator may require a Service Provider to pay or otherwise provide for any applicable withholding tax determined by the Administrator to be due at the time restrictions lapse or, in the event of an election under Code Section 83(b), at the time of the Award.

        8.2.5    <u>No Deferral Provisions</u>.  Notwithstanding any other provision of the Plan, a Restricted Stock Award shall not provide for any deferral of compensation recognition after vesting with respect to Restricted Stock which would cause the Award to constitute a deferral of compensation subject to Code Section 409A, unless the Award Agreement shall specifically comply with all requirements for a timely deferral under Code Section 409A.

        8.2.6    <u>Rights as a Member</u>.  The Holder of Restricted Shares shall have rights equivalent to those of a member and shall be a Member when the Restricted Shares grant is entered upon the records of the duly authorized transfer agent of the Company.

HLIU001364

*FF Global Holdings Ltd. Equity Incentive Plan*

  8.3  <u>Restricted Share Units</u>.

    8.3.1 <u>Awards</u>. The Administrator may award Restricted Share Units ("RSUs") entitling recipients to receive Shares upon completion of a specified vesting period entitling recipients to receive Shares upon the attainment of specified performance goals. The Administrator may make RSU Awards independent of, or in connection with, the granting of any other Award under the Plan. The Administrator, in its sole discretion, shall determine the performance goals applicable under each such Award, the periods during which performance is to be measured, and all other limitations and conditions applicable to the awards of RSUs.

    8.3.2 <u>Award Agreement</u>. RSUs shall be granted under an Award Agreement referring to the terms, conditions, and restrictions applicable to such Award.

    8.3.3 <u>No Deferral Provisions</u>. Notwithstanding anything herein to the contrary, RSUs shall provide for prompt issuance of Shares upon vesting of the Award (in all events no later than the fifteenth (15th) day of the third (3rd) month after the later of the end of the calendar year or the Company's fiscal year in which vesting occurs) and shall not include any deferral of issuance and/or of compensation recognition after vesting which would cause the Award to constitute a deferral of compensation subject to Code Section 409A, unless the Award Agreement shall specifically comply with all requirements for a timely deferral under Code Section 409A. The Administrator may at any time accelerate vesting by waiving any or all of the goals, restrictions or conditions imposed under any RSU.

    8.3.4 <u>No Member or Secured Rights</u>. A Holder shall be entitled to receive a share certificate evidencing the acquisition of Shares under an RSU only upon satisfaction of all conditions specified in the Award Agreement evidencing the Award. A Holder receiving an RSU Award shall have no rights of a Member as to Shares covered by such Award unless and until such Shares are issued to the Holder under the Plan. Prior to receipt of the Shares underlying such Award, an RSU Award shall represent no more than an unfunded, unsecured, contractual obligation of the Company and the Company shall be under no obligation to set aside any assets to fund such Award. Prior to vesting and issuance of the Shares, the Holder shall have no greater claim to the Class A Ordinary Shares underlying such Award or any other assets of the Company or any Subsidiary than any other unsecured general creditor and such rights may not be sold, pledged, assigned or transferred in any manner other than by will or by the laws of intestate succession as provided in Section 12.

  9.  **CONDITIONS TO RECEIPT OF SHARES**

    9.1 <u>Conditions to Delivery of Share Certificates</u>. The Plan is intended to qualify as a compensation benefit plan within the meaning of Rule 701 of the Securities Act. The Company shall not be required to issue or deliver any certificate or certificates for Shares granted or purchased under an Award or upon the exercise of any Option prior to fulfillment of all of the following conditions:

      (a)  The admission of such Shares to listing on all stock exchanges on which such class of shares are then listed;

HLIU001365

*FF Global Holdings Ltd. Equity Incentive Plan*

(b)     The completion of any registration or other qualification of such Shares under any state or federal law, or under the rulings or regulations of the Securities and Exchange Commission or any other governmental regulatory body which the Administrator shall, in its sole discretion, deem necessary or advisable;

(c)     The obtaining of any approval or other clearance from any state or federal governmental agency or compliance with any lock-up period as provided in Section 11, which the Administrator shall, in its sole discretion, determine to be necessary or advisable; and

(d)     The receipt by the Company of full payment for such Shares, if any, and any applicable withholding tax determined by the Administrator, which in the sole discretion of the Administrator may be in the same form as the consideration used by the Holder to pay for such Shares or the Company may agree to withhold such amounts from the Shares delivered under the Option or other Award, in the complete and sole discretion of the Administrator.

## 10.    ADJUSTMENTS

10.1     <u>Corporate Transaction or Capitalization Event</u>. In the event that the Administrator determines that any dividend or other distribution (whether in the form of cash, Class A Ordinary Shares, other securities, or other property), recapitalization, reclassification, share split, reverse share split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, liquidation, dissolution, or sale, transfer, exchange or other disposition of all or substantially all of the assets of Company, or exchange of Class A Ordinary Shares or other securities of Company, issuance of warrants or other rights to purchase Class A Ordinary Shares or other securities of Company, or other similar corporate transaction or event ("Corporate Transaction"), in the Administrator's sole discretion, affects the Class A Ordinary Shares such that an adjustment is determined by the Administrator to be appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended by the Company to be made available under the Plan or with respect to any Award, then the Administrator shall, in such manner as it may deem equitable, adjust any or all of:

(a)     the number and kind of Class A Ordinary Shares (or other securities or property) with respect to which Awards may be granted (including, but not limited to, adjustments of the limitations in Section 3 on the maximum number and kind of Shares which may be issued);

(b)     the number and kind of Class A Ordinary Shares (or other securities or property) subject to outstanding Awards; and

(c)     the grant, exercise price or base price with respect to any Award.

Notwithstanding anything herein to the contrary, the Administrator will make such adjustments to an Award required by Section 25102(o) of the California Corporations Code to the extent the Company is relying upon the exemption afforded thereby with respect to the Award.

HLIU001366

*FF Global Holdings Ltd. Equity Incentive Plan*

10.2    Administrative Discretion.

(a)    In the event of a merger of the Company with or into another corporation or other entity or an Acquisition, the Administrator, in its sole discretion, and on such terms and conditions as it deems appropriate, either by the terms of the Award or by action taken prior to the occurrence of such transaction or event and either automatically or upon the Holder's request, is hereby authorized to take any one or more of the following actions whenever the Administrator determines that such action is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended by the Company to be made available under the Plan or with respect to any Award granted or issued under the Plan or to facilitate such transaction or event:

(i)    To provide for either the purchase of any such Award or Restricted Shares for an amount of cash equal to the amount that could have been obtained upon the exercise or realization of the Holder's rights had such Award been currently exercisable or payable or fully vested, or the replacement of such Award with other rights or property selected by the Administrator in its sole discretion;

(ii)    To provide that such Award shall be exercisable or vested as to all Shares covered thereby, notwithstanding anything to the contrary in the Plan or the provisions of such Award;

(iii)    To provide that such Award be assumed by the successor or survivor corporation, or a parent or subsidiary thereof, or shall be substituted for by similar options, rights or awards covering the shares of the successor or survivor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of Shares and prices;

(iv)    To make adjustments in the number and type of Ordinary Shares (or other securities or property) subject to outstanding Awards and/or in the terms and conditions of (including the grant or exercise price), and the criteria included in, outstanding Awards or Awards which may be granted in the future; or

(v)    To provide that immediately upon the consummation of such event, such Award shall terminate; provided, that for a specified period of time prior to such event, such Award shall be fully vested and exercisable as to all Shares covered thereby, notwithstanding anything to the contrary in the Plan or the provisions of such Award Agreement.

(b)    Subject to limitations set forth in the Plan, the Administrator may, in its sole discretion, include such further provisions and limitations in any Award Agreement or certificate, as it may deem appropriate.

(c)    Notwithstanding the terms of Section 10.2 above, if Company undergoes an Acquisition, then any surviving corporation or entity or acquiring corporation or entity, or affiliate of such corporation or entity, may assume any Award outstanding under the Plan for the acquiring entity's share awards (including an award to acquire the same consideration paid to the members in the transaction described in this subsection (c), or if members were offered a choice of consideration, the type of consideration chosen by the holders

16

HLIU001367

*FF Global Holdings Ltd. Equity Incentive Plan*

of a majority of the outstanding shares) or may substitute similar share awards (including an award to acquire the same consideration paid to the members in the transaction described in this subsection (c), or if members were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares) for those outstanding under the Plan.  In the event any surviving corporation or entity or acquiring corporation or entity in an Acquisition, or affiliate of such corporation or entity, does not assume an Award or does not substitute similar share or cash awards for those outstanding under the Plan, then with respect to (i) Awards held by participants in the Plan whose status as a Service Provider has not terminated prior to such event, the vesting of such Awards shall be accelerated and made fully exercisable and all restrictions thereon shall lapse prior to the closing of the Acquisition, and (ii) all Awards outstanding under the Plan shall be terminated if not exercised prior to the closing of the Acquisition.

(d)     The existence of the Plan, any Award or Award Agreement hereunder shall not affect or restrict in any way the right or power of Company or the members of Company to make or authorize any adjustment, recapitalization, reorganization or other change in Company's capital structure or its business, any merger or consolidation of Company, any issue of shares or of options, warrants or rights to purchase shares or of bonds, debentures, preferred or prior preference shares, whose rights are superior to or affect the Class A Ordinary Shares or the rights thereof, or which are convertible into or exchangeable for Class A Ordinary Shares, or the dissolution or liquidation of Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise.

11.     **AWARD AGREEMENT/AWARD RESTRICTIONS**.   Delivery of Shares issued pursuant to Awards under this Plan together with any rights, securities or additional shares that have been received pursuant to a share dividend, share split, reorganization or other transaction that has been received as a result of an Award are conditioned on the execution by the Holder of the Award Agreement.  Grants of Awards and the issuance of Shares pursuant to Awards under this Plan shall be subject to the restrictions set forth in the Award Agreement, including a lock-up, a Company right of first refusal, a drag-along, and a requirement to sign any documents reasonably required of a member, including, but not limited to, any then in effect voting agreement or co-sale agreement at the time of exercise.

12.     **NON-TRANSFERABILITY OF AWARDS.**  No Award granted under this Plan may be directly or indirectly sold, pledged, assigned, hypothecated, transferred, disposed of or encumbered in any manner whatsoever, other than by will or by the laws of descent or distribution prior to vesting and exercise (if applicable) under the terms of the Award and may be exercised, during the lifetime of the Service Provider, only by the Service Provider. Notwithstanding the forgoing, the Administrator may in its discretion allow Non-qualified Share Options that may be transferred by instrument to an inter vivos or testamentary trust in which the Options are to be passed to beneficiaries upon the death of the trustor (settlor) or by gift or pursuant to domestic relations orders to any "Immediate Family Member" (as defined below) of the optionee to the extent permissible under Rule 701 under the Securities Act.  "Immediate Family Member" means any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law,  or  sister-in-law  (including  adoptive  relationships),  any  person  sharing  the

HLIU001368

*FF Global Holdings Ltd. Equity Incentive Plan*

optionee's household (other than a tenant or employee), a trust in which these persons have more than fifty percent (50%) of the beneficial interest, a foundation in which these persons (or the optionee) control the management of assets, and any other entity in which these persons (or the optionee) own more than fifty percent (50%) of the voting interests.

13.   **RESTRICTIVE LEGENDS**.   The certificates representing the Shares issued upon exercise of Options granted pursuant to this Plan shall bear appropriate legends giving notice of applicable restrictions on transfer under Applicable Laws and the Plan.

14.   **NO RIGHT TO CONTINUED EMPLOYMENT OR SERVICE.**   Nothing in this Plan shall confer upon any Service Provider any right with respect to continuation of employment by or consultancy to the Company, nor shall it interfere in any way with the Company's or any Subsidiary's right to terminate any Service Provider's employment or consultancy at any time, with or without cause and with or without prior notice.

15.   **TERM OF PLAN.**   The Plan shall become effective upon its initial adoption by the Board of Directors of Company and shall continue in effect until it is terminated under Section 17.   No Award may be issued under the Plan after the tenth (10th) anniversary of the earlier of (i) the date upon which the Plan is adopted by the Board of Directors of Company or (ii) the date the Plan is approved by the members.

16.   **TIME OF GRANTING OF AWARDS.**   The date of grant of an Award shall, for all purposes, be the date on which the Administrator makes the determination granting such Award, or such other date as is determined by the Administrator.   Notice of the determination shall be given to each Service Provider to whom an Award is so granted within a reasonable time after the date of such grant.

17.   **AMENDMENT AND TERMINATION OF THE PLAN.**

17.1   <u>Amendment and Termination</u>.   The Board may at any time wholly or partially amend, alter, suspend or terminate the Plan.   However, without approval of the Company's members given within twelve (12) months before or after the action by the Board, no action of the Board may, except as provided in Section 9, increase the limits imposed in Section 3 on the maximum number of Shares which may be issued under the Plan or extend the term of the Plan under Section 15.

17.2   <u>Member Approval</u>.   The Board shall obtain member approval of Company for any Plan amendment to the extent necessary and desirable to comply with Applicable Laws.

17.3   <u>Effect of Amendment or Termination</u>.   No amendment, alteration, suspension or termination of the Plan shall impair the rights of any Holder, unless mutually agreed otherwise between the Holder and the Administrator, which agreement must be in writing and signed by the Holder and the Company; <u>provided</u> <u>however</u>, that the foregoing shall not limit the authority of the Administrator to exercise all authority and discretion conveyed to it herein or in any Award Agreement.   Termination of the Plan shall not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to Awards granted under the Plan prior to the date of such termination.

HLIU001369

*FF Global Holdings Ltd. Equity Incentive Plan*

18.  **MEMBER APPROVAL.**  The Plan shall be submitted for the approval of Company's members within twelve (12) months after the date of the Board's initial adoption of the Plan.  Awards may be granted or awarded prior to such member approval, provided that if such approval has not been obtained at the end of said twelve (12) month period, all Awards previously granted or awarded under the Plan shall thereupon be canceled and become null and void.

19.  **LEAVES OF ABSENCE/TRANSFER BETWEEN LOCATIONS.**  Unless the Administrator provides otherwise, vesting of Awards granted hereunder will be suspended during any unpaid leave of absence.  A Holder will not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, or any Subsidiary.  For purposes of Incentive Share Options, no such leave may exceed three (3) months, unless reemployment upon expiration of such leave is guaranteed by statute or contract.  If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then six (6) months following the first (1st) day of such leave, any Incentive Share Option held by the Holder will cease to be treated as an Incentive Share Option and will be treated for tax purposes as a Non-qualified Share Option.

20.  **TAX WITHHOLDING.**  Prior to the delivery of any Shares or cash pursuant to an Award (or exercise thereof), the Company will have the power and the right to deduct or withhold, or require a Holder to remit to the Company, an amount sufficient to satisfy Federal, state, local, foreign or other taxes (including the Holder's FICA obligation) required to be withheld with respect to such Award (or exercise thereof).

The Administrator, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit a Holder to satisfy such tax withholding obligation, in whole or in part by such methods as the Administrator shall determine, including, without limitation, (i) paying cash, (ii) electing to have the Company withhold otherwise deliverable Shares having a fair market value equal to the minimum statutory amount required to be withheld, (iii) delivering to the Company already-owned Shares having a fair market value equal to the statutory amount required to be withheld, provided the delivery of such Shares will not result in any adverse accounting consequences, as the Administrator determines in its sole discretion, (iv) selling a sufficient number of Shares otherwise deliverable to the Participant through such means as the Administrator may determine in its sole discretion (whether through a broker or otherwise) equal to the amount required to be withheld, or (v) any combination of the foregoing methods of payment.  The amount of the withholding requirement will be deemed to include any amount which the Administrator agrees may be withheld at the time the election is made, not to exceed the amount determined by using the maximum federal, state or local marginal income tax rates applicable to the Holder with respect to the Award on the date that the amount of tax to be withheld is to be determined.  The fair market value of the Shares to be withheld or delivered will be determined as of the date that the taxes are required to be withheld.

21.  **INABILITY TO OBTAIN AUTHORITY.**  The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder,

HLIU001370

*FF Global Holdings Ltd. Equity Incentive Plan*

shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

22. **RESERVATION OF SHARES.**  Company during the term of this Plan, shall at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

23. **GOVERNING LAW.** The validity and enforceability of this Plan shall be governed by and construed in accordance with the laws of the state of California without regard to otherwise governing principles of conflicts of law.

\* \* \* \* \* \* \*

HLIU001371

HLIU001372-HLIU001385

U.S. Form of Option Agreement

## FF GLOBAL HOLDINGS LTD.

## EQUITY INCENTIVE PLAN

## SHARE OPTION AGREEMENT

Unless otherwise defined herein, the terms defined in the Equity Incentive Plan (the "Plan") shall have the same defined meanings in this Share Option Agreement (the "Option Agreement").

## I.   NOTICE OF SHARE OPTION GRANT

**Name:**

**Address:**

The undersigned Holder has been granted an Option to purchase Class A Ordinary Shares of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Date of Grant:                          _____

Vesting Commencement Date:              _____

Exercise Price per Share:          $_____

Total Number of Shares Granted:         _____

Total Exercise Price :             $_____

Type of Option:               ___     Incentive Share Option

                              ___     Non-qualified Share Option

Term/Expiration Date:                   _____

Vesting Schedule:

This Option shall be exercisable, in whole or in part, according to the following vesting schedule:

[Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Holder continuing to be a wService Provider through each such date.]

HLIU001372

Termination Period:

This Option shall be exercisable for three (3) months after Holder ceases to be a Service Provider, unless such termination is due to (i) Holder's death or Disability, in which case this Option shall be exercisable for six (6) months after Holder ceases to be a Service Provider; or (ii) Holder's termination for Cause, in which case, to the extent permissible under Applicable Laws, this Option shall terminate upon such termination for Cause.  Notwithstanding the foregoing sentence, in no event may this Option be exercised after the Term/Expiration Date as provided above and this Option may be subject to earlier termination as provided in Section 10 of the Plan.

## II.   <u>AGREEMENT</u>

1.     <u>Grant of Option</u>.  The Administrator of the Company hereby grants to the Holder named in the Notice of Share Option Grant in Part I of this Agreement ("Holder"), an option (the "Option") to purchase the number of Shares set forth in the Notice of Share Option Grant, at the exercise price per Share set forth in the Notice of Share Option Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference.  Subject to Section 17 of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Share Option Grant as an Incentive Share Option ("ISO"), this Option is intended to qualify as an "incentive stock option" as defined in Section 422 of the Code.  Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Non-qualified Share Option ("NSO").  Further, if for any reason this Option (or portion thereof) shall not qualify as an ISO, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a NSO granted under the Plan.  In no event shall the Administrator, the Company or any Parent or Subsidiary or any of their respective employees or directors have any liability to Holder (or any other person) due to the failure of the Option to qualify for any reason as an ISO.

2.     <u>Exercise of Option</u>.

(a)     <u>Right to Exercise</u>.  This Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice of Share Option Grant and with the applicable provisions of the Plan and this Option Agreement.

(b)     <u>Method of Exercise</u>.  This Option shall be exercisable by delivery of an exercise notice in the form attached as <u>Exhibit A</u> (the "Exercise Notice") or in a manner and pursuant to such procedures as the Administrator may determine, which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised (the "Exercised Shares"), and such other representations and agreements as may be required by the Company.  As a condition to exercise this Option, Holder must sign any documents reasonably required of a member, including, but not limited to, any then in effect voting agreement or co-sale agreement at the time of exercise.  The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares, together with any applicable tax withholding. This Option shall be deemed to be exercised upon receipt by the Company of such fully executed

HLIU001373

Exercise Notice accompanied by the aggregate Exercise Price, together with any applicable tax withholding, and the Holder signing any documents reasonably required of a member, including, but not limited to, any then in effect voting agreement or co-sale agreement at the time of exercise.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws.  Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Holder on the date on which the Option is exercised with respect to such Shares.

3.      <u>Holder's Representations</u>.  In the event the Shares have not been registered under the Securities Act of 1933, as amended or the regulatory rules of any other jurisdiction (the "Securities Act"), at the time this Option is exercised, Holder shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as <u>Exhibit B</u>.

4.      <u>Lock-Up Period</u>.  Holder hereby agrees that Holder shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Class A Ordinary Shares (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Class A Ordinary Shares (or other securities) of the Company held by Holder (other than those included in the registration) for a period specified by the representative of the underwriters of Class A Ordinary Shares (or other securities) of the Company not to exceed one hundred and eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate applicable regulatory restrictions, including but not limited to, on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto).

Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto.  In addition, if requested by the Company or the representative of the underwriters of Class A Ordinary Shares (or other securities) of the Company, Holder shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act.  The obligations described in this Section 4 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future.  The Company may impose stop-transfer instructions with respect to Class A Ordinary Shares (or other securities) subject to the foregoing restriction until the end of said one hundred and eighty (180) day (or other) period.  Holder agrees that any transferee of the Option or Class A Ordinary Shares acquired pursuant to the Option shall be bound by this Section 4.

HLIU001374

5.     <u>Method of Payment</u>.  Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Holder:

(a)     cash;

(b)     check;

(c)     consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d)     surrender of other Shares which (i) shall be valued at its Fair Market Value on the date of exercise, and (ii) must be owned free and clear of any liens, claims, encumbrances or security interests, if accepting such Shares, in the sole discretion of the Administrator, shall not result in any adverse accounting consequences to the Company.

6.     <u>Restrictions on Exercise</u>.  This Option may not be exercised until such time as the Plan has been approved by the members of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

7.     <u>Non-Transferability of Option</u>.

(a)     This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Holder only by Holder.  The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of Holder.

(b)     Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or after the Administrator determines that it is, will, or may no longer be relying upon the exemption from registration of Options under the Exchange Act as set forth in Rule 12h-1(f) promulgated under the Exchange Act (the "Reliance End Date"), Holder shall not transfer this Option or, prior to exercise, the Shares subject to this Option, in any manner other than (i) to persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (ii) to an executor or guardian of Holder upon the death or disability of Holder.  Until the Reliance End Date, the Options and, prior to exercise, the Shares subject to this Option, may not be pledged, hypothecated or otherwise transferred or disposed of, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than as permitted in clauses (i) and (ii) of this paragraph.

8.     <u>Term of Option</u>.  This Option may be exercised only within the term set out in the Notice of Share Option Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option Agreement.

HLIU001375

9.      <u>Tax Obligations</u>.

(a)      <u>Tax Withholding</u>.  Holder agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Holder) for the satisfaction of all Federal, state, local and foreign income and employment tax withholding requirements applicable to the Option exercise.  Holder acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

(b)      <u>Notice of Disqualifying Disposition of ISO Shares</u>.  If the Option granted to Holder herein is an ISO, and if Holder sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two (2) years after the Date of Grant, or (ii) the date one (1) year after the date of exercise, Holder shall immediately notify the Company in writing of such disposition.  Holder agrees that Holder may be subject to income tax withholding by the Company on the compensation income recognized by Holder.

(c)      <u>Code Section 409A and Code Section 457A</u>.  Under Section 409A, an Option that vests after December 31, 2004 (or that vested on or prior to such date but which was materially modified after October 3, 2004) that was granted with a per Share exercise price that is determined by the U.S. Internal Revenue Service (the "IRS") to be less than the Fair Market Value of a Share on the date of grant (a "discount option") or that covers other than "service recipient stock" (as defined under Section 409A) may be considered "deferred compensation."  An Option that is a "discount option" or that covers other than service recipient stock may result in (i) income recognition by Holder prior to the exercise of the Option, (ii) an additional twenty percent (20%) U.S. federal income tax, and (iii) potential penalty and interest charges.  The option may also result in additional state income, penalty and interest charges to the Holder.  Holder acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per Share exercise price of this Option equals or exceeds the Fair Market Value of a Share on the date of grant or that the Shares covered by this Option will be classified as service recipient stock in a later examination.  Holder agrees that if the IRS determines that the Option was granted with a per Share exercise price that was less than the Fair Market Value of a Share on the date of grant or covers other than service recipient stock, Holder shall be solely responsible for Holder's costs related to such a determination.  Further, Holder agrees that if the IRS determines that the Option is deferred compensation subject to, and within the meaning of, Section 457A, Holder shall be solely responsible for Holder's costs related to such a determination.

10.      <u>Entire Agreement; Governing Law</u>.  The Plan is incorporated herein by reference.  The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Holder with respect to the subject matter hereof, and may not be modified adversely to the Holder's interest except by means of a writing signed by the Company and Holder.  This Option Agreement is governed by the internal substantive laws but not the choice of law rules of California.

11.      <u>No Guarantee of Continued Service</u>.  HOLDER ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE

HLIU001376

COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING HOLDER) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER. HOLDER FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH HOLDER'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING HOLDER) TO TERMINATE HOLDER'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

Holder acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Holder has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Holder hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Holder further agrees to notify the Company upon any change in the residence address indicated below.

By Holder's signature below, Holder acknowledges and agrees that the grant of this Option is in full satisfaction of any oral or written promise to grant a share option, equity or any equity-related interest in the Company or any Subsidiary or affiliate, including, but not limited to any promise set forth in an offer letter or other agreement with a Subsidiary or other affiliate of the Company and/or related oral discussions (a "Promised Interest"). Accordingly, Holder hereby irrevocably and unconditionally releases and forever discharges the Company and any Subsidiary, and any successors, assigns, directors, officers, employees, consultants, agents, representatives, members, shareholders and affiliates of the Company and any Subsidiary, from any obligation to issue any securities of the Company or any Subsidiary or any other compensation in respect of the Promised Interest and from all any and all claims, liabilities or obligations, whether now existing or hereafter arising, which in any way relate to or arise out the Promised Interest.

Holder acknowledges that Holder has been advised to consult with legal counsel and is familiar with the provisions of California Civil Code Section 1542, a statute that otherwise prohibits the release of unknown claims, which provides as follows:

HLIU001377

      A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

HOLDER                                        FF GLOBAL HOLDINGS LTD.

_____          _____
Signature                                       By

_____          _____
Print Name                                    Print Name

_____          _____
                                             Title

_____
Residence Address

HLIU001378

**EXHIBIT A**

**EQUITY INCENTIVE PLAN**

**EXERCISE NOTICE**

FF Global Holdings Ltd.

Attention: Share Administration

1.      <u>Exercise of Option</u>.  Effective as of today, _____, _____, the undersigned ("Holder") hereby elects to exercise Holder's option (the "Option") to purchase _____ Class A Ordinary Shares (the "Shares") of FF Global Holdings Ltd. (the "Company") under and pursuant to the Equity Incentive Plan (the "Plan") and the Share Option Agreement dated _____, _____ (the "Option Agreement").

2.      <u>Delivery of Payment</u>.  Holder herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement, and any and all withholding taxes due in connection with the exercise of the Option.  As a condition to exercise, Holder also agrees to sign any member documents, including, but not limited to, any voting agreement or co-sale agreement, reasonably requested by the Company.

3.      <u>Representations of Holder</u>.  Holder acknowledges that Holder has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

4.      <u>Rights as Member</u>.  Until the issuance of the Shares (as evidenced by the appropriate entry in the register of members, or on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a member shall exist with respect to the Class A Ordinary Shares subject to an Award, notwithstanding the exercise of the Option.  The Shares shall be issued to Holder as soon as practicable after the Option is exercised in accordance with the Option Agreement.  No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 10 of the Plan.

5.      <u>Company's Right of First Refusal</u>.  Before any Shares held by Holder or any transferee (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 5 (the "Right of First Refusal").  For clarity, the Company may assign the Right of First Refusal to any other members or investors of the Company.

        (a)      <u>Notice of Proposed Transfer</u>.  The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee

HLIU001379

("Proposed Transferee"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the "Offered Price"), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)     Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)     Purchase Price.  The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section 5 shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)     Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within thirty (30) days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)     Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 5, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, *provided* that such sale or other transfer is consummated within one hundred and twenty (120) days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section 5, Section 6 and Section 8, and Section 4 of the Option Agreement shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)     Exception for Certain Family Transfers.  Anything to the contrary contained in this Section 5 notwithstanding, the transfer of any or all of the Shares during the Holder's lifetime or on the Holder's death by will or intestacy to the Holder's immediate family or a trust for the benefit of the Holder's immediate family shall be exempt from the provisions of this Section 5.  "Immediate Family" as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section 5, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 5.

(g)     Prohibition of Transfer to a Competitor.  Notwithstanding anything to the contrary contained in this Section 5, the Holder agrees that the Shares may not be transferred to a

HLIU001380

competitor of the Company (as determined in good faith by the Administrator).  Any transfer or attempted transfer to a competitor shall be null and void.

(h)     Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) a Public Offering, or (ii) an Acquisition in which the successor corporation has equity securities that are publicly traded.

6.     Drag-Along. Each holder of Class A Ordinary Shares, including Holder, will be subject to the drag-along right and other provisions set forth in the Memorandum and Articles of Association of the Company.

7.     Tax Consultation.  Holder understands that Holder may suffer adverse tax consequences as a result of Holder's purchase or disposition of the Shares.  Holder represents that Holder has consulted with any tax consultants Holder deems advisable in connection with the purchase or disposition of the Shares and that Holder is not relying on the Company for any tax advice.

8.     Restrictive Legends and Stop-Transfer Orders.

(a)     Legends.  Holder understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or Federal or non-U.S. securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD OF TIME FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES AND MAY NOT

HLIU001381

BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER PRIOR TO THE EXPIRATION OF SUCH PERIOD WITHOUT THE CONSENT OF THE COMPANY OR THE MANAGING UNDERWRITER.

(b)     <u>Stop-Transfer Notices</u>.  Holder agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     <u>Refusal to Transfer</u>.  The Company shall not be required (i) to transfer on its books or in the register of members any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

9.     <u>Successors and Assigns</u>.  The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Holder and his or her heirs, executors, administrators, successors and assigns.

10.     <u>Interpretation</u>.  Any dispute regarding the interpretation of this Exercise Notice shall be submitted by Holder or by the Company forthwith to the Administrator, which shall review such dispute at its next regular meeting.  The resolution of such a dispute by the Administrator shall be final and binding on all parties.

11.     <u>Governing Law; Severability</u>.  This Exercise Notice is governed by the internal substantive laws, but not the choice of law rules, of California.  In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Exercise Notice shall continue in full force and effect.

12.     <u>Entire Agreement</u>.  The Plan and Option Agreement are incorporated herein by reference.  This Exercise Notice, the Plan, the Option Agreement and the Investment Representation Statement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Holder with respect to the subject matter hereof, and may not be modified adversely to the Holder's interest except by means of a writing signed by the Company and Holder.

Submitted by:                          Accepted by:
HOLDER                                 FF GLOBAL HOLDINGS LTD.


_____        _____
Signature                              By

_____        _____
Print Name                             Print Name

HLIU001382

_____
Title

Address:                                        Address:

_____               _____

_____               _____

                                               _____
                                               Date Received

HLIU001383

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

HOLDER          :

COMPANY         :          FF GLOBAL HOLDINGS LTD.

SECURITY        :          CLASS A ORDINARY SHARE

AMOUNT          :

DATE            :

In connection with the purchase of the above-listed Securities, the undersigned Holder represents to the Company the following:

(a)     Holder is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.  Holder is acquiring these Securities for investment for Holder's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the U.S. Securities Act of 1933, as amended (the "Securities Act").

(b)     Holder acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Holder's investment intent as expressed herein.  In this connection, Holder understands that, in the view of the U.S. Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Holder's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one (1) year or any other fixed period in the future.  Holder further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  Holder further acknowledges and understands that the Company is under no obligation to register the Securities. Holder understands that the certificate evidencing the Securities shall be imprinted with any legend required under applicable state, Federal and non-U.S. securities laws.

(c)     Holder is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions.  Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to Holder, the exercise shall be exempt from registration under the Securities Act.  In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such

HLIU001384

longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of the applicable conditions specified by Rule 144, including in the case of affiliates (1) the availability of certain public information about the Company, (2) the amount of Securities being sold during any three (3) month period not exceeding specified limitations, (3) the resale being made in an unsolicited "broker's transaction", transactions directly with a "market maker" or "riskless principal transactions" (as those terms are defined under the Securities Exchange Act of 1934) and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which may require (i) the availability of current public information about the Company; (ii) the resale to occur more than a specified period after the purchase and full payment (within the meaning of Rule 144) for the Securities; and (iii) in the case of the sale of Securities by an affiliate, the satisfaction of the conditions set forth in sections (2), (3) and (4) of the paragraph immediately above.

(d)      Holder further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption shall be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 shall have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.  Holder understands that no assurances can be given that any such other registration exemption shall be available in such event.

HOLDER

_____
Signature

_____
Print Name

_____
Date

HLIU001385

HLIU001399-HLIU001425

U.S. Form of Early-Exercise Option Agreement

# FF GLOBAL HOLDINGS LTD.

## EQUITY INCENTIVE PLAN

## SHARE OPTION AGREEMENT — EARLY EXERCISE

Unless otherwise defined herein, the terms defined in the Equity Incentive Plan (the "Plan") shall have the same defined meanings in this Share Option Agreement – Early Exercise (the "Option Agreement").

## I.    NOTICE OF SHARE OPTION GRANT

**Name:**

**Address:**

The undersigned Holder has been granted an Option to purchase Class A Ordinary Shares of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Date of Grant: _____

Vesting Commencement Date: _____

Exercise Price per Share: $_____

Total Number of Shares Granted: _____

Total Exercise Price: $_____

Type of Option: ___    Incentive Share Option

_X_    Nonstatutory Share Option

Early-Exercise Deadline: [30/45] day anniversary of Date of Grant

Term/Expiration Date: _____

Vesting Schedule:

This Option shall be exercisable, in whole or in part, according to the following vesting schedule:

[Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting

Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Holder continuing to be a Service Provider through each such date.]

Termination Period:

This Option shall be exercisable for three (3) months after Holder ceases to be a Service Provider, unless such termination is due to (i) Holder's death or Disability, in which case this Option shall be exercisable for six (6) months after Holder ceases to be a Service Provider; or (ii) Holder's termination for Cause, in which case, to the extent permissible under Applicable Laws, this Option shall terminate upon such termination for Cause.  Notwithstanding the foregoing sentence, in no event may this Option be exercised after the Term/Expiration Date as provided above and this Option may be subject to earlier termination as provided in Section 10 of the Plan.

## II.   **AGREEMENT**

1.    Grant of Option.  The Administrator of the Company hereby grants to the Holder named in the Notice of Share Option Grant in Part I of this Agreement ("Holder"), an option (the "Option") to purchase the number of Shares set forth in the Notice of Share Option Grant, at the exercise price per Share set forth in the Notice of Share Option Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference.  Subject to Section 17 of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Share Option Grant as an Incentive Share Option ("ISO"), this Option is intended to qualify as an "incentive stock option" as defined in Section 422 of the Code.  Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Non-qualified Share Option ("NSO").  Further, if for any reason this Option (or portion thereof) shall not qualify as an ISO, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a NSO granted under the Plan.  In no event shall the Administrator, the Company or any Parent or Subsidiary or any of their respective employees or directors have any liability to Holder (or any other person) due to the failure of the Option to qualify for any reason as an ISO.

2.    Exercise of Option.  This Option shall be exercisable during its term in accordance with the provisions of Section 7 of the Plan as follows:

(a)    Right to Exercise.

(i)    Subject to subsections 2(a)(ii) and 2(a)(iii) below, until the Early-Exercise Deadline set forth in the Notice of Share Option Grant, this Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Share Option Grant.  After the Early-Exercise Deadline, this Option will not be exercisable as to any unvested Shares.

Alternatively, at the election of Holder, this Option may be exercised in whole or in part at any time as to Shares that have not yet vested.  Vested Shares shall not be subject to the Company's repurchase right (as set forth in the Restricted Share Purchase Agreement, attached hereto as Exhibit C-1).

HLIU001400

(ii)     As a condition to exercising this Option for unvested Shares, Holder shall execute the Restricted Share Purchase Agreement.

(iii)     This Option may not be exercised for a fraction of a Share.

(b)     <u>Method of Exercise</u>.  This Option shall be exercisable by delivery of an exercise notice in the form attached as <u>Exhibit A</u> (the "Exercise Notice") or in a manner and pursuant to such procedures as the Administrator may determine, which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised (the "Exercised Shares"), and such other representations and agreements as may be required by the Company.  As a condition to exercise this Option, Holder must (i) to the extent Holder is exercising unvested Shares, deliver to the Company a signed copy of the 83(b) election in the form attached as <u>Exhibit C-4</u> and agree to timely file the 83(b) election with the Internal Revenue Service and (ii) sign any documents reasonably required of a member, including, but not limited to, any then in effect voting agreement or co-sale agreement at the time of exercise.  The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares, together with any applicable tax withholding.  This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price, together with any applicable tax withholding, a signed copy of the 83(b) election (if the Holder is exercising unvested Shares) and the Holder signing any documents reasonably required of a member, including, but not limited to, any then in effect voting agreement or co-sale agreement at the time of exercise.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws.  Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Holder on the date on which the Option is exercised with respect to such Shares.

3.     <u>Holder's Representations</u>.  In the event the Shares have not been registered under the Securities Act of 1933, as amended or the regulatory rules of any other jurisdiction (the "Securities Act"), at the time this Option is exercised, Holder shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as <u>Exhibit B</u>.

4.     <u>Lock-Up Period</u>.  Holder hereby agrees that Holder shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Class A Ordinary Shares (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Class A Ordinary Shares (or other securities) of the Company held by Holder (other than those included in the registration) for a period specified by the representative of the underwriters of Class A Ordinary Shares (or other securities) of the Company not to exceed one hundred and eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate applicable regulatory restrictions, including but not limited to, on (i) the publication or other distribution of research reports and (ii) analyst

HLIU001401

recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto).

Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto.   In addition, if requested by the Company or the representative of the underwriters of Class A Ordinary Shares (or other securities) of the Company, Holder shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act.   The obligations described in this Section 4 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future.   The Company may impose stop-transfer instructions with respect to the Class A Ordinary Shares (or other securities) subject to the foregoing restriction until the end of said one hundred and eighty (180) day (or other) period.   Holder agrees that any transferee of the Option or shares acquired pursuant to the Option shall be bound by this Section 4.

5. <u>Method of Payment</u>.   Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Holder:

(a)     cash;

(b)     check;

(c)     consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d)     surrender of other Shares which (i) shall be valued at its Fair Market Value on the date of exercise, and (ii) must be owned free and clear of any liens, claims, encumbrances or security interests, if accepting such Shares, in the sole discretion of the Administrator, shall not result in any adverse accounting consequences to the Company.

6. <u>Restrictions on Exercise</u>.   This Option may not be exercised until such time as the Plan has been approved by the members of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

7. <u>Non-Transferability of Option</u>.

(a)     This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Holder only by Holder.   The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of Holder.

(b)     Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or after the Administrator determines that it is, will, or may no longer be relying upon the exemption from registration of Options under the Exchange Act as set

HLIU001402

forth in Rule 12h-1(f) promulgated under the Exchange Act (the "Reliance End Date"), Holder shall not transfer this Option or, prior to exercise, the Shares subject to this Option, in any manner other than (i) to persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (ii) to an executor or guardian of Holder upon the death or disability of Holder.  Until the Reliance End Date, the Options and, prior to exercise, the Shares subject to this Option, may not be pledged, hypothecated or otherwise transferred or disposed of, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than as permitted in clauses (i) and (ii) of this paragraph.

8.    <u>Term of Option</u>.  This Option may be exercised only within the term set out in the Notice of Share Option Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option Agreement.

9.    <u>Tax Obligations</u>.

(a)    <u>Tax Withholding</u>.  Holder agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Holder) for the satisfaction of all Federal, state, local and foreign income and employment tax withholding requirements applicable to the Option exercise.  Holder acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

(b)    <u>Notice of Disqualifying Disposition of ISO Shares</u>.  If the Option granted to Holder herein is an ISO, and if Holder sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two (2) years after the Date of Grant, or (ii) the date one (1) year after the date of exercise, Holder shall immediately notify the Company in writing of such disposition.  Holder agrees that Holder may be subject to income tax withholding by the Company on the compensation income recognized by Holder.

(c)    <u>Code Section 409A and Code Section 457A</u>.  Under Section 409A, an Option that vests after December 31, 2004 (or that vested on or prior to such date but which was materially modified after October 3, 2004) that was granted with a per Share exercise price that is determined by the U.S. Internal Revenue Service (the "IRS") to be less than the Fair Market Value of a Share on the date of grant (a "discount option") or that covers other than "service recipient stock" (as defined under Section 409A) may be considered "deferred compensation."  An Option that is a "discount option" or that covers other than service recipient stock may result in (i) income recognition by Holder prior to the exercise of the Option, (ii) an additional twenty percent (20%) U.S. federal income tax, and (iii) potential penalty and interest charges.  The option may also result in additional state income, penalty and interest charges to the Holder.  Holder acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per Share exercise price of this Option equals or exceeds the Fair Market Value of a Share on the date of grant or that the Shares covered by this Option will be classified as service recipient stock in a later examination.  Holder agrees that if the IRS determines that the Option was granted with a per Share exercise price that was less than the Fair Market Value of a Share on the date of grant or covers other than service recipient stock, Holder shall be solely responsible for Holder's costs related to such a determination.  Further, Holder agrees that if the IRS determines that the Option is deferred compensation subject to, and within the

-5-

meaning of, Section 457A, Holder shall be solely responsible for Holder's costs related to such a determination.

10.    <u>Entire Agreement; Governing Law</u>.   The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Holder with respect to the subject matter hereof, and may not be modified adversely to the Holder's interest except by means of a writing signed by the Company and Holder.   This Option Agreement is governed by the internal substantive laws but not the choice of law rules of California.

11.    <u>No Guarantee of Continued Service</u>.   HOLDER ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING HOLDER) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER.   HOLDER FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH HOLDER'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING HOLDER) TO TERMINATE HOLDER'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

HLIU001404

Holder acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Holder has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Holder hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Holder further agrees to notify the Company upon any change in the residence address indicated below.

Holder acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Holder has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Holder hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Holder further agrees to notify the Company upon any change in the residence address indicated below.

By Holder's signature below, Holder acknowledges and agrees that the grant of this Option is in full satisfaction of any oral or written promise to grant a share option, equity or any equity-related interest in the Company or any Subsidiary or affiliate, including, but not limited to any promise set forth in an offer letter or other agreement with a Subsidiary or other affiliate of the Company and/or related oral discussions (a "Promised Interest"). Accordingly, Holder hereby irrevocably and unconditionally releases and forever discharges the Company and any Subsidiary, and any successors, assigns, directors, officers, employees, consultants, agents, representatives, members, shareholders and affiliates of the Company and any Subsidiary, from any obligation to issue any securities of the Company or any Subsidiary or any other compensation in respect of the Promised Interest and from all any and all claims, liabilities or obligations, whether now existing or hereafter arising, which in any way relate to or arise out the Promised Interest.

Holder acknowledges that Holder has been advised to consult with legal counsel and is familiar with the provisions of California Civil Code Section 1542, a statute that otherwise prohibits the release of unknown claims, which provides as follows:

HLIU001405

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

HOLDER                                         FF GLOBAL HOLDINGS LTD.

_____              _____
Signature                                     By

_____              _____
Print Name                                    Print Name

_____              _____
                                              Title

_____
Residence Address

-8-

HLIU001406

**EXHIBIT A**

**EQUITY INCENTIVE PLAN**

**EXERCISE NOTICE**

FF Global Holdings Ltd.

Attention: Share Administration

1.  <u>Exercise of Option</u>.  Effective as of today, _____, ____, the undersigned ("Holder") hereby elects to exercise Holder's option (the "Option") to purchase _____ Class A Ordinary Shares (the "Shares") of FF Global Holdings Ltd. (the "Company") under and pursuant to the Equity Incentive Plan (the "Plan") and the Share Option Agreement – Early Exercise dated _____, _____ (the "Option Agreement").

2.  <u>Delivery of Payment</u>.  Holder herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement, any and all withholding taxes due in connection with the exercise of the Option and a signed copy of the 83(b) election attached hereto as <u>Exhibit C-4</u> if the Holder is exercising unvested Shares.  As a condition to exercise, Holder also agrees to sign any member documents, including, but not limited to, any voting agreement or co-sale agreement, reasonably requested by the Company.

3.  <u>Representations of Holder</u>.  Holder acknowledges that Holder has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.  Holder agrees that Holder will timely file the 83(b) election with Internal Revenue Service and if Holder fails to timely file such 83(b) election, then Holder must notify the Company of the failure to file such 83(b) election.

4.  <u>Rights as Member</u>.  Until the issuance of the Shares (as evidenced by the appropriate entry in the register of members, or on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a member shall exist with respect to the Class A Ordinary Shares subject to an Award, notwithstanding the exercise of the Option.  The Shares shall be issued to Holder as soon as practicable after the Option is exercised in accordance with the Option Agreement.  No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 10 of the Plan.

5.  <u>Company's Right of First Refusal</u>.  Before any Shares held by Holder or any transferee (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 5 (the "Right of First Refusal").  For clarity, the Company may assign the Right of First Refusal to any other members or investors of the Company.

(a)  <u>Notice of Proposed Transfer</u>.  The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee

("Proposed Transferee"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the "Offered Price"), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)     Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)     Purchase Price.  The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section 5 shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)     Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within thirty (30) days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)     Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 5, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, *provided* that such sale or other transfer is consummated within one hundred and twenty (120) days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section 5, Section 6 and Section 8, and Section 4 of the Option Agreement shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)     Exception for Certain Family Transfers.  Anything to the contrary contained in this Section 5 notwithstanding, the transfer of any or all of the Shares during the Holder's lifetime or on the Holder's death by will or intestacy to the Holder's immediate family or a trust for the benefit of the Holder's immediate family shall be exempt from the provisions of this Section 5.  "Immediate Family" as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section 5, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 5.

(g)     Prohibition of Transfer to a Competitor.  Notwithstanding anything to the contrary contained in this Section 5, the Holder agrees that the Shares may not be transferred to a

HLIU001408

competitor of the Company (as determined in good faith by the Administrator). Any transfer or attempted transfer to a competitor shall be null and void.

(h)  Termination of Right of First Refusal. The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) a Public Offering, or (ii) an Acquisition in which the successor corporation has equity securities that are publicly traded.

6.  Drag-Along. Each holder of Class A Ordinary Shares, including Holder, will be subject to the drag-along right and other provisions set forth in the Memorandum and Articles of Association of the Company.

7.  Tax Consultation. Holder understands that Holder may suffer adverse tax consequences as a result of Holder's purchase or disposition of the Shares. Holder represents that Holder has consulted with any tax consultants Holder deems advisable in connection with the purchase or disposition of the Shares and that Holder is not relying on the Company for any tax advice.

8.  Restrictive Legends and Stop-Transfer Orders.

(a)  Legends. Holder understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state, Federal or non-U.S. securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD OF TIME FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER PRIOR TO THE

-3-

EXPIRATION OF SUCH PERIOD WITHOUT THE CONSENT OF THE COMPANY OR THE MANAGING UNDERWRITER.

(b)     <u>Stop-Transfer Notices</u>.  Holder agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     <u>Refusal to Transfer</u>.  The Company shall not be required (i) to transfer on its books or in the register of members any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

9.     <u>Successors and Assigns</u>.  The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Holder and his or her heirs, executors, administrators, successors and assigns.

10.     <u>Interpretation</u>.  Any dispute regarding the interpretation of this Exercise Notice shall be submitted by Holder or by the Company forthwith to the Administrator, which shall review such dispute at its next regular meeting.  The resolution of such a dispute by the Administrator shall be final and binding on all parties.

11.     <u>Governing Law; Severability</u>.  This Exercise Notice is governed by the internal substantive laws, but not the choice of law rules, of California.  In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Exercise Notice shall continue in full force and effect.

12.     <u>Entire Agreement</u>.  The Plan and Option Agreement are incorporated herein by reference.  This Exercise Notice, the Plan, the Restricted Share Purchase Agreement, the Option Agreement and the Investment Representation Statement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Holder with respect to the subject matter hereof, and may not be modified adversely to the Holder's interest except by means of a writing signed by the Company and Holder.

Submitted by:                                    Accepted by:
HOLDER                                          FF GLOBAL HOLDINGS LTD.


_____          _____
Signature                                        By


_____          _____
Print Name                                       Print Name

HLIU001410

_____

Title

Address:                                    Address:

_____           _____

_____           _____

                                           _____

                                           Date Received

-5-

HLIU001411

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

HOLDER            :

COMPANY           :            FF GLOBAL HOLDINGS LTD.

SECURITY          :            CLASS A ORDINARY SHARE

AMOUNT            :

DATE              :

   In connection with the purchase of the above-listed Securities, the undersigned Holder represents to the Company the following:

    (a)  Holder is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.  Holder is acquiring these Securities for investment for Holder's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the U.S. Securities Act of 1933, as amended (the "Securities Act").

    (b)  Holder acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Holder's investment intent as expressed herein.   In this connection, Holder understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Holder's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one (1) year or any other fixed period in the future.  Holder further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  Holder further acknowledges and understands that the Company is under no obligation to register the Securities.  Holder understands that the certificate evidencing the Securities shall be imprinted with any legend required under applicable state, Federal and non-U.S. securities laws.

    (c)  Holder is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions.  Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to Holder, the exercise shall be exempt from registration under the Securities Act.  In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the Securities exempt under Rule 701

may be resold, subject to the satisfaction of the applicable conditions specified by Rule 144, including in the case of affiliates (1) the availability of certain public information about the Company, (2) the amount of Securities being sold during any three (3) month period not exceeding specified limitations, (3) the resale being made in an unsolicited "broker's transaction", transactions directly with a "market maker" or "riskless principal transactions" (as those terms are defined under the Securities Exchange Act of 1934) and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which may require (i) the availability of current public information about the Company; (ii) the resale to occur more than a specified period after the purchase and full payment (within the meaning of Rule 144) for the Securities; and (iii) in the case of the sale of Securities by an affiliate, the satisfaction of the conditions set forth in sections (2), (3) and (4) of the paragraph immediately above.

(d)     Holder further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption shall be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 shall have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.  Holder understands that no assurances can be given that any such other registration exemption shall be available in such event.

HOLDER

_____
Signature

_____
Print Name

_____
Date

HLIU001413

**EXHIBIT C-1**

**FF GLOBAL HOLDINGS LTD.**

**EQUITY INCENTIVE PLAN**

**RESTRICTED SHARE PURCHASE AGREEMENT**

THIS RESTRICTED SHARE PURCHASE AGREEMENT (the "Agreement") is made between _____ (the "Purchaser") and FF Global Holdings Ltd. (the "Company") or its assignees of rights hereunder as of _____, ____.

Unless otherwise defined herein, the terms defined in the  Equity Incentive Plan shall have the same defined meanings in this Agreement.

<u>RECITALS</u>

A.      Pursuant to the exercise of the option (grant number ____) granted to Purchaser under the Plan and pursuant to the Share Option Agreement – Early Exercise (the "Option Agreement") dated _____, ____ by and between the Company and Purchaser with respect to such grant (the "Option"), which Plan and Option Agreement are hereby incorporated by reference, Purchaser has elected to purchase _____ of those Class A Ordinary Shares which have not become vested under the vesting schedule set forth in the Option Agreement ("Unvested Shares"). The Unvested Shares and the shares subject to the Option Agreement, which have become vested are sometimes collectively referred to herein as the "Shares."

B.      As required by the Option Agreement, as a condition to Purchaser's election to exercise the option, Purchaser must execute this Agreement, which sets forth the rights and obligations of the parties with respect to Shares acquired upon exercise of the Option.

1.      <u>Repurchase Option</u>.

(a)      If Purchaser's status as a Service Provider is terminated for any reason, including for death and Disability, the Company shall have the right and option for ninety (90) days from such date to purchase from Purchaser, or Purchaser's personal representative, as the case may be, all of the Purchaser's Unvested Shares as of the date of such termination at the price paid by the Purchaser for such Shares (the "Repurchase Option").

(b)      Upon the occurrence of such termination, the Company may exercise its Repurchase Option by delivering personally or by registered mail, to Purchaser (or his or her transferee or legal representative, as the case may be) with a copy to the escrow agent described in Section 2 below, a notice in writing indicating the Company's intention to exercise the Repurchase Option AND, at the Company's option, (i) by delivering to the Purchaser (or the Purchaser's transferee or legal representative) a check in the amount of the aggregate repurchase price, or (ii) by the Company canceling an amount of the Purchaser's indebtedness to the Company equal to the aggregate repurchase price, or (iii) by a combination of (i) and (ii) so that the combined payment and

HLIU001414

cancellation of indebtedness equals such aggregate repurchase price.  Upon delivery of such notice and payment of the aggregate repurchase price in any of the ways described above, the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and the rights and interests therein or relating thereto, and the Company shall have the right to retain and transfer to its own name the number of Unvested Shares being repurchased by the Company.

(c)     Whenever the Company shall have the right to repurchase Unvested Shares hereunder, the Company may designate and assign one or more employees, officers, directors or members of the Company or other persons or organizations to exercise all or a part of the Company's Repurchase Option under this Agreement and purchase all or a part of such Unvested Shares.

(d)     If the Company does not elect to exercise the Repurchase Option conferred above by giving the requisite notice within ninety (90) days following the termination, the Repurchase Option shall terminate.

(e)     The Repurchase Option shall terminate in accordance with the vesting schedule contained in Purchaser's Option Agreement.

2.     <u>Transferability of the Shares; Escrow</u>.

(a)     Purchaser hereby authorizes and directs the Secretary of the Company, or such other person designated by the Company, to transfer the Unvested Shares as to which the Repurchase Option has been exercised from Purchaser to the Company.

(b)     To insure the availability for delivery of Purchaser's Unvested Shares upon repurchase by the Company pursuant to the Repurchase Option under Section 1, Purchaser hereby appoints the Secretary, or any other person designated by the Company as escrow agent (the "Escrow Agent"), as its attorney-in-fact to sell, assign and transfer unto the Company, such Unvested Shares, if any, repurchased by the Company pursuant to the Repurchase Option and shall, upon execution of this Agreement, deliver and deposit with the Escrow Agent, the share certificates representing the Unvested Shares, together with the share assignment duly endorsed in blank, attached hereto as <u>Exhibit C-2</u>.  The Unvested Shares and share assignment shall be held by the Escrow Agent in escrow, pursuant to the Joint Escrow Instructions of the Company and Purchaser attached as <u>Exhibit C-3</u> hereto, until the Company exercises its Repurchase Option, until such Unvested Shares are vested, or until such time as this Agreement no longer is in effect.  Upon vesting of the Unvested Shares, the Escrow Agent shall promptly deliver to the Purchaser the certificate or certificates representing such Shares in the Escrow Agent's possession belonging to the Purchaser, and the Escrow Agent shall be discharged of all further obligations hereunder; provided, however, that the Escrow Agent shall nevertheless retain such certificate or certificates as Escrow Agent if so required pursuant to other restrictions imposed pursuant to this Agreement.

(c)     Neither the Company nor the Escrow Agent shall be liable for any act it may do or omit to do with respect to holding the Shares in escrow and while acting in good faith and in the exercise of its judgment.

(d)     Transfer or sale of the Shares is subject to restrictions on transfer imposed by any applicable state, Federal and non-U.S. securities laws.  Any transferee shall hold such Shares

-2-

subject to all the provisions hereof and the Exercise Notice executed by the Purchaser with respect to any Unvested Shares purchased by Purchaser and shall acknowledge the same by signing a copy of this Agreement.

3.  <u>Ownership, Voting Rights, Duties</u>.  This Agreement shall not affect in any way the ownership, voting rights or other rights or duties of Purchaser, except as specifically provided herein.

4.  <u>Legends</u>.  The share certificate evidencing the Shares issued hereunder shall be endorsed with the following legend (in addition to any legend required under applicable federal and state securities laws):

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS UPON TRANSFER AND RIGHTS OF REPURCHASE AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE MEMBER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

5.  <u>Adjustment for Share Split</u>.  All references to the number of Shares and the purchase price of the Shares in this Agreement shall be appropriately adjusted to reflect any share split, share dividend or other change in the Shares, which may be made by the Company pursuant to Section 10 of the Plan after the date of this Agreement.

6.  <u>Notices</u>.  Notices required hereunder shall be given in person or by registered mail to the address of Purchaser shown on the records of the Company, and to the Company at their respective principal executive offices.

7.  <u>Survival of Terms</u>.  This Agreement shall apply to and bind Purchaser and the Company and their respective permitted assignees and transferees, heirs, legatees, executors, administrators and legal successors.

8.  <u>Section 83(b) Election</u>.  Purchaser hereby acknowledges that he or she has been informed that, with respect to the exercise of an Option for Unvested Shares, an election (the "Election") may be filed by the Purchaser with the Internal Revenue Service, within thirty (30) days of the purchase of the exercised Shares, electing pursuant to Section 83(b) of the Code to be taxed currently on any difference between the purchase price of the exercised Shares and their Fair Market Value on the date of purchase.  In the case of a Nonstatutory Share Option, this will result in the recognition of taxable income to the Purchaser on the date of exercise, measured by the excess, if any, of the Fair Market Value of the exercised Shares, at the time the Option is exercised over the purchase price for the exercised Shares.  Absent such an Election, taxable income will be measured and recognized by Purchaser at the time or times on which the Company's Repurchase Option lapses.  In the case of an Incentive Share Option, such an Election will result in a recognition of income to the Purchaser for alternative minimum tax purposes on the date of exercise, measured by the excess, if any, of the Fair Market Value of the exercised Shares, at the time the option is exercised, over the purchase price for the exercised Shares.  Absent such an Election, alternative minimum taxable income will be measured and recognized by Purchaser at the time or times on which the Company's Repurchase Option lapses.

-3-

HLIU001416

This discussion is intended only as a summary of the general United States income tax laws that apply to exercising Options as to Shares that have not yet vested and is accurate only as of the date this form Agreement was approved by the Board.  The federal, state and local tax consequences to any particular taxpayer will depend upon his or her individual circumstances.  Purchaser is strongly encouraged to seek the advice of his or her own tax consultants in connection with the purchase of the Shares and the advisability of filing of the Election under Section 83(b) of the Code.  A form of Election under Section 83(b) is attached hereto as <u>Exhibit C-4</u> for reference.

PURCHASER ACKNOWLEDGES THAT IT IS PURCHASER'S SOLE RESPONSIBILITY AND NOT THE COMPANY'S TO FILE TIMELY THE ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF PURCHASER REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON PURCHASER'S BEHALF.

9.    <u>Representations</u>.  Purchaser has reviewed with his or her own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Agreement.  Purchaser is relying solely on such advisors and not on any statements or representations of the Company or any of its agents.  Purchaser understands that he or she (and not the Company) shall be responsible for his or her own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

10.    <u>Entire Agreement; Governing Law</u>.  The Plan and Option Agreement are incorporated herein by reference.  The Plan, the Option Agreement, the Exercise Notice, this Agreement, and the Investment Representation Statement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Purchaser with respect to the subject matter hereof, and may not be modified adversely to the Purchaser's interest except by means of a writing signed by the Company and Purchaser.  This Agreement is governed by the internal substantive laws but not the choice of law rules of California.

Purchaser represents that he or she has read this Agreement and is familiar with its terms and provisions.  Purchaser hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Board upon any questions arising under this Agreement.

IN WITNESS WHEREOF, this Agreement is deemed made as of the date first set forth above.

HOLDER                                        FF GLOBAL HOLDINGS LTD.


_____              _____
Signature                                    By

_____              _____
Print Name                                   Print Name

_____              _____
                                             Title

-4-

HLIU001417

_____

Residence Address

Dated: _____, _____

HLIU001418

**EXHIBIT C-2**

**ASSIGNMENT SEPARATE FROM CERTIFICATE**

FOR VALUE RECEIVED I, _____, hereby sell, assign and transfer unto FF Global Holdings Ltd. _____ Class A Ordinary Shares of FF Global Holdings Ltd. standing in my name of the books of said corporation represented by Certificate No. _____ herewith and do hereby irrevocably constitute and appoint _____ to transfer the said shares on the books of the within named corporation with full power of substitution in the premises.

This Share Assignment may be used only in accordance with the Restricted Share Purchase Agreement between FF Global Holdings Ltd. and the undersigned dated _____, _____ (the "Agreement").

Dated: _____,____          Signature:_____

INSTRUCTIONS: Please do not fill in any blanks other than the signature line.  The purpose of this assignment is to enable the Company to exercise its "repurchase option," as set forth in the Agreement, without requiring additional signatures on the part of the Purchaser.

**EXHIBIT C-3**

**JOINT ESCROW INSTRUCTIONS**

_____, _____

Corporate Secretary
FF Global Holdings Ltd.

Dear _____:

As Escrow Agent for both FF Global Holdings Ltd. (the "Company"), and the undersigned purchaser of shares of the Company (the "Purchaser"), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain Restricted Share Purchase Agreement (the "Agreement") between the Company and the undersigned, in accordance with the following instructions:

1.       In the event the Company and/or any assignee of the Company (referred to collectively for convenience herein as the "Company") exercises the Company's repurchase option set forth in the Agreement, the Company shall give to Purchaser and you a written notice specifying the number of shares to be purchased, the purchase price, and the time for a closing hereunder at the principal office of the Company.  Purchaser and the Company hereby irrevocably authorize and direct you to close the transaction contemplated by such notice in accordance with the terms of said notice.

2.       At the closing, you are directed (a) to date the share assignments necessary for the transfer in question, (b) to fill in the number of shares being transferred, and (c) to deliver the share assignments, together with the certificate evidencing the shares to be transferred, to the Company or its assignee, against the simultaneous delivery to you of the purchase price (by cash, a check, or some combination thereof) for the number of shares being purchased pursuant to the exercise of the Company's repurchase option.

3.       Purchaser irrevocably authorizes the Company to deposit with you any certificates evidencing shares to be held by you hereunder and any additions and substitutions to said shares as defined in the Agreement.  Purchaser does hereby irrevocably constitute and appoint you as Purchaser's attorney-in-fact and agent for the term of this escrow to execute with respect to such securities all documents necessary or appropriate to make such securities negotiable and to complete any transaction herein contemplated, including but not limited to the filing with any applicable state blue sky authority of any required applications for consent to, or notice of transfer of, the securities. Subject to the provisions of this paragraph 3, Purchaser shall exercise all rights and privileges of a member of the Company while the shares are held by you.

4.       Upon written request of the Purchaser, but no more than once per calendar year, unless the Company's repurchase option has been exercised, you shall deliver to Purchaser a certificate or certificates representing so many shares as are not then subject to the Company's repurchase option.  Within one hundred and twenty (120) days after cessation of Purchaser's

HLIU001420

continuous employment by or services to the Company, or any parent or subsidiary of the Company, you shall deliver to Purchaser a certificate or certificates representing the aggregate number of shares held or issued pursuant to the Agreement and not purchased by the Company or its assignees pursuant to exercise of the Company's repurchase option.

5.      If at the time of termination of this escrow you should have in your possession any documents, securities, or other property belonging to Purchaser, you shall deliver all of the same to Purchaser and shall be discharged of all further obligations hereunder.

6.      Your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.

7.      You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties.  You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact for Purchaser while acting in good faith, and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

8.      You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law and are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court.  In case you obey or comply with any such order, judgment or decree, you shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

9.      You shall not be liable in any respect on account of the identity, authorities or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

10.     You shall not be liable for the outlawing of any rights under the Statute of Limitations with respect to these Joint Escrow Instructions or any documents deposited with you.

11.     You shall be entitled to employ such legal counsel and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefor.

12.     Your responsibilities as Escrow Agent hereunder shall terminate if you shall cease to be an officer or agent of the Company or if you shall resign by written notice to each party.  In the event of any such termination, the Company shall appoint a successor Escrow Agent.

13.     If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

-2-

HLIU001421

14.     It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities held by you hereunder, you are authorized and directed to retain in your possession without liability to anyone all or any part of said securities until such disputes shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

15.     Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail with postage and fees prepaid, addressed to each of the other parties thereunto entitled at the following addresses or at such other addresses as a party may designate by ten (10) days' advance written notice to each of the other parties hereto.

16.     By signing these Joint Escrow Instructions, you become a party hereto only for the purpose of said Joint Escrow Instructions; you do not become a party to the Agreement.

17.     This instrument shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

18.     These Joint Escrow Instructions shall be governed by the internal substantive laws, but not the choice of law rules, of California.

PURCHASER                                    FF GLOBAL HOLDINGS LTD.


_____          _____
Signature                                    By


_____          _____
Print Name                                   Print Name


_____          _____
                                             Title


_____
Residence Address


ESCROW AGENT


_____
Corporate Secretary

Dated: _____

HLIU001422

## <u>EXHIBIT C-4</u>

## INSTRUCTIONS FOR FILING SECTION 83(b) ELECTION

Attached is a form of election under Section 83(b) of the Internal Revenue Code and an accompanying IRS cover letter.  Please fill in your social security number and sign the election and cover letter, then proceed as follows:

**(a)**   Make **<u>five</u>** copies of the original completed Section 83(b) election form.

**(b)**   Send the original completed election form, one copy of the completed election form, the cover letter, and a self-addressed stamped return envelope to the Internal Revenue Service Center where you would otherwise file your tax return.  Even if an address for an Internal Revenue Service Center is already included in the forms below, it is your obligation to verify such address.  This can be done by searching for the term "where to file" on <u>www.irs.gov</u> or by calling 1 (800) 829-1040.  Sending the election via certified mail, requesting a return receipt, is also recommended.

**(c)**   Deliver one copy of the completed election form to the Company.

**(d)**   Attach one copy of the completed election form to your federal personal income tax return (Form 1040) when you file it for the year.

**(e)**   Attach one copy of the completed election form to your state personal income tax return when you file it for the year (assuming you file a state income tax return).

**(f)**   Retain one copy of the completed election form for your personal permanent records.

*Please note that the election must be filed with the IRS within 30 days of the date of your restricted stock purchase.  Failure to file within that time will render the election void and you may recognize ordinary taxable income as your vesting restrictions lapse.  The Company and its counsel cannot assume responsibility for failure to file the election in a timely manner under any circumstances.*

HLIU001423

**RETURN SERVICE REQUESTED**

Department of the Treasury
Internal Revenue Service
Fresno, CA 93888-0002

        Re:      **Election Under Section 83(b) of the Internal Revenue Code**

Dear Sir or Madam:

      Enclosed please find an executed form of election under Section 83(b) of the Internal Revenue Code of 1986, as amended, filed with respect to an interest in FF Global Holdings Ltd.

Also enclosed is a copy of the signed form of election under Section 83(b).  Please acknowledge receipt of these materials by marking the copy when received and returning it in the enclosed stamped, self-addressed envelope.

      Thank you very much for your assistance.

        Very truly yours,

        _____

        Signature

        _____

        Print Name

Enclosures

HLIU001424

# ELECTION UNDER SECTION 83(b)
# OF THE INTERNAL REVENUE CODE OF 1986

The undersigned taxpayer hereby elects, pursuant to Sections 55 and 83(b) of the Internal Revenue Code of 1986, as amended, to include in taxpayer's gross income or alternative minimum taxable income, as the case may be, for the current taxable year the amount of any compensation taxable to taxpayer in connection with taxpayer's receipt of the property described below.

1.      The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

|  | TAXPAYER | SPOUSE |
|---|---|---|
| NAME: | _____ | _____ |
| ADDRESS: | _____ | _____ |
|  | _____ | _____ |
| TAX ID NO.: | _____ | _____ |
| TAXABLE YEAR: | _____ | |

2.      The property with respect to which the election is made is described as follows: _____ shares (the "Shares") of the Class A Ordinary Shares of FF Global Holdings Ltd. (the "Company").

3.      The date on which the property was transferred is:_____ ,_____.

4.      The property is subject to the following restrictions:

The Shares may not be transferred and are subject to forfeiture under the terms of an agreement between the taxpayer and the Company.  These restrictions lapse upon the satisfaction of certain conditions contained in such agreement.

5.      The Fair Market Value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms shall never lapse, of such property is: $___ per Class A Ordinary Share.

6.      The amount (if any) paid for such property is:  $___ per Class A Ordinary Share.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property.  The transferee of such property is the person performing the services in connection with the transfer of said property.

<u>The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.</u>

Dated: _____, _____        _____
                                                                         Taxpayer

The undersigned spouse of taxpayer joins in this election.

Dated: _____, _____        _____
                                                                         Spouse of Taxpayer

-3-

# Exhibit 7A

| From: | H. Liu |
|---|---|
| **Sent:** | Tuesday, November 21, 2017 8:34 AM CST |
| **To:** | Jerry.Wang@ff.com |
| **BCC:** | Liu gmail Henry H. |
| **Subject:** | TS |
| **Attachments:** | 11212017FF&HLTermSheet.pdf |

Please find the attached.  Best regards.

HLIU003700

HLIU003701-HLIU003702

Confidential & Privileged

Term Sheet
Between FF and HL
(November 21, 2017)

This Terms Sheet ("Terms") sets forth the terms and condition of employment of Henry L ("HL") at FF Global Holdings Ltd., Faraday & Future Inc., d/b/a Faraday, and Faraday owned LeSEE ("FF").  These Terms supersedes and replaces any and all previous agreements between the parties.  If any provision of these Terms is ineffective in whole or in part, the remainder of the Terms shall remain effective.  The Terms shall be constructed in accordance with the laws of the State of California.

Position & Duties:
FF shall appoint HL the Global Vice Chairman of the Global Board and concurrently the Global General Counsel, and the Global Senior Advisor of FF, reporting to FF's Chairman and CEO.  FF shall give HL adequate authority and support in performing his duties.  HL's duties and responsibilities commensurate with such positions, and subject to typical exceptions for serving on other civic/charitable/corporate boards with no direct conflict of interest with FF and for managing personal investments.

Term:
HL shall commence as soon as practical and expects to be no later than January 1, 2018, based on agreed Terms.  FF shall guarantee HL's employment as provided in the Terms for five years.  Thereafter such employment shall continue until terminated by either party pursuant to the Terms.

Base Salaries:
FF shall guarantee in paying HL a minimum annual base salary of $1,250,000.00 for five years.  The amount reflects HL's current annual base pay amount.  Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF.

Signing Bonus:
FF shall advance HL a signing bonus of $250,000.00 for his job switch loss.

Bonus Opportunity:
FF shall award HL annual bonus based on annual review.  FF shall give HL access to special Bonus based on a percentage of overall transaction, after successful financing including Series

1

HLIU003701

Confidential & Privileged

A, China Joint Venture, and other special projects and important tasks, etc., in which HL plays one of the leading roles of the project group and makes substantial contributions.

Equity Grants:

FF shall entitle HL to FF's long-term and short-term incentives.  FF shall grant HL at no cost and outright, 3% of FF's total equity shares, namely 30,000,000.00 equity shares representing 3% of the total and all of 1,000,000,000 equity shares of FF as FF has represented and warranted.  FF shall cause HL's granted equity shares to be vested at the schedule of 50% upon HL's joining FF; 25% six months after HL's joining FF; and 25% on the first anniversary date of HL's employment with FF, all with adequate consideration of tax benefits available to HL.

Benefits/PTO:

FF shall entitle HL to participate in all benefit plans and programs at the same level with all senior level executives of FF, including corporate housing, transportation, retirement, welfare, vacation and PTO, insurances including health, life, and D&O.  FF shall honor and adopt all employee friendly best practices in favor of HL as a valued senior executive of FF, with regard to severance payments, change of control, parachute payments, tax treatments and other customary executive compensation provisions.

Signed by,                                          Signed by,


Signature: _____                Signature: _____
For & on behalf of Faraday                   Henry L
Position:                                            Printed Name:
Printed Name:

Date:                                                Date:

HLIU003702

# Exhibit 8

## Liu, Hong (Henry)

| | |
|---|---|
| **From:** | Liu, Hong (Henry) |
| **Sent:** | Friday, December 22, 2017 3:43 PM |
| **To:** | Recht, Philip R. |
| **Subject:** | RE: [EXTERNAL] Outstanding invoices |

Phil:  You have been a great partner and friend. Let's move forward on this existing project.  With all best holiday wishes.  henry

---

**From:** Recht, Philip R.
**Sent:** Friday, December 22, 2017 3:32 PM
**To:** Liu, Hong (Henry)
**Subject:** Re: [EXTERNAL] Outstanding invoices

Great and great job in reviving this relationship. Looking forward to lots of interesting work going forward. Happy holidays.

Sent from my iPhone

On Dec 22, 2017, at 12:09 PM, Liu, Hong (Henry) <HLiu@mayerbrown.com> wrote:

> Excellent. Moving forward as planned. I will execute it and send back to the top management cc you and our team. All the best.  Henry
>
> On Dec 22, 2017, at 21:06, Recht, Philip R. <PRecht@mayerbrown.com> wrote:
>
>> FYI.
>> Sent from my iPhone
>>
>> Begin forwarded message:
>>
>>> **From:** Amanda Walker <Amanda.Walker@ff.com>
>>> **Date:** December 22, 2017 at 11:57:29 AM PST
>>> **To:** "Recht, Philip R." <PRecht@mayerbrown.com>
>>> **Cc:** Lillian Xu <Lillian.Xu@ff.com>, "Jerry Wang (FF China)" <Jerry.Wang@ff.com>
>>> **Subject: RE: [EXTERNAL] Outstanding invoices**
>>>
>>> Great, thank you Philip.  Attached please also find the supplemental engagement letter that one of your colleagues had requested back in October to reinitiate the engagement.
>>>
>>> Best,
>>> Amanda
>>>
>>> **From:** Recht, Philip R. [mailto:PRecht@mayerbrown.com]
>>> **Sent:** Friday, December 22, 2017 11:16 AM
>>> **To:** Amanda Walker <Amanda.Walker@ff.com>
>>> **Cc:** Lillian Xu <Lillian.Xu@ff.com>
>>> **Subject:** Re: [EXTERNAL] Outstanding invoices

1

HLIU003707

Amanda—good news. I'll be gone all next week but will see if we can get
started on the work in my absence. Will let you know shortly. Phil.

Sent from my iPhone

On Dec 22, 2017, at 11:05 AM, Amanda Walker
<Amanda.Walker@ff.com> wrote:

> Hi Phil – We received approval to wire the $197,268,
> and I am working with the accounting crew we have left
> in the office to have that wire out today. Our accounting
> team is also entering that previously uninvoiced $19K in
> the system, so that additional payment may not go out
> until after the holiday but I am told it is on their radar
> and will be paid as well.
>
> Attached is a spreadsheet I started with the different
> preliminary categories of information that we are trying
> to obtain regarding these 10 states, and my initial
> research. As we briefly discussed during our call, the
> main questions that we initially have are:
>
> - Can we operate a direct sales model in
>   these 10 states?
> - As an alternative, what are the key dealer
>   franchise model pros/cons in these 10
>   states? (I know this is a very broad question
>   but we are really just looking for a high level
>   overview).
> - Can we mix and match a direct sales and
>   dealer franchise model within state
>   borders, i.e. can we open flagship FF direct
>   sales stores in LA and SF, while still offering
>   dealer franchises for sale in California?
> - Can we offer an equity stake in Faraday to a
>   franchisee as an additional incentive to
>   purchase a Faraday franchise?
> - Can we offer franchisees a web platform as
>   an additional sales tool (that links to our
>   main FF website)? An overview of any key
>   auto internet sales laws in these states
>   would also be very helpful.
>
> Please let me know if you have any further questions
> about these initial inquiries. We were hoping to get
> some preliminary information during the week of Jan. 2,
> but please let us know if you have any concerns in light
> of the holiday.
>
> Best,
> Amanda
> _____

2

HLIU003708

**Faraday Future**

Amanda Walker
Corporate Counsel, Legal
+1 858 736 6978

18455 S Figueroa St,
Gardena, CA 90248

FF.com

---

**From:** Recht, Philip R. [mailto:PRecht@mayerbrown.com]
**Sent:** Thursday, December 21, 2017 2:52 PM
**To:** Amanda Walker <Amanda.Walker@ff.com>
**Subject:** RE: [EXTERNAL] Outstanding invoices

Amanda—The wire instructions are attached above.  As I mentioned, I'll be out of town starting tomorrow.  But, you can reach me by email and cell phone while I'm away.  So, don't hesitate to get in touch if you have additional questions, etc.  I hope this all works out so we can resume our work together.  Thanks.  Phil.

---

**From:** Amanda Walker [mailto:Amanda.Walker@ff.com]
**Sent:** Thursday, December 21, 2017 2:12 PM
**To:** Recht, Philip R.
**Subject:** RE: [EXTERNAL] Outstanding invoices

Hi Phil – Sorry I missed your call. I am still working on getting the necessary internal sign offs before these payments can be issued but I should have more information shortly.  That would be great if you could send me wire instructions in the meantime.

Best,
Amanda

---

**From:** Recht, Philip R. [mailto:PRecht@mayerbrown.com]
**Sent:** Wednesday, December 20, 2017 12:21 PM
**To:** Amanda Walker <Amanda.Walker@ff.com>
**Subject:** [EXTERNAL] Outstanding invoices

Amanda—Very good to meet by phone this morning.  I look forward to resuming our work for Faraday.  As we discussed, however, there are a number of outstanding invoices from our firm that must be paid before the firm will allow us to

3

HLIU003709

recommence.  I've attached the invoices above.  As you will see, the invoices represent two separate lines of work, as follows:

1.  Regulatory work—This is the work that I was involved in and that we discussed this morning.  As you will see, there are two bills.  The first is for $52,500, which represents our work on the first phase of the project.  The second is for $19,914, which represents our work on the second, but as yet unfinished, phase of the project.  (Your predecessor attorneys had asked us to hold off sending Faraday the bill for our time on the second phase until the first bill was paid.  So, we had not previously sent this bill to Faraday.)  Together, the bills add up to $72,414.

2.  Employment work—There are three invoices for this work, which was overseen by Maureen Gorman, a labor and employment partner in our Palo Alto office.  I have only a rudimentary understanding of the nature of the project.  So, if you wish to know more about its origins and content, you may wish to contact Maureen directly.  The three invoices amount to $154,768 in total.  However, we have a $10,000 security deposit retainer from Faraday that could be applied, thus reducing the amount owing to $144,768.

Should you have any questions about these invoices, please don't hesitate to get in touch. Thanks.  Phil.

Philip R. Recht
Mayer Brown LLP
350 S. Grand Avenue, 25th Floor
Los Angeles, CA  90071
Direct:  213 229-9512
Main:  213 229-9500
Mobile: 310 493-9781
Fax:  213 625-0248
PRecht@mayerbrown.com

_____
_____
4

HLIU003710

This email and any files transmitted with it are intended
solely for the use of the individual or entity to whom
they are addressed. If you have received this email in
error please notify the system manager. If you are not
the named addressee you should not disseminate,
distribute or copy this e-mail.


<DS_FFPar State Comparison.xlsx>

<Mayer Brown_FF Supplemental Engagement (12.22.17).pdf>

HLIU003711

Exhibit 9

| From: | H. Liu |
|---|---|
| Sent: | Thursday, January 11, 2018 9:38 AM CST |
| To: | Jerry Wang (FF China) |
| CC: | Liu gmail Henry H. |
| Subject: | Re: [EXTERNAL] Fwd: TS |
| Attachments: | 01112018FFHLTermSheet(CleanoverJW).docx, 01112018FFHLTermSheet(RLoverJW).docx |

Hi Jerry:  Please find the attached.  Best regards.  Henry

On Mon, Jan 1, 2018 at 11:10 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

Dear Mr. Liu,


Happy New Year! Please refer to attachment comments based on our discussion and previous term sheet, please let me know your feedback and sincerely looking forward to partnership!


Best regards,

Jerry


_____


**Faraday Future**


**Jerry Wang**

General Manager │ Global Capital and Investment Banking


e    jerry.wang@ff.com

c    +1 201-354-7734 / +86 151-1690-3389

a    18455 S Figueroa St, Gardena, CA 90248

w    www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the

HLIU003717

authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Wednesday, November 22, 2017 5:08 AM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Subject:** [EXTERNAL] Fwd: TS

Begin forwarded message:

    **From:** "H. Liu" <henryliuesq@gmail.com>
    **Date:** November 21, 2017 at 9:34:54 AM EST
    **To:** Jerry.Wang@ff.com
    **Subject: TS**

    Please find the attached.  Best regards.

HLIU003718

HLIU003722-HLIU003724

Confidential & Privileged

Employment Agreement~~Term Sheet~~

Between FF and HL

(January __2, 2018)

This Employment Agreement~~Terms Sheet~~ ("Agreement~~Terms~~") sets forth the terms and condition of employment of Henry L ("HL") at FF Global Holdings Ltd.~~,~~ which owns 100% of such entities including, without limitation, ~~,~~ Faraday & Future Inc., LeSEE~~,~~, City Sky Limited, ~~d/b/a Faraday, and Faraday owned LeSEE~~ ("FF"). These Terms ("Terms") supersede~~s~~ and replace~~s~~ any and all previous agreements between the parties. If any provision of these Terms is ineffective in whole or in part, the remainder of the Terms shall remain effective.  The Terms shall be constructed in accordance with and governed by the laws of the State of California without regard to otherwise governing principles of conflicts of law.

Position & Duties:

FF shall appoint HL Senior ~~Board Member of FF~~ ~~Global Board~~; Global President, ~~and concurrently the Global General Counsel at HL's choice, and the Global Senior Advisor of FF, directly reporting to FF's ~~Chairman and~~ CEO. FF shall give HL adequate authority and support in performing his duties. HL's duties and responsibilities shall be commensurate with such positions, and subject to typical exceptions for serving on other civic/charitable/corporate boards with no direct conflict of interest with FF and for managing personal investments.

Term:

HL shall commence as soon as practical and expects to be no later than February 1~~January 15~~, 2018, based on agreed Terms. FF shall guarantee HL's employment and base salaries as provided in the Terms for five years. Thereafter such employment shall continue until terminated by either party, upon 90 days advance notice, pursuant to the Terms.

Base Salaries:

FF shall pay~~guarantee in paying~~ HL a minimum annual base salary of $1,000,000.00, in semi-monthly (bi-weekly) installments, ~~for five years. ~~The amount reflects HL's current annual base pay amount.~~ If HL is terminated for any reason during the five year term he will be entitled to receive any remaining portion of the five years of base salaries not yet paid in a lump sum. Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF.

Signing Bonus:

FF shall pay~~advance~~ HL a signing bonus of $3,00~~25~~0,000.00, ~~including partially equivalence of benefits (housing, transportation etc.), for his job switch loss~~ payable in five equal installments,

1

HLIU003722

Confidential & Privileged

with the first installment paid upon the signing of the Agreement and each of the remaining installments paid at each of the following four anniversary of HL's start of employment at FF and paid in lump sum in the event of an early termination during the five year guaranteed employment term.

Bonus Opportunity:

FF shall award HL annual bonus based on annual review. FF shall give HL access to special Bonus based on a percentage of overall transactions, after successful financing including equity financing , China Joint Venture, and other special projects and important tasks, etc., in which HL plays one of the leading roles of the project group and makes substantial contributions.

Equity Grants:

FF shall entitle HL to FF's long-term and short-term incentives. FF shall grant HL at nominimum cost required by law and outright, 2% of FF's total equity shares determined on a fully diluted and converted basispre Series A dilution, , namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000 equity shares of FF pre Series A , as FF has represented and warranted, with standard vesting schedule and adequate consideration of tax benefits available to HL. Any and all of the remaining unvested portion of such 2% of the total shares shall become immediately and fully vested to HL upon any early termination of HL's employment with FF within the guaranteed employment term with FF.  In the event that HL's employment is terminated HL can cause FF to repurchase his such shares and rights at no less than market value.  FF shall reimburse HL and provide HL with financing assistances with regard to any additional costs that HL may incur in connection with the equity grants. FF has represented that there are no multiple classes of shares with different rights and values.

Benefits/PTO:

FF shall entitle HL to participate in all benefit plans and programs at the same level with all senior level executives of FF, including, without limitation, corporate housing, transportation, retirement, welfare, vacation and PTO, insurances including health, life, and D&O. FF shall honor and adopt all employee and executive friendly best practices in favor of HL as a valued senior executive of FF, with regard to severance payments, change of control, parachute payments, tax treatments and any other customary executive compensation provisions. HL is entitled to indemnification from FF on terms no less than any other executives and employees.

Relocation:

At the request of FF, HL shall relocate from New York to Los Angeles. FF shall pay for all HL's relocation costs and expenses as a senior executive, including, without limitation, family house-hunting trips, moving and storage of household goods, settling in allowances, interim living,

2

HLIU003723

Confidential & Privileged

expenses in selling and buying a residence, and house sales assistance including guaranteed buy out of his residence.

Survivor Benefits:
HL is entitled to death benefits if he dies during the five year term and during his employment at FF, including two year of base salary for his surviving spouse and children.  Upon his death all his equity interests become fully vested and will pass to his surviving spouse and his children.

Signed by,                                           Signed by,


Signature:_____         Signature: _____
For & on behalf of Faraday           Henry L
Position:                                       Printed Name:
Printed Name:


Date:                                            Date:

3

HLIU003724

HLIU003719-HLIU003721

Confidential & Privileged

Employment Agreement

Between FF and HL

(January __, 2018)

This Employment Agreement ("Agreement") sets forth the terms and condition of employment of Henry L ("HL") at FF Global Holdings Ltd which owns 100% of such entities including, without limitation, Faraday & Future Inc., LeSEE, City Sky Limited, d/b/a Faraday ("FF"). These Terms ("Terms") supersede and replace any and all previous agreements between the parties. If any provision of these Terms is ineffective in whole or in part, the remainder of the Terms shall remain effective.  The Terms shall be constructed in accordance with and governed by the laws of the State of California without regard to otherwise governing principles of conflicts of law.

Position & Duties:
FF shall appoint HL Senior Board Member of FF Global Board; Global President, and concurrently the Global General Counsel at HL's choice, and the Global Senior Advisor of FF, directly reporting to FF's CEO. FF shall give HL adequate authority and support in performing his duties. HL's duties and responsibilities shall be commensurate with such positions, and subject to typical exceptions for serving on other civic/charitable/corporate boards with no direct conflict of interest with FF and for managing personal investments.

Term:
HL shall commence as soon as practical and expects to be no later than February 1, 2018, based on agreed Terms. FF shall guarantee HL's employment and base salaries as provided in the Terms for five years. Thereafter such employment shall continue until terminated by either party, upon 90 days advance notice, pursuant to the Terms.

Base Salaries:
FF shall pay HL a minimum annual base salary of $1,000,000.00, in semi-monthly (bi-weekly) installments, for five years. If HL is terminated for any reason during the five year term he will be entitled to receive any remaining portion of the five years of base salaries not yet paid in a lump sum. Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF.

Signing Bonus:
FF shall pay HL a signing bonus of $3,000,000.00, payable in five equal installments, with the first installment paid upon the signing of the Agreement and each of the remaining installments paid at each of the following four anniversary of HL's start of employment at FF and paid in lump sum in the event of an early termination during the five year guaranteed employment term.

1

HLIU003719

Confidential & Privileged

Bonus Opportunity:

FF shall award HL annual bonus based on annual review. FF shall give HL access to special Bonus based on a percentage of overall transactions, after successful financing including equity financing, China Joint Venture, and other special projects and important tasks, etc., in which HL plays one of the leading roles of the project group and makes substantial contributions.

Equity Grants:

FF shall entitle HL to FF's long-term and short-term incentives. FF shall grant HL at no cost and outright, 2% of FF's total equity shares determined on a fully diluted and converted basis, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000 equity shares of FF as FF has represented and warranted, with standard vesting schedule and adequate consideration of tax benefits available to HL. Any and all of the remaining unvested portion of such 2% of the total shares shall become immediately and fully vested to HL upon any early termination of HL's employment with FF within the guaranteed employment term with FF.  In the event that HL's employment is terminated HL can cause FF to repurchase his such shares and rights at no less than market value.  FF shall reimburse HL and provide HL with financing assistances with regard to any additional costs that HL may incur in connection with the equity grants. FF has represented that there are no multiple classes of shares with different rights and values.

Benefits/PTO:

FF shall entitle HL to participate in all benefit plans and programs at the same level with all senior level executives of FF, including, without limitation, corporate housing, transportation, retirement, welfare, vacation and PTO, insurances including health, life, and D&O. FF shall honor and adopt all employee and executive friendly best practices in favor of HL as a valued senior executive of FF, with regard to severance payments, change of control, parachute payments, tax treatments and any other customary executive compensation provisions. HL is entitled to indemnification from FF on terms no less than any other executives and employees.

Relocation:

At the request of FF, HL shall relocate from New York to Los Angeles. FF shall pay for all HL's relocation costs and expenses as a senior executive, including, without limitation, family house-hunting trips, moving and storage of household goods, settling in allowances, interim living, expenses in selling and buying a residence, and house sales assistance including guaranteed buy out of his residence.

HLIU003720

Confidential & Privileged

<u>Survivor Benefits</u>:

HL is entitled to death benefits if he dies during the five year term and during his employment at FF, including two year of base salary for his surviving spouse and children.  Upon his death all his equity interests become fully vested and will pass to his surviving spouse and his children.

Signed by,                                                        Signed by,

Signature:_____                        Signature: _____
For & on behalf of Faraday                            Henry L
Position:                                                            Printed Name:
Printed Name:

Date:                                                                Date:

HLIU003721

Exhibit 10

| From: | H. Liu |
|---|---|
| Sent: | Wednesday, January 17, 2018 9:49 AM CST |
| To: | Jerry Wang (FF China) |
| BCC: | Liu gmail Henry H. |
| Subject: | Re: [EXTERNAL] Fwd: TS |
| Attachments: | 01172018FFHLTermSheetBasedonJerryRevisedVersion(Clean).docx, 01172018FFHLTermSheetBasedonJerryRevisedVersion(Redline).docx, 01172018StockTransferAgreement.docx |

Hi Jerry:  As mentioned, please find the attached.  Best regards.  HL

On Tue, Jan 16, 2018 at 6:58 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

Dear Mr. Liu,


Apologize for getting back to you late, please refer to my comment based on updated file, and please let me know your suggestions or if we need to schedule a call to further discuss. Thanks again!


Best,

Jerry


_____


**Faraday Future**


**Jerry Wang**

General Manager | Global Capital and Investment Banking


e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com

-

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF

HLIU003744

Inc. email is requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Thursday, January 11, 2018 11:38 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** Liu gmail Henry H. <henryliuesq@gmail.com>
**Subject:** Re: [EXTERNAL] Fwd: TS

Hi Jerry:  Please find the attached.  Best regards.  Henry

On Mon, Jan 1, 2018 at 11:10 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

Dear Mr. Liu,

Happy New Year! Please refer to attachment comments based on our discussion and previous term sheet, please let me know your feedback and sincerely looking forward to partnership!

Best regards,

Jerry

————————————————

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

HLIU003745

a  18455 S Figueroa St, Gardena, CA 90248

w  [www.ff.com](www.ff.com)

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

---

**From:** H. Liu [mailto:[henryliuesq@gmail.com](henryliuesq@gmail.com)]
**Sent:** Wednesday, November 22, 2017 5:08 AM
**To:** Jerry Wang (FF China) <[Jerry.Wang@ff.com](Jerry.Wang@ff.com)>
**Subject:** [EXTERNAL] Fwd: TS

Begin forwarded message:

> **From:** "H. Liu" <[henryliuesq@gmail.com](henryliuesq@gmail.com)>
> **Date:** November 21, 2017 at 9:34:54 AM EST
> **To:** [Jerry.Wang@ff.com](Jerry.Wang@ff.com)
> **Subject: TS**
>
> Please find the attached.  Best regards.

HLIU003746

HLIU003748-HLIU003750

Confidential & Privileged

Employment Agreement

Between FF and HL

(January __, 2018)

This Employment Agreement ("Agreement") sets forth the terms and condition of employment of Henry L ("HL") at FF Global Holdings Ltd which owns 100% of such entities including, without limitation, Faraday & Future Inc., LeSEE (in~~by~~ VIE Structure), City Sky Limited, d/b/a Faraday and their successors, assignees and transferees ("FF"). These Terms ("Terms") supersede and replace any and all previous agreements between the parties. If any provision of these Terms is ineffective in whole or in part, the remainder of the Terms shall remain effective.  The Terms shall be constructed in accordance with and governed by the laws of the State of California without regard to otherwise governing principles of conflicts of law.

Position & Duties:
FF shall appoint HL Senior Board Member of FF Global Board; Global President (aka and functions as Global Chief Administrative Officer), and concurrently the Global General Counsel at HL's choice, and the Global Senior Advisor of FF, directly reporting to FF's CEO. FF shall give HL adequate authority and support in performing his duties. HL's duties and responsibilities shall be commensurate with such positions, and subject to typical exceptions for serving on other civic/charitable/corporate boards with no direct conflict of interest with FF and for managing personal investments.

Term:
HL shall commence as soon as practical and expects to be no later than February 1, 2018, based on agreed Terms. FF shall guarantee HL's employment and base salaries as provided in the Terms for five years. Thereafter such employment shall continue at the then same levels of responsibilities, compensation and benefits as provided in this Agreement until terminated by either party, upon 90 days advance notice, pursuant to the Terms.

Base Salaries:
FF shall pay HL a minimum annual base salary of $1,000,000.00, in semi-monthly (bi-weekly) installments, for five years. If HL is terminated for any reason during the five year term he will be entitled to receive any remaining portion of the five years of base salaries not yet paid in a lump sum. Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF.

Signing Bonus:
FF shall pay HL a signing bonus of $3,000,000.00, payable in five equal installments, with the first

1

HLIU003748

Confidential & Privileged

installment paid upon the signing of the Agreement and each of the remaining installments paid at each of the following four anniversary of HL's start of employment at FF and paid in lump sum in the event of an early termination during the five year guaranteed employment term.

Bonus Opportunity:

FF shall award HL annual bonus based on annual review. FF shall give HL access to special Bonus based on a percentage of overall transactions, ~~after successful financing~~ including successful equity and debt financing, China Joint Venture, and other special projects and important tasks, etc., in which HL plays one of the leading roles of the project group and makes substantial contributions.

Equity Grants:

FF shall entitle HL to FF's long-term and short-term incentives. FF shall grant HL at minimum cost required by law and outright, 2% of FF's total equity shares pre Series A dilution, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.00 equity shares of FF pre Series A, as FF has represented and warranted, with standard vesting schedule and adequate consideration of tax benefits available to HL. Any and all of the remaining unvested portion of such 2% of the total shares shall become immediately and fully vested to HL upon any early termination of HL's employment with FF within the guaranteed employment term with FF. FF has represented that it had successfully completed Series A financing in December 2017.  FF has further represented that there are no multiple classes of shares with different rights and values offered to employees expect the Founder (YT himself). HL will act in concert with the Founder under the circumstance permitted by law.

Benefits/PTO:

FF shall entitle HL to participate in all benefit plans and programs at the same level with all senior level executives of FF, including, without limitation, corporate housing, transportation, retirement, welfare, vacation and PTO, insurances including health, life, and D&O. FF shall honor and adopt all employee and executive friendly best practices in favor of HL as a valued senior executive of FF, with regard to severance payments, change of control, parachute payments, tax treatments and any other customary executive compensation provisions. HL is entitled to indemnification from FF on terms no less than any other executives and employees.

Relocation:

~~At the request of FF, HL shall relocate from New York to Los Angeles.~~ FF shall pay for all HL's reasonable relocation costs and expenses as a senior executive, including, without limitation, family house-hunting trips, moving and storage of household goods, settling in allowances, interim living etc.

2

Confidential & Privileged

<u>Survivor Benefits</u>:

HL is entitled to death benefits if he dies during the five year term and during his employment
at FF, including two year of base salary for his surviving spouse and children.  Upon his death all
his equity interests become fully vested and will pass to his surviving spouse and his children.

Signed by,                                  Signed by,


Signature:_____          Signature: _____
For & on behalf of Faraday               Henry L
Position:                                        Printed Name:
Printed Name:


Date:                                            Date:

3

HLIU003747

Confidential & Privileged

STOCK TRANSFER AGREEMENT

This Stock Transfer Agreement (the "Agreement") is made and entered into as of ___ day of January, 2018, by and between YT (the "Transferor") and HL (the "Transferee") (separately "Party" or jointly "Parties"), as a legally bound agreement on both Parties and on their successors, assignees and transferees.

1. Transferor owns shares of common stock of FF Global Holdings Ltd which owns 100% of such entities including, without limitation, Faraday & Future Inc., LeSEE (in VIE Structure), City Sky Limited, d/b/a Faraday and their successors, assignees and transferees ("FF", "Company"). Transferor and Transferee have entered into this Agreement pursuant to which the Transferor wishes to transfer such shares of the Company it directly or indirectly owns and warrants that it has all the vested and other right to transfer, to Transferee: shares equal to 1% of the Company's total equity shares pre Series A dilution, namely 10,000,000.00 equity shares representing 1% of the total and all of 1,000,000,000.00 equity shares of the Company pre Series A (the "Shares" or "Stocks"), with adequate consideration of tax benefits available to Transferee. Transferor has represented that the Company had successfully completed its Series A financing in December 2017.

2. Transferor hereby sells, transfers, assign and convey free of any and all obligations and completely unencumbered and with full indemnifications, to Transferee, and Transferee hereby acquires, all of Transferor's right, title and interest in and to the Shares ("Acquired Shares"). It has been agreed by the Parties that the Acquired Shares shall be transferred for a total price of $100.00 as a full consideration which Transferor acknowledges of full acceptance of it upon signing of this Agreement.

3. The Agreement is effective and binding upon signing, and Transferor and Transferee may agree that the delivery by Transferor to Transferee the certificate or other documents representing the Acquired Shares with necessary stock powers duly executed at a time when Transferee so demands including at the time of the Company's IPO. Any delay to enforce the terms of this Agreement and any delay to act on a breach of its term by the Transferee does not constitute a waiver of those rights.

4. If any provision of this Agreement is ineffective in whole or in part, the remainder of the Agreement shall remain in effect. This Agreement is binding on both Parties by virtue of the conduct of both parties and in spite of any defect or error in the formality of its execution.

5. The rights, benefits, liabilities and responsibilities contained within the terms of this Agreement are assignable by any Party with the prior written agreement of the other Party.

Transferor:                                  Transferee:

Signature: _____                       Signature: _____
Print Name: _____                         Print Name: _____

HLIU003747

Exhibit 11

13:55

Jiawei Wang, Jerry, Yueting Jia Nephew, in charge of financing & HR N

Jan 22, 2018 14:51

They arranged to arrive at the company at 2pm this afternoon. I can either accompany them on the visit or not participate in the visit. It depends on the convenience of your time.

Jan 22, 201815:09

Thank you, manager Liu, for accepting my modifications to the Employment Agreement. I no longer have any issues with this agreement. Ultimately the HR director DG will need to review it. If he also does not have any other issue with it, we can then finalize it. I have sent you the Share Transfer Agreement modification. We can briefly discuss it this afternoon.

It is up to you. Since you have already seen the company, if you think it is unnecessary to accompany them, how about we meet at 2pm this afternoon?

Jan 22, 201815:44

We'll arrive at the company at 2pm this afternoon. I guess we will be there the whole afternoon. Let's just find a convenient time to meet up in a little bit.

HLIU002338

13:55

< 王佳伟Jerry贾跃亭外甥管融资人事N   •••

Jan 22, 2018 14:51

他们安排的是下午两点到公司。我可以陪他们参观也可以不参加参观，看你的时间方便。 

Jan 22, 2018 15:09

 刘总好，谢谢您接受我对Employment Agreement的修改，我对这份协议没问题了，最终在请HR负责人DG审阅，如果他也没其他问题我们就可以定稿了。我把Share Transfer Agreement的修改发给您了，咱们下午可以简单讨论一下

 看看您的建议，因为您已经看过公司了，如果您觉得不用陪他们，咱们就２点见？

Jan 22, 2018 15:44

我们两点到公司，估计下午都在。咱们待会择时见。 

  

HLIU002339

## DECLARATION AND CERTIFICATION

We, <u>Ko & Martin - Certified Interpreters and Translators</u>, declare that we are

( ✓ )    Certified Court Interpreters as described in GC68565

We are certified to interpret and translate <u>from the Chinese language to the English language and from the English language to the Chinese language.</u>

We further declare that we have translated the attached document <u>from the Chinese language to the English language.</u>

We declare to the best of our abilities and belief, that this is a true and accurate translation of the <u>Chinese</u> language text of <u>the 3 pages of text messages as described below.</u>

### Specific Description of the Document

1. 01222018 Wang of FF Message re FF HR Dept. Review of Liu EA
2. 01252018 Wang of FF Message re FF Legal Review & HR Approval of Liu Agreement
3. 01262018 Wang of FF Message re Vijay Sekhon of Sidley Austin has been reviewing agreements

We declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration is signed this <u>5th of April 2021</u> in <u>Los Angeles</u>, California.


<u>Lingling Men Martin</u>
President
Ko & Martin - Certified Interpreters and Translators


_____
Signature


KO & MARTIN – Certified Interpreters and Translators
www.komartin.com
Email: chinese.division@komartin.com

HLIU002340

# Exhibit 12

13:57

Jiawei Wang, Jerry, Yueting Jia  Nephew, in charge of financing & HR N

···

Jan 25, 2018 17:15

Thank you. I made the final modification in one place. Please check. If you have no issues with it, I will then ask HR to send the final version to you. We will sign it on our end immediately after you sign it. Thank you.

Jan 25, 2018 17:57

Jerry, please check your email. Regards!

Jan 25, 2018 18:02

Received it. Thank you. Currently going through final process internally.

Jan 25, 2018 20:28

Hi, manager Liu, DG replied, and the company has confirmed internally regarding your joining. But since it involves the five-year guaranteed employment, which is something we have never come across before, our Legal Department is now working closely with HR in doing the final review. Sorry I did not catch this earlier. In order to keep the confidentiality, I did not go through them earlier. I will try to get them to do their review as quickly possible. But all remuneration, conditions and principles have been confirmed. Apologize again.

HLIU002341

13:57

‹   王佳伟Jerry贾跃亭外甥管融资人事N   •••

Jan 25, 2018 17:15

 谢谢您，我加了一处最后的修改，请您查收，如没问题我让HR发出定稿版，您签署后我们这边立即签署，谢谢

Jan 25, 2018 17:57

Jerry: 请查电邮。祝好。 

Jan 25, 2018 18:02

 收到谢谢您，正在内部推动最后流程

Jan 25, 2018 20:28

 刘总好，DG也已经回复了，您加入这件事内部已经确认了，但由于涉及五年保证雇佣，以前从没遇到过，法务部正在抓紧配合HR在做最后审阅，抱歉之前是我大意了为了保密没经过他们，我会尽量压缩他们的审阅时间。但所有待遇条件原则已经确定，再次抱歉！

HLIU002342

## DECLARATION AND CERTIFICATION

We, <u>Ko & Martin - Certified Interpreters and Translators</u>, declare that we are

( ✓ )    Certified Court Interpreters as described in GC68565

We are certified to interpret and translate <u>from the Chinese language to the English language and from the English language to the Chinese language.</u>

We further declare that we have translated the attached document <u>from the Chinese language to the English language.</u>

We declare to the best of our abilities and belief, that this is a true and accurate translation of the <u>Chinese</u> language text of <u>the 3 pages of text messages as described below.</u>

### Specific Description of the Document

1. 01222018 Wang of FF Message re FF HR Dept. Review of Liu EA
2. 01252018 Wang of FF Message re FF Legal Review & HR Approval of Liu Agreement
3. 01262018 Wang of FF Message re Vijay Sekhon of Sidley Austin has been reviewing agreements

We declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration is signed this <u>5th of April 2021</u> in <u>Los Angeles</u>, California.

<u>Lingling Men Martin</u>
President
Ko & Martin - Certified Interpreters and Translators

<u>*[signature]*</u>
Signature

KO & MARTIN – Certified Interpreters and Translators
www.komartin.com
Email: chinese.division@komartin.com

Exhibit 13

17:03

Jiawei Wang, Jerry, Yueting Jia  Nephew, in charge of financing & HR N

Jerry, thank you for your hard work last night. Let's talk over the phone later.

Jan 26, 2018 10:50

OK. Is it convenient to talk over the phone now, Mr. Liu? Sorry.

Jan 26, 2018 11:01

Ok, now is ok.

Jan 26, 2018 12:24

Received your email.  Will push through immediately.

Jan 26, 2018 15:39

Hi, manager Liu. Thank you for your understanding, and I look forward to your proposed revised version. I would like to clarify one thing.  Sidley's company partner VJ is reviewing this agreement for us right now to make sure there is no violation of any stipulations with investors. The share transfer clause is a key concern, but he may also make other minor modifications. I will ask him to focus on major issues instead of details and confirm as soon as possible.

HLIU002335

17:03

王佳伟 Jerry 贾跃亭外甥管融资人事 N



Jerry: 你们昨晚辛苦了。咱们再通话。

Jan 26, 2018 10:50

 好的，您现在方便通话吗刘总，实在抱歉

Jan 26, 2018 11:01

好的。现在可以。 

Jan 26, 2018 12:24

 收到您的邮件，会立即推动

Jan 26, 2018 15:39

 刘总好，谢谢您的理解并等您的建议修改稿。一件事澄清：Sidley 的公司合伙人 VJ 在帮我们看这个协议，确保没有违反与投资者的约定，转股这条是一个重点顾虑，但他可能有别的细微修改，我会让他宜粗不宜细尽快确认。

  

HLIU002336

## DECLARATION AND CERTIFICATION

We, <u>Ko & Martin - Certified Interpreters and Translators</u>, declare that we are

( ✓ )    Certified Court Interpreters as described in GC68565

We are certified to interpret and translate <u>from the Chinese language to the English language and from the English language to the Chinese language.</u>

We further declare that we have translated the attached document <u>from the Chinese language to the English language.</u>

We declare to the best of our abilities and belief, that this is a true and accurate translation of the <u>Chinese</u> language text of <u>the 3 pages of text messages as described below.</u>

### Specific Description of the Document

1. 01222018 Wang of FF Message re FF HR Dept. Review of Liu EA
2. 01252018 Wang of FF Message re FF Legal Review & HR Approval of Liu Agreement
3. 01262018 Wang of FF Message re Vijay Sekhon of Sidley Austin has been reviewing agreements

We declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration is signed this <u>5th of April 2021</u> in <u>Los Angeles</u>, California.


<u>Lingling Men Martin</u>
President
Ko & Martin - Certified Interpreters and Translators


Signature

KO & MARTIN – Certified Interpreters and Translators
www.komartin.com
Email: chinese.division@komartin.com

# Exhibit 14

**DECLARATION AND CERTIFICATION**

We, <u>Ko & Martin - Certified Interpreters and Translators</u>, declare that we are

( ✓ )   Certified Court Interpreters as described in GC68565

We are certified to interpret and translate <u>from the Chinese language to the English language and from the English language to the Chinese language.</u>

We further declare that we have translated the attached document <u>from the Chinese language to the English language.</u>

We declare to the best of our abilities and belief, that this is a true and accurate translation of the Chinese language text of **<u>Email from hliusunshine@gmail.com dated 04/15/2021 with subject <i>Chat history for group "Jiawei Wang Jerry, Yueting Jia nephew and the finance and human resource manager N, Wentao Huang FF Legal Counsel Hainan economy and trade…"</i></u>**

**Specific Description of the Document**

**<u>Email from hliusunshine@gmail.com dated 04/15/2021 with subject <i>Chat history for group "Jiawei Wang Jerry, Yueting Jia nephew and the finance and human resource manager N, Wentao Huang FF Legal Counsel Hainan economy and trade…"</i></u>**

We declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration is signed this <u>18th of May 2021</u> in <u>Los Angeles</u>, California.

<u>Lingling Men Martin</u>
President
Ko & Martin - Certified Interpreters and Translators

Signature

KO & MARTIN – Certified Interpreters and Translators
www.komartin.com
Email: chinese.division@komartin.com



H Liu <hliusunshine@gmail.com>

**Chat history for group "Jiawei Wang Jerry, Yueting Jia nephew and the finance and human resource manager N, Wentao Huang FF Legal Counsel Hainan economy and trade…"**

H Liu <hliusunshine@gmail.com>                                    Thu, Apr 15, 2021 at 5:32 PM
To: H Liu Sunshine Legal Matter Email <HLiuSunshine@gmail.com>

Dear:

The text and image message history of the WeChat group "Jiawei Wang Jerry, Yueting Jia nephew and the finance and human resource manager N, Wentao Huang FF Legal Counsel Hainan economy and trade…" is as follows.

 ——————— 2018-1-26 ———————

**Jiawei Wang Jerry at 22:02**

Mr. Liu and Mr. Huang, a WeChat group has been created for communication. [Shake][Shake]

**Jiawei Wang Jerry at 22:02**

Many thanks to Mr. Huang for your coordination for the term(s) of the employment contract(s). [Fight][Fight]

**Wentao Huang at 22:10**

@Henry Liu welcome you to join our company. You will be a great help to YT and to the company's operation and rapid development in the future. Perhaps we talk on the phone when you have time to share information and some personnel arrangement need to be discussed in advance. I'm currently in China.

**Henry Liu at 22:23**

Thanks, Jerry. Hello Wentao. Thanks for your strong support. Feel free to call at any time. Best regards.

**Wentao Huang at 22:25**

Are you in New York? I'm in Shanghai. We can call via Wechat when you have time.

**Henry Liu at 22:25**

Sounds good. I'm in New York. Feel free to call via WeChat at any time.

**HLIU007670**

 Gmail

H Liu <hliusunshine@gmail.com>

---

## Chat history for group "王佳伟Jerry贾跃亭外甥管融资人事N, 黄文涛FFLegal Counsel 海南经贸..."

---

**H Liu** <hliusunshine@gmail.com>                                    Thu, Apr 15, 2021 at 5:32 PM
To: H Liu Sunshine Legal Matter Email <HLiuSunshine@gmail.com>

Dear:

The text and image message history of the WeChat group "王佳伟Jerry贾跃亭外甥管融资人事N, 黄文涛FFLegal Counsel 海南经贸..." is as follows.

——————— 2018-1-26 ———————

**王佳伟Jerry 22:02**
拉个群对接下刘总和黄总[Shake][Shake]

**王佳伟Jerry 22:02**
感谢黄总对雇佣合同条款的协调[Fight][Fight]

**黄文涛 22:10**
@Henry Liu 热烈欢迎您加入公司，对YT及公司今后运营及快速发展会起到极大帮助。您方便时咱们通个电话，分享信息，一些人事安排也想提前商量一下，我现在在国内。

**Henry Liu 22:23**
感谢Jerry. 文涛好。感谢你的大力支持。方便时请随时通话。祝好。

**黄文涛 22:25**
您在纽约吗？我在上海，方便时咱们可以微信电话

**Henry Liu 22:25**
好的。在纽约。请随时微信通话。

# Exhibit 15

| From: | H. Liu |
|---|---|
| Sent: | Friday, January 26, 2018 6:55 PM CST |
| To: | Teddy Kang |
| CC: | Jerry Wang (FF China); DG Jiang |
| BCC: | Liu gmail Henry H. |
| Subject: | Re: FF Engagement Agreement |
| Attachments: | 01252018FFHLAgreement Final Revise Final (Clean) (ExecutionVersionHL).pdf, image001.png |

Dear Teddy,

Many thanks for your e-mail.  Attached please find my signed Employment Agreement between FF and HL dated January 25, 2018.

Looking forward to receiving the FF counter-signed version.

I am also very excited about this great opportunity to be part of the FF family.

Best regards to you, Jerry, DG and everyone at FF.

Henry

On Fri, Jan 26, 2018 at 6:26 PM, Teddy Kang <Teddy.Kang@ff.com> wrote:
Hi Henry,
It's my pleasure meeting you here (electronically) and congratulations on your offer with FF!
Assuming everything on the offer is acceptable, please sign and return it back to us and we'll execute it on our end and send you a copy for your records.  Once we finalize the offer letter, we'll begin the onboarding process by sending you a follow up email with further instructions on moving forward.
Should you have any questions through out the initial onboarding process, please don't hesitate to reach out to me directly.  I will make myself available to you to help answer any questions you might have.
Again, congratulations and we certainly look forward to seeing you here at FF!
Please have a great rest of your day and weekend!
Kind regards,
tk
310.405.2590

**From:** "Jerry Wang (FF China)" <Jerry.Wang@ff.com>
**Date:** Friday, January 26, 2018 at 11:19 AM
**To:** Teddy Kang <Teddy.Kang@ff.com>, "H. Liu" <henryliuesq@gmail.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** FF Engagement Agreement

Hi Teddy,


As discussed, can you follow up with Mr. Henry Liu for signing and onboarding process to FF as Chief Administrative Officer? Much appreciated your support.

HLIU004107

Mr. Liu,

Congratulations and very much looking forward to our partnership!

Sincerely,

Jerry

**Jerry Wang**

General Manager | Global Capital and Investment Banking



e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com

-

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

HLIU004109

HLIU004109

HLIU004110-HLIU004112

Confidential & Privileged

Employment Agreement

Between FF and HL

(January 25, 2018)

This Employment Agreement ("Agreement") sets forth the terms and condition of employment of Hong Liu (aka (Henry) Hong Liu, "HL") at FF Global Holdings Ltd., and Smart King Limited which owns 100% of and controls such entities including, without limitation, FF Global Holdings Ltd., Faraday & Future Inc., LeSEE (in VIE Structure), City Sky Limited, d/b/a Faraday and their successors, assignees and transferees ("FF"). These Terms ("Terms") supersede and replace any and all previous agreements and other agreements as may be specifically referred to herein, between the parties. If any provision of these Terms is ineffective in whole or in part, the remainder of the Terms shall remain effective.  The Terms shall be constructed in accordance with and governed by the laws of the State of California without regard to otherwise governing principles of conflicts of law.

Position & Duties:

FF shall appoint HL Senior Board Member of FF Global Board; Global Chief Administrative Officer, with the Chinese translation of 全球行政总裁, or other similar and comparable title as may be further discussed and agreed, and concurrently the Global General Counsel at HL's choice, and the Global Senior Advisor of FF, directly reporting to FF's CEO. FF shall give HL adequate authority and support in performing his duties. HL's duties and responsibilities shall be commensurate with such positions, and subject to typical exceptions for serving on other civic/charitable/corporate boards with no direct conflict of interest with FF and for managing personal investments.

Term:

HL shall commence as soon as practical and expects to be no later than February 1, 2018 or other days as may be mutually agreed, based on agreed Terms. For formality purpose only, FF may or may not ask HL to sign the standard form of employment letter ("Offer Letter") applicable to all executives and employees of FF in U.S.A. when joining the company, however, FF has expressed agreed and specifically acknowledged that the Letter and all its contents shall be superseded and overridden by this Agreement. FF shall guarantee HL's employment and base salaries as provided in the Terms for five years except for HL decides to leave FF at his own. Thereafter such employment shall continue at the then same levels of responsibilities and compensation including the continued annual amount of signing bonus and other benefits as provided in this Agreement until terminated by either party, upon 90 days advance notice, pursuant to the Terms.

1



Confidential & Privileged

<u>Base Salaries</u>:

FF shall pay HL a minimum annual base salary of $1,000,000.00, in semi-monthly (bi-weekly) installments, for five years. If HL is terminated by FF for any reason during the five year term he will be entitled to receive any remaining portion of the five years of base salaries not yet paid in a lump sum. Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF.

<u>Signing Bonus</u>:

FF shall pay HL a signing bonus of $3,000,000.00, payable in five equal installments, with the first installment paid upon the signing of the Agreement and each of the remaining installments paid at each of the following four anniversary of HL's start of employment at FF and paid in lump sum in the event of an early termination by FF during the five year guaranteed employment term.

<u>Bonus Opportunity</u>:

FF shall award HL discretionary annual bonus based on annual review. Annual bonus will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF. FF shall give HL access to special Bonus based on a percentage of overall transactions, including successful equity and debt financing, China Joint Venture, and other special projects and important tasks, etc., in which HL plays one of the leading roles of the project group and makes substantial contributions.

<u>Equity Grants</u>:

FF shall entitle HL to FF's long-term and short-term incentives. FF shall grant HL at minimum cost required by law and outright, 2% of FF's total equity shares pre Series A dilution in the form of restrictive stocks or equity option as HL may select based on any of FF's available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.00 equity shares of FF pre Series A, as FF has represented and warranted, with the FF established and standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as HL may select and with adequate consideration of tax benefits available to HL. Any and all of the remaining unvested portion of such 2% of the total shares shall become immediately and fully vested to HL upon any early termination by FF of HL's employment within the guaranteed employment term with FF.  Such an early termination can only be effectuated based on the specific cause of a serious breach of fiduciary duty to FF as a senior executive of FF after fully adjudicated against HL by a competent court in the United States, and HL will be fully covered by FF with executive indemnifications. FF has represented that it had successfully completed first closing of Series A financing in December 2017, which is subject to CFIUS approval and it is possible that the global corporate structure of FF may be adjusted in compliance with any decisions to be concluded by CFIUS, which FF represents and warrants that it will ensure that provisions concerning HL as contained in this Agreement shall not be adversely affected.   FF has further

2



HLIU004111

Confidential & Privileged

represented that there are no multiple classes of shares with different rights and values offered to employees except the Founder (Yueting Jia, "YT" himself). HL will act in concert with the Founder under the circumstances permitted by law.

Benefits/PTO:

FF shall entitle HL to participate in all benefit plans and programs at the same level with all senior level executives of FF, including, without limitation, corporate housing, transportation, retirement, welfare, vacation and PTO, insurances including health, life, and D&O. FF shall honor and adopt all employee and executive friendly best practices in favor of HL as a valued senior executive of FF, with regard to severance payments, change of control, parachute payments, tax treatments and any other customary executive compensation provisions. HL is entitled to indemnification from FF on terms no less than any other executives and employees.

Relocation:

FF shall pay for all HL's reasonable relocation costs and expenses as a senior executive, including, without limitation, family house-hunting trips, moving and storage of household goods, settling in allowances, interim living etc.

Survivor Benefits:

HL is entitled to death benefits if he dies during the five year term and during his employment at FF, including two year of base salary for his surviving spouse and children. Upon his death vesting schedules for his unvested equity interests shall have a two-year acceleration and all vested equity interests will pass to his surviving spouse and his children with adequate consideration of tax benefits to his survivors.

Signed by,                                          Signed by,

Signature:_____                 Signature: _____
For & authorized by & on behalf of FF        Hong Liu
Position:                                            Printed Name: Hong Liu
Printed Name:

Jointly signed and acknowledged by:

Signature: _____
Board Director, FF
Jiawei Wang

3

HLIU004112

# Exhibit 16

| From: | Teddy Kang |
|---|---|
| Sent: | Friday, January 26, 2018 7:35 PM CST |
| To: | H. Liu |
| CC: | Jerry Wang (FF China); DG Jiang |
| Subject: | Re: [EXTERNAL] Re: FF Engagement Agreement |
| Attachments: | 01252018FFHLAgreement Final Signed.pdf |

Hi Henry,
Please find the attached fully counter-signed Employment Agreement for your records.
We just need one more thing for now, please let us know when your first day of employment will be with us so we can make the necessary arrangements….
If there's anything else you need in the meantime, please don't hesitate to contact me!
Thank you!
tk

**From:** "H. Liu" <henryliuesq@gmail.com>
**Date:** Friday, January 26, 2018 at 4:55 PM
**To:** Teddy Kang <Teddy.Kang@ff.com>
**Cc:** "Jerry Wang (FF China)" <Jerry.Wang@ff.com>, DG Jiang <Dg.Jiang@ff.com>
**Subject:** [EXTERNAL] Re: FF Engagement Agreement
Dear Teddy,
Many thanks for your e-mail.  Attached please find my signed Employment Agreement between FF and HL dated January 25, 2018.
Looking forward to receiving the FF counter-signed version.
I am also very excited about this great opportunity to be part of the FF family.
Best regards to you, Jerry, DG and everyone at FF.
Henry

On Fri, Jan 26, 2018 at 6:26 PM, Teddy Kang <Teddy.Kang@ff.com> wrote:
Hi Henry,
It's my pleasure meeting you here (electronically) and congratulations on your offer with FF!
Assuming everything on the offer is acceptable, please sign and return it back to us and we'll execute it on our end and send you a copy for your records.  Once we finalize the offer letter, we'll begin the onboarding process by sending you a follow up email with further instructions on moving forward.
Should you have any questions through out the initial onboarding process, please don't hesitate to reach out to me directly.  I will make myself available to you to help answer any questions you might have.
Again, congratulations and we certainly look forward to seeing you here at FF!
Please have a great rest of your day and weekend!
Kind regards,
tk
310.405.2590

**From:** "Jerry Wang (FF China)" <Jerry.Wang@ff.com>
**Date:** Friday, January 26, 2018 at 11:19 AM
**To:** Teddy Kang <Teddy.Kang@ff.com>, "H. Liu" <henryliuesq@gmail.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** FF Engagement Agreement

Hi Teddy,

As discussed, can you follow up with Mr. Henry Liu for signing and onboarding process to FF as Chief Administrative Officer? Much appreciated your support.


Mr. Liu,


Congratulations and very much looking forward to our partnership!


Sincerely,

Jerry


**Jerry Wang**

General Manager │ Global Capital and Investment Banking



e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com

-

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.


*All we do is for our earth, please consider the environment before printing out this email.*

Case 2:20-cv-08035-SVW-JPR   Document 161   Filed 05/19/21   Page 297 of 467   Page ID
#:4105

HLIU004124-HLIU004126

Confidential & Privileged

Employment Agreement

Between FF and HL

(January 25, 2018)

This Employment Agreement ("Agreement") sets forth the terms and condition of employment of Hong Liu (aka (Henry) Hong Liu, "HL") at FF Global Holdings Ltd., and Smart King Limited which owns 100% of and controls such entities including, without limitation, FF Global Holdings Ltd., Faraday & Future Inc., LeSEE (in VIE Structure), City Sky Limited, d/b/a Faraday and their successors, assignees and transferees ("FF"). These Terms ("Terms") supersede and replace any and all previous agreements and other agreements as may be specifically referred to herein, between the parties. If any provision of these Terms is ineffective in whole or in part, the remainder of the Terms shall remain effective.  The Terms shall be constructed in accordance with and governed by the laws of the State of California without regard to otherwise governing principles of conflicts of law.

Position & Duties:

FF shall appoint HL Senior Board Member of FF Global Board; Global Chief Administrative Officer, with the Chinese translation of 全球行政总裁, or other similar and comparable title as may be further discussed and agreed, and concurrently the Global General Counsel at HL's choice, and the Global Senior Advisor of FF, directly reporting to FF's CEO. FF shall give HL adequate authority and support in performing his duties. HL's duties and responsibilities shall be commensurate with such positions, and subject to typical exceptions for serving on other civic/charitable/corporate boards with no direct conflict of interest with FF and for managing personal investments.

Term:

HL shall commence as soon as practical and expects to be no later than February 1, 2018 or other days as may be mutually agreed, based on agreed Terms. For formality purpose only, FF may or may not ask HL to sign the standard form of employment letter ("Offer Letter") applicable to all executives and employees of FF in U.S.A. when joining the company, however, FF has expressed agreed and specifically acknowledged that the Letter and all its contents shall be superseded and overridden by this Agreement. FF shall guarantee HL's employment and base salaries as provided in the Terms for five years except for HL decides to leave FF at his own. Thereafter such employment shall continue at the then same levels of responsibilities and compensation including the continued annual amount of signing bonus and other benefits as provided in this Agreement until terminated by either party, upon 90 days advance notice, pursuant to the Terms.

1



Confidential & Privileged

Base Salaries:

FF shall pay HL a minimum annual base salary of $1,000,000.00, in semi-monthly (bi-weekly) installments, for five years. If HL is terminated by FF for any reason during the five year term he will be entitled to receive any remaining portion of the five years of base salaries not yet paid in a lump sum. Base salary will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF.

Signing Bonus:

FF shall pay HL a signing bonus of $3,000,000.00, payable in five equal installments, with the first installment paid upon the signing of the Agreement and each of the remaining installments paid at each of the following four anniversary of HL's start of employment at FF and paid in lump sum in the event of an early termination by FF during the five year guaranteed employment term.

Bonus Opportunity:

FF shall award HL discretionary annual bonus based on annual review. Annual bonus will be reviewed on an annual basis for increases in accordance with the review process for senior level executives of FF. FF shall give HL access to special Bonus based on a percentage of overall transactions, including successful equity and debt financing, China Joint Venture, and other special projects and important tasks, etc., in which HL plays one of the leading roles of the project group and makes substantial contributions.

Equity Grants:

FF shall entitle HL to FF's long-term and short-term incentives. FF shall grant HL at minimum cost required by law and outright, 2% of FF's total equity shares pre Series A dilution in the form of restrictive stocks or equity option as HL may select based on any of FF's available equity grant forms to select from, namely 20,000,000.00 equity shares representing 2% of the total and all of 1,000,000,000.00 equity shares of FF pre Series A, as FF has represented and warranted, with the FF established and standard equity share or option vesting schedule and any of FF's earliest available vesting schedules as HL may select and with adequate consideration of tax benefits available to HL. Any and all of the remaining unvested portion of such 2% of the total shares shall become immediately and fully vested to HL upon any early termination by FF of HL's employment within the guaranteed employment term with FF.  Such an early termination can only be effectuated based on the specific cause of a serious breach of fiduciary duty to FF as a senior executive of FF after fully adjudicated against HL by a competent court in the United States, and HL will be fully covered by FF with executive indemnifications. FF has represented that it had successfully completed first closing of Series A financing in December 2017, which is subject to CFIUS approval and it is possible that the global corporate structure of FF may be adjusted in compliance with any decisions to be concluded by CFIUS, which FF represents and warrants that it will ensure that provisions concerning HL as contained in this Agreement shall not be adversely affected.   FF has further

2



HLIU004125

Confidential & Privileged

represented that there are no multiple classes of shares with different rights and values offered to employees except the Founder (Yueting Jia, "YT" himself).  HL will act in concert with the Founder under the circumstances permitted by law.

Benefits/PTO:

FF shall entitle HL to participate in all benefit plans and programs at the same level with all senior level executives of FF, including, without limitation, corporate housing, transportation, retirement, welfare, vacation and PTO, insurances including health, life, and D&O. FF shall honor and adopt all employee and executive friendly best practices in favor of HL as a valued senior executive of FF, with regard to severance payments, change of control, parachute payments, tax treatments and any other customary executive compensation provisions. HL is entitled to indemnification from FF on terms no less than any other executives and employees.

Relocation:

FF shall pay for all HL's reasonable relocation costs and expenses as a senior executive, including, without limitation, family house-hunting trips, moving and storage of household goods, settling in allowances, interim living etc.

Survivor Benefits:

HL is entitled to death benefits if he dies during the five year term and during his employment at FF, including two year of base salary for his surviving spouse and children. Upon his death vesting schedules for his unvested equity interests shall have a two-year acceleration  and all vested equity interests will pass to his surviving spouse and his children with adequate consideration of tax benefits to his survivors.

Signed by,

Signature: _____

For & authorized by & on behalf of FF

Position:

Printed Name: Teddy Kang

Signed by,

Signature: _____

Hong Liu

Printed Name: Hong Liu

Jointly signed and acknowledged by:

Signature: _____

Board Director, FF

Jiawei Wang

3

HLIU004126

Exhibit 17

| From: | Jerry Wang (FF China) |
|---|---|
| Sent: | Tuesday, January 30, 2018 1:31 PM CST |
| To: | H. Liu |
| CC: | DG Jiang |
| Subject: | RE: [EXTERNAL] Further revisions on Share Transfer Agreement |
| Attachments: | Redline.pdf, Revised Director Compensation Agreement (clean).docx |

Dear Mr. Liu,

Congratulations again for having you on board and very much looking forward working with you starting in near future!

As we discussed and follow up on previous email, there are certain constrains listed below to limit our ability to do a direct or indirect share transfer without triggering default, which will bear significant losses and consequences to YT and FF. Please take a look this version drafted by company external counsel Sidley, and I make it clear to make it unchanged as much as possible and reflect all business terms that we mutually agreed.

Please let me know if we need to do a call to explain further, and Sidley is happy to arrange a conference call together with us to walk through and discuss solutions. Thanks and have a good day!

Best,
Jerry

_____

**Faraday Future**

**Jerry Wang**
General Manager │ Global Capital and Investment Banking
e  jerry.wang@ff.com
c  +1 201-354-7734 / +86 151-1690-3389
a  18455 S Figueroa St, Gardena, CA 90248
w  www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** Jerry Wang (FF China)
**Sent:** Friday, January 26, 2018 3:38 PM
**To:** 'H. Liu' <henryliuesq@gmail.com>
**Subject:** RE: [EXTERNAL] Further revisions on Share Transfer Agreement

Dear Mr. Liu,

Thanks again for your patience, please refer to below the terms in Series A documents that set the limit to share transfer. Please let us know how you would like to revise the draft to avoid triggering the terms and we will cooperative and have it signed ASAP once confirmed with this point.

Thanks again for your understanding!

Best,
Jerry

---------------------------------

4.1 Restriction on Transfers.

(a)      Shareholders. Prior to a Qualified IPO, no Shareholder shall, and shall procure that each of its Affiliates shall not, directly or indirectly, sell, assign, transfer, pledge, hypothecate, or otherwise encumber or dispose of in any way or otherwise grant any interest or right with respect to (the "Transfer," "Transferring," "Transferred," "Transferor" and "Transferee" having meanings correlative to the foregoing) all or any part of any interest in any Equity Securities of the Company now or hereafter owned or held by such Shareholders, save as provided in Section 4.1(b) and provided that such Transfers are made in compliance with this Section 4.

(b)      Permitted Transfers. The restrictions on Transfer set forth in Section 4.1(a) shall not apply to the following Transfers (each, a "Permitted Transfer"):

(i)      Subject to Section 12.2(d), the Founder HoldCo shall be permitted to direct the Company to grant and issue Class A Ordinary Shares pursuant to the STI representing in aggregate not more than 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) (the "STI Target Number") to eligible Applicable Employees, selected by Founder HoldCo, to incentivize them for the best interests of the Group;

(ii)      The Founder HoldCo shall be permitted to Transfer such number of Class B Preferred Shares up to another 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) for purposes of discharging any contingent liabilities of the Founder HoldCo, Founder and their respective Affiliates provided that: (A) unless otherwise approved by the Majority Class A Preferred Shareholder in writing, the Class B Preferred Shares so Transferred shall immediately upon completion of such Transfer be automatically re-designated into Class B Ordinary Shares and the Directors shall ensure the register of members of the Company duly reflect such automatic re-designation; and (B) any Transfer proposed to be made pursuant to this Section 4.1(b)(ii) shall be subject to the rights of first refusal of the Class A Preferred Shareholders provided under Section 4.2(a)(1)-(5) and Section 4.3 and, accordingly, the provisions of Section 4.2(a)(1)-(5) and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(ii), but Section 4.2(a)(6)-(10) shall not apply.

(iii)      Any Shareholder (other than a Class A Preferred Shareholder) shall be permitted to Transfer any outstanding Equity Securities issued by the Company upon receipt of the prior written consent to such Transfer by the Majority Class A Preferred Shareholder and the Founder HoldCo, which consent may be granted by the Majority Class A Preferred Shareholder and the Founder HoldCo in their respective sole and absolute discretion, provided that after such consent is granted, the Transfer subject to such consent shall then be subject to the rights of first refusal and co-sale rights of all the Class A Preferred Shareholders and the Founder HoldCo (including the Shareholders granting the consent to such Transfer in the first place) provided under Section 4.2 and Section 4.3.

HLIU004172

(iv)     The following shall apply in relation to Transfers by relevant Class A Preferred Shareholders:

(1)     The first Transfer by the Series A Investor of all or part of its Class A Preferred Shares in a single transaction after First Closing shall not be restricted in any respects and none of the provisions of Section 4.2 or Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(iv)(1);

(2)     Any Class A Preferred Shareholder shall, after the first Transfer set forth in clause (1) above, be permitted to Transfer any of its Class A Preferred Shares to any Person other than a Competitor, and provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Founder HoldCo provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(iv)(2);

(v)     A Transfer of Class B Preferred Shares by the Founder HoldCo in accordance with Section 5.13(b) of the Subscription Agreement, which shall automatically (without a resolution of the Directors and/or Shareholders or any other action being required) be re-designated into Class A Ordinary Shares immediately on such Transfer being effected; and

(vi)     Any Transfer of Equity Securities by the Founder HoldCo after a Default Notice has been issued in accordance with Section 12.1 and provided that all of the rights described in Section 12.2(a) to 12.2(e) have and continue to be in effect, and further provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Majority Class A Preferred Shareholder provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(vi).

For the avoidance of doubt, any Transfer made pursuant to Sections 4.1(b)(i), 4.1(b)(iv)(1), or 4.1(b)(v) is not subject to or in any way restricted or limited by Section 4.2 or Section 4.3.

8. Reserved Matters. The Shareholders shall exercise all voting rights and other powers of control available to them in relation to each Group Company to procure that each Group Company and/or its board of directors shall not, and as a separate covenant the Company shall exercise all voting rights and other powers of control available to it in relation to each Group Company (other than the Company itself) to procure that each such other Group Company and/or its board of directors shall not, at any time on or after the First Closing and thereafter, do or approve any of the matters set forth in Schedule II (Reserved Matters), in each case without the prior approval in writing of the Majority Class A Preferred Shareholder or a Series A Director. As a separate and independent covenant, the Company agrees that it shall (so far as it is legally able to do so) observe and comply with the provisions, prohibitions and restrictions in this Section 8.

SCHEDULE II Reserved Matters

(a) Subject to Section 16.12, change its name or amend its Charter Documents;

(b) Approve any annual budget and business plan other than those relating to the Business;

(c) Issue, repurchase or redeem (or agree to issue, repurchase or redeem) any Equity Securities or debt securities or amend the rights attaching to any Equity Securities or debt securities, or undertake any consolidation, sub-division, reclassification or conversion of any of its share capital, except an issuance of Equity Securities following a failure to make a Subscription Payment (as defined in the Subscription Agreement) and an issuance of Equity Securities in accordance with the Subscription Agreement (in the form entered into on the date of this Agreement).

HLIU004173

(d) Make any material change to the nature or scope of its business or the Business;

(e) Declare, pay or make any dividend or distribution;

(f) Enter into (or agree to enter into) any transaction other than in its ordinary and usual course of business in relation to the Business, including the disposal or transfer of any business, property or assets or any interests therein (other than in its ordinary and usual course of business);

(g) Enter into (or agree to enter into) any transaction with any Connected Person, including the Founder, the Founder HoldCo, the Class A Ordinary Shareholders and their respective Affiliates;

(h) Pass any resolution that may result in its dissolution, winding-up or liquidation or any receivership or enter into any material debt restructuring or arrangement with its third party creditors;

(i) Implement any IPO; and/or

(j) Any matters that may have a Material Adverse Effect on it or on the Group.

12. Default Notice

12.1 If any of the following events occurs, the Majority Class A Preferred Shareholder may at any time after such occurrence give a "Default Notice" in writing to Founder HoldCo (with reasonable details specifying the event which the Default Notice relates to):

… …

(d) the Founder ceases to own (directly or indirectly) 100% of the economic rights and 100% of the voting rights in any Founder Entity; or (ii) the Founder HoldCo Transfers any of its Equity Securities in breach of Section 4; or (iii) the Founder otherwise ceases to own (directly or indirectly) 100% of the economic rights and 100% voting powers with respect to any of the Class B Preferred Shares held by Founder HoldCo from time to time (other than in each case as a result of a Transfer of Class B Preferred Shares in compliance with this Agreement or pursuant to the Share Pledge Agreement) (each a "Change of Control Event"), provided that, with respect to this clause (d), "100% shall be deemed to be "50%" in the case of a involuntary Transfer of Equity Securities effected as a result of an enforcement event by one or more creditors against the Equity Securities;

… …

---

**Faraday Future**

**Jerry Wang**
General Manager │ Global Capital and Investment Banking
e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

HLIU004174

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Friday, January 26, 2018 1:06 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached SA as further revised per your request.  It looks like that what may be best at this point, without destroying the whole purposes and what has already been agreed on, is to put in some simple and necessary definitions on the restrictive time period to reflect the current Series A financing documents as you have stated.

Best regards to you and DG.

Henry

HLIU004175

HLIU004176-HLIU004178

Confidential & Privileged

DIRECTOR COMPENSATION AGREEMENT

This Director Compensation Agreement (this "Agreement") is made and entered into as of the [●]th day of January, 2018, by and between Yueting Jia, the indirect sole shareholder of Founder HoldCo (as defined below) (the "Founder"), and Hong Liu (aka (Henry) Hong Liu, the "Appointee") (separately, a "Party" or collectively, the "Parties"), as a legally bound agreement on the Parties and on their successors, assignees and transferees.

1. FF Top Holding Ltd. ("Founder HoldCo") owns an aggregate amount of 600,000,000 Class B preferred shares of Smart King Limited (the "Company"), which in turn owns 100% of entities including, without limitation, FF Global Holdings Ltd, Faraday & Future, Inc., LeSee entities (in Schedule I to this Agreement), City of Sky Limited (d/b/a Faraday) and their successors, assignees and transferees.  The Parties have entered into this Agreement pursuant to which: (i) the Founder will cause Founder HoldCo to appoint the Appointee, and the Appointee accepts such appointment, to serve as a director on the board of directors of the Company and (ii) in exchange for the Appointee's service as a director on the board of directors of the Company, the Founder agrees to pay the Appointee an amount equal to $[●] (such cash payment to the Appointee, the "Director Compensation"), contingent upon and effective as of the completion of (a) a firm commitment underwritten public offering of the Company's stock with a valuation of the Company not less than $[●] billion (a "Qualified IPO") and (b) the sale of a sufficient number of Founder HoldCo's shares of the Company in or as soon as reasonably practicable following such Qualified IPO for an amount greater than or equal to the Director Compensation. The vesting of the Director Compensation is subject to the same vesting conditions as provided and agreed in the Employment Agreement between the Appointee and the Company on this same day ("EA").

2. The Founder represents that the Company successfully completed its Series A financing in December 2017. It has been acknowledged by the Parties that the Director Compensation is for a full and accepted consideration upon signing of this Agreement. It is the good faith belief and genuine intention of the Parties that this Agreement is to promote the interests of all of the Company's shareholders and stakeholders.

3. This Agreement is effective and binding upon the signing.  The Parties agree that the delivery of the Director Compensation by the Founder to the Appointee shall be in the form of wire transfer of immediately available funds after the conditions in the preceding sentence have been satisfied.  The Founder's performance of its obligations under this Agreement are in all respects subject to the restrictions set forth in that certain Shareholders Agreement, dated as of November 30, 2017, as amended, by and among the Company, Founder HoldCo, the Founder and Season Smart Limited.  It is further understood and agreed among the Parties that the demand by the Appointee for the delivery of the Director Compensation shall be contingent upon the satisfaction of the conditions set forth in the preceding paragraph. If the Appointee decides to leave the Company at his own will during his employment term as provided in the EA or his employment at the Company is terminated by the Company during such a term based on the specific cause of a serious breach of fiduciary duties to the Company as a senior executive of the Company after finally adjudicated against the Appointee by a competent court in the United States (the Appointee will be fully covered by the Company with

ACTIVE 228420980

HLIU004176

Confidential & Privileged

executive indemnifications to the extent set forth in the Company's standard form of director indemnification agreement), any remaining unvested portion of the Director Compensation at the time when such departure or termination effectuates will be automatically forfeited. Any delay to enforce the terms of this Agreement and any delay to act on a breach of its term by the Appointee does not constitute a waiver of those rights.

4.   The Appointee agrees not to divulge, communicate, use to the detriment of the Company or for the benefit of any other person, or misuse in any way, (i) information regarding the existence of this Agreement, any terms set forth in this Agreement, or information he received in connection with the negotiations of this Agreement, (ii) any confidential or secret information relating to the Company or any subsidiary of the Company or (iii) any other technical, business, proprietary or financial information of the Company including personnel information, secret processes, know-how, customer lists, formulas or other technical data not available to the public generally or to the competitors of the Company ("Confidential Information"), except to the extent that the Appointee demonstrates that such Confidential Information (A) becomes a matter of public record or is published in a newspaper, magazine or other periodical available to the general public, other than as a result of any act or omission of the Appointee, or (B) is required to be disclosed by any law, regulation or order of any court or regulatory commission, department or agency.  The Appointee acknowledges and agrees that any information or data the Appointee has acquired on any of these matters or items were received in confidence and are subject to the terms of this Agreement.  The Appointee acknowledges and agrees that any breach of this paragraph by the Appointee shall result in the automatic termination of this Agreement and all of the Founder's obligations under this Agreement, and a forfeiture by the Appointee of any and all rights of the Appointee under this Agreement.

5.   If any provision of this Agreement is ineffective in whole or in part, the remainder of this Agreement shall remain in effect.  This Agreement is binding on all Parties by virtue of the conduct of both parties and in spite of any defect or error in the formality of its execution.

6.   The rights, benefits, liabilities and responsibilities contained within the terms of this Agreement are not assignable by any Party with the prior written agreement of the other Party.

7.   The Parties agree that this Agreement shall be governed and construed in accordance with the laws of the State of California, and that any dispute arising out of or related to this Agreement shall be resolved exclusively in the state or federal courts located in Los Angeles, California.

[*The remainder of this page has been intentionally left blank.*]

HLIU004177

Confidential & Privileged

IN WITNESS WHEREOF, the undersigned have hereunto caused this Director Compensation Agreement to be executed as of the date first set forth above.

FOUNDER

_____

Yueting Jia

APPOINTEE

_____

Hong Liu (aka (Henry) Hong Liu)

HLIU004178

HLIU004179-HLIU004183

Confidential & Privileged

~~STOCK TRANSFER~~DIRECTOR COMPENSATION AGREEMENT

This ~~Stock Transfer~~Director Compensation Agreement (~~the~~this "Agreement") is made and entered into as of ~~25~~the [●]th day of January, 2018, by and between Yueting Jia ~~(the "Transferor~~, the indirect sole shareholder of Founder HoldCo (as defined below) (the "Founder")"), and Hong Liu (aka (Henry) Hong Liu, the "~~Transferee~~Appointee") (separately, a "Party" or ~~jointly~~collectively, the "Parties"), as a legally bound agreement on ~~both~~the Parties and on their successors, assignees and transferees.

1. ~~Transferor owns~~FF Top Holding Ltd. ("Founder HoldCo") owns an aggregate amount of 600,000,000 Class B preferred shares ~~of stock~~of Smart King Limited (the "Company"), which in turn owns 100% of ~~such~~entities including, without limitation, FF Global Holdings Ltd, Faraday & Future, Inc., ~~LeSEE (in VIE Structure~~LeSee entities (in Schedule I to this Agreement), City of Sky Limited, (d/b/a Faraday) and their successors, assignees and transferees ~~("FF", "Company").  Transferor and Transferee~~. The Parties have entered into this Agreement pursuant to which: (i) the ~~Transferor wishes to transfer with full consideration such shares of the Company it directly or indirectly owns and warrants that it has all the vested and other right to transfer, to Transferee: shares equal to 1% of the Company's total equity shares pre Series A dilution, namely 10,000,000.00 equity shares representing 1% of the total and all of 1,000,000,000.00 equity shares of the Company pre Series A (the "Shares" or "Stocks")~~Founder will cause Founder HoldCo to appoint the Appointee, and the Appointee accepts such appointment, to serve as a director on the board of directors of the Company and (ii) in exchange for the Appointee's service as a director on the board of directors of the Company, the Founder agrees to pay the Appointee an amount equal to $[●] (such cash payment to the Appointee, the "Director Compensation"), contingent upon and effective as of the completion of (a) a firm commitment underwritten public offering of the Company's stock with a valuation of the Company not less than $[●] billion (a "Qualified IPO") and (b) the sale of a sufficient number of Founder HoldCo's shares of the Company in or as soon as reasonably practicable following such Qualified IPO for an amount greater than or equal to the Director Compensation. The vesting of ~~Shares to Transferee~~the Director Compensation is subject to the same vesting conditions as provided and agreed in the Employment Agreement between ~~Transferee~~the Appointee and ~~FF~~the Company on this same day ("EA"). ~~Transferor has represented~~

2.  The Founder represents that the Company ~~had~~successfully completed its Series A financing in December 2017. It has been acknowledged by the Parties that the ~~Shares transfer~~Director Compensation is for a full and accepted consideration upon signing of this Agreement. It is the good faith belief and genuine intention of ~~Transferor and Transferee that the~~the Parties that this Agreement is to promote the interests of all ~~FF's~~of the Company's shareholders and stakeholders.

~~2~~3. ~~The~~This Agreement is effective and binding upon the signing. ~~Transferor and Transferee~~The Parties agree that the delivery ~~by Transferor to Transferee~~of the Director Compensation by the Founder to the Appointee shall be in the form of ~~certificate or other documents, or best efforts and good faith sales proceeds after the Company's IPO.  This is in due respect~~ful ~~of any~~ time restrictions on the ~~transfers of shares by Transferor~~ in the executed legal documents of the Series A financing wire transfer of immediately available funds after the conditions in the preceding sentence have been satisfied.  The Founder's performance of its obligations under this Agreement are in all respects subject to the

Confidential & Privileged

restrictions set forth in that certain Shareholders Agreement, dated as of November 30, 2017, as amended, by and among the Company, Founder HoldCo, the Founder and Season Smart Limited.  It is further understood and agreed ~~between Transferor and Transferee~~among the Parties that the demand by ~~Transferee~~the Appointee for the delivery of ~~Shares shall be no earlier than an IPO and no later than a reasonable and practical time after the post IPO lock-up period as described above. If the Transferee~~the Director Compensation shall be contingent upon the satisfaction of the conditions set forth in the preceding paragraph. If the Appointee decides to leave the Company at his own will during his ~~guaranteed~~ employment term as provided in the EA or his employment at the Company is terminated by the Company during such a term based on the specific cause of a serious breach of fiduciary ~~duty~~duties to ~~FF~~the Company as a senior executive of ~~FF~~the Company after ~~fully~~finally adjudicated against the ~~Transferee~~Appointee by a competent court in the United States (~~Transferee~~the Appointee will be fully covered by ~~FF~~the Company with executive indemnifications to the extent set forth in the Company's standard form of director indemnification agreement), any remaining unvested ~~Shares~~portion of the Director Compensation at the time when such departure or termination effectuates will be automatically forfeited. Any delay to enforce the terms of this Agreement and any delay to act on a breach of its term by the ~~Transferee~~Appointee does not constitute a waiver of those rights.

4.  The Appointee agrees not to divulge, communicate, use to the detriment of the Company or for the benefit of any other person, or misuse in any way, (i) information regarding the existence of this Agreement, any terms set forth in this Agreement, or information he received in connection with the negotiations of this Agreement, (ii) any confidential or secret information relating to the Company or any subsidiary of the Company or (iii) any other technical, business, proprietary or financial information of the Company including personnel information, secret processes, know-how, customer lists, formulas or other technical data not available to the public generally or to the competitors of the Company ("Confidential Information"), except to the extent that the Appointee demonstrates that such Confidential Information (A) becomes a matter of public record or is published in a newspaper, magazine or other periodical available to the general public, other than as a result of any act or omission of the Appointee, or (B) is required to be disclosed by any law, regulation or order of any court or regulatory commission, department or agency.  The Appointee acknowledges and agrees that any information or data the Appointee has acquired on any of these matters or items were received in confidence and are subject to the terms of this Agreement.  The Appointee acknowledges and agrees that any breach of this paragraph by the Appointee shall result in the automatic termination of this Agreement and all of the Founder's obligations under this Agreement, and a forfeiture by the Appointee of any and all rights of the Appointee under this Agreement.

~~3~~5.  If any provision of this Agreement is ineffective in whole or in part, the remainder of ~~the~~this Agreement shall remain in effect.  This Agreement is binding on ~~both~~all Parties by virtue of the conduct of both parties and in spite of any defect or error in the formality of its execution.

~~4~~6.  The rights, benefits, liabilities and responsibilities contained within the terms of this Agreement are not assignable by any Party with the prior written agreement of the other Party.

Transferor:                                              Transferee:

ACTIVE 228420980

**HLIU004180**

Confidential & Privileged

7.  The Parties agree that this Agreement shall be governed and construed in accordance with the laws of the State of California, and that any dispute arising out of or related to this Agreement shall be resolved exclusively in the state or federal courts located in Los Angeles, California.

*[The remainder of this page has been intentionally left blank.]*

ACTIVE 228420980

HLIU004181

Confidential & Privileged

IN WITNESS WHEREOF, the undersigned have hereunto caused this Director Compensation Agreement to be executed as of the date first set forth above.

FOUNDER

Signature:

Signature: _____ —

_____

Yueting Jia

APPOINTEE

_____

Print Name: Yueting Jia
(Henry) Hong Liu

Print Name: Hong Liu (aka

HLIU004182

| Summary report: Litéra® Change-Pro TDC 10.1.0.300 Document comparison done on 1/30/2018 10:39:17 AM | |
|---|---|
| **Style name:** Sidley Default | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 01262018StockTransferAgreement (Clean) Final.docx | |
| **Modified filename:** Revised Director Compensation Agreement (clean) (003).docx | |
| **Changes:** | |
| Add | 71 |
| Delete | 54 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 133 |

HLIU004183

# Exhibit 18

| From: | Jerry Wang (FF China) |
|---|---|
| Sent: | Tuesday, January 30, 2018 7:24 PM CST |
| To: | H. Liu |
| CC: | DG Jiang |
| Subject: | RE: [EXTERNAL] Further revisions on Share Transfer Agreement |
| Attachments: | 01302018DirectorCompensationAgreement(Redlines).docx |

Dear Mr. Liu,

Please refer to further comments based on your Redline version, and please let me know if you would like to schedule a call with Sidley to briefly discuss how to best describe the specific amount.

Thanks,
Jerry

---

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Tuesday, January 30, 2018 4:19 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached quick read of the DA (Redline & Clean), for your purview.

Best regards to you and DG.

Henry

On Tue, Jan 30, 2018 at 2:31 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

  Dear Mr. Liu,

HLIU004199

Congratulations again for having you on board and very much looking forward working with you starting in near future!

As we discussed and follow up on previous email, there are certain constrains listed below to limit our ability to do a direct or indirect share transfer without triggering default, which will bear significant losses and consequences to YT and FF. Please take a look this version drafted by company external counsel Sidley, and I make it clear to make it unchanged as much as possible and reflect all business terms that we mutually agreed.

Please let me know if we need to do a call to explain further, and Sidley is happy to arrange a conference call together with us to walk through and discuss solutions. Thanks and have a good day!

Best,
Jerry

_____

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e    jerry.wang@ff.com
c    +1 201-354-7734 / +86 151-1690-3389
a    18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** Jerry Wang (FF China)
**Sent:** Friday, January 26, 2018 3:38 PM
**To:** 'H. Liu' <henryliuesq@gmail.com>
**Subject:** RE: [EXTERNAL] Further revisions on Share Transfer Agreement

Dear Mr. Liu,

Thanks again for your patience, please refer to below the terms in Series A documents that set the limit to share transfer. Please let us know how you would like to revise the draft to avoid triggering the terms and we will cooperative and have it signed ASAP once confirmed with this point.

Thanks again for your understanding!

Best,

Jerry

---------------------------------

4.1 Restriction on Transfers.

(a)     Shareholders. Prior to a Qualified IPO, no Shareholder shall, and shall procure that each of its Affiliates shall not, directly or indirectly, sell, assign, transfer, pledge, hypothecate, or otherwise encumber or dispose of in any way or otherwise grant any interest or right with respect to (the "Transfer," "Transferring," "Transferred," "Transferor" and "Transferee" having meanings correlative to the foregoing) all or any part of any interest in any Equity Securities of the Company now or hereafter owned or held by such Shareholders, save as provided in Section 4.1(b) and provided that such Transfers are made in compliance with this Section 4.

(b)     Permitted Transfers. The restrictions on Transfer set forth in Section 4.1(a) shall not apply to the following Transfers (each, a "Permitted Transfer"):

(i)      Subject to Section 12.2(d), the Founder HoldCo shall be permitted to direct the Company to grant and issue Class A Ordinary Shares pursuant to the STI representing in aggregate not more than 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) (the "STI Target Number") to eligible Applicable Employees, selected by Founder HoldCo, to incentivise them for the best interests of the Group;

(ii)     The Founder HoldCo shall be permitted to Transfer such number of Class B Preferred Shares up to another 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) for purposes of discharging any contingent liabilities of the Founder HoldCo, Founder and their respective Affiliates provided that: (A) unless otherwise approved by the Majority Class A Preferred Shareholder in writing, the Class B Preferred Shares so Transferred shall immediately upon completion of such Transfer be automatically re-designated into Class B Ordinary Shares and the Directors shall ensure the register of members of the Company duly reflect such automatic re-designation; and (B) any Transfer proposed to be made pursuant to this Section 4.1(b)(ii) shall be subject to the rights of first refusal of the Class A Preferred Shareholders provided under Section 4.2(a)(1)-(5) and Section 4.3 and, accordingly, the provisions of Section 4.2(a)(1)-(5) and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(ii), but Section 4.2(a)(6)-(10) shall not apply.

(iii)    Any Shareholder (other than a Class A Preferred Shareholder) shall be permitted to Transfer any outstanding Equity Securities issued by the Company upon receipt of the prior written consent to such Transfer by the Majority Class A Preferred Shareholder and the Founder HoldCo, which consent may be granted by the Majority Class A Preferred Shareholder and the Founder HoldCo in their respective sole and absolute discretion, provided that after such consent is granted, the Transfer subject to such consent shall then be subject to the rights of first refusal and co-sale rights of all the Class A Preferred Shareholders and the Founder HoldCo (including the Shareholders granting the consent to such Transfer in the first place) provided under Section 4.2 and Section 4.3.

(iv)    The following shall apply in relation to Transfers by relevant Class A Preferred Shareholders:
(1)      The first Transfer by the Series A Investor of all or part of its Class A Preferred Shares in a single transaction after First Closing shall not be restricted in any respects and none of the provisions of Section 4.2 or Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(iv)(1);

HLIU004201

(2)      Any Class A Preferred Shareholder shall, after the first Transfer set forth in clause (1) above, be permitted to Transfer any of its Class A Preferred Shares to any Person other than a Competitor, and provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Founder HoldCo provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(iv)(2);

(v)      A Transfer of Class B Preferred Shares by the Founder HoldCo in accordance with Section 5.13(b) of the Subscription Agreement, which shall automatically (without a resolution of the Directors and/or Shareholders or any other action being required) be re-designated into Class A Ordinary Shares immediately on such Transfer being effected; and

(vi)      Any Transfer of Equity Securities by the Founder HoldCo after a Default Notice has been issued in accordance with Section 12.1 and provided that all of the rights described in Section 12.2(a) to 12.2(e) have and continue to be in effect, and further provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Majority Class A Preferred Shareholder provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(vi).

For the avoidance of doubt, any Transfer made pursuant to Sections 4.1(b)(i), 4.1(b)(iv)(1), or 4.1(b)(v) is not subject to or in any way restricted or limited by Section 4.2 or Section 4.3.

8. Reserved Matters. The Shareholders shall exercise all voting rights and other powers of control available to them in relation to each Group Company to procure that each Group Company and/or its board of directors shall not, and as a separate covenant the Company shall exercise all voting rights and other powers of control available to it in relation to each Group Company (other than the Company itself) to procure that each such other Group Company and/or its board of directors shall not, at any time on or after the First Closing and thereafter, do or approve any of the matters set forth in Schedule II (Reserved Matters), in each case without the prior approval in writing of the Majority Class A Preferred Shareholder or a Series A Director. As a separate and independent covenant, the Company agrees that it shall (so far as it is legally able to do so) observe and comply with the provisions, prohibitions and restrictions in this Section 8.

SCHEDULE II Reserved Matters
(a) Subject to Section 16.12, change its name or amend its Charter Documents;

(b) Approve any annual budget and business plan other than those relating to the Business;

(c) Issue, repurchase or redeem (or agree to issue, repurchase or redeem) any Equity Securities or debt securities or amend the rights attaching to any Equity Securities or debt securities, or undertake any consolidation, sub-division, reclassification or conversion of any of its share capital, except an issuance of Equity Securities following a failure to make a Subscription Payment (as defined in the Subscription Agreement) and an issuance of Equity Securities in accordance with the Subscription Agreement (in the form entered into on the date of this Agreement).

(d) Make any material change to the nature or scope of its business or the Business;

(e) Declare, pay or make any dividend or distribution;

HLIU004202

(f) Enter into (or agree to enter into) any transaction other than in its ordinary and usual course of business in relation to the Business, including the disposal or transfer of any business, property or assets or any interests therein (other than in its ordinary and usual course of business);

(g) Enter into (or agree to enter into) any transaction with any Connected Person, including the Founder, the Founder HoldCo, the Class A Ordinary Shareholders and their respective Affiliates;

(h) Pass any resolution that may result in its dissolution, winding-up or liquidation or any receivership or enter into any material debt restructuring or arrangement with its third party creditors;

(i) Implement any IPO; and/or

(j) Any matters that may have a Material Adverse Effect on it or on the Group.

12. Default Notice

12.1 If any of the following events occurs, the Majority Class A Preferred Shareholder may at any time after such occurrence give a "Default Notice" in writing to Founder HoldCo (with reasonable details specifying the event which the Default Notice relates to):

... ...

(d) the Founder ceases to own (directly or indirectly) 100% of the economic rights and 100% of the voting rights in any Founder Entity; or (ii) the Founder HoldCo Transfers any of its Equity Securities in breach of Section 4; or (iii) the Founder otherwise ceases to own (directly or indirectly) 100% of the economic rights and 100% voting powers with respect to any of the Class B Preferred Shares held by Founder HoldCo from time to time (other than in each case as a result of a Transfer of Class B Preferred Shares in compliance with this Agreement or pursuant to the Share Pledge Agreement) (each a "Change of Control Event"), provided that, with respect to this clause (d), "100% shall be deemed to be "50%" in the case of a involuntary Transfer of Equity Securities effected as a result of an enforcement event by one or more creditors against the Equity Securities;

… …

---

**Faraday Future**

**Jerry Wang**

General Manager | Global Capital and Investment Banking

e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Friday, January 26, 2018 1:06 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached SA as further revised per your request.  It looks like that what may be best at this point, without destroying the whole purposes and what has already been agreed on, is to put in some simple and necessary definitions on the restrictive time period to reflect the current Series A financing documents as you have stated.

Best regards to you and DG.

Henry

HLIU004204

**HLIU004205-HLIU004208**

Confidential & Privileged

DIRECTOR COMPENSATION AGREEMENT

This Director Compensation Agreement (this "Agreement") is made and entered into as of the ____[●]th day of January, 2018, by and between Yueting Jia, the indirect sole shareholder of Founder HoldCo (as defined below) (the "Founder"), and Hong Liu (aka (Henry) Hong Liu, the "Appointee") (separately, a "Party" or collectively, the "Parties"), as a legally bound agreement on the Parties and on their successors, assignees and transferees.

1. FF Top Holding Ltd. ("Founder HoldCo") owns an aggregate amount of 600,000,000 Class B preferred shares of Smart King Limited (the "Company"), which in turn owns 100% of entities including, without limitation, FF Global Holdings Ltd, Faraday & Future, Inc., LeSee entities (in Schedule I to this Agreement), City of Sky Limited (d/b/a Faraday) and their successors, assignees and transferees.  The Parties have entered into this Agreement pursuant to which: (i) the Founder will cause Founder HoldCo to appoint the Appointee, and the Appointee accepts such appointment, to serve as a director on the board of directors of the Company and (ii) in exchange for the Appointee's service as a director on the board of directors of the Company, the Founder agrees to pay the Appointee a cash amount or other means of payment as may be mutually agreed by Appointee and the Founder, equal to the cash value of shares equal to 1% of the Company's total equity shares pre Series A dilution, namely 10,000,000.00 equity shares representing 1% of the total and all of 1,000,000,000.00 equity shares of the Company pre Series A (the "Shares" or "Stocks") $[●] (such cash payment to the Appointee, the "Director Compensation"), contingent upon the reasonably earliest possible and available cash realization of the Shares including the happening of one or more of the following events: and effective as of the completion of (a) a firm commitment underwritten public offering of the Company's stock with a valuation of the Company not less than the dollar amount as is provided in the Company's pre Series A Agreement$[●] billion (a "Qualified IPO"), and; or (b) the sale of a sufficient number of Founder HoldCo's shares of the Company in or as soon as reasonably practicable following such Qualified IPO or a sale or sales of any assets of the Company and any of its affiliates for an amount greater than or equal to the Director Compensation; or (c) a change of control in the Company. .  The vesting of the Director Compensation is subject to the same and best available vesting conditions as provided and agreed in the Employment Agreement between the Appointee and the Company on this same day ("EA").

2. The Founder represents that the Company successfully completed its Series A financing in December 2017. It has been acknowledged by the Parties that the Director Compensation is for a full and accepted consideration upon signing of this Agreement. It is the good faith belief and genuine intention of the Parties that this Agreement is to promote the interests of all of the Company's shareholders and stakeholders.

3. This Agreement is effective and binding upon the signing.  The Parties agree that the delivery of the Director Compensation by the Founder to the Appointee shall be in the form of wire transfer of immediately available funds after the conditions in the preceding sentence have been satisfied.  The Founder's performance of its obligations under this Agreement are in all respects subject to the restrictions set forth in that certain Shareholders Agreement, dated as of November 30, 2017, as amended, by and among the Company, Founder HoldCo, the Founder and Season Smart Limited (the

ACTIVE 228420980

**Comments:**

**Commented [JW1]:** Should be mutually agreed

**Commented [JW2]:** Needs to discuss mutually with VJ and HL to see if this is properly addressed.

**Commented [JW3]:** There will be no separate sell of asset from YT personal related to FF, only through IPO and sell shares. If an asset sale happens this is company behavior, not related to FF.

**Commented [JW4]:** If there is change of control but no liquidation event happens, it is impossible to make the payment. Suggest not to mention to much details and we will discuss if this happens with a liquidation event.

**Commented [JW5]:** This has already been mutually agreed.

Confidential & Privileged

"Agreement").  It is further understood and agreed among the Parties that the demand by the Appointee for the delivery of the Director Compensation shall be contingent upon the satisfaction of the conditions set forth in the preceding paragraph. If the Appointee decides to leave the Company at his own will during his employment term as provided in the EA or his employment at the Company is terminated by the Company during such a term based on the specific cause of a serious breach of fiduciary duties to the Company as a senior executive of the Company after finally adjudicated against the Appointee by a competent court in the United States (the Appointee will be fully covered by the Company with executive indemnifications to the extent set forth in the Company's standard form of director indemnification agreement), any remaining unvested portion of the Director Compensation at the time when such departure or termination effectuates will be automatically forfeited. Any delay to enforce the terms of this Agreement and any delay to act on a breach of its term by the Appointee does not constitute a waiver of those rights.

4. [*Note: 4 has aAlready been provided in Para 3 in fiduciary duty which is in line with agreed EA.*]
The Appointee agrees not to divulge, communicate, use to the detriment of the Company or for the benefit of any other person, or misuse in any way, (i) information regarding the existence of this Agreement, any terms set forth in this Agreement, or information he received in connection with the negotiations of this Agreement, (ii) any confidential or secret information relating to the Company or any subsidiary of the Company or (iii) any other technical, business, proprietary or financial information of the Company including personnel information, secret processes, know-how, customer lists, formulas or other technical data not available to the public generally or to the competitors of the Company ("Confidential Information"), except to the extent that the Appointee demonstrates that such Confidential Information (A) becomes a matter of public record or is published in a newspaper, magazine or other periodical available to the general public, other than as a result of any act or omission of the Appointee, or (B) is required to be disclosed by any law, regulation or order of any court or regulatory commission, department or agency.  The Appointee acknowledges and agrees that any information or data the Appointee has acquired on any of these matters or items were received in confidence and are subject to the terms of this Agreement.  The Appointee acknowledges and agrees that any breach of this paragraph by the Appointee shall result in the automatic termination of this Agreement and all of the Founder's obligations under this Agreement, and a forfeiture by the Appointee of any and all rights of the Appointee under this Agreement.

> **Commented [JW6]:** We need to keep at least confidentiality.

45.  If any provision of this Agreement is ineffective in whole or in part, the remainder of this Agreement shall remain in effect.  This Agreement is binding on all Parties by virtue of the conduct of both parties and in spite of any defect or error in the formality of its execution.

56.  The rights, benefits, liabilities and responsibilities contained within the terms of this Agreement are not assignable by any Party with the prior written agreement of the other Party.

67.  The Parties agree that this Agreement shall be governed and construed in accordance with the laws of the State of California, and that any dispute arising out of or related to this Agreement shall be resolved exclusively in the state or federal courts located in Los Angeles, California.

ACTIVE 228420980

HLIU004206

Confidential & Privileged

[*The remainder of this page has been intentionally left blank.*]

ACTIVE 228420980

HLIU004207

Confidential & Privileged

    IN WITNESS WHEREOF, the undersigned have hereunto caused this Director Compensation Agreement to be executed as of the date first set forth above.

 

                                 <u>FOUNDER</u>

                                   _____

                                   Yueting Jia

 

                                 <u>APPOINTEE</u>

                                 _____

                                 Hong Liu (aka (Henry) Hong Liu)

ACTIVE 228420980

# Exhibit 19

| From: | Jerry Wang (FF China) |
|---|---|
| Sent: | Tuesday, January 30, 2018 10:33 PM CST |
| To: | H. Liu |
| CC: | DG Jiang |
| Subject: | RE: [EXTERNAL] Further revisions on Share Transfer Agreement |
| Attachments: | 01302018DirectorCompensationAgreement(RedlinesonJW)RR.docx |

Thank you Mr. Liu, please refer to brief comments and if you think it is fine I will forward to Sidley and discuss with them.

_____

**Faraday Future**

**Jerry Wang**

General Manager | Global Capital and Investment Banking

e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Tuesday, January 30, 2018 8:13 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

As spoke earlier, please find the attached.

Best regards to you and DG.

Henry

On Tue, Jan 30, 2018 at 8:55 PM, H. Liu <henryliuesq@gmail.com> wrote:

   Hi Jerry:  Please find my a few additional comments.  Best regards to you and DG.  Henry

   On Tue, Jan 30, 2018 at 8:24 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

      Dear Mr. Liu,

Please refer to further comments based on your Redline version, and please let me know if you would like to schedule a call with Sidley to briefly discuss how to best describe the specific amount.

Thanks,
Jerry

_____

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Tuesday, January 30, 2018 4:19 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached quick read of the DA (Redline & Clean), for your purview.

Best regards to you and DG.

Henry

On Tue, Jan 30, 2018 at 2:31 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

Dear Mr. Liu,

Congratulations again for having you on board and very much looking forward working with you starting in near future!

As we discussed and follow up on previous email, there are certain constrains listed below to limit our ability to do a direct or indirect share transfer without triggering default, which will bear significant losses and consequences to YT and FF. Please take a look this version drafted by company

external counsel Sidley, and I make it clear to make it unchanged as much as possible and reflect all business terms that we mutually agreed.

Please let me know if we need to do a call to explain further, and Sidley is happy to arrange a conference call together with us to walk through and discuss solutions. Thanks and have a good day!

Best,
Jerry

―――――――――――――――

**Faraday Future**

**Jerry Wang**

General Manager | Global Capital and Investment Banking

e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF. email are requested to delete such email, including any attachments. Any non-business, personal use of FF. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** Jerry Wang (FF China)
**Sent:** Friday, January 26, 2018 3:38 PM
**To:** 'H. Liu' <henryliuesq@gmail.com>
**Subject:** RE: [EXTERNAL] Further revisions on Share Transfer Agreement

Dear Mr. Liu,

Thanks again for your patience, please refer to below the terms in Series A documents that set the limit to share transfer. Please let us know how you would like to revise the draft to avoid triggering the terms and we will cooperative and have it signed ASAP once confirmed with this point.

Thanks again for your understanding!

Best,
Jerry

---------------------------------

4.1 Restriction on Transfers.
(a)        Shareholders. Prior to a Qualified IPO, no Shareholder shall, and shall procure that each of its Affiliates shall not, directly or indirectly, sell, assign, transfer, pledge, hypothecate, or otherwise

HLIU004239

encumber or dispose of in any way or otherwise grant any interest or right with respect to (the "Transfer," "Transferring," "Transferred," "Transferor" and "Transferee" having meanings correlative to the foregoing) all or any part of any interest in any Equity Securities of the Company now or hereafter owned or held by such Shareholders, save as provided in Section 4.1(b) and provided that such Transfers are made in compliance with this Section 4.

(b)      Permitted Transfers. The restrictions on Transfer set forth in Section 4.1(a) shall not apply to the following Transfers (each, a "Permitted Transfer"):

(i)      Subject to Section 12.2(d), the Founder HoldCo shall be permitted to direct the Company to grant and issue Class A Ordinary Shares pursuant to the STI representing in aggregate not more than 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) (the "STI Target Number") to eligible Applicable Employees, selected by Founder HoldCo, to incentivise them for the best interests of the Group;

(ii)      The Founder HoldCo shall be permitted to Transfer such number of Class B Preferred Shares up to another 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) for purposes of discharging any contingent liabilities of the Founder HoldCo, Founder and their respective Affiliates provided that: (A) unless otherwise approved by the Majority Class A Preferred Shareholder in writing, the Class B Preferred Shares so Transferred shall immediately upon completion of such Transfer be automatically re-designated into Class B Ordinary Shares and the Directors shall ensure the register of members of the Company duly reflect such automatic re-designation; and (B) any Transfer proposed to be made pursuant to this Section 4.1(b)(ii) shall be subject to the rights of first refusal of the Class A Preferred Shareholders provided under Section 4.2(a)(1)-(5) and Section 4.3 and, accordingly, the provisions of Section 4.2(a)(1)-(5) and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(ii), but Section 4.2(a)(6)-(10) shall not apply.

(iii)      Any Shareholder (other than a Class A Preferred Shareholder) shall be permitted to Transfer any outstanding Equity Securities issued by the Company upon receipt of the prior written consent to such Transfer by the Majority Class A Preferred Shareholder and the Founder HoldCo, which consent may be granted by the Majority Class A Preferred Shareholder and the Founder HoldCo in their respective sole and absolute discretion, provided that after such consent is granted, the Transfer subject to such consent shall then be subject to the rights of first refusal and co-sale rights of all the Class A Preferred Shareholders and the Founder HoldCo (including the Shareholders granting the consent to such Transfer in the first place) provided under Section 4.2 and Section 4.3.

(iv)      The following shall apply in relation to Transfers by relevant Class A Preferred Shareholders:
(1)      The first Transfer by the Series A Investor of all or part of its Class A Preferred Shares in a single transaction after First Closing shall not be restricted in any respects and none of the provisions of Section 4.2 or Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(iv)(1);
(2)      Any Class A Preferred Shareholder shall, after the first Transfer set forth in clause (1) above, be permitted to Transfer any of its Class A Preferred Shares to any Person other than a Competitor, and provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Founder HoldCo provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(iv)(2);
(v)      A Transfer of Class B Preferred Shares by the Founder HoldCo in accordance with Section 5.13(b) of the Subscription Agreement, which shall automatically (without a resolution of the

HLIU004240

Directors and/or Shareholders or any other action being required) be re-designated into Class A Ordinary Shares immediately on such Transfer being effected; and

(vi)      Any Transfer of Equity Securities by the Founder HoldCo after a Default Notice has been issued in accordance with Section 12.1 and provided that all of the rights described in Section 12.2(a) to 12.2(e) have and continue to be in effect, and further provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Majority Class A Preferred Shareholder provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(vi).

For the avoidance of doubt, any Transfer made pursuant to Sections 4.1(b)(i), 4.1(b)(iv)(1), or 4.1(b)(v) is not subject to or in any way restricted or limited by Section 4.2 or Section 4.3.

8. Reserved Matters. The Shareholders shall exercise all voting rights and other powers of control available to them in relation to each Group Company to procure that each Group Company and/or its board of directors shall not, and as a separate covenant the Company shall exercise all voting rights and other powers of control available to it in relation to each Group Company (other than the Company itself) to procure that each such other Group Company and/or its board of directors shall not, at any time on or after the First Closing and thereafter, do or approve any of the matters set forth in Schedule II (Reserved Matters), in each case without the prior approval in writing of the Majority Class A Preferred Shareholder or a Series A Director. As a separate and independent covenant, the Company agrees that it shall (so far as it is legally able to do so) observe and comply with the provisions, prohibitions and restrictions in this Section 8.

SCHEDULE II Reserved Matters
(a) Subject to Section 16.12, change its name or amend its Charter Documents;

(b) Approve any annual budget and business plan other than those relating to the Business;

(c) Issue, repurchase or redeem (or agree to issue, repurchase or redeem) any Equity Securities or debt securities or amend the rights attaching to any Equity Securities or debt securities, or undertake any consolidation, sub-division, reclassification or conversion of any of its share capital, except an issuance of Equity Securities following a failure to make a Subscription Payment (as defined in the Subscription Agreement) and an issuance of Equity Securities in accordance with the Subscription Agreement (in the form entered into on the date of this Agreement).

(d) Make any material change to the nature or scope of its business or the Business;

(e) Declare, pay or make any dividend or distribution;

(f) Enter into (or agree to enter into) any transaction other than in its ordinary and usual course of business in relation to the Business, including the disposal or transfer of any business, property or assets or any interests therein (other than in its ordinary and usual course of business);

(g) Enter into (or agree to enter into) any transaction with any Connected Person, including the Founder, the Founder HoldCo, the Class A Ordinary Shareholders and their respective Affiliates;

(h) Pass any resolution that may result in its dissolution, winding-up or liquidation or any receivership or enter into any material debt restructuring or arrangement with its third party creditors;

(i) Implement any IPO; and/or

(j) Any matters that may have a Material Adverse Effect on it or on the Group.

12. Default Notice
12.1 If any of the following events occurs, the Majority Class A Preferred Shareholder may at any time after such occurrence give a "Default Notice" in writing to Founder HoldCo (with reasonable details specifying the event which the Default Notice relates to):
... ...
(d) the Founder ceases to own (directly or indirectly) 100% of the economic rights and 100% of the voting rights in any Founder Entity; or (ii) the Founder HoldCo Transfers any of its Equity Securities in breach of Section 4; or (iii) the Founder otherwise ceases to own (directly or indirectly) 100% of the economic rights and 100% voting powers with respect to any of the Class B Preferred Shares held by Founder HoldCo from time to time (other than in each case as a result of a Transfer of Class B Preferred Shares in compliance with this Agreement or pursuant to the Share Pledge Agreement) (each a "Change of Control Event"), provided that, with respect to this clause (d), "100% shall be deemed to be "50%" in the case of a involuntary Transfer of Equity Securities effected as a result of an enforcement event by one or more creditors against the Equity Securities;

… …

_____

**Faraday Future**

**Jerry Wang**

General Manager | Global Capital and Investment Banking

e  jerry.wang@ff.com
c  +1 201-354-7734 | +86 151-1690-3389
a  18455 S Figueroa St, Gardena, CA 90248
w  www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Friday, January 26, 2018 1:06 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached SA as further revised per your request.  It looks like that what may be best at this point, without destroying the whole purposes and what has already been agreed on, is to put in some simple and necessary definitions on the restrictive time period to reflect the current Series A financing documents as you have stated.

Best regards to you and DG.

Henry

HLIU004243

HLIU004244-HLIU004246

Confidential & Privileged

DIRECTOR COMPENSATION AGREEMENT

This Director Compensation Agreement (this "Agreement") is made and entered into as of the ___– th day of January, 2018, by and between Yueting Jia, the indirect sole shareholder of Founder HoldCo (as defined below) (the "Founder"), and Hong Liu (aka (Henry) Hong Liu, the "Appointee") (separately, a "Party" or collectively, the "Parties"), as a legally bound agreement on the Parties and on their successors, assignees and transferees.

1. FF Top Holding Ltd. ("Founder HoldCo") owns an aggregate amount of 600,000,000 Class B preferred shares of Smart King Limited (the "Company"), which in turn owns 100% of entities including, without limitation, FF Global Holdings Ltd, Faraday & Future, Inc., LeSee entities (in Schedule I to this Agreement), City of Sky Limited (d/b/a Faraday) and their successors, assignees and transferees.  The Parties have entered into this Agreement pursuant to which: (i) the Founder will cause Founder HoldCo to appoint the Appointee, and the Appointee accepts such appointment, to serve as a director on the board of directors of the Company and (ii) in exchange for the Appointee's service as a director on the board of directors of the Company, the Founder agrees to pay the Appointee a cash amount, or other means of payment as may be mutually agreed by Appointee and the Founder, equal to the cash value of shares equal to, for the purpose of calculating the cash value, 1% of the Company's total equity shares pre Series A dilution, namely 10,000,000.00 equity shares representing 1% of the total and all of 1,000,000,000.00 equity shares of the Company pre Series A (the "Shares" or "Stocks") (the "Director Compensation"), upon the reasonably earliest possible and available cash realization of the Shares including the happening of one or more of the following events: (a) a firm commitment underwritten public offering of the Company's stock (a "Qualified IPO"), and the sale of a sufficient number of Founder HoldCo's shares of the Company in or as soon as reasonably practicable following such Qualified IPO for an amount greater than or equal to the Director Compensation; or (b) Aany transactions including but not limited to, merger, acquisition, sale or disposal of assets other than an IPO, resulting in cash available to Founder HoldCo for the Director Compensation; and (c) an change of control in the Company resulting in cash available to Founder HoldCo for the Director Compensation. The vesting of the Director Compensation is subject to the same vesting conditions as provided and agreed in the Employment Agreement between the Appointee and the Company dated January 25th, 2018on this same day ("EA").

2. The Founder represents that the Company successfully completed its Series A financing in December 2017. It has been acknowledged by the Parties that the Director Compensation is for a full and accepted consideration upon signing of this Agreement. It is the good faith belief and genuine intention of the Parties that this Agreement is to promote the interests of all of the Company's shareholders and stakeholders.

3. This Agreement is effective and binding upon the signing.  The Parties agree that the delivery of the Director Compensation by the Founder to the Appointee shall be in the form of wire transfer of immediately available funds after the conditions in the preceding sentence have been satisfied.  The Founder's performance of its obligations under this Agreement are in all respects subject to the restrictions set forth in that certain Shareholders Agreement, dated as of November 30, 2017, as

**Commented [JW1]:** Needs to discuss mutually with VJ and HL to see if this is properly addressed.

**Commented [JW2]:** There will be no separate sell of asset from YT personal related to FF, only through IPO and sell shares. If an asset sale happens this is company behavior, not related to FF.

**Commented [JW3]:** If there is change of control but no liquidation event happens, it is impossible to make the payment. Suggest not to mention to much details and we will discuss if this happens with a liquidation event.

**Commented [JW4]:** This has already been mutually agreed.

ACTIVE 228420980

**HLIU004244**

Confidential & Privileged

amended, by and among the Company, Founder HoldCo, the Founder and Season Smart Limited (the "Agreement").  It is further understood and agreed among the Parties that the demand by the Appointee for the delivery of the Director Compensation shall be contingent upon the satisfaction of the conditions set forth in the preceding paragraph. If the Appointee decides to leave the Company at his own will during his employment term as provided in the EA or his employment at the Company is terminated by the Company during such a term based on the specific cause of a serious breach of fiduciary duties to the Company as a senior executive of the Company after finally adjudicated against the Appointee by a competent court in the United States (the Appointee will be fully covered by the Company with executive indemnifications to the extent set forth in the Company's standard form of director indemnification agreement), any remaining unvested portion of the Director Compensation at the time when such departure or termination effectuates will be automatically forfeited. Any delay to enforce the terms of this Agreement and any delay to act on a breach of its term by the Appointee does not constitute a waiver of those rights.

[*Note: 4 has already been provided in Para 3 in fiduciary duty which is in line with agreed EA. Fiduciary duty includes and has higher confidentiality standards.*] 4.  The terms of this Agreement are confidential between the parties and shall not be disclosed to anyone else except as may be necessary to effectuate its terms mutually agreed between Founder and Appointee in writing or electronic notice.

5 4.  If any provision of this Agreement is ineffective in whole or in part, the remainder of this Agreement shall remain in effect.  This Agreement is binding on all Parties by virtue of the conduct of both parties and in spite of any defect or error in the formality of its execution.

6 5.  The rights, benefits, liabilities and responsibilities contained within the terms of this Agreement are not assignable by any Party with the prior written agreement of the other Party.

7 6.  The Parties agree that this Agreement shall be governed and construed in accordance with the laws of the State of California, and that any dispute arising out of or related to this Agreement shall be resolved exclusively in the state or federal courts located in Los Angeles, California.

IN WITNESS WHEREOF, the undersigned have hereunto caused this Director Compensation Agreement to be executed as of the date first set forth above.

FOUNDER

_____

Yueting Jia

APPOINTEE

_____

ACTIVE 228420980

> **Commented [JW5]:**  We need to keep at least confidentiality.

HLIU004245

Confidential & Privileged

Hong Liu (aka (Henry) Hong Liu)

ACTIVE 228420980

HLIU004246

# Exhibit 20

| From: | Jerry Wang (FF China) |
|---|---|
| Sent: | Thursday, February 1, 2018 6:08 PM CST |
| To: | H. Liu |
| Subject: | RE: [EXTERNAL] Further revisions on Share Transfer Agreement |
| Attachments: | Director Compensation Agreement.docx |

**Privileged and Confidential**

Dear Mr. Liu,

Please kindly refer the revised version. Comment from Sidley: "Thanks Jerry – this is better, but still carries moderate risk of breach of the shareholders agreement (and will have to be disclosed in connection with an IPO)".

Please let me know if we need to discuss in phone for further clarification, thank you.

Best,
Jerry

---

**Faraday Future**

**Jerry Wang**
General Manager │ Global Capital and Investment Banking
e  jerry.wang@ff.com
c  +1 201-354-7734 / +86 151-1690-3389
a  18455 S Figueroa St, Gardena, CA 90248
w  www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Thursday, February 1, 2018 5:03 AM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Based on our discussions yesterday evening, please find the attached which hopefully will be the final version.

Best regards to you and DG.

HLIU004283

Henry

On Tue, Jan 30, 2018 at 11:33 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

> Thank you Mr. Liu, please refer to brief comments and if you think it is fine I will forward to Sidley and discuss with them.

_____

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e  jerry.wang@ff.com
c  +1 201-354-7734 / +86 151-1690-3389
a  18455 S Figueroa St, Gardena, CA 90248
w  www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Tuesday, January 30, 2018 8:13 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

As spoke earlier, please find the attached.

Best regards to you and DG.

Henry

On Tue, Jan 30, 2018 at 8:55 PM, H. Liu <henryliuesq@gmail.com> wrote:

> Hi Jerry:  Please find my a few additional comments.  Best regards to you and DG.  Henry

On Tue, Jan 30, 2018 at 8:24 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

> Dear Mr. Liu,

HLIU004284

Please refer to further comments based on your Redline version, and please let me know if you
would like to schedule a call with Sidley to briefly discuss how to best describe the specific amount.

Thanks,
Jerry

_____

**Faraday Future**

**Jerry Wang**
General Manager | Global Capital and Investment Banking

e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of
confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received
any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the
responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc.
should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise
re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Tuesday, January 30, 2018 4:19 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached quick read of the DA (Redline & Clean), for your purview.

Best regards to you and DG.

Henry

On Tue, Jan 30, 2018 at 2:31 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

Dear Mr. Liu,

Congratulations again for having you on board and very much looking forward working with you
starting in near future!

As we discussed and follow up on previous email, there are certain constrains listed below to limit
our ability to do a direct or indirect share transfer without triggering default, which will bear
significant losses and consequences to YT and FF. Please take a look this version drafted by

HLIU004285

company external counsel Sidley, and I make it clear to make it unchanged as much as possible and reflect all business terms that we mutually agreed.

Please let me know if we need to do a call to explain further, and Sidley is happy to arrange a conference call together with us to walk through and discuss solutions. Thanks and have a good day!

Best,
Jerry

---

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** Jerry Wang (FF China)
**Sent:** Friday, January 26, 2018 3:38 PM
**To:** 'H. Liu' <henryliuesq@gmail.com>
**Subject:** RE: [EXTERNAL] Further revisions on Share Transfer Agreement

Dear Mr. Liu,

Thanks again for your patience, please refer to below the terms in Series A documents that set the limit to share transfer. Please let us know how you would like to revise the draft to avoid triggering the terms and we will cooperative and have it signed ASAP once confirmed with this point.

Thanks again for your understanding!

Best,
Jerry

---------------------------------

4.1 Restriction on Transfers.

HLIU004286

(a)      Shareholders. Prior to a Qualified IPO, no Shareholder shall, and shall procure that each of its Affiliates shall not, directly or indirectly, sell, assign, transfer, pledge, hypothecate, or otherwise encumber or dispose of in any way or otherwise grant any interest or right with respect to (the "Transfer," "Transferring," "Transferred," "Transferor" and "Transferee" having meanings correlative to the foregoing) all or any part of any interest in any Equity Securities of the Company now or hereafter owned or held by such Shareholders, save as provided in Section 4.1(b) and provided that such Transfers are made in compliance with this Section 4.

(b)      Permitted Transfers. The restrictions on Transfer set forth in Section 4.1(a) shall not apply to the following Transfers (each, a "Permitted Transfer"):

(i)      Subject to Section 12.2(d), the Founder HoldCo shall be permitted to direct the Company to grant and issue Class A Ordinary Shares pursuant to the STI representing an aggregate not more than 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) (the "STI Target Number") to eligible Applicable Employees, selected by Founder HoldCo, to incentivise them for the best interests of the Group;

(ii)      The Founder HoldCo shall be permitted to Transfer such number of Class B Preferred Shares up to another 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) for purposes of discharging any contingent liabilities of the Founder HoldCo, Founder and their respective Affiliates provided that: (A) unless otherwise approved by the Majority Class A Preferred Shareholder in writing, the Class B Preferred Shares so Transferred shall immediately upon completion of such Transfer be automatically re-designated into Class B Ordinary Shares and the Directors shall ensure the register of members of the Company duly reflect such automatic re-designation; and (B) any Transfer proposed to be made pursuant to this Section 4.1(b)(ii) shall be subject to the rights of first refusal of the Class A Preferred Shareholders provided under Section 4.2(a)(1)-(5) and Section 4.3 and, accordingly, the provisions of Section 4.2(a)(1)-(5) and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(ii), but Section 4.2(a)(6)-(10) shall not apply.

(iii)      Any Shareholder (other than a Class A Preferred Shareholder) shall be permitted to Transfer any outstanding Equity Securities issued by the Company upon receipt of the prior written consent to such Transfer by the Majority Class A Preferred Shareholder and the Founder HoldCo, which consent may be granted by the Majority Class A Preferred Shareholder and the Founder HoldCo in their respective sole and absolute discretion, provided that after such consent is granted, the Transfer subject to such consent shall then be subject to the rights of first refusal and co-sale rights of all the Class A Preferred Shareholders and the Founder HoldCo (including the Shareholders granting the consent to such Transfer in the first place) provided under Section 4.2 and Section 4.3.

(iv)      The following shall apply in relation to Transfers by relevant Class A Preferred Shareholders:
(1)      The first Transfer by the Series A Investor of all or part of its Class A Preferred Shares in a single transaction after First Closing shall not be restricted in any respects and none of the provisions of Section 4.2 or Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(iv)(1);
(2)      Any Class A Preferred Shareholder shall, after the first Transfer set forth in clause (1) above, be permitted to Transfer any of its Class A Preferred Shares to any Person other than a Competitor, and provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Founder HoldCo provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(iv)(2);

(v)      A Transfer of Class B Preferred Shares by the Founder HoldCo in accordance with Section 5.13(b) of the Subscription Agreement, which shall automatically (without a resolution of the Directors and/or Shareholders or any other action being required) be re-designated into Class A Ordinary Shares immediately on such Transfer being effected; and

(vi)      Any Transfer of Equity Securities by the Founder HoldCo after a Default Notice has been issued in accordance with Section 12.1 and provided that all of the rights described in Section 12.2(a) to 12.2(e) have and continue to be in effect, and further provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Majority Class A Preferred Shareholder provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(vi).

For the avoidance of doubt, any Transfer made pursuant to Sections 4.1(b)(i), 4.1(b)(iv)(1), or 4.1(b)(v) is not subject to or in any way restricted or limited by Section 4.2 or Section 4.3.

8. Reserved Matters. The Shareholders shall exercise all voting rights and other powers of control available to them in relation to each Group Company to procure that each Group Company and/or its board of directors shall not, and as a separate covenant the Company shall exercise all voting rights and other powers of control available to it in relation to each Group Company (other than the Company itself) to procure that each such other Group Company and/or its board of directors shall not, at any time on or after the First Closing and thereafter, do or approve any of the matters set forth in Schedule II (Reserved Matters), in each case without the prior approval in writing of the Majority Class A Preferred Shareholder or a Series A Director. As a separate and independent covenant, the Company agrees that it shall (so far as it is legally able to do so) observe and comply with the provisions, prohibitions and restrictions in this Section 8.

SCHEDULE II Reserved Matters
(a) Subject to Section 16.12, change its name or amend its Charter Documents;

(b) Approve any annual budget and business plan other than those relating to the Business;

(c) Issue, repurchase or redeem (or agree to issue, repurchase or redeem) any Equity Securities or debt securities or amend the rights attaching to any Equity Securities or debt securities, or undertake any consolidation, sub-division, reclassification or conversion of any of its share capital, except an issuance of Equity Securities following a failure to make a Subscription Payment (as defined in the Subscription Agreement) and an issuance of Equity Securities in accordance with the Subscription Agreement (in the form entered into on the date of this Agreement).

(d) Make any material change to the nature or scope of its business or the Business;

(e) Declare, pay or make any dividend or distribution;

(f) Enter into (or agree to enter into) any transaction other than in its ordinary and usual course of business in relation to the Business, including the disposal or transfer of any business, property or assets or any interests therein (other than in its ordinary and usual course of business);

(g) Enter into (or agree to enter into) any transaction with any Connected Person, including the Founder, the Founder HoldCo, the Class A Ordinary Shareholders and their respective Affiliates;

(h) Pass any resolution that may result in its dissolution, winding-up or liquidation or any receivership or enter into any material debt restructuring or arrangement with its third party creditors;

(i) Implement any IPO; and/or

(j) Any matters that may have a Material Adverse Effect on it or on the Group.

12. Default Notice

12.1 If any of the following events occurs, the Majority Class A Preferred Shareholder may at any time after such occurrence give a "Default Notice" in writing to Founder HoldCo (with reasonable details specifying the event which the Default Notice relates to):

... ...

(d) the Founder ceases to own (directly or indirectly) 100% of the economic rights and 100% of the voting rights in any Founder Entity; or (ii) the Founder HoldCo Transfers any of its Equity Securities in breach of Section 4; or (iii) the Founder otherwise ceases to own (directly or indirectly) 100% of the economic rights and 100% voting powers with respect to any of the Class B Preferred Shares held by Founder HoldCo from time to time (other than in each case as a result of a Transfer of Class B Preferred Shares in compliance with this Agreement or pursuant to the Share Pledge Agreement) (each a "Change of Control Event"), provided that, with respect to this clause (d), "100% shall be deemed to be "50%" in the case of a involuntary Transfer of Equity Securities effected as a result of an enforcement event by one or more creditors against the Equity Securities;

… …

_____

**Faraday Future**

**Jerry Wang**

General Manager | Global Capital and Investment Banking

e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Friday, January 26, 2018 1:06 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>

**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached SA as further revised per your request.  It looks like that what may be best at this point, without destroying the whole purposes and what has already been agreed on, is to put in some simple and necessary definitions on the restrictive time period to reflect the current Series A financing documents as you have stated.

Best regards to you and DG.

Henry

HLIU004290

HLIU004291-HLIU004293

Confidential & Privileged

DIRECTOR COMPENSATION AGREEMENT

This Director Compensation Agreement (this "Agreement") is made and entered into as of the
__ th day of ~~January~~February, 2018, by and between Yueting Jia, the indirect sole shareholder of
Founder HoldCo (as defined below) (the "Founder"), and Hong Liu (aka (Henry) Hong Liu, the
"Appointee") (separately, a "Party" or collectively, the "Parties"), as a legally bound agreement on the
Parties and on their successors, assignees and transferees.

1. FF Top Holding Ltd. ("Founder HoldCo") owns an aggregate amount of 600,000,000 Class B
preferred shares of Smart King Limited (the "Company"), which in turn owns 100% of entities including,
without limitation, FF Global Holdings Ltd, Faraday & Future, Inc., LeSee entities, City of Sky Limited
(d/b/a Faraday) and their successors, assignees and transferees.   The Parties have entered into this
Agreement pursuant to which: (i) the Founder will cause Founder HoldCo to appoint the Appointee, and
the Appointee accepts such appointment, to serve as a director with all D&O insurance and
indemnifications on the board of directors of the Company and (ii) in exchange for the Appointee's
service as a director on the board of directors of the Company, the Founder agrees to pay the Appointee
a cash amount, or other means of payment as may be mutually agreed by Appointee and the Founder,
equal to the cash value of shares equal to, for the only purpose of calculating and computing such cash
amount, 1% of the Company's total equity shares pre Series A dilution, namely 10,000,000.00 equity
shares representing 1% of the total and all of 1,000,000,000.00 equity shares of the Company pre Series
A (the "Shares" or "Stocks") (the "Director Compensation"), upon the reasonably earliest possible and
available cash realization of the Shares including the happening of one or more of the following events:
(a) a firm commitment underwritten public offering of the Company's stock (a "Qualified IPO"), and the
sale of a sufficient number of Founder HoldCo's shares of the Company in or as soon as reasonably
practicable following such Qualified IPO for an amount greater than or equal to the Director
Compensation; or (b) any transactions including but not limited to, merger, acquisition, sale or disposal
of assets other than an IPO, resulting in cash available to Founder HoldCo for the Director
Compensation; and (c) a change of control in the Company resulting in cash available to Founder HoldCo
for the Director Compensation.   The vesting of the Director Compensation is subject to the same vesting
conditions as provided and agreed in the Employment Agreement between the Appointee and the
Company dated January 25th, 2018 ("EA").

2. The Founder represents that the Company successfully completed its Series A financing in
December 2017. It has been acknowledged by the Parties that the Director Compensation is for a full
and accepted consideration upon signing of this Agreement. It is the good faith belief and genuine
intention of the Parties that this Agreement is to promote and safeguard the interests of all of the
Company's shareholders and stakeholders.

3. This Agreement is effective and binding upon the signing.  The Parties agree that the delivery
of the Director Compensation by the Founder to the Appointee shall be in the form of wire transfer of
immediately available funds after the conditions in the preceding sentence have been satisfied.  The
Founder's performance of its obligations under this Agreement are in all respects subject to the
restrictions set forth in that certain Shareholders Agreement, dated as of November 30, 2017, as

ACTIVE 228420980

**HLIU004291**

Confidential & Privileged

amended, by and among the Company, Founder HoldCo, the Founder and Season Smart Limited (the "Agreement").  It is further understood and agreed among the Parties that the demand by the Appointee for the delivery of the Director Compensation shall be contingent upon the satisfaction of the conditions set forth in the preceding paragraph. If the Appointee decides to leave the Company at his own will during his employment term as provided in the EA or his employment at the Company is terminated by the Company during such a term based on the specific cause of a serious breach of fiduciary duties to the Company as a senior executive of the Company after finally adjudicated against the Appointee by a competent court in the United States (the Appointee will be fully covered by the Company with executive indemnifications to the extent set forth in the Company's standard form of director indemnification agreement), any remaining unvested portion of the Director Compensation at the time when such departure or termination effectuates will be automatically forfeited. Any delay to enforce the terms of this Agreement and any delay to act on a breach of its term by the Appointee does not constitute a waiver of those rights.

4.  The terms of this Agreement are confidential between the parties and shall not be disclosed to anyone else except mutually agreed between Founder and Appointee in writing or electronic notice.

5.  If any provision of this Agreement is ineffective in whole or in part, the remainder of this Agreement shall remain in effect.  This Agreement is binding on all Parties by virtue of the conduct of both parties and in spite of any defect or error in the formality of its execution.

6.  The rights, benefits, liabilities and responsibilities contained within the terms of this Agreement are not assignable by any Party with the prior written agreement of the other Party.

7.  The Parties agree that this Agreement shall be governed and construed in accordance with the laws of the State of California, and that any dispute arising out of or related to this Agreement shall be resolved exclusively in the state or federal courts located in Los Angeles, California.

8.  The Parties hereby agree that this Agreement shall not be effective until, but the Parties may not amend this Agreement absent mutual consent prior to, the consummation of a Qualified IPO.

IN WITNESS WHEREOF, the undersigned have hereunto caused this Director Compensation Agreement to be executed as of the date first set forth above.

FOUNDER


_____

Yueting Jia


APPOINTEE

HLIU004292

Confidential & Privileged

_____
Hong Liu (aka (Henry) Hong Liu)

HLIU004293

Exhibit 21

| | |
|---|---|
| **From:** | H. Liu |
| **Sent:** | Friday, February 2, 2018 6:18 PM CST |
| **To:** | Jerry Wang |
| **BCC:** | Liu gmail Henry H. |
| **Subject:** | Re: [EXTERNAL] Further revisions on Share Transfer Agreement |
| **Attachments:** | 02022018Director Compensation Agreement (Final Version HL Signed)).pdf |

Hi Jerry,

Pleases find the attached signed version.

Best regards,

Henry

On Fri, Feb 2, 2018 at 5:31 PM, Jerry Wang <Jerry.Wang@ff.com> wrote:

Dear Mr. Liu,


Please refer to minor modification and clean version of the SA, and please let me know if this is OK and I will ask for final confirmation.


Thanks,

Jerry


_____


**Faraday Future**


**Jerry Wang**

General Manager │ Global Capital and Investment Banking


e    jerry.wang@ff.com

c    +1 201-354-7734 / +86 151-1690-3389

a    18455 S Figueroa St, Gardena, CA 90248

HLIU004359

w  [www.ff.com](http://www.ff.com)

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:[henryliuesq@gmail.com](mailto:henryliuesq@gmail.com)]
**Sent:** Friday, February 2, 2018 11:07 AM
**To:** Jerry Wang <[Jerry.Wang@ff.com](mailto:Jerry.Wang@ff.com)>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached.

Best regards,

Henry

On Thu, Feb 1, 2018 at 7:08 PM, Jerry Wang (FF China) <[Jerry.Wang@ff.com](mailto:Jerry.Wang@ff.com)> wrote:

**Privileged and Confidential**

Dear Mr. Liu,

Please kindly refer the revised version. Comment from Sidley: "Thanks Jerry – this is better, but still carries moderate risk of breach of the shareholders agreement (and will have to be disclosed in connection with an IPO)".

HLIU004360

Please let me know if we need to discuss in phone for further clarification, thank you.


Best,

Jerry


_____

**Faraday Future**


**Jerry Wang**

General Manager │ Global Capital and Investment Banking


e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com


FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*


**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Thursday, February 1, 2018 5:03 AM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement


Hi Jerry,

Based on our discussions yesterday evening, please find the attached which hopefully will be the final version.

Best regards to you and DG.

Henry

On Tue, Jan 30, 2018 at 11:33 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

Thank you Mr. Liu, please refer to brief comments and if you think it is fine I will forward to Sidley and discuss with them.

_____

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

HLIU004362

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Tuesday, January 30, 2018 8:13 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement


Hi Jerry,


As spoke earlier, please find the attached.


Best regards to you and DG.


Henry


On Tue, Jan 30, 2018 at 8:55 PM, H. Liu <henryliuesq@gmail.com> wrote:

  Hi Jerry:  Please find my a few additional comments.  Best regards to you and DG.  Henry



  On Tue, Jan 30, 2018 at 8:24 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

  Dear Mr. Liu,


  Please refer to further comments based on your Redline version, and please let me know if you would like to schedule a call with Sidley to briefly discuss how to best describe the specific amount.


  Thanks,

  Jerry

_____

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Tuesday, January 30, 2018 4:19 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** Re: [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached quick read of the DA (Redline & Clean), for your purview.

Best regards to you and DG.

HLIU004364

Henry

On Tue, Jan 30, 2018 at 2:31 PM, Jerry Wang (FF China) <Jerry.Wang@ff.com> wrote:

Dear Mr. Liu,

Congratulations again for having you on board and very much looking forward working with you starting in near future!

As we discussed and follow up on previous email, there are certain constrains listed below to limit our ability to do a direct or indirect share transfer without triggering default, which will bear significant losses and consequences to YT and FF. Please take a look this version drafted by company external counsel Sidley, and I make it clear to make it unchanged as much as possible and reflect all business terms that we mutually agreed.

Please let me know if we need to do a call to explain further, and Sidley is happy to arrange a conference call together with us to walk through and discuss solutions. Thanks and have a good day!

Best,

Jerry

_____

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e    jerry.wang@ff.com

c    +1 201-354-7734 / +86 151-1690-3389

a    18455 S Figueroa St, Gardena, CA 90248

w  [www.ff.com](www.ff.com)

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of
confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously
received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is
solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email
purportedly from FF Inc. should rely on the authenticity or completeness of such email, unless it is received directly from FF Inc.. No person is entitled
to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

---

**From:** Jerry Wang (FF China)
**Sent:** Friday, January 26, 2018 3:38 PM
**To:** 'H. Liu' <[henryliuesq@gmail.com](henryliuesq@gmail.com)>
**Subject:** RE: [EXTERNAL] Further revisions on Share Transfer Agreement

Dear Mr. Liu,

Thanks again for your patience, please refer to below the terms in Series A documents
that set the limit to share transfer. Please let us know how you would like to revise the
draft to avoid triggering the terms and we will cooperative and have it signed ASAP once
confirmed with this point.

Thanks again for your understanding!

Best,

Jerry

----------------------------------

4.1 Restriction on Transfers.

(a)      Shareholders. Prior to a Qualified IPO, no Shareholder shall, and shall procure
that each of its Affiliates shall not, directly or indirectly, sell, assign, transfer, pledge,

HLIU004366

hypothecate, or otherwise encumber or dispose of in any way or otherwise grant any interest or right with respect to (the "Transfer," "Transferring," "Transferred," "Transferor" and "Transferee" having meanings correlative to the foregoing) all or any part of any interest in any Equity Securities of the Company now or hereafter owned or held by such Shareholders, save as provided in Section 4.1(b) and provided that such Transfers are made in compliance with this Section 4.

(b)     Permitted Transfers. The restrictions on Transfer set forth in Section 4.1(a) shall not apply to the following Transfers (each, a "Permitted Transfer"):

(i)     Subject to Section 12.2(d), the Founder HoldCo shall be permitted to direct the Company to grant and issue Class A Ordinary Shares pursuant to the STI representing in aggregate not more than 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) (the "STI Target Number") to eligible Applicable Employees, selected by Founder HoldCo, to incentivise them for the best interests of the Group;

(ii)     The Founder HoldCo shall be permitted to Transfer such number of Class B Preferred Shares up to another 5.5% of the total number of issued Shares (calculated on a fully diluted basis assuming full issuance under the Equity Incentive Plan) for purposes of discharging any contingent liabilities of the Founder HoldCo, Founder and their respective Affiliates provided that: (A) unless otherwise approved by the Majority Class A Preferred Shareholder in writing, the Class B Preferred Shares so Transferred shall immediately upon completion of such Transfer be automatically re-designated into Class B Ordinary Shares and the Directors shall ensure the register of members of the Company duly reflect such automatic re-designation; and (B) any Transfer proposed to be made pursuant to this Section 4.1(b)(ii) shall be subject to the rights of first refusal of the Class A Preferred Shareholders provided under Section 4.2(a)(1)-(5) and Section 4.3 and, accordingly, the provisions of Section 4.2(a)(1)-(5) and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(ii), but Section 4.2(a)(6)-(10) shall not apply.

(iii)     Any Shareholder (other than a Class A Preferred Shareholder) shall be permitted to Transfer any outstanding Equity Securities issued by the Company upon receipt of the prior written consent to such Transfer by the Majority Class A Preferred Shareholder and the Founder HoldCo, which consent may be granted by the Majority Class A Preferred Shareholder and the Founder HoldCo in their respective sole and absolute discretion, provided that after such consent is granted, the Transfer subject to such consent shall then be subject to the rights of first refusal and co-sale rights of all the Class A Preferred Shareholders and the Founder HoldCo (including the Shareholders granting the consent to such Transfer in the first place) provided under Section 4.2 and Section 4.3.

(iv)     The following shall apply in relation to Transfers by relevant Class A Preferred Shareholders:

(1)     The first Transfer by the Series A Investor of all or part of its Class A Preferred Shares in a single transaction after First Closing shall not be restricted in any respects and none of the provisions of Section 4.2 or Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(iv)(1);

(2)     Any Class A Preferred Shareholder shall, after the first Transfer set forth in clause (1) above, be permitted to Transfer any of its Class A Preferred Shares to any Person other than a Competitor, and provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Founder HoldCo provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(a)(iv)(2);

(v)     A Transfer of Class B Preferred Shares by the Founder HoldCo in accordance with Section 5.13(b) of the Subscription Agreement, which shall automatically (without a resolution of the Directors and/or Shareholders or any other action being required) be re-designated into Class A Ordinary Shares immediately on such Transfer being effected; and

(vi)     Any Transfer of Equity Securities by the Founder HoldCo after a Default Notice has been issued in accordance with Section 12.1 and provided that all of the rights described in Section 12.2(a) to 12.2(e) have and continue to be in effect, and further provided that such Transfer shall be subject to the rights of first refusal and co-sale rights of the Majority Class A Preferred Shareholder provided under Section 4.2 and Section 4.3 and, accordingly, the provisions of Section 4.2 and Section 4.3 shall apply to the Transfers contemplated by this Section 4.1(b)(vi).

For the avoidance of doubt, any Transfer made pursuant to Sections 4.1(b)(i), 4.1(b)(iv)(1), or 4.1(b)(v) is not subject to or in any way restricted or limited by Section 4.2 or Section 4.3.

8. Reserved Matters. The Shareholders shall exercise all voting rights and other powers of control available to them in relation to each Group Company to procure that each Group Company and/or its board of directors shall not, and as a separate covenant the Company shall exercise all voting rights and other powers of control available to it in relation to each Group Company (other than the Company itself) to procure that each such other Group Company and/or its board of directors shall not, at any time on or after the First Closing and thereafter, do or approve any of the matters set forth in Schedule II

(Reserved Matters), in each case without the prior approval in writing of the Majority Class A Preferred Shareholder or a Series A Director. As a separate and independent covenant, the Company agrees that it shall (so far as it is legally able to do so) observe and comply with the provisions, prohibitions and restrictions in this Section 8.

SCHEDULE II Reserved Matters

(a) Subject to Section 16.12, change its name or amend its Charter Documents;

(b) Approve any annual budget and business plan other than those relating to the Business;

(c) Issue, repurchase or redeem (or agree to issue, repurchase or redeem) any Equity Securities or debt securities or amend the rights attaching to any Equity Securities or debt securities, or undertake any consolidation, sub-division, reclassification or conversion of any of its share capital, except an issuance of Equity Securities following a failure to make a Subscription Payment (as defined in the Subscription Agreement) and an issuance of Equity Securities in accordance with the Subscription Agreement (in the form entered into on the date of this Agreement).

(d) Make any material change to the nature or scope of its business or the Business;

(e) Declare, pay or make any dividend or distribution;

(f) Enter into (or agree to enter into) any transaction other than in its ordinary and usual course of business in relation to the Business, including the disposal or transfer of any business, property or assets or any interests therein (other than in its ordinary and usual course of business);

(g) Enter into (or agree to enter into) any transaction with any Connected Person, including the Founder, the Founder HoldCo, the Class A Ordinary Shareholders and their respective Affiliates;

HLIU004369

(h) Pass any resolution that may result in its dissolution, winding-up or liquidation or any receivership or enter into any material debt restructuring or arrangement with its third party creditors;

(i) Implement any IPO; and/or

(j) Any matters that may have a Material Adverse Effect on it or on the Group.

12. Default Notice

12.1 If any of the following events occurs, the Majority Class A Preferred Shareholder may at any time after such occurrence give a "Default Notice" in writing to Founder HoldCo (with reasonable details specifying the event which the Default Notice relates to):

... …

(d) the Founder ceases to own (directly or indirectly) 100% of the economic rights and 100% of the voting rights in any Founder Entity; or (ii) the Founder HoldCo Transfers any of its Equity Securities in breach of Section 4; or (iii) the Founder otherwise ceases to own (directly or indirectly) 100% of the economic rights and 100% voting powers with respect to any of the Class B Preferred Shares held by Founder HoldCo from time to time (other than in each case as a result of a Transfer of Class B Preferred Shares in compliance with this Agreement or pursuant to the Share Pledge Agreement) (each a "Change of Control Event"), provided that, with respect to this clause (d), "100% shall be deemed to be "50%" in the case of a involuntary Transfer of Equity Securities effected as a result of an enforcement event by one or more creditors against the Equity Securities;

… …

_____

**Faraday Future**

**Jerry Wang**

General Manager │ Global Capital and Investment Banking

e   jerry.wang@ff.com

c   +1 201-354-7734 / +86 151-1690-3389

a   18455 S Figueroa St, Gardena, CA 90248

w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** H. Liu [mailto:henryliuesq@gmail.com]
**Sent:** Friday, January 26, 2018 1:06 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** DG Jiang <Dg.Jiang@ff.com>
**Subject:** [EXTERNAL] Further revisions on Share Transfer Agreement

Hi Jerry,

Please find the attached SA as further revised per your request.  It looks like that what may be best at this point, without destroying the whole purposes and what has already been agreed on, is to put in some simple and necessary definitions on the restrictive time period to reflect the current Series A financing documents as you have stated.

Best regards to you and DG.

Henry

HLIU004372

HLIU004373-HLIU004375

Confidential & Privileged

DIRECTOR COMPENSATION AGREEMENT

This Director Compensation Agreement (this "Agreement") is made and entered into as of the 2nd day of February, 2018, by and between Yueting Jia, the indirect sole shareholder of Founder HoldCo (as defined below) (the "Founder"), and Hong Liu (aka (Henry) Hong Liu, the "Appointee") (separately, a "Party" or collectively, the "Parties"), as a legally bound agreement on the Parties and on their successors, assignees and transferees.

1. FF Top Holding Ltd. ("Founder HoldCo") owns an aggregate amount of 600,000,000 Class B preferred shares of Smart King Limited (the "Company"), which in turn owns 100% of entities including, without limitation, FF Global Holdings Ltd, Faraday & Future, Inc., LeSee entities (in VIE form), City of Sky Limited (d/b/a Faraday) and their successors, assignees and transferees.  The Parties have entered into this Agreement pursuant to which: (i) the Founder will cause Founder HoldCo to appoint the Appointee, and the Appointee accepts such appointment, to serve as a director with all D&O insurance and indemnifications on the board of directors of the Company and (ii) in exchange for the Appointee's service as a director on the board of directors of the Company, the Founder agrees to pay the Appointee a cash amount, or other means of payment as may be mutually agreed by Appointee and the Founder, equal to the cash value of shares equal to, for the only purpose of calculating and computing such cash amount, 1% of the Company's total equity shares pre Series A dilution, namely 10,000,000.00 equity shares representing 1% of the total and all of 1,000,000,000.00 equity shares of the Company pre Series A (the "Shares" or "Stocks") (the "Director Compensation"), upon the reasonably earliest possible and available cash realization of the Shares including the sooner happening of one or more of the following events: (a) a firm commitment underwritten public offering of the Company's stock (a "Qualified IPO"), and the sale of a sufficient number of Founder HoldCo's shares of the Company in or as soon as reasonably practicable following such Qualified IPO for an amount greater than or equal to the Director Compensation; or (b) any transactions including but not limited to, merger, acquisition, sale or disposal of assets other than an IPO, resulting in cash available to Founder HoldCo for the Director Compensation; or (c) a change of control in the Company resulting in cash available to Founder HoldCo for the Director Compensation ("Event" or "Events").   The vesting of the Director Compensation is subject to the same vesting conditions as provided and agreed in the Employment Agreement between the Appointee and the Company dated January 25th, 2018 ("EA").

2. The Founder represents that the Company successfully completed its Series A financing in December 2017. It has been acknowledged by the Parties that the Director Compensation is for a full and accepted consideration upon signing of this Agreement. It is the good faith belief and genuine intention of the Parties that this Agreement is to promote and safeguard the interests of all of the Company's shareholders and stakeholders.

3. This Agreement is effective and binding upon the signing.  The Parties agree that the delivery of the Director Compensation by the Founder to the Appointee shall be in the form of wire transfer of available funds after the conditions in the preceding sentence have been satisfied.  The Founder's performance of its obligations under this Agreement are in all respects subject to the restrictions set

1



HLIU004373

Confidential & Privileged

forth in that certain Shareholders Agreement, dated as of November 30, 2017, as amended, by and among the Company, Founder HoldCo, the Founder and Season Smart Limited (the "Agreement").  It is further understood and agreed among the Parties that the demand by the Appointee for the delivery of the Director Compensation shall be contingent upon the satisfaction of the conditions set forth in the preceding paragraph. If the Appointee decides to leave the Company at his own will during his employment term as provided in the EA or his employment at the Company is terminated by the Company during such a term based on the specific cause of a serious breach of fiduciary duties to the Company as a senior executive of the Company after finally adjudicated against the Appointee by a competent court in the United States ("Departure or Termination") (the Appointee will be fully covered by the Company with executive indemnifications to the extent set forth in the Company's standard form of director indemnification agreement), any remaining unvested portion of the Director Compensation at the time when such Departure or Termination effectuates will be automatically forfeited. If the Appointee leaves the Company without such a Departure or Termination, any and all of the remaining unvested portion of the Director Compensation shall become immediately and fully vested to the Appointee as is similarly provided in the EA. Any delay to enforce the terms of this Agreement and any delay to act on a breach of its term by the Appointee does not constitute a waiver of those rights.

4.  The terms of this Agreement are confidential between the parties and shall not be disclosed to anyone else except mutually agreed between Founder and Appointee in writing or electronic notice.

5.  If any provision of this Agreement is ineffective in whole or in part, the remainder of this Agreement shall remain in effect.  This Agreement is binding on all Parties by virtue of the conduct of both parties and in spite of any defect or error in the formality of its execution.

6.  The rights, benefits, liabilities and responsibilities contained within the terms of this Agreement are not assignable by any Party with the prior written agreement of the other Party.

7.  The Parties agree that this Agreement shall be governed and construed in accordance with the laws of the State of California, and that any dispute arising out of or related to this Agreement shall be resolved exclusively in the state or federal courts located in Los Angeles, California.

8.  The Parties hereby agree that the Director Compensation payment provisions in this Agreement shall become fully effective at the sooner of the removal and nonexistent of any current restrictions on the Founder or the Found Holdco to Transfer all or any part of any interest in any Equity Securities, or the happening of any of the Event.

[*The remainder of this page has been intentionally left blank.*]

2

HLIU004374

Confidential & Privileged

IN WITNESS WHEREOF, the undersigned have hereunto caused this Director Compensation Agreement to be executed as of the date first set forth above.

FOUNDER

_____
Yueting Jia

APPOINTEE

_____
Hong Liu (aka (Henry) Hong Liu)

3

HLIU004375

# Exhibit 22

## Liu, Hong (Henry)

| | |
|---|---|
| **From:** | Liu, Hong (Henry) |
| **Sent:** | Wednesday, February 07, 2018 12:04 PM |
| **To:** | Geller, Kenneth S. |
| **Cc:** | Theiss, Paul W. |
| **Subject:** | Wishing to resign and withdraw from Mayer Brown LLP as an Equity Partner |

Dear Ken,

As I have communicated to Paul Theiss, Chairman of the Firm, on February 5, 2018, I am writing to inform you, as the Managing Partner of the Firm, that I wish to resign and withdraw from Mayer Brown LLP as an Equity Partner, effective on February 15, 2018.

Thank you and all,

Henry

**(Henry) Hong Liu**
**Partner**
**Mayer Brown LLP**
1221 Avenue of the Americas
New York, NY 10020-1001
T +1 212 506 2886
C +1 917 753 0885
F +1 212 894 5866
hliu@mayerbrown.com



HLIU000388

Exhibit 23

| From: | Henry Liu [/o=First Organization/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b1798900635e48188929f08c0bfbd5eb-Henry] |
|---|---|
| **Sent**: | 2/23/2018 2:14:30 PM |
| **To**: | Sandy Gilliam [/o=First Organization/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=13618e78f3a64111a52f44abb0069b3d-Sandy] |
| **Subject**: | Re: In-House Counsel |

Please drop by when you have a second. Thanks.

---

**From:** Sandy Gilliam <Sandy.Gilliam@ff.com>
**Date:** Thursday, February 22, 2018 at 13:59
**To:** Henry Liu <henry.liu@ff.com>
**Subject:** In-House Counsel

Hi Henry,

To register as In-House Counsel, I will need your CA address, can you please send your California address to me?

Thank you in advance.

FF00001202

Exhibit 24

# CERTIFICATE OF REGISTRATION

## THE STATE BAR OF CALIFORNIA

certifies that having complied with the requirements of
California Rules of Court, Rule 9.46 and Rules of the State Bar of California,

Hong Liu

is registered as In-House Counsel for

Faraday & Future, Inc.

and is entitled to engage in activities authorized by the Rules.

**Registration Number:** 803228

**Date:** 04/17/2018

Amy C. Nuñez, Interim Director, Admissions

HLIU004449



# THE STATE BAR OF CALIFORNIA
## OFFICE OF ADMISSIONS

180 HOWARD STREET • SAN FRANCISCO, CALIFORNIA 94105-1617 • (415) 538-2300
845 S. FIGUEROA STREET • LOS ANGELES, CALIFORNIA 90017-2515 • (213) 765-1500

April 18, 2018

Hong Liu
Faraday & Future, Inc.
18455 S. Figueroa St.
Gardena, CA 90248

**RE: Registered In-House Counsel Registration**
**MJP #: 803228**
**File #: 351704**

Dear Hong Liu:

Pursuant to Rules of the State Bar Title 3, Division 3, Rule 3.370 and California Rules of Court, Rule 9.46, **you have been approved as a "Registered In-House Counsel" effective April 17, 2018.** Your certificate of registration is enclosed.

You may practice as Registered In-House Counsel while your Determination of Moral Character Application is being processed.

**Your registration must be renewed annually. Renewal notices are emailed every December, and must be returned by mail with an original copy of a Certificate of Good Standing(s) from the state(s) in which you are admitted. Your initial annual renewal reporting date will be February 1, 2019.** Failure to comply with this requirement is grounds for revocation of your registration.

**You are also required to complete 25 hours of MCLE credit within one year of your effective date of registration. Your initial MCLE compliance reporting date is April 17, 2019.** Failure to comply with this requirement is grounds for revocation of your registration. Please review the MCLE section of our website at http://mcle.calbar.ca.gov for more information.

**You must set up a profile using the "My State Bar Profile" portal on our website at, www.calbar.ca.gov.** You will soon receive a billing statement via email for  your annual membership dues. You can pay your annual membership dues and certify MCLE compliance through your profile. You will need an access code to log in to your profile. To obtain an access code, contact the Member Service Center at (888) 800-3400.

Please call (213) 765-1500, and ask to speak to someone in the Eligibility Department  if you have questions.

Sincerely,

Sherry L. Johnson
Program Assistant II
Office of Admissions, Eligibility

HLIU004450

Exhibit 25



# Faraday Future Appoints Henry Liu Global Chief Administrative Officer, Global Executive Vice President, And Global General Counsel

## HENRY LIU TO LEAD FF'S GLOBAL LEGAL, GOVERNMENT AFFAIRS, ADMINISTRATION, AND CAPITAL.



NEWS PROVIDED BY
**Faraday Future →**
09:00 ET

LOS ANGELES, Aug. 1, 2018 /PRNewswire/ -- Faraday Future (FF) announced today that Henry (Hong) Liu, renowned expert in international legal, banking, and regulatory affairs, and former global equity partner at international law firm Mayer Brown LLP, has assumed the positions of Global Chief Administrative Officer (CAO), Global Executive Vice President, and Global General Counsel, based at the company's Gardena, California, main campus near Los Angeles. Additionally, he serves as chair of FF's newly created Functional Subcommittee.

HLIU004574



Henry Hong Liu, newly appointed Chief Administrative Officer (CAO), Global Executive Vice President, Global General Counsel at Faraday Future (FF)

With more than 25 years of professional, business, and management experience in the United States and Asia Pacific regions, Mr. Liu is a crucial asset to FF as it heads toward the launch of its luxury all-electric, connected, intelligent FF 91, and all subsequent



HLIU004575



Established in May 2014, the company is headquartered in Los Angeles with R&D centers and offices in Silicon Valley, Beijing, Shanghai, and Guangzhou. FF's vision is: create a shared intelligent mobility ecosystem that empowers everyone to move, connect, breathe and live freely.

The 1,000+ "Futurists" at FF bring experience from best-in-class companies spanning the consumer electronics, auto, Internet, and energy industries. With over 4 years of R&D development, the FF team has achieved milestones with unprecedented speed, including having successfully turned the original FF 91 concept into a production ready vehicle in approximately 2.5 years.

FF has brought to life three product revolutions - an "all-in-one" car, a third internet living space, and a super car-robot. The company has developed six technological revolutions, including vehicle platform, computing platform, autonomous driving, powertrain, Internet, and AI.

HLIU004576

www.ff.com

www.twitter.com/faradayfuture

www.facebook.com/faradayfuture

www.instagram.com/faradayfuture

www.linkedin.com/company/faradayfuture

For More Information About Faraday Future, contact: press@ff.com

Contact:

John Schilling

PR Director

john.schilling@ff.com

SOURCE Faraday Future

Related Links

http://ff.com

Henry Hong Liu, newly appointed Chief Administrative Officer (CAO), Global Executive Vice
President, Global General Counsel at Faraday Future (FF)

HLIU004577

Exhibit 26

| Employee ID | Last Name | Grant Name | Quantity Granted | Vesting Schedule (See Above) | Expire Date | Alternative Vest Base Date (Vest Commencement Date) | Allow early Exercise |
|---|---|---|---|---|---|---|---|
| RBC0P7449 | Liu | 10/24/2018 - $0.36 US - ISO | 8,000,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 15-Feb-2018 | FALSE |
| RBC0P7449 | Liu | 10/24/2018 - $0.36 US - ISO | 4,000,000 | 1/48th Monthly for 4 Years | 15-Feb-2029 | 15-Feb-2019 | FALSE |
| RBC0P7449 | Liu | 10/24/2018 - $0.36 US - ISO | 4,000,000 | 1/48th Monthly for 4 Years | 15-Feb-2030 | 15-Feb-2020 | FALSE |
| RBC0P7449 | Liu | 10/24/2018 - $0.36 US - ISO | 4,000,000 | 1/48th Monthly for 4 Years | 15-Feb-2031 | 15-Feb-2021 | FALSE |
| JBIARVDMR | Eisner | 10/24/2018 - $0.36 US - ISO | 90,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 21-May-2018 | FALSE |
| JBIARVDMR | Eisner | 10/24/2018 - $0.36 US - ISO | 30,000 | 1/48th Monthly for 4 Years | 21-May-2029 | 21-May-2019 | FALSE |
| JBIARVDMR | Eisner | 10/24/2018 - $0.36 US - ISO | 15,000 | 1/48th Monthly for 4 Years | 21-May-2030 | 21-May-2020 | FALSE |
| JBIARVDMR | Eisner | 10/24/2018 - $0.36 US - ISO | 15,000 | 1/48th Monthly for 4 Years | 21-May-2031 | 21-May-2021 | FALSE |
| NNGRPX9JE | Johnson | 10/24/2018 - $0.36 US - ISO | 90,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 21-May-2018 | FALSE |
| NNGRPX9JE | Johnson | 10/24/2018 - $0.36 US - ISO | 30,000 | 1/48th Monthly for 4 Years | 21-May-2029 | 21-May-2019 | FALSE |
| NNGRPX9JE | Johnson | 10/24/2018 - $0.36 US - ISO | 15,000 | 1/48th Monthly for 4 Years | 21-May-2030 | 21-May-2020 | FALSE |
| NNGRPX9JE | Johnson | 10/24/2018 - $0.36 US - ISO | 15,000 | 1/48th Monthly for 4 Years | 21-May-2031 | 21-May-2021 | FALSE |
| Y4VXO2127 | Skibbe | 10/24/2018 - $0.36 US - ISO | 90,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 21-May-2018 | FALSE |
| Y4VXO2127 | Skibbe | 10/24/2018 - $0.36 US - ISO | 30,000 | 1/48th Monthly for 4 Years | 21-May-2029 | 21-May-2019 | FALSE |
| Y4VXO2127 | Skibbe | 10/24/2018 - $0.36 US - ISO | 15,000 | 1/48th Monthly for 4 Years | 21-May-2030 | 21-May-2020 | FALSE |
| Y4VXO2127 | Skibbe | 10/24/2018 - $0.36 US - ISO | 15,000 | 1/48th Monthly for 4 Years | 21-May-2031 | 21-May-2021 | FALSE |
| 5HJOTJK8M | Fritz | 10/24/2018 - $0.36 US - ISO | 100,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 29-Jan-2018 | FALSE |
| XPNLVE414 | Hsu | 10/24/2018 - $0.36 US - ISO | 80,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 30-Apr-2018 | FALSE |
| ZG2GI4RC0 | Chen | 10/24/2018 - $0.36 US - ISO | 50,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 29-May-2018 | FALSE |
| S1W28P0V1 | Guthi | 10/24/2018 - $0.36 US - ISO | 30,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 25-Jun-2018 | FALSE |
| UDHJPYKHG | Bullock | 10/24/2018 - $0.36 US - ISO | 25,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 7-May-2018 | FALSE |
| ZPBMOVFTI | Gilliam | 10/24/2018 - $0.36 US - ISO | 15,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 1-Jan-2018 | FALSE |
| 8800Y2R6W | Hsieh | 10/24/2018 - $0.36 US - ISO | 30,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 1-Jan-2018 | FALSE |
| RZZMVKPMZ | Southammavong | 10/24/2018 - $0.36 US - ISO | 35,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 1-Jan-2018 | FALSE |
| 6H2O358OM | Gonzales | 10/24/2018 - $0.36 US - ISO | 5,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 12-Mar-2018 | FALSE |
| NF4H1WGJ1 | Liu | 10/24/2018 - $0.36 US - ISO | 6,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 19-Mar-2018 | FALSE |
| W6W7HI7J0 | Wong | 10/24/2018 - $0.36 US - ISO | 5,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 1-Apr-2018 | FALSE |
| NCDXF6V1D | Bobadilla | 10/24/2018 - $0.36 US - ISO | 10,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 16-Apr-2018 | FALSE |
| 2UEAMQSM6 | Banuelos | 10/24/2018 - $0.36 US - ISO | 20,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 20-Feb-2018 | FALSE |
| JRMNRX0A9 | Kim | 10/24/2018 - $0.36 US - ISO | 5,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 1-Jan-2018 | FALSE |
| KFFMXAQDR | Lund | 10/24/2018 - $0.36 US - ISO | 20,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 1-Jan-2018 | FALSE |
| U01FNIQDM | Chiu | 10/24/2018 - $0.36 US - ISO | 5,000 | 25% @ 1 year, monthly thereafter for 3 years | 24-Oct-2028 | 30-Jul-2018 | FALSE |

Thai Tran

Privacy

10/25/2018

Solium

shareworks.solium.com

**Jannet Calix**
Director, Private Market Operations

+1 480.308.8173   t
jannet.calix@solium.com

**Solium**

222 S. Mill Avenue
Suite 424
Tempe, AZ 85281
United States

HLIU006844

Exhibit 27

Tuesday, October 30, 2018 at 10:48:22 AM Pacific Daylight Time

| | |
|---|---|
| **Subject:** | Fwd: Smart King Board Meeting Minutes |
| **Date:** | Saturday, October 27, 2018 at 13:33:02 Pacific Daylight Time |
| **From:** | Jarret Johnson |
| **To:** | Henry Liu |
| **Attachments:** | Minutes of Board Meeting of Smart King Ltd. (09.21.2018).pdf |

Here are the minutes that contain the language you asked for about WARN.

Get Outlook for iOS

---------- Forwarded message ----------
From: "Jarret Johnson" <jarret.johnson@ff.com>
Date: Tue, Oct 9, 2018 at 2:04 PM -0700
Subject: Smart King Board Meeting Minutes
To: "Jerry Wang" <Jerry.Wang@ff.com>, "Henry Liu" <henry.liu@ff.com>, "Chaoying Deng" <Chaoying.Deng@ff.com>,
"Nick Sampson" <Nick@ff.com>, "Ruokun Jia" <Ruokun.Jia@ff.com>, "jamesxia@evergrande.com"
<jamesxia@evergrande.com>, "Jianjun Peng(FF China)" <jianjun.peng@ff.com>

Dear Members of the Board of Directors of Smart King Ltd.:

Attached please find a copy of the Minutes of the Meeting of the Board of Directors of Smart King Ltd. held
on 9/21/2018.

Regards,

**Jarret Johnson**
Assistant General Counsel, Transactions & Financial Services
Faraday Future
18455 S. Figueroa Street, Gardena, CA 90248
jarret.johnson@ff.com
(310) 503-1850

HLIU008363

# Exhibit 28

**From:**      Henry Liu [henry.liu@ff.com]
**Sent:**      7/30/2018 9:26:16 PM
**To:**        Ian Eisner [ian.eisner@ff.com]; Scott Wang [Yining.Wang@ff.com]; Harvey Karlovac [harvey.karlovac@ff.com]
**CC:**        Brian Fritz [Brian.Fritz@ff.com]
**Subject:**   Re: meeting recording

I would agree with Ian and that it would be in the company as well as everyone's best interest to follow the applicable laws and rules.

---

**From:** Ian Eisner <ian.eisner@ff.com>
**Date:** Monday, July 30, 2018 at 18:20
**To:** Scott Wang <Scott.Wang@ff.com>, Harvey Karlovac <harvey.karlovac@ff.com>
**Cc:** Henry Liu <henry.liu@ff.com>, Brian Fritz <Brian.Fritz@ff.com>
**Subject:** Re: meeting recording

Hi Scott,

Subject to any thoughts Henry might have, from a litigation perspective, it's our strong recommendation not to record ExComm meetings. Any such recordings would potentially be discoverable in litigation involving the company (for example, ExComm meetings have been the subject of discovery in the EVelozcity litigation). We'd risk our litigation opponents taking statements made during ExComm meetings out of context to damage the company. The fact is that there have been statements made at ExComm meetings that, while well intentioned, would potentially damage the company if they had been recorded and produced in the context of litigation (or leaked to the media). Further, recording the meetings may have a chilling effect on what participants are willing to contribute at meetings. (Note that it's my understanding that, under CA, the attendees would need to be informed that they are being recorded.)

Happy to discuss further,
Ian


Get Outlook for iOS


On Mon, Jul 30, 2018 at 5:06 PM -0700, "Scott Wang" <Scott.Wang@ff.com> wrote:

> Ian, pls provide your perspective
>
> Best Regards,
> _____
>
> **Faraday Future**
>
> Scott Wang
>
> CEO Office Operation
> & UP2U Business Partner
> +1 919 621 1211
>
> 18455 S Figueroa St,
> Gardena, CA 90248
>
> FF.com
> _____

FF, inc. email may include content, whether in the body of an email or in an attachment, that is intended to be confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF, inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF, inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF, inc. No one who receives an email purportedly from FF, inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF, inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF, inc. email, without FF, inc.'s express written permission.

**From:** Harvey Karlovac
**Sent:** Monday, July 30, 2018 5:04 PM
**To:** Scott Wang <Scott.Wang@ff.com>
**Cc:** Ian Eisner <ian.eisner@ff.com>
**Subject:** RE: meeting recording

Scott, as a further thought on this prospective course of action, may I connect you here with litigation guru, as in FF may not necessarily want to be documenting all discussions... Thanks-

**Harvey Karlovac**
Senior Legal Counsel, Trade Compliance
Faraday Future
18455 S. Figueroa St.
Gardena, CA 90248 USA
Mobile 310.874.8732
www.ff.com

**From:** Harvey Karlovac
**Sent:** Friday, July 27, 2018 1:17 PM
**To:** Sheryl Skibbe <sheryl.skibbe@ff.com>
**Cc:** XiaoOu Ma <XiaoOu.Ma@ff.com>; Scott Wang <Scott.Wang@ff.com>
**Subject:** RE: meeting recording

Hi Sherry, I was passing by Scott's desk and shared my ideas when he asked, but we defer to you as the SME!

**Harvey Karlovac**
Senior Legal Counsel, Trade Compliance
Faraday Future
18455 S. Figueroa St.
Gardena, CA 90248 USA
Mobile 310.874.8732
www.ff.com

**From:** Scott Wang
**Sent:** Friday, July 27, 2018 1:03 PM
**To:** Sheryl Skibbe <sheryl.skibbe@ff.com>; Harvey Karlovac <harvey.karlovac@ff.com>
**Cc:** XiaoOu Ma <Xiaoou.Ma@ff.com>
**Subject:** meeting recording

Sheryl and Harvey,
YT requested to record all the key meetings so that we
   1. Have a track record of the meetings
   2. Can leverage these footage for future documentaries

Need your help to assign a layer and guide us on how to do this within the confines of CA law.

I was told that the recording needs to get all the consent of the attendees if the meeting is more than 3 people. Pls help me with the exact requirements and restrictions. E.g.
What verbiage should we include in the meeting invite?

CONFIDENTIAL

What announcement we need to make at the beginning of the meeting or each new guest speaker enters the room? Etc.

Best Regards,

**Faraday Future**

Scott Wang

CEO Office Operation
& UP2U Business Partner
+1 919 621 1211

18455 S Figueroa St,
Gardena, CA 90248

FF.com

FF, inc. email may include content, whether in the body of an email or in an attachment, that is intended to be confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF, inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF, inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF, inc. No one who receives an email purportedly from FF, inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF, inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF, inc. email, without FF, inc.'s express written permission.

FF00001246

Exhibit 29

Wednesday, January 23, 2019 at 10:23:29 AM Pacific Standard Time

**Subject:** Work Responsibilities
**Date:** Wednesday, January 23, 2019 at 10:19:45 Pacific Standard Time
**From:** Henry Liu
**To:** YT Jia

YT:

Good morning. In response to your request on January 7, 2019,  to submit you a work plan as part of the company's annual planning, I provided you on January 14 "2019 Work Thoughts and Plan" (The "Plan", revised version dated January 12, 2019, in Chinese as YT does not regularly use English as his working language). The Plan provides that I would continue to perform my same management responsibilities that I have performed since I joined the company. More than a week has passed since I submitted the Plan to you and I have received no response to my Plan. I am concerned that you have stripped me of my job responsibilities due to the various complaints that I have raised regarding the company's failure to comply with various state and federal laws.

As is widely known, at least since October 2018, my management responsibilities have been continuously reduced, removed and replaced by you, and my authority and support in performing my duties have also diminished, all without my advance knowledge or agreement. I have been very concerned about these actions, and I have protested to you many times during our past conversations. I have previously expressed to you my grave concern regarding the company's failure to comply with the laws of the State of California and the United States, as well as the company's failure to build a best practice in corporate governance.  For example, I have directly expressed my views to you and others at the company on how to best comply with laws regarding many company practices, including but not limited to, your improper authorization of the recording of meetings without required consent; immigration and work permit compliance issues which you have ignored; failing to adequately investigate sexual harassment complaints against management especially your close associates; retaliation against employees who have raised concerns regarding financial issues; and timely compliance with the WARN Act. I have also constantly reminded you to resolve your personal situations as someone identified as a repeated "Dishonest Person" by the Chinese courts, and to try to resolve your numerous personal lawsuits.  I have also advised you to address the reports about your other possible legal issues and financing dealings, including the surprise visits by the US FBI to you in May 2018, so that these issues will not hurt the company and its stakeholders including you yourself. I sincerely wish that you had not and would not retaliate against me for what I have done in performing my responsibilities and duties.

I am committed to continue performing my responsibilities at the company based on contractual and legal obligations, as well as my dedication to work with you and all colleagues to bring our company to a success.

I look forward to hearing from you soon.

Thank you.

Henry

**Page 1 of 2**

HLIU000969

Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email:   kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiden Law Group LLP
322 Eighth Avenue, Suite 1704
New York, NY 10001
Telephone:   (646) 766-1914
Facsimile:   (646) 304-5277

*Attorneys for Plaintiff/Counter-Defendant,*
*Hong Liu*

## UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| HONG LIU,<br><br>Plaintiff,<br><br>v.<br><br>FARADAY&FUTURE INC., SMART KINGLTD., JIAWEI WANG, and CHAOYING DENG<br><br>Defendants.<br><hr>FARADAY&FUTURE INC.,<br><br>Counterclaimant,<br><br>v.<br><br>HONG LIU,<br><br>Counter-Defendant. | **Case No:** 2:20-cv-08035-SVW-JPR<br><br>**DECLARATION OF AMIAD KUSHNER IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT, IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, Amiad Kushner, declare as follows:

1. I am a Partner at the law firm of Seiden Law Group LLP, which is counsel of record for Plaintiff Hong Liu ("Plaintiff" or "Liu") in the above- captioned matter. I am admitted to practice before the courts of the State of New York, and I am admitted *pro hac vice* in this matter.  I make this declaration based on my own personal knowledge and documents in possession of my firm.

2. I make this declaration in support of Plaintiff's cross motion for summary Judgement, in support of Plaintiff's motion for partial summary judgment, and in opposition to Defendants' motion for summary judgment.

3. Attached to this declaration are true and correct copies of the following documents:

  a. A true and correct copy of an e-mail sent on January 26, 2018 from Jerry Wang of Faraday&Future Inc. ("FF") to Feifei Bian and Vijay Sekhon of Sidley Austin LLP.

  b. A true and correct copy of the J. Richard Supple Expert Report.

  c. A true and correct copy of transcripts of oral arguments before Magistrate Judge Rosenbluth on May 12, 2021.

  d. A true and correct copy of page 118 of the transcript of Mayer Brown LLP's 30(b)(6) deposition held on April 26, 2021.

  e. A true and correct copy of Smart King's Responses to Plaintiff's first four Requests for Admission.

  f. A true and correct copy of a portion of the Smart King 30(b)(6) Deposition held on April 8, 2021.

  g. A true and correct copy of an FF employee grant page with the Employee Grant Number 4484, showing that 8,000,000 of Plaintiff's options were cancelled on February 11, 2019.

h.  A true and correct copy of an FF employee grant page with the Employee Grant Number 4485, showing that 4,000,000 of Plaintiff's options were cancelled on February 11, 2019.

i.  A true and correct copy of an FF employee grant page with the Employee Grant Number 4486, showing that 4,000,000 of Plaintiff's options were cancelled on February 11, 2019.

j.  A true and correct copy of an FF employee grant page with the Employee Grant Number 4487, showing that 4,000,000 of Plaintiff's options were cancelled on February 11, 2019.

I declare under penalty of perjury that the foregoing is, to the best of my knowledge and belief, true and correct.

Dated:      New York, New York
            May 18, 2021

                            ____/s/Amiad Kushner____
                               Amiad Kushner

Exhibit A

**From:**     Jerry Wang (FF China) [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A13EE35D36764DFDACED9FB3DBFE2A11-JERRY]
**Sent:**     1/26/2018 6:35:53 PM
**To:**       Bian, Feifei [fbian@sidley.com]
**CC:**       Sekhon, Vijay S. [vsekhon@sidley.com]
**Subject:**  RE: [EXTERNAL] ████████████████████

Feifei,

████████████████████████████████████, Also he will sign our standard offer letter so that should be fine to cover some basic terms in there.

████████████████████████████████████████████████████████████

Thanks,
Jerry

_____

**Faraday Future**

**Jerry Wang**
General Manager | Global Capital and Investment Banking
e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

**From:** Bian, Feifei [mailto:fbian@sidley.com]
**Sent:** Friday, January 26, 2018 3:31 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** Sekhon, Vijay S. <vsekhon@sidley.com>
**Subject:** RE: [EXTERNAL] ████████████████████

██████████████████████████████████████████ As to the employment agreement, we noticed that there appears to be missing many standard provisions we would usually see in a similar employment agreement. We are wondering if you'd like our employee benefits specialists to take a look?

████████████████████████████████████████████████████████████████████████████████████████

CONFIDENTIAL

… …

**FEIFEI BIAN**
Associate

SIDLEY AUSTIN LLP

CONFIDENTIAL

FF00005189

+1 310 595 9478
fbian@sidley.com

---

**From:** Jerry Wang (FF China) [mailto:Jerry.Wang@ff.com]
**Sent:** Friday, January 26, 2018 3:16 PM
**To:** Bian, Feifei <fbian@sidley.com>
**Cc:** Sekhon, Vijay S. <vsekhon@sidley.com>
**Subject:** RE: [EXTERNAL] ██████████████

██████████████████████████████

Jerry

---

**Faraday Future**

**Jerry Wang**
General Manager | Global Capital and Investment Banking
e   jerry.wang@ff.com
c   +1 201-354-7734 / +86 151-1690-3389
a   18455 S Figueroa St, Gardena, CA 90248
w   www.ff.com

FF Inc. email may include content, whether in the body of an email or in an attachment, that is intended to be privileged and confidential. Delivery of confidential material by email not does not diminish the confidential nature of such material. All persons who believe that they have erroneously received any FF Inc. email are requested to delete such email, including any attachments. Any non-business, personal use of FF Inc. email system is solely the responsibility of the sender, and none of the content of any such email is to be attributed to FF Inc. No one who receives an email purportedly from FF Inc. should rely on the authenticity or completeness of that email, unless it is received directly from FF Inc.. No person is entitled to copy, forward or otherwise re-use any material contained in any FF Inc. email, without FF Inc.'s express written permission.

*All we do is for our earth, please consider the environment before printing out this email.*

---

**From:** Bian, Feifei [mailto:fbian@sidley.com]
**Sent:** Friday, January 26, 2018 12:50 PM
**To:** Jerry Wang (FF China) <Jerry.Wang@ff.com>
**Cc:** Sekhon, Vijay S. <vsekhon@sidley.com>
**Subject:** [EXTERNAL] ██████████████

███████████████████████████████████

Feifei

**FEIFEI BIAN**
Associate

**SIDLEY AUSTIN LLP**
1999 Avenue of the Stars
17th Floor
Los Angeles, CA 90067
+1 310 595 9478
fbian@sidley.com
www.sidley.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL

FF00005191

# Exhibit B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

_____X

HONG LIU,                                    :        Case No. 2-20-cv-08035-SVW-JPR

        Plaintiff,                          :        Hon. Stephen V. Wilson

     v.                                      :

FARADAY&FUTURE INC., SMART               :
KING LTD., JIA WEI WANG and
CHAOYING DENG,                              :

        Defendants.                       :

AND RELATED COUNTERCLAIM                     :

_____X


EXPERT REPORT OF J. RICHARD SUPPLE, JR.


1.      I am a partner in the New York office of Clyde & Co US LLP.  Plaintiff Hong Liu has retained me in this matter as an expert in lawyers' professional ethics.  I submit this Report in connection therewith.

### Background

2.      My qualifications as an expert are as follows:

a.      Since 1993, I have regularly and continuously practiced as a lawyer in the area of professional ethics.  From 1993 to 1999, I was a Senior Staff Attorney at the Departmental Disciplinary Committee, Appellate Division, First Judicial Department in New York, where I prosecuted charges of professional misconduct against lawyers in dozens of matters.  Since 1999, I have continuously been in private practice representing law firms and lawyers of all kinds and in all manner of professional ethics matters, including, but not limited to, advisory matters, federal and state court litigations involving alleged attorney malpractice or misconduct, arbitrations, and appeals.  In the last 5 years, I was retained in two now-concluded

1

federal and state litigations (one in the United States District Court for the Southern District of New York and the other in the New York State Supreme Court, Erie County) and was qualified in a still-pending arbitration in New York before the American Arbitration Association where I testified.  Because the matters settled shortly after I submitted my reports, I was not deposed and did not testify in the above-referenced federal and state court litigations.

        b.      In addition to practicing for clients, I was general counsel of an AmLaw 100-sized law firm between 2017 and 2019, during which time I advised senior management of my now-former firm on sensitive ethics issues on a near-daily basis.

        c.      I have taught and spoken extensively on issues of professional ethics at continuing legal education seminars or in other conference settings across the United States and outside the country.

        d.      From 2004 to 2016, I was an adjunct professor of law at the Benjamin N. Cardozo Law School, where I taught a course each year on professional ethics.

        e.      I am a co-author of New York Attorney Discipline, Practice and Procedure (New York Law Journal Press), which is updated and re-published every other year, and author of the chapter on professional discipline in the Fifth Edition of the well-known treatise, Commercial Litigation in New York State Courts (Thomson Reuters), released in October 2020.

        f.      From 2010-2013, I was chair of the Professional Discipline Committee, New York City Bar Association.

My curriculum vitae is attached as **Exhibit A**.

    3.      I am being compensated at $750 per hour for preparing this Report and, if necessary, for giving testimony.  Associates from my firm who assist me are being compensated at their usual hourly rates.

2

*Facts*

4.      For purposes of forming my opinions and preparing this Report, I reviewed the following documents:

         a.      The papers comprising Faraday&Future, Inc. ("Faraday") and Smart King Ltd.'s motion for summary judgment or, in the alternative, partial summary judgment, of plaintiff Hong Liu's complaint, dated April 26, 2021;

         b.      Order, dated April 29, 2021;

         c.      The exhibits attached to plaintiff Hong Liu's opposition to the motion described in paragraph 4(a) *supra* and in support of Hong Liu's cross-motion for summary judgment, to be filed the same day as this Report.

5.      I have no first-hand knowledge of facts relevant to this case.  For purposes of my analysis, I assume the following facts to be substantially accurate.

*Background*

6.      Plaintiff Hong "Henry" Liu is, and at all times relevant to this Report, was an attorney admitted to practice in New York.

7.      Defendant Faraday is an electric automobile company headquartered in California.  Faraday's indirect parent company is Defendant Smart King Ltd.

8.      Jia Wei "Jerry" Wang is, and at all times relevant to this Report, was Vice-President of Capital Markets at Faraday.

9.      Chaoying Deng is, and at all times relevant to this Report, was Vice-President of Administration at Faraday.

10.      As of 2015, Liu was a partner in the New York office of the large international law firm Mayer Brown LLP.

3

*Faraday's Retentions of Mayer Brown*

11.     In December 2015, Faraday retained Mayer Brown for regulatory matters.  Mayer Brown's lead partner for the Faraday engagement was Philip Recht, an attorney in Mayer Brown's Los Angeles office.

12.     On May 31, 2017, Faraday executed a second written retainer agreement with Mayer Brown.  Recht was Mayer Brown's lead partner for this second engagement.

13.     On October 20, 2017, Liu sent Faraday a proposed retainer agreement for a range of legal services, including advice concerning capital markets, strategies, corporate, securities, intellectual property, wealth management matters, and "other tasks and matters as may be instructed by" Faraday.  The proposed agreement's signature line for Mayer Brown did not originally identify a specific partner.

14.     More than two months later, on December 22, 2017, Faraday signed and returned the October 20 draft agreement to Recht, but not Liu.  Recht forwarded the agreement to Liu who signed it for Mayer Brown.  The fully executed agreement was thereupon sent to Faraday.

15.     While at Mayer Brown, Liu was not billing partner for Faraday and personally did no work for Faraday, nor did he supervise the work of other Mayer Brown attorneys.

*Faraday Solicits Liu For Employment*

16.     On or about October 15, 2017, Faraday affirmatively contacted Liu and invited him to meet with Faraday in person in California.

17.     On October 17, 2017, Liu travelled to California to meet with Faraday.  At the meeting, Faraday discussed potential future engagements with Mayer Brown and suggested possible employment for Liu with the company.

18.     On October 25, 2017, Wang sent Liu a term sheet and option valuation estimate relating to Faraday's proposed employment of Liu.  In addition to salary considerations, Faraday

proposed that Liu receive equity interests in the company, including certain stock options, and that the equity interests be derived from two sources, Faraday and Yueting Jia ("Jia"), Faraday's then-chief executive officer.  The option valuation estimate Wang sent to Liu indicated that Faraday projected its value to be in the hundreds of millions to billions of United States dollars.

19.     Before Wang sent these documents to Liu, Liu had not demanded or solicited equity interests in Faraday as consideration for his employment.

20.     As of October 15, 2017, Faraday was a substantial ongoing business with its own in-house legal department.  Faraday had also retained the law firm Sidley Austin LLP as outside counsel.

21.     Between October 26 and 29, 2017, Liu and Wang discussed Liu's potential employment at Faraday.  Liu verbally told Wang that Faraday should be advised by independent counsel regarding his prospective employment and Wang responded that Faraday would be advised in the matter by Sidley Austin.

22.     On November 16, 2017, Wang sent Liu documents with respect to Liu's prospective employment, including a template document that invited Liu's response to Faraday's proposals for equity and options-based employment compensation.  On November 21, 2017, Liu sent Wang a term sheet that, amongst other provisions, proposed to grant Liu 3% of Faraday's total equity shares.

23.     On January 1, 2018, Wang sent Liu a proposed employment agreement.  On January 10, 2018, Jia proposed that Faraday equity interests be conveyed to Liu in two separate agreements – one that would continue to be referred to as Liu's employment agreement (conveying 2% of Faraday's equity shares) and the other called a stock transfer agreement (later titled a director compensation agreement and transferring to Liu from Jia 1% of Faraday's equity shares).  Jia was not an individual client of Mayer Brown or Liu personally.

24.     On January 22, 2018, Wang advised Liu that Faraday's Human Resources department was reviewing the proposed agreements.

25.     On January 25, 2018, Wang advised Liu that Faraday's legal department was doing a final review of the proposed agreements.

26.     On January 26, 2018, Wang informed Liu that Sidley Austin was reviewing the proposed employment agreement for Faraday.

27.     On January 26, 2018, Sidley Austin asked Wang whether Faraday wanted employee benefits attorneys in the firm to further review the employment agreement.  Wang responded that Liu would be signing Faraday's standard offer letter "so it should be fine to cover some basic terms in there."

28.     On January 26, 2018, Faraday and Liu executed Liu's employment agreement.

29.     Between January 26, 2018 and February 2, 2018, Faraday and Liu negotiated and finalized Liu's director compensation agreement.  Sidley Austin provided legal advice regarding this agreement to Faraday on an ongoing, continuous basis during this period.

30.     On April 17, 2018, after commencing employment with Faraday, Liu registered as in-house counsel to Faraday pursuant to California Rule of Court 9.46.

### Analysis

31.     My opinions below are grounded upon prevailing ethics rules and law as well as relevant bar opinions in New York and respected secondary sources regarding lawyers' duties to clients and third parties.  At all times relevant for my analysis, New York's Rules of Professional Conduct (hereafter, "NY Rules") were applicable to Liu because he was licensed to practice law only in New York as of February 2, 2018.  NY Rule 8.5(b)(2)(i) ("If the lawyer is licensed to practice only in this state, the rules to be applied shall be the rules of this state."); N.Y. State Eth. Op. 1054 (2015) (foreign ethics laws may apply "[i]f the [New York-admitted] lawyer is permitted to practice in [the foreign state]"); and see Calif. Rule of Prof. Cond. 1-

100(D) (California disciplinary rules only apply to non-members of the California Bar when they are "engaged in the performance of <u>lawyer functions</u> in [California]") (emphasis added).

32.　　Faraday contends that Liu's conduct while negotiating employment violated NY Rules 1.8(a), 1.7 and 1.5, which respectively prohibit attorneys from: (a) transacting business with current clients under certain circumstances; (b) acting for a client despite an un-waived conflict of interest; and (c) making an agreement with a client for an excessive legal fee.  The NY Rules are "rules of reason.  They should be interpreted with reference to the purposes of legal representation and of the law itself."  NY Rules, Scope, cmt. [6]; *see also Niesig v. Team I,* 558 N.E. 1030, 1032 (N.Y. 1990) (New York courts apply disciplinary rules in litigation "as guidelines to be applied with due regard for the broad range of interests at stake"), *citing Foley & Co. v. Valderbilt,* 523 F.2d 1357, 1360 (2d Cir. 1975) (Gurfein, J. concurring) ("When we agree that the Code applies in an equitable manner to a matter before us, we should not hesitate to apply it with vigor. When we find an area of uncertainty, however, we must use our judicial process to make our own decision in the interests of justice to all concerned.")

33.　　In consideration of the above-recited facts, it is my professional opinion that Liu did not violate a duty of care to Faraday under any of the above-referenced NY Rules.

*Rule 1.8(a)*

34.　　NY Rule 1.8(a) forbids a lawyer from "enter[ing] into a business transaction with a client" if the lawyer and "client" have "differing interests and if the client expects the lawyer to exercise professional judgment therein for the protection of the client unless" the lawyer makes certain written disclosures to the client, obtains consent for the transaction, and the transaction itself is "fair and reasonable."  Liu and Faraday did not, of course, negotiate with identical interests.  Accordingly, as threshold conditions for NY Rule 1.8(a)'s imposition of written disclosure and consent requirements, it must be determined whether Faraday was a "client" of Liu's for purposes of the rule, and if Faraday was Liu's client, whether Faraday expected Liu to

"exercise professional judgment" for Faraday's protection when negotiating his employment. *See* N.Y. State Eth. Op. 913 (2012) ("Rule 1.8(a) invites a twofold inquiry. The first is whether the transaction itself is one in which the lawyer and client have differing interests <u>and</u> in which the client expects the lawyer to exercise the lawyer's independent professional judgment on the client's behalf. If the answers are yes, then as a second step the lawyer must assure that the terms are fair and reasonable" and the other writing and consent requirements in the rule are met) (emphasis in original).

<u>Whether Faraday was Liu's "Client"</u>

35.　　As an initial consideration, I do not believe Faraday was Liu's client (as opposed to Mayer Brown's client) for purposes of NY Rule 1.8(a).

36.　　As per the facts above, Liu personally performed or supervised no work for Faraday before and while negotiating his employment. All work for Faraday was done by other Mayer Brown attorneys. Accordingly, the only theory for finding that Faraday was Liu's client is imputation; namely, that because certain Mayer Brown attorneys were acting for Faraday, Liu (and every other Mayer Brown attorney) should automatically be deemed Faraday's "lawyer."

37.　　NY Rule 1.10 deals with the circumstances under which conduct by one lawyer in a law firm is attributed to all other lawyers in the law firm. Rule 1.10 states that "[w]hile lawyers are associated in a firm, none of them shall knowingly <u>represent</u> a client when any one of them practicing alone would be <u>prohibited</u> from doing so by Rule 1.7, 1.8 or 1.9, unless as otherwise provided therein." (emphasis added). NY Rule 1.10 does not logically encompass NY Rule 1.8(a) because, although NY Rule 1.8(a) regulates certain transactions between lawyers and their clients, it does not prohibit a lawyer from representing a client. Thus, the mere fact that other Mayer Brown attorneys represented Faraday should not make Liu Faraday's "lawyer" for purposes of a NY Rule 1.8(a) analysis. This conclusion is reinforced by the concerns underlying the rationale for imputing conduct between lawyers generally.

38.     According to the Restatement (Third) of the Law Governing Lawyers § 123, cmt. b:

> Imputation of conflicts of interest to affiliated lawyers reflects three concerns. First, lawyers in a law firm or other affiliation … ordinarily share each other's interests. A fee for one lawyer in a partnership, for example, normally benefits all lawyers in the partnership. Where a lawyer's relationship with a client creates an incentive to violate an obligation to another client, an affiliated lawyer will often have similar incentive to favor one client over the other. Second, lawyers affiliated as described in this Section ordinarily have access to files and other confidential information about each other's clients. Indeed, clients might assume that their confidential information will be shared among affiliated lawyers … Sharing confidential client information among affiliated lawyers might compromise the representation of one or both clients if the representations conflict. Third, a client would often have difficulty proving that the adverse representation by an affiliated lawyer was wholly isolated. Duties of confidentiality on the part of the affiliated lawyers prevents adequate disclosure of the interactions among them. Moreover, to demonstrate that the lawyer misused confidential information the client often would be forced to reveal the very information whose confidentiality the client seeks to protect. However, considerations of free choice of lawyers by clients and the free mobility of lawyers between firms or other employers caution against extending imputation further than necessary.

39.     Based on the facts made known to me, none of the Restatement's three above-cited concerns is relevant here.  Mayer Brown's work for Faraday did not incentivize Liu to negotiate a better or worse employment agreement for himself and the facts do not suggest that confidential information provided by Faraday to Recht (or another Mayer Brown lawyer actively representing Faraday) helped Liu negotiate different and more favorable employment terms with Faraday, which proposed employment terms to Liu on its own account.  Moreover, Liu's negotiation with Faraday was plainly an "isolated" matter, and Liu was not representing a client adverse to Faraday's interests.  Because none of the above concerns applies, the Restatement's cautionary language that imputation should not unreasonably be extended to interfere with a lawyer's mobility between employers is applicable.

40.     Further, if NY Rules 1.8(a) and 1.10 were strictly construed such that Recht's (or other Mayer Brown lawyers') work for Faraday automatically made Faraday Liu's client for purposes of NY Rule 1.8(a), inequitable results contrary to the "reasonable" purposes of the NY

Rules could follow.  Law firms like Mayer Brown are enormous entities, with thousands of

lawyers spread throughout the world. Applying NY Rule 1.8(a) in a strict liability sense, without

regard to reason, facts and circumstances, could make lawyers who negotiate for a position with

a sophisticated entity client, with an in-house legal team, vulnerable to an after-the-fact,

draconian claim for recission based on the imputation of other lawyers' conduct, even though

the lawyer did no legal work for the client and notwithstanding that the lawyer's firm's

relationship with a corporate client was literally of no moment to the negotiation or its outcome.

A rule of ethics grounded on reason and equity would not permit such a result.

<u>Whether Faraday Expected Liu to Exercise Professional Judgment on its Behalf</u>

41.     Even if Faraday was Liu's client, NY Rule 1.8(a) should not apply to Liu's

negotiations with Faraday because it was not reasonable for Liu to believe or expect that

Faraday was relying upon him to exercise personal judgment to protect its interests when Liu

was negotiating the terms of his prospective employment with Faraday.  The issue of client

reliance is the key element of a NY Rule 1.8(a) analysis.  N.Y. State Eth. Opp. 1055 n. 1 (2015),

the leading New York ethics opinion on the subject, sets forth the factors determinative of

whether the client expects the lawyer to exercise reasonable professional judgment on the

client's behalf:

> These include (i) whether the client has other counsel in the matter, for example,
> because it is a corporation or other entity with a legal department, (ii) whether the
> lawyer is responsible for client matters in the subject area, and (iii) whether the
> client is an individual or an entity and the client's level of sophistication in legal
> matters.  We believe it is more likely that an individual client or one that is not
> sophisticated in legal matters is more likely to rely on a lawyer that does not
> represent the client in that matter than would be the case with an institutional
> client.

42.     An application of these factors indicates that Faraday was not expecting Liu to

exercise professional judgment on its behalf in connection with the negotiation of the

employment agreement.  Faraday had both in-house and outside counsel for its negotiation with

Liu.  Liu was not responsible for Faraday's matters with Mayer Brown and had never done legal

work for Faraday.  And, in contrast to an unsophisticated lay individual, Faraday was a sophisticated international automobile company that valued itself in terms of hundreds of millions or billions of United States dollars.  In sum, none of the facts known to me suggest that Faraday was in any way dependent upon Liu.  NY Rule 1.8(a) should not be applied prophylactically under these circumstances. *See e.g. Matter of Chariff,* 633 N.Y.S.2d 618, 620 (N.Y. App. Div. 1995) (although attorney did not comply with disclosure and consent requirements when making a loan agreement with his client, the predecessor version of NY Rule 1.8(a) was not violated insofar the sophisticated businessman client was not deceived by his lawyer and was aware of all relevant information before making the loan"); *and see* N.Y. City Eth. Op. 2000-3 (2000) (there is "no *per se* ethical prohibition on the acceptance of shares or other securities, including options, as compensation for legal services to be rendered").

43.     "The crucial question is whether the defendant attorney established that the contract was made by the client with full knowledge of all material circumstances known to the attorney, and was in every respect free from fraud …"  *Howard v. Murray,* 346 N.E.2d 238, 239 (N.Y. 1976) (internal citations omitted).  Here, Liu was in no position to take advantage of Faraday, and any argument that Faraday would not have agreed to the employment agreements it signed with Liu if only Liu had reminded it to consult its own legal counsel – as Faraday, in fact, was doing – seems far-fetched.  "A lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a … financial transaction with a client … For these reasons business transactions between a lawyer and client are not advisable."  NY Rule 1.8, cmt. [1].  Where, however, a "client" is actually represented by lawyers for a transaction, the client should not be heard to argue later that the lawyer on the receiving end of the transaction exercised professional judgment for the client's benefit in the deal.

*Rule 1.7*

44.     NY Rule 1.7(a) states: "[A] lawyer shall not represent a client if a reasonable lawyer would conclude that … there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests," unless the client consents to the representation.  "When a reasonable lawyer would conclude that the risk of adverse effect on professional judgment is not a significant one, then there is no conflict …"  N.Y. State Eth. Op. 1048 (2015).  Put another way, for a risk to be "significant," it must be more than just "possible."  *See also* N.Y. State Eth. Op. 712 (1999) (there is no conflict of interest merely because there is a "fanciful, theoretical or *de minimis* risk that the lawyer's judgment will be affected adversely by a potentially relevant set of interests").

45.     Based on the facts and circumstances discussed above, it is my opinion that a reasonable lawyer would not conclude there was a "significant risk" when Liu was negotiating his employment terms that he would exercise professional judgment improperly for Faraday. For the reasons discussed above, Faraday formulated its own proposals for equity-based compensation, applying its own valuations, and was not looking for Liu to exercise his professional judgment for its benefit while negotiating Liu's employment.  Instead, Faraday relied on its own human resources department, in-house counsel, and outside counsel for professional judgment vis-à-vis Liu's prospective employment.

46.     Further diminishing any prospect that Liu might exercise judgment adversely to Faraday is that Mayer Brown's regulatory work for Faraday bore no meaningful relationship to the subject of Liu's employment negotiations.  *See* N.Y. State Eth. Op. 994 (2013) (opining that Rule 1.7 was not violated where an attorney whose firm represented a school district negotiated for employment as a sports coach at a school in the district because there was little risk "of

adverse effect if … the legal work on behalf of the school district were unrelated to the lawyer's

work as coach").

*Rule 1.5*

47.     Pursuant to NY Rule 1.5(a), a lawyer may not:

make an agreement" to "collect an excessive or illegal fee … A fee is excessive
when, after a review of the facts, a reasonable lawyer would be left with a definite
and firm conclusion that the fee is excessive."  Whether or not a fee is excessive
depends upon a non-exclusive list of factors, including "(1) the time and skill
required, the novelty and difficulty of the questions involved, and the skill
requisite to perform the legal service property; (2) the likelihood, if apparent or
made known to the client, that the acceptance of the particular employment will
preclude other employment by the lawyer; (3) the fee customarily charged in the
locality for similar legal services; (4) the amount involved and the results
obtained; (5) the time limitations imposed by the client or by circumstances; (6)
the nature and length of the professional relationship with the client; (7) the
experience, reputation and ability of the lawyer … performing the services; and
(8) whether the fee is fixed or contingent
.

48.     Whether an exchange of securities for legal services would amount to an

"excessive" fee should be considered in terms of the facts known to the lawyer when the

agreement was made and should not be determined "with the wisdom of hindsight." N.Y. City

Eth. Op. 2000-3 *supra*; *see also Lawrence v. Miller,* 901 N.E.2d 1268, 1272 n. 4 (N.Y. 2008) ("In

general, agreements entered into between competent adults, where there is no deception or

overreaching in their making, should be enforced as written.  Accordingly, the power to

invalidate fee agreements with hindsight should be exercised only with great caution.").

49.     As the text of NY Rule 1.5 indicates, the test for determining whether a legal fee

is excessive is fact-intensive and the standard for showing that a legal fee is "excessive" is

difficult to meet.  *See* N.Y. City Eth. Op. 2000-3 *supra* (determining whether a fee is excessive

where securities are received for legal services is "more complex").  In this instance, I do not

believe that the standard is met.  Some of the NY Rule 1.5 factors are plainly inapplicable to a

negotiation for in-house employment.  But to the extent other factors may be applied, they argue

for substantial compensation.  Faraday solicited Liu to take responsibility for managing its legal

and administrative matters as its general counsel and chief administrative officer.  Plainly, as Liu was already very well compensated as a senior equity partner in a large international law firm, Faraday was for all intents and purposes obligated to make Liu a substantial offer if it genuinely hoped to entice Liu to leave Mayer Brown.  Further, it is generally known and understood that compensation for a general counsel of a substantial company is high.

50.     The experience, reputation and ability of the lawyer is "the most important factor" when determining whether a legal fee is excessive.  N.Y. State Eth. Op. 1004 (2015).  The facts indicate that Liu was a senior partner at the globally respected firm Mayer Brown and had decades of experience.  Accordingly, I do not believe, on the record presented to me, that a reasonable lawyer would "definitely and firmly" conclude that Liu's acceptance of employment terms offered by Faraday (at the time the terms were accepted) amounted to a breach of his ethical obligations to Faraday under NY Rule 1.5.

*Conclusion*

51.     For the reasons herein, it is my professional opinion that Liu did not violate a duty to Faraday under NY Rules 1.8(a), 1.7 or 1.5.

Dated: May 18, 2021

*J. Richard Supple, Jr.*
J. Richard Supple, Jr.

14

# EXHIBIT A

**J. Richard Supple Jr.**
**c/o Clyde & Co US LLP**
**405 Lexington Avenue**
**New York, NY 10174**
**212.710.3914**
**rick.supple@clydeco.us**

**Legal Experience**

Clyde & Co US LLP, New York, NY (Partner 11/19 to present)

Represents law firms and lawyers in all kinds of professional ethics-related matters, including disciplinary and legal malpractice cases, partnership and fee disputes, internal investigations, disqualification and sanctions motions, and appeals.  Also advises on risk management and regulatory compliance issues, litigation finance, lateral movement, and law firm partnership agreements and dissolution.

Hinshaw & Culbertson LLP, New York, NY (Partner 3/04-11/19)

Litigated all manner of ethics-related cases for lawyers and law firms, including at trial, arbitration and on appeal.  Retained as an expert in matters concerning a lawyer's duty of care.  Advised clients regarding litigation finance and risk management issues.  Leader of the firm's 40+ attorney Professional Responsibility and Risk Management Practice Group from 1/16 to 2/19 and served as the firm's General Counsel from 3/17 to 2/19.

Edwards & Angell, LLP, New York, NY (Counsel 5/01-2/04)

Lead attorney in disciplinary and other professional ethics-related litigations, including appeals.  Handled hearings, arbitrations and depositions.  Also represented clients in significant class action litigation, mass tort cases, intellectual property matters and other commercial disputes in jurisdictions around the country.

Beldock, Levine & Hoffman LLP, New York, NY (Associate 6/99-5/01)

Represented clients in disciplinary, malpractice and other professional ethics-related litigations, including appeals.  Also handled state and federal criminal cases and civil litigations involving patent and trademark issues, creditor rights, personal injury, and estate matters.

Supreme Court, State of New York, Appellate Division, First Department
Departmental Disciplinary Committee, New York, NY (Staff Attorney 3/94-6/99)

Investigated and prosecuted complex disciplinary matters, including approximately 20 reported cases involving formal hearings.

Legal Aid Society, Brooklyn, NY (9/89-3/94)

Represented indigent defendants in state criminal cases from arraignment to trial.  Lead counsel at numerous felony jury trials.

**Significant Professional Affiliations**

Benjamin N. Cardozo School of Law, Adjunct Professor, 2004 – 2016

Practising Law Institute, Faculty Member

New York City Bar Association, Professional Discipline Committee, Chair, 2010 – 2013

**Education**

University of Wisconsin Law School, Madison, WI, J.D., 5/89

Duke University, Durham, NC, B.A. *magna cum laude*, 5/85

**Authorships**

Co-author, Commercial Litigation in New York State Courts (5th ed.)

Co-author, New York Attorney Discipline: Practice and Procedure (Biennial editions through 2020)

**Recent Speaking Presentations**

"Ethical Considerations for Attorneys in the Gig Economy," Calvary Institute, New York, NY, October 2020

"Negotiation Ethics," New York State Attorney General's Office, New York, NY, September 2020

"Ethics for the Negotiating Lawyer," Practising Law Institute, New York, NY, January 2013, January 2014, March 2015, March 2016, January 2017, January 2018, January 2019, January 2020

"Cryptocurrency: Show Me the Money," Legal Malpractice & Risk Management Conference (LMRM), Chicago, IL, March 2019

"Update – Litigation Finance," General Counsel Roundtable, Miami, FL, January 2019, Oklahoma City, OK, April 2019

"It's a Jungle Out There: Managing Risks in Mid-Sized Firms," LMRM, Chicago, IL, March 2018

"Winning the Arms Race in Big Civil Cases — the Upside and Downside of Litigation Finance," LMRM, Chicago, IL, March 2017

"The 'New' New York Rules on Attorney Discipline Procedure," Practicing Law Institute, New York, NY, January 2017

"Staying Out of Trouble 2016: The In-House Attorney-Client Privilege and Ethics and Technology Quiz Show," Practicing Law Institute, New York, NY, December 2016

"Playing the Away Game, How Can Non-Resident New York Lawyers Comply," New York State Bar Association, Miami, FL, September 2016

"Understanding the Moral Compass of In-House Lawyers," NYU Stern School of Business, New York, NY, July 2016

"Evaluation of Attorneys' Fees in Complex Litigation," New York, NY, June 2016

"Phantom Clients and How to Exorcise Them," LMRM, Chicago, IL, March 2016

"Ethics for the Trademark Lawyer," Practising Law Institute, New York, NY, March 2015

"Defenses to Disqualification Motions: What Works and What Doesn't," LMRM, Chicago, IL, February 2015

"Getting Admitted in the First and Second Departments," New York City Bar Association, New York, NY, October 2014

"Attorney Discipline in New York: Structure, Process & Trends," New York City Bar Association, New York, NY, July 2014

"'Playbook' Disqualifications," LMRM, Chicago, IL, March 2014

"Staying Out of Trouble: What Every Lawyer Should Know About Ethics," Practicing Law Institute, New York, NY, December 2013

"Defending Wall Street and Main Street: The Revolving Door and Lawyers as Whistleblowers," New York County Lawyers Association, New York, NY, November 2013

"Attorney Discipline in New York—Four Different Departments, Four Different Approaches," New York State Bar Association, New York, NY, January 2013

"Ethics in Purchases and Sales of Homes," New York State Bar Association, New York, NY, April 2013 and May 2015

"Ethics and Professionalism: Best Practices for Attorneys," New York City Bar Association, New York, NY, April 2013, April 2014 and May 2015

"The Disciplinary Process—How it Works," New York City Bar Association, New York, NY, July 2013

# Exhibit C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


HONG LIU,                        )  CASE NO: 2:20-CV-08035-SVW-JPRx
                                 )
              Plaintiff,         )            CIVIL
                                 )
      vs.                        )        Los Angeles, California
                                 )
FARADAY & FUTURE, INC, ET AL, )       Wednesday, May 12, 2021
                                 )
              Defendants.        )
_____ )


TELEPHONIC CONFERENCE RE PLAINTIFF'S EX PARTE APPLICATION
TO CLARIFY COURT'S MAY 3, 2021 ORDER


BEFORE THE HONORABLE JEAN P. ROSENBLUTH,
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:              SEE PAGE 2


Court Reporter:           Recorded; Digital

Courtroom Deputy:         Bea Martinez

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1  were some language in the opposition brief that was a little

2  mushy or something.  I'm not so concerned with that.  I'm

3  concerned that any document that Mr. Liu authored, regardless

4  of whether it's giving advice or anything like that, that fell

5  into those categories was produced, and Mr. Kessel has

6  represented that they were.  So --

7          **MR. KESSEL:**  And Ms. Grochow has also attested to

8  that in Paragraph 6 of her Declaration.

9          **THE COURT:**  All right.  So, we are now past

10  Ms. Martinez's workday, so I don't want to keep her

11  unnecessarily and I think that we have covered pretty much

12  everything.  I will summarize what my rulings are, but does

13  anybody have anything, you know, final that they want to say?

14          **MR. KUSHNER:**  I would just like to say thank you,

15  Your Honor, for your careful consideration of the issues and we

16  will -- you know, as you suggested, if Judge Wilson denies

17  summary judgment we would like the opportunity to leave or to

18  revisit some of these rulings at that time.

19          **THE COURT:**  Yeah, you might want to, you know, broach

20  some of that with -- I'm not saying to ask for any kind of

21  ruling from Judge Wilson, but I think it would help you and it

22  would help me and it would help if he has -- you know, I've

23  been speaking with him about these issues, he's aware and he's

24  engaged, and if you get some kind of guidance from him I

25  certainly am going to listen to that.  So, that's fine.  I'm

43

1   not saying I will rule in your favor, but certainly if you want

2   to do that, that's fine.

3          So, here's what -- Mr. Kessel, did you have any last

4   thing that you wanted to say?

5          **MR. KESSEL:**  No.

6          **THE COURT:**  All right.

7          **MR. KESSEL:**  No, Your Honor.

8          **THE COURT:**  All right, thank you.

9          So, here's how I'm going to rule.  I am going to deny

10  the motion, except as -- except to the extent that I will order

11  Defendants to supply Plaintiff with a declaration or

12  declarations by no later than May 19th concerning the search of

13  Mr. Bob Ye and Ms. Sheryl Skibee's email accounts stating that

14  they have been searched and either that here are some new

15  documents that we found and hand those over that are responsive

16  to my Order concerning termination, or that they have been

17  searched and after, you know, a reasonable inquiry diligent

18  search nothing further has been found that is responsive

19  concerning Mr. Liu's termination.

20         All right.  Well, thank you, and I am here if you

21  need me, but, no offense, I hope I don't hear from you for a

22  little while.  I have other things to do.  But I am --

23         **AUTOMATED PHONE PROMPT:**  A participant has left the

24  conference.

25         **THE COURT:**  All right.  Well, I guess that's the

# Exhibit D

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4

 5      HONG LIU,                        )

 6               Plaintiff,              )  Case No.

 7      vs.                              )  2:20-cv-08035-SVW-JPR

 8      FARADAY&FUTURE INC., SMART       )

 9      KING LTD., JIA WEI WANG, and     )

10      CHAOYING DENG,                   )

11               Defendants.             )

12      _____ )

13      AND RELATED COUNTERCLAIM.        )

14      _____ )

15

16        VIDEOTAPED 30(B)(6) DEPOSITION OF MAYER BROWN LLP

17                  TESTIMONY OF CHARLES REGAN

18                      APRIL 26, 2021

19

20

21      REPORTED REMOTELY BY:

22

23      JANET FRENCH, CSR NO. 946

24

25      Notary Public

                                              Page 1
```

```
 1          THE WITNESS:  I don't believe that I -- I did not

 2     inquire into that, and I don't know the answer to that

 3     to be honest.

 4          Q.   (BY MR. STOLPER)  The 24 clients -- I know

 5     we weren't getting into names of clients and I don't

 6     want to know the names of clients, but you mentioned

 7     there were 24 earlier that Henry was credited as the

 8     billing partner.

 9          Faraday was not among the 24; correct?

10          MS. NOLL:  I believe this was asked and answered.

11          THE WITNESS:  So that is -- that is correct that

12     it was not among the 24 for whom he was the billing

13     partner.

14          Q.   (BY MR. STOLPER)  What would you need to do

15     to determine that Henry did not work on any Faraday

16     matters prior to his leaving Mayer Brown?

17          MS. GROCHOW:  Objection.  It's beyond the scope

18     of the topics noticed.

19          MS. NOLL:  Yes.  I object to that too.  I don't

20     understand the question.  I'm not sure it's even

21     accurate as to what Mr. Regan testified to, and it is

22     beyond the scope.  That is not something the witness

23     prepared in preparation for today.

24          Q.   (BY MR. STOLPER)  I just asked a second ago

25     if Henry worked on any Faraday matters, and you said
```

Page 118

Exhibit E

1  LAUREN E. GROCHOW, Bar No. 293601
   lauren.grochow@troutman.com
2  TROUTMAN PEPPER HAMILTON SANDERS LLP
   5 Park Plaza, Suite 1400
3  Irvine, CA  92614-2545
   Telephone: 949.622.2700
4  Facsimile:  949.622.2739

5  DANIEL N. ANZISKA, *Pro Hac Vice*
   daniel.anziska@troutman.com
6  TROUTMAN PEPPER HAMILTON SANDERS LLP
   875 Third Avenue
7  New York, NY 10022
   Telephone: 212.704.6000
8  Facsimile: 212.704.6288

9  MACKENZIE L. WILLOW-JOHNSON, *Pro Hac Vice*
   mackenzie.willow-johnson@troutman.com
10 TROUTMAN PEPPER HAMILTON SANDERS LLP
   305 Church at North Hills Street, Suite 1200
11 Raleigh, NC 27609
   Telephone: 919.740.9949
12 Facsimile:  704.998.4051

13 Attorneys for Defendants
   SMART KING LTD., JIAWEI WANG, and CHAOYING DENG
14 and Defendant and Counterclaimant FARADAY&FUTURE INC.

15                UNITED STATES DISTRICT COURT

16                CENTRAL DISTRICT OF CALIFORNIA

17                     WESTERN DIVISION

18

19 HONG LIU,                          Case No.  2:20-cv-08035-SVW-JPR

20        Plaintiff,                   Honorable Stephen V. Wilson

21    v.                              **DEFENDANT SMART KING
                                      LTD.'S RESPONSE TO**
22 FARADAY&FUTURE INC.,               **PLAINTIFF'S REQUESTS FOR**
   SMART KING LTD., JIAWEI            **ADMISSION (SET ONE)**
23 WANG, and CHAOYING DENG,

24        Defendants.

25 ─────────────────────────────

26 AND RELATED COUNTERCLAIM.

27

28

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA  92614-2545

PROPOUNDING PARTY:     HONG LIU

RESPONDING PARTY:     SMART KING LTD.

SET NUMBER:     ONE

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant Smart King Ltd. ("Smart King") hereby responds to the First Set of Requests for Admission ("Requests") propounded by Plaintiff Hong Liu ("Liu"), as follows:

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of and in relation to this action.  Smart King's responses are subject to their objections to the instructions, objections to the definitions, and specific objections, without waiving and expressly preserving all such objections.  Smart King also submits these responses subject to, without intending to waive, and expressly preserving: (a) any objections as to competency, materiality, privilege and admissibility of any of the information provided; and (b) the right to object to any other discovery involving or relating to the subject matter of the Requests responded to herein.

Smart King has not completed its factual and legal investigation, discovery or trial preparation.  Consequently, the following responses are given without prejudice to Smart King's right to produce subsequently discovered evidence relating to this action.  Smart King reserves its right to amend, modify, or supplement its responses to the Requests as new information is obtained, or as Smart King otherwise deems appropriate or necessary.

## GENERAL OBJECTIONS

The following general objections (collectively, the "General Objections") are made to each and every one of the Requests and are incorporated into each and every one of Smart King's objections and responses to the Requests set forth below. The express assertion of any objection to any of the Requests in the Responses to

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Requests section, *infra*, shall not waive, nor shall be construed as a waiver or indication of the inapplicability of, any objection set forth in the Preliminary Statement or in the General Objections.  When a response to any of the Requests specifically refers to a response to any earlier Request, that earlier response, including any and all objections, is hereby fully incorporated by reference as if the same had been set forth in length therein.

1.     Smart King objects to the Requests, and to each specific Request therein, to the extent that they seek information that is neither relevant to the claim or defense of any party in this action, nor are reasonably calculated to lead to the discovery of admissible evidence.

2.     Smart King objects to the Requests, and to each specific Request therein, to the extent that they are overly broad, unduly burdensome, vague and/or ambiguous to the point of oppression.

3.     Smart King objects to the Requests, and to each specific Request therein, to the extent that they call for information that is protected by the attorney client privilege, common interest doctrine, attorney work-product doctrine, or any other applicable privilege, doctrine or immunity.

4.     Smart King objects to the Requests, and to each specific Request therein, to the extent that they call for information that is confidential and/or proprietary.

5.     Smart King objects to the Requests, and to each specific Request therein, to the extent that they call for information protected from discovery by any Constitutional, statutory and/or common law privacy right.

9.     Each and every response and objection to each specific Request set forth hereinafter shall be deemed to specifically incorporate the foregoing Preliminary Statement and the General Objections.  The express reference to or inclusion of any objection to any Request in no way constitutes, and should not be

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA  92614-2545

construed as a waiver, or admission of the inapplicability of, any other objection.

## OBJECTIONS TO INSTRUCTIONS

Smart King objects to each of the instructions and to the Requests in general, to the extent that they call for or require Smart King to do some act that is not required by the Federal Rules of Civil Procedure and the applicable Local Rules of the United States District Court for the Central District of California.

## OBJECTIONS TO DEFINITIONS

1.     Smart King objects to the terms "YOU" and "YOUR" as used in the Requests on the grounds that the definition is unreasonably broad.  Depending upon Liu's intended meaning, the definitions of those terms are vague and, subject to context, are artificially narrow and unreasonably restrictive or unreasonably broad and overreaching.  Additionally, Liu's use of these terms, as defined, improperly seeks information protected from discovery based on a Privilege or Privacy.  In particular, Smart King objects to these terms to the extent they include counsel for Smart King, other than Liu, or Smart King's experts.

2.     Smart King objects to the term "PERSON" and "PERSONS" because the definition is overly broad and unduly burdensome.

## RESPONSES TO REQUESTS FOR ADMISSION

REQUEST FOR ADMISSION NO. 1:

Admit that Plaintiff was granted 20 million options in SMART KING pursuant to the EQUITY INCENTIVE PLAN, with an exercise price of 36 cents per share.

RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Subject to and without waiving the foregoing objections, the Preliminary Statement, the General Objections, and the Objections to Definitions, Smart King responds as follows: Admitted that Liu was granted 20,000,000 options in Smart King, however, Liu's Employment Agreement with Faraday&Future Inc. ("FF")

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

was and is rescindable, void *ab initio*, and unenforceable due to Liu's breaches of that agreement, breaches of his fiduciary duties owed to FF, violations of the rules of professional conduct that governed Liu's actions as FF's counsel and its fiduciary, violation of the California Business & Professions Code, and because the agreement was the product of a constructive fraud,  and moreover, Liu breached the fiduciary duties he owed FF as its Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor and by virtue of his employment with FF, Liu was in material breach of his Employment Agreement, and was therefore terminated, and as such, no options in Smart King putatively available to Liu thereunder vested.  Except as admitted, denied.

**REQUEST FOR ADMISSION NO. 2:**

Admit that in or around October 2018, Plaintiff was granted 20 million options in SMART KING pursuant to the EQUITY INCENTIVE PLAN.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Subject to and without waiving the foregoing objections, the Preliminary Statement, the General Objections, and the Objections to Definitions, Smart King responds as follows: Admitted that Liu was granted 20,000,000 options in Smart King, however, Liu's Employment Agreement with FF was and is rescindable, void *ab initio*, and unenforceable due to Liu's breaches of that agreement, breaches of his fiduciary duties owed to FF, violations of the rules of professional conduct that governed Liu's actions as FF's counsel and its fiduciary, violation of the California Business & Professions Code, and because the agreement was the product of a constructive fraud, and moreover, Liu breached the fiduciary duties he owed FF as its Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor and by virtue of his employment with FF, Liu was in material breach of his Employment Agreement, and was therefore terminated, and as such, no options in Smart King putatively available to Liu thereunder vested.  Except as admitted, denied.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**REQUEST FOR ADMISSION NO. 3:**

Admit that in or around October 2018, Plaintiff was granted 20 million "equity options" (as that term is used in the EMPLOYMENT AGREEMENT), pursuant to the EMPLOYMENT AGREEMENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Subject to and without waiving the foregoing objections, the Preliminary Statement, the General Objections, and the Objections to Definitions, Smart King responds as follows: Admitted that Liu was granted 20,000,000 options in Smart King, however, Liu's Employment Agreement with FF was and is rescindable, void *ab initio*, and unenforceable due to Liu's breaches of that agreement, breaches of his fiduciary duties owed to FF, violations of the rules of professional conduct that governed Liu's actions as FF's counsel and its fiduciary, violation of the California Business & Professions Code, and because the agreement was the product of a constructive fraud,  and moreover, Liu breached the fiduciary duties he owed FF as its Global Chief Administrative Officer, Global General Counsel, and Global Senior Advisor and by virtue of his employment with FF, Liu was in material breach of his Employment Agreement, and was therefore terminated, and as such, no options in Smart King putatively available to Liu thereunder vested.  Except as admitted, denied.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Plaintiff was never granted "equity options" (as that term is used in the EMPLOYMENT AGREEMENT) pursuant to the EMPLOYMENT AGREEMENT.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Subject to and without waiving the foregoing objections, the Preliminary Statement, the General Objections, and the Objections to Definitions, Smart King responds as follows: Denied.

Exhibit F

Page 1

1          UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
2  - - - - - - - - - - - - - - - - - x
   HONG LIU,                          :
3                                     :        Case Number
          Plaintiff,                  :     2:20-cv-08035
4                                     :        SVW-JPR
          vs.                         :
5                                     :
   FARADAY&FUTURE INC., SMART         :
6  KING LTD., JIAWEI WANG, and        :
   CHAOYING DENG,                     :
7                                     :
          Defendants.                 :
8  - - - - - - - - - - - - - - - - - x
   FARADAY&FUTURE INC.,               :
9                                     :
          Counterclaimant,            :
10                                    :
          vs.                         :
11                                    :
   HONG LIU,                          :
12                                    :
          Counter-Defendant.          :
13                                    :
   - - - - - - - - - - - - - - - - - x
14

          *Portions of the transcript are designated
15         confidential*
16            Veritext Virtual Zoom Videotaped
17  Deposition of JIAWEI WANG, a 30(b)(6) witness, taken
18  on Thursday, April 8, 2021, held in Los Angeles,
19  California, commencing at 8:47 a.m., Pacific
20  Standard Time, before Jamie I. Moskowitz, a
21  Certified Court Reporter and Certified Livenote
22  Reporter.
23
24
25

Page 36

1   granted to Mr. Liu?

2       A       Yes.

3       Q       And do you see how there's a column

4   with the heading Outstanding?  Do you see that?

5       A       Yes.

6       Q       And do you see that it says 8 million

7   are outstanding in the first row?  Do you see that?

8       A       Yes.

9       Q       So does this reflect that on

10  October 24th, 2018, options to acquire 8 million

11  Smart King shares granted to Mr. Liu?

12              MR. GOLDMAN:  Objection.  The document

13      speaks for itself.

14              THE WITNESS:  Yes.

15  BY MR. KUSHNER:

16      Q       Let's go to the -- just the next line.

17              Do you see a reference to cancel due

18  to termination, and on the date of February 11,

19  2019?

20      A       Yes.

21      Q       And in the column heading Outstanding,

22  do you see that it says minus 8 million?

23      A       Yes.

24      Q       Does this record reflect that on

25  February 11, 2019, 8 million Smart King options that

```
                                                   Page 37
 1    had been issued to Mr. Liu were canceled?  Is that
 2    correct?
 3                 MR. GOLDMAN:  Objection.  The document
 4        speaks for itself.
 5                 THE WITNESS:  Yes.
 6    BY MR. KUSHNER:
 7        Q        I'd like to show you another exhibit,
 8    Mr. Wang.
 9                 Actually, Mr. Wang, just one more --
10    one more question about this document.  I apologize.
11                 Mr. Wang, do you still have Smart King
12    Exhibit 4 in front of you?
13        A        If you mean the Solium Sharework
14    option granted to Hong Liu, the document is on
15    our -- on our screen, yes.
16        Q        Thank you.
17                 I just want to direct your attention
18    to the first page of this exhibit.
19                 Do you see a reference to employee
20    grant number?  It's -- it's towards the top of the
21    page, right under the heading Faraday Future Inc.
22        A        Yes.
23        Q        What is an employee grant number?
24        A        I don't know.
25        Q        Do you see a reference to 4484 right
```

```
                                               Page 38
 1    after employee grant number?
 2         A         Yes.
 3                   MR. KUSHNER:  Okay.  Counsel, I would
 4         just ask that when this deposition is
 5         continued, Mr. Wang be prepared to answer the
 6         question of what -- what an employee grant
 7         number is.
 8    BY MR. KUSHNER:
 9         Q         And just another question about
10    Page 3, Mr. Wang.
11         A         Yeah.  Can you go to Page 3?
12         Q         Mr. Wang, at the very bottom of
13    Page 3, of the text on Page 3, there -- there is a
14    section entitled "Explicit Cancels."
15                   Do you see that?
16         A         Yes, I do.
17         Q         What is an explicit cancel?
18         A         I don't know.
19                   MR. KUSHNER:  Counsel, just the same
20         point about this, this -- with the question,
21         when this deposition is continued, Mr. Wang be
22         prepared to answer that question.
23                   MR. GOLDMAN:  And can I ask the court
24         reporter -- can I please ask the court reporter
25         to repeat that question just so I have it?
```

```
                                              Page 39
 1                THE COURT REPORTER:  Sure.
 2                    (Whereupon, the testimony was read
 3         back as requested.)
 4                MR. GOLDMAN:  Thank you.
 5                THE COURT REPORTER:  You're welcome.
 6  BY MR. KUSHNER:
 7      Q        Mr. Wang, I'd like to show you the
 8  next exhibit.
 9                    (Whereupon, Exhibit 5 was marked for
10         Identification.)
11  BY MR. KUSHNER:
12      Q        I'm showing you what's been marked as
13  Smart King 5.
14      A        Uh-huh.
15      Q        Do you recognize this document?
16      A        Yes, I do.
17      Q        What -- what do you recognize it to
18  be?
19      A        This is a similar report generated by
20  Solium Shareworks regarding -- to Hong Liu's option.
21      Q        Can you scroll down to the third page?
22                Do you -- do you see that -- do you
23  see the incentive share option activity section?
24      A        Yes.
25      Q        And do you see that this reflects that
```

Page 40

1    on October 24th, 2018, there was a grant of

2    4 million Smart King options to Mr. Liu?

3                    MR. GOLDMAN:  Objection, the document

4        speaks for itself.

5                    THE WITNESS:  Yes.

6    BY MR. KUSHNER:

7        Q        And do you see that this document

8    reflects that on February 11th, 2019, those

9    4 million stock options were canceled?

10                   MR. GOLDMAN:  Objection.  Again, the

11       document speaks for itself.

12                   THE WITNESS:  Yes.

13   BY MR. KUSHNER:

14       Q        Mr. Wang, can you just go back to the

15   first page of this exhibit?  Can you tell me what

16   the employee grant number is?

17       A        I don't know.

18       Q        Do you see a number next to employee

19   grant number?

20       A        Yes.

21       Q        What is that number?

22       A        It is 4485.

23                   MR. KUSHNER:  I'd like to show you

24       another exhibit.

25

```
                                              Page 41
 1    BY MR. KUSHNER:

 2         Q        Actually, Mr. Wang, I apologize.  Let

 3    me just go back to Exhibit 5 for a moment.

 4               MR. KUSHNER:  I just want to let the

 5         record reflect that Exhibit 5 has the Bates

 6         range FF2203 to 2205.

 7               And now let's look at Exhibit 6.

 8               (Whereupon, Exhibit 6 was marked for

 9         Identification.)

10               MR. KUSHNER:  Just for the record,

11         Exhibit 6 has the Bates range FF2209 to FF2211.

12    BY MR. KUSHNER:

13         Q        Mr. Wang, do you recognize Exhibit 6?

14         A        Yes.

15         Q        What is Exhibit 6?

16         A        This looks like a report generated by

17    Solium Shareworks reflecting Hong Liu's option

18    grant.

19         Q        What is the -- the grant number?

20         A        If you mean how many options are

21    granted in -- according to this document, then I see

22    the granted options is 4 million.

23         Q        Yeah.  I'm referring to employee grant

24    number, which is on the first page, right under

25    Faraday Future Inc.
```

```
                                               Page 42

 1               Do you see that?

 2      A        Yes.

 3      Q        And what is the employee grant number?

 4               MR. GOLDMAN:  Objection, document

 5      speaks for itself.

 6               THE WITNESS:  It is 4486.

 7   BY MR. KUSHNER:

 8      Q        And looking now at the third page of

 9   this exhibit, does this document reflect that on

10   October 24th, 2018, Mr. Liu was -- was granted

11   options to acquire 4 million shares of Smart King?

12               MR. GOLDMAN:  Objection, document

13      speaks for itself.

14               THE WITNESS:  Yes.

15   BY MR. KUSHNER:

16      Q        And does this document reflect that on

17   February 11, 2019, those 4 million options were

18   canceled?

19               MR. GOLDMAN:  Objection, document

20      speaks for itself.

21               THE WITNESS:  Yes.

22               MR. KUSHNER:  I'd like to show you

23      another exhibit, Mr. Wang.

24               (Whereupon, Exhibit 7 was marked for

25      Identification.)
```

Page 43

1    BY MR. KUSHNER:

2        Q        I'm showing you what's been marked as

3    Smart King 7.  The Bates range of this exhibit is

4    FF2206 to 2208.

5                    Mr. Wang, do you recognize this

6    document?

7        A        Yes.

8        Q        What is it?

9        A        This is a document generated by

10   Shareworks reflecting Hong Liu's option.

11       Q        Do you see employee grant number on

12   the first page of this document?

13       A        Yes, I do.

14       Q        What is that number?

15                    MR. GOLDMAN:  Objection, document

16       speaks for itself.

17                    THE WITNESS:  It is 4487.

18   BY MR. KUSHNER:

19       Q        Can you turn to the third page of this

20   exhibit?  Do you see the section entitled "Incentive

21   Share Option Activity"?

22                    THE COURT REPORTER:  Entitled?  I'm

23       sorry.

24                    MR. KUSHNER:  Entitled "Incentive

25       Share Option Activity."

```
                                        Page 44

 1                 THE COURT REPORTER:   Thank you.

 2                 THE WITNESS:   Yes.

 3   BY MR. KUSHNER:

 4        Q         Does this reflect that on

 5   October 24th, 2018, Mr. Liu was granted options to

 6   acquire 4 million shares of Smart King stock?

 7        A         Yes.

 8        Q         And does this reflect that on

 9   February 11th, 2019, those 4 million options were

10   canceled?

11                 MR. GOLDMAN:   Objection, the document

12        speaks for itself, and a belated objection to

13        the previous question on the same grounds.

14                 THE WITNESS:   Yes.

15                 MR. KUSHNER:   Counsel, I think this

16        would be a good time for a break.

17                 MR. GOLDMAN:   Sure.  And are you going

18        to continue asking questions about these

19        documents or other confidential documents?

20        Because if not, after the break, maybe we

21        should end the confidential designation of the

22        transcript here so we don't forget about it

23        when we come back.

24                 MR. KUSHNER:   I think -- I think we're

25        done with this particular exhibit, but why
```

Exhibit G



# View Employee Grant

Powered by
SHAREWORKS Plan Admin

<u>Hong Liu</u>

(Awards Plan participation ends 11-Feb-2019)

| Employee Number: | RBC0P7449 | Account Number: | CS-524614-80 |
|---|---|---|---|

---

**Faraday Future Inc. » <u>Smart King LTD EIP</u> » <u>10/24/2018 - $0.36 US - ISO</u>**

| Employee Grant Number: | 4484 | Options Granted: | 8,000,000 |
|---|---|---|---|
| Grant Based Plan Name: | Smart King LTD EIP | Options Outstanding: | 0 |
| Grant Name: | 10/24/2018 - $0.36 US - ISO | Options Exercisable: | 0 |
| Grant Date: | 24-Oct-2018 | | |
| Expiry Date: | 24-Oct-2028 | | |
| Grant Price: | $0.36 USD | | |
| Fund: | FF4:PRIVATE_US | | |
| Award Type: | Option Award (ISO) - Private - Faraday Future | | |
| Expense Amortization Acceleration Date: | | | |
| Service Start Date: | | | |
| Issued Under Rule 701: | Yes | | |
| Allow New Early Exercises: | No | | |
| Location at Time of Grant: | Not Assigned | | |
| ISO/CSOP Disqualification Date: | 15-May-2018 | | |
| Vesting Schedule: | 25% @ 1 year, monthly thereafter for 3 years | | |
| Vesting Start Date: | 15-Feb-2018 | | |

---

**Vest Schedule - Options**

| Original Vest Date | Vest Date | Total Potential Vesting At Date | Granted | Cancelled | Exercised | Outstanding | Disqualifying Dispositions | Expire/Cancel Date |
|---|---|---|---|---|---|---|---|---|
| | | | Options | | | | | |
| 15-Feb-2019 | 15-Feb-2019 | 0 | 2,000,000 | 2,000,000 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2019 | 15-Mar-2019 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2019 | 15-Apr-2019 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 15-May-2019 | 15-May-2019 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2019 | 15-Jun-2019 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2019 | 15-Jul-2019 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2019 | 15-Aug-2019 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2019 | 15-Sep-2019 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2019 | 15-Oct-2019 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2019 | 15-Nov-2019 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2019 | 15-Dec-2019 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2020 | 15-Jan-2020 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2020 | 15-Feb-2020 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2020 | 15-Mar-2020 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2020 | 15-Apr-2020 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2020 | 15-May-2020 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2020 | 15-Jun-2020 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2020 | 15-Jul-2020 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2020 | 15-Aug-2020 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2020 | 15-Sep-2020 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2020 | 15-Oct-2020 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2020 | 15-Nov-2020 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2020 | 15-Dec-2020 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2021 | 15-Jan-2021 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2021 | 15-Feb-2021 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2021 | 15-Mar-2021 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2021 | 15-Apr-2021 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2021 | 15-May-2021 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2021 | 15-Jun-2021 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2021 | 15-Jul-2021 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2021 | 15-Aug-2021 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2021 | 15-Sep-2021 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2021 | 15-Oct-2021 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2021 | 15-Nov-2021 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2021 | 15-Dec-2021 | 0 | 166,666 | 166,666 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2022 | 15-Jan-2022 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2022 | 15-Feb-2022 | 0 | 166,667 | 166,667 | 0 | 0 | 0 | 15-May-2018 |
| | | | 8,000,000 | 8,000,000 | 0 | 0 | 0 | |

CONFIDENTIAL

**Incentive Share Option - Activity**

| Date | Activity | Outstanding | Exercisable |
|---|---|---|---|
| 24-Oct-2018 | Grant | 8,000,000 | |
| 11-Feb-2019 | Cancel due to termination | -8,000,000 | |
| 05-Mar-2021 | Ending balance | 0 | 0 |

**Explicit Cancels**

| Cancel Date | Entitlement | Cancel Type | Allocate Units From | Quantity Cancelled | | |
|---|---|---|---|---|---|---|
| 11-Feb-2019 | Options | Termination | Any | 8,000,000 | Edit | Delete |
| | | | | 8,000,000 | | |

CONFIDENTIAL

Exhibit H



# View Employee Grant

Powered by
SHAREWORKS Plan Admin

Hong Liu

(Awards Plan participation ends 11-Feb-2019)

| Employee Number: | RBC0P7449 | Account Number: | CS-524614-80 |
|---|---|---|---|

---

**Faraday Future Inc. » Smart King LTD EIP » 10/24/2018 - $0.36 US - ISO**

| Employee Grant Number: | 4485 | Options Granted: | 4,000,000 |
|---|---|---|---|
| Grant Based Plan Name: | Smart King LTD EIP | Options Outstanding: | 0 |
| Grant Name: | 10/24/2018 - $0.36 US - ISO | Options Exercisable: | 0 |
| Grant Date: | 24-Oct-2018 | | |
| Expiry Date: | 15-Feb-2029 | | |
| Grant Price: | $0.36 USD | | |
| Fund: | FF4:PRIVATE_US | | |
| Award Type: | Option Award (ISO) - Private - Faraday Future | | |
| Expense Amortization Acceleration Date: | | | |
| Service Start Date: | | | |
| Issued Under Rule 701: | Yes | | |
| Allow New Early Exercises: | No | | |
| Location at Time of Grant: | Not Assigned | | |
| ISO/CSOP Disqualification Date: | 15-May-2018 | | |
| Vesting Schedule: | 1/48th Monthly for 4 Years | | |
| Vesting Start Date: | 15-Feb-2019 | | |

## Vest Schedule - Options

| Original Vest Date | Vest Date | Options | | | | | | Expire/Cancel Date |
|---|---|---|---|---|---|---|---|---|
| | | Total Potential Vesting At Date | Granted | Cancelled | Exercised | Outstanding | Disqualifying Dispositions | |
| 15-Mar-2019 | 15-Mar-2019 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2019 | 15-Apr-2019 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2019 | 15-May-2019 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2019 | 15-Jun-2019 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |

CONFIDENTIAL

FF00002203

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 15-Jul-2019 | 15-Jul-2019 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2019 | 15-Aug-2019 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2019 | 15-Sep-2019 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2019 | 15-Oct-2019 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2019 | 15-Nov-2019 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2019 | 15-Dec-2019 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2020 | 15-Jan-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2020 | 15-Feb-2020 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2020 | 15-Mar-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2020 | 15-Apr-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2020 | 15-May-2020 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2020 | 15-Jun-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2020 | 15-Jul-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2020 | 15-Aug-2020 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2020 | 15-Sep-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2020 | 15-Oct-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2020 | 15-Nov-2020 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2020 | 15-Dec-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2021 | 15-Jan-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2021 | 15-Feb-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2021 | 15-Mar-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2021 | 15-Apr-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2021 | 15-May-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2021 | 15-Jun-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2021 | 15-Jul-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2021 | 15-Aug-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2021 | 15-Sep-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2021 | 15-Oct-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2021 | 15-Nov-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2021 | 15-Dec-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2022 | 15-Jan-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2022 | 15-Feb-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2022 | 15-Mar-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2022 | 15-Apr-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2022 | 15-May-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2022 | 15-Jun-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |

CONFIDENTIAL

| 15-Jul-2022 | 15-Jul-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2022 | 15-Aug-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2022 | 15-Sep-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2022 | 15-Oct-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2022 | 15-Nov-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2022 | 15-Dec-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2023 | 15-Jan-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2023 | 15-Feb-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| | | | 4,000,000 | 4,000,000 | 0 | 0 | 0 | |

### Incentive Share Option - Activity

| Date | Activity | Outstanding | Exercisable |
|---|---|---|---|
| 24-Oct-2018 | Grant | 4,000,000 | |
| 11-Feb-2019 | Cancel due to termination | -4,000,000 | |
| 05-Mar-2021 | Ending balance | 0 | 0 |

### Explicit Cancels

| Cancel Date | Entitlement | Cancel Type | Allocate Units From | Quantity Cancelled | | |
|---|---|---|---|---|---|---|
| 11-Feb-2019 | Options | Termination | Any | 4,000,000 | Edit | Delele |
| | | | | 4,000,000 | | |

CONFIDENTIAL

# Exhibit I



# View Employee Grant

Powered by
SHAREWORKS Plan Admin

Hong Liu

(Awards Plan participation ends 11-Feb-2019)

| Employee Number: | RBC0P7449 | Account Number: | CS-524614-80 |
|---|---|---|---|

**Faraday Future Inc. » Smart King LTD EIP » 10/24/2018 - $0.36 US - ISO**

| Employee Grant Number: | 4486 | Options Granted: | 4,000,000 |
|---|---|---|---|
| Grant Based Plan Name: | Smart King LTD EIP | Options Outstanding: | 0 |
| Grant Name: | 10/24/2018 - $0.36 US - ISO | Options Exercisable: | 0 |
| Grant Date: | 24-Oct-2018 | | |
| Expiry Date: | 15-Feb-2030 | | |
| Grant Price: | $0.36 USD | | |
| Fund: | FF4:PRIVATE_US | | |
| Award Type: | Option Award (ISO) - Private - Faraday Future | | |
| Expense Amortization Acceleration Date: | | | |
| Service Start Date: | | | |
| Issued Under Rule 701: | Yes | | |
| Allow New Early Exercises: | No | | |
| Location at Time of Grant: | Not Assigned | | |
| ISO/CSOP Disqualification Date: | 15-May-2018 | | |
| Vesting Schedule: | 1/48th Monthly for 4 Years | | |
| Vesting Start Date: | 15-Feb-2020 | | |

## Vest Schedule - Options

| Original Vest Date | Vest Date | Options | | | | | | Expire/Cancel Date |
|---|---|---|---|---|---|---|---|---|
| | | Total Potential Vesting At Date | Granted | Cancelled | Exercised | Outstanding | Disqualifying Dispositions | |
| 15-Mar-2020 | 15-Mar-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2020 | 15-Apr-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2020 | 15-May-2020 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2020 | 15-Jun-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |

CONFIDENTIAL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 15-Jul-2020 | 15-Jul-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2020 | 15-Aug-2020 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2020 | 15-Sep-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2020 | 15-Oct-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2020 | 15-Nov-2020 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2020 | 15-Dec-2020 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2021 | 15-Jan-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2021 | 15-Feb-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2021 | 15-Mar-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2021 | 15-Apr-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2021 | 15-May-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2021 | 15-Jun-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2021 | 15-Jul-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2021 | 15-Aug-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2021 | 15-Sep-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2021 | 15-Oct-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2021 | 15-Nov-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2021 | 15-Dec-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2022 | 15-Jan-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2022 | 15-Feb-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2022 | 15-Mar-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2022 | 15-Apr-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2022 | 15-May-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2022 | 15-Jun-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2022 | 15-Jul-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2022 | 15-Aug-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2022 | 15-Sep-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2022 | 15-Oct-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2022 | 15-Nov-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2022 | 15-Dec-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2023 | 15-Jan-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2023 | 15-Feb-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2023 | 15-Mar-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2023 | 15-Apr-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2023 | 15-May-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2023 | 15-Jun-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |

CONFIDENTIAL

| 15-Jul-2023 | 15-Jul-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2023 | 15-Aug-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2023 | 15-Sep-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2023 | 15-Oct-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2023 | 15-Nov-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2023 | 15-Dec-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2024 | 15-Jan-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2024 | 15-Feb-2024 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| | | | 4,000,000 | 4,000,000 | 0 | 0 | 0 | |

### Incentive Share Option - Activity

| Date | Activity | Outstanding | Exercisable |
|---|---|---|---|
| 24-Oct-2018 | Grant | 4,000,000 | |
| 11-Feb-2019 | Cancel due to termination | -4,000,000 | |
| 05-Mar-2021 | Ending balance | 0 | 0 |

### Explicit Cancels

| Cancel Date | Entitlement | Cancel Type | Allocate Units From | Quantity Cancelled | | |
|---|---|---|---|---|---|---|
| 11-Feb-2019 | Options | Termination | Any | 4,000,000 | Edit | Delele |
| | | | | 4,000,000 | | |

CONFIDENTIAL

FF00002211

# Exhibit J



# View Employee Grant
Powered by
SHAREWORKS Plan Admin

Hong Liu

(Awards Plan participation ends 11-Feb-2019)

| Employee Number: | RBC0P7449 | Account Number: | CS-524614-80 |
|---|---|---|---|

Faraday Future Inc. » Smart King LTD EIP » 10/24/2018 - $0.36 US - ISO

| Employee Grant Number: | 4487 | Options Granted: | 4,000,000 |
|---|---|---|---|
| Grant Based Plan Name: | Smart King LTD EIP | Options Outstanding: | 0 |
| Grant Name: | 10/24/2018 - $0.36 US - ISO | Options Exercisable: | 0 |
| Grant Date: | 24-Oct-2018 | | |
| Expiry Date: | 15-Feb-2031 | | |
| Grant Price: | $0.36 USD | | |
| Fund: | FF4:PRIVATE_US | | |
| Award Type: | Option Award (ISO) - Private - Faraday Future | | |
| Expense Amortization Acceleration Date: | | | |
| Service Start Date: | | | |
| Issued Under Rule 701: | Yes | | |
| Allow New Early Exercises: | No | | |
| Location at Time of Grant: | Not Assigned | | |
| ISO/CSOP Disqualification Date: | 15-May-2018 | | |
| Vesting Schedule: | 1/48th Monthly for 4 Years | | |
| Vesting Start Date: | 15-Feb-2021 | | |

## Vest Schedule - Options

| Original Vest Date | Vest Date | Options | | | | | | Expire/Cancel Date |
|---|---|---|---|---|---|---|---|---|
| | | Total Potential Vesting At Date | Granted | Cancelled | Exercised | Outstanding | Disqualifying Dispositions | |
| 15-Mar-2021 | 15-Mar-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2021 | 15-Apr-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2021 | 15-May-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2021 | 15-Jun-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |

CONFIDENTIAL

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 15-Jul-2021 | 15-Jul-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2021 | 15-Aug-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2021 | 15-Sep-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2021 | 15-Oct-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2021 | 15-Nov-2021 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2021 | 15-Dec-2021 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2022 | 15-Jan-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2022 | 15-Feb-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2022 | 15-Mar-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2022 | 15-Apr-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2022 | 15-May-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2022 | 15-Jun-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2022 | 15-Jul-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2022 | 15-Aug-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2022 | 15-Sep-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2022 | 15-Oct-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2022 | 15-Nov-2022 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2022 | 15-Dec-2022 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2023 | 15-Jan-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2023 | 15-Feb-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2023 | 15-Mar-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2023 | 15-Apr-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2023 | 15-May-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2023 | 15-Jun-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jul-2023 | 15-Jul-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2023 | 15-Aug-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2023 | 15-Sep-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2023 | 15-Oct-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2023 | 15-Nov-2023 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2023 | 15-Dec-2023 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2024 | 15-Jan-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2024 | 15-Feb-2024 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Mar-2024 | 15-Mar-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Apr-2024 | 15-Apr-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-May-2024 | 15-May-2024 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jun-2024 | 15-Jun-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |

CONFIDENTIAL

| 15-Jul-2024 | 15-Jul-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Aug-2024 | 15-Aug-2024 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Sep-2024 | 15-Sep-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Oct-2024 | 15-Oct-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Nov-2024 | 15-Nov-2024 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| 15-Dec-2024 | 15-Dec-2024 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Jan-2025 | 15-Jan-2025 | 0 | 83,333 | 83,333 | 0 | 0 | 0 | 15-May-2018 |
| 15-Feb-2025 | 15-Feb-2025 | 0 | 83,334 | 83,334 | 0 | 0 | 0 | 15-May-2018 |
| | | | 4,000,000 | 4,000,000 | 0 | 0 | 0 | |

### Incentive Share Option - Activity

| Date | Activity | Outstanding | Exercisable |
|------|----------|-------------|-------------|
| 24-Oct-2018 | Grant | 4,000,000 | |
| 11-Feb-2019 | Cancel due to termination | -4,000,000 | |
| 05-Mar-2021 | Ending balance | 0 | 0 |

### Explicit Cancels

| Cancel Date | Entitlement | Cancel Type | Allocate Units From | Quantity Cancelled | | |
|-------------|-------------|-------------|---------------------|--------------------|------|--------|
| 11-Feb-2019 | Options | Termination | Any | 4,000,000 | Edit | Delele |
| | | | | 4,000,000 | | |

CONFIDENTIAL

FF00002208

Kevin D. Hughes (Bar No. 188749)
FOUNDATION LAW GROUP LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: 424.253.1266
Email:  kevin@foundationlaw.com

Amiad Kushner (*pro hac vice*)
Akushner@seidenlawgroup.com
Jake Nachmani (*pro hac vice*)
Jnachmani@seidenlawgroup.com
Seiden Law Group LLP
469 Seventh Avenue, 5th Fl.
New York, NY 10018
Telephone:   (646) 766-1914
Facsimile:    (646) 304-5277
Facsimile:    (646) 304 – 5277

*Attorneys for Plaintiff/Counter-Defendant,*
*Hong Liu*

# UNITED STATES DISTRICT COURT FOR
# THE CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

HONG LIU,

              Plaintiff,

 

          v.

FARADAY&FUTURE INC.,
SMART KINGLTD., JIAWEI
WANG, and CHAOYING DENG

          Defendants.

FARADAY&FUTURE INC.,

          Counterclaimant,

          v.

HONG LIU,

          Counter-Defendant.

**Case No:** 2:20-cv-08035-SVW-JPR

**[PROPOSED] JUDGMENT**

| | |
|---|---|
| **JUDGE:** | **Hon. Stephen V. Wilson** |
| **DATE:** | **June 21, 2021** |
| **TIME:** | **1:30 p.m.** |
| **CTRM:** | **10A** |

Plaintiff/Counter-Defendant Hong Liu's ("Plaintiff" or "Liu") cross motion for summary judgment on Defendant/Counterclaimant Faraday&Future Inc.'s ("FF") Second Amended Counterclaim (ECF 95), summary judgment on FF's and FF Intelligent Mobility Global Holdings Ltd.'s (f/k/a Smart King Ltd. ("Smart King")) affirmative defenses in FF and Smart King's Second Amended Answers (ECF 93 & 94, respectively), and partial summary judgment on Count I of Plaintiff's Complaint (breach of contract) came before the Court for hearing on June 21, 2021 ("Motion").

Having considered the moving and opposition papers, arguments, and all other matters presented to the Court, the Court finds that no genuine issue of fact exists as to FF's Second Amended Counterclaim and the affirmative defenses set forth in FF and Smart King's Second Amended Answers, warranting summary judgment against Defendants.  No genuine issue of fact exists as to Plaintiff's breach of contract claim, warranting summary judgment in favor of Plaintiff.

IT IS HEREBY ORDERED that Plaintiff's Motion is GRANTED and JUDGMENT IS HEREBY ENTERED against Defendants and in favor of Plaintiff, on FF's Second Amended Counterclaim, on FF and Smart King's affirmative defenses, and on the liability element of Plaintiff's breach of contract claim.


IT IS SO ORDERED AND JUDGMENT IS SO ENTERED.


Dated:_____          _____

                                Hon. Stephen V. Wilson
                                Judge, United States District Court